UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

-   -   -

HONORABLE AMANDA ARNOLD SANSONE
UNITED STATES MAGISTRATE JUDGE PRESIDING


NBIS CONSTRUCTION & TRANSPORT,      )
INSURANCE SERVICES, INC., a/s/o     )
SIMS CRANE & EQUIPMENT COMPANY,     )
                                    )
                PLAINTIFF,          )
                                    )
            VS:                     )8:19-CV-2777-VMC-AAS
                                    )
LIEBHERR-AMERICA, INC., d/b/a       )
LIEBHERR USA, CO., and              )
LIEBHERR CRANES, INC.,              )
                                    )
_____DEFENDANTS._____)



BENCH TRIAL - VOLUME I
REPORTER'S REPORT OF PROCEEDINGS
FEBRUARY 7, 2022
TAMPA, FLORIDA




SHARON A. MILLER, CSR, RPR, CRR, RMR
IL CSR 084-2617
FEDERAL OFFICIAL COURT REPORTER
801 N. FLORIDA AVENUE, SUITE 13A
TAMPA, FLORIDA 33602

Proceedings recorded by mechanical stenography,
transcript produced by computer-aided transcription

1    APPEARANCES OF COUNSEL:

2    ON BEHALF OF PLAINTIFF:

3              COZEN O'CONNOR
               BY:   MR. JOSHUA ROSS GOODMAN
4                    MR. JOSEPH FRANK RICH
               200 South Biscayne Boulevard, Suite 3000
5              Miami, FL  33131
               (305) 704-5940
6              jgoodman@cozen.com
               jrich@cozen.com
7
               COZEN O'CONNOR
8              BY:  MS. MARIA ERMAKOVA
               175 Greenwich Street, 55th Floor
9              New York, NY  10007
               (212) 883-4902
10             Mermakova@cozen.co

11

12   ON BEHALF OF DEFENDANTS:

13
               CREMER, SPINA, SHAUGHNESSY, JANSEN & SIEGERT
14             BY:  MR. WILLIAM J. CREMER
                    MR. THOMAS R. PENDER
15                  MR. CONNOR SINGLETON
               One North Franklin Street, 10th Floor
16             Chicago, Illinois 60606
               (312) 726-3800
17             wcremer@cremerlaw.com
               tpender@cremerlaw.com
18             csingleton@cremerlaw

19

20

21

22

23

24

25

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1

2                          I   N   D   E   X

3    WITNESSES                                          PAGES

4

5                          RALF VIETEN

6    Direct examination by Mr. Goodman                    70

7    (incomplete)

8                 E   X   H   I   B   I   T   S

9    PLAINTIFF EXHIBITS

10   No. 1                                                76
     No. 2                                                95
11   No. 3                                                96
     No. 4                                                99
12   No. 5                                               104
     No. 6                                               106
13   No. 7                                               108
     No. 8                                               108
14   No. 9                                               110
     No. 10                                              110
15   No. 11                                              112
     No. 12                                              115
16   No. 13                                              118
     No. 14                                              118
17   No. 15                                              119
     No. 16                                              128
18   No. 17                                              131
     No. 18                                              135
19   No. 19                                              141
     No. 20                                              143
20   No. 21                                              143
     No. 22                                              145
21   No. 23                                              151
     No. 24                                              153
22   No. 25                                              162
     No. 26                                              162
23   No. 27                                              172
     No. 28                                              173
24   No. 29                                              175
     No. 30                                              180
25                      (Continued)

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

PLAINTIFF EXHIBITS

No. 31                                           181
No. 32                                           183
No. 33                                           185
No. 34                                           186
No. 35 and 36                                    190
No. 37                                           191
No. 38                                           193
No. 39                                           194
No. 40                                           196
No. 41                                           201
No. 42                                           203
No. 43                                           205
No. 44                                           206
No. 45                                           208
No. 46                                           210
No. 47                                           212
No. 48                                           214
No. 50                                           217
No. 51                                           218
No. 52                                           220
Nos. 53 and 54                                   221
No. 55                                           222
No. 56                                           223
No. 57                                           224
No. 58                                           227
No. 59                                           228
No. 60                                           229
No. 61                                           231
No. 62                                           233
No. 63                                           235
No. 64                                           238

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1                TAMPA, FLORIDA; FEBRUARY 7, 2022

 2                          -   -   -

 3              (COURT IN SESSION AT 9:02 A.M.)

 4              THE COURT:  Good morning.  In terms of masks, no

 5      masks, it's -- as long as you can all socially distance.  I

 6      realize your teams have probably been spending plenty of

 7      time with each other but not that you necessarily need to

 8      distance from one another.  I will take mine off more than

 9      anything to help not have my voice be as muffled, but,

10      again, to the extent that you're having to get closer to

11      someone that maybe is not part of your little pod, by all

12      means put your mask on, and if anyone were to leave their

13      mask on the entire time, you're welcome to as well.

14              Okay.  So let's go ahead.  This is case number

15      19-cv-2777-AAS, NBIS Construction and Transport Insurance

16      Services as subrogee of Sims Crane & Equipment Company, and

17      then -- versus the defendants Liebherr-America, Liebherr USA

18      and Liebherr Cranes.

19              Can Counsel state their appearances starting with

20      Counsel for plaintiff.

21              MR. GOODMAN:  Josh Goodman for the plaintiff along

22      with my colleague Joseph Rich.

23              THE COURT:  Thank you.

24              MR. GOODMAN:  And Maria Ermakova.

25              MR. RICH:  Good morning, Your Honor.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  Do you have a client representative

2    here?

3          MR. GOODMAN:  We do.  We have Elizabeth Edelman from

4    NBIS as well as Derek Sather from Sims.

5          THE COURT:  Thank you.  And they're welcome.  I

6    realize it's sort of a tight quarters for plaintiff's side.

7    They're welcome, if they want to be sitting at Counsel

8    table, they can.  However you want all to do it to be most

9    comfortable.  It's a little bit of tight quarters over on

10   that side, so.

11         And then for the defendant, please.

12         MR. CREMER:  William Cremer and Tom Pender and

13   Connor Singleton for the Liebherr defendants.

14         THE COURT:  Thank you.  And do you have a client

15   representative?

16         MR. CREMER:  We are not going to have anyone during

17   the case.

18         THE COURT:  Also with it not being a jury trial, and

19   I've got my intern sitting in the jury box really more so

20   that they can have the best vantage point to be able to see

21   everything, not because I want you to feel like you have a

22   stand-in jury or anything.

23         But because this is not a jury trial, by all means,

24   as long as you can be heard and as long as our court

25   reporter knows who's making objections, that type of thing,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    you can stand up obviously for those, but otherwise if you

2    want to remain seated, particularly when we're having these

3    type of conversations, feel free to do so.

4            In terms of asking witnesses questions, you can go

5    to the podium.  That's probably the easiest in terms of

6    being able to be seen by the witness, but then you can also

7    remain at your seat.  If you have a lot of papers, that

8    podium is not big enough to spread the papers out when

9    you're asking questions about exhibits, so either way.

10           Particularly I know for plaintiff counsel, you

11   probably will need to go to the podium to be able to be seen

12   because the podium is in the way of that table.

13           Any questions about anything like that?  Okay.

14   Rumor has it that we have some witness and exhibit list

15   changes.  I know also know we have the two motions that have

16   been filed.  Now, it was a little bit curious to me that we

17   have a new witness list for the plaintiff -- I'm sorry --

18   the defendant given that we have the pretrial statement that

19   governs.  I did look and there are some different -- there's

20   two new witnesses on the defendants' witness list that I

21   didn't see on the prior list.

22           First of all, has this February 4th list been

23   exchanged and given to the plaintiff?

24           MR. SINGLETON:  The exhibit list is just witnesses,

25   we've discussed in the order they're going to be presented.

1    There's no new witness, new witnesses identified in the list

2    that plaintiff is unaware of.

3              THE COURT:  I didn't see Mr. Bond or Mr. Vigilante

4    on the original April 8 list that was attached to the

5    pretrial statement.

6              MR. GOODMAN:  Mr. Bond and Mr. Vigilante are

7    plaintiff's experts.

8              THE COURT:  Got you.  They are putting -- I see what

9    you're doing.  Okay.  So it's sort of the catch-all of

10   cross-examining.  Okay, I understand now.

11             Well, I was not cross-referencing the plaintiff's

12   list.  I was cross-referencing to the prior list.  So then

13   is it fair for -- well, let's address this then.  Are you

14   planning then to re-call them during defendants' case or are

15   you planning to just simply have a broader cross-examination

16   during plaintiff's case?

17             MR. CREMER:  I think the genesis of this revised

18   list is because the court reporter contacted us and said

19   could you give me a list of witnesses and we gave her that

20   and so we included all witnesses.

21             THE COURT:  Okay.

22             MR. CREMER:  Apologize if it's confusing to the

23   Court.

24             THE COURT:  Okay.  This is making more sense then.

25   So rather than just giving -- pointing to where the prior

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    two were, you generated a new one of who you now thought

2    were actually going to be called to make it cleaner.

3            MR. CREMER:  Of all live witnesses we believe will

4    be called during this week.

5            THE COURT:  Let's do this.  Let's dispense with this

6    one that was given to the court reporter.  This is really to

7    help her more with spellings and things of that type with

8    names.  Rather than muddying up the docket, I'm not going to

9    put this one on the docket.  It's just an aid for the

10   transcription, but we'll stick with the original defendants'

11   witness list at 67-5 and then plaintiff's witness list at

12   67-3.

13           So then as far as the exhibit list goes, I have

14   those as 67-4 and 67-6, so that's what I was planning to go

15   off of in terms of keeping track of what's been identified

16   and what's been admitted.

17           Is there any reason, and I'll start with plaintiff,

18   why we can't go -- we can't use your 67-4 exhibit list?

19           MR. GOODMAN:  Yes, Your Honor.  Those are all fine.

20   Those are all the exhibits that we were using at trial in

21   this matter.  We did reorganize them so that the exhibit as

22   they would go in would have the correct number so it would

23   be easier to keep track of we thought for the Court, for the

24   defendant then, for any appellate issues.

25           THE COURT:  So is that on a new -- is that in a new

1    document or no?

2         MR. GOODMAN:  We have not submitted that yet, Your

3    Honor.  We're getting that prepared and we will have that

4    for Your Honor.

5         THE COURT:  I have no problem going off 67-4 as long

6    as you're able to tell me where it's on there.  There's

7    plenty of space for us to write this, and what I do is I

8    just mark what the actual trial exhibit number was on it.

9    That's fine to do that, and then that way we know there

10   isn't an exhibit that gets sort of slipped in.  So I'd

11   prefer to go off of 67-4 and then we can just keep track as

12   we go along with what the trial exhibit numbers become.

13        MR. GOODMAN:  Sure.  That would be fine.  I do

14   apologize.  Sometimes I'm a little soft spoken.

15        THE COURT:  That's better actually.  That's much

16   better.

17        MR. GOODMAN:  Thank you, Ma'am.

18        THE COURT:  So then in terms of the defendants'

19   exhibit list then, 67-6, any reason why we can't be

20   utilizing this?

21        MR. CREMER:  I think primarily we can.  We did add

22   several exhibits which we shared with plaintiff's counsel

23   that there's no objections over, but we could just add those

24   I think if you want to go with the original list, Your

25   Honor.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  Yes.  Let's do that, but you did

2    disclose those to plaintiff's counsel?

3          MR. CREMER:  Yes, we have.

4          THE COURT:  And, Mr. Goodman, was there any

5    objection to those exhibits?

6          MR. GOODMAN:  No, Your Honor.

7          THE COURT:  How many are we talking about,

8    Mr. Cremer?

9          MR. CREMER:  At the most 10.

10         THE COURT:  Well, the good news is your 67-6 has

11   some extra blank sheets, so we'll be able to add them in,

12   blank rows, so we'll be able to add those I think there with

13   the exhibit numbers.

14         So to be clear, so what Ms. Morgan has, Mr. Cremer,

15   that's the 10 that have been added then.

16         MR. CREMER:  That's now a current complete list with

17   the additional 10.

18         THE COURT:  Okay.  That's fine then.  I'll just make

19   sure I handwrite mine on my copy.  I'll stick with what I've

20   been working and Ms. Morgan can use that, and if we have any

21   confusion, we can address it then.

22         So then also, Mr. Goodman, is what Ms. Morgan has,

23   is that in any way modified what was filed at 57-4?  Is that

24   renumbered?

25         MR. GOODMAN:  What we are going to be presenting is

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    renumbered, Your Honor, but they are all on that list.

2           THE COURT:  It's a list Ms. Morgan has is the

3    original 67-4 list?

4           MR. GOODMAN:  Right.  That's the original list and

5    what we are going to be presenting are a subset of all of

6    those but renumbered, so they are going to be numbered as

7    they are entered into as they are used.

8           THE COURT:  And you're working on that now?

9           MR. GOODMAN:  If that's acceptable to Your Honor.

10          THE COURT:  I think we'll just stick with the one

11   that we have, and we'll be able to cross-reference.  We're

12   used all the time knowing that the one that was submitted

13   with the pretrial statement doesn't necessarily come in

14   order.

15          MR. GOODMAN:  I apologize to the Court.

16          THE COURT:  That's fine.  And we're used to that.

17   So I think that covers witness list and exhibit lists.

18          Let's talk about the motions that were filed.  One

19   is the motion to take judicial notice of the two OSHA

20   documents, and then there's a motion to strike that motion

21   to take judicial notice.

22          Why -- it seems to me that the judicial notice

23   aspect is a matter that would come up when these documents

24   are admitted into evidence, and I did see that both of these

25   documents, it appears to me -- although, Mr. Goodman, feel

1    free to clarify -- it appears to me looking at the date and

2    the description that on the original exhibit list at least

3    these were documents 36 and 65; is that correct?  I'll just

4    read it.  Thirty-six, the sponsoring witness was listed as

5    Ralf Vieten and Anthony Bond.  And 36 says letter dated

6    August 17th, 2018 from Leslie L. Grove, III, and then it was

7    an exhibit of both of their depositions.  And then 65, it

8    lists six different witnesses that that was intended or

9    potentially coming in through, and it says OSHA memorandum

10   from Leslie L. Grove, III, re: notification results of

11   fatality investigation dated August 16th, 2018.

12           MR. GOODMAN:  That's correct, Your Honor.

13           THE COURT:  So why -- what was the -- I guess what

14   event occurred then caused you to file the motion for

15   judicial -- the request to take judicial notice?

16           MR. GOODMAN:  Yes, Your Honor.  So about a week and

17   a half to maybe two weeks ago, I had sent to the defendants

18   a proposed both substantive and procedural stipulations.

19   They had provided those back to me with some changes I

20   believe on Wednesday, and then after I saw that they had

21   struck that they would stipulate that those two documents

22   were true and accurate.  That is why I then filed that

23   motion.

24           The Court I think understands, like you said,

25   generally that would be requested at the time that evidence

1    would be moved into evidence; however, in this case, those

2    are going to be documents one and two, so I thought it would

3    be easier for the trial and for the Court if we discussed

4    that before we started.

5             THE COURT:  Okay.  So, let me turn to you Mr. Cremer

6    then, is it an authenticity concern?  Again, these were on

7    the August -- excuse me -- the April 2021 exhibit list and

8    there wasn't any type of dispute addressed at the pretrial

9    conference on that or the most recent pretrial conference.

10   Is it authenticity or do you have -- is the issue more to

11   the extent that I'm taking judicial notice, whether it's the

12   fact that they exist, which seems to me to be a pretty easy

13   judicial notice issue, of course, and I don't hear

14   Mr. Goodman to be requesting this.  To the extent that he

15   was requesting that I take judicial notice of any disputed

16   facts in there, that would be a different matter.

17            What is it in terms of the documents themselves that

18   the concern is now that the defendants have?

19            MR. CREMER:  Well, we filed as part of our final

20   pretrial order a motion in limine to bar the introduction of

21   OSHA reports as generally being inadmissible, and I felt as

22   though this attempt -- well, to go back a little further.

23   Mr. Goodman issued subpoenas to call in the OSHA

24   investigators which we objected to and he withdrew.  I doubt

25   that OSHA would have complied with the subpoenas anyway.

1      You know, these investigations based on the case law
2  we cited to the Court in our motion in limine are not
3  admissible as evidence of cause or fault.  And that's the
4  basis of my objection.  And it came after the period of time
5  that the Court had set for the parties which had disputes
6  over the admissibility or any type of pretrial motions that
7  would be filed, and we were in the midst of getting ready
8  and we so we filed the motion to strike in lieu of filing a
9  response.
10      THE COURT:  Okay.  Well, I'm going to deny the
11  motion to strike.  In terms of the motion to request
12  judicial notice, I'm going to take judicial notice of the
13  fact that there are OSHA documents and the fact that these
14  two documents exist and that they are -- one's a letter and
15  one's a report.  I am not taking judicial notice of any of
16  the disputed facts in that, nor am I taking them as evidence
17  of cause or fault.
18      At this point I am taking judicial notice that those
19  documents do, in fact, exist and that they are Government
20  agency documents.  But, again, they're not being admitted at
21  this point as any proof of what is stated inside of them
22  which are the opinions of the OSHA investigator.
23      Just for the record to be clear, the motion to
24  strike is at 141 and that is denied.  The motion to take
25  judicial notice at 140 is granted, again, to -- I'm taking

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    judicial notice of the fact of those documents.

2         Anything else we need to address before we start

3    openings?  I know there were some technical issues.  Have

4    those been resolved at least, Mr. Goodman, to your

5    satisfaction to be able to go forward with your opening?  I

6    understand you weren't having issues necessarily as much,

7    but are you ready to go?

8         MR. GOODMAN:  I believe I am, Your Honor.  May I

9    just check to make sure it's good to go?

10        THE COURT:  Mr. Cremer, was your side able to

11   resolve the technical issues?

12        MR. CREMER:  Your Honor, we'll just work around it.

13   It's not a big issue.

14        THE COURT:  And we'll just turn the lights down.

15   And I know the ruling was that each side can have an hour

16   for openings and an hour for closing.  By no means do you

17   need to fill up all of that time, but just so you know, I'm

18   going to be looking at the clock when you hit close to an

19   hour and I'll just give you have a 10-minute warning,

20   otherwise I won't interrupt you.

21        MR. GOODMAN:  Good morning, Your Honor.  May it

22   please the Court.  This is about Liebherr US's failures.

23   It's about Liebherr US's failures to provide a Product

24   Safety Bulletin to Sims.  It is about Liebherr US's failures

25   to provide a retrofit cover plate to Sims.  It's about

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Liebherr US's failures to provide warning stickers and

2    warnings to Sims.  And it's about Liebherr US's failures to

3    properly train Sims personnel.

4         Had Liebherr not committed these failures, all of

5    the information that we just discussed would have warned

6    Sims against manipulating the T4 pin and provided Sims the

7    knowledge of the risk associated with manipulating the T4

8    pin being the uncontrolled retraction of booms section 6, 5

9    and 4 on the 84-meter boom.

10        But Sims never knew this because Liebherr US never

11   warned them.  Because of the failure to warn and the lack of

12   training on February 19th, 2018, the Liebherr LTM 1500

13   600-ton crane had an uncontrolled retraction of boom section

14   6, 5 and 4 resulting in over $3 million in damages to the

15   crane owned and operated by Sims.

16        This is the same conclusion reached by OSHA in its

17   investigation where they found that this incident could have

18   been prevented if the manufacturer supplied the written

19   Product Safety Bulletin notice, a product modification

20   retrofit cover plate with warning labels to be affixed to

21   the crane and the update change revisions for the operating

22   instructions in a timely manner as soon as the manufacturer

23   became aware of this issue.

24        What OSHA did not know was that the manufacturer

25   Liebherr Germany which is a complete and separate company

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   and corporation from Liebherr US, Liebherr Germany

2   manufactures these cranes.  They actually did, in fact,

3   provide all of this information to Liebherr US and they

4   charged Liebherr US to provide all of the information in a

5   timely fashion to all owners of the Liebherr LTM 1500 in the

6   United States, but Liebherr US failed to provide all of that

7   information to Sims.

8          The overwhelming evidence is going to show that

9   Liebherr US had a duty to provide all of this information to

10   Sims; that Liebherr US breached that duty because they

11   failed to provide that information in a timely fashion; that

12   it was foreseeable to Liebherr US that if they failed to

13   provide this information there could be an uncontrolled

14   retraction of the boom causing extensive property damage to

15   the crane, and it was foreseeable because it stated it in

16   the Product Safety Bulletin that they failed to provide to

17   Sims.

18          Additionally, but for Liebherr's failures, this

19   accident and this incident would never have occurred.

20   Ultimately there was 3,215,239 in damages to the crane.

21   Sims had an insurance policy that it paid premiums on month

22   after month and year after year, and so luckily for Sims

23   they had insurance coverage that paid for their damages.

24          After salvage of the damaged crane, their insurer

25   had damages of $1,744,752.74 that it is seeking in this

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   litigation today.

2          Before we speak about the liability and damages of

3   this case, it's important to understand the Liebherr LTM

4   product.  The Liebherr LTM product in this case is not

5   alleged to be defective in any manner.  It was properly

6   designed, properly engineered and properly manufactured.  It

7   was a good product.

8          The interesting thing about the Liebherr LTM 1500 is

9   it has two different boom configurations.  It has a 50-meter

10  boom configuration, and it has an 84-meter boom

11  configuration.  To make the 50-meter boom configuration or

12  the 84-meter boom configuration, the new booms have to be

13  installed into the crane base that you see here.  The crane

14  base consists of boom section 1 and boom section 2.

15         To install the -- excuse me.  To install the

16  50-meter boom, you take that telescopic boom section 3 and

17  install it in to boom section two, and you lock it down with

18  the T3 pin.  Now, to unlock and remove that 50-meter boom

19  telescopic boom section 3, you would unlock pin T3, the same

20  pin that you used to lock.

21         Now, to install the 84-meter boom telescopic

22  sections 6, 5, 4 and 3, that 84-meter boom package is

23  installed in the same manner as the 50-meter boom package.

24  It's installed into section two, and to lock it down, you

25  would lock pin T3, the same pin number that you would for

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

20

1    the 50-meter boom.  To unlock it, you would unlock again T3.

2            The only pin that anyone is ever supposed to use to

3    unlock or unlock the 50-meter boom or the 84-meter boom is

4    the T3 pin.

5            Now, here is the 50-meter boom on the crane at

6    issue, and this what we're looking at is the T3 pin.  And

7    over the T3 pin you'll see a cover plate, and the cover

8    plate on the crane at issue was mechanically attached with

9    bolts that you see here (indicating).

10           Here is an exemplar picture of an 84-meter boom, and

11   what you'll see is the T3 pin right here that has a cover

12   over it, and you'll see that that exemplar 84-meter boom T3

13   pin cover is attached with mechanically what's called wing

14   nuts.  Immediately next to the T3 pin on the 84-meter boom

15   is the T4 pin.  The T4 pin is open and accessible; however,

16   and as strange as it sounds, the T4 pin should never be

17   touched.  It should never be locked.  It should never be

18   unlocked.  It should never be manipulated.

19           This is what's called an S wrench.  This S wrench is

20   used to lock and unlock the T3 pin.  Unfortunately, that S

21   wrench can also lock and unlock the T4 pin that should never

22   be locked or unlocked or manipulated.

23           So let's talk about the facts leading to the

24   February 19th, 2018 incident.  The facts will show that on

25   Friday, February 16th, three days before the incident, Sims'

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    employees exchanged this 50-meter boom out for the 84-meter

2    boom in preparation for a job that they were going to be

3    conducting the following Monday on February 19th.

4         When Sims' employees were conducting that boom swap,

5    they had their education, their experience, the training

6    provided by Liebherr US and the operator's manual.  The

7    exchange required the removal of the head section that made

8    up the 50-meter boom.  So what ended up happening was they

9    had to take the 50-meter boom and retract it.  They had to

10   extend out sections -- excuse me -- sections, 1, 2 and 3 to

11   the necessary extensions, and then around this location

12   where the laser marker is, the T3 pin is located

13   (indicating).  The T3 pin was unlocked and the T3 boom

14   section was taken out.

15        Prior to the installation of the 84-meter boom

16   four-section package, the cover over the T3 pin is required

17   to be removed, this cover (indicating).  Sims employee who

18   was an oiler, also known as an apprentice, Shane Burrows who

19   was an NCCCO certified rigger mistakenly did not remove the

20   cover before the installation of the 84-meter boom

21   four-section package.

22        The reason for this was the cover on the crane had

23   bolts.  This top photo is the crane at issue, and the cover

24   had bolts.  The cover was also the same color as the crane

25   itself, and in the crane industry Shane Burrows understood

1    if something had bolts, it was never supposed to be removed.

2    So he did not remove it before installing the 84-meter boom

3    four-section package.

4         To install the 84-meter boom four-section package,

5    the T3 section slides into the T2 section and the T3 pin is

6    supposed to be locked through the T2 section access hole,

7    but because Shane Burrows did not remove the cover plate off

8    the T3, the first pin he saw was that close pin right next

9    to the T3 which is the T4 pin that is never supposed to be

10   locked, never supposed to be unlocked and it's never

11   supposed to be manipulated.

12        Shane, however, manipulated the T4 pin thinking it

13   was the T3 pin.  The pins look exactly alike and they can

14   both be manipulated with the S wrench; however, as we said,

15   the T4 pin should never be manipulated.

16        What happened was you had the 84-meter boom, the

17   cover plate on the T3, no cover on the T4.  Shane Burrows

18   sitting on top of the boom section watching for the first

19   pin to come in, he doesn't see the T3 because the cover

20   plate is on.  The next pin he sees, though, is the T4 so he

21   locks it down, but he was experienced enough to know that

22   there was an issue with the pin because it was going in the

23   wrong direction.  So Shane advised his supervisor who's the

24   NCCO crane operator certified Andrew Farris.

25        Andrew looked, came up under the boom, looked into

1    the T2 section and he saw that the cover plate was on the

2    T3.   Realizing that Shane had readjusted the T4 Andrew

3    Farris readjusted it back in the same manner and method by

4    which Henry Wared taught him how to adjust the T3 pin.

5           The 84-meter boom package was removed from the T2

6    section after they readjusted the T4.   They took the cover

7    plate off the T3.   They reinstalled the 84-meter boom

8    package and they locked it down for the 84-meter boom.

9           So here is the T3 pin uncovered, the T4 pin.   They

10   slid in the 84-meter boom package and they locked down the

11   T3 pin, the first pin that came through.

12          Three days later, on February 19th, 2018, Andrew

13   Farris was at the job site and he was telescoping out

14   sections T6, T5 and T4.   At that time all Farris had was his

15   education, his experience, his training, and the operator's

16   manual produced by Liebherr Germany.

17          While he was scoping it out, the telescopic cylinder

18   would not detach from section T4 even though the crane's

19   computer system known as the LICCON system showed that all

20   pins were locked and that there were no error codes.   The

21   LICCON system is supposed to show when pins are locked, and

22   the LICCON system is supposed to provide error codes if

23   there is an error.   But what the LICCON system doesn't do is

24   advise if a pin is not at the correct depth, even if it is

25   locked.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

24

1          Because the cylinder would not come and catch the T3

2    to boom out the T3 section, Andrew contacted Sims Service,

3    persistence, and he also contacted a journeyman crane

4    operator with more than 30 years of experience to find out

5    what he would do in that situation.  Therefore, after

6    discussing it and per industry standards and in compliance

7    with the Liebherr manual, Andrew manually detached the

8    telescopic cylinder from T4 rather than using the LICCON

9    system.  While attempting to manually attach the telescopic

10   cylinder to T3, boom sections T6, T5 and T4 collapsed

11   uncontrollably damaging the crane.

12          A little history about the crane before we got to

13   this place in time where this incident occurred.  So, this

14   was a used crane and Liebherr Germany, the manufacturer, is

15   a separate corporation from Liebherr US, the defendant in

16   this case.

17          Liebherr Germany manufactures the crane.  Liebherr

18   US is a sales, service and training organization.  Liebherr

19   US obtained the crane from Liebherr Germany and they

20   obtained it for approximately $2.9 million.  At the same

21   time, on August 30th, 2016, Liebherr US entered into an

22   agreement to sell the used 2012 Liebherr LTM 1500 with

23   serial number 073386 to Schuch HeavyLift Corporation.

24   Schuch HeavyLift at the same time entered into an agreement

25   to sell the exact same crane to Atlantic Coast Cranes, and

25

1    at the exact same time, Atlantic Coast Cranes entered into

2    an agreement to sell the Liebherr LTM 1500 to Sims Crane.

3    It is simply brokering cranes.  It's a normal standard thing

4    that goes on in the crane industry because these cranes are

5    coming over from Germany.  They're 600 tons.  They require a

6    lot of care in bringing them over.

7           So this brokering allows Sims to rely on a company

8    like Atlantic Coast Cranes to do the heavy lifting in

9    getting the crane from Germany to its port of entry in

10   Jacksonville, Florida.

11          But Liebherr was on notice that Sims was going to

12   own the crane.  Here is an email that went from Liebherr US

13   to Liebherr US.  It actually originally started from

14   Liebherr Germany to Liebherr US, and Liebherr US sent it

15   around to other Liebherr US folks.  It's says, "as

16   previously informed, please note that the crane sold to Sims

17   through company Schuch will be delivered to Jacksonville,

18   Florida."

19          Liebherr was also on notice that Sims owned this

20   crane because Liebherr US actually provided Sims with

21   assistance obtaining the crane at the Jacksonville port and

22   then trained them for a week.  As you can see here, it says

23   on the Liebherr's documentation, their service report, it

24   says, "customer," and customer's noted as Sims Crane &

25   Equipment, "had bought a used LTM 1500 and requires machine

26

1    to be built and training."

2          So Liebherr was on notice and knew that Sims owned

3    this specific crane.  And during that training Liebherr was

4    negligent in how it trained Sims.  The facts will show that

5    Liebherr US knew that this was Sims' first Liebherr LTM

6    1500.  An email between Liebherr employees specifically

7    said, "the crane mentioned above was sold to Sims Crane in

8    Florida with an assist from Schuch HeavyLift. They are a new

9    customer and they need to pull the boom in order to

10   transport the machine.  My understanding is that they have

11   no experience with Liebherr Cranes, much less how to remove

12   the boom on an LTM 1500."

13         Liebherr was aware that they did not have the

14   knowledge and information and training on how to remove the

15   boom on an LTM 1500 and they needed to provide training for

16   that.  So initially Liebherr US wants Eric Ranich to train.

17   For whatever reason, Eric Ranich gets pulled off, so

18   Liebherr US wants Karl Redman to train, but Karl Redman is

19   pulled off to another job.  So ultimately they have Henry

20   Ward who handles the training of Sims.

21         The unfortunate thing about this for Sims was that

22   Henry Ward had no classroom training on the Liebherr LTM

23   1500 himself.  And because of that Henry Ward negligently

24   trained Sims on the use of the LTM 1500.

25         First and foremost, he was supposed to provide 80

27

1    hours' worth of training.  He only provided one week.

2    Additionally, the training objectives specifically provides

3    that Henry Ward is supposed to provide Sims comprehensive

4    knowledge of all safety concerns, but the evidence is going

5    to show that Henry Ward skipped a number of safety concerns

6    in the training.

7          Last and most importantly, the Liebherr Germany

8    operator's manual provides that the T3 pin when locked is

9    supposed to be locked to 11 millimeters above the locking

10   bore, but this is not how Henry Ward trained Andrew Farris

11   or Jason D'Angelo.  In independent depositions, both Andrew

12   Farris and Jason D'Angelo testified that Henry Ward never

13   mentioned anything about having the T3 pin being

14   11 millimeters above the locking bore.  Instead, he

15   mentioned that they just needed to install the pin until it

16   was tight but not over tight because if they did make it

17   over tight they would break the inner mechanism.

18          THE COURT:  Hang on one second.

19   (Brief pause.)

20          THE COURT:  Sorry about that.  Go ahead.

21          MR. GOODMAN:  Resetting my time.

22          THE COURT:  I'll give you credit.

23          MR. GOODMAN:  Thank you, Judge.

24          So as we said, Henry Ward did not train the Sims

25   Crane operators to install and lock down the T3 pin to

1    11-millimeter above the locking bore.  He simply trained

2    them to tighten it down so it was taut but not over tight,

3    because if they made it over tight it would break the inner

4    mechanism.

5            What's interesting to note is that it was both

6    Andrew Farris and Jason D'Angelo testified to the exact same

7    thing.

8            Secondly, Liebherr was negligent in failing to

9    provide Sims the Product Safety Bulletin, the retrofit cover

10   plate, the retrofit warning stickers and the new information

11   for the Operator's Manual.  The Liebherr Operator's Manual

12   that was created by Liebherr Germany provides in it at the

13   beginning some warning signs, and those warnings signs have

14   signal words like danger, warning, caution, and next to

15   those danger, warning and cautions, there are triangles with

16   exclamation points and they're colored in with yellow.

17           And the explanation of these is that the

18   designations are of the dangerous situation which could lead

19   to death, serious injury, personal injury or property damage

20   and where that can occur, it is identified in the section in

21   the Operator's Manual.

22           Next.  But in the Liebherr Germany published

23   Operator's Manual, there's nothing next to the T3 pin

24   instructions that reflects that anything involving the

25   installation of the T3 pin can cause personal injury, death

1    or property damage.  And that is why Liebherr Germany

2    thought it important to publish what's called a Product

3    Safety Bulletin.  And what the evidence is going to show is

4    that this Product Safety Bulletin warns specifically against

5    the failure mode that occurs in this case.  Due to recent

6    events Liebherr Germany published that Product Safety

7    Bulletin instructing people and especially crane operators

8    and users that they should never manipulate the T4 pin,

9    because if they do, they were warned of the risk associated

10   with it, that the boom section 6, 5 and 4 could

11   uncontrollably collapse in the same manner and method that

12   it happened in this case.  And this was published and

13   provided to Liebherr US three months, approximately three

14   months before this incident.

15        The Product Safety Bulletin also came with a new

16   cover plate.  As you recall, the old cover plate is this

17   round cover plate, and the round cover plate only covers the

18   T3 pin, the pin that you are supposed to manipulate, but it

19   does not cover the T4 pin, the pin that you're never

20   supposed to manipulate.  Because of that confusion Liebherr

21   Germany came out with a new cover plate.  This cover plate

22   protects and covers both the T3 and the T4 pin.  So one

23   could never leave the cover plate on the T3 pin but still

24   have access to the T4.

25        Additionally, there were stickers on the new cover

1    plate as well as beside the pins themselves.  One of the

2    stickers had a pin with no X and that was next to and on top

3    of the T3 pin.  One sticker had a pin and big red X's over

4    it, which is understood to mean that that pin should never

5    be touched.

6         Now, Liebherr Germany sent this Product Safety

7    Bulletin, the retrofit cover plate, the stickers, to

8    Liebherr US advising them and instructing them and charging

9    them with the duty and responsibility to send it out to all

10   U. S. owners of the Liebherr LTM 1500.  And it was

11   originally sent to Ralf Vieten and Ralf Vieten sent it to

12   his managers and said send this out.

13        And it was sent out to a number of U. S. crane

14   owners, and it was sent out in January and in early

15   February.  The latest it was received was February 6th by

16   any -- excuse me -- February 7th by any the crane operators

17   that received it.

18        However, Liebherr US did not send it to Sims and

19   Liebherr did not send it to Sims because Trina Cross, who's

20   the manager of the Modification Department, identified that

21   there was an issue, and she writes it down here, and it's a

22   little bit difficult to see, but she writes down there that

23   she is not able to update the process folder on the H drive.

24   Check customer info in system says Schuch.  Paperwork says

25   Sims.  So she has a discrepancy.  She does not know who owns

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    this crane, and she did testify, we'll be designating her

2    deposition, that she should have fixed it, found out who the

3    correct owner was so that they could send these Product

4    Safety Bulletins out to them.

5         But not only did she not send it to Sims.  She also

6    did not send it to Schuch, and we'll be designating the

7    deposition transcripts of Schuch, and Schuch testified that

8    had they received the Product Safety Bulletin, they would

9    have done what they always do in these situations because

10   it's a habit and routine practice for them to receive

11   information like this because they were a crane broker, but

12   they would immediately forward the information to the new

13   crane owner and let the Liebherr US know that the crane is

14   owned by another entity.  But in this situation, Liebherr US

15   already was aware that Sims owned this crane.

16        So on February 19th, we have this uncontrolled

17   retraction of the boom, and Liebherr three days later

18   realizes this happens.  And so Liebherr sends an internal

19   email between Liebherr folks saying, "I need confirmation

20   that we sent this Product Safety Bulletin and the cover

21   plate to Sims, there was an accident."  A day later,

22   Liebherr Germany contacts Liebherr US and says, hey, I need

23   confirmation that you sent out the Product Safety Bulletin

24   and cover plate warnings to Sims, there was an accident.

25        So what does Liebherr US do?  They send the Product

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Safety Bulletin to Sims, but unfortunately it was sent after

2    the accident had already occurred and so Sims could not take

3    advantage of the information in it.

4         The bulletin they received was the cover plate, the

5    warnings stickers, the new information, so ultimately the

6    evidence is going to show that the cause of the

7    February 19th incident was a failure of the T4 pin.  The T4

8    pin was not at the correct depth, and because of that, the

9    load on it caused it to fail.

10        We had a metallurgist Thomas Eager who provided his

11   report to our origin and cause investigator Anthony Bond and

12   Dr. Eager out of MIT determined that the pin was proper,

13   appropriate material and it was fit for the use it was

14   intended.

15        Anthony Bond will ultimately testify and support

16   that opinion in his origin and cause opinion, and he also

17   found that Liebherr failed to warn of the risk associated

18   with the T4 pin after consulting with our human factors

19   expert Dr. William Vigilante who will testify in this case.

20        Anthony Bond will also testify that Sims did not

21   violate any OSHA requirements, any ASME codes, any standard

22   operating procedures; that Farris did not violate any OSHA

23   codes, any ASME codes, any standard operating procedures,

24   and that Andrew Burrows did not violate any ASME codes, OSHA

25   codes or standard operating procedures.  And, finally, OSHA

1    did not issue any citations to Sims.

2         Our human factors expert Dr. William Vigilante will

3    testify that the manipulation of the T4 minimum created a

4    hazard that users had to be aware of and a warning was

5    necessary to warn the users of the risk associated with the

6    T4 pin.

7         The Operator's Manual originally provided to Sims

8    did not warn of the risk associated with the T4 pin.  The

9    training did not warn Sims of the risk associated with the

10   T4 pin.  Liebherr US knew that Sims owned this.  Liebherr

11   Germany published a Product Safety Bulletin and a retrofit

12   cover plate to ameliorate the issue with the product --

13   excuse me -- with the Operator's Manual, and that the

14   Product Safety Bulletin would have provided Sims the

15   information necessary to identify the risk associated with

16   the issue of manipulating that T4 pin.

17        Finally, we will conclude that Liebherr's acts

18   created the condition that caused the crane to fail.

19        OSHA, as we said at the beginning, also found the

20   same thing, that this incident would not have occurred if

21   Liebherr US would have provided this information.  OSHA also

22   found that there was no violation on the part of Sims, and

23   what's interesting is Liebherr Germany's own Operator's

24   Manual would conclude that Liebherr US is at fault for this

25   because it specifically states "warning, outdated version of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    crane documentation.  If subsequently supplied information

2    updates and an addenda to the crane documentation are not

3    observed and added, there's a danger of accidents.

4    Personnel can be killed or seriously injured.  This could

5    result in property damage."  Exactly what happened here.

6    Liebherr US is a training company.  They have these

7    operator's manuals and they should have known that.

8         Finally, the damages of this case.  Liebherr

9    evaluated the repair costs and determined that the repair of

10   this crane was about $1.4 million.  To replace it would be

11   about $4.5 million, and a fair market valuation was about a

12   little excess of $3 million.

13        But ultimately as we sit here today, the ultimate

14   amount was paid $3,215,239 in damages by the insurer.  The

15   insurer incurred towing cost and salvage costs for a

16   subtotal that they're seeking here today of $1,744,752.74.

17        At the end of our case, we're going to ask the Court

18   to award that amount, $1,744,752.74 plus prejudgment

19   interest from the time of this loss which is on

20   February 19th, 2018, approximately four years ago.  Thank

21   you.

22        THE COURT:  Thank you.  Mr. Cremer.

23        MR. CREMER:  Mr. Pender.

24        THE COURT:  Just so you all know, I can see

25   everything on the big screen, but like you all, I have a

1    small screen too.  I should have asked.  Is everybody's

2    smaller screens working at their Counsel table, they're able

3    to see?

4              MR. CREMER:  Yes.

5              MR. PENDER:  May it please the Court.  My name is

6    Thomas Pender.  I'm here on behalf of Liebherr US.  Good

7    morning, Your Honor.  Good morning, Ladies and Gentlemen,

8    Counsel.

9              We represent the defendant in this case which is

10   Liebherr-America, Inc. You'll also see in the caption

11   there's a former name Liebherr Cranes, Inc.  There's a d/b/a

12   that they use, Liebherr USA, but it is a United States

13   entity, a Virginia corporation that we represent.

14             So I want to start by talking about the company that

15   we don't represent that is a defendant in this case -- that

16   is not a defendant in this case, and that is Liebherr-Werk

17   Ehingen.  It's in Ehingen, Germany.  They are the

18   manufacturers of this crane, this 2012 crane.

19             Liebherr-Werk Ehingen re-sold the crane.  They sold

20   it to an initial customer in 2012.  The crane came back to

21   them as a used crane.  They refurbished it and put it on the

22   market as a resale crane and they re-sold it in 2016.

23   Liebherr-Werk Ehingen, the German corporation, made a deal

24   with a company in New York called Schuch, and they used

25   Liebherr US as part of that transaction.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          Liebherr-Werk Ehingen also was the company that

2     agreed to provide a free week of crane training to Schuch.

3     Liebherr-Werk Ehingen, again, not the defendant, not my

4     client, is the company that wrote and created the crane's

5     Operations Manual.  Liebherr-Werk Ehingen is the company

6     that wrote and issued the November 2017 Product Safety

7     Bulletin.  It's the company that created the modified cover

8     plate and decals, and they requested Liebherr US's

9     assistance with mailing those items to crane owners in the

10    U. S., owners of the LTM 1500 cranes in the U. S.

11          This is Liebherr-Werk Ehingen's LTM 1500-8.1 crane.

12    And you'll see -- sorry.  There are three collars here:

13    One, two, three.  We're showing the crane here with the

14    three, the three-boom configuration, the short

15    configuration, what's called the 50-meter boom configuration

16    in a retracted or telescoped position.

17          Here is Liebherr-Werk Ehingen's LTM 1500-8.1

18    retracted with the six sections.  Again you can see, 1, 2,

19    3, 4, 5, 6 collars there, all retracted.

20          Here is the 84-meter, so that's sixth section is

21    what's called the long boom or the 84-meter boom, and here

22    is a photograph of it fully extended up in the air.  Here's

23    T1, T2, 3, 4, 5, and just out of frame is 6.  When, as has

24    been explained somewhat by Mr. Goodman, 1 and 2 are always

25    on the crane.  The only exchanges when you're doing the

1    short boom, the 50-meter boom, it's going to have an extra

2    section which is that third section.  When you use the long

3    boom, the 84-meter boom, it's going to have three extra

4    sections, 3, 4, 5 and 6, four extra sections.

5         Either way, the connection when those are being

6    exchanged and those are being locked together happens right

7    here (indicating), L2, L3, always is where the connection

8    takes place.  It's the only place where a connection occurs

9    regardless of whether you're putting in the long or the

10   short.

11        Our client, the defendant in this case, is

12   Liebherr-America, Inc., in Newport News, Virginia with a

13   location in Houston, Texas as well.  I want to run back to

14   this one more time.  Mr. Goodman's opening statement made me

15   think of something that I wanted that the witnesses will

16   talk about here.

17        These sections are extended out and connected by a

18   cylinder arm that runs up and down these tubes, and that

19   cylinder -- these sections 4, 5 and 6, they're always pinned

20   (indicating).  They have these pins.  They're always pinned.

21   They're always locked.  So, when the crane is like this and

22   it's time to extend the boom, the first thing the cylinder

23   does is the cylinder inside grabs, it goes inside, it grabs

24   No. 6 tube and it pins into the side of the tube and it then

25   pushes 6 out.  And when it gets 6 all the way out, it has a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      device that grabs the locking pin, those black pins that

2      we're talking about, pulls it down and up to lock it into

3      place.  The cylinder then detaches and retracts back down.

4      Now, it goes and it grabs No. 5, pins into No. 5, pushes

5      No. 5 out, pins into No. 5, pulls the locking pin down,

6      pushes the No. 5 out.

7              When it gets fully extended, it allows the locking

8      pin to go back up and now it unpins, goes back to 4 and so

9      on and so on.  So those locking pins are always in a locked

10     position in 4, 5 and 6.  They're only pulled down during

11     this extension process.  They never need to be touched by

12     any operator under any circumstances.

13             Now, going back to our customer, our client, the

14     defendant Liebherr US.  In 2016 at the request of

15     Liebherr-Werk Ehingen, LUS was asked to purchase and resell

16     this crane to this company Schuch HeavyLift in New York

17     City.  That's in 2016.

18             In January and February of 2017 at the request of

19     Liebherr Ehingen, LUS provided a free week of crane training

20     to Schuch and its customer, ultimate end customer Sims.

21             In October of 2017, at the request of Liebherr-Werk

22     Ehingen, LUS was asked to confirm the location of 35 LTM

23     1500s in the United States, and you'll see this exhibit.

24     Germany sends to LUS a list of 35 cranes in the U. S. and

25     says can you confirm that these are going -- these cranes

1    are in the U. S., we're going to be issuing a Product Safety

2    Bulletin?  One of the cranes on that list is this 073386

3    crane that we've been talking about, and the list that

4    Germany sent us identifies what is thought to be the current

5    owner as Schuch HeavyLift in New York City.

6         In December of 2017 and January of 2017 -- or

7    January of 2018 at the request of Ehingen, LUS begins

8    disseminating the Product Safety Bulletin to these LTM

9    owners in the United States.  That process takes place

10   during January and February of 2018, and Mr. Goodman showed

11   you that several of the crane owners got the Product Safety

12   Bulletin in January.  Some of them got it in February.

13        Actually, the exhibit that he showed you where he

14   said none of them got it later than February 7th was

15   incorrect.  There's a crane owner on there called Ness.

16   They didn't get it until February 24th.  Sims didn't get it

17   until after this accident.

18        This was an ongoing process at LUS to get these

19   Product Safety Bulletins out.  And of the 35 cranes that

20   were on that list that Liebherr Germany had sent, LUS was

21   having difficulty with about six or seven of the crane

22   owners, trying to find the correct crane owners, and there

23   was contradictory information in their systems.

24        One of the six or seven that LUS was having trouble

25   with verifying the final location was this 073386 crane.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    There's -- there was a mention, not a lot of discussion, but
2    a mention about the fact that ultimately LWE issued a new
3    section of its Operator's Manual that they claim they should
4    have had.  That actually didn't happen until more than a
5    year after all of this in April of 2019.  In April of 2019
6    is when Germany mailed out the supplement to their
7    Operator's Manual.  That happens well after the training,
8    well after the accident, well after all of this original
9    Product Safety Bulletin information.
10        I want to go back a little bit to the documentation
11   related to the crane sale as far as LUS knew it to be.  All
12   of LUS, LUS contract documents for the sale of this crane
13   specify the purchaser as a company called Schuch HeavyLift
14   and had an address of 80 Pine Street in New York and a
15   contact of a gentleman named Bill Adams.
16        Here is the Liebherr used equipment sales
17   acknowledgment showing the buyer's information, Schuch
18   HeavyLift, 80 Pine Street in New York City, and giving the
19   buyer's business phone number with a 212 area code.  That's
20   the contact information that goes into the system at LUS,
21   and at Ehingen, Germany.
22        The sales price is $3.1 million which will become
23   relevant when we get to the damages part of the case.
24   Liebherr US sold this crane for $3.1 million.  The other
25   part of this transaction, and this is just part of the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    documents, part of the terms and conditions, this crane was

2    sold "as is", a used crane sold as is.

3            You'll also see in the contract documents for this

4    crane, there are provisions that talk about where notices

5    should go.  There's a notice provision in the contract.  And

6    you'll see the witnesses talk about that.  It says that all

7    of the notices for this crane should go to the persons and

8    the addresses on the cover sheet of this contract.  That's

9    Schuch HeavyLift, 80 Pine Street in New York.

10           There it is, a little bit closer, the same slide.

11           This crane was sold in "as is" condition with a

12   limited warranty and no offer in that contract to provide

13   training.  LUS sold that crane to Schuch for 3.1 million and

14   Schuch requested that all product notices be sent to its

15   address in New York per that contract.

16           Yes, the evidence is conflicting on the information

17   as to who the customer and owner is, and that really is the

18   reason why certain cranes, crane owners were not notified as

19   quickly as others, and this being one of them.

20           When LUS sold that crane to Schuch, you saw very

21   quickly Mr. Goodmen went through the subsequent

22   transactions, the, quote unquote, brokering of that crane.

23   None of the parties in that transaction ever touched or used

24   the crane.  It was all done very quickly.  But our sale, our

25   client sale was to Schuch.  Schuch never called us back

42

1    later and said, hey, by the way, you know, our contract

2    where we said to send the notices to us, well, we've re-sold

3    the crane and we've sold it to a broker called Atlantic

4    Coast Cranes in Virginia.  They never told us that.  We were

5    not aware.  LUS was not aware that the crane was sold to

6    Atlantic Coast Cranes.

7           Similarly, LUS was not aware that Atlantic Coast

8    Cranes sold the crane to Sims Crane.  Sims never contacted

9    Liebherr to say, hey, *we are the purchasers of your crane,*

10   *we want to be on record with you to send notices to us.*

11          What you will see, and what you have seen is that

12   one Liebherr-Werk Ehingen employee emailed one Liebherr US

13   employee in the crane sales department to tell him that the

14   crane had been sold to Sims with an assist from Schuch.

15   That's where the contradictory information comes into

16   evidence.

17          There is some information we have that the crane has

18   been sold to Sims, but we have documentation and a sales and

19   a notice provision in the contract that says the crane has

20   been sold to Schuch.  LUS is not going to send Product

21   Safety Bulletins and modifications to someone who doesn't

22   own the crane.  They're not just going to willy-nilly mail

23   it out.  They're not going to mail it out to Schuch if

24   Schuch doesn't own the crane.  And, again, neither Liebherr

25   US nor Liebherr-Werk Ehingen were part of those brokering

1    transactions where Schuch sold to Atlantic Coast and

2    Atlantic Coast sold to Sims.

3            We've heard a bit of information about the

4    Liebherr-Werk Ehingen crane manual, and I want to address

5    some of those.  Liebherr Germany's manual gives detailed

6    instructions on how to exchange the 50-meter and the

7    84-meter booms.  It gives specific warnings throughout that

8    the improper assembly or disassembly of this crane can

9    result in injury, death, property damage, and we'll look at

10   some of those.

11           It specifically instructs, again, that the

12   connection, the connecting point whether you're putting in

13   the short or the long, the connecting point is always and

14   only between T2 and T3 sections, and it specifically

15   instructs you how to pin that T3 pin.

16           There is, as you will see and you start to see, an

17   opening, a collar in that yellow crane boom housing, that T3

18   pin has to come up through that housing with an overlap of

19   11 millimeters, a very precise measurement to be locked.

20   That is in the crane manual, and we'll look at that.

21           The crane manual from Germany gave no instructions

22   about manipulating the T4 pin, and it gave no instructions

23   on what to do if, as was done in this case, somebody

24   mistakenly manipulated that T4 pin.  Germany's own manual

25   had nothing.  It was silent about that.

44

1          The crane operator on the day of the occurrence, the

2     gentleman that work for Sims Crane, whom you'll hear testify

3     in this case, Andrew Farris, will testify that on every

4     occasion that he exchanged the boom sections, when he

5     swapped out the 50 meter for 84 meter, vice versa, he always

6     referred to the LWE manual.  That manual requires that the

7     person performing the boom exchange must be trained and

8     expert on that procedure.  It also warns the operator to

9     stop operating the crane in the event of a crane

10    malfunction.

11         Let's take a look at the actual manual.  This is in

12    the forward, the very beginning of the manual.  "Warning.

13    Danger of accident due to incorrect operation of the crane.

14    Incorrect operation can lead to accidents.  Personnel can be

15    killed or seriously injured.  This could result in property

16    damage.  Only authorized and trained expert personnel are

17    permitted to work on the crane."

18         The lower warning.  "Warning.  Measures without the

19    help of Liebherr Service.  In case -- measures in case of a

20    problem, which are carried out without consulting Liebherr

21    Service, can cause damage to the crane.  Personnel can be

22    killed or seriously injured.  This could result in property

23    damage."

24         The warnings don't end there.  Germany's manual

25    warns that the risks associated with continuing to operate

1    the crane in a state of ignorance.  Warning -- if the crane

2    documentation is not understood.  "If parts of the crane

3    documentation are not understood and the tasks are carried

4    out on or with the crane, then there is a danger of

5    accidents.  Personnel could be killed or seriously injured.

6    This could result in property damage.  In case of questions

7    regarding the crane documentation, before carrying out the

8    respective task, contact Liebherr Service."

9          The warnings continue.  This is in the section on

10   assembly of the crane, general safety technical guidelines.

11         Here's a warning.  "Danger due to operating error.

12   In the interest of both yourself and others, make sure you

13   understand how your crane operates and familiarize yourself

14   with the risks associated with the work to be done.  The

15   main operating errors which are made again and again include

16   the following:" And the last one, "mistakes during assembly

17   or disassembly of the boom."

18         The manual goes on from there.  "Here are the safety

19   technical notes for the assembly and disassembly of the

20   crane."  Section 14, entitled assembly/disassembly.  The

21   German manual warns "risk of fatal injury due to incorrect

22   assembly or disassembly.  The assembly/disassembly of

23   components may never be performed by untrained personnel.

24   Incorrect assembly/disassembly can result in death or severe

25   injury.  May only be carried out by authorized and trained

1    personnel!"

2          And on the boom exchange, always and only being

3    between T2 and T3, here's the manual section on telescoping,

4    the telescoping sections.  "The crane can be operated with a

5    50-meter boom or an 84-meter boom.  The telescope separation

6    is always between T2 and T3."  That T3 pin is locked into

7    and through the bore or the collar on T2.

8          Here are the specifics.  Remember Mr. Goodman told

9    you that Andrew Farris relied on his training and the

10   manual, but somehow he didn't know that there had to be an

11   11-millimeter overlap.  Well, here is the manual.  Here is

12   the section on telescoping sections disassembly/assembly,

13   locking T2 with T3 mechanically and you back out the

14   emergency screw completely until the locking pin is in

15   position.  Check if the pin overlap on the locking bore is

16   at least 11 millimeters.

17         And then at the bottom, the trouble shooting

18   section, if you're having trouble.  "The pin overlap may be

19   less than 11 millimeters.  Continue to back out the screw

20   until the pin overlap is at least 11-millimeters.  The pin

21   has to come through that locking collar at least

22   11-millimeters" for T 3.

23         The LWE manual goes on to warn further.  What should

24   you do if you run into a problem?  The obligations of the

25   crane operator.  "The crane operator before starting work

1    must check all the devices, must monitor the crane for

2    obvious defects and in case of problems endangering safety,

3    the crane operator must cease crane operation."  It tells

4    him or her to stop.

5         What you'll hear in this case is that Liebherr US

6    apparently failed to warn or instruct on what to do about a

7    T4 pin being manipulated.  There's nothing in the German

8    crane Operator's Manual about the T4 pin being manipulated

9    or what to do if that occurs.

10        How would Liebherr US ever be able to train in

11   something that's not even in the manual that comes from the

12   manufacturer?

13        The manual from Germany does not give instructions

14   for the proper pin setting position for the T4 pin to be

15   fully locked.  The manual does not give instructions on what

16   to do if that pin is mistakenly touched or manipulated

17   during the 84-meter boom swap.

18        Henry Ward, you will hear from, is a Liebherr US

19   employee with decades of experience, training customers and

20   giving them orientation on the cranes that they purchase.

21   He is the most experienced Liebherr US person on the LTM

22   1500.  There was a comment that -- and you'll hear some

23   Liebherr US technicians go to Germany to take classes on

24   certain cranes, and Mr. Ward has done that on many cranes.

25   But for the LTM 1500, he wasn't sent to Germany to sit in a

1    class with a bunch of technicians.  An expert from Germany

2    actually came to the U. S. and spent two weeks with Henry

3    Ward personally training him and orienting him on the LTM

4    1500.

5         You will also hear that Liebherr US's training,

6    Henry Ward's training is based on and limited by what is in

7    the German manual, the manual from Germany.

8         He has no knowledge greater than the manufacturer

9    and he doesn't provide training that is not in that manual.

10   He also trains the customers on what is necessary to operate

11   that crane and what the customer wants to know.

12        So you'll hear Henry say, Henry Ward testify, if he

13   shows up for training and he says, okay, there's a section

14   here I need to cover on outriggers and the customer says,

15   Henry, we know how to do outriggers, can we just go to

16   another section?  He will oblige them and move on to what

17   they need to know.  That's why not every single checkmark in

18   his training checklist is marked in this case.

19        The crane operators, we've already discussed Andrew

20   Farris.  The other crane operator that Sims Crane hired was

21   a man named Jason D'Angelo.  Sims actually hired

22   Mr. D'Angelo to be the lead operator on this crane and

23   Farris was to be the backup operator.  And when they took

24   possession of this crane and they made arrangements to get a

25   free week of crane training, they could have sent anybody to

1    that crane training but they decided to only send Mr. Farris

2    and Mr. D'Angelo.

3           Henry Ward from Liebherr US will testify that he

4    trained them on how to do the exchange procedure.  He had

5    them actually -- had them to do the work, to physically

6    remove a 50-meter boom which is what comes on the crane when

7    it's delivered and attached the 84-meter boom and remove it.

8           How do we know that?  We have Henry Ward's records

9    of his crane training, and you'll see that in evidence.  The

10   crane training checklist says the contents of the Liebherr

11   crane operating instructions is the basis for the training,

12   i.e., everything Henry Ward trains from is from this manual.

13   Two, Liebherr expects the employer, Sims Crane, to designate

14   fully competent operators.  And Liebherr takes no

15   responsibility or liability for the competence of the

16   operator or for the consequences of his actions after

17   training.

18          That is in this document and that is signed by

19   Mr. Farris, Mr. D'Angelo and Mr. Ward.  The dates are

20   January 30th to February 4th.  That's the week that Henry

21   Ward spent with them training them.

22          Here is the checklist on boom training that Henry

23   covered with Mr. Farris and Mr. D'Angelo on the 50- and

24   84-meter booms check, and here at the bottom is the

25   signature of Andrew Farris acknowledging that he received

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    that training.

2            The plaintiff will make several admissions regarding

3    Mr. Ward's training.  Mr. Farris and Mr. D'Angelo will both

4    tell you, this Court, that they were, in fact, trained on

5    the proper pinning procedure, to pin and unpin the T3 pin

6    for the boom exchange.

7            Mr. D'Angelo called Henry Ward's training

8    comprehensive.  Mr. Farris will testify that the training

9    included the proper identification of the T3 pin and the

10   proper locking and this is critical.  Mr. Farris was trained

11   and knew how to identify T3 and distinguish it from T4.

12   They will, both Farris and D'Angelo, admit that they were

13   OSHA qualified and competent, a legal requirement on the

14   proper boom exchange procedure following Henry Ward's

15   training.

16           We know they were competent because Sims Crane

17   actually performed this exchange during the year that they

18   owned the crane 35 times.  Mr. Farris himself conducted five

19   of those exchanges.  Mr. Farris, the operator at all

20   relevant times, will testify that the training he received

21   from LUS instructed him on how to properly exchange the

22   booms.  He will testify that the LUS trainer actually had he

23   and D'Angelo remove the boom section during the exchange.

24   Mr. Farris will admit that he knew before this accident that

25   the only locking pin to manipulate during the boom exchange

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    was T3, and he knew never to touch the T4 pin.  Andrew

2    Farris, the man who went through our training, knew that and

3    knew it as a result of the training and knew it before this

4    accident.

5         Farris as I mentioned will testify that he could

6    distinguish the T3 from the T4 pin, and perhaps we're all

7    beginning to understand why the Liebherr Germany manual says

8    you have to be an expert on this crane if you're going to do

9    these types of maneuvers.  These pins are very near each

10   other.  You have to be able to tell the difference.

11        Well, even as untrained, our untrained eyes can tell

12   the difference here, here is the T3 pin going into the boom

13   section.  It is down and recessed into that opening so it is

14   unlocked as it goes in because it's going to be locked when

15   it's put in, and it has this very obvious circular collar

16   with bolts around it (indicating).

17        Here is the T4 pin, always locked, never to be

18   touched does not have that collar, and you can see, even we

19   can see, this one is unlocked and recessed.  This one is

20   above the bore even casting a bit of a shadow back here

21   (indicating), it is in the locked position.

22        That's very obvious for us to see, but still,

23   nonetheless, the manual says you have to be an expert if you

24   are going to be the one doing this maneuver to be able to

25   distinguish that.

1          Some other points to remember about in our

2     chronology and our time frame here.  When Henry Ward is

3     doing this training that they are claiming was negligent, in

4     January and February of 2017, the Product Safety Bulletin

5     does not exist.  The event that was the genesis of the

6     Product Safety Bulletin, an event that occurred in Japan,

7     has not yet even occurred.  There are no known incidents of

8     a sudden boom retraction due to manipulation of the

9     incorrect T4 pin or from somebody mistakenly leaving the

10     cover on the T3 pin.  So Henry Ward has the benefit of none

11     of that information that he could have or would have passed

12     on to Sims Crane.

13          The evidence you will hear about this event in Japan

14     that spurred Germany to issue the Product Safety Bulletin

15     was an event that occurred five months after Henry trained

16     Sims in Japan.  It did not involve what we have in this

17     case, an untrained person leaving the dust cover over the T3

18     pin while they try and install it.  Instead you'll hear the

19     evidence that it involved someone who was manipulating the

20     pins on the 84-meter boom while it was still on the ground

21     awaiting to be placed up into section two.  Somebody in

22     Japan began to manipulate those pins and there was an

23     incident.

24          Importantly, LWE, the German company, never advised

25     our client LUS or any of its employees about this event in

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Japan, or that this event was the impetus for an upcoming
2    Product Safety Bulletin.
3         The event and the reasons for the Product Safety
4    Bulletin were not known to our client until much later after
5    this litigation.
6         Liebherr US's first notice of anything is in
7    November 2017 when the Product Safety Bulletin comes out and
8    it's issued by the manufacturer in Germany.  Liebherr US has
9    no knowledge of the reason or the pre-disposing event that
10   led to this.  LUS receives Product Safety Bulletins and
11   modifications from Germany frequently.  This isn't the only
12   one.  It's not an isolated case.  Germany is constantly
13   trying to update their manuals, their warnings and keep
14   product information coming to the client.
15        The request that LUS receives from Germany, and
16   you'll see, it is a list of 35 cranes that Germany says they
17   think are in the U. S.  It lists 073386 as among the 35
18   cranes, and as we mentioned earlier, the list we get from
19   Germany identifies again Schuch in New York as the owner.
20   And it asks can you attempt to locate or confirm that these
21   cranes are still in the U. S.?
22        Liebherr has conflicting records for 073386.  Is it
23   Schuch or is it Sims?  We do have contradictory information
24   in our systems.  So what do they do?  They sold this crane
25   to Schuch and the notices provision in the contract says

54

1   contact us at the address or the numbers we provided.

2        Mr. Adams had subsequently, or LUS had subsequently

3   learned that Mr. Adams had another telephone number, and he

4   confirmed this in his deposition, hard to see but he was

5   asked is this your phone number 240-463-8474, and he said

6   that is correct.

7        That phone number was different than the one that

8   Schuch provided on the contract, but nonetheless LUS was

9   able to get that phone number from Mr. Adams.  And in

10  January of 2018, when they're trying to reconcile the

11  differences in their systems, they make efforts to call

12  Mr. Adams of Schuch at the number, three attempts to call

13  him on two separate days.  They do not get through to him

14  but they're working on resolving the contradictory

15  information.

16       Schuch and Mr. Adams never responded to LUS's calls.

17  You'll hear Mr. Adams testimony that he frequently deletes

18  any messages that are left for him.  There remains this

19  contradictory information on the records regarding this

20  crane, and ultimately as LUS starts to distribute these

21  Product Safety Bulletins, the Sims Crane is not the only one

22  where there's contradictory information.  You'll hear of the

23  35, about 28 or so they were able to confirm and get out

24  rather quickly.  There were about six or seven they were not

25  able to, and 073386 is one of those seven.

55

1         The Product Safety Bulletin comes first and then LUS

2    is instructed to follow that in a different mailing with the

3    new cover plate and the new details which they begin sending

4    out in January of 2017.  And you'll hear the information on

5    when the 35 crane owners received the modification.  Sims

6    received theirs as we know after the February 19th, 2017

7    crane accident and there's another crane operator that LUS

8    was not able to get the modifications to until later in

9    February after this accident as well.  Sims was not the only

10   one.

11         And, again, any discussion of the ultimate

12   supplement to the Operator's Manual where they rewrite the

13   section on the pinning, that comes out over a year later,

14   couldn't possibly be involved in any causation of this case.

15         What did the LWE Product Safety Bulletin do?  How --

16   much has been made that if they had that, that this accident

17   would have would not have happened.  What the Product Safety

18   Bulletin does, and you'll see it in evidence, is it warned

19   the owners of the crane about unlocking the wrong release

20   screw or pin and that that could result in an uncontrolled

21   retraction of the crane.

22         But it said, all you have to do is carefully follow

23   the relevant sections of your current Operator's Manual, the

24   manual that you have.  It did not provide new instructions

25   in that Product Safety Bulletin.  It didn't say, hey, if you

1    mistakenly touch T4, here's what you need to do, didn't say

2    anything about that.

3            It warned the owners that the failure to follow the

4    instructions in the existing instructions, in the existing

5    manual could result in improper mounting of the sections,

6    personal injury, death and property damage.

7            It advised the crane owners you can continue to

8    operate your crane, just meticulously follow the crane

9    Operator's Manual.  And, again, Sims Crane at all times had

10   that manual.  Andrew Farris read that manual every time he

11   did this crane.  So this Product Safety Bulletin is held up

12   to the "be-all and end-all" and savior of this case doesn't

13   say any -- doesn't provide any of the information that

14   plaintiff claims would have prevented this accident.

15           Instead, it says follow your existing manual which

16   you already have.  Here's the section of the product man --

17   product bulletin itself.  "We would like to emphasize to you

18   as the operator of the above-mentioned mobile crane types

19   that for dismounting and mounting of the telescope sections,

20   you must carefully follow the relevant sections of the

21   Operation Manual.  In particular"..., and it cites to the

22   sections.  "Failure to follow these important instructions

23   could result in the incorrect mounting/dismounting of the

24   telescopic sections and cause property damage, serious

25   injury, possible loss of life."

1          Again, it doesn't provide any new instruction about

2    what to do if you mistakenly leave the cover on and somebody

3    touches the T4 pin.

4          Importantly, it says, "In the meantime, you can

5    continue to operate your crane.  Just meticulously follow

6    the steps in the Operator's Manual."

7          The Product Safety Bulletin does not provide

8    information on what to do if the T4 pin is manipulated, how

9    to -- the steps to be taken if it's mistakenly unlocked or

10   locked, or what to do to make sure that the T4 pin is

11   restored to its proper position if it's mistakenly

12   manipulated.  Doesn't provide any information about that

13   subject.

14         We believe that the evidence will show that

15   Mr. Ward's training and Liebherr US's issuance of the

16   Product Safety Bulletin were not a competent cause of this

17   accident.  The manual says only experts are to be involved

18   in the assembly and disassembly of this crane, and the

19   evidence will be that Shane Burrows was no expert.

20   Mr. Goodman said he is currently an NCCCO certified rigger.

21   Back in 2016 he wasn't certified in anything.  He was an

22   apprentice.

23         He was completely untrained on the LTM 1500.  He

24   will admit to you that he, Shane Burrows, never read the

25   Liebherr-Werk Ehingen manual.  He was simply following

1    instructions of the lead operator Mr. Farris.  Mr. Farris,

2    the trained and competent operator, should have been up on

3    top of that boom when they were exchanging it.  He wasn't.

4    He told the apprentice, Shane, you go up there, and when you

5    see the pin come through, lock it.  The mistakes made by

6    Shane Burrows includes leaving the dust cover on, and then

7    not recognizing the T4 pin.  We looked at it earlier.  It's

8    fairly easy to recognize the difference between a locked --

9    sorry, an unlocked T3 pin and a locked T4 pin.  Shane

10   Burrows could not make the distinction that day.

11   Mr. Burrows relied on an untrained apprentice that never

12   read the manual for this critical pinning procedure.

13          He manipulated the T4 pin incorrectly.  But Andrew

14   Farris, the trained person, once Shane Burrows said, hey,

15   this pin doesn't seem to be locking.  Actually when I turn

16   it, it seems to be unlocking, there's an issue up here,

17   Andrew.  That's when Farris finally goes up on top of the

18   boom section.  And Farris will testify he realized that

19   Shane Burrows had made this mistake.

20          He will say that's -- he said, Shane, *that's not the*

21   *T3 pin.  That's the T4 pin.  Back this section back out.*

22   They back it out.  He can see Shane has left the dust cover

23   over the T3 pin.  They take the dust cover off and Farris

24   tries to reset that T4 pin to what he thinks is the correct

25   position, but he doesn't.  He doesn't set it up through the

```
 1    bore far enough to lock it into place.  He leaves it lower
 2    than it should be, lower than its factory setting.  And
 3    later when the cylinder comes through during the operations
 4    for this crane, the cylinder shears that pin off and now
 5    there's no locking pin securing the T4 pin section.  Those
 6    are the errors that led to this accident.
 7          Much has been made about the rules and the
 8    procedures at LUS.  Sims Crane has their own safety
 9    procedures.  This is a document that Andrew Farris was given
10    when he was hired.  It's Sims Crane's general safety rules.
11    Farris ignored his own company safety rules which include --
12    he followed No. 6, as we'll hear.  He reported on an unsafe
13    condition to his manager and supervisor immediately.  But
14    No. 7 says, "if at any time you're unsure of how to perform
15    a task, stop and request assistance from your manager."  No.
16    8, "do not remove or bypass any guards on any machinery."
17    You'll hear that he violated that.  And, 10, "do not attempt
18    to repair or tamper with equipment that is not working
19    properly.  Immediately report it to, the condition, to your
20    manager and supervisor."
21          When Farris has the issue on the day of the
22    accident, here's what happens.  T4 pin has been mistakenly
23    manipulated three days prior when he was setting up the
24    crane.  Now it's Monday morning.  Now he's at the Hampton
25    Inn job site here in Tampa ready to put it out.
```

60

1        He has the cylinder pin in to 6, unlock the pin,

2   extend 6 out, release the pin, cylinder releases from the

3   sides, goes back, grabs 5.  Pushes 5, pulls the 5 pin down,

4   pushes 5 out, releases the 5 pin up in the lock, unlocks

5   from the side.  Goes back to grab 4.  And as he goes to push

6   4 up, the machine, the crane, the system will not let him

7   unlock that cylinder arm.  And he's puzzled by that.  He

8   tries the whole procedure again and the crane senses that

9   there's an issue and is not letting him unlock the cylinder

10  arm from that T4 pin.

11       So Farris, you will hear, he followed the first

12  guideline which was he immediately called his supervisor, a

13  man named Mike Gay, and Mike Gay said, *Andrew, hold on.*

14  *I'll have a technician out there right away.*  That

15  technician was seven miles, eleven minutes away, but Andrew

16  did not wait for that technician to show up.  Instead, he

17  called this gentleman Bill Piper, another operator who may

18  have had a ton of experience as a crane operator, but had

19  never operated an LTM 1500, had never read the crane manual,

20  and he gives -- Piper gives Andrew Farris the recommendation

21  that, you know what?  Maybe you got to put it into manual

22  mode.

23       Now, again, the system is protectively not letting

24  Farris unlock the cylinder from T4, but what Andrew does is

25  he follows the advice of his colleague who's never read the

61

1    manual and he manually releases the pin from the cylinder in
2    T4 and retracts it to go get T3.  Andrew has now violated
3    another of Sims' provisions which is do not bypass the
4    safety mechanisms on this crane.
5          And it's when he pins into T3 and starts to push out
6    T3, there's a lot of movement on this crane.  There's no
7    pin.  There's no locking pin in T4.  There's no cylinder
8    pins in the side of 2.  It's just held up by friction, and
9    that's when it's unsecured, and the movement of the boom
10   causing the uncontrolled telescoping inward and the damage
11   to the crane.
12         We believe that the evidence will show that Liebherr
13   US owed no duties under the facts of this case.  You will
14   hear no evidence that support the imposition of a duty on
15   our client.  Sims Crane didn't purchase this crane from LUS.
16   It didn't purchase any training from LUS.  Sims Crane had no
17   special relationship with LUS, and as you've heard, Sims
18   Crane stipulates that the crane had no defects.
19         There's no legal argument made here that LUS had
20   some post-sale duty to warn a non-manufacturing -- a
21   non-manufacturing seller like LUS had a post-sale duty to
22   warn anyone, let alone downstream purchasers of its
23   products.  Instead the legal argument that's presented in
24   the trial brief is about a zone of risk that we don't
25   believe is supported.

1            The facts established that LUS's training was not a
2   proximate cause of this accident; that Sims Crane operators
3   will admit that they were fully trained in the boom exchange
4   procedure.  They knew how to recognize the T3 pin.  They
5   knew they had to remove the dust cover and the dangers
6   associated with improper assembly.  The operators that LUS
7   trained knew that.  Shane Burrows who didn't attend our
8   training and never read our manual, he didn't know any of
9   that.

10           Sims Crane will admit that its operators were
11  competent and qualified following our training.  And,
12  importantly, Sims Crane's operators safely and properly
13  exchanged the boom section 35 times before this accident.
14  That's part of the joint pretrial stipulation of facts.
15  It's also in the OSHA records.  The process had been
16  completed approximately 35 times previously.

17           How can one argue that training was insufficient
18  when they had done it properly 35 times?  We believe the
19  facts will further establish that the after-accident receipt
20  of the Product Safety Bulletin was not a cause.  It provided
21  no new instructions.  It just said follow the manual.  It
22  provided no instructions on the T4 pin or what to do to
23  reset it.  And Farris admits that he needed -- everything he
24  needed to know to do the exchange he got from his training
25  and from reading the manual.  He'll admit that he already

1   knew that the improper assembly could cause death, injury or

2   property damage.

3        We have two defense experts that the Court will

4   hear.  Jeff Travis is our crane and safety expert who will

5   testify that Sims Crane violated OSHA and other crane safety

6   standards in their assembly.  He'll testify that the German

7   safety campaign with the product bulletins did not provide

8   the customers with any more information on what was already

9   available in the existing manual.  And he will testify that

10  it is pure speculation for anyone to testify that the prior

11  receipt of the bulletin or modifications would have changed

12  the outcome of this event.

13       We'll also be presenting Dr. Rachel Kelly, a human

14  factors scientist, who will testify in the effectiveness of

15  the warnings in this context, and that in her opinion based

16  on Andrew Farris' prior history of behavior, he was unlikely

17  to follow any additional instructions that would be given.

18  And she will testify that the training provided by Liebherr

19  US adequately described the process and the hazards

20  associated with the boom exchanges.

21       On the damages side of the case, this is purely an

22  insurance reimbursement claim.  Sims Crane's witnesses who

23  are cooperating with their insurance company will testify

24  that they believe they had losses beyond the mere damage to

25  this crane, but Sims Crane didn't join this lawsuit which we

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

64

```
1    would suggest is their admission that they knew they were at

2    fault.  This claim is only for insurance subrogation

3    damages.

4             MR. GOODMAN:  Your Honor, may I object?  This is

5    getting into a little bit of an argument.

6             THE COURT:  Yeah.  Let's take a look at the evidence

7    and finish up, please.

8             MR. PENDER:  The evidence will be that NBIS, the

9    insurance company, charged Sims Crane over a million dollars

10   in premiums every year, and when they finally had a loss

11   that they now seek to have reimbursed.  And recoverable

12   damages could be either the cost to repair or the difference

13   in the fair market value before and after.

14             As we've seen the cost to repair this crane back to

15   its condition would have been $1.4 million, and yet there's

16   1.7 being claimed in this case.

17             The evidence of how they got to their pre-accident

18   valuation of fair market value, you'll hear from their

19   expert Mr. Bristow is that he used comps.  He went out to

20   the market and he found four similar cranes that he used as

21   comps for pricing.  But we'll point out that the comps that

22   he used were not actually appropriate and that his

23   methodology is not reasonable.

24             He used comps that were cranes listed for sale; in

25   other words, he just assumed that whatever price was listed
```

65

1    as the offer price was the value of that crane.  He didn't

2    find out whether or not any of the four comps that he uses

3    actually did sell for that price.

4            Our defense damages expert Dennis Muron will testify

5    that the plaintiff's pre-accident fair market value is

6    inflated.  Two of the four comps that Mr. Bristow uses were

7    incorrect.  One was a crane that he listed for $3.184

8    million and it was later listed for a reduced price of about

9    half that amount.  And the fourth of his four comps which

10   had been listed -- he listed valued at $3.1 million as of

11   the date of his report was still for sale and had never been

12   sold, so we don't know if that amount was correct or

13   reasonable or not.

14           There are other methods that the Court will hear

15   about to determine the value of the crane.  Liebherr sold

16   the crane for $3.1 million.  Sims used it for a year.  Their

17   own expert will say if you use a crane, you should take

18   5 percent depreciation.  That results in a pre-accident

19   market value of less than $3,000,000, or 2.945.

20           THE COURT:  You're right at the one-hour mark, so

21   how much more longer do you have?

22           MR. PENDER:  I'll finish up, Your Honor.  We believe

23   that there are several unescapable conclusions that will

24   reveal itself at the end of the plaintiff's evidence; that

25   the plaintiff insurance company's claim on negligent mailing

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    of the LWE safety campaign fails because the insured will

2    admit that it was properly trained and fully knowledgeable

3    on how to diagnose these issues with the locking pins and

4    how to exchange the boom sections.

5          Plaintiff insurance company's claim of negligent

6    distribution of the Product Safety Bulletin also fails

7    because nothing in the manual provided additional

8    information not already in the manual or known by their

9    operators, and the claim that the different training or

10   earlier issuance of the Product Safety Bulletin would have

11   prevented this accident is pure speculation.  Thank you.

12         THE COURT:  Thank you.  Let's take a recess.  Given

13   that it's 11:30, it seems to make more sense to take a

14   longer recess and have it be lunch and come back.

15         What I'd like to find out first from plaintiff is

16   your first witness is the testimony rather lengthy or is it

17   a short testimony?

18         MR. GOODMAN:  No.  The first witness will actually

19   be Liebherr US, and I expect that may go on for the

20   afternoon, Your Honor.

21         THE COURT:  Then let's go ahead and take a recess.

22   It's 11:30 now.  I mean it seems to me that we just do an

23   hour lunch break.  Will that give enough time for, I'll

24   start with you, Mr. Goodman, for plaintiffs to be able to do

25   whatever you need to do to prepare for the afternoon of

```
 1        testimony?

 2                 MR. GOODMAN:  Yes, Your Honor.

 3                 THE COURT:  And Mr. Cremer, Mr. Pender, how about

 4        for the defense?

 5                 MR. CREMER:  That's fine.

 6                 THE COURT:  We'll take an hour.  We'll come back at

 7        12:30, and we'll begin right then with the first witness.

 8        We'll go for -- you know, we'll take natural breaks, try to

 9        take a break every hour and a half, two hours for a comfort

10        break and then we'll run to 5:00 today.

11                 MR. GOODMAN:  One bit.  The parties, I don't think

12        we've advised the Court of it, the parties are going to

13        tender the examinations of the damage experts.  We will not

14        be calling them live.  We previously advised the Court that

15        we would.  We are just going to designate those.

16                 MR. CREMER:  We agreed to that.

17                 THE COURT:  Are there other matters -- I'm happy to

18        give you all more time over the lunch hour if there are

19        other issues like that that you're still working through,

20        and an hour is just sort of my general time frame where I

21        want sometimes where people are wanting the trial to wrap up

22        faster, we'll even shorten it to a half hour depending on

23        what people have brought as their snacks and otherwise, but

24        the default is an hour.

25                 Are you needing more time to address other issues
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

 1    like that during the break?

 2            MR. GOODMAN:  We are not.

 3            MR. CREMER:  I think we are fine with an hour.

 4            THE COURT:  We'll come back at 12:30 and then

 5    plaintiffs can be ready to call their first witness.

 6            Is either side invoking the rule of sequestration?

 7            MR. GOODMAN:  Yes, Judge.

 8            THE COURT:  I would just ask, you all know who your

 9    witnesses are better than we do.  Just make sure that

10    they've all been instructed to remain in the hallway and

11    we'll call them in one at a time as it's their turn to

12    testify.

13            Thank you.  We're in recess until 12:30.

14    (Lunch recess.)

15            THE COURT:  Mr. Goodman, you may call your first

16    witness.

17            MR. GOODMAN:  Thank you, Your Honor.  Plaintiffs

18    call the defendants Liebherr US.

19    (Witness sworn.)

20            COURTROOM DEPUTY CLERK:  Have a seat and once you

21    attach the little lavalier, I want you to state your name

22    and spell it, please.  Can you state your name and spell it

23    for the record, please.

24            THE WITNESS:  My name is Ralf Vieten, R-A-L-F,

25    V-I-E-T-E-N.

1              COURTROOM DEPUTY CLERK:  Thank you.

2              MR. GOODMAN:  Your Honor, before we start, I'm

3     having a little issue with the monitor.  I'm not sure if

4     there's --

5              COURTROOM DEPUTY CLERK:  Is your monitor working,

6     sir?

7              THE WITNESS:  Yes, it is.

8              THE COURT:  Do you want the lights turned down a

9     little bit?

10             MR. GOODMAN:  Mr. Vieten, I'm going to provide you a

11    copy of the exhibits you'll be looking at today.

12             THE WITNESS:  Yes.

13             MR. GOODMAN:  Let the record reflect that I've

14    provided a copy at the beginning of the case to the

15    defendants, Your Honor.

16             THE COURT:  Is that the entire exhibits that you put

17    in front of him?

18             MR. GOODMAN:  That is the entire exhibit, and then I

19    provided him all of the exhibits, and here is a copy of

20    Plaintiff's Exhibit 26 and the condensed version of 26, 110

21    and 111.

22             THE COURT:  The record should reflect that all

23    binders containing copies of all the exhibits are now on the

24    table in front of the witness.

25

1                          RALF VIETEN,

2      having been first duly sworn under oath, was examined and

3      testified as follows:

4                          DIRECT EXAMINATION

5      BY MR. GOODMAN:

6          Q    Mr. Vieten, who are you presently employed with?

7          A    Liebherr.

8          Q    How long have you been employed with them?

9          A    First time from 2001 to 2009.  Second time, 2017

10     until today.

11         Q    What's your current title?

12         A    General Manager of Customer Service.

13         Q    What was your title between 2017/2018?

14         A    2017, the end of 2017, customer serv -- again,

15     general manager customer service.  Beginning of 2017 I was

16     not with Liebherr.

17         Q    And what were your job responsibilities until 2018?

18         A    Customer service.

19         Q    Are you familiar with the events that occurred on

20     February 19th, 2018 when a 2012 Liebherr LTM 1500 had an

21     uncontrolled retraction of boom sections 6, 5 and 4 while

22     being operated by Sims Crane & Equipment Company?

23         A    Yes, I do.

24         Q    So if I go over some definitions maybe so we can

25     stay on the same page.  If I refer to the loss or the

       UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   incident or the event, can we agree that that's the

2   February 19th, 2018 event?

3       A    Yes.

4       Q    If I refer to Sims, can we agree that's Sims Crane &

5   Equipment Company?

6       A    Yes.

7       Q    And during today's discussion, if I refer to the

8   crane or the crane at issue, is it okay that we're referring

9   to the 2012 Liebherr LTM 1500 with serial number 073386 that

10  was involved in the loss?

11      A    Yes.

12      Q    Liebherr-Werk Ehingen is a corporation that

13  manufactures cranes; is that correct?

14      A    That's correct.

15      Q    If I refer to Liebherr Germany, can we agree that is

16  Liebherr-Werk Ehingen GmbH that we're referring to?

17      A    Yes.

18      Q    Liebherr Germany is not a defendant in this case.

19  Is that your understanding?

20      A    Yes.

21      Q    If I refer to Liebherr or Liebherr US, will you

22  understand that's the defendants in this case?

23      A    Yes.

24      Q    And Liebherr US is a sales, service and training

25  organization; is that correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A      Yes.

2      Q      Liebherr US does not manufacture cranes; correct?

3      A      That's correct.

4      Q      Liebherr US does not publish operator's manuals; is

5   that correct?

6      A      That's correct.

7      Q      Liebherr US does not publish product safety

8   bulletins; is that correct?

9      A      That's correct.

10      Q      In 2016 Liebherr US sold a crane at issue; is that

11   correct?

12      A      To my knowledge, yes.

13      Q      And Liebherr US was aware that Sims owned the crane

14   since November 17th, 2016; isn't that correct?

15      A      No.

16      Q      On November 10th, 2017, Liebherr Germany provided

17   Liebherr US with a Product Safety Bulletin warning of the

18   risk associated with manipulating the T4 pin on the crane;

19   is that correct?

20      A      That's correct.

21      Q      Liebherr Germany also provided Liebherr US with a

22   retrofit cover -- excuse me -- Retrofit Kit to send to all

23   LTM 1500 crane owners; is that correct?

24      A      That's correct.

25      Q      And the Product Safety Bulletin Retrofit Kit

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   provided that the risk associated with manipulating the T4

2   pin on the 50-meter boom of the crane that the T6, T5 and T4

3   boom sections can collapse in on itself; correct?

4        A    Say that again?

5        Q    The Product Safety Bulletin and the Retrofit Kit

6   provided that the risks associated with manipulating the T4

7   pin on the 50-meter boom of the crane is at the T6, T5 and

8   T4 boom sections can collapse in on itself; is that correct?

9        A    That's correct.

10       Q    That's exactly what occurred at the loss; correct?

11       A    Yes.

12       Q    Liebherr US had a duty and responsibility to send

13   the Product Safety Bulletin and Retrofit Kit to Sims in a

14   timely manner before the loss; correct?

15       A    Not necessarily to Sims, to the customer or the

16   owner at the time.

17       Q    And Sims was an owner at the time; correct?

18       A    No.

19       Q    Schuch was an owner at the time; correct?

20       A    Correct.

21       Q    And Liebherr US did not send it to Schuch prior to

22   the loss; is that correct?

23       A    That's correct.

24       Q    Liebherr US failed to provide a product safety --

25            THE REPORTER:  Can you repeat that slower?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1           MR. GOODMAN:  Sorry, I got going.  I apologize.

2    BY MR. GOODMAN:

3       Q    Liebherr US failed to provide the Product Safety

4    Bulletin and Retrofit Kit to the entity it understood owned

5    the crane before the loss; is that correct?

6       A    That is correct.

7       Q    Between January 30th, 2017 and February 4th, 2017,

8    Liebherr US trained Sims on the crane; correct?

9       A    Do not know.  I wasn't there.

10      Q    The corporation doesn't know, sir?

11      A    The corporation has documents of this.  If it's in

12   the documents then it is, yes.

13      Q    Have you been provided any documents that would

14   educate you on whether or not Liebherr US trained Sims on

15   the crane between January 30th --

16      A    Yes.  That is correct.

17      Q    At the training, Liebherr US had the duty and

18   responsibility to provide the Sims operators with

19   comprehensive knowledge of the crane including safety

20   concerns; correct?

21      A    Correct.

22      Q    The risks associated with manipulating the T4 pin on

23   the 84-meter boom of the crane is a safety concern; correct?

24      A    Correct.

25      Q    The risks associated with manipulating the T4 pin on

1    the 84-meter boom of the crane is that the T6, T5, T4 boom

2    sections can collapse in on itself; correct?

3        A    Correct.

4        Q    And at the time of the training, Liebherr US was

5    aware of the risks associated with manipulating the T4 pin

6    on the 84-meter boom of the crane is that the T6, T5 and T4

7    boom sections can collapse in on itself; is that correct?

8        A    Correct.

9        Q    Liebherr US failed to inform Sims of the risk

10   associated with manipulating the T4 pin during the training;

11   correct?

12       A    Correct.

13       Q    On February 19th, 2018, the cranes T6, T5 and T4 pin

14   boom sections collapsed in on itself because the T4 pin had

15   been inadvertently manipulated two days before by a Sims

16   employee; correct?

17       A    Correct.

18       Q    On February 19th, 2018, when the cranes T6, T5 and

19   T4 boom sections collapsed in on itself, the crane was

20   damaged; correct?

21       A    Correct.

22       Q    And Liebherr US determined it would cost

23   $1,452,492.08 to repair the damage to the crane caused by

24   the boom collapse; correct?

25       A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    And Liebherr US also determined that a new LTM 1500

2    would cost $4,580,000; correct?

3        A    Correct.

4        Q    Let's talk about some OSHA findings in the report

5    regarding the loss.  So I'm showing you Exhibit 1.  Do you

6    recognize this, sir?

7             THE COURT:  Let's hold on.  Ms. Morgan, do you think

8    it's a cord?  Before it wasn't doing that.  Let's go off the

9    record.

10   (Discussion had off the record.)

11            THE COURT:  Back on the record.

12   BY MR. GOODMAN:

13       Q    Showing you what's been marked as Exhibit 1 for

14   identification, sir.  Do you see that?

15            MR. CREMER:  I would object to the foundation of the

16   admissibility of this document in use.

17            THE COURT:  Go ahead and set the foundation for it.

18   BY MR. GOODMAN:

19       Q    Sir, do you recognize this document as a U. S.

20   Department of Labor OSHA report, Notification Results of

21   Facility Investigation, sir?

22       A    Yes.

23       Q    Have you seen this document before, sir?

24       A    Yes.

25            MR. GOODMAN:  Your Honor, I'd like to submit Exhibit

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      1 for identification into evidence as Exhibit 1.

2              THE COURT:  Any further objection?

3              MR. CREMER:  Yes, Your Honor, I object.  There's no

4      foundation as to the content of this document being reliable

5      whatsoever.  We don't know who authored it.  We don't know

6      under what circumstances it was made, and we have no

7      foundation for its admissibility at this point.

8              THE COURT:  Overruled.  And you can ask questions

9      about what he knows about it and what reliance he had on it,

10     how it was used in the course by the company.  Go ahead.

11     BY MR. GOODMAN:

12         Q    Are you familiar with Viking Rigging & Crane

13     Erecting, Inc., sir?

14         A    No, I'm not.

15         Q    Are you familiar with Sims Crane & Equipment

16     Company?

17         A    Yes, I am.

18         Q    And do you understand that Sims Crane & Equipment

19     Company is a Tampa, Florida based crane and rigging company?

20         A    Yes.

21         Q    Do you understand that on February 19th, 2018 at

22     approximately 7:00 a.m. Christopher Wade, age 38 and four

23     additional employees of Viking Rigging & Crane Erecting,

24     Inc., along with four employees of Sims Crane & Equipment

25     were in the process of erecting a Potain MDT 389 tower

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    crane?

2        A    Yes.

3        Q    Did you understand that during the scoping out of

4    the boom sections of this crane, Liebherr LTM 1500 8.1, the

5    crane suffered a sudden and uncontrolled retraction of the

6    boom sections that caused the hook and block suspended

7    approximately 60 feet in the air to come straight down?

8        A    Yes.

9        Q    And that the hook and block came straight down and

10   struck Mr. Wade on his right side?

11       A    Yes.

12       Q    Mr. Wade was transported to Tampa General Hospital

13   where he was admitted; correct?

14       A    Yes.

15       Q    On April 12th, 2018, Mr. Wade succumbed to his

16   injuries while he was still in the hospital; correct?

17       A    Yes.

18       Q    Sims Crane & Equipment Company was contracted to do

19   this job by reinforced structures for a time frame of six

20   months to provide tower crane services for the Hampton Inn

21   Homewood 2 Suites construction project located at 1155 East

22   Kennedy Boulevard in Tampa, Florida; correct?

23       A    I guess, yes.  I mean I have no knowledge of where

24   this all went, you know, so.

25       Q    Do you understand that Sims Crane & Equipment

1    Company subcontract with Viking Rigging & Erecting was to

2    erect a tower crane to assist?

3        A    I have no knowledge of that, no.

4        Q    Do you understand that Sims Crane & Equipment

5    Company supplied a Liebherr LTM 1500-8.1 rubber wheeled

6    crane as the assist crane in the erection of the tower

7    crane?

8        A    It looks like it, but I'm not sure.  I don't know

9    how they did it.

10       Q    The corporation is unaware of that, sir?

11       A    Unaware.

12       Q    What was that answer?

13       A    Unaware.

14       Q    The assist crane mobilized and arrived at the site

15   on Saturday, February 17th, 2018; is that correct, sir?

16       A    Yes.

17       Q    And the crane was placed in the position to give it

18   the maximum swing radius to pick up the tower crane pieces

19   off the trailers while not swinging suspended pieces over

20   the heads of other trade employees working on the foundation

21   form work; correct?

22       A    We don't know that.

23       Q    You don't know that?

24       A    The corporation cannot know that.

25            MR. CREMER:  I object to this testimony.  Liebherr

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

80

1    was not present for this event, was made aware of it after

2    the event, and, of course, the corporation has no knowledge

3    --

4           THE COURT:  You don't need to say all that when you

5    can just object, and he's testifying fine.  He's saying he's

6    being asked if he knows about it and he's saying he doesn't

7    know, so this line of testimony can continue.

8           MR. CREMER:  I understand, Your Honor.  What's the

9    point of going through a document that the corporation or

10   this witness has no knowledge of?

11          THE COURT:  Well, you can ask him on

12   cross-examination.  At this point, he can go ahead and

13   continue on with the testimony.

14          Go ahead.

15   BY MR. GOODMAN:

16       Q    The crane was set up and inspected, correct, the

17   Liebherr crane?  Is that correct?

18       A    From the customer?

19       Q    The customer; correct.

20       A    The customer, but I don't know how they did it.  The

21   corporation does not know.

22       Q    Do you understand that they did inspect the crane,

23   though, at the work site?

24       A    I do not know.

25       Q    Liebherr US undertook an investigation of this

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

81

 1    incident after the loss; correct?

 2        A    That's correct.

 3        Q    And did it find out independent -- did it conduct an

 4    independent investigation of what the events were that

 5    occurred?

 6        A    Yes.  I think they did, but I have no knowledge of

 7    what they did on this and how they did it.

 8            MR. GOODMAN:  Can we take a five-minute break,

 9    Judge?

10            THE COURT:  You may.

11   (Recess had.)

12   BY MR. GOODMAN:

13        Q    Mr. Vieten, do you understand that on the morning of

14   the loss, Viking Rigging & Crane Erecting employees arrived

15   on the site at approximately 6:30 a.m. on February 19th,

16   2018 to scope out the area for the erection of the tower

17   crane?

18        A    That's -- if that's in the report, yes, it is, yes.

19        Q    Do you understand that this was the first time

20   Viking Rigging & Crane Erecting --

21            THE REPORTER:  Can you please slow down.  First

22   time...

23   BY MR. GOODMAN:

24        Q    Do you understand that this was the first time

25   Viking Rigging & Crane Erecting, Inc.'s, employees had been

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   to the site?

2       A    I'm not aware of that.

3       Q    Do you understand that Sims Crane's account manager

4   and personnel arrived on site at approximately 7:00 a.m.?

5       A    I guess so, yeah.

6       Q    And during the time frame between 7:00 a.m. and 7:15

7   a.m., the employees of both companies gathered to discuss

8   the Pre Task Safety Analysis commonly referred to as a Job

9   Hazard Analysis for the Potain MDT 389 tower erection?

10      A    I do not know.

11      Q    Do you understand what the safety analysis outlined,

12  what the roles of each of the supervisors was and the

13  sequence of erection to include the weight of the pieces to

14  be lifted and the order of each piece to be lifted?

15      A    No, I do not know.

16      Q    Do you understand that upon completion of the safety

17  analysis meeting, the employees signed the acknowledgment

18  sheet and went to their respected areas to begin the work?

19      A    Okay.  I don't know, again.

20      Q    Do you understand that the owner of Viking Rigging &

21  Erecting, Inc., was designated the supervisor of the

22  erection of the tower crane and had an overall

23  responsibility for the process?

24      A    Do not know.

25      Q    Do you understand that the first of the tower crane

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    parts arrived at approximately 7:30 a.m. delivered by Sims

2    Crane equipment tractor trailers?

3        A    No, not aware of that.

4        Q    Do you understand that at approximately 7:30 a.m.

5    the Sims Crane operator began a walk-around inspection of

6    the lower part of the assist crane to check for any leaks or

7    displacement of the level of the crane from the initial

8    setup that was performed on the previous Saturday?

9        A    Not aware of that.

10       Q    Do you understand that upon completion of the lower

11   walk-around inspection, Sims Crane operator performed the

12   daily inspection of the upper parts of the crane, and upon

13   completion began to program the on-board crane computer for

14   the particular boom configuration for the planned lifts?

15       A    No knowledge of that either.

16       Q    Do you understand that the crane operator then began

17   to scope out the boom sections?

18       A    That's what the report says, yeah.

19       Q    Do you understand that the boom sections scope out

20   one at a time and lock in place?

21       A    Okay.  Again, in the report.  I have no knowledge of

22   saying that that is the case, yes.

23       Q    So Liebherr doesn't have any knowledge that the boom

24   sections on the LTM 1500 scope out one at a time and lock in

25   place?

1      A      Yes, we do.  Yeah, according to the report, yes, we
2   do.
3      Q      And besides the report, Liebherr US doesn't know how
4   the crane itself works; correct?
5      A      That crane particular, in that particular case, no,
6   we don't.
7      Q      The boom cylinder will pin a boom section and then
8   scope the section fully out; correct?
9      A      Correct.
10     Q      And once the section fully scopes out, it locks in
11  place by pins and the boom cylinder would unpin and retract;
12  correct?
13     A      That's correct.
14     Q      The process repeats until all the boom sections are
15  scoped out and pinned; correct?
16     A      Correct.
17     Q      And the crane computer controls this process once
18  the information is programmed and executed; correct?
19     A      Correct.
20     Q      The crane computer will also monitor the cylinder
21  and boom section positions and will report error codes in
22  the event of any faults; correct?
23     A      Correct.
24     Q      Do you understand that on the date of loss that
25  Andrew Farris, the crane operator, scoped out and locked

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    boom section 6, 5 and 4?

2        A    Yes.

3        Q    Do you understand that Andrew Farris stated that the

4    boom cylinder would not unlock from section 4 to enable it

5    to retract from section 3?

6        A    Yes.

7        Q    And do you understand that the computer was reading

8    everything as normal and locked with no error codes?

9        A    If that's what the report says, yes.

10       Q    Do you understand that Andrew Farris then decided to

11   attempt to reset the computer and start over the scoping out

12   process?

13       A    I've been told that that's what he did, yes.

14       Q    And then Andrew Farris zeroed out the sections to

15   allow the computer to bring sections 6, 5, and 4 back into

16   the main mast; correct?

17       A    Not to my knowledge, but, yes, okay.

18       Q    That's not to Liebherr's knowledge either; correct?

19       A    That's correct.

20       Q    And Andrew Farris then reprogrammed the computer to

21   scope the sections of the boom out again; correct?

22       A    Right.

23       Q    And the same result occurred with the unlocking of

24   the cylinder from boom section 4; correct?

25       A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    At this time Andrew Farris contacted a supervisor
 2   detailing what was occurring with the crane; correct?
 3        A    Correct.
 4        Q    And the supervisor dispatched a mechanic out to the
 5   site to investigate the problem; correct?
 6        A    Correct.
 7        Q    And Andrew Farris also contacted another crane
 8   operator and explained the situation to him; correct?
 9        A    Correct.
10        Q    They discussed that in the crane operator's
11   experience he would have manually retracted the cylinder as
12   it could possibly be a faulty sensor in the boom section if
13   there are no error codes showing on the main computer;
14   correct?
15        A    I do not know that.
16        Q    Andrew Farris then called for his oiler to bring him
17   the Operator Manual to operate the crane manually per the
18   manufacturer's instructions?
19        A    I do not know that.
20        Q    Both the oiler and Andrew Farris verified the
21   computer was not in error; correct?
22        A    I do not know.
23        Q    Then they attempt to manually retrieve the cylinder
24   from section 4?
25        A    I do not know.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    The cylinder was manually retracted per the

2    computer, and while attempting to lock it in to section 3,

3    the scoped out sections 6, 5 and 4 suddenly and without

4    warning fully retracted uncontrollably back into the

5    cylinder; correct?

6      A    Correct, but I do not know.

7      Q    And Liebherr doesn't know; correct?

8      A    Liebherr doesn't know.

9      Q    And during the approximate 30-minute time frame that

10   Andrew Farris was attempting to scope out and lock the boom

11   sections -- strike that.

12         Do you understand that Sims Crane & Equipment

13   Company changed out the boom configuration on February 16th,

14   2018?

15     A    We as a company?  No, we did not know it.

16     Q    And the change of the boom lengths went from

17   50-meter to the 84-meter involved the short boom sections

18   being unlocked, removed and replaced with the longer boom

19   sections inserting it into the main boom housing; correct?

20     A    That's the procedure, yes.

21     Q    And this process had been completed up to

22   approximately 35 times previously by Sims.  Is that your

23   understanding?

24     A    That's my understanding.

25     Q    And the boom sections contained pins that are

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    unlocked and locked in place using a specific wrench tool;

2    correct?

3         A    That's correct.

4         Q    And that wrench tool -- strike that.  The tool

5    depending upon the rotation would unlock or lock the pins;

6    correct?

7         A    Correct.

8         Q    And the pins hold the boom sections in place when

9    scoped out and in use; correct?

10        A    Correct.

11        Q    And there were two locking pin locations in the long

12   boom configuration in section 3 and only one locking pin in

13   the short boom configuration; correct?

14        A    Correct.

15        Q    The two locking pins were located approximately

16   23 inches apart on the long boom and had no markings to

17   identify which pin to unlock; correct?

18        A    I don't know.

19        Q    Well, before the Product Safety Bulletin, was there

20   any identifying marks on the crane to tell which pin to lock

21   or unlock?

22        A    I'm not aware of if there was any other.

23        Q    And Liebherr would be aware of it, right, if there

24   was?

25        A    If there was, Liebherr should be aware of it, yes.

89

1    Q    So prior to the Product Safety Bulletin --

2    A    But Liebherr is not aware if it's still in place at

3  that time.  When the crane was delivered maybe it was in

4  place, but I don't know.  I do not know.

5    Q    Did Liebherr deliver it to Schuch with warnings on

6  it?

7    A    I do not know.

8    Q    There was also an unlabeled cover plate attached to

9  the boom covering the pin that was required to be unlocked

10 and is known as the T3 pin; correct?

11   A    Correct.

12   Q    And the other pin, the T4 pin had no cover; correct?

13   A    That's correct.

14   Q    And Shane Burrows climbed on to the crane boom to

15 line up the boom sections with the pin; correct?

16   A    Say that again.

17   Q    Shane Burrows on February 16th climbed on to the

18 crane boom to line up the boom section with the pin;

19 correct?

20   A    Yes.  That's what it says, yes.

21        THE COURT:  Mr. Goodman, let me stop you for a

22 minute.  We have somebody here with a cord.

23        MR. GOODMAN:  Thank you.

24 (Off the record.)

25        THE COURT:  Back on the record.  Sorry to interrupt

90

1    you, Mr. Goodman, but I wanted to go ahead and take care of

2    it while I knew we had someone here.

3         MR. GOODMAN:  Thank you, Judge.

4    BY MR. GOODMAN:

5         Q    Mr. Vieten, the operator only -- excuse me.  Shane

6    Burrows only saw one pin that was exposed with no cover

7    plate when he was up on the boom; is that correct?

8         A    I do not know.

9         Q    Shane Burrows unlocked the wrong locking pin;

10   correct?

11        A    Correct.

12        Q    How is it that you know that he unlocked the wrong

13   locking pin but you don't know that he only saw one exposed

14   pin?

15        A    I do not know.

16        Q    When this pin failed to unlock the same as the other

17   pins, Shane Burrows advised his crane operator Andrew

18   Farris; correct?

19        A    I do not know if he did.

20        Q    Andrew Farris climbed onto the boom and attempted to

21   unlock the pin; correct?

22        A    I do not know.

23        Q    Andrew Farris then identified the locking pin as the

24   wrong one to unlock; correct?

25        A    I do not know.

1      Q     Andrew Farris then reset the pin back in the

2   position that they both thought it was to begin with;

3   correct.

4      A     Do not know.

5      Q     Andrew Farris then removed the cover and the correct

6   pin was unlocked and set in place; correct?

7      A     Do not know.

8      Q     The long boom sections were installed, the pins were

9   locked and the crane was ready for delivery to the site the

10  next morning; correct?

11     A     Do not know.

12     Q     The assist crane arrived at the site on Saturday,

13  February 17th, 2018; correct?

14     A     I do not know.

15     Q     The crane was set up and inspected; correct?

16     A     I do not know.

17     Q     The crane operator then scoped out the first section

18  of the crane to 92 percent as part of the inspection setup

19  process; correct?

20     A     Do not know.

21     Q     There were no issues noted, so the boom was

22  retracted and the crane was secured for the weekend;

23  correct?

24     A     Do not know.

25     Q     Following the event, Sims Crane & Equipment operator

1    drove the crane to the main facility in Tampa, Florida, and

2    secured the crane in a controlled access locked warehouse

3    while awaiting an engineer's inspection; correct?

4        A    I do not know.

5        Q    During the inspection that was conducted, it was

6    determined that the pin that was unlocked, the T4, and

7    locked back into the wrong position was an impermissible

8    telescopic locking pin; correct?

9        A    I do not know.

10       Q    The manufacturer sets the pin at a specific height;

11   correct?

12       A    I do not know.

13       Q    The T4 pin when reset by the employees was actually

14   set approximately 11/16 of an inch lower than it should be;

15   correct?

16       A    I do not know.

17       Q    The engineer conducted the inspection of the crane

18   after the incident confirmed the height; correct?

19       A    I do not know.

20       Q    The engineer determined the failure was the result

21   of an improperly adjusted shear locking pin in between boom

22   sections 3 and 4; correct?

23       A    I do not know.

24       Q    And that resulted in an uncontrolled retraction of

25   boom section 4 and subsequently boom sections 5 and 6,

1    correct?

2        A    I do not know.

3        Q    On February 28th, 2018 Sims Crane & Equipment

4    received a package from Liebherr US that included a written

5    Product Safety Bulletin notice, a product modification

6    retrofit cover plate with warnings labels to be affixed to

7    the crane and updated change revisions for the operating

8    instructions, specifically chapter 90.05; correct?

9        A    I do not know, but if it is something that they

10   received, yes, that may be, yes.  I do not know exact when.

11       Q    But Liebherr US sent all that information to Sims

12   after the loss; correct?

13       A    That's correct.

14       Q    And the retrofit cover plate provided by the

15   manufacturer is a plate that covers both locking pins on the

16   boom sections; correct?

17       A    Do not know.

18       Q    You don't know what the new cover plate looks like?

19       A    I do know what it looks like, but I do not know what

20   the purpose for it was at the time.

21       Q    So your Liebherr US was a training company doesn't

22   know the purpose of what the cover plate is on the Liebherr

23   LTM 1500; correct?

24       A    That's correct.

25       Q    The incident could have been prevented from the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    manufacturer -- strike that.

2         The incident could have been prevented if Liebherr

3    US would have supplied the written Product Safety Bulletin

4    notice, product modification retrofit cover plate with

5    warnings labels to be affixed to the crane and the update

6    change revisions for the operating instructions,

7    specifically chapter 90.05, in a timely manner to Sims as

8    soon as Liebherr US became aware of the issue; correct?

9         A    Do not know.

10        Q    Showing you what's been marked as Exhibit 2, sir.

11   Are you familiar with this document, U. S. Department of

12   Labor Occupational Safety and Health Administration letter

13   of August 17th, 2018?

14        A    Yes.

15        Q    Have you seen this document before?

16        A    Yes.

17        MR. GOODMAN:  I'd like to move Exhibit 2 for

18   identification into evidence as Exhibit 2.

19        THE COURT:  Any objection?

20        MR. CREMER:  Yes, Your Honor.  This document,

21   there's no foundation for admissibility of this document

22   whatsoever.

23        THE COURT:  And I'm going to admit it for purposes

24   of him asking the witness what he knows about the document

25   and asking questions about anything.  If he doesn't know

1    anything, then he can testify to that as well.  Go ahead.

2    (Plaintiff's Exhibit No. 2 was admitted.)

3    BY MR. GOODMAN:

4        Q    It's your understanding that OSHA inspected the work

5    site of Viking Rigging & Crane Erecting to determine whether

6    a violation of OSHA safety and health standards related to

7    the accident had occurred?

8        A    I was -- we as the company were not aware of it,

9    but...

10       Q    Do you understand that the work place inspection

11   found no alleged violations of safety health standards that

12   occurred related to the accident and, therefore, no

13   citations or proposed penalties were issued to the employer?

14       A    No knowledge of that.

15       Q    Showing you what's been marked as exhibit 3, sir,

16   for identification.  Are you familiar with that as the

17   Liebherr organizational chart?

18       A    Yes.

19       Q    Do you recognize that, because that's produced by

20   Liebherr; correct?

21       A    That's correct.

22           MR. GOODMAN:  Your Honor, I'd like to move Exhibit 3

23   for identification into evidence as Exhibit 3?

24           MR. CREMER:  No objection.

25           THE COURT:  Okay.  It's admitted.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   (Plaintiff's Exhibit No. 3 was admitted.)

2   BY MR. GOODMAN:

3        Q    Up at the top right, it notes Liebherr-Werk Ehingen

4   GmbH.  Do you see that, sir?

5        A    Yes.

6        Q    And Liebherr-Werk Ehingen, which we're going to

7   refer to as Liebherr Germany, is the manufacturer of the LTM

8   1500; is that correct?

9        A    That's correct.

10       Q    And Liebherr-America, Inc., is a separate

11  corporation from Liebherr-Werk Ehingen GmbH; correct?

12       A    Liebherr USA is not from Liebherr-Werk.  LUS is a

13  separate company in the United States.

14       Q    So the defendants in this case is a separate company

15  from Liebherr Germany; correct?

16       A    That's correct.

17       Q    The defendants in this case are sales, service and

18  training organization; correct?

19       A    That's correct.

20       Q    Defendants in this case do not manufacture cranes;

21  correct?

22       A    Correct.

23       Q    Defendants in this case do not publish operator's

24  manuals; correct?

25       A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q     Defendants in this case do not publish Product

2   Safety Bulletins; correct?

3      A     Correct.

4      Q     Defendants in this case do not manufacture retrofit

5   cover plates; correct?

6      A     That's correct.

7      Q     The defendants in this case do not manufacture

8   warning stickers and warning labels; correct?

9      A     That's correct.

10      Q     Under the service portion of the organization,

11   Liebherr Service U. S. provides training to crane customers

12   owning Liebherr Germany cranes; correct?

13      A     That's correct.

14      Q     And Liebherr US trains customers and clients on

15   products manufactured by Liebherr Germany; correct?

16      A     That's correct.

17      Q     Liebherr US was involved in training Sims on the use

18   of the crane at issue; correct?

19      A     That's correct.

20      Q     Liebherr was also involved in commissioning the

21   crane at issue; correct?

22      A     That's correct.

23      Q     Can you explain to us what commissioning of a crane

24   entails?

25      A     Hand over of the equipment to the customer.  Okay.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  Familiarizing the customer with the differences of the crane

2  type.  Familiarizing a customer with a specific crane type.

3      Q    I'm going to show you Exhibit 4 for identification,

4  sir.  Are you familiar with this document?

5      A    Yes.

6      Q    How are you familiar with this document?

7      A    This is one of the 1500s made in Liebherr-Werk

8  Ehingen.  We sell them here in Florida.

9      Q    Are you familiar with the product advantages mobile

10  crane document that's in front of you?

11      A    Can you say that again?

12      Q    Are you familiar with the product advantages mobile

13  crane document that is in front of you?

14      A    Yes.

15      Q    And how are you familiar with that, sir?

16      A    Fairly okay.

17          MR. GOODMAN:  Your Honor, I'm going to move Exhibit

18  4 for identification into evidence as Exhibit 4?

19          MR. CREMER:  No objection.

20          THE COURT:  Exhibit 4 is admitted.  And just for the

21  record, this is IAI0049 through Bates number to IAI0068.

22          MR. GOODMAN:  That's correct, Judge.

23  (Plaintiff's Exhibit No. 4 was admitted.)

24  BY MR. GOODMAN:

25      Q    This is a true and accurate representaiton of a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Liebherr LTM 1500 with a 50-meter boom installed; correct?

2    A    Correct.

3    Q    On page 2 at the top is a base section of the crane;

4    correct?

5    A    Correct.

6    Q    As it relates to the boom, the base section of the

7    crane includes boom sections 1 and 2; correct?

8    A    That's correct.

9    Q    And on page two in the middle left of the page is

10   showing telescopic boom 3; correct?

11   A    Correct.

12   Q    And the telescopic boom section 3 in the middle left

13   of page two can be inserted into the boom base at the top of

14   the page to create the 50-meter boom; correct?

15   A    Correct.

16   Q    If I talk about the 50-meter boom or 50-meter boom

17   package, can we agree that I'm speaking about the telescopic

18   boom section 3 that is inserted into the boom base to create

19   the 50-meter boom?

20   A    Yes.

21   Q    And on page two in the middle right of the page,

22   it's showing telescopic boom sections 3, 4, 5 and 6;

23   correct?

24   A    Correct.

25   Q    And the telescopic boom section 3, 4, 5 and 6 in the

1   right of the middle of page two can be inserted into the

2   boom base at the top of the page to create the 84-meter

3   boom; is that correct?

4        A    That's correct.

5        Q    If I talk about the 84-meter boom package or the

6   84-meter package, can we agree that we're speaking about the

7   telescopic boom sections 3, 4, 5 and 6?

8        A    Yes, sir.

9        Q    And page six shows that the crane boom section 3 of

10  the 84-meter package can be removed or installed either over

11  the crane's rear, the crane's front or the crane's side;

12  correct?

13       A    That's correct.

14       Q    Page six also reflects that boom sections 2 through

15  6 can be removed or sections 3 through 6 can be removed;

16  correct?

17       A    Say that again.

18       Q    Page six also reflects that the boom sections 2

19  through 6 can be removed or sections 3 through 6; correct?

20       A    Correct.

21       Q    And page seven reflects the sequence of removing the

22  boom sections; correct?

23       A    Yes.

24       Q    And page seven in the top paragraph provide that to

25  conduct the change, extend telescopes 2 and 3 to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    100 percent, retract telescoping ram and interlock it with

2    telescopes 1 or 2; correct?

3         A    Correct.

4         Q    Based on this, the boom section can be removed

5    between sections 1 and 2 or sections 2 and 3; correct?

6         A    That's correct.

7         Q    And based on this, the boom connections can be made

8    at either sections 1 and 2 or 2 and 3; correct?

9         A    Correct.

10        Q    Page seven in the middle of the page provides extend

11   telescopes 1 or 2 until the interlocking pin is accessible;

12   correct?

13        A    Correct.

14        Q    And page seven in the middle goes on to state in the

15   fifth sentence of the paragraph, release the interlock

16   between telescope 1 and 2 which would be pin 2 or 2 and 3

17   which would be pin 3; correct?

18        A    Correct.

19        Q    So the crane has pins that connect each of the boom

20   sections to the one before and after it; correct?

21        A    Correct.

22        Q    So page eight on the bottom left, as you look at the

23   page, reflects the crane with boom section 3 installed to

24   make the 50-meter boom; correct?

25        A    Correct.

1    Q    And page eight on the bottom right, as you look at

2    the page, reflects the crane with boom sections 3, 4, 5 and

3    6 to make the 84-meter boom; correct?

4    A    Correct.

5    Q    So for the 50-meter boom, the crane has a T1 pin

6    that connects the base to the boom section 1; correct?

7    A    Correct.

8    Q    And for the 50-meter boom, the crane has a T2 pin

9    that connects boom section 1 to boom section 2; correct?

10   A    Again on the 84?

11   Q    On the 50.

12   A    On the 50, yes.

13   Q    For the 50-meter boom, the crane has a T3 pin that

14   connects boom section 2 to boom sections 3; correct?

15   A    Right.

16   Q    And then for the 50-meter boom to be removed, the

17   head section which is the boom exchange section 3 is removed

18   by unlocking the T3 pin and removing boom section 3 from

19   boom section 2; correct?

20   A    Correct.

21   Q    And the 84-meter boom package can then be inserted

22   into boom section 2; correct?

23   A    Correct.

24   Q    And then the T3 pin is then locked connecting boom

25   section 2 to boom section 3; correct?

1      A    Correct.

2      Q    And the 84-meter boom package, the crane has a T4

3   pin that connects boom section 3 to boom section 4; correct?

4      A    Correct.

5      Q    And it also has a T5 pin that connects the boom

6   section 4 to boom section 5; correct?

7      A    Correct.

8      Q    And then for the 84-meter boom, the boom has a T6

9   that connects boom section 5 to boom section 6?

10      A    Correct.

11      Q    And if the 84-meter boom package is being connected

12   or removed from boom section 2, the only locking pin that

13   should be manipulated is the T3 pin; correct?

14      A    Correct.

15      Q    And if a 50-meter boom is being connected or removed

16   from the crane boom, the only locking pin that should be

17   manipulated is the T3 pin; is that correct?

18      A    That's correct.

19      Q    So whenever swapping out the 50-meter boom for the

20   84-meter boom or vice versa, the only locking pin that

21   should be manipulated is the T3 pin; right?

22      A    Right.

23      Q    Pin 4, T4 should never be manipulated; correct?

24      A    That's correct.

25      Q    I'm showing you what's been marked as Exhibit 5.

1    Can you take a look at it and let me know if you're familiar

2    with it?

3        A    Yes.

4        Q    And do you recognize this to be the LTM 1500?

5        A    Yes.

6             MR. GOODMAN:  I'd like to move Exhibit 5 for

7    identification into evidence as Exhibit 5.

8             THE COURT:  Any objection?

9             MR. CREMER:  No objection.

10            THE COURT:  It's admitted.

11   (Plaintiff's Exhibit No. 5 was admitted.)

12   BY MR. GOODMAN:

13       Q    This is a fair and accurate representation of how

14   the T3 pin is locked connecting the crane base to the

15   50-meter boom package; correct?

16       A    Yes.

17       Q    And on this exhibit, if we look at the boxes on the

18   top left and top right of the exhibit, those boxes are

19   showing a close-up view of the T3 pin being locked through

20   the T2 locking hole; correct?

21       A    Correct.

22       Q    And it's connecting the T3 to the T2; correct?

23       A    Correct.

24       Q    And the item noted as No. 1 is an S wrench; correct?

25       A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And that S wrench can manipulate the T3 pin;

2    correct?

3    A    Correct.

4    Q    And that S wrench can also manipulate the T4 pin;

5    correct?

6    A    Yes, it could.

7    Q    And on the exhibit there's an emergency release

8    screw that is designated with a No. 2; correct?

9    A    Correct.

10   Q    And so the emergency release screw is inside the

11   locking pin; correct?

12   A    Correct.

13   Q    So by screwing up or down the emergency release

14   screw, that manipulates up or down the locking pin; correct?

15   A    Correct.

16   Q    I'd like to show you what's been marked as Exhibit 6

17   for identification.  Take a look at it, and then once it's

18   done, I'll ask you some questions.

19        Is that a fair and accurate representation of how

20   the 84-meter boom is locked into the base?

21   A    To my knowledge, yes.

22   Q    And that's locked in by the T3 pin; is that correct?

23   A    That's correct.

24   Q    So I'm showing you the video again, Exhibit 6, and

25   I'd like to move Exhibit 6 for identification into evidence

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   as Exhibit 6.

2           THE COURT:  Any objection?

3           MR. CREMER:  No, Your Honor.

4           THE COURT:  Just so the record is clear, was there

5   intended to be any sound?

6           MR. GOODMAN:  No, Judge.

7           THE COURT:  Okay.  Thank you.  It's admitted.

8   (Plaintiff's Exhibit No. 6 was admitted.)

9   BY MR. GOODMAN:

10      Q    Do you recognize this as being published by

11  Liebherr?

12      A    I'm not so sure.  Yes, it could be, yes, but I'm not

13  100 percent sure.

14      Q    And this video shows information on the connection

15  of the 84-meter boom to the base; correct?

16      A    Correct.

17      Q    And on the left as we look at the screen, that's the

18  84-meter boom package; correct?

19      A    Yes.

20      Q    And that is assembly, that's telescopes 3 through 6;

21  correct?

22      A    Correct.

23      Q    On the right was boom sections 1 and 2; correct?

24      A    That's correct.

25      Q    And here you have boom section 2 going over boom

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    section 3; correct?

2        A    Correct.

3        Q    Does Liebherr publish videos like this?

4        A    Yes, we do.

5        Q    Now, this is crane personnel locking in the T3 pin;

6    correct?

7        A    Correct.

8        Q    This is a fair and accurate representation of how

9    it's supposed to be conducted?

10       A    Yes.

11       Q    You don't see the operator at any time take out any

12   sort of ruler and make sure it's 11-millimeters above the

13   locking bore, do you?

14       A    No, I don't see it.

15       Q    Showing you what's been marked as Exhibit 7 for

16   identification.  Do you recognize this, sir?

17       A    Not really.

18       Q    Does this appear to be the T2 locking hole?

19       A    It could be.

20       Q    Could it be anything else?

21       A    Not sure.

22       Q    Is that the size of a T2 locking hole?

23       A    Again it could be, yes.

24            MR. GOODMAN:  I'd like to move for Exhibit 7 for

25   identification into evidence as Exhibit 7.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1              MR. CREMER:  No objection.
 2              THE COURT:  It's admitted.
 3    (Plaintiff's Exhibit No. 7 was admitted.)
 4    BY MR. GOODMAN:
 5         Q    I'd like to show you now, sir, what's been marked
 6    for identification as Exhibit 8.  I'd ask you to watch this
 7    and then I'll ask you some questions after.  Is that a fair
 8    and accurate representation of the LICCON system on the LTM
 9    1500?
10         A    That is the LICCON system, yes.
11         Q    Do you recognize that to be such?
12         A    Yes.
13         Q    And you're familiar with that; correct?
14         A    Sort of kind of, yes.
15              MR. GOODMAN:  Your Honor, I'd like to move Exhibit 8
16    for identification into evidence as Exhibit 8.
17              THE COURT:  Any objection?
18              MR. CREMER:  No, Your Honor.
19              THE COURT:  It's admitted.
20    (Plaintiff's Exhibit No. 8 was admitted.)
21    BY MR. GOODMAN:
22         Q    To extend the boom, one has to press the button and
23    the boom can go to 46, 92 or 100; is that correct?
24         A    That's correct.
25         Q    And to retract the boom, one just has to press the
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

109

1   button and either bring it back from 100 to 92 or 46 or

2   zero.  That's correct?

3       A    That's correct.

4       Q    I'd like to show you what's been marked as Exhibit 9

5   for identification.  Do you recognize this to be a Liebherr

6   LTM 1500?

7       A    No, I do not.  Now maybe, yes.

8       Q    Do you recognize it now to be a Liebherr 1500?

9       A    Yes.

10      Q    Is that a Liebherr LTM 1500 with its 84-meter boom

11  extended?

12      A    It looks to me, yes.

13      Q    And how are you familiar with that, sir?

14      A    Not too much.

15      Q    Have you seen a Liebherr LTM 1500 before, sir?

16      A    Yes, I have.

17      Q    And is that the interior of the operator's cab for

18  the LTM 1500?

19      A    It sure looks like it, yes, sir.

20      Q    And if the operator would look up, that's what an

21  operator would see from the cab?

22      A    Yes.

23           MR. GOODMAN:  Your Honor, I'd move Exhibit 9 for

24  identification into evidence as Exhibit 9.

25           THE COURT:  Any objection?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1              MR. CREMER:  No, Your Honor.
 2              THE COURT:  It's admitted.
 3   (Plaintiff's Exhibit No. 9 was admitted.)
 4   BY MR. GOODMAN:
 5        Q    I'd like to show you Exhibit 10 for identification.
 6     If you'd turn to -- strike that.
 7              Are you familiar with this document?
 8        A    No, I'm not.
 9        Q    Do you recognize it as Liebherr's Mobile Crane
10     Technology At A Glance document?
11        A    Yes.
12        Q    Are you familiar with Liebherr's mobile crane
13     technology?
14        A    I'm familiar with technology, but not necessarily
15     with that document.
16              MR. GOODMAN:  Your Honor, I'd like to move Exhibit
17     10 for identification into evidence as Exhibit 10.
18              MR. CREMER:  No objection.
19              THE COURT:  Admitted.
20   (Plaintiff's Exhibit No. 10 was admitted.)
21   BY MR. GOODMAN:
22        Q    I'd like you to turn to page 28 of the exhibit.  Is
23     that a fair and accurate representation of a Liebherr LTM
24     1500 boom?
25        A    It doesn't tell me that it is the LTM 1500.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    Does it appear to be?

2        A    It appears to be the 1500, yes.

3        Q    And on the right, as you look at the document,

4    there's the T1 pin; is that correct?

5        A    That's correct.

6        Q    And the T1 pin is covered; correct?

7        A    Yes, it is.  It's hard to see, but yes, it is.

8        Q    On the Liebherr LTM 1500, the 2012 edition, the T1

9    has a permanent cover on it; correct?

10       A    I think so, yes.

11       Q    And then to the left of the T1 is the T2 pin;

12   correct?

13       A    Yes.

14       Q    And on the 2012 Liebherr LTM 1500 edition, T2 has a

15   permanent cover on it, correct?

16       A    Yes.

17       Q    And to the left of that is the T3 pin; correct.

18       A    Correct.

19       Q    And on the 2012 version of the Liebherr LTM 1500,

20   the T3 is open and accessible; correct?

21       A    That's correct.

22       Q    And then to the left of that is the T4 pin; correct?

23       A    Correct.

24       Q    And on the Liebherr LTM 1500 edition, the T4 pin is

25   open and accessible, correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1         A    Correct.
 2         Q    And to the left of that is the T5 pin; correct?
 3         A    Correct.
 4         Q    And on the 2012 edition of the Liebherr LTM 1500,
 5    the T5 pin is covered; correct?
 6         A    Right.
 7         Q    And then to the left of that is the T6 pin; correct?
 8         A    Correct.
 9         Q    And the T6 pin on the Liebherr LTM 1500 2012
10    edition, the T6 pin is also covered; correct?
11         A    Right.
12         Q    I'd like to show you what's been marked as Exhibit
13    11.  Do you recognize this to be a Liebherr LTM 1500?
14         A    It looks like it.
15         Q    Is it a true and accurate representation of a
16    Liebherr LTM 1500?
17         A    It looks like it, yes, sir.
18              MR. GOODMAN:  Now, I'd like to move Exhibit 11 for
19    identification into evidence as Exhibit 11.
20              MR. CREMER:  No objection.
21              THE COURT:  It's admitted.
22    (Plaintiff's Exhibit No. 11 was admitted.)
23    BY MR. GOODMAN:
24         Q    So this is the Liebherr boom; correct?
25         A    Yes.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And when a Liebherr LTM 1500 booms out, it needs to

2   be at around 70 degrees; is that correct?

3      A    I do not know the degree.

4      Q    The Liebherr US has no idea what the degree the boom

5   needs to be at when extending it?

6      A    I do not know, no.

7      Q    Inside the boom, there's a cylinder; correct?

8      A    Correct.

9      Q    And the cylinder pushes out the boom sections;

10  correct?

11     A    Correct.

12     Q    And here you have the boom sections being pushed out

13  by the cylinder; correct?

14     A    Correct.

15     Q    I'm showing you what's been marked as Exhibit 12 for

16  identification.  Is this a fair and accurate representation

17  of a Liebherr -- is this a fair and accurate representation

18  of a Liebherr LTM 1500 boom section?

19     A    It looks to me like a boom section, but I don't know

20  if it's a 1500.

21     Q    Are you familiar with the Telematik system?

22     A    Sort of kind of, yes.

23     Q    So let's run the video, and you can tell us whether

24  this is a fair and accurate representation of how the

25  Telematik system works.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    (Exhibit published.)

2    BY MR. GOODMAN:

3        Q    Is that a fair and accurate representation of how

4    the Telematik system works --

5        A    Yes.

6        Q    -- on the LTM 1500?

7        A    Yes.

8        Q    So what it's showing here is the grabber connected

9    to a pin; correct?

10       A    Correct.

11       Q    And that's the cylinder?

12       A    That's the cylinder.

13       Q    And the cylinder slides back and forth?

14       A    That's correct.

15       Q    And here it grabs the pin, and to boom out the next

16   section, it would unlock the pin by pulling it down;

17   correct?

18       A    Right.

19       Q    Like it's doing now?

20       A    Right.

21       Q    And then the two red pins that are horizontal,

22   they'll push out, connect to the boom and they push out the

23   boom section; correct?

24       A    That's correct.  This is not just from the 1500.

25   This is on all the cranes like this.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And then the grabber will push the pin back up so it

2    locks it in place; correct?

3      A    That's correct.

4      Q    And the two red pins that are horizontal will come

5    sliding back in; correct?

6      A    That's correct.

7      Q    And the cylinder goes back down to get the next boom

8    section; correct?

9      A    That's correct.

10     Q    Until the boom is pushed out to the extent that it's

11   put into the LICCON system; correct?

12     A    That's correct.

13     Q    That's the cylinder is grabbing another pin;

14   correct?  (Indicating.)

15     A    Yes.

16     Q    Showing you what's been marked as Exhibit 13 --

17          THE COURT:  Mr. Goodman, do you want to move that

18    into evidence?

19          MR. GOODMAN:  Yes, Your Honor.  I apologize.

20          MR. CREMER:  No objection.

21          THE COURT:  Exhibit 12 is admitted.

22   (Plaintiff's Exhibit No. 12 was admitted.)

23   BY MR. GOODMAN:

24     Q    Is this a fair and accurate representation of the

25    Liebherr LTM 1500 that was sold to Sims?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

116

1    A    No, it was not sold to Sims by Liebherr.

2    Q    I didn't ask if it was sold to Sims by Liebherr.  I

3  just said it was sold to Sims?

4    A    Yes.

5    Q    This was owned by Sims; correct?

6    A    That's correct.

7    Q    If you turn to the second page of Exhibit 13, that's

8  the boom of the Liebherr LTM 1500; correct?

9    A    Yes.

10    Q    Is it a fair and accurate representation of what the

11  boom would look like?

12    A    Fair enough, yes.

13    Q    And the next page of Exhibit 13, is that the boom

14  section that comes out of a Liebherr LTM 1500?

15    A    Yes.

16    Q    That would be boom sections 4, 5 and 6; is that

17  correct?

18    A    That's correct.

19    Q    Turn to the next page.  That's the inside of boom

20  section 4?

21    A    Yes.  Yes.  I'm not sure if it's 4.  I don't know.

22    Q    If you turn to the next page, there's a pin there

23  and there's something in front of the pin; correct?

24    A    Uh-huh.  Correct.

25    Q    Could there be a pin in front of the pin that we're

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   looking at?  Can you tell?

2        A    I think so, yeah.

3        Q    On the next page, is that where a pin should be on

4   the boom section?

5        A    I'm not 100 percent sure if it's supposed to be

6   right there.  No, I'm not sure.

7        Q    If you turn to the next page, tell me what this is

8   on a Liebherr.

9        A    That's the serial number type and the serial number

10  plate and the year built.

11       Q    Does every crane only have -- strike that.  Every

12  crane has its own serial number; is that correct?

13       A    That's correct.

14       Q    So this crane serial number is 073386; correct?

15       A    That's correct.

16       Q    There's no other Liebherr crane in the world that

17  would have that same serial number; is that correct?

18       A    That's correct.

19       Q    If you turn to the next page, this references the

20  port of discharge is Jacksonville; correct?

21       A    Yep.

22       Q    And Liebherr puts this on to reference where the

23  crane is commissioned; correct?

24       A    Where the crane lands, yes.

25       Q    Where the crane lands?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        A    Yes.
 2        Q    So this crane 073386 would have landed in
 3   Jacksonville?
 4        A    Yes.
 5             MR. GOODMAN:  I'd like to move Exhibit 13 into
 6   evidence as Exhibit 13.
 7             MR. CREMER:  No objection.
 8             THE COURT:  Objection?
 9             MR. CREMER:  No objection.
10             THE COURT:  That's admitted.
11   (Plaintiff's Exhibit No. 13 was admitted.)
12   BY MR. GOODMAN:
13        Q    I'd like you to turn to Exhibit 14.  Is this a fair
14   and accurate representation of the bottom of a pin from a
15   Liebherr LTM 1500?
16        A    It's a pin.  I'm not sure if it was a pin from a
17   Liebherr.
18             MR. GOODMAN:  I'd like to move Exhibit 14 into
19   evidence as Exhibit 14.
20             MR. CREMER:  No objection.
21             THE COURT:  It's admitted.
22   (Plaintiff's Exhibit No. 14 was admitted.)
23   BY MR. GOODMAN:
24        Q    I'd like you to turn to Exhibit 15.  Do you
25   recognize this document, sir?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes, I do.

2      Q    What is it?

3      A    This is a bulletin, Safety Bulletin.

4      Q    And who published this Safety Bulletin?

5      A    Liebherr Germany.

6      Q    And was this Safety Bulletin ever provided to

7    Liebherr US?

8      A    Yes, it was.

9           MR. GOODMAN:  Your Honor, I'd like to move Exhibit

10   15 for identification into evidence as Exhibit 15.

11          MR. CREMER:  No objection.

12          THE COURT:  It's admitted.

13   (Plaintiff's Exhibit No. 15 was admitted.)

14   BY MR. GOODMAN:

15     Q    This document is titled in all caps, bolded and

16   underlined Product Safety Bulletin; correct?

17     A    Correct.

18     Q    And as you said, Liebherr Germany publishes this

19   Product Safety Bulletin; correct?

20     A    That's correct.

21     Q    And Liebherr Germany sent this product -- Product

22   Safety Bulletin to Liebherr US; correct?

23     A    That's correct.

24     Q    And then Liebherr US is responsible to send the

25   Product Safety Bulletin to crane owners in the U. S. that it

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

120

1    has notice of; correct?

2        A    That's correct.

3        Q    And Liebherr sends the Product Safety Bulletin to

4    original purchasers; correct?

5        A    Correct.

6        Q    And if there's a second purchaser of the crane that

7    Liebherr has notice of Liebherr will send the --

8            THE REPORTER:  Mr. Goodman, can you repeat that?

9            MR. GOODMAN:  I apologize, ma'am.

10   BY MR. GOODMAN:

11       Q    If there's a second purchaser of a crane that

12   Liebherr has notice of, Liebherr will send the Product

13   Safety Bulletin to the second purchaser of the crane?

14       A    Instead of the first one, yes.

15       Q    And if there's a third purchaser of the crane that

16   Liebherr has notice of, Liebherr will send a Product Safety

17   Bulletin to the third purchaser of the crane; correct?

18       A    Correct.

19       Q    So as long as Liebherr has been placed on notice of

20   who owns a specific crane, it's Liebherr's internal standard

21   operating procedure to send the Product Safety Bulletin to

22   that crane owner; correct?

23       A    That's correct.

24       Q    And the date of this Product Safety Bulletin is

25   November 8th, 2017?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    That's correct.

2      Q    As of November 8th, 2017, Liebherr is aware that

3   Sims owns the crane at issue; correct?

4      A    I'm not sure.  This doesn't say that it's Sims.

5      Q    If Liebherr was aware that Sims owned the crane

6   073386, Liebherr would have a duty to send them the Product

7   Safety Bulletin; correct?

8      A    That's correct.

9      Q    Under the title, it says -- this Product Safety

10   Bulletin states in bold and all capital letters, "This

11   bulletin contains important safety information pertaining to

12   the proper and safe setup and operation of Liebherr mobile

13   cranes LTM 1500-8.1, LTM 1500 and LTM 1515N.  Failure to

14   follow these instructions could result in the uncontrolled

15   retraction of telescopic boom during operation resulting in

16   serious injury or death."  Correct?

17      A    That's correct.

18      Q    And the first sentence this Product Safety Bulletin

19   says, "in light of recent event reported to Liebherr."

20   Correct?

21      A    Yes.

22      Q    Liebherr in the Product Safety Bulletin refers to

23   Liebherr Germany; correct?

24      A    That's correct.

25      Q    So nothing was reported to Liebherr US?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     A     Nothing was reported to Liebherr US.

2     Q     Liebherr has no idea of the recent event that was

3   reported to Liebherr Germany that is referenced in the

4   Product Safety Bulletin?

5     A     That's correct.

6     Q     So Liebherr US as a sales, service and training

7   organization could not contact Liebherr Germany to find out

8   what the recent event was; correct?

9     A     That's correct.

10    Q     And Liebherr did not educate its trainers on the

11   recent event; correct?

12    A     I'm not sure.  I'm not aware of that.

13    Q     And Liebherr does not educate trainers on product

14   safety bulletins; correct?

15    A     I'm not -- I'm not sure.

16    Q     Liebherr could have contacted Liebherr Germany to

17   ask what the recent event was; correct?

18    A     Yes.  I did talk to Mr. Reher after all of the

19   position.  I asked Mr. Reher, the managing director, what

20   the event was and he told me that there was a manipulated

21   boom in Japan on the ground, manipulated boom No. 4 and it

22   also had an accident.

23    Q     The T4 pin was manipulated on the ground?

24    A     T4 pin was manipulated on the ground in Japan.

25    Q     Was anything -- nothing was preventing you from

1    making that same call immediately after you received this

2    Product Safety Bulletin from Germany; correct?

3        A    Correct.

4        Q    This Product Safety Bulletin goes on to state, "if

5    during the assembly and disassembly of the above-mentioned

6    Liebherr mobile crane types, for example, during conversion

7    of the 50-meter telescopic boom, telescopic boom head T3 to

8    the 84-meter telescopic boom telescope extension, the

9    separation of the respective connections of the telescopic

10   sections are performed incorrectly, in particular if the

11   wrong emergency release screw is mechanically locked or

12   unlocked incorrectly it can result in an uncontrolled

13   retraction of the telescopic sections."  Correct?

14       A    Correct.

15       Q    So this Product Safety Bulletin is warning that if

16   any other pin other than the T3 is manipulated, like if the

17   T4 pin is manipulated, it can cause boom sections 6, 5 and 4

18   to collapse uncontrollably in on itself; correct?

19       A    That's correct.

20       Q    And the Product Safety Bulletin goes on to state,

21   "we, again, would like to emphasize to you as the operator

22   of the above-mentioned mobile crane types, that for

23   mounting/dismounting of the telescopic sections, you must

24   carefully follow the relevant sections of the operation

25   manual, in particular, Chapter 5.60, telescopic sections

1    disassembly/assembly and Chapter 5.13 disassembly/assembly

2    telescopic boom with transport device."  Correct?

3        A    Correct.

4        Q    It goes on to state:  "Failure to follow these

5    important instructions could result in the incorrect

6    mounting/dismounting of the telescopic sections and cause

7    property damage, serious personal injury or possible loss of

8    life."  Correct?

9        A    Correct.

10        Q    And these important instructions referenced are the

11    Product Safety Bulletin in Chapter 5.6 and 5.13; correct?

12        A    Correct.

13        Q    And it further states:  "In our ongoing effort to

14    prevent improper locking and/or unlocking during

15    assembly/disassembly of the telescopic sections, we were

16    contacting all customers who own one of the above-mentioned

17    mobile crane types with the 84-meter telescopic boom."

18    Correct?

19        A    That's correct.

20        Q    As a reader of this document, you would understand

21    that sentence to mean that Liebherr Germany wanted to get

22    this Product Safety Bulletin to all owners of the Liebherr

23    LTM 1500 to prevent improper locking and unlocking of the T4

24    pin during assembly/disassembly of the telescopic sections;

25    correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A     Yes.

2       Q     And the Product Safety Bulletin further states:  "In

3   the near future, you will be receiving a product retrofit of

4   the cover plate for locking pin telescopic 3 and 4,

5   referencing a new cover plate for pins T3 and T4."  Correct?

6       A     That's correct.

7       Q     And on the second page of the Product Safety

8   Bulletin it states:  "In the meantime, you may continue to

9   operate your Liebherr mobile crane safely so long as you

10  meticulously follow the operation manual."  Correct?

11      A     That's correct.

12      Q     And then the next paragraph after that it states:

13  "We kindly ask that you carefully follow the information in

14  this Product Safety Bulletin in the future."  Correct?

15      A     Correct.

16      Q     So the information in the Product Safety Bulletin is

17  different from the information in the Operator's Manual;

18  correct?

19      A     Correct.

20      Q     As a reader of this document, you would agree that

21  you understand it to mean that an operator should

22  meticulously follow the operation manual while carefully

23  noting the new information in the Product Safety Bulletin;

24  correct?

25      A     That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Finally, in the Product Safety Bulletin, it states,
2  "if the unit is no longer in your possession, we would
3  appreciate it if you would immediately forward this
4  information to the new owner and simultaneously contact us
5  to advise us of the contact information for the crane's new
6  owner."  Correct?
7      A    That's correct.
8      Q    As the reader of this document, you would agree that
9  Liebherr Germany wants this document immediately forward to
10 the owners of the cranes.  Correct?
11     A    Immediately or in a certain time frame, yes.
12     Q    And there's no other document in this litigation
13 that you're aware of that Liebherr produced that requests
14 someone to update Liebherr on who the owner of a crane is;
15 correct?
16     A    That's correct.
17     Q    This is the only document; correct?
18     A    It's the only document.
19     Q    And the Product Safety Bulletin is signed by Ralf
20 Baus and Rainer Pilli; correct?
21     A    Correct.
22     Q    They were employed at the time with Liebherr
23 Germany; is that correct?
24     A    That's correct.
25     Q    And you communicated with them before and after this

1    Product Safety Bulletin was issued; correct?

2        A    That's correct.

3        Q    You know both these individuals; correct?

4        A    I do know both people, yes.

5        Q    So at any time you could have picked up the phone

6    and contacted either one of them to discuss the Product

7    Safety Bulletin; correct?

8        A    I could have, but there was no reason for it.

9             MR. GOODMAN:  Your Honor, I'd like to move Exhibit

10   15 into evidence as Exhibit 15.

11            MR. CREMER:  No objection.

12            THE COURT:  It's admitted.  It's already admitted.

13   Now it's doubly admitted.  Better safe than sorry.

14            MR. GOODMAN:  Losing track.

15   BY MR. GOODMAN:

16       Q    Mr. Vieten, I'd like to show you Exhibit 16.  Do you

17   recognize this document?

18       A    Yes.

19       Q    How do you recognize this document?

20       A    I think it's one out of the operator's book.

21            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

22   16 for identification into evidence as Exhibit 16.

23            THE COURT:  Any objection?

24            MR. CREMER:  No objection.

25            THE COURT:  It's admitted.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    (Plaintiff's Exhibit No. 16 was admitted.)

2    BY MR. GOODMAN:

3        Q    This is the forward to the appendix for the

4    Operator's Manual; correct?

5        A    Correct.

6        Q    And the preface states that this crane may only be

7    used in flawless technical condition and according to its

8    mission as well as with constant awareness of safety and

9    danger; correct?

10       A    Correct.

11       Q    You would agree that without a Product Safety

12   Bulletin, an operator is not using the crane with the

13   awareness of safety and dangers that would have been raised

14   in the Product Safety Bulletin; correct?

15       A    Repeat that, please.

16       Q    So you would agree that without the Product Safety

17   Bulletin, an operator does not have the knowledge of the

18   safety and dangers that were raised in the Product Safety

19   Bulletin; correct?

20       A    That's correct.

21       Q    You would agree that Liebherr US's failing to

22   provide the Product Safety Bulletin to Sims prevented the

23   Sims operator from using the crane with the constant

24   awareness of safety and danger that Liebherr Germany

25   suggests; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Say that again.

2    Q    If Liebherr US failed to provide Product Safety

3 Bulletin to Sims per Exhibit 16, Liebherr US prevented Sims

4 from operating the crane with the safety awareness and

5 danger awareness that Liebherr Germany suggested; correct?

6    A    We prevented them to?

7    Q    Correct.  If Liebherr US did not provide the Product

8 Safety Bulletin to Sims, then Sims does not have the

9 information about the dangers that are in the Product Safety

10 Bulletin; correct?

11    A    They have it in their -- already in the 5.6 and

12 5.13.  It's just reiterating that statement.  That statement

13 is in the 5.6 and 5.13.  That's what the other -- that's

14 where it's at.

15        MR. GOODMAN:  I'm going to object as nonresponsive

16 and move to strike his answer.

17        THE COURT:  I'm not going to strike it, but go ahead

18 and ask the question again perhaps more clearly so you can

19 get a more responsive answer.

20        THE WITNESS:  Yes.

21 BY MR. GOODMAN:

22    Q    If Liebherr US did not provide Sims with the Product

23 Safety Bulletin, Sims would not have the information in the

24 Product Safety Bulletin; correct?

25    A    On the safety bulletin, correct, yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q     And then on Exhibit 16 there's a note.  It says

2    "modifications on the crane may only be made with written

3    approval by Liebherr-Werk Ehingen GmbH."  Correct?

4    A     That's correct.

5    Q     Would a crane operator need written approval from

6    Liebherr Germany to change out the 50-meter boom for the

7    84-meter boom?

8    A     No.

9    Q     Would a crane operator need Liebherr Germany's

10   written approval to change out the boom from the 84-meter

11   boom to the 50-meter boom?

12   A     No.

13   Q     Would you agree then that the changing out of the

14   50-meter boom to the 84-meter boom or the 84-meter boom to

15   the 50-meter boom then is not a modification; correct?

16   A     That's correct.

17   Q     I'm going show you what's been marked as Exhibit 17

18   for identification.  Do you recognize Exhibit 17?

19   A     Yes.

20   Q     And what is it?

21   A     It's the retrofitting of a cover plate bulletin.

22         MR. GOODMAN:  I'd like to move Exhibit 17 for

23   identification into evidence as Exhibit 17?

24         THE COURT:  Any objection?

25         MR. CREMER:  No objection.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  Admitted.

2   (Plaintiff's Exhibit No. No. 17 was admitted.)

3   BY MR. GOODMAN:

4      Q    The information in this document is not in the

5   Operator's Manual; correct?

6      A    Correct.

7      Q    This document is titled in bold retrofitting of a

8   cover plate upon telescopic boom separation of the 84-meter

9   boom to the locking pin telescopic sections 3 and 4;

10  correct?

11     A    Correct.

12     Q    The document states, "as we already informed you

13  with the customer letter of November 8, 2017," correct?

14     A    Correct.

15     Q    And that letter of November 8th, 2017 was Exhibit 15

16  that we already looked at; correct?

17     A    Yes.

18     Q    And the information that's Exhibit 15 is not in the

19  Operator's Manual; correct?

20     A    The information on 15?

21     Q    Correct, is not in the Operator's Manual; correct?

22     A    I think this 5.6 and 5.13 are stressing also in the

23  section, I think expressing that you are, you know,

24  operating the crane, and if you don't do it a certain way

25  that it would be, you know.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    You would agree that there's no place in the

2    Operator's Manual that says, "if during the assembly and

3    disassembly of the above-mentioned Liebherr mobile crane

4    types, the separation of the respective connections, the

5    telescopic sections are performed incorrectly, in particular

6    if the wrong emergency release screw is mechanically locked

7    or unlocked incorrectly, it can result in an uncontrollable

8    retraction of the telescopic sections."  Correct?

9      A    Correct.  But I'm not sure if it's in there or not

10   in those sentences.  I'm not sure.  Because it is

11   reiteration of that.  This bulletin is a reiteration of

12   what's written in the product operating book.

13   BY MR. GOODMAN:

14     Q    Mr. Vieten, I'm going to show you what we're going

15   to mark -- strike that.  We'll get to it.

16          I'd like you to turn back to Exhibit 17.  Exhibit 17

17   goes on to state:  "Your crane operator or workshop

18   personnel should exchange the next opportunity or

19   unconditionally upon the next telescopic boom separation the

20   presently installed round cover plate."  Correct?

21     A    Yes.

22     Q    As a reader of this document, you understand it to

23   mean that Liebherr Germany wants the crane owner to

24   immediately at the very next opportunity exchange the round

25   cover plate; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A     That's correct.

2      Q     If you turn to page 3 of the Exhibit, this is the

3    old round cover plate over the T3 pin on the 84-meter boom

4    that Liebherr Germany wants the owners to remove; correct?

5      A     That's correct.

6      Q     And we know it's the 84-meter boom package because

7    we can see the T3 pin right next to the T4 pin; correct?

8      A     The T3 pin is covered up.

9      Q     It's right next to the T4 pin?

10     A     It's right next to the T4 pin.

11     Q     It's not covered, correct, the T4 pin?

12     A     That's correct, not covered.

13     Q     And then there's actually a red line that goes from

14   that cover plate over the T3 to the bottom of the page, and

15   it says, the text says, "the presently mounted cover plate

16   has to be exchanged and scrapped."  Correct?

17     A     That's correct.

18     Q     That means thrown out; correct?

19     A     Thrown out.

20     Q     Because there's a new cover plate; correct?

21     A     There's a new cover plate.

22     Q     So in the exhibit, Liebherr is telling the crane

23   owner that this round cover plate should be removed and

24   never used again; correct?

25     A     Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          Q    And the photo shows the round cover plate with wing

2     nuts; correct?

3          A    That's correct.

4          Q    However, the round cover plate on the crane at issue

5     was attached with bolts; correct?

6          A    (No response.)

7          Q    The round cover plate on the crane at issue was

8     attached with bolts; correct?

9          A    Yes.  I think so, yes.

10         Q    I'd like to show you what's been marked as Exhibit

11    18 for identification.

12              Your Honor, I'd like to move Exhibit 17 for

13    identification into evidence as Exhibit 17.

14              MR. CREMER:  No objection.

15              THE COURT:  It's admitted.

16    (Plaintiff's Exhibit No. 17 was admitted.)

17    BY MR. GOODMAN:

18         Q    I'd like to show you what's been marked as Exhibit

19    18 for identification.  Take a look at this, and let me know

20    if it fairly and accurately represents what the T3 pin on a

21    50-meter boom for an LTM 1500 would look like?

22         A    It looks like it to me, yes.

23              MR. GOODMAN:  Your Honor, I'd like to move Exhibit

24    18 into evidence.

25              THE COURT:  It's admitted.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          MR. CREMER:  No objection.

2   (Plaintiff's Exhibit No. 18 was admitted.)

3   BY MR. GOODMAN:

4          Q    And on this boom, there are bolts that are

5   connecting the boom cover for the T3 pin; correct?

6          A    That is correct.

7          Q    And there should not be bolts; correct?

8          A    There should be wing nuts.

9          Q    Should somebody at Liebherr who's doing the

10  commissioning of a crane identify when something has bolts

11  on it and should have wing nuts on it?

12         A    Do not know if it was there at the time of the

13  handover.  If it was at the time of the handover and we know

14  it, that it's supposed to be wing nuts, then yes.

15         Q    And if you turn to the next page of Exhibit 18, does

16  this photo fairly and accurately represent a T3 pin on a

17  50-meter boom?

18         A    Yes.

19         Q    I'd like to turn to the next page.  Does this photo

20  fairly and accurately represent a cover plate over a T3 pin

21  on a 50-meter boom?

22         A    Yes.

23         MR. GOODMAN:  Your Honor, I'd like to move Exhibit

24  18 for identification into evidence as Exhibit 18.

25         MR. CREMER:  No objection.

136

1              THE COURT:  It's admitted.

2    (Plaintiff's Exhibit No. 18 was admitted.)

3    BY MR. GOODMAN:

4         Q    The round cover plate of Exhibit -- that's

5    referenced in Exhibit 18 is only able to cover the T3 pin;

6    correct?

7         A    That's correct.

8         Q    And it was only to be placed in the T3 pin of the

9    boom section that was not being used with the crane;

10   correct?

11        A    Yes.

12        Q    So if the 84-meter boom is being used, the cover

13   plate would be on the T3 section of the 50-meter boom; is

14   that correct?

15        A    I'm not sure.

16        Q    Is that how it's supposed to be?

17        A    I think so.

18        Q    And if the 50-meter boom is being used, the cover

19   plate should be on the T3 of the 84-meter boom?

20        A    That's correct.

21        Q    If the cover plate's on the 84-meter boom, the T4

22   pin is still accessible; correct?

23        A    Yes.

24        Q    And the T4 pin should never be manipulated; correct?

25        A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    The T3 pin is the locking pin.  That's the one that

2    should be manipulated; correct?

3    A    That's correct.

4    Q    That locks and unlocks either the 50-meter boom or

5    the 84-meter boom to the base section; correct?

6    A    That's correct.

7    Q    So with the Product Safety Bulletin and the Retrofit

8    Kit, the round cover plate we have been discussing is to be

9    replaced with the cover plate shown in Exhibit 17 right

10   there?

11   A    Yes.

12   Q    And that cover plate covers both the T3 pin and the

13   T4 pin; correct?

14   A    That's correct.

15   Q    And that cover plate is also a different color from

16   the crane boom; correct?

17   A    That's correct.

18   Q    And that cover plate also has stickers on it;

19   correct?

20   A    That's correct.

21   Q    And there's a sticker over the T3 pin that is just a

22   pin; correct?

23   A    That's correct.

24   Q    And then there's a sticker over the T4 pin that has

25   a pin with an X over it; correct?

138

1    A    That's correct.

2    Q    And if we go to the second page of Exhibit 17 right

3 there, those are the reference stickers; correct?

4    A    Also the labels, yes.

5    Q    The stickers are the ones without the X is

6 referenced as unlocking the telescopic boom locking pin;

7 correct?

8    A    That's correct.

9    Q    And it says the locking pin may be unlocked

10 according to the operator instructions; correct?

11    A    Yes.

12    Q    And then under that there's a sticker with a pin and

13 X over it; correct?

14    A    That's correct.

15    Q    And it says, "do not unlock the telescopic boom

16 locking pin."  Correct?

17    A    That's correct.

18    Q    And under that there's a warning; correct?

19    A    Yes.

20    Q    And there's a triangle that's yellow; correct?

21    A    Yes.

22    Q    And there's an exclamation point in that triangle;

23 correct?

24    A    Yes.

25    Q    And it says, "warning.  Impermissible telescopic

1   boom locking pin unlocked.  The telescopic boom can retract

2   in an uncontrolled manner, death, severe bodily injuries,

3   property damages.  If a locking pin is marked with a sign,

4   never unlock the locking pin."  Correct?

5       A    That's what it says.

6       Q    And this is not in the Operator's Manual; correct?

7       A    That's correct.

8       Q    Prior to the Product Safety Bulletin, there were no

9   warnings on the telescopic boom sections; correct?

10      A    Correct.

11      Q    There were no warnings on the cover plate; correct?

12      A    That's correct.

13      THE COURT:  Mr. Goodman, when you're getting to a

14  natural break relatively soon, we'll take a comfort break.

15      MR. GOODMAN:  Fine.  Now is fine, Your Honor.  I

16  want to make sure I moved Exhibit 18 into evidence.

17      MR. CREMER:  No objection.

18      THE COURT:  It's admitted.  I have a note on here

19  that you're admitting it, but better safe than sorry, 18.

20  And then I do not have admitted 19 yet, just 18.

21      MR. GOODMAN:  Thank you, Judge.

22      THE COURT:  Okay.  Let's take a short break.  We've

23  been going a little longer than that hour and a half.  Let's

24  go ahead and go to 20 'til, so we'll take about a 20-minute

25  break.  And then I'll just remind you, Mr. Vieten, that you

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    are still testifying so don't speak to anybody about your

2    testimony.

3          When you come back, you'll be sitting back on the

4    chair.  When you stand up, make sure you take the microphone

5    off you.  You wouldn't be the first person to stand up and

6    try to walk away with it on.  Consider it a warning to take

7    it off.

8          THE WITNESS:  All right.

9          THE COURT:  We're in recess until about 20 'til.

10   (Recess had at 2:17 p.m.)

11   (Court resumed at 2:41 p.m.)

12   BY MR. GOODMAN:

13        Q    Mr. Vieten, before we took our break, we were

14   looking -- we were starting to look at Exhibit 19.  So I'd

15   ask you to take a look at Exhibit 19.  Do you recognize

16   this?

17        A    Yes.

18        Q    What is it?

19        A    It's the cover plate and the warning labels.

20        MR. GOODMAN:  Your Honor, I'd move Exhibit 19 for

21   identification into evidence as Exhibit 19.

22        THE COURT:  Any objection?

23        MR. CREMER:  No, Your Honor.

24        THE COURT:  Exhibit 19 is admitted.

25   (Plaintiff's Exhibit No. 19 was admitted.)

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1   BY MR. GOODMAN:
 2        Q    Tell me what the purpose of this was?
 3        A    To cover hole No. 3 and hole No. 4.
 4        Q    And the original cover plate did not cover T4?
 5        A    That's correct.
 6        Q    And it has warning stickers on top of it; correct?
 7        A    Correct.
 8        Q    And the warning sticker with the X goes over the T4
 9   pin; correct?
10        A    That's correct.
11        Q    And the warning sticker without the X goes over the
12   T3 pin; correct?
13        A    That's correct.
14        Q    And the warning sticker with the X over the T4 pin
15   would mean do not touch; correct?
16        A    That's correct.
17        Q    And those warning stickers were not on the original
18   cover; correct?
19        A    Correct.
20        Q    Those warnings stickers were not on the boom before
21   the product retrofit; correct?
22        A    Did not see it, correct.
23        Q    Now, if you turn back to Exhibit 17 and on page two
24   of 17 here, here are the stickers that are on top of that
25   cover plate; correct?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    That's correct.

2      Q    And the top one without the X it just says "the

3   locking pin may be unlocked according to the operating

4   instructions."  Correct?

5      A    That's correct.

6      Q    And on the bottom, the sticker with the X on it, it

7   says, "warning, impermissible telescopic boom locking pin

8   unlocked.  Telescopic boom can retract in an uncontrolled

9   manner, death, severe bodily injuries, property damage.  If

10  the locking pin is marked with a sign, never unlock the

11  locking pin."  Correct?

12     A    That's correct.

13     Q    That warning is not in the Operator's Manual;

14  correct?

15     A    I assume so, yes.

16     Q    You assume it's not in the Operator's Manual?

17     A    I assume it's not in the Operator's Manual.

18     Q    I'd like to show you what's marked as Exhibit 20 for

19  identification, do you recognize those?

20     A    Yes.  Those are the labels.

21     Q    And are those the warning stickers that we just

22  discussed?

23     A    Yes.

24     Q    They came with the Product Safety Bulletin?

25     A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q     And they were not provided before the Product Safety

2   Bulletin; correct?

3      A     That's correct.

4            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

5   20 into evidence as Exhibit 20.

6            MR. CREMER:  No objection.

7            THE COURT:  It's admitted.  Exhibit 20 is admitted.

8   (Plaintiff's Exhibit No. 20 was admitted.)

9   BY MR. GOODMAN:

10     Q     Mr. Vieten, I'd like to show you Exhibit 21.  Do you

11   recognize this?

12     A     Yes.

13     Q     And how do you recognize it?

14     A     This is showing section 3 and section 4 on top of

15   each other and showing the openings for the pins.

16            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

17   21 into evidence as Exhibit 21.

18            MR. CREMER:  No objection.

19            THE COURT:  Exhibit 21 admitted.

20   (Plaintiff's Exhibit No. 21 was admitted.)

21   BY MR. GOODMAN:

22     Q     Twenty-one fairly and accurately represents the T3

23   pins and T4 pins on section 3 on the 84-meter boom without

24   the retrofitted cover plate; is that correct?

25     A     That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    And Exhibit 21 on the left side of the page as you

2   look at it shows the boom with the warnings signs installed

3   next to the pins without the retrofit cover plate; is that

4   correct?

5        A    That's correct.

6        Q    And Exhibit 21 on the right side of the page as you

7   look at it shows the boom with the warnings signs installed

8   next to the pin with the retrofitted cover plate; correct?

9        A    That's correct.

10       Q    Before this Retrofit Kit providing these warnings,

11   there was not warnings installed on the booms of the LTM

12   1500s; correct?

13       A    It looks like it, yes.

14       Q    I'd like to show you what's been marked as Exhibit

15   22 for identification.  Do you recognize this?

16       A    It looks like a picture of sections 3 and 4.

17       Q    Of the LTM 1500?

18       A    Of the LTM 1500 I assume.

19            MR. GOODMAN:  Your Honor, I'd move Exhibit 22 into

20   evidence as Exhibit 22.

21            MR. CREMER:  No objection.

22            THE COURT:  Exhibit 22 is admitted.

23   (Plaintiff's Exhibit No. 22 was admitted.)

24   BY MR. GOODMAN:

25       Q    Now, this is reflecting what the warning stickers

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    would look like on the boom section; correct?

2        A    Correct.

3        Q    Before the product retrofit was provided, there were

4    no stickers like this; correct?

5        A    I'm not sure.

6        Q    You're not sure whether before the product retrofit

7    was issued there was any?

8        A    I'm not sure, absolutely, yes.  What I'm saying is,

9    okay, I'm not sure in 2012 when the crane was made that

10   there were already stickers on there.  I'm not sure.  I'm

11   not aware of it.  The company is not aware of it.

12       Q    Why would Liebherr Germany provide warning stickers

13   for a product retrofit if there were already warning

14   stickers on there?

15       A    I do not know.  I can't answer that question.

16       Q    You never talked to them about it?

17       A    No.  I never talked to them about that.

18       Q    As you sit here today, you're not aware?

19       A    I'm not aware of it.

20       Q    You're not aware there were warnings stickers on the

21   Liebherr LTM 1500 that was in Sims' possession prior to the

22   product retrofit and whether it had warning stickers;

23   correct?

24       A    Not aware of it, absolutely.

25       Q    I'd like to show you what's been marked as Exhibit

1    23 for identification.  I'd like you to take a look at this.

2    Is this a fair and accurate representation of the LTM 1500

3    with the 50-meter boom?

4        A    I assume so.

5        Q    Is this a fair and accurate representation of the

6    Liebherr LTM 1500 with the 50-meter boom retracted fully?

7        A    Yes.

8        Q    Is this a fair and accurate representation of how

9    that 50-meter boom would be removed from the base?

10       A    Not sure about that.  The 33 percent there is

11   throwing me off a little bit.

12       Q    Are you unsure whether it goes from 33, 46 to 100 to

13   retract it?

14       A    Right.  It's normally 0, 46, 90 and 100.  I don't

15   know where the 33 comes from.

16       Q    So other than that, does it fairly and accurately --

17       A    Other than that, it's fairly accurate, yes.

18            THE COURT:  Try not to talk over each other.  I know

19   that you think it's going to make everything go faster, but

20   it just makes everything go slower.

21            MR. GOODMAN:  My apologies, Your Honor.

22   BY MR. GOODMAN:

23       Q    So other than that, does this fairly and accurately

24   depict --

25       A    Yes.  Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

147

1      Q    So when the T3 boom is removed and the 84-meter boom

2    is installed without a cover plate, is that what the

3    84-meter boom -- is that a fair and accurate representation

4    of what the 84-meter boom would look like --

5      A    Yes.

6      Q    -- without the cover plate?

7      A    Yes.

8      Q    On the right is the T3 pin?

9      A    Yes.

10     Q    On the left is the T4 pin?

11     A    Yes.

12     Q    And this would be installed into the base of the

13   boom?

14     A    Yes.

15     Q    And then through the T2 pin hole, one would see the

16   T3 pin; correct?

17     A    Right.

18          MR. CREMER:  Your Honor, I object to this foundation

19   for the accuracy of this animation.  I have no idea where

20   this came from.  It's not a Liebherr production.  I don't

21   know if it's accurate or not.

22          THE COURT:  Go ahead and address the question and

23   tell us where it came from.  I don't know where it came

24   from.

25          MR. GOODMAN:  Your Honor, this is an animation.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    It's no different than the photo.  He can say whether it

2    fairly and accurately depicts.  We're not saying it's a

3    scientific reenactment of what went on, which is a higher

4    standard.  It is simply an animation, and the witness can

5    say whether it fairly and accurately depicts what it is

6    shown, just like any other photo.

7            THE COURT:  Okay.  Well, I'll let you keep asking to

8    the extent that he recognizes it as something that is fairly

9    and accurately depicting it.  To the extent that it does

10   not, he can say that as well.

11           THE WITNESS:  Okay.

12   BY MR. GOODMAN:

13   Q    So one would see the T2 pin -- excuse me -- the T3

14   pin through that T2 access hole; is that correct?

15   A    I can assume.

16   Q    That fairly and accurately depicts it?

17   A    Yes.

18   Q    Now, the 84-meter boom with the old cover plate,

19   does that fairly and accurately depict what the 84-meter

20   boom would look like with the old cover plate on?

21   A    Fairly accurately.

22   Q    The only difference here would be that there are

23   bolts on the cover plate over the T3 rather than wing nuts?

24   A    Right.

25   Q    And if one was to slide the boom into the base and

1    look into the T2 hole, is that what one would fairly and

2    accurately see?

3        A    Yes.

4        Q    And then if it slid further, one would see the T4

5    pin; is that correct?

6        A    That's correct.

7        Q    And with the 84-meter boom with the retro cover

8    plate, does that fairly depict how the retrofit cover plate

9    would be installed on the 84-meter boom?

10       A    As an animation, yes.

11       Q    And it would be over the T2 and the T3 pin; correct?

12   Excuse me -- the T3 and T4 pin?

13       A    That's correct, 3 and 4 --

14       Q    T3 and T4, correct?

15       A    -- yes.

16       Q    The only difference here --

17            THE REPORTER:  One at a time, please.

18            MR. GOODMAN:  I apologize, ma'am.

19   BY MR. GOODMAN:

20       Q    The only difference here is that the cover plate is

21   being held on mechanically by bolts instead of wing nuts;

22   correct?

23       A    Right.

24       Q    And there are warning stickers on the sides of the

25   T3 and the T4 pins; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

150

1      A      That's correct.

2      Q      And there are warnings stickers on the top of the

3  cover plate; correct?

4      A      That's correct.

5      Q      Liebherr has never tested whether or not the new

6  cover plate being on the 84-meter boom could slide into the

7  T2; correct?

8      A      I'm not aware of that.

9      Q      So if the 84-meter boom could slide into the base of

10  the boom with the cover plate still installed, does this

11  fairly and accurately depict how it would look?  If they saw

12  the T3 pin, there would be a cover plate with a sticker;

13  correct?

14      A      Yes.

15      Q      It would not have an X; correct?

16      A      That's correct.

17      Q      And then if it went in further, there would be a

18  cover plate with a sticker and an X; correct?

19      A      Correct.

20      Q      And the T4 pin, though, would not be accessible with

21  this new retrofit cover plate; correct?

22      A      That's correct.

23      Q      So if someone was trying to manipulate the T4 pin as

24  you look at it now, it would be unable to do so; correct?

25      A      That's correct.  But you couldn't operate the No. 3

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

151

1    either because it has the cover on there too.

2        Q    So you couldn't operate No. T3 or T4 with the

3    retrofit cover plate; correct?

4        A    That's correct.

5        Q    That's a great point.

6            I'd like to move Exhibit 23 into evidence as Exhibit

7    23.

8            MR. CREMER:  I object to it.  I think I don't

9    believe it's an accurate representation dimensionally of

10   this product.

11           THE COURT:  All right.  Parts of it the witness

12   testified were accurate.  It's admitted.  Again, part of it

13   he testified that he thought it was accurate.  Part of it he

14   thought that he testified it was not accurate.  It's

15   admitted with that qualification that the testimony that

16   addresses some of it as being more accurate than other

17   parts.

18  (Plaintiff's Exhibit No. 23 was admitted.)

19  BY MR. GOODMAN:

20       Q    I just want to summarize a few things with you, sir.

21   The crane base is boom sections 1 and 2; correct?

22       A    Correct.

23       Q    And there are two boom packages for this crane;

24   correct?

25       A    Yes.

1    Q    There's a 50-meter boom that includes a boom package

2    section 3; correct?

3    A    Correct.

4    Q    And there's an 84-meter boom package that includes

5    boom sections 3, 4, 5 and 6; correct?

6    A    Correct.

7    Q    If the crane operator wants to have a 50-meter boom

8    they would install the one boom section 3 to the base;

9    correct?

10   A    Right.

11   Q    If the crane operator wants to have an 84-meter

12   boom, they would install the 84-meter boom package that

13   includes boom sections 3, 4, 5 and 6; correct?

14   A    That's correct.

15   Q    I'd like to talk about now when Liebherr US sent out

16   the Product Safety Bulletin to owners.  Okay?

17   A    Okay.

18   Q    I'd like you to turn to Exhibit 24 for

19   identification and I'd like you to look through -- there's

20   LAI3138, 3136, 3133, 3132, 3131, 3128, 3140, 3142, 3129,

21   3130, 3141 and 3134, 3137, 3135.

22        I'd like you to take a look at all those and tell me

23   whether you recognize them.  Would you rather look on the

24   screen or in the books, sir?

25   A    I could look on the screen.  I'm fine.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    Do you recognize all those, sir?

2        A    Yes, these are all the customers who have an LTM

3    1500 and would be affected with the same bulletin.

4        Q    Are these proofs of delivery of the Product Safety

5    Bulletin?

6        A    It's proof of by the UPS delivery.

7             MR. GOODMAN:  Your Honor, I'd like to move Exhibit

8    24 for identification into evidence as Exhibit 24.

9             MR. CREMER:  No objection.

10            THE COURT:  I'll admit it as a composite exhibit of

11   all those proofs of delivery.

12   (Plaintiff's Exhibit No. 24 was admitted.)

13   BY MR. GOODMAN:

14       Q    Thank you, Your Honor.

15            Now, Liebherr US sent these Product Safety Bulletins

16   to all of these crane owners because Liebherr US had a duty

17   and responsibility to provide the Product Safety Bulletin

18   and retrofit covers to these crane owners; correct?

19       A    That's correct.

20       Q    And you'd agree that the first document IAI3138, it

21   was delivered on January 11th, 2018; correct?

22       A    Correct.

23       Q    And IAI3136 was delivered on January 11th, 2018;

24   correct?

25       A    That is correct.

1          Q    And IAI3133 was delivered on January 11th, 2018;
2     correct?
3          A    That's correct.
4          Q    And IAI3132 was delivered on January 11th, 2018;
5     correct?
6          A    That's correct.
7          Q    And for IAI3131, it was delivered on January 15th,
8     2018; correct?
9          A    Correct.
10         Q    And IAI3128, it was delivered on February 2nd, 2018;
11    correct?
12         A    That's correct.
13         Q    And IAI3140 was delivered on February 2nd, 2018;
14    correct?
15         A    That's correct.
16         Q    And IAI3142 was delivered on February 2nd, 2018;
17    correct?
18         A    Correct.
19         Q    And IAI3129 was delivered on February 2nd, 2018;
20    correct?
21         A    That's correct.
22         Q    And IAI3130 was delivered on February 2nd, 2018;
23    correct?
24         A    Correct.
25         Q    And IAI3141 was delivered on February 5th, 2018;

```
1    correct?

2        A    That's correct.

3        Q    And IAI3134 was delivered on February 6th, 2018;

4    correct?

5        A    That's correct.

6        Q    And IAI3137 was delivered on February 6th, 2018;

7    correct?

8        A    That's correct.

9        Q    And IAI3135 was delivered on February 7th, 2018;

10   correct?

11       A    Correct.

12       Q    I want to show you what's been marked as Exhibit 25.

13   Can you take a look at that and let me know when you're

14   done?  This is document IAI3144, IAI3143, NBIS1081, 1080,

15   4900, 4893, 4894, 1072, 1073, 1076, 1074, 1077, 4871.

16       A    This is the whole package going to Sims Crane.

17       Q    And this was sent to Sims Crane on February 26th,

18   2018; correct?  It was delivered on February 26th, 2018;

19   correct?

20       A    February 26th, 2018, yes.

21       Q    It was delivered at 11:16 a.m.; correct?

22       A    That's what it states.

23       Q    And the shipment was sent to Chris, Sims Crane &

24   Equipment, 1219 North U. S. Highway 301, Tampa, Florida

25   33619; correct?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    That's correct.

2       Q    And this Product Safety Bulletin was sent to Sims

3   Crane because Liebherr US had a duty and responsibility to

4   send the Product Safety Bulletin retrofit cover plate and

5   retrofit stickers to Sims Crane & Equipment; correct?

6       A    Correct.

7       Q    On page LAI3143, it has Sims Crane Equipment

8   company's address in there; correct?

9       A    Correct.

10      Q    Liebherr US would have had to input that address in

11  there; correct?

12      A    That's correct.

13      Q    So as plaintiff of the date of this Product Safety

14  Bulletin, Liebherr US knew that Sims address was 1219 North

15  U. S. Highway 301 in Tampa, Florida, 33619; correct?

16      A    As of which date?

17      Q    The date of the Product Safety Bulletin.

18      A    No.

19      Q    It was not at the date of the Product Safety

20  Bulletin?

21      A    No.

22      Q    Why is it not the date of the Product Safety

23  Bulletin?

24      A    The Product Safety Bulletin was issued on 8/11,

25  November 8, 2017.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And when was this sent?

2      A    In February of 2018.

3      Q    This Product Safety Bulletin was not sent to Schuch;

4    correct?

5      A    This product was not sent to Schuch, correct.

6      Q    And Liebherr never sent any Product Safety Bulletin

7    like this one to Schuch; correct?

8      A    That is correct.

9      Q    And this Product Safety Bulletin was for the safety

10   of people and property; right?

11     A    Yes.

12     Q    It was to prevent personal injury, property damage

13   and death; correct?

14     A    Yes.

15     Q    Before the date that was received here,

16   February 26th, 2018, Liebherr had never sent this Product

17   Safety Bulletin to Sims; correct?

18     A    That's what it looks like, yes, sir.

19     Q    They -- Liebherr US only sent it to Sims once;

20   correct?

21     A    Yes.

22     Q    And it was on February 26th, 2018; is that correct?

23     A    That's correct.

24     Q    You would agree Liebherr failed in its duty to

25   provide Sims its Product Safety Bulletin in a timely manner;

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  correct?

2    A    No, I'm not agreeing.

3    Q    You don't agree with that, sir?

4    A    No.

5    Q    Do you remember you and I were in a deposition

6  together?

7    A    Yes, sir.

8    Q    And you were there?

9    A    Yes, I was.

10   Q    And I was there?

11   A    Yes.

12   Q    And your attorneys sitting here today were there;

13  correct?

14   A    Yes, that's correct.

15   Q    And there was a court reporter there?

16   A    Yes.

17   Q    And do you remember that everything that you and I

18  were saying was being reported; correct?

19   A    That's correct.

20   Q    Do you remember I asked you "question --

21        MR. CREMER:  Page.

22        MR. GOODMAN:  Page 191.  193, excuse me.

23  BY MR. GOODMAN:

24   Q    "So do you think that Liebherr US failed in its

25  responsibility to Sims in sending out the Product Safety

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Bulletin three-and-a-half to four months after it received

2    it?"

3            Then I asked, "Why did you look at your lawyer?"

4            And you answer, "I mean, again, I say no, I don't

5    have to look at him.  I say no, I don't."

6            Then I ask you.  "So three-and-a-half, four months

7    is acceptable to send out a safety notice to a client on

8    something that can damage the product, damage life and kill

9    somebody?  Is that correct?  Three-and-a-half, four months

10   is acceptable?"

11           And your answer "again, are you asking my opinion or

12   are you asking, do you know what I'm saying, Liebherr's

13   opinion?  You're asking Liebherr's opinion?"

14           And the question, "well, you're here for the

15   corporation; right?"

16           And you answer, "yeah, I'm here for the

17   corporation."

18           And I ask, "all right, so just stop jumping around

19   between you.  I'm asking the corporation, sir.  What's

20   Liebherr's expectation in sending out Product Safety

21   Bulletins to customers?"

22           And your answer "get it done as soon as possible."

23           And I asked, "so is three-and-a-half, four months as

24   soon as possible?"

25           Your answer, "in some instances it is because we

1    have a lot of" -- and I ask.  "In this instance was it, was

2    three-and-a-half, four months acceptable?"

3              Your answer, "no."

4              MR. CREMER:  Objection.  That's not impeaching at

5    all.

6              THE COURT:  Overruled.

7    BY MR. GOODMAN:

8         Q    Is it acceptable to send this out three-and-a-half

9    to four months after, sir, receipt?

10        A    Yes.  I say okay, yes, because we have a lot of

11   other modifications to take care of at the same time.

12        Q    Are you telling the truth then, sir, or are you

13   telling the truth now?

14        A    I'm telling the truth then and I'm telling the truth

15   now.

16        Q    Last time you said it wasn't acceptable but now

17   you're saying it is acceptable?

18        A    Acceptable, you know, I'm saying, you say you

19   bringing in, you know, Sims Crane.  At the time we didn't

20   even know that Sims Crane owned the crane.

21        Q    So Liebherr didn't know that Sims owned the crane

22   before the date that they sent this Product Safety Bulletin?

23        A    That's correct.

24        Q    I'd like to discuss with you Exhibit 26, the

25   Operator's Manual.  Are you familiar with this, sir?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Yes.

2    Q    Do you recognize it?

3    A    Yes.

4    Q    And what is it?

5    A    It's a mobile crane with telescopic boom operating

6    instructions.

7    Q    It's for the Liebherr LTM 1500?

8    A    It's for the LTM 1500.

9    Q    And the same crane that was supplied to Sims;

10   correct?

11   A    That's correct.

12        MR. GOODMAN:  Your Honor, I'd like to move Exhibit

13   26 for identification into evidence as Exhibit 26.

14        MR. CREMER:  No objection.

15        THE COURT:  It's admitted.  I don't know that you

16   moved in Exhibit 25.

17        MR. GOODMAN:  Your Honor, I'd like to move in

18   Exhibit 25 for identification as Exhibit 25.

19        THE COURT:  Any objection?

20        MR. CREMER:  If I remember what it was.

21        THE COURT:  It's the composite.  It's the UPS

22   notification of when.

23        MR. CREMER:  No objection, Your Honor.

24        THE COURT:  25 is admitted also.

25        MR. GOODMAN:  Thank you, Judge.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   (Plaintiff's Exhibit Nos. 25 and 26 were admitted.)

2   BY MR. GOODMAN:

3       Q    This Operator Manual would have been prepared and

4   published at the time of the manufacturer of the crane;

5   correct?

6       A    That's correct.

7       Q    Since the crane is a 2012.  It's Operator's Manual

8   would have been prepared on or before 2012; correct?

9       A    That's correct.  Before or around.

10      Q    And Liebherr is aware of the information in the

11  Operator's Manual; correct?

12      A    That's correct.

13      Q    Liebherr was aware then before 2012 that the T4

14  locking pin is -- Liebherr -- strike that.

15           Liebherr was aware before 2012 that if the T4

16  locking pin on the Liebherr LTM 1500 is inappropriately

17  adjusted there can be an uncontrolled retraction of sections

18  4, 5 and 6?

19      A    Yes.

20      Q    And Liebherr was aware that could happen since the

21  issuance of the Operator's Manual; correct?

22      A    Correct.

23      Q    The Operator's Manual is for use by the operator

24  while they're using the equipment; right?

25      A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       Q    And if we turn to page two of the Operator's Manual,

2  it states, "this crane may only be used when no

3  modifications were made on the crane."  Correct?

4       A    Correct.

5       Q    Moving from the 84-meter boom to the 50-meter boom

6  and vice versa, that's not a modification; correct?

7       A    Not a modification.

8       Q    So the crane can be used when it's moved from the 84

9  to the 50 or vice versa; right?

10      A    That's correct.

11      Q    And on page two, it says, "the Operator's Manual

12 also states that modifications on the crane may only be made

13 with written approval by Liebherr-Werk Ehingen GmbH," which

14 we're referring to as Liebherr Germany; is that correct?

15      A    That's correct.

16      Q    To move the 84 to the 50 or the 50 to the 84 would

17 not require written approval by the Liebherr Germany;

18 correct?

19      A    No, it does not.

20      Q    So the changing of the 50-meter boom for the

21 84-meter and vice versa is not considered a modification by

22 Liebherr; correct?

23      A    That's correct.

24      Q    Page two of the Operator's Manual states the terms

25 danger, excuse me, on page 3, "Operator's Manual, danger,

1    warning, caution and attention."  Correct?

2        A    Correct.

3        Q    And those are signal words; correct?

4        A    That's correct.

5        Q    And next to the terms, "danger, warning and

6    caution," there are yellow triangles with black exclamation

7    marks; correct?

8        A    Correct.

9        Q    And those are designated dangerous situations which

10   could lead to either death, serious injury or property

11   damage; correct?

12       A    That's correct.

13       Q    And even when there's just a caution signal word

14   without a triangle, with an exclamation point, it can

15   designate a dangerous situation that could lead to property

16   damage; correct?

17       A    Correct.

18       Q    And below that there's a signal word note with a

19   sign, an I with a circle around it, and that designates

20   useful information; correct?

21       A    That's correct.

22       Q    And then below that it says, "the crane

23   documentation is comprised of among other things all

24   subsequently supplied information, updates and addenda for

25   the crane documentation."  Correct?

1      A      That's correct.

2      Q      So the crane documentation for the 2012 Liebherr LTM

3   1500 would include the Product Safety Bulletin and Retrofit

4   Kit; correct?

5      A      Repeat that.

6      Q      Right.  Page 3 that we're looking at, it states that

7   the crane documentation is comprised of among other things

8   all subsequently supplied information, updates and addenda

9   for the crane documentation; correct?

10     A      Yes.

11     Q      So that would include the Product Safety Bulletin

12   and the product retrofit was part of the crane

13   documentation; correct?

14     A      That's correct.

15     Q      Page 3 provides that the crane documentation, among

16   other things, make it possible for the operator to operate

17   the crane safely and provides the operator with information

18   about the functionality of important components and systems;

19   correct?

20     A      Yes.

21     Q      So without the Product Safety Bulletin, you would

22   agree that it makes it less possible for the operator to

23   operate the crane safely, and it makes it less possible for

24   the operator to have the information about the functionality

25   of important components and systems; correct?

1      A    Correct.

2      Q    Now, if we go to page 4 it provides three warnings

3  with exclamation points and yellow triangles.  The first

4  warning on page 4 states:  "Danger of accidents due to

5  incorrect operation of the crane.  Incorrect operation of

6  the crane can lead to accidents.  Personnel can be killed or

7  seriously injured.  This could result in property damage."

8  Correct?

9      A    That's correct.

10     Q    And the first warning goes on to state that the only

11 authorized and trained expert personnel are meticulously

12 permitted to work on the crane; correct?

13     A    Correct.

14     Q    Nowhere in the Operator's Manual or anywhere else

15 does Liebherr Germany or Liebherr define what an authorized

16 and trained expert is; correct?

17     A    That's correct.

18     Q    They leave that to the crane operators; correct?

19     A    That's correct.  We are not training crane

20 operations.  We're training a hand-over, just the

21 similarities of all the cranes in the industry which they

22 learn to operate in different -- on different machines or at

23 the industry.

24     Q    And you would agree that nowhere in the Operator's

25 Manual does it say manipulating the T4 pin is an incorrect

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    operation of the crane; correct?

2        A    Correct.

3        Q    So if Sims determined that Shane Burrows was an

4    authorized and trained expert in what he was doing, Liebherr

5    would defer to Sims on whether or not he was an authorized

6    and trained expert; correct?

7        A    We would defer to Sims, yes.

8        Q    The first warning goes on to state, "the crane

9    documentation is part of the crane and must be accessible on

10   the crane.  The crane documentation must be observed.  Using

11   the crane documentation makes it easier to become familiar

12   with the crane and avoid problems due to improper operation.

13   Place the crane documentation accessible in the driver's cab

14   or in the crane cab."  Correct?

15       A    That's what it says.

16       Q    And we know from page 3 that provides that the crane

17   documentation includes the Product Safety Bulletin and

18   everything that goes along with that; correct?

19       A    That's what it says.

20       Q    So you would agree then that Liebherr not providing

21   Sims the Product Safety Bulletin timely prevented Sims from

22   becoming familiar with the crane and avoiding problems due

23   to improper operation; correct?

24       A    I do not.

25       Q    You would agree that without the Product Safety

 1   Bulletin, Sims is operating the crane without full crane

 2   documentation on the date of loss; correct?

 3       A    I'm not sure if they had the training crane

 4   documentation on the crane that day, no, we don't know.

 5       Q    We know from the previous exhibit that they did not

 6   get this Product Safety Bulletin before February 19th, 2018;

 7   correct?

 8       A    That is correct.

 9       Q    So if they did not have the Product Safety Bulletin

10   on February 19th, 2018, you'd agree that they were operating

11   the crane without the full crane documentation; correct?

12       A    The bulletin.

13       Q    Sir, I'm just asking you whether or not they would

14   be operating the crane without the full crane documentation

15   if they don't have the Product Safety Bulletin; correct?

16       A    That's correct.

17       Q    None of the warnings that we see on this page

18   express that if you manipulate the T4 pin it's encapsulated

19   in any of these warnings; correct?

20       A    That's correct.

21       Q    And none of the warnings here express that if the T4

22   pin is manipulated one way, it shouldn't be manipulated

23   back; correct?

24       A    Correct.

25       Q    The second warning states: "Outdated Version of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Crane Documentation.  If subsequently supplied information,

2    updates and addenda to the crane documentation are observed

3    and added, there is a danger of accidents.  Personnel can be

4    killed or seriously injured.  This could result in property

5    damage.  Observe and add all subsequently supplied

6    information, updates, and addenda for the crane

7    documentation.  Make sure that all affected persons always

8    know and understand the latest version of the crane

9    documentation."  Correct, sir?

10        A    Correct.

11        Q    Liebherr is aware of that warning?

12        A    It's in the books, yes, so we are aware of it.

13        Q    And we know from page 3 that provides the crane

14   documentation includes the Product Safety Bulletin and

15   everything that goes along with it; correct?

16        A    Correct.

17        Q    So Liebherr not providing Sims with the Product

18   Safety Bulletin timely caused Sims to rely on an outdated

19   version of the crane documentation; correct?

20        A    Yes.

21        Q    So Liebherr knew that Sims was operating the crane

22   without subsequently supplied information for the Product

23   Safety Bulletin?

24        A    No, I did not know that.

25        Q    And that's because it's your contention that

1   Liebherr US was not aware that Sims owned the crane on

2   February 19th, 2018?

3        A    Yes.

4        Q    And you're sticking to that answer, sir?

5        A    I am.

6        Q    And Liebherr knew that manipulating the T4 pin could

7   cause personnel to be killed, injured or property damage;

8   correct?

9        A    Yes.

10       Q    There's nothing wrong with an operator manually

11  retracting a cylinder; correct?

12       A    There's nothing wrong with?

13       Q    With an operator manually retracting a cylinder;

14  correct?  It's in the Operator's Manual?

15       A    No.  It says in the Operator's Manual I think it

16  says, okay, it has to be a mechanic.  Manual.  I think.  I'm

17  not 100 percent sure.  I don't want to speculate here.

18       Q    We can come back to that, sir.  But you're not aware

19  whether or not it does or doesn't say?

20       A    No, I'm not aware of it.

21       Q    But nonetheless, it's in the Operator's Manual that

22  the cylinder can be retracted manually; correct?

23       A    Yes.

24       Q    Now, let's talk about the sale and purchase of the

25  Liebherr LTM 1500.  I'd like you to turn to Exhibit 27 if

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

171

1    you don't mind.

2         Your Honor, I'm not sure but I'd like to move for

3    Exhibit 26 into evidence as Exhibit 26.

4         THE COURT:  Okay.  I have it already in evidence and

5    there was no objection, but...

6         MR. CREMER:  No objection, Your Honor.

7         THE COURT:  Let me just ask you.  The condensed 26

8    that I have, is that just a shorter version of 26?  What is

9    that?

10        MR. GOODMAN:  Yes, Your Honor.  So 26 is fairly

11   large, so I condensed 26 down to the pages that we were

12   using so the Court and the witness and the parties do not

13   have to go through the entire manual.

14        THE COURT:  Is there any objection to that,

15   Mr. Cremer.

16        MR. CREMER:  I don't know what's in it.  In theory,

17   though.

18        THE COURT:  What we'll do is overnight -- and you

19   gave Mr. Cremer a copy of the condensed version?

20        MR. GOODMAN:  Yes, Your Honor.

21        THE COURT:  So then perhaps tonight, it looks like

22   26, 110 and 111 have all been condensed to 26.  If you could

23   just look tonight and then if that is acceptable, then we'll

24   move that in as 26A tomorrow.

25

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   BY MR. GOODMAN:

2       Q    Mr. Vieten, I'd like you to take a look at what's

3   been marked as Exhibit 27 for identification.  Take a look

4   at that.  Let me know if you're familiar with that.

5       A    I've seen it, yes.

6       Q    What is it?

7       A    It's an email from Mr. Bulat Adnan to Mr. Daniel

8   Pitzer and Mr. Jacobson.

9            MR. GOODMAN:  I'd like to move Exhibit 27 into

10  evidence as Exhibit 27.

11           MR. CREMER:  No objection.

12           THE COURT:  Admitted.

13  (Plaintiff's Exhibit No. 27 was admitted.)

14  BY MR. GOODMAN:

15      Q    What's the date of this email?

16      A    August 26th, 2016.

17      Q    Who is Adnan Bulat?

18      A    He's a used crane manager from Ellerbee, Germany.

19      Q    Who is Daniel Pitzer?

20      A    Daniel Pitzer at the time he was the managing

21  director of US.

22      Q    Who is Bret Jacobson?

23      A    Bret is the manager for the state administration.

24      Q    And what do you understand this email to mean?

25      A    What do I understand the email?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Strike that.  This is an email going from Adnan

2   Bulat, Daniel Pitzer and Bret Jacobson discussing the best

3   offer for the crane LTM 1500-8.1 with code 17727 and

4   advising that the total amount due would be $2,944,830; is

5   that correct?

6      A    That's correct.

7      Q    I'd like you to turn to Exhibit 28 for

8   identification.  Do you recognize that?

9      A    That's an email from Mr. Jacobson internally to

10  Mr. Miller who was the administrator for the sales.

11         MR. GOODMAN:  Your, Honor I'd like to move Exhibit

12  28 as Exhibit 28.

13         MR. CREMER:  No objection.

14         THE COURT:  Exhibit 28 is admitted.

15  (Plaintiff's Exhibit No. 28 was admitted.)

16  BY MR. GOODMAN:

17     Q    So Exhibit 28 is from Bret Jacobson?  He's an

18  employee of Liebherr US; is that correct?

19     A    Yes.

20     Q    And it's sent to Petra Miller who's an employee of

21  Liebherr US.

22     A    That's correct.

23     Q    The date is Wednesday, August 31st, 2016; correct?

24     A    Correct.

25     Q    The subject is 300,000 from Schuch HeavyLift;

1    correct?

2        A    Correct.

3        Q    The attachment on this is a pro forma invoice, LTM

4    1500-8.1 SN073386, down payment, 30 August 2016; correct?

5        A    Correct.

6        Q    And in the body Bret Jacobson says to Petra, "I'm

7    expecting a wire in the amount of 300,000 from Schuch

8    HeavyLift for the crane that I mentioned to you yesterday."

9    Is that correct?

10       A    That's correct.

11       Q    And then he goes on to say, "so far there's no

12   official file for the crane, but I started a book on my desk

13   to keep track of things."  Correct?

14       A    Correct.

15       Q    He was supposed to start on official file for the

16   sale of the crane; correct?

17       A    That's correct.

18       Q    And not having an official file would have violated

19   the standard operating procedures of Liebherr US; correct?

20       A    Correct.

21       Q    I'd like to show you what's marked as Exhibit 29.

22   Are you familiar with this?

23       A    Yes.

24       Q    What is this?

25       A    This is a sales contract, used equipment sales

1    acknowledgment.

2         MR. GOODMAN:  Your Honor, I'd like to move Exhibit

3    29 for identification into evidence as Exhibit 29.

4         MR. CREMER:  No objection.

5         THE COURT:  Exhibit 29 is admitted.

6    (Plaintiff's Exhibit No. 29 was admitted.)

7    BY MR. GOODMAN:

8         Q    Exhibit 29 is a sales contract dated August 30th,

9    2016; correct?

10        A    Correct.

11        Q    And the seller of the equipment is Liebherr US;

12   correct?

13        A    Correct.

14        Q    And the buyer is Schuch HeavyLift Corporation;

15   correct?

16        A    That's correct.

17        Q    And the contract is selling the crane from Liebherr

18   to Schuch HeavyLift Corporation; correct?

19        A    That's correct.

20        Q    Is it okay in today's conversation we refer to

21   Schuch HeavyLift Corporation just as Schuch?

22        A    Yes.

23        Q    And the contract is signed by Bret Jacobson and

24   Daniel Pitzer on behalf of Liebherr US; correct?

25        A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And they have the authority to do so; correct?

2      A    That's correct.

3      Q    They were employees of Liebherr US; correct?

4      A    That's correct.

5      Q    Bret Jacobson and Daniel Pitzer were representing

6   Liebherr at the time with this contract; correct?

7      A    That's correct.

8      Q    Sims is not a party to this agreement, Exhibit 29;

9   correct?

10      A    Not part, not mentioned at all, no.

11      Q    And the only two parties to this agreement are

12   Liebherr and Schuch; correct?

13      A    That's correct.

14      Q    And attached to the used equipment sales

15   acknowledgment is Liebherr general terms and conditions of

16   sale; correct?

17      A    Yes.

18      Q    And he has a paragraph on page 4 of 4 which is

19   LAI0017, letter H.  Do you see that?

20      A    Yes.

21      Q    And that says, "no third-party beneficiary."

22   Correct?

23      A    Correct.

24      Q    It says, "the parties hereto agree that this

25   agreement shall enure only to the benefit of the parties

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    hereto and to no third parties except the manufacturer and

2    any other manufacturers of components of the equipment who

3    both parties expressly agree are intended third-party

4    beneficiaries of this agreement."  Correct?

5        A    Correct.

6        Q    Sims is not an intended third-party beneficiary of

7    this agreement; correct?

8        A    It's not mentioned, no.

9        Q    And Sims is not a third-party beneficiary of this

10   agreement; correct?

11       A    Correct.

12       Q    This agreement only enures to the benefit of Schuch

13   and Liebherr US; correct?

14       A    Correct.

15       Q    And Sims was not a manufacturer of any of the

16   components parties of the equipment; correct?

17       A    That's correct.

18       Q    Go to the next page, IAI0606.  It's Exhibit A of the

19   agreement provides the detailed equipment description;

20   correct?

21       A    That's correct.

22       Q    And Exhibit A of the agreement references the

23   Liebherr LTM 1500-8.1 with serial number 073386 and crane

24   code number LWE-17727 with items deleted and items to be

25   sold with the crane; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A     That's correct.

2        Q     And the technical data in Exhibit A of the agreement

3    provides that the code number for the crane is LWE-17727;

4    correct?

5        A     That's correct.

6        Q     And each crane has its own code number; correct?

7        A     That's correct.

8        Q     So there's only one Liebherr LTM 1500 in the world

9    that has crane code LWE-17727; correct?

10       A     Yes.  I assume, yeah.

11       Q     And that's the same code number that's in Exhibit 27

12   and 28, correct, that's referenced?

13       A     Yes.

14       Q     So the cranes that they're discussing in Exhibit 27

15   and 28 is this crane that Liebherr US sold to Schuch;

16   correct?

17       A     Correct.

18       Q     And the technical data in the agreement, it provides

19   the serial number for the crane is 073386; correct?

20       A     Correct.

21       Q     And each crane has its own serial number; correct?

22       A     That's correct.

23       Q     And so there's only one Liebherr LTM 1500 in the

24   world that has serial number 073386; correct?

25       A     That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And this is the same serial number in the subject

2    line of Exhibit 28; correct?

3    A    Yes.  Yes.

4    Q    And attached to this at IAI0608 is a Liebherr

5    limited warranty; correct?

6    A    Yes.

7    Q    And this warranty would be subject to Liebherr

8    general terms and conditions of the sale that we previously

9    went over; correct?

10   A    Correct.

11   Q    So the Liebherr limited warranty would only apply

12   to the intended parties of the contract which would be

13   Liebherr US and Schuch; correct?

14   A    That's correct.

15   Q    And so it would not apply to Sims; correct?

16   A    That's correct.

17   Q    And the sale price of this crane from Liebherr to

18   Schuch in total -- well, the original price was $3,100,000

19   plus taxes; correct?

20   A    Yes.

21   Q    I'd like to show you what's marked as Exhibit 30 for

22   identification.  Do you recognize this?

23   A    This is from Mr. Steve Hoffman from Schuch in

24   Germany or here in the United States, I don't know, to

25   Mr. Jacobson.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Mr. Jacobson is an employee of Liebherr US; is that

2    correct?

3    A    Liebherr US.

4         MR. GOODMAN:  I'd like to move Exhibit 30 into

5    evidence as Exhibit 30.

6         MR. CREMER:  No objection.

7         THE COURT:  Exhibit 30 is admitted as plaintiff's

8    Exhibit 30.

9  (Plaintiff's Exhibit No. 30 was admitted.)

10 BY MR. GOODMAN:

11   Q    And in this email on IAI0571 at the bottom, it says,

12   "dear, Mr. Hoffman, a few open items on this order."

13   Correct?

14   A    Yes.

15   Q    And the subject line on this is the LTM 1500-8.1 SN

16   073386 with code 17727; correct?

17   A    Correct.

18   Q    And then if we turn to IAI0572, which is the next

19   page, on the bottom of that bullet point it says, "what did

20   your customer say about the travel configuration of the

21   machine?  I assume that they signed off on the first

22   drawing, but I am not sure about that."  That's what it

23   says; correct?

24   A    Correct.

25   Q    That's from Bret Jacobson; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    As a reader of this, you would understand that

3   Mr. Hoffman has a customer; correct.

4      A    Yes.

5      Q    I'd like to show you what's been marked as Exhibit

6   31.  Do you recognize that, sir?

7      A    It's an email from Mr. Hoffman to Mr. Jacobson.

8           MR. GOODMAN:  Your Honor, I'd like to move Exhibit

9   31 for identification into evidence as Exhibit 31.

10          THE COURT:  Any objection?

11          MR. CREMER:  No, Your Honor.

12          THE COURT:  Hold on.  Let me admit 31.  I don't

13   think you've moved 30, though, also.

14          MR. GOODMAN:  I'd like to move Exhibit 30 into

15   evidence, your Honor.

16          THE COURT:  Any objection?

17          MR. CREMER:  No.

18          MR. GOODMAN:  Thank you, judge.

19          THE COURT:  That's admitted too.

20   (Plaintiff's Exhibit Nos. 30 and 31 were admitted.)

21   BY MR. GOODMAN:

22      Q    Exhibit 31 is an email from Steve Hoffman of Schuch

23   HeavyLift; correct?

24      A    Right.

25      Q    And it's to Bret Jacobson; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    Correct.

2       Q    And Bret Jacobson is an employee of Liebherr US;

3  correct?

4       A    Correct.

5       Q    And dated October 16, 2016; correct?

6       A    I guess so.

7       Q    And on it, Steve Hoffman is telling Bret Jacobson,

8  "I will check it with my customer and let you know".

9  Correct?

10      A    That's correct.

11      Q    And the subject is the LTM 1500-8.1 SN with code

12  17727?

13      A    It says, "open items."

14      Q    Open items.  But it's referencing a specific crane;

15  correct?

16      A    Uh-huh.

17      Q    And that crane is 073386; correct?

18      A    That's correct.

19      Q    As a reader of this email, would you understand that

20  Steve Hoffman is telling Bret Jacobson that he's going to

21  check on some stuff with his customer?

22      A    Yes.

23      Q    And so as a reader of this email, would you

24  understand that Steve Hoffman at Schuch has a customer?

25      A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    I'd like to show you Exhibit 32 for identification.

2   Do you recognize this document, sir?

3      A    It's an email from Mr. Jacobson to Mr. Hoffman.

4           MR. GOODMAN:  I'd like to move Exhibit 32 for

5   identification into evidence as Exhibit 32.

6           MR. CREMER:  No objection.

7           THE COURT:  Exhibit 32 is moved into evidence as

8   plaintiff's Exhibit 32.

9  (Plaintiff's Exhibit No. 32 was admitted.)

10  BY MR. GOODMAN:

11     Q    This is an email from Bret Jake to Steve Hoffman at

12  Schuch; correct?

13     A    Yes.

14     Q    Bret Jacobson is an employee of Liebherr US; is that

15  correct?

16     A    Yes.

17     Q    The date is October 13th, 2016; is that correct?

18     A    That's correct.

19     Q    And in it Bret Jacobson says to Steve Hoffman, Dear

20  Mr. Hoffman, can you please give me an update on the tax

21  status of Schuch HeavyLift in New York and also sign and

22  return the latest travel drawing if it will suit the needs

23  of your customer; correct?

24     A    That's correct.

25     Q    As a reader of this email, do you understand that

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Bret Jacobson understands that Steve Hoffman has Schuch as a
2    customer?
3        A    As a customer, yes.
4        Q    And the subject is the crane 073386?
5        A    That's correct.
6        Q    I'd like to show you what's marked as Exhibit 33 for
7    identification.  Are you familiar with this, sir?
8        A    It's again a used equipment sales acknowledgment.
9        Q    And who is that between?
10       A    Again between Liebherr USA and Schuch.
11       Q    And this is an addendum to the previous used
12   equipment sales acknowledgment that we previously looked at;
13   correct?
14       A    Yes, sir.
15       Q    And the only parties to this agreement is Liebherr
16   US and Schuch HeavyLift; correct?
17       A    That's correct.
18       Q    And Schuch HeavyLift's address on this is 80 Pine
19   Street, New York, New York; is that correct?
20       A    That's correct.
21       Q    And the total payment for the total invoice is
22   $3,000,100; is that correct?
23       A    That's correct.
24       Q    And the only change between addendum one to the used
25   sales acknowledgment and the crane agreement that we had

1    previously looked at under Exhibit 29 is that the taxes are

2    removed; correct?

3        A    Sure.  Looks like it, yes, sir.

4        Q    And the parties were all still the same; correct?

5        A    Same parties.

6        Q    Sims is not a third-party beneficiary to this

7    contract?

8        A    Sims is not mentioned here.

9        Q    Sims is not a party to the contract; correct?

10       A    Sims is not part of the contract.

11            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

12   33 into evidence as Exhibit 33.

13            MR. CREMER:  No objection.

14            THE COURT:  33 is admitted.

15   (Plaintiff's Exhibit No. 33 was admitted.)

16   BY MR. GOODMAN:

17       Q    Sir, I'd like you to turn to Exhibit 34 for me.

18       A    That's from Mr. Adnan to Jacobson about the crane

19   delivery.

20       Q    You recognize this email?

21       A    I personally don't recognize the email, but, you

22   know, I'm saying I recognize it as an email to them, yes.

23       Q    You recognize that as a Liebherr US email?

24       A    That's correct.

25            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1    34 for identification into evidence as Exhibit 34.
 2              MR. CREMER:  No objection.
 3              THE COURT:  34 is admitted.
 4    (Plaintiff's Exhibit No. 34 was admitted.)
 5    BY MR. GOODMAN:
 6         Q    This is an email from Adnan Bulat from Liebherr
 7    Germany; correct?
 8         A    That's correct.
 9         Q    And it's to Bret Jacobson of Liebherr US; correct?
10         A    That's correct.
11         Q    And Bret Jacobson was an employee of Liebherr US at
12    the time; correct?
13         A    Correct.
14         Q    And it's sent on Thursday, November 17th, 2016;
15    correct?
16         A    Correct.
17         Q    And the subject is delivery, LTM 1500-8.1, code
18    17727; correct?
19         A    Correct.
20         Q    And that's the same code for the crane that we've
21    been discussing today; correct?
22         A    That's correct.
23         Q    The same code for the crane that was in the sales
24    agreement between Liebherr US and Schuch; correct?
25         A    Correct.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    And it says, from Mr. Bulat to Mr. Jacobson, "Dear

2    Bret.  As previously informed, please note that the AM crane

3    sold to Sims Florida through company Schuch will again be

4    delivered to Jacksonville, Florida and not to Brunswick."

5    Correct?

6        A    Correct.

7        Q    From this email Mr. Jacobson should understand that

8    the crane 17727 was sold to Sims; correct?

9        A    Yes.

10       Q    And at the time Mr. Jacobson is an employee of

11   Liebherr US; correct?

12       A    That's correct.

13       Q    And when Mr. Jacobson found out that Sims was

14   purchasing the crane 17727, Mr. Jacobson should have updated

15   the computer system; correct?

16       A    Yes.

17       Q    That's a standard operating procedure at Liebherr

18   US?

19       A    To my knowledge, yes.

20       Q    And if Bret Jacobson did not update the Liebherr

21   computer system that the crane 17727 had been sold to Sims,

22   Bret Jacobson violated Leibherr's own standard operating

23   procedures; correct?

24       A    Violated?

25       Q    Correct.  Because he should have inputted it?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    He should have corrected it, yes.

2      Q    And if he didn't, he breached his responsibility as

3  to Liebherr US?

4      A    He didn't take care of it.  He could have taken care

5  of it a different way, yes.

6      Q    He should have done that; correct?

7      A    He could have done that, yes.

8      Q    And he should have done that; correct?

9      A    Yes.

10     Q    I'm going to show you what's -- Your Honor, can I

11  move Exhibit 34 into evidence as Exhibit 34.

12          MR. CREMER:  No objection.

13          THE COURT:  34 is admitted.

14  (Plaintiff's Exhibit No. 34 was admitted.)

15  BY MR. GOODMAN:

16     Q    I'd like you to turn to Exhibit 35, sir.  Are you

17  familiar with this?

18     A    Yes.  It's another email from Mr. Jacobson to

19  Ms. Miller.

20     Q    And this is an email from Bret Jacobson who's

21  employed at the time by Liebherr US; correct?

22     A    Correct.

23     Q    It's to Petra Miller who's employed at Liebherr US;

24  correct?

25     A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And the date is Monday, November 21st, 2016;

2    correct?

3      A    Correct.

4      Q    And it's FYI.  Do you understand F-Y-I at Liebherr

5    US means for your information?

6      A    For your information, yes.

7      Q    And he's forwarding the email that we just discussed

8    that says, "as previously informed, please note that the AM

9    crane sold to Sims Florida through company Schuch will again

10    be delivered to Jacksonville, Florida and not to Brunswick."

11    Correct?

12      A    Correct.

13      Q    And now not only does Bret Jacobson know that this

14    crane 17727 has been sold to Sims, but now Petra Miller also

15    knows; correct?

16      A    That's correct.

17      Q    And Petra Miller should have made sure that it was

18    correctly shown in the Liebherr US's computer systems;

19    correct?

20      A    Correct.

21          MR. GOODMAN:  Your Honor, I'd like to submit Exhibit

22    35 for identification into evidence as Exhibit 35.

23          MR. CREMER:  No objection.

24          THE COURT:  Admitted 35 is admitted.

25    (Plaintiff's Exhibit No. 35 was admitted.)

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    BY MR. GOODMAN:

2        Q    I'd like to show you what's been marked as Exhibit

3    36, sir.  Do you recognize this?

4        A    It's a pro forma invoice to Schuch, deliver to

5    Schuch.  Can you make it a little larger?  There you go.

6            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

7    36 into evidence as Exhibit 36.

8            MR. CREMER:  No objection.

9            THE COURT:  36 is admitted.

10   (Plaintiff's Exhibit No. 36 was admitted.)

11   BY MR. GOODMAN:

12       Q    This is a Liebherr US pro forma invoice; correct?

13       A    Correct.

14       Q    This was issued to Schuch HeavyLift; correct?

15       A    That's correct.

16       Q    And it was for the price of crane 073386; correct?

17       A    That's correct.

18       Q    And that is the same kind that we just talked about

19   in Exhibits 34 and 35; correct?

20       A    That is correct.

21       Q    And it says paid on the bottom; correct?

22       A    It says paid.

23       Q    Liebherr US got paid for this crane; correct?

24       A    It looks like it, yes.

25       Q    And it got paid $3,100,000?

1      A    I assume.

2      Q    If Liebherr did not get paid $3,100,000 Liebherr

3  would be proceeding against Schuch to obtain that money;

4  correct?

5      A    Absolutely.

6      Q    There's no process to obtain that; is that correct?

7      A    Yes.

8      Q    It was paid 3,100,000 for this crane?

9      A    Yes, sir.

10     Q    I'd like you to turn to Exhibit 37.  Do you

11  recognize this, sir?

12     A    An email from Mr. Jacobson to Mr. Nicholas and

13  copies to Mr. Adnan and Mr. Miller.

14          THE WITNESS:  I'd like to move Exhibit 37 into

15  evidence as Exhibit 37.

16          MR. CREMER:  No objection.

17          THE COURT:  37 is admitted.

18  (Plaintiff's Exhibit No. 37 was admitted.)

19  BY MR. GOODMAN:

20     Q    This is an email from Bret Jacobson who's an

21  employee of Liebherr US to Nicholas Stark, an employee of

22  Liebherr Germany, on Wednesday, December 14th, 2016;

23  correct?

24     A    Correct.

25     Q    And the email says "Nicholas, can I ask you for a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    favor regarding this crane?"  Correct?

2        A    Correct.

3        Q    And the crane that they're referring to is crane

4    073386 code 17727; correct?

5        A    That's correct.

6        Q    It's the crane we've been talking about today; sir,

7    the crane we've been talking about today; correct?

8        A    The crane we've been talking about today.

9        Q    It goes on to say, "can you send a scan back to me

10   of the complete order acknowledgment for this machine?  It

11   was not in the usual place here and I want to be sure we can

12   refer to it if we need to."  Correct?

13       A    Correct.

14       Q    And it should have been in its usual place; correct?

15       A    Yes.

16       Q    It should have been in the file that Bret Jacobson

17   never prepared; correct?

18       A    I don't know what he's referring there to, usual

19   place.  I don't know what the usual place is.  I don't.

20       Q    I'm showing you now what's been marked as Exhibit

21   38.  Do you recognize this, sir?

22       A    From Mr. Jacobson to Petra Miller.

23            MR. GOODMAN:  I'd like to move 38 into evidence as

24   Exhibit 38.

25            MR. CREMER:  No objection.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  38 is admitted.

2     (Plaintiff's Exhibit No. 38 was admitted.)

3     BY MR. GOODMAN:

4          Q     This is an email from Bret Jacobson who's an

5     employee of Liebherr US, Petra Miller who's an employee of

6     Leibherr US with a c.c. to John Ryall who's an employee of

7     Liebherr US with the subject of the shipment of LTM 1500-8.1

8     17727; correct?

9          A     That's correct.

10         Q     And in the text it says Sims Crane info; correct?

11         A     That's correct.

12         Q     I'd like to show you what's been marked as Exhibit

13    39.

14         A     From Mr. Jacobson to Mr. Lloyd.

15         Q     What is this?

16         A     Mr. Lloyd, William Lloyd.

17         Q     It's an email between Liebherr US and Liebherr US;

18    correct?

19         A     That's correct.

20         MR. GOODMAN:  Your Honor, I'd like to move Exhibit

21    39 for identification into evidence as Exhibit 39.

22         MR. CREMER:  No objection.

23         THE COURT:  39 is admitted.

24    (Plaintiff's Exhibit No. 39 was admitted.)

25

1    BY MR. GOODMAN:

2        Q    This is an email from Bret Jacobson of Liebherr US,

3    he was an employee at the time, to William Lloyd who's an

4    employee of Liebherr US, cc'ing John Ryall who's an employee

5    of Liebherr US and Petra Miller who's an employee of

6    Liebherr US on January 3rd, 2017 at 1:59 with the subject

7    LTM 1500-8.1 SN 073386 for Sims Crane.  They need assistance

8    at the port; correct?

9        A    That's correct.

10        Q    And it goes on to say, "dear, William, crane

11    mentioned involved was sold to Sims Crane in Florida with an

12    assist from Schuch HeavyLift."  Correct?

13        A    Correct.

14        Q    As a reader of this email, everyone on this email

15    would understand that crane 073386 was sold to Sims with an

16    assist from Schuch; correct?

17        A    That's correct.

18        Q    And from this email, everyone would understand that

19    as of January 3rd, 2017, Sims owns this crane 073386;

20    correct?

21        A    Did own this crane when they have it.

22        Q    When they had it.  And then underneath it says,

23    "they asked me today could we be sure to have someone at the

24    port to assist with the loadout of this crane."  Correct?

25        A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

195

1    Q    It goes on to say, "they are a new customer," they

2    being Sims; correct?

3    A    Correct.

4    Q    "And they," they being Sims; correct?

5    A    Correct.

6    Q    "need to pull the boom in order to transport the

7    machine.  My understanding is that 'they'," they being Sims;

8    correct?

9    A    (Nodding head.)

10   Q    "have no experience with Liebherr Cranes much less

11   how to remove the boom on an LTM 1500."

12   A    That's correct.

13   Q    As a reader of this, you understand that Sims is a

14   new owner of a Liebherr LTM 1500 and they have no idea how

15   to remove the boom from the LTM 1500; correct?

16   A    That's correct.

17         MR. GOODMAN:  Your Honor, I'd like to move Exhibit

18   39 into evidence as Exhibit 39 if I hadn't done so already.

19         THE COURT:  I think you did so already.  There was

20   no objection.  Is that your understanding, Mr. Cremer?

21         MR. CREMER:  Yes.

22         THE COURT:  It is admitted.

23   BY MR. GOODMAN:

24   Q    I'd like to show you what's been marked as Exhibit

25   40 for identification.  Take a look at that.  Do you

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    recognize that, sir?

2        A    Yes.

3        Q    How do you recognize that?

4        A    It's an email from Mr. Jacobson personally to

5    Mr. Lloyd who copied Mr. Ryall and Ms. Miller.

6            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

7    40 into evidence as Exhibit 40.

8            MR. CREMER:  No objection.

9            THE COURT:  It's admitted.

10   (Plaintiff's Exhibit No. 40 was admitted.)

11   BY MR. GOODMAN:

12       Q    This is an email from Bret Jacobson who's an

13   employee of Liebherr US to William Lloyd who's an employee

14   of Liebherr US with a c.c. to John Ryall who's an employee

15   of Liebherr US and c.c. to Petra Miller who's an employee of

16   Liebherr service on January 3rd, 2017; correct?

17       A    That's correct.

18       Q    And the subject is 073386 for Sims Crane; correct?

19       A    Correct.

20       Q    Under it says, "sorry, contact information for

21   Schuch is Billy Adams.  I'm not sure of contact information

22   for Sims.  Kind regards, Bret H. Jacobson, Senior Manager

23   Sales Support and Marketing, National Sales Manager - Used

24   Cranes.  Mobile and Crawler Cranes Division, Liebherr USA

25   Company."  Correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Correct.

2    Q    Now, we know from prior exhibits that Bret Jacobson

3  knows that Sims has purchased the crane 073386; correct?

4    A    Yes, but not from us.  It looks like from Schuch.

5    Q    From Schuch.  But Bret Jacobson knows that; correct?

6    A    I assume, yes.

7    Q    You got that in an email?

8    A    Yes, I assume that, yes.

9    Q    And as a reader of the emails that we've gone over,

10  you understand that --

11    A    I would.

12    Q    -- Schuch has sold the crane to Sims; correct?

13    A    That's what you could read out of it.

14    Q    And Adnan Bulat from Liebherr Germany in Exhibit 34

15  also tells Bret Jacobson that crane 17727, which is the same

16  crane as 073386, has been sold to Sims; correct?

17    A    That's what he says, yes.

18    Q    Now, Bret Jacobson is being told that by Liebherr

19  Germany and Schuch that this crane is being sold to Sims;

20  correct?

21    A    Yes.

22    Q    It would have been incumbent on him and his

23  responsibility if he did not have the information for Sims

24  to obtain it; correct?

25    A    He could have, yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    He should have; correct?

2      A    He could have.

3      Q    It's important for Liebherr US to have crane owner's

4   information so that if Product Safety Bulletins are

5   published by Liebherr Germany, Liebherr US knows where to

6   send it; correct?

7      A    We don't know the deal between Schuch and Sims.

8   Okay?  Maybe it was between them, you know, how they sold

9   it.  Maybe they didn't sell it, they leased it to them.

10  I've seen that before too.

11          MR. GOODMAN:  I object as nonresponsive and move to

12  strike that.

13          THE COURT:  I'm not going to strike, but try to just

14  answer the question, Mr. Vieten.

15  BY MR. GOODMAN:

16     Q    Based upon these emails -- strike that.

17          As a reader of these emails that we've gone over,

18  you would understand that Sims is going to own this crane

19  073386; correct?

20     A    Yes.  Not necessarily from us.

21     Q    But Liebherr US will send Product Safety Bulletins

22  to second purchasers, third purchasers, fourth purchasers,

23  whoever owns the crane; correct?

24     A    Whoever own the cranes.

25     Q    It's important for Liebherr US to know who the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    current --
2         THE COURT:  Please slow down.
3    BY MR. GOODMAN:
4         Q    It's important for Liebherr US to know who owns the
5    crane so they can send them Product Safety Bulletins;
6    correct?
7         A    Yes, sir.
8         Q    So it would have been important for Bret Jacobson to
9    obtain the contact information for Sims; correct?
10        A    He could have, yes.
11        Q    He should have; correct?
12        A    He could have.
13        Q    You just smiled.  You want to agree with me, don't
14   you, sir?
15        A    No, not necessarily.  It can go one way or the
16   other.
17        Q    Well, you'll agree with me that it's important for
18   Liebherr US to have crane --
19        A    Absolutely.
20        Q    -- crane owner's information?
21        A    Absolutely.
22        Q    And it's important for Liebherr US to have that
23   crane information so they can send product safety bulletins
24   that are going to save people's lives, prevent personal
25   injury and prevent property damage?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

200

1    A    Absolutely.

2    Q    And Liebherr US relies on its employees; correct?

3    A    That's correct.

4    Q    And especially relies on its managers; right?

5    A    That's correct.

6    Q    It relies on its managers to do the right thing;

7    correct?

8    A    Correct.

9    Q    It relies on its managers to obtain the information

10   that's necessary for Liebherr to operate its business;

11   correct?

12   A    Correct.

13   Q    And one part of that business is providing Product

14   Safety Bulletins to customers, correct, sir?

15   A    That's correct.

16   Q    And so it would have been incumbent and it would

17   have been the responsibility of Bret Jacobson to obtain the

18   Sims information and the contact information if he did not

19   know it, correct, sir?

20   A    Correct.

21        MR. GOODMAN:  I'd like to submit Exhibit 40 for

22   identification into evidence as Exhibit 40.

23        THE COURT:  I have it came in already, and

24   Mr. Cremer did not object.  Is that your understanding,

25   Mr. Cremer?

1          MR. CREMER:  Yes, Your Honor.

2          THE COURT:  Either way, it is Exhibit 40.

3     BY MR. GOODMAN:

4          Q    I'd like you to turn to Exhibit 41, sir.  Do you

5     recognize this, sir?

6          A    Yes, an email from Mr. Jacobson to Mr. Steve Hoffman

7     for Schuch.

8          MR. GOODMAN:  I'd like to admit Exhibit 41 into

9     evidence as Exhibit 41.

10         THE COURT:  Any objection?

11         MR. CREMER:  No objection.

12         THE COURT:  It's admitted.

13    (Plaintiff's Exhibit No. 41 was admitted.)

14    BY MR. GOODMAN:

15         Q    This is an email from Bret Jacobson Liebherr US --

16    he's an employee at the time, correct?

17         A    Correct.

18         Q    -- (continuing) to Steve Hoffman of Schuch; is that

19    correct?

20         A    That's correct.

21         Q    And it's cc'd to Adnan Bulat of Liebherr Germany; is

22    that correct?

23         A    That's correct.

24         Q    And William Lloyd, an employee of Liebherr US; is

25    that correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A      That's correct.

2      Q      And Petra Miller, an employee of Liebherr US;

3    correct?

4      A      That's correct.

5      Q      It got towed -- the subject is LTM 1500-8.1 SN

6    073386 code 17727; correct?

7      A      That's correct.

8      Q      And the second paragraph Bret Jacobson is telling

9    Mr. Hoffman "our Mr. Lloyd is responsible for coordinating

10   the pickup from our side.  I know that he has spoken to

11   Mr. Adams already and possibly someone from Sims."  Correct?

12     A      Correct.

13     Q      Pick up is tentatively scheduled for the 17th and

14   this crane is being arranged to pull a boom; correct?

15     A      Correct.

16     Q      I'd like you to turn to Exhibit 42.  Do you

17   recognize this, sir?

18     A      This is a service report, a worksheet from Mr. Henry

19   Ward.

20           MR. GOODMAN:  Your Honor, I'd like to move Exhibit

21   42 into evidence as Exhibit 42.

22           MR. CREMER:  No objection.

23           THE COURT:  42 is admitted.

24   (Plaintiff's Exhibit No. 42 was admitted.)

25

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1   BY MR. GOODMAN:
 2        Q    It has Liebherr Crane Incorporated at the top;
 3   correct?
 4        A    That's correct.
 5        Q    This is a Liebherr document; correct?
 6        A    That's correct.
 7        Q    Liebherr employees fill this out; correct?
 8        A    Yes.
 9        Q    The crane number is 073386; correct?
10        A    That's correct.
11        Q    And the type is LTM 1500?
12        A    Correct.
13        Q    The date on this is February -- the date it was
14   keyed in was February 15th, 2017; correct?
15        A    I don't see keyed in date there.  Oh, yeah, right
16   there.  Yep.
17        Q    The date the job was done was January 18th, 2017;
18   correct?
19        A    That's correct.
20        Q    And it says place of departure, Boerne, Texas;
21   correct?
22        A    Correct.
23        Q    Do you understand Henry Ward to have been in Boerne,
24   Texas at that time?
25        A    I think he still lives in Texas.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q     And then the place of arrival is Jacksonville,

2    Florida; correct?

3      A     That's correct.

4      Q     And that's where crane 073386 was being

5    commissioned; correct?

6      A     That's correct.

7      Q     And this document says, "assist with inspection and

8    removal of boom from machine so customer can transport to

9    their yard."  Correct?

10     A     That's correct.

11     Q     And the company name in this is Sims Crane; correct?

12     A     That's correct.

13     Q     And the place is Tampa, Florida; correct?

14     A     That's correct.

15     Q     I'd like you to turn to Exhibit 43 for

16   identification.  Do you recognize this?

17     A     It is from Liebherr US, document to Sims Crane

18   shipping address.

19     Q     This is a line document, correct; sir?

20     A     This is a line document for transportation, yes.

21           MR. GOODMAN:  I'd like to move Exhibit 43 for

22   identification into evidence as Exhibit 43.

23           MR. CREMER:  No objection.

24           THE COURT:  43 is admitted.

25   (Plaintiff's Exhibit No. 43 was admitted.)

 1   BY MR. GOODMAN:

 2        Q    Up at the top it says Sims Crane & Equipment Company

 3   with a P.O. box; correct?

 4        A    That's correct.

 5        Q    At the right it says, "Sims Crane & Equipment

 6   Company, Inc., 1219 U. S. Highway 301 North, Tampa, Florida,

 7   33619."  Correct?

 8        A    That's correct.

 9        Q    So Liebherr has Sims Crane Equipment Company's

10   address; correct?

11        A    That's correct.

12        Q    And they have it as of the date of February 3rd,

13   2017; correct?

14        A    That's correct.

15        Q    That's the date of this exhibit; correct?

16        A    Correct.

17        Q    And this is for parts; correct?

18        A    Yes, it is.

19        Q    And it's for parts for customer No. 602782; correct?

20        A    That's correct.

21        Q    And every customer is supposed to have one customer

22   number at Liebherr US; is that correct?

23        A    That's correct.

24        Q    And so Sims Crane & Equipment Company, their

25   customer numbers should always be 062782?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    If you have different locations, you may get a

2  different number.

3      Q    If you have one location, the 1219 U. S. Highway 301

4  North Tampa, Florida, you would have one customer number;

5  correct?

6      A    That one number, yes.

7      Q    I'd like to show you what's been marked as Exhibit

8  44.  Do you recognize this?

9      A    That's Mr. Ryall, our employee in sales.

10         MR. GOODMAN:  Your Honor, I'd like to move Exhibit

11  44 for identification into evidence as Exhibit 44.

12         MR. CREMER:  No objection.

13         THE COURT:  44 is admitted.

14  (Plaintiff's Exhibit No. 44 was admitted.)

15  BY MR. GOODMAN:

16     Q    At the bottom, this is from Steve Stodghill and it

17  says steve@simscrane.com; correct?

18     A    Yes.

19     Q    It is sent on Friday, February 3rd, 2017; is that

20  correct?

21     A    That's correct.

22     Q    It's sent to a Wolfgang Herzog; is that correct?

23     A    That's correct.

24     Q    And Mr. Herzog is an employee of Liebherr US at the

25  time; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    That's correct.  A different division.

2    Q    And the subject is luffing jib for LTM 1500;

3   correct?

4    A    Yes.

5    Q    And then down in the bottom of the body of the email

6   it says, "Wolfgang, can you quote pricing or who I may

7   contact for the all terrain line for Liebherr."  Correct?

8    A    Correct.

9    Q    Then it says, "I need to get pricing for additional

10   luffing jib inserts."  Correct?

11    A    Correct.

12    Q    And then it goes on to say, "we currently have

13   70-meter N-230 feet locking jib for our 2012 LTM 1500-8.1,

14   the serial number 073386 and would like to have pricing for

15   the full maximum luffer jib."  Correct?

16    A    Correct.

17    Q    So as a reader of this, Wolfgang Herzog should

18   understand that Steve Stodghill at Sims owns crane 073386;

19   correct?

20    A    Owns or gets one, gets this crane, yes.  It doesn't

21   specifically say which serial number on that email.

22    Q    On the third paragraph down it says 073386, does it

23   not?

24    A    Yes.  Okay.  Yes.

25    Q    So this email does; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

208

```
 1        A    Yes, it does.  Yes.
 2        Q    And like we said, every crane has its own serial
 3   number?
 4        A    One serial number.
 5        Q    There's only one 073386; is that correct?
 6        A    That's correct.
 7        Q    I'd like you to turn to Exhibit 45, sir.  Do you
 8   recognize this?
 9        A    It's from Steve at Sims to Mr.  Herzog and to
10   Mr. Ryall.
11             MR. GOODMAN:  Your Honor, I'd like to move Exhibit
12   45 for identification into evidence as Exhibit 45.
13             THE COURT:  Any objection?  I'm sorry.  I didn't
14   hear.  Was there an objection?
15             MR. CREMER:  I'm sorry, Your Honor.  No.
16             THE COURT:  It's admitted.
17   (Plaintiff's Exhibit No. 45 was admitted.)
18   BY MR. GOODMAN:
19        Q    At the bottom it's -- at the bottom of this Exhibit
20   45 where it's IAI0675 and it goes to IAI0676, it is from
21   Wolfgang Herzog, Liebherr US; correct?
22        A    Correct.
23        Q    And he's an employee at Liebherr US; correct?
24        A    That's correct.
25        Q    And this is sent on February 3rd, 2017; correct?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    It is correct.

2    Q    And it's sent to John Ryall at Liebherr US; correct?

3    A    Correct.

4    Q    John Ryall is an employee of Liebherr US; is that

5    correct?

6    A    That's correct.

7    Q    It's also sent to Steve Stodghill; is that correct?

8    A    That's correct.

9    Q    And the subject is for LTM 1500-8.1; is that

10   correct?

11   A    That's correct.

12   Q    And it says, "Steve, I'll copy John Ryall onto this

13   email.  He covers the mobile cranes and will certainly be

14   able to help you," and then he gives a phone number;

15   correct?

16   A    That's correct.

17   Q    I'd like you to turn to Exhibit 46 for

18   identification.  Do you recognize this, sir?

19   A    Yes.  This is an email from John Ryall to

20   Mr. Pitzer.

21        MR. GOODMAN:  Your Honor, I'd like to move Exhibit

22   46 for identification into evidence as Exhibit 46.

23        MR. CREMER:  No objection.

24        THE COURT:  It's admitted.

25   (Plaintiff's Exhibit No. 46 was admitted.)

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  Hold on one minute.  I think we're going

2     to need to take a quick break.  We need to give Ms. Miller a

3     break with her hands.  She's having to go really fast with a

4     lot of names.

5          MR. GOODMAN:  I apologize.

6          THE COURT:  That's okay.  Let's go ahead, and before

7     we go off the record, timing-wise I'm thinking we can take a

8     short break and then perhaps go a little bit past 5:00.  I

9     don't know what your time frame is with this witness.

10         MR. GOODMAN:  That would be helpful, Your Honor.  I

11    think we're going to move -- the beginning was a little

12    slower because of all the technical nature of how the crane

13    worked, but I think this should move a little quicker.  We

14    won't move quick.

15         THE COURT:  Just don't talk faster.

16         MR. GOODMAN:  I will not talk faster, I promise.

17         THE COURT:  Let's take a short break until about

18    4:30, usual 15 minutes, and then we'll come back and do an

19    hour and wrap up around 5:30.  Does that work for everybody?

20    I see a lot of nodding heads.  A little later than I like to

21    end, but I think that will give us another full more hour of

22    testimony.  So we'll take a short recess.

23  (Recess had from 4:10 to 4:21 p.m.)

24         THE COURT:  Let's do one more hour, and if at some

25    point before that you come to a natural stopping point, by

1      all means you'll be giving us the gift of time.  Don't go

2      past that hour.

3            MR. GOODMAN:  I'll do my best, Your Honor.

4      BY MR. GOODMAN:

5         Q    Mr. Vieten, before we stopped, we had looked at

6      Exhibit 45.  So I'd like you to turn to Exhibit 46 if you

7      would and tell me if you recognize this exhibit.

8         A    It's an email from Mr. Ryall to Mr. Pitzer.

9         Q    And Mr. Ryall and Mr. Pitzer are both employees of

10     Liebherr US on February 6th, 2017; correct?

11        A    That's correct.

12           MR. GOODMAN:  Your Honor, I'd like to move Exhibit

13     46 into evidence as Exhibit 46.

14           MR. CREMER:  No objection.

15           THE COURT:  It's admitted.

16     (Plaintiff's Exhibit No. 46 was admitted.)

17     BY MR. GOODMAN:

18        Q    And the email says, "hi, Daniel.  I told Mike

19     LaPierre they were being sold a not complete build spec on

20     the 1500 from Schuch.  He asked me then if we could fix it

21     and Lord knows we tried.  So this is the kind of expertise

22     Billy Adams provides to their customers.  Can we help them

23     out with non-spare parts pricing?"  Do you see that?

24        A    Yes, sir.

25        Q    Do you see the email underneath, it's an email from

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Steve Stodghill to Wolfgang Herzog?

2        A    Yes.

3        Q    And it's regarding the LTM 1500; correct?

4        A    That's correct, but in the email it says, "give me a

5    call for training on the LR1300."

6        Q    Right.  But this is talking about the 1500; correct?

7        A    In the subject line, yes.

8        Q    And Liebherr US has only sold Schuch one Liebherr

9    LTM 1500; correct?

10       A    To my knowledge, yes.

11       Q    I'd like you to turn to Exhibit 47.  Do you

12   recognize this, sir?

13       A    Email from Mr. Ryall to Mr. Smith.

14       Q    And at the time, Mr. Ryall and Mr. Smith are both

15   Liebherr US employees; correct?

16       A    Yes, that's correct.

17            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

18   47 into evidence as Exhibit 47.

19            MR. CREMER:  No objection.

20            THE COURT:  Admitted.

21   (Plaintiff's Exhibit No. 47 was admitted.)

22   BY MR. GOODMAN:

23       Q    And this is the subject "price for luffing jib

24   section for LTM 1500-8.1 073386."  Correct?

25       A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    This is the crane we've been talking about all day;

2  correct?

3    A    Correct.

4    Q    It says, "Smitty."  Is Smitty a nickname for

5  Johnathan Smith?

6    A    That's correct.

7    Q    It says, "Smitty, John just called you from the new

8  mobile number.  Would you have a read please below and see

9  how we can prepare an offer for the parts for the LTM

10  1500-8.1 that Schuch bought from us and sold to Sims Crane &

11  Equipment."

12    A    Yes.

13    Q    Do you see that?

14    A    Yes.

15    Q    As a reader of this email, would you understand that

16  John Ryall knows that Liebherr's LTM 1500-8.1 073386 that

17  they sold to Schuch was then sold to Sims?

18    A    Yes, sir.

19    Q    And now Johnathan Smith knows; right?

20    A    That's correct.

21    Q    So Smitty knows even; correct?

22    A    That's correct.

23    Q    I'd like to show you what's been marked as Exhibit

24  48.  Do you recognize this?

25    A    Yes.  Again another email from Mr. Ryall to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Mr. Smith.

2        Q    Then --

3        A    I mean this one says Johnathan.

4        Q    And this one says Johnathan and both Ryall and Smith

5    are employees of Liebherr US on February 9th, 2017; correct?

6        A    That's correct.

7            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

8    48 into evidence as Exhibit 48.

9            MR. CREMER:  No objection.

10           THE COURT:  It's admitted.

11   (Plaintiff's Exhibit No. 48 was admitted.)

12   BY MR. GOODMAN:

13       Q    This one says, "Johnathan, you have a price for

14   those parts in Houston from the Stevenson machine."

15   Correct?

16       A    Correct.  Yes.

17       Q    And the subject is 1500-8.1, parts for Sims crane

18   LTM 1500-8.1 SN 073386; correct?

19       A    That's correct.

20       Q    So as a reader of this email, would you understand

21   that Sims is -- Sims owns crane 073386, and it's looking for

22   parts?

23       A    They own it or will own it, yes, that's correct.

24       Q    Now, I'm going to show you Exhibit 49.  Do you

25   recognize that, sir?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A      Yes.

2      Q      Can you tell me what that is?

3      A      It's a customs invoice for some parts for this

4   particular crane and it is addressed to Sims.

5           MR. GOODMAN:  Your Honor, I'd like to move Exhibit

6   49 into evidence as Exhibit 49.

7           MR. CREMER:  No objection.

8           THE COURT:  It's admitted.

9   (Plaintiff's Exhibit No. 49 was admitted.)

10  BY MR. GOODMAN:

11     Q      This is a Liebherr invoice dated February 20th,

12  2017; correct?

13     A      Correct.

14     Q      And it's to Sims Crane & Equipment; correct?

15     A      That is correct.

16     Q      And it's for machine LTM 1500-8.1 073386; is that

17  correct?

18     A      Yes.

19     Q      Is that the same as 073386?

20     A      That's correct.

21     Q      It's for customer No. 510666; correct?

22     A      Correct.

23     Q      And it's for Sims Crane Equipment Company at 1219

24  North U. S. Highway 301, 33619; correct?

25     A      That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     Q     We discussed previously that all Liebherr customers

2  have one customer number; correct?

3     A     That's correct.

4     Q     And here on Exhibit 49 the customer number is

5  510666; correct?

6     A     It's different than the other one.

7     Q     If we look back at Exhibit 43 --

8     A     It's different, yeah.  It's different.

9     Q     It's different, correct?

10    A     Yeah, it's different.

11    Q     And if you have different customer numbers, it makes

12 it more difficult to keep up with that specific customer,

13 does it not?

14    A     That is correct.

15    Q     Especially if it's the same address?

16    A     It's the same address, correct.

17    Q     I'd like you to turn to Exhibit 50.  Do you

18 recognize this?

19    A     Mr. Ryall email to Ms. Miller.

20    Q     And at the time Mr. Ryall, Ms. Miller --

21    A     Both LUS employees.

22    Q     And Ms. Sanchez were all Liebherr US employees;

23 correct?

24    A     That's correct.

25          MR. GOODMAN:  Your Honor, I'd like to move Exhibit

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    50 into evidence as Exhibit 50.

2            MR. CREMER:  No objection.

3            THE COURT:  It's admitted.

4    (Plaintiff's Exhibit No. 50 was admitted.)

5    BY MR. GOODMAN:

6        Q    And so now you have an email from John Ryall on

7    March 20th, 2017 and the subject is Sims Crane LTM 1500-8.1

8    SN 073386 parts order; correct?

9        A    That's correct.

10       Q    It says, "Petra, customer Sims Crane & Equipment has

11   initiated wire transfer for quotation No. 102106/021."

12   Correct?

13       A    That's correct.

14       Q    It's common for people or entities who own cranes to

15   buy parts for them; correct?

16       A    Right.

17       Q    It would be uncommon for people that don't own

18   cranes to buy parts; correct?

19       A    That's correct.

20       Q    So is it reasonable that Sam and Petra and John

21   Ryall would understand that Sims cranes owns this 073386 as

22   of March 20th, 2017?

23       A    Yes.

24       Q    I'd like to show you what's marked as Exhibit 51.

25   Do you recognize this, sir?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A     Yes.

2        Q     And what is it?

3        A     It's an acknowledgment of order.

4              MR. GOODMAN:  Your Honor, I'd like to move Exhibit

5    51 into evidence as Exhibit 51.

6              MR. CREMER:  No objection.

7              THE COURT:  It's admitted.

8    (Plaintiff's Exhibit No. 51 was admitted.)

9    BY MR. GOODMAN:

10       Q     This Liebherr acknowledgment of order is going to

11   Sims Crane & Equipment Company at 1219 U. S. Highway 301

12   North Tampa, Florida, 33619; correct?

13       A     Correct.

14       Q     It's the same address we've previously seen for

15   Sims; correct?

16       A     Correct.

17       Q     And here you have parts; correct?

18       A     Correct.

19       Q     And it's parts for crane number Z73386; correct?

20       A     Correct.

21       Q     Is that known as the same -- is that known to be the

22   same thing as 073386 that Liebherr owns?

23       A     That's correct.  Yes.

24             THE COURT:  Slow down, Mr. Goodman.

25             THE WITNESS:  Z stands for zero.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

BY MR. GOODMAN:

Q    Zero, thank you.  And this is an order for parts; correct?

A    Correct.

Q    And the customer number on Exhibit 57851 is 602782; correct?

A    Correct.

Q    So that's the same as Exhibit 43 but different from Exhibit 489; correct?

A    (Nodding head.)

Q    Now we're getting different customer numbers on different orders; correct?

A    Correct.

Q    And that violates the standard operating procedures of Liebherr US?

A    Yes, same address, yes.

Q    And it's not supposed to be that way so that Liebherr US knows the addresses for the crane owners of specific cranes; correct?

A    That's correct.

Q    Showing you what's been marked as Exhibit 52.  Do you recognize this?

A    This is an email from Mr. Cupp to Mr. Bob Sneed at Sims Crane regarding again the 073386 crane.

Q    And at the time Mr. Cupp, C-U-P-P, is an employee of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Liebherr; correct?

2        A    That's correct.

3             MR. GOODMAN:  Your Honor, I'd like to move Exhibit

4    52 into evidence as Exhibit 52.

5             MR. CREMER:  No objection.

6             THE COURT:  Admitted.

7    (Plaintiff's Exhibit No. 52 was admitted.)

8    BY MR. GOODMAN:

9        Q    This is for parts; correct?

10       A    That's correct.

11       Q    And again we spoke about how crane owners will

12   generally buy parts for the cranes they own; correct?

13       A    Correct.

14       Q    People do not buy parts for cranes they don't own;

15   correct?

16       A    That's correct.

17       Q    Do you recognize this?

18       A    Again another email from Mr. Cupp to Mr. Bob Sneed

19   regarding the parts order for this crane.

20            MR. GOODMAN:  I'd like to move Exhibit 53 into

21   evidence as Exhibit 53.

22            MR. CREMER:  No objection.

23            THE COURT:  It's admitted.

24   (Plaintiff's Exhibit No. 53 was admitted.)

25

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    BY MR. GOODMAN:

2        Q    At the time Mr. Cupp is an employee of Liebherr US;

3    is that correct?

4        A    That's correct.

5        Q    And it's discussing parts for crane number 073386;

6    correct?

7        A    Correct.

8        Q    I'd like to show you Exhibit 54.  Do you recognize

9    this?

10       A    Mr. Cupp to Mr. Sneed again referring to the 073386

11   which is this crane, and talking about a paid order.  And

12   even he's mentioned down there the serial number of the

13   1500.

14            MR. GOODMAN:  Your Honor, I'd like to move 54 into

15   evidence as Exhibit 54.

16            MR. CREMER:  No objection.

17            THE COURT:  Admitted.

18   (Plaintiff's Exhibit No. 54 was admitted.)

19   BY MR. GOODMAN:

20       Q    At the time Jason Cupp is an employee of Liebherr

21   US; is that correct?

22       A    That's correct.

23       Q    I'd like to show you what's marked as Exhibit 55 and

24   take a look at this.  Let me know if you recognize it.

25       A    An acknowledgment of order to Sims Crane about this

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

crane 1500-8.1 on September 26th, 2017.

        MR. GOODMAN:  Your Honor, I'd like to move Exhibit
55 into evidence as Exhibit 55.

        MR. CREMER:  No objection.

        THE COURT:  Admitted.

(Plaintiff's Exhibit No. 55 was admitted.)

BY MR. GOODMAN:

  Q   And here it has Sims Crane Service, LLC and the same
address that we've been referencing as Sims 1219 U. S.
Highway 301 North in Tampa, Florida; correct?

  A   Correct.

  Q   And this is again for machine 073386; correct?

  A   That's correct.

  Q   And it's for parts; correct?

  A   That's correct.

  Q   And here you have customer number 701487; correct?

  A   That's correct.

  Q   So the customer order on Exhibit 55 is different
from the customer number on Exhibit 43 and 51 which is
different from Exhibit 49; correct?

  A   That's correct.

  Q   So now Sims Crane at that address has three
different customer numbers at Liebherr US; is that correct?

  A   That's correct.

  Q   That's not good; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    No.

2      Q    I'm going to show you what's been marked as Exhibit

3   56.  Do you recognize that, sir?

4      A    That's an acknowledgment of order.

5      Q    And who is it to?

6      A    Sims Crane.  Sims Cranes number, this same customer

7   number.

8      Q    Who is it from?

9      A    Mr. Cupp.

10      Q    And what company is it from?

11      A    Liebherr US.

12           MR. GOODMAN:  I'd move Exhibit 56 into evidence as

13   Exhibit 56.

14           MR. CREMER:  No objection.

15           THE COURT:  It's admitted.

16   (Plaintiff's Exhibit No. 56 was admitted.)

17   BY MR. GOODMAN:

18      Q    And this is on machine number 073386; correct?

19      A    That's correct.

20      Q    And again they're buying parts; correct?

21      A    That's correct.

22      Q    And they being Sims; correct?

23      A    That's correct.

24      Q    I'd like to turn to Exhibit 57.  I want to talk

25   about commissioning and training.  Okay?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A     Yes.

2      Q     Can you tell us what commissioning is again?

3      A     Commissioning is the handover of the equipment.

4      Q     And who does Liebherr hand the crane over to?

5      A     To customers.

6      Q     Is it generally --

7      A     Or third-party clients sometimes, operators of the

8   crane.

9      Q     Operators of the crane?

10     A     Operators of that crane, yeah.

11     Q     Operators of that crane?

12     A     Yes.  Or any other crane too, of course.

13     Q     I'd like to show you Exhibit 57, sir.  Do you

14   recognize this?

15     A     Yes.

16     Q     And what is this?

17     A     It's an email from Mr. Harris to Mr. John Ryall,

18   copy Mr. Pitzer and Mr. Gericke and Trina Cross.

19           MR. GOODMAN:  I'd like to move 57 into evidence as

20   Exhibit 57.

21           MR. CREMER:  No objection.

22           THE COURT:  It's admitted.

23   (Plaintiff's Exhibit No. 57 was admitted.)

24   BY MR. GOODMAN:

25     Q     So this is an email from Harris who's an employee of

225

```
1     Liebherr US; is that correct?
2          A     That's correct.
3          Q     Sent on January 6th, 2017, correct?
4          A     That's correct.
5          Q     Sent to John Ryall who's a line employee; correct?
6          A     That's correct.
7          Q     And Mr. Pitzer who's a Liebherr employee; correct?
8          A     That's correct.
9          Q     And Mr. Gericke who's a Liebherr employee; correct?
10         A     Correct.
11         Q     And to Trina Cross who's a Liebherr employee;
12    correct?
13         A     That's correct.
14         Q     The subject is LTM 1500-8.1 073386; is that correct?
15         A     Correct.
16         Q     It says, "John, here is the quote for the completion
17    of training and commissioning of the 073386.  If this crane
18    is going to be stationed in Florida, then Eric Ranich could
19    do this training and the travel time expense may change.
20    Please let me know if this quote will work for the customer
21    and we can get them on the schedule as soon as possible."
22         A     That's correct.
23         Q     Schuch is out of New York; correct?
24         A     That's correct.
25         Q     Sims is out of Florida?
```

226

1      A     That's correct.

2      Q     And as of this date, you'd agree with me, that all

3   the previous documentation that we've seen should have

4   placed -- should have placed Liebherr on notice that Sims

5   was purchasing and would be owning crane 073386?

6      A     You know, I'm saying quite a few months because now

7   you're back in January of 2017 so you went back.

8      Q     My question was about the other documentation that

9   we --

10     A     The other document, yeah, yes.

11     Q     I'd like you to -- I'd like to move Exhibit 57 into

12  evidence as Exhibit 57 if I haven't done so already.

13          THE COURT:  I think it's already in evidence with no

14  objection.  Is that your understanding, Mr. Cremer?

15          MR. CREMER:  That's correct, Your Honor.

16          THE COURT:  It's admitted.

17  BY MR. GOODMAN:

18     Q     I'd like you to turn to Exhibit 58, sir.  Do you

19  recognize that?

20     A     Yes.

21     Q     What is that?

22     A     It's a Liebherr crane service quote to Schuch to

23  Mr. Bill Adams from Schuch, and it's for the time for one

24  engineer to complete training on that particular crane at

25  8173386.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1           MR. GOODMAN:  Your Honor, I'd like to move Exhibit

2      58 into evidence as Exhibit 58.

3           MR. CREMER:  No objection.

4           MR. GOODMAN:  What is the time --

5           THE COURT:  58 is admitted.

6   (Plaintiff's Exhibit No. 58 was admitted.)

7   BY MR. GOODMAN:

8      Q    What is the time for one engineer to complete the

9      training on the crane as referenced in this service quote?

10     A    Eighty hours.

11     Q    And you would agree with me that it's normally 80

12     hours for training new customers on the LTM 1500; correct?

13     A    Correct.  Standard or procedure or sometimes it can

14     go less if a customer already has similar equipment or the

15     same equipment.

16     Q    But only if they have similar equipment or the same

17     equipment; correct?

18     A    Yes.

19     Q    So if a customer does not have similar equipment or

20     the same equipment, then that customer should receive

21     approximately 80 hours; correct?

22     A    Yes, that's true.  They should.

23     Q    I'd like you to look at Exhibit 59.  Do you

24     recognize this?

25     A    It's a report of repairs.  It's another technician

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    report.

2         Q    This is a Liebherr document?

3         A    It's a Liebherr document.

4              MR. GOODMAN:  Your Honor, I'd like to move Exhibit

5    59 into evidence as Exhibit 59.

6              MR. CREMER:  No objection.

7              THE COURT:  59 is admitted.

8    (Plaintiff's Exhibit No. 59 was admitted.)

9    BY MR. GOODMAN:

10        Q    This is for crane number 073386?

11        A    That's correct.

12        Q    And it's for the LTM 1500; correct?

13        A    That's correct.

14        Q    The customer is Sims Crane & Rigging; correct?

15        A    That's correct.

16        Q    And it says that Karl Redman was unable to assist in

17   training due to being pulled off the job and sent to another

18   job; correct?

19        A    That's correct.

20        Q    I'd like to show you what's been marked as Exhibit

21   60.  Do you recognize this?

22        A    It's a service report from Mr. Henry Ward,

23   particular crane 1500-8.1, Sims Crane Rental is named as the

24   company name and it's a time sheet.

25             MR. GOODMAN:  Your Honor, I'd like to move Exhibit

1    60 into evidence as Exhibit 60.

2             MR. CREMER:  No objection.

3             THE COURT:  Exhibit 60 is admitted.

4    (Plaintiff's Exhibit No. 60 was admitted.)

5    BY MR. GOODMAN:

6        Q    This is a Liebherr document; is that correct?

7        A    That's correct.

8        Q    Completed by Leibherr; correct?

9        A    Correct.

10       Q    And Exhibit 59 was completed by Liebherr; is that

11   correct?

12       A    That's correct.

13       Q    If it says Liebherr Cranes on top of the document,

14   it would be Liebherr Cranes that would be completing the

15   document; is that correct?

16       A    That's correct.

17       Q    And so this says for crane number 073386; correct?

18       A    That's correct.

19       Q    It's for the LTM 1500; correct?

20       A    That's correct.

21       Q    The company name is Sims Crane Rental; correct?

22       A    That's correct.

23       Q    And the place is Tampa, Florida; correct?

24       A    That's correct.

25       Q    And it says, "customer has taken delivery of an LTM

1    1500 and wants machine commissioning and also operator

2    training."  Correct?

3         A    Correct.

4         Q    So could it also be read Sims Crane Rental has taken

5    delivery of an LTM 1500-8.1 and wants machine commissioning,

6    also operator training?

7         A    You could have written it that way, yes.

8         Q    And the date of this was February 3rd, 2017;

9    correct?

10        A    That's correct.

11        Q    And it was keyed in on March 6th, 2017; correct?

12        A    That's correct.

13        Q    And what does it mean when somebody is keyed in?

14        A    Keyed in means, okay, this is a document which gets

15   into the database of Liebherr Service System.

16        Q    So now this information that's on this document is

17   actually in the computer system at Liebherr US; correct?

18        A    That's correct.

19        Q    And if there's any document that says keyed in, that

20   document has been inputted into Liebherr US's computer

21   system; correct?

22        A    That's correct.

23        Q    And it's inputted as of the date where it says

24   keyed; correct?

25        A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    So this document would have been keyed into the
2  system on March 6th, 2017; correct?
3      A    That's correct.
4      Q    I'd like to you turn to Exhibit 61.  Do you
5  recognize this?
6      A    Yes.
7      Q    What is this?
8      A    It's a report of repairs.
9           MR. GOODMAN:  Your Honor, I'd like to move Exhibit
10  61 into evidence as Exhibit 61.
11          MR. CREMER:  No objection.
12          THE COURT:  Admitted.
13  (Plaintiff's Exhibit No. 61 was admitted.)
14  BY MR. GOODMAN:
15      Q    And this was prepared by Liebherr crane?
16      A    This was prepared by Liebherr.
17      Q    And it's a report of repairs; correct?
18      A    Yes.  Correct.
19      Q    And it's for crane number 073386; correct?
20      A    Correct.
21      Q    It's for an LTM 1500?
22      A    LTM 1500.
23      Q    Customer Sims Crane?
24      A    Customer Sims Crane.
25      Q    And it says, "customer had bought a used LTM 1500

1    and wants machine built and some operator training."

2    Correct?

3        A    That's correct.

4        Q    Could it also be read Sims Crane & Equipment had

5    bought the used LTM 1500-8.1 and wants machine built and

6    some operator training; correct?

7        A    Yes, it could be.

8        Q    And that's February 3rd, 2017; correct?

9        A    That's correct.

10       Q    And then it goes down to say, "erected machine with

11   236,000 pounds of counterweight, installed the TY Guying

12   assembly and tested.  Then installed 70-meter of luffing jib

13   and removed.  Then changed the 50-meter boom to 84-meter

14   boom and tested."  Correct?

15       A    That's correct.

16       Q    At the time that Henry Ward changed the 50-meter

17   boom to the 84-meter boom, did he have to contact Liebherr

18   Germany to request permission to do that?

19       A    No.

20       Q    It's not a modification; correct?

21       A    No, it's not a modification.

22            MR. GOODMAN:  Your Honor, if I haven't done so

23   already, I'd like to submit Exhibit 61 into evidence as

24   Exhibit 61.

25            THE COURT:  It's already admitted without objection.

1       Is that your understanding too, Mr. Cremer?

2              MR. CREMER:  Yes, Your Honor.

3              THE COURT:  Okay.

4   BY MR. GOODMAN:

5       Q    I'd like you to look at Exhibit 62.

6       A    Yes.

7       Q    Do you recognize Exhibit 62?

8       A    Yes.

9       Q    What is it?

10      A    It's another service report worksheet for Mr. Henry

11   Ward on the same crane at Sims Crane.

12             MR. GOODMAN:  Your Honor, I'd like to move Exhibit

13   62 into evidence as Exhibit 62.

14             MR. CREMER:  No objection.

15             THE COURT:  It's admitted.

16   (Plaintiff's Exhibit No. 62 was admitted.)

17   BY MR. GOODMAN:

18      Q    This is a Liebherr document?

19      A    It's a Liebherr document.

20      Q    It's prepared by Liebherr?

21      A    Yes.

22      Q    And the crane is 073386; correct?

23      A    That's correct.

24      Q    For an LTM 1500; correct?

25      A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And the company name is Sims Crane & Equipment;

2  correct?

3      A    That's correct.

4      Q    And this was done on February 4th, 2017; correct?

5      A    That's correct.

6      Q    And this information that's on the sheet was keyed

7  into Liebherr US computer system on March 8th, 2017;

8  correct?

9      A    Yeah.  Yes.  Looks like 8, maybe a 9, but, yeah, 8,

10  maybe 4.  I don't know --

11      Q    Either March 4th, March 8th or March 9th?

12      A    -- yeah, something like that, yes, uh-huh.

13      Q    But in March of 2017 --

14      A    That's correct.

15      Q    I'd like you to turn to Exhibit 63.  Do you

16  recognize this?

17      A    Yeah.  It's a confirmation of an order filled out,

18  "load out, training and commissioning."

19      Q    And this is a Liebherr completed document; correct?

20      A    It's a Liebherr completed document.

21      Q    And the date of this is April 6th, 2017; correct?

22      A    That is correct.

23      MR. GOODMAN:  Your Honor, I'd like to move Exhibit

24  63 into evidence as Exhibit 63.

25      MR. CREMER:  No objection.

1          THE COURT:  It's admitted.

2    (Plaintiff's Exhibit No. 63 was admitted.)

3    BY MR. GOODMAN:

4          Q    The service manager is Trina Cross; correct?

5          A    Correct.

6          Q    Trina Cross is not a crane operator; correct?

7          A    No, she's not.

8          Q    She's has no crane operator training; correct?

9          A    She has no crane operator training, correct.

10         Q    She's not a trainer, correct, either; correct?

11         A    No, she's not.

12         Q    She's not NCCCO certified, is she?

13         A    No, she's not.

14         Q    But she is the manager of Henry Ward; correct?

15         A    That's correct.

16         Q    And she's filling out this confirmation order;

17   correct?

18         A    That's correct.

19         Q    And she would have a habit in her routine practice

20   of completing this confirmation of order; correct?

21         A    That's correct.

22         Q    And the description is "load out/training and

23   commissioning," correct?

24         A    That's correct.

25         Q    And it's for machine 073386; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    That's correct.

2      Q    And it's for the LTM 1500; correct?

3      A    Correct.

4      Q    And the customer information, the end customer says

5  Schuch in New York, New York; is that correct?

6      A    That's correct.

7      Q    And the service location is Schuch in New York, New

8  York; correct?

9      A    That's correct.

10      Q    But we know from prior documents that this crane is

11  going to Jacksonville; correct?

12      A    That's correct.

13      Q    We know from prior documents that Sims is purchasing

14  this crane; correct?

15      A    Yes.

16      Q    And so on the bottom of this, it says, "not able to

17  update process folder on H drive to number."  The Liebherr

18  US system has an H drive; correct?

19      A    That's correct.

20      Q    The H drive is where all the customer information is

21  kept; correct?

22      A    Yes.

23      Q    And that information on that H drive actually then

24  gets transferred over to Liebherr Germany; correct?

25      A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    So Liebherr Germany knows where all the U. S.

2    Liebherr Cranes are located; correct?

3    A    No.  I need to correct that.  The H drive is our

4    platform of everything collectively using on the cranes.  If

5    there are changes to a crane from here to Germany, we are

6    filling out another form and emailing it to Germany.

7    Q    Okay.

8    A    So not everything on that H drive goes to Germany,

9    no.

10   Q    Okay.  But the information on the H drive, if it has

11   a customer information, that information goes to Germany;

12   correct?

13   A    Yes.

14   Q    So Liebherr Germany in their records reflects the

15   records of Liebherr US's H drive; right?

16   A    That's correct.

17   Q    And on the bottom of it says, "check customer info

18   on system.  Says Schuch, paperwork Sims."  Correct?

19   A    Correct.

20   Q    So there's a discrepancy?

21   A    That's a discrepancy.

22   Q    And the discrepancy is that Trina Cross is seeing

23   between the system that she says says Schuch and the

24   paperwork that says Sims; correct?

25   A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And so it's her responsibility to determine who
2    owned this and to update the H drive; correct?
3      A    Not necessarily it's her duty, but it -- she alerted
4    somebody by saying this needs to be checked into, it needs
5    to be corrected.
6      Q    And it would have been Liebherr US's?
7      A    It would have been Liebherr US's to correct it.
8      Q    So it's Liebherr US's duty to correct it so they
9    have the proper name and address and contact information for
10   the actual owner of the crane 073386; correct?
11     A    Yes.
12     Q    I'd like to show you Exhibit 64.  Tell me what this
13   is.
14     A    It's a crane operator training.
15     Q    I'd like to move Exhibit 64 into evidence as Exhibit
16   64.
17          MR. CREMER:  No objection.
18          THE COURT:  64 is admitted.
19   (Plaintiff's Exhibit No. 64 was admitted.)
20   BY MR. GOODMAN:
21     Q    Now, this is a Liebherr document; correct?
22     A    That's correct.
23     Q    And this is the document that Liebherr trainers use
24   when they train customers on Liebherr products; correct?
25     A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          Q     And the record of crane operator training says,
2     "this training program is made up of individual sections.
3     Under each section are several topics.  As each topic is
4     covered and completed, it must be checked off."  The
5     Liebherr trainer is supposed to check that off; correct?
6          A     That's correct.
7          Q     Then it goes on to say, "each section should then be
8     signed by the Liebherr engineer who conducted the training
9     and by the operator or other personnel who received the
10    training."  Correct?
11         A     That's correct.
12         Q     Then it goes on to say, "the operator is signing the
13    form to confirm that he or she fully understands and
14    comprehends the training provided."  Correct?
15         A     That's correct.
16         Q     Would you agree with the proposition that there are
17    no knowns, like people know what they know?  Like you know
18    what you know; correct?
19         A     Yes.
20         Q     And then some people -- and then you know sometimes
21    what you don't know; correct?
22         A     That's correct.
23         Q     Would you agree with the proposition that there are
24    sometimes unknown unknowns, like you don't know what you
25    don't know; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A      Okay.  Yes.

2      Q      That makes sense; right?

3      A      Yes.

4      Q      So it's the Liebherr operator -- strike that.

5             It's the line trainer's responsibility to inform

6    this new crane operator, this customer, of what they don't

7    know; right?

8      A      Correct.

9      Q      And even things that they don't know they don't even

10   know; correct?

11     A      Correct.

12     Q      And so it goes on to talk about objectives; right?

13     A      Talks about what?

14     Q      It says, "the training for crane operators is

15   designed to equip operators with a comprehensive knowledge

16   of the controls, arrangements, operational system,

17   procedures, characteristics and safety concerns and

18   considerations relating to the specific crane."  That's what

19   it says?

20     A      (Nodding head.)

21     Q      That's what Henry Ward's responsibility is; correct?

22     A      Yes.  His responsibility, yes.

23     Q      And when it says, "comprehensive knowledge," that

24   would mean as total knowledge of this machine as possible;

25   correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A     Not necessarily this machine.  Any crane.

2        Q     But if Henry Ward is training Sims on a Liebherr LTM

3    1500, it would be his responsibility to provide almost total

4    knowledge about the crane to the Sims operators that he's

5    training; correct?

6        A     Correct.  Exception is if a customer/trainee already

7    knows operations on that crane or if it's similar to any

8    other crane and they can discuss and say, well, we already

9    know how that works.  We already know how this works.  We

10   already know the hydraulic system, so it can be said, okay,

11   skip this and we go to the next.

12       Q     But it's also the Liebherr trainer's

13   responsibility --

14       A     Yeah.

15       Q     -- to determine whether or not they really do know

16   that information; correct?

17       A     Well, yeah.  It's a togetherness, you know, since

18   they have to ask the trainee if they have knowledge of it or

19   not, and maybe find out if they don't, then you need to

20   emphasize to them that you may need to train them if you

21   don't have knowledge.

22       Q     And in this situation, we've read an email earlier

23   where Liebherr understood that Sims had never owned a

24   Liebherr LTM 1500 and didn't know how to handle the boom,

25   insert and retract it or things like that; correct?

1      A    Sure.  Sure.

2      Q    So it would have been incumbent upon Henry Ward to

3  go through all that; correct?

4      A    You're correct, but as I said, the handover is

5  entailing, okay, to show the customer all the differences

6  between the Liebherr crane and any other crane, so if any

7  other crane has the same functions, they're not necessarily

8  training that with the customer, even with a new customer.

9      Q    It goes on to say, "Liebherr will provide this

10  training to the persons that are designated by the employer

11  as the crane operator."  Correct?

12      A    That's correct.

13      Q    So Liebherr is going to provide this training to the

14  crane operators; correct?

15      A    That's correct.

16      Q    And the crane training that was provided by Henry

17  Ward to Sims went from January 30th to February 4th, 2017;

18  correct?

19      A    That's correct.

20      Q    And we know it's on the crane 073386; correct?

21      A    That's correct.

22      Q    And so the dates of the training is only for one

23  week; correct?

24      A    That's correct.

25      Q    So it's approximately 40 hours; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A     That's correct.

2        Q     And we previously spoke about how the new customer

3    on the Liebherr LTM 1500 should have approximately 80 hours

4    of training?

5        A     Could have, yes.  Could have, yes.

6        Q     Now, I want you to turn to the next page, LAI0505.

7    Would you agree that Henry Ward did not go through any of

8    these items; correct?

9        A     I can agree to that because it may be at the bottom.

10   I see it not yet, but maybe he marked NA, not applicable.

11   Yeah, marked NA, not applicable, because he probably

12   discussed with the operator he already knows these things,

13   okay, we don't need to go over this.

14       Q     Do you know that's what happened or --

15       A     I don't know it.  I just assume.

16       Q     You're assuming.  Okay.

17       A     It says NA, for me that means, okay, he didn't go

18   over it.

19       Q     And that would be his decision not to go over

20   something, correct, whether or not he believes the crane

21   operator really understands or does not understand?

22       A     His decision with the customer.

23       Q     And if you turn to LAI0506, that's also -- --

24       A     Also.  Same thing.

25       Q     -- NA.  So he didn't go over that?

1      A     Assumingly, yes.

2      Q     And if you go to LAI0513, no checkmarks there;

3   right?

4      A     Yes.

5      Q     And this is the general maintenance and mechanic and

6   shop foreman training; correct?

7      A     That's correct.

8      Q     He didn't do any of that; right?

9      A     Looks like it.

10      Q     He looks like he did not?

11      A     Looks like he did not.

12      Q     I'd like you to turn to Exhibit 65.  Tell me what

13   this is, sir.

14      A     Application of employment for Liebherr.

15      Q     Do you recognize this?

16      A     I recognize this, yes.

17            MR. GOODMAN:  Your Honor, I'd like to move Exhibit

18   65 into evidence as Exhibit 65.

19            MR. CREMER:  No objection.

20            THE COURT:  65 is admitted.

21   (Plaintiff's Exhibit No. 65 was admitted.)

22   BY MR. GOODMAN:

23      Q     Based on Mr. Wards' application for employment, he

24   had never done any training on any cranes; correct?

25      A     Way back in the days, when is this, 2004?  So that

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

245

```
 1      was his first initial applying for the job looks like.
 2           Q    He had been a mechanic and he performed AC repairs
 3      on cars; correct?
 4           A    That's correct.
 5           Q    He had never worked on cranes before; correct?
 6           A    Well, he worked for Maxim Crane, so you could assume
 7      that he maybe worked for someplace.
 8           Q    But he worked as a mechanic, right?
 9           A    But he worked as a mechanic.
10           Q    He wasn't a trainer on the cranes; correct?
11           A    Correct.
12           Q    He was not a crane operator?
13           A    Not to my knowledge, no.
14           Q    He's not NCCO certified; correct?
15           A    I don't know.
16           MR. GOODMAN:  Your Honor, I'd like to move Exhibit
17      65 into evidence as Exhibit 65, if I haven't done so
18      already.
19           THE COURT:  I have it's already admitted.
20           MR. CREMER:  I think it's admitted, but no
21      objection.
22           THE COURT:  It is admitted.  There was no objection.
23      BY MR. GOODMAN:
24           Q    I'd like to take a look at Exhibit 66.
25           A    Yes, sir.
```

1        Q    Are you familiar with this?

2        A    Yes, sir.

3        Q    What is this?

4        A    It's a performance review rating report.

5        Q    Is this from Liebherr of Henry Ward?

6        A    This is from Liebherr, Henry Ward, yes.

7             MR. GOODMAN:  Your Honor, I'd like to move Exhibit

8    66 into evidence as Exhibit 66.

9             MR. CREMER:  No objection.

10            THE COURT:  66 is admitted.

11   (Plaintiff's Exhibit No. 66 was admitted.)

12   BY MR. GOODMAN:

13       Q    And this is his review back in 2007; correct?

14       A    Yeah.  This looks like a case of review, but only

15   pay increase review.  It's just -- you know what I'm saying?

16   Acknowledge that he will have a new pay rate because nothing

17   else is marked.

18       Q    So nobody went over anything else on this worksheet

19   with him other than just giving him a pay increase?

20       A    That's what it looks like.

21       Q    I'd like you to turn to Exhibit 67.  What is this?

22       A    This is another performance rating.

23       Q    Liebherr completing it for Henry Ward; is that

24   correct?

25       A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

247

1          MR. GOODMAN:  Your Honor, I'd like to move Exhibit

2     67 into evidence as Exhibit 67.

3          MR. CREMER:  No objection.

4          THE COURT:  Admitted.

5     (Plaintiff's Exhibit No. 67 was admitted.)

6     BY MR. GOODMAN:

7          Q    And he didn't get a pay raise here in 2007; correct?

8          A    No, that's correct.  Midyear Liebherr does not do

9     any pay increases.  Midyear we only do sometimes review.

10         Q    And here his job knowledge review was satisfactory;

11    right?

12         A    Yes.

13         Q    Do you know who did -- do you know whose signature

14    the rating supervisor is?

15         A    Rating supervisor?  No, I do not know who that is.

16         Q    How about the department head signature?

17         A    That's me.

18         Q    That's your signature.  I'd like to turn to Exhibit

19    68.  Do you know what this is?

20         A    It's another performance rating review.

21         Q    It's of who?

22         A    It's a performance or rating review, and it is, you

23    know, done on 3/22/08.  I can't hardly read this, but...

24         Q    Is that of Henry Ward?

25         A    It's Henry Ward, yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    And Liebherr is doing that review?
 2        A    Yes, Liebherr is doing that review.
 3        Q    And it's in 2008; correct?
 4        A    That's correct.
 5        Q    And there's nobody's signature under supervisor,
 6   department head, human resource or employee; is that
 7   correct?
 8        A    That's correct.
 9        Q    All right.  Performance reviews are important for
10   employees; correct?
11        A    Yes.
12        Q    So that he could understand what they need to do
13   better at it; correct?
14        A    Better or change.
15        Q    How good they're doing?
16        A    Right.
17        Q    And if they don't see them, then they don't know
18   what they need to do better at and they don't know what
19   they're doing good at?
20        A    Some of them also seeing it as a pay increase too.
21        Q    Some don't even pay attention to it; correct?
22        A    Some of them don't, yeah.
23        Q    I'd like to show you what's been marked as Exhibit
24   69.
25             THE COURT:  Did you want to move 68 into evidence?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1              MR. GOODMAN:  Yes, Your Honor.

2              MR. CREMER:  No objection.

3              THE COURT:  That's moved into evidence, admitted

4       into evidence.

5    (Plaintiff's Exhibit No. 68 was admitted.)

6    BY MR. GOODMAN:

7         Q    I'd like to show you what's been marked as Exhibit

8       69.

9         A    Henry Ward.  The performance rating of Henry Ward,

10      overall rating and -- you know what I'm saying, and it was

11      done by me.

12             MR. GOODMAN:  And, Your Honor, I'd like to move

13      Exhibit 69 into evidence as Exhibit 69.

14             MR. CREMER:  No objection.

15             THE COURT:  Admitted.

16    (Plaintiff's Exhibit No. 69 admitted.)

17    BY MR. GOODMAN:

18        Q    And under overall rating, it says, "confidence

19      through experience will improve any weak areas, potential

20      for exceptional performance."  Correct?

21        A    That's correct.

22        Q    And so in 2009, he wasn't an exceptional performer;

23      correct?

24        A    No, I'm not saying that.

25        Q    He has potential.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    He is not exceptional.

2    Q    We can't talk over one another.

3         So he's not an exceptional performer?

4    A    Exceptional is all on the left side.  No, he's not.

5    He's in between exceptional and the other.

6    Q    Are you a crane operator, sir?

7    A    No, I'm not.

8    Q    Are you a crane trainer?

9    A    No.

10   Q    Are you NCCCO certified?

11   A    No.

12   Q    Have you ever gone out and watched Henry Ward?

13   A    Yes, I have.

14   Q    Have you watched him train?

15   A    Yes, I have.

16   Q    Have you ever taken classes on how to train any

17   customers?

18   A    Yes, I have.

19   Q    Where did you take this?

20   A    Germany.

21   Q    How many courses did you take?

22   A    Two or three.

23   Q    How many hours did you do?

24   A    Three weeks at a time.

25   Q    But you've never trained?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

251

1       A    No.

2       Q    Have you ever taken training on the LTM 1500?

3       A    No.

4       Q    I'd like to show you what's been marked as Exhibit

5    70.  Do you know what that is?

6       A    That's another performance review.

7       Q    Who is it of?

8       A    Of Mr. Henry Ward.

9       Q    And who's doing it?  Liebherr?

10      A    Liebherr.

11      Q    And would his manager Trina Cross be the one --

12      A    Trina Cross, yes.

13      Q    Go to LAI0733 -- Your Honor, I'd like to move

14   Exhibit 70 into evidence as Exhibit 70.

15           MR. CREMER:  No objection.

16           THE COURT:  All right.  Exhibit 70 is admitted.

17   (Plaintiff's Exhibit No. 70 was admitted.)

18   BY MR. GOODMAN:

19      Q    Under the comments on safety, it says, "safety is

20   paramount for all service engineers and you are held at a

21   very high standard."  Is that true?

22      A    That's true.

23      Q    So you hold your trainers to a very high standard;

24   correct?

25      A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    They're teaching new customers how to safely operate

2   and use the cranes that Liebherr Germany is manufacturing;

3   correct?

4        A    That's correct.

5        Q    And the cranes that Liebherr US is selling; correct?

6        A    That's correct.

7        Q    I'd like you to take a look at Exhibit 71.  Can you

8   tell me what that is?

9        A    That's another performance review, again, on Henry

10  Ward done by Ms. Trina Cross two years later.

11            MR. GOODMAN:  Your Honor, I would like to move

12  Exhibit 71 into evidence as Exhibit 71.

13            MR. CREMER:  No objection.

14            THE COURT:  Admitted.

15  (Plaintiff's Exhibit No. 71 was admitted.)

16  BY MR. GOODMAN:

17       Q    I'd like you to turn to Exhibit 72.  Do you know

18  what this is?

19       A    Yeah.  This is a document, appears Mr. Henry Ward

20  was trained on by Germany in Germany.

21       Q    And the Liebherr LTM 1500 is not on this sheet;

22  correct?

23       A    Liebherr LTM 1500 is not on this.

24       Q    Henry Ward did not get classroom training on the LTM

25  1500 in Germany; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    It looks like he has not had a class and training on

2    it, that's correct, but he had it on similar cranes which is

3    a LTM 1750.  And he also have thorough training, hands-on

4    which is another class on the 1500 with somebody else like

5    Mr. Redman was going to do at Sims.

6      Q    Sure.  Now, if you have training on one type of

7    crane, is it acceptable then to operate another type of

8    crane?

9      A    Yes, depending on size, yes.

10     Q    So if you have -- if you have training on -- let's

11   say, I want to say what's the smallest crane?

12     A    N40.

13     Q    N40?

14     A    It's a 40-ton crane versus a 500-ton crane.  It's a

15   little different.

16     Q    Little different.

17     A    It's a little different.

18     Q    So it's better to have classroom training on the

19   types of cranes that you're operating; correct.

20     A    That's correct.

21     Q    I'd like you to turn to Exhibit 70.

22     A    Not only.  You know, I mean if you have hands-on

23   training, sometimes hands-on training can be even better

24   than classroom training.

25     Q    Both is good; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Both is good, absolutely, correct.

2    Q    I'd like you to turn --

3         THE COURT:  If you want to move to admit 72?

4         MR. GOODMAN:  Yes, Your Honor.

5         MR. CREMER:  No objection.

6         THE COURT:  It's admitted.

7  (Plaintiff's Exhibit No. 72 was admitted.)

8         MR. GOODMAN:  Your Honor, just to note, I have about

9    20 exhibits more to go for Mr. Vieten.  I'm not sure what

10   you'd like to do.

11        THE COURT:  Is now a good time to break?

12        MR. GOODMAN:  Now would be good time to break.

13        THE COURT:  Okay.  Then let's go ahead and just stop

14   now.  We can resume in the morning.

15        Just a couple of housekeeping matters.  You may step

16   down.  It does seem to me perhaps, Mr. Goodman, makes sense

17   with those, the next 20 exhibits to talk about them with

18   Mr. Cremer and if there's some he's not going to object to,

19   we can perhaps just admit them all first thing in the

20   morning so we're not having to each time handle them one by

21   one.

22        MR. GOODMAN:  That would be great, Judge.

23        THE COURT:  Also, the other bit of homework would be

24   that condensed 26 exhibit.  If you could make sure

25   Mr. Cremer has an opportunity to look at that and see that

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

255

```
1    and see if he objects to how you've condensed that exhibit,
2    keeping in mind that 26 itself is already admitted.
3           This would be, I would think, a 26A or some way to
4    make it clear that it's a smaller version of the original
5    exhibit, and then I know you're going to get with Ms. Morgan
6    about the exhibit list.  So that you all can go over the
7    exhibits tomorrow morning, perhaps what makes sense is for
8    you all to still come to the courthouse at 9:00 but for us
9    to start a little bit later whenever you're finished going
10   over the exhibits and looking at them.  We could start at
11   9:30, 9:20, whatever that is.
12           MR. GOODMAN:  Do you want to go over them now?
13           MR. CREMER:  No.
14           THE COURT:  So let's do that, and that will also
15   give -- I think that would also be fair to Mr. Cremer first
16   thing to go look at that condensed Exhibit 26.  You may get
17   a better answer for him if you give him an opportunity to
18   take a break from that.
19           MR. GOODMAN:  Take advantage of him now.
20           THE COURT:  And then so let's plan, we'll start at
21   9:30, but if you all could get here by 9:00 just so that you
22   have the time.  There's no hearings occurring in this
23   courtroom before we start, so you can meet in here and have
24   them go over the exhibits here and you can also leave
25   everything in here tonight if you'd like.
```

256

1          MR. GOODMAN:  Thank you, Your Honor.

2          THE COURT:  Is there anything else we need to

3     discuss on the record?

4          MR. CREMER:  No, Your Honor.

5          THE COURT:  Off the record then.

6     (Court recessed at 5:20 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

          UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION