1
1                    UNITED STATES OF AMERICA
                UNITED STATES DISTRICT COURT
2                   MIDDLE DISTRICT OF FLORIDA

3                        -   -   -

4              HONORABLE AMANDA ARNOLD SANSONE
           UNITED STATES MAGISTRATE JUDGE PRESIDING

5

6   NBIS CONSTRUCTION & TRANSPORT,        )
    INSURANCE SERVICES, INC., a/s/o       )
7   SIMS CRANE & EQUIPMENT COMPANY,       )
                                          )
8                    PLAINTIFF,           )
                                          )
9              VS:                        )8:19-CV-2777-VMC-AAS
                                          )
10  LIEBHERR-AMERICA, INC., d/b/a         )
    LIEBHERR USA, CO., and                )
11  LIEBHERR CRANES, INC.,                )
                                          )
12  _____DEFENDANTS.___)

13

14

15                  BENCH TRIAL – VOLUME II
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                       FEBRUARY 8, 2022
16                     TAMPA, FLORIDA

17

18

19  SHARON A. MILLER, CSR, RPR, CRR, RMR
    IL CSR 084-2617
20  FEDERAL OFFICIAL COURT REPORTER
    801 N. FLORIDA AVENUE, SUITE 13A
21  TAMPA, FLORIDA 33602

22  Proceedings recorded by mechanical stenography,
    transcript produced by computer-aided transcription
23

24

25

    UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    APPEARANCES OF COUNSEL:

2    ON BEHALF OF PLAINTIFF:

3            COZEN O'CONNOR
             BY:  MR. JOSHUA ROSS GOODMAN
4                 MR. JOSEPH FRANK RICH
             200 South Biscayne Boulevard, Suite 3000
5            Miami, FL  33131
             (305) 704-5940
6            jgoodman@cozen.com
             jrich@cozen.com
7
             COZEN O'CONNOR
8            BY:  MS. MARIA ERMAKOVA
             175 Greenwich Street, 55th Floor
9            New York, NY  10007
             (212) 883-4902
10           Mermakova@cozen.co

11

12   ON BEHALF OF DEFENDANTS:

13
             CREMER, SPINA, SHAUGHNESSY, JANSEN & SIEGERT
14           BY:  MR. WILLIAM J. CREMER
                  MR. THOMAS R. PENDER
15                MR. CONNOR SINGLETON
             One North Franklin Street, 10th Floor
16           Chicago, Illinois 60606
             (312) 726-3800
17           wcremer@cremerlaw.com
             tpender@cremerlaw.com
18           csingleton@cremerlaw

19

20

21

22

23

24

25

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1                              I   N   D   E   X

2    WITNESSES                                            PAGES

3                          RALF VIETEN

4    Direct examination (resumed) by Mr. Goodman          5
     Cross examination by Mr. Cremer                       39
5    Redirect examination by Mr. Goodman                   71
     Recross examination by Mr. Cremer                     83
6

7                        JOHNATHAN SMITH

8    Direct examination by Mr. Goodman                     86
     Cross examination by Mr. Cremer                       105
9    Redirect examination by Mr. Goodman                   119
     Recross examination by Mr. Cremer                     126
10

11                      HENRY RAY WARD

12   Direct examination bu Mr. Goodman                     130
     Cross examination by Mr. Cremer                       142
13   Redirect examination by Mr. Goodman                   145

14                   JACK STEVEN STODGHILL

15   Direct examination by Mr. Goodman                     148
     Cross examination by Mr. Pender                        164
16   Redirect examination by Mr. Goodman                   204

17               E   X   H   I   B   I   T   S

18   PLAINTIFF EXHIBITS

19   No. 26A                                               5
     Nos. 73 through 93                                    4
20   Nos. 94 through 105                                   147

21   DEFENSE EXHIBITS

22   Nos. 1, 4, 5, 148, 157, 158                           86
     Nos. 16, 28,30, 31, 33, 36, 45                        149
23

24

25

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1                  TAMPA, FLORIDA; FEBRUARY 8, 2022

 2                         -    -    -

 3            (COURT IN SESSION AT 9:30 A.M.)

 4            THE COURT:  Good morning.  Anything we need to

 5      address before the witness comes back on the stand?

 6            MR. GOODMAN:  Yes, Your Honor.  We have discussed

 7      the exhibits that we will be using today and that will be 73

 8      through 93.  And the parties have agreed that they could be

 9      entered into evidence.

10            THE COURT:  Okay.  So you're moving Plaintiff's 73

11      through 93 into evidence.

12            And, Mr. Cremer, any objection?

13            MR. CREMER:  No objection.

14            THE COURT:  So all of those exhibits are admitted

15      then.

16   (Plaintiff's Exhibit Nos. 73 through 93 were admitted.)

17            THE COURT:  And, then, Mr. Cremer, did you have a

18      chance to look at the condensed version of Exhibit 26?

19            MR. CREMER:  Yes, Your Honor.  I did.  And 26 is

20      fine.

21            THE COURT:  So let's move that in, then,

22      Mr. Goodman, as Plaintiff's Exhibit 26A just to make it

23      clear --

24            MR. GOODMAN:  Thank you, Judge.

25            THE COURT:  -- that it's connected to that and that
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

 1   is admitted.  So 26A is admitted.

 2   (Plaintiff's Exhibit No. 26A is admitted.)

 3             THE COURT:  Anything else that we need to address?

 4             MR. GOODMAN:  I don't believe so, Judge.

 5             MR. CREMER:  That's it.

 6             THE COURT:  Then we can go ahead and bring the

 7   witness in.

 8             Mr. Vieten, I'll remind you that you're still under

 9   oath from yesterday.

10             Go ahead.

11             MR. GOODMAN:  Thank you, Your Honor.  Is there any

12   way that we could get the computer flipped over?

13                         RALF VIETEN,

14   having been previously duly sworn under oath, was examined and

15   testified as follows:

16                   DIRECT EXAMINATION (RESUMED)

17   BY MR. GOODMAN:

18        Q    Good morning, Mr. Vieten.

19        A    Good morning.

20        Q    I'd like you to turn to Exhibit 73.

21        A    My screen just went blank.

22        Q    Is it working now, sir?  Is it working now, sir?

23        A    Yes.

24        Q    All right.  Perfect.  You see in front of you

25   Exhibit 73?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Yes, I do.

2    Q    Are you familiar with this document?

3    A    Yes, I am.

4    Q    And what is this document?

5    A    It's an email from Ms. Sibylle Maier to me with the

6    subject of the letter of the LTM 1500-8.1.  "This bulletin

7    contains important safety information."

8    Q    Who is Sibylle?

9    A    Sibylle Maier is the administrative assistant for

10   the LWE or Germany Liebherr division.

11   Q    And you are receiving this email from Liebherr

12   Germany on November 10th, 2017; is that correct?

13   A    That's correct.

14   Q    And the body of the email says, "This bulletin

15   contains important safety information pertaining to the

16   proper and safe setup and operation of Liebherr mobile

17   cranes LTM 1500-8.1, LTM 1500 and LTM 1550N.  Failure to

18   follow these instructions could result in the uncontrolled

19   retraction of the telescopic boom during operation resulting

20   in serious injury or death."  Correct?

21   A    That's correct.

22   Q    I'd like you to turn to Exhibit 74, sir.  Do you

23   recognize this?

24   A    Yes, sir.

25   Q    And what is this?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A      This is the listing of all the cranes we are

2     supposed to inform the customers about the letter.

3        Q      And did you receive Exhibit 74 as an attachment to

4     Exhibit 73?

5        A      Yes, I did.

6        Q      And Exhibit 74 has all of the LTM 1500s that need to

7     receive the Product Safety Bulletin; is that correct?

8        A      That's correct.

9        Q      And the retrofit cover plate; is that correct?

10       A      That's correct.

11       Q      And if we go --

12       A      Not the cover plate yet, because the cover plate yet

13    is not mentioned in here.

14       Q      The cover plate is not mentioned yet?

15       A      No.

16       Q      This is just the Product Safety Bulletin?

17       A      This is just the Product Safety Bulletin.

18       Q      This is only for the United States customers?

19       A      Only.

20       Q      Only the U. S. customers?

21       A      Only the United States customers.

22       Q      This is the Product Safety Bulletin that we would

23    have looked at Exhibit 158 yesterday?

24       A      Yes.

25       Q      And then down at the bottom highlighted, there's a

1  number 073386; correct?

2      A    That's correct.

3      Q    And that is a Liebherr LTM 1500; is that correct?

4      A    That's correct.

5      Q    And the entity that's reflected as owning that crane

6  is Schuch HeavyLift Corp.; correct?

7      A    That's correct.

8      Q    So the Product Safety Bulletin should have been sent

9  by Liebherr US to Schuch Heavylift Corp; correct?

10      A    No.  At the time, only Schuch was listed only as

11  that customer.

12      Q    If Schuch was listed on this list as the customer

13  and Liebherr Germany asked Liebherr US to send the Product

14  Safety Bulletin to all the individuals and entities on this

15  list, then Liebherr US should have sent the Product Safety

16  Bulletin to Schuch HeavyLift Corp; correct?

17      A    That's correct.

18      Q    I'd like you to turn to Exhibit 75.  Do you

19  recognize this, sir?

20      A    Yes.

21      Q    And this is an email from you, as employee of

22  Liebherr US, to Johnathan Smith, an employee of Liebherr US

23  and Auday Aluzry, an employee of had Liebherr US, with a

24  c.c. to Trina Baughman on Friday, November 10th, 2017;

25  correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    That's correct.

2      Q    Trina Baughman and Trina Cross is the same person?

3      A    The same person.

4      Q    Just a different last name; correct?

5      A    That's correct.

6      Q    She changed her name because of marriage

7 circumstances?

8      A    That's correct.

9      Q    And this email you're sending to Johnathan and Auday

10 and you're forwarding the email from Exhibit 73 with the

11 attachment Exhibit 74; correct?

12      A    That's correct.

13      Q    And the importance on this is high; correct?

14      A    Correct.

15      Q    So you believe that this is an important email that

16 they need to pay attention to; correct?

17      A    Correct.

18      Q    It's important because this information has to get

19 out to customers, and if it doesn't get out to customers,

20 there can be impact to life, personnel and to property;

21 correct?

22      A    Yes.

23      Q    And you email Johnathan and Auday and say, "please

24 read below and see attached letters.  Please take care of

25 this addressing with the customers;" correct?

1    A    That's correct.

2    Q    So it was your expectation that Johnathan Smith and

3    Auday Aluzry would send the Product Safety Bulletin to

4    Schuch HeavyLift; is that correct?

5    A    That's correct.

6    Q    I'd like you to turn to Exhibit 76.  This is an

7    email from Paul Hoelz at Liebherr LWE; correct?

8    A    That's correct.

9    Q    That's Liebherr Germany?

10    A    That's correct.

11    Q    And Paul Hoelz is an employee of Liebherr Germany;

12    is that correct?

13    A    That's correct.

14    Q    And on this date, November 14th, 2017, he is sending

15    this email to Trina Baughman who's Trina Cross; is that

16    correct?

17    A    That's correct.

18    Q    And it's with attachments; correct?

19    A    That's correct.

20    Q    Now, you speak German, yes?

21    A    Yes, I do.

22    Q    Do you know what the attachments say here in

23    English?

24    A    Yes, I do.

25    Q    Can you tell us what that would say in English?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A     Umbau EN Nachlieferung, which means a delivery, RV.

2  It's a Ausgleichsbehaelter, which means it's an exchange

3  tank, pdf, Umbau 3121.

4      Q     Can you explain what that means in English?

5      A     In English, this means this is a modification

6  announcement as an Umbau.  Umbau means modification.

7  Modification No. 3118 means it's a modification a customer

8  would carry out themselves, and it is a part of, you know,

9  after the fact the crane has been delivered.

10     Q     This email is also cc'd to a Derrick Harris, who's a

11 Liebherr US employee; correct?

12     A     That's correct.

13     Q     Ralf Vieten, who is yourself; correct?

14     A     That's me.

15     Q     You're an employee of Liebherr US at the time?

16     A     That's correct.

17     Q     And Harald Hummel, who's an employee of Liebherr

18 Germany; correct?

19     A     That's correct.

20     Q     And Paul Hoelz is telling Ms. Baughman, "Good

21 morning, Trina.  As you already know, on cranes with an

22 84-meter boom, the MOD 3121 retrofitting of a cover plate

23 and warning signs has to be carried out;" correct?

24     A     That's correct.

25     Q     "Please send at least one to two days before

1    delivery of the required parts, the customer letter which

2    you have received on 10/11/2017 from Mrs. Maier;" correct?

3        A    That's correct.

4        Q    "The required parts will leave Liebherr Germany

5    within this week."  Correct?

6        A    Correct.

7        Q    And so this email from Mr. Hoelz to Ms. Baughman is

8    telling her that she's going to receive modification parts

9    for the LTM 1500; correct?

10       A    That's correct.

11       Q    And it should follow the letter, which is the

12   Product Safety Bulletin; correct?

13       A    Correct.

14       Q    And it should follow that letter to the individuals

15   and entities that were listed on Exhibit 74; correct?

16       A    That's correct.

17       Q    So the modification should be sent, then, to Schuch

18   HeavyLift; correct?

19       A    That's correct.

20       Q    I'm going to show you Exhibit 77.  Do you recognize

21   this, sir?

22       A    Yes.

23       Q    And this is an email from Trina Baughman, an

24   employee of Liebherr US, to Mr. Harris, an employee of

25   Liebherr US, with a c.c. to Mr. Aluzry, yourself and

1   Mr. Smith, all employees of Liebherr US; correct?

2       A    That's correct.

3       Q    And it's forwarding the customer letter that was

4   Exhibit 73; correct?

5       A    That's correct.

6       Q    And the importance of this is high; correct?

7       A    Yes.

8       Q    And the importance is high because this customer

9   letter and the Product Safety Bulletin can affect someone's

10  personal health, their life or property; correct?

11      A    Correct.

12      Q    And the email says "Derrick, here is the letter that

13  Paul Hoelz is referring to for MOD 3118/3121.  We will work

14  the logistics upon my return unless you got this and I will

15  back away" and a smily face; correct?

16      A    Correct.

17      Q    And she, Ms. Baughman, was actually going on a

18  two-week vacation; correct?

19      A    I assume.

20      Q    And then on the bottom it says, "Johnathan, Auday,

21  and Mr. Vieten.  The MOD department will tend to this

22  customer letter with the MOD campaign," which it references.

23  "Smile, one less letter for you and one more for the MOD

24  Squad" with a smiley face; correct?

25      A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

14

1    Q    And the Mod Squad was Trina Baughman's group;

2    correct?

3    A    That's correct.

4    Q    And she's responsible for sending out all the

5    modification letters which will be the Product Safety

6    Bulletin; correct?

7    A    Not necessarily.  She was responsible at the time

8    for the modifications to carry out.  Because as I said

9    earlier, we have the 3,000s and then we have also the 5,000s

10   and 6,000 numbers, which are carried out by only us, and she

11   would schedule it with the customers, her group.

12   Q    As a c.c. on this email, you understood from this

13   email that Ms. Baughman was expressing to everyone that she

14   and her department were going to send out the Product Safety

15   Bulletin and the retrofit cover plate; correct?

16   A    That's correct.

17   Q    So you were relying on Mrs. Baughman's word that she

18   was going to send out the Product Safety Bulletin and the

19   retrofit cover plate to all those individuals on the list

20   that we looked at on Exhibit 74; correct?

21   A    That's correct.

22   Q    So she should have sent out that Product Safety

23   Bulletin and the retrofit cover plate to Schuch HeavyLift,

24   who was on that list; correct?

25   A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   Q    And at the time you received this email, you're

2   aware that this modification can cause personal injury, a

3   loss of life or loss of property; correct?

4   A    That's what it states, yes.

5   Q    And at the time, everyone understands from this

6   email that Ms. Baughman is going away for a little while;

7   correct?

8   A    Correct.

9   Q    But at no time did someone pick up the pieces and

10  say *hey, this is an important high priority, high importance*

11  *modification.  This needs to get out today.  We'll assign*

12  *somebody else,* did they?

13  A    No.  It does not.

14  Q    So everybody accepted that it would be sent out by

15  Ms. Baughman when she came back after her two-week vacation;

16  correct?

17  A    She's saying okay, that Mr. Harris is to take care

18  of this, Mr. Derrick.  She was delegating it to him.

19  Q    She was delegating it to Derrick Harris?

20  A    She said "otherwise, you know, I will take care of

21  it when I'm coming back."  So she was asking him to do it.

22  Q    And if the modification and the Product Safety

23  Bulletin never went to Schuch HeavyLift, then Mr. Harris

24  didn't undertake the direction that he was given by

25  Ms. Baughman; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

16

```
 1        A     Not necessarily.  Because Mr. Harris, then, if it
 2   didn't go out maybe had a reason why it didn't go out.
 3        Q     Okay.  But he was directed by Ms. Baughman to send
 4   it out; correct?
 5        A     Yes.  To send out to all of the customers.
 6        Q     All the customers?
 7        A     Not just Schuch.  All the customers.
 8        Q     Schuch HeavyLift should have received the Product
 9   Safety Bulletin and the retrofit cover plate; correct?
10        A     In the order as he was working at it, yes.
11        Q     I'd like to show you what's been marked as
12   Exhibit 78.
13        A     Mr. Harris answers Mr. Smith --
14        Q     Hold on one second for a question.
15        A     Okay.
16        Q     So you recognize this?
17        A     Yes, I do.
18        Q     And then at the bottom of it, it's an email from
19   Johnathan Smith to Derrick Harris, Trina Baughman, Aluzry
20   and it's forwarding the email of Exhibit 73 that you had
21   forwarded to Johnathan Smith; correct?
22        A     That is correct.
23        Q     And Johnathan Smith on Thursday, February 22nd, 2018
24   at 9:27 a.m. emails Derrick Harris and asks:  "Hello,
25   Derrick.  I need to know if you have a confirmation of
```

1    shipping for the letter going to LTM 1500-8.1 073386.  Thank

2    you, sir."  Correct?

3        A    Right.

4        Q    At this time, Mr. Smith is trying to find out

5    whether or not the Product Safety Bulletin went to the

6    owners of crane 073386; correct?

7        A    That's correct.

8        Q    If you turn to Exhibit 79, do you recognize this,

9    sir?

10       A    Yes.

11       Q    This is an email from Mr. Harris, an employee of

12   Liebherr US, to Mr. Smith, cc'ing Baughman and Aluzry in

13   response to the previous Exhibit that we just looked at

14   saying -- not really answering the question, but just saying

15   "Johnathan, I do have this MOD here."  And the MOD is a

16   modification?

17       A    That's correct.

18       Q    And MOD would be referring to the Product Safety

19   Bulletin and the retrofit cover plate?

20       A    That's correct.

21       Q    It says, "I do have this MOD here.  It can be

22   shipped out today.  Do you have an address, location to ship

23   it to?"  Correct?

24       A    Correct.

25       Q    If you turn to Exhibit 80, do you recognize this,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    correct, sir?

2        A    Yes, I do.

3        Q    This is an email from Mr. Smith back to Mr. Harris

4    on Thursday, February 22nd at 11:34 a.m. and it's saying

5    "Derrick, Sims Crane & Equipment Company.  Chris Peek, 1219

6    North US Highway 301, Tampa, Florida 33619;" correct?

7        A    Correct.

8        Q    That's the same address that we saw on all those

9    documents that we were talking about yesterday; correct?

10       A    That's correct.

11       Q    And it's the same address that all of these various

12   orders had with, we notice, three different customer numbers

13   for Sims; correct?

14       A    That's correct.

15       Q    And if you'll turn to the next page, Exhibit 81,

16   this is an email from Derrick Harris back to Johnathan Smith

17   on Thursday, February 22nd, 2018 at 12:45 with a c.c. to

18   Baughman and Aluzry and Derrick Harris is asking Mr. Smith:

19           "Did Sims buy this crane from Schuch?  Or are they

20   the same company?"  Correct?

21       A    Correct.

22       Q    And then if we turn to Exhibit 82, it's an email

23   back from Smith to Harris in summons to that email at 11:47

24   and it simply says "purchased from Schuch in 2016;" correct?

25       A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And if we go to Exhibit 83, do you recognize this,

2   sir?

3      A    Yes.

4      Q    This is a response to the email from Harris back to

5   Smith on February 22nd, 2018, the same day, 11:58 a.m. with

6   a c.c. to Baughman, Aluzry, Martinson, Yisrael Khezquiyahu,

7   K-H-E-Z-Q-U-I-Y-A-H-U, right?

8      A    Correct.

9      Q    And Allen Tyreanne, T-Y-R-E-A-N-N-E, and a Grace

10  Tiarra, all of Liebherr US?

11     A    All of Liebherr US.

12     Q    And Derrick Harris tells Johnathan Smith:

13  "Johnathan, this MOD" -- and he's referring to the Product

14  Safety Bulletin and the Retrofit Kit, correct?

15     A    Correct.

16     Q    -- "will be shipped out today.  I've been calling

17  Bill Adams, but no answer.  Thank you for the information."

18          And then he says, "hello, Tyreanne and Tiarra.

19  Could you please update the system to reflect the owner of

20  crane 073386 LTM 1500-8.1 is now Sims Crane & Equipment."

21          Is that correct?

22     A    That's correct.

23     Q    And if you turn to Exhibit 84, are you familiar with

24  that, sir?

25     A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And this is from Grace Tiarra at Liebherr responding

2    to Derrick Harris saying the LTM 1500-8.1 customer has been

3    updated; correct?

4      A    Correct.

5      Q    And that's on February 22nd, 2018 at 1:11 p.m.;

6    correct?

7      A    That's correct.

8      Q    That was all done in less than one day; correct?

9      A    That's correct.

10      Q    Updating the owner of the LTM 1500 from Schuch to

11    Sims; is that correct?

12      A    All happened on that day, yes.

13      Q    And that's all it took, correct, to identify who

14    correctly owned the LTM 1500-8.1 073386, is for somebody to

15    ask that question?  Correct?

16      A    Sure.

17      Q    I'd like you to turn to Exhibit 85.

18      A    Okay.

19      Q    Are you familiar with this?

20      A    It's the letter from Mr. Pilli to me and to

21    Ms. Baughman and c.c.'d Ms. Sibylle Maier and talking about

22    the customer unlocking telescope T2 from telescope T3

23    mechanically.

24      Q    This is from Liebherr Germany from you the following

25    day from the emails that we were previously talking about

1    and it was sent to you on Friday, February 23rd, 2018;

2    correct?

3        A    That's correct.

4        Q    And Mr. Pilli wants to know:  "Hello Mr. Vieten,

5    Hello Trina.  As you perhaps knew, there was an accident on

6    the crane 073386 (Customer, Schuch Heavy Corp. 812090 --

7    rent to Sims Crane) in context to the unlocking/locking

8    procedures of telescopes."  correct?

9        A    Correct.

10       Q    So is this an email from Liebherr Germany to you

11   advising you that there was an accident with this crane due

12   to the locking and unlocking of the T4 pin?

13       A    He's asking me if I already know at this point.

14   Yes.

15       Q    That's what he's referencing, though; correct?

16       A    That's what he's referencing.

17       Q    The locking and unlocking of the T4 pin; correct?

18       A    That's correct.

19       Q    And uncontrolled retraction of the boom; correct?

20       A    That's correct.

21       Q    And that's what is discussed in the Product Safety

22   Bulletin; correct?

23       A    That is correct.  And in the book also, and the

24   Operator's Manual, too.

25       Q    That's a great point.  We'll talk about that in a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    little while.

2         And then if you go to the next page -- excuse me,

3    the next Exhibit, Exhibit 86, this is an email from Trina

4    Baughman back to Mr. Pilli with a c.c. to Maier, Hoelz and

5    Kenzelmann; correct?

6         A    Correct.

7         Q    And a c.c. to you; correct?

8         A    Correct.

9         Q    And Ms. Baughman is telling Mr. Pilli: "Good day,

10   sir.  All customers, except the following, were sent the

11   letter and MOD due to contact discrepancies in our system."

12        And at the bottom is 073386.  3121 sent 21

13   February 2018; correct?

14        A    That's correct.

15        Q    Isn't it true, though, that that didn't go out

16   until -- it doesn't make much of a difference because

17   February 21st is still after the date of the loss, which is

18   February 19th; is that correct?

19        A    That's correct.

20        Q    But isn't it true that this Product Safety Bulletin

21   and the cover plate went out February 22nd and not

22   February 21st?

23        A    Yeah.  That's correct.  Yeah.  I think so.  Yeah.

24        Q    So this is confirming by Tina Baughman that they

25   never sent the Product Safety Bulletin to Schuch or to Sims;

1    correct?

2        A    Or the others.

3        Q    Or these others that are listed here; right?

4        A    Correct.

5        Q    All these other owners are potentially operating a

6    crane without the information in the Product Safety

7    Bulletin; correct?

8        A    Yes, but the Safety Bulletin also says, okay, that

9    there is no danger in keeping the crane running.

10       Q    Thank you very much.

11       A    Keeping the crane operating.

12       Q    Thank you.  I'd like to turn to Exhibit 87.  And

13   this is an email from, at the bottom, Mr. Pilli to Trina

14   Baughman and yourself, and it says:  "Hello, Trina" -- this

15   is on the same day -- "does this mean that you didn't send

16   out the customer letter and the MOD to Schuch Heavy Corp

17   812090 before the accident happened?  Please answer as soon

18   as possible!"  Exclamation point; right?

19       A    Right.

20       Q    Germany knows that this loss occurred because of the

21   manipulation of the T4 pin; correct?

22            MR. CREMER:  Object.  Calls for speculation.

23            THE COURT:  Sustained.

24   BY MR. GOODMAN:

25       Q    Do you understand from reading this email that it's

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    your impression that you believe that Liebherr Germany

2    understands this loss occurred because of the locking and

3    unlocking of the T4 pin?

4        A    I understand from this that this crane had an

5    accident.

6        Q    And then if you turn to Exhibit 88, Trina Baughman

7    does not respond to the prior email; correct?  You respond;

8    correct?

9        A    That's correct.

10       Q    And you respond on Friday, February 23rd, 2018 at

11   8:48 a.m.; correct?

12       A    That's correct.

13       Q    And you're sending it to Mr. Pilli with a c.c. to

14   Baughman, Maier, Hoelz, Kenzelman and Schwellinger; is that

15   correct?

16       A    That's correct.

17       Q    You say "hello, Mr. Pilli.  That is correct that the

18   modification parts and the letter" -- that you're talking

19   about the Product Safety Bulletin and the retrofit cover

20   plate; correct?

21       A    That's correct.

22       Q    -- "was not sent to Sims because until yesterday the

23   contact in our data system was Schuch without notes.  It was

24   corrected yesterday, not before the accident."  Correct?

25       A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    But you would agree, sir, that based upon what we

2    looked at yesterday, there were a number of emails and

3    orders by Sims purchasing equipment for 073386 from

4    Liebherr; correct?

5    A    It appears so, yes.

6    Q    And it was actually in Exhibit 34, an email from

7    Adnan Bulat, that you see here in front of you, an email

8    from Adnan Bulat on Thursday, November 17th, 2016, which is

9    well before the accident; right?

10   A    Yes.

11   Q    And it's well before Liebherr Germany provided a

12   Product Safety Bulletin and retrofit cover plate to Liebherr

13   US; correct?

14   A    Correct.

15   Q    That was well before this email?  Exhibit 34 is well

16   before the date of the accident, February 19th, 2018;

17   correct?

18   A    That's correct.

19   Q    And it is well before the date when Liebherr Germany

20   provided Liebherr US the Product Safety Bulletin and

21   retrofit cover plate; correct?

22   A    Yes.

23   Q    And this email from Adnan Bulat is to Bret Jacobson

24   and it's referencing code 17727; correct?

25   A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And that's crane 073386; correct?

2    A    Yes.

3    Q    And Liebherr US knows that; correct?

4    A    Yes.

5    Q    And in this email Exhibit 34, it says "Dear Bret, as

6    previously informed, please note that the AM crane sold to

7    Sims Florida through company Schuch will, again, be

8    delivered to Jacksonville, Florida and not to Brunswick."

9    Correct?

10    A    Correct.

11    Q    You would agree that as of November 17th, 2016,

12    Liebherr US employee was on notice that the crane 073386,

13    code 17727, had been purchased by Sims; correct?

14    A    Not necessarily purchased, but is in possession of

15    that customer.

16    Q    Well, it says sold, correct, sir?

17    A    Yes.

18    Q    What does sold mean to you?

19    A    Sold means sale.  Sold to them.  Yes.

20    Q    So let's -- I'll ask that question again.

21         So as of November 17th, 2016, a Liebherr US employee

22    is on notice that the crane 073386, code 17727, has been

23    sold to Sims from Schuch; correct?

24    A    Correct.

25    Q    And as we talked about yesterday, it was Bret

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Jacobson's responsibility then to update the systems at

2    Liebherr US to reflect that; correct?

3        A    Either himself or maybe delegate this to somebody

4    else.

5        Q    But he should have had it done; correct?

6        A    He could have had it done.

7        Q    He should have had it done?

8        A    He could have.  I cannot say he should have because

9    this is something in the company.  As you saw, other

10   departments maybe changed that, you know.  There are --

11       Q    Is there any information at Liebherr US that

12   Mr. Jacobson updated the LUS, the Liebherr US computer

13   systems and somebody changed it?

14       A    No.

15       Q    So at the time of this email, Bret Jacobson should

16   have on his own or delegated to someone else the

17   responsibility of updating Liebherr US's systems to reflect

18   that the crane 073386, code 17727, was purchased by Sims;

19   correct; sir?

20       A    Correct.

21       Q    Now, I'd like to turn to Exhibit 89.

22            Before we get to 89, the list of cranes that were

23   provided by Liebherr Germany to Liebherr US reflected 073386

24   as being owned by Schuch?

25       A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    If Bret Jacobson had updated the Liebherr US systems

2  on the date that he received that email, that we just spoke

3  about, that list that was received by Liebherr US would have

4  reflected that 073386 was owned by Sims; correct?

5    A    Yes.  You could you assume that, yes.

6    Q    That's how it would work; correct?

7    A    Yes.  That's how it would work.

8    Q    So I'd like you to look at Exhibit 89, sir.

9         Do you recognize this as an email from OSHA to

10  Liebherr referencing the crane accident of February 2018?

11    A    I do not know from whom this is.  Looking at this

12  document, I've never seen it, except as I see it's from

13  OSHA.

14    Q    And OSHA is asking some questions; correct?

15    A    Correct.

16    Q    And the questions that they ask -- the first

17  question is:  "Was this document" -- and the document

18  they're referencing is the Product Safety Bulletin; correct?

19    A    It says it in the attachment or it says in the

20  subject line.

21    Q    Okay.  So the first question is:  "Was this document

22  referencing the Product Safety Bulletin provided to Sims

23  Crane & Equipment, Inc., prior to February 19th, 2018?"

24  Correct?

25    A    Yes.  Correct.  It's asking that question, yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And then there's subparts to that question.  "If so,
2   can you please provide the date it was sent?"  Correct?
3      A    Correct.
4      Q    And the next question in that subpart of one is:
5   "Can you provide any verification, if it exists, that it was
6   received?"  Correct?
7      A    Yes.
8      Q    The next question, No. 2, is:  "Was this
9   document" -- again, referring to Product Safety Bulletin;
10  correct?
11     A    Correct.
12     Q    -- "provided to Sims Crane & Equipment, Inc. after
13  February 19th, 2018?"  Correct?
14     A    Yes.
15     Q    And then the subpart A is:  "If so, can you please
16  provide the date it was sent?"
17          And then B says, "Can you provide any documentation
18  that it exists, that it was received?"  Correct?
19     A    Okay.
20     Q    And then question three says: "If this document was
21  not provided to Sims Crane & Equipment, Inc. prior to
22  February 19th, 2018 and it was dated 08/11/2017, can you
23  please explain why it was not provided to said company" --
24  said company being Sims; correct?
25     A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    "Sooner?"  Correct?

2    A    Correct.

3    Q    I'd like you to look at Exhibit 90.

4         Do you recognize this, sir?

5    A    Again, I've never seen this.

6    Q    This is an email from Cremer Spina sent on Thursday,

7    August 23rd, 2018 to OSHA; correct?

8    A    Correct.

9    Q    And it's a response to that email Exhibit 89;

10   correct?

11   A    Correct.

12   Q    And Cremer Spina is the law firm that's representing

13   you in this litigation; correct?

14   A    That's correct.

15   Q    And by you, I mean Liebherr US; correct?

16   A    Correct.

17   Q    And so they had the authority at the time to speak

18   on Liebherr US's behalf; correct?

19   A    Correct.

20   Q    They had the authority to speak on Liebherr US's

21   behalf to OSHA; correct?

22   A    Correct.

23   Q    And if we go to the next page of that Exhibit, this

24   is addressed to the compliance officer at OSHA Tampa;

25   correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A     Yes.

2       Q     And it says "Dear blank.  I have been retained by

3   Liebherr to respond to your inquiry to Mr. Pilli Rainer

4   pertaining to an accident which occurred on February 19th,

5   2018, involving a Liebherr mobile crane model LTM 1500;"

6   correct?

7       A     Correct.

8       Q     It goes on to say, "Your questions all pertain to a

9   specific Liebherr Product Safety Bulletin, dated

10  November 8th, 2017."  Correct?

11      A     Correct.

12      Q     And that Product Safety Bulletin is the Product

13  Safety Bulletin we were discussing yesterday; correct?

14      A     That's correct.

15      Q     It goes on to say "For the sake of clarity, I will

16  restate each question you asked and provide answers to each

17  question in turn."  Correct?

18      A     Yes.

19      Q     And question one is:  "Was this document provided to

20  Sims Crane & Equipment prior to February 19th, 2018?"

21  Correct?

22      A     Correct.

23      Q     And the answer to that is just a simple "no," right?

24      A     Yes.

25      Q     And there's no answers to subpart questions 1A and

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    1B because the answer is "no."  Correct?

2       A    Correct.

3       Q    Nothing was preventing your Counsel from putting in

4    more elaboration in response to that question, was there?

5       A    I can't speak for the Counsel.  No -- yes.

6       Q    They were acting on Liebherr US's behalf; correct?

7       A    Yes.  That's correct.

8       Q    And question No. 2 was was this document provided to

9    Sims Crane & Equipment after February 19th, 2018; correct?

10      A    Correct.

11      Q    February 19th, 2018 is the date of the accident;

12   right?

13      A    That's correct.

14      Q    The answer to this question is "yes".  Correct?

15      A    Correct.

16      Q    It goes on to say, question 2A, "If so, can you

17   please provide the date it was sent?"

18           And here it says, "The safety bulletin was sent to

19   Sims Crane by UPS on or about February 21st, 2018".

20   Correct?

21      A    Correct.

22      Q    That's after the date of the loss of February 19th,

23   2018; correct?

24      A    That is correct.

25      Q    And then it says, question B, "Can you provide any

1     document if it exists that it was received?"

2          And answer two says, "See attached UPS delivery

3     notification document".  Correct?

4     A    Correct.

5     Q    So there was a delivery notification document that

6     reflected that the Product Safety Bulletin and retrofit

7     cover plate was sent to Sims on or about February 21st,

8     2018; correct?

9     A    That is correct.

10    Q    And then the next question is:  "If this document

11    was not provided to Sims Crane & Equipment, Inc., prior to

12    February 19th, 2018, and it was dated 08/11/2017, can you

13    please explain why it was not provided to said company

14    sooner?"

15         That's a question; correct?

16    A    That's correct.

17    Q    And the answer to this question on behalf of

18    Liebherr US is:  "The safety bulletin was not provided to

19    Sims Crane prior to February 19, 2018 because Liebherr was

20    not informed that the subject crane was in the possession of

21    Sims Crane in November of 2017 when the Safety Bulletin was

22    issued or thereafter up to and including February 19th, 2018

23    when the subject accident occurred.  Liebherr sales

24    documents show the subject crane was sold to Schuch Heavy

25    Corp. located 800 Pine Street, New York, New York on or

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

34

1    about January 18th, 2017".  Correct?

2        A    That's correct.

3        Q    That's an incorrect answer; right?

4        A    At the time, no.

5        Q    As you sit here, though, today looking at everything

6    that we looked at yesterday, you would agree, though, that

7    that's an incorrect answer; correct?

8        A    Yes.

9        Q    So although the Liebherr sales documents show that

10   the subject crane was sold to Schuch Heavy Corp. on or about

11   January 18, 2017, a number of other Liebherr documents after

12   that date reflect that this crane 073386 was ultimately sold

13   to Sims Crane and in the possession of Sims Crane as of and

14   prior to February 19th, 2018; correct?

15       A    Yes.  That's correct.

16       Q    I'd like you to turn to Exhibit 91, sir.  Do you

17   recognize this?

18       A    This looks like some kind of a sales order something

19   or listing of sales items, accessories.

20       Q    And up at the top it's regarding an LTM 1500-8.1

21   073386 Sims Crane and Rigging; correct?

22       A    Correct.

23       Q    And it says, "To whom it may concern.  Here you will

24   find our quotation for parts and repairs for the

25   above-mentioned crane."

1          Do you see that, sir?

2     A    Yes.

3     Q    So this is a repair estimate for the damage to the

4  crane 073386 after the February 19th, 2018 incident?

5     A    Correct.

6     Q    This is on Liebherr US letterhead; correct?

7     A    That is on Liebherr letterhead, yes, sir.

8     Q    This would have been prepared on or behalf of

9  Liebherr; correct?

10    A    I do not know if it was on Liebherr Ehingen Germany

11 or Liebherr USA.

12    Q    On page two, it's signed by Johnathan Smith?

13    A    Now I know.  Okay.  Now I see.  Okay.  It is by

14 Liebherr US.

15    Q    This document would have been prepared by Liebherr

16 US?

17    A    That's correct.

18    Q    And Liebherr US determined based on this document,

19 the damage to the crane from the February 19th, 2018 event

20 was $1,452,492.08; correct?

21    A    That's correct.

22    Q    I'd like to turn to Exhibit 92.  This is an offer by

23 Liebherr US to Sims Crane & Equipment for a new Liebherr LTM

24 1500-8.1.  Correct?

25    A    Okay.  Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    Is that what it looks like to you, sir?  Do you

2   recognize that?

3        A    Yes, it does.  It does, yeah.

4        Q    And this would have been a replacement for the

5   073386 that was damaged on the date of the incident;

6   correct?

7        A    That is correct.

8        Q    And if you turn to page 3, LAI0664, the replacement

9   cost for this crane that was damaged would be $4,580,000;

10  correct, sir?

11       A    That's correct.  As new.

12       Q    As new?

13       A    As new.

14       Q    For replacement cost?

15       A    Yes.

16       Q    For a new crane?

17       A    Yeah.  For a new crane, yes.

18       Q    And this crane that was in this Exhibit -- that's

19  referenced in this Exhibit has the same components and

20  additions and items on the crane that the crane in the

21  incident had; correct?

22       A    We can assume so, yes.

23       Q    I'd like you to turn to Exhibit 93.  Now, if you

24  take a look at the first three pages of this Composite

25  Exhibit, these are fair and accurate representations of the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Liebherr LTM 1500 073386?

2        A    Yes.

3        Q    And if you turn to the fourth page of the Exhibit,

4    this is a Liebherr plate that's on the crane that reflects

5    it is the crane 073386; correct?

6        A    That's correct.

7        Q    With the year 2012; correct?

8        A    That's correct.

9        Q    And the type is the LTM 1500-8.1; correct?

10       A    That's correct.

11       Q    And that's the crane we've been discussing for the

12   last two days; correct?

13       A    That is correct.

14       Q    And on the next page it says, "Jacksonville";

15   correct?

16       A    Yes.

17       Q    And Jacksonville is where it was commissioned;

18   correct?

19       A    Yes.  And where it landed on the port.

20       Q    And where it landed?

21       A    Yes.

22       Q    It did not land in New York?

23       A    That's correct.

24       Q    It did not land where Schuch is located?

25       A    That's correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    It landed in Jacksonville; correct?

2    A    That's correct.

3    Q    Initially it was supposed to go to Schuch; correct?

4    A    That's correct.

5    Q    And they changed where it was going to land; is that

6    correct?

7    A    Yes.

8    Q    And it was changed where it was TO land because it

9    was purchased by Sims; correct?

10   A    Yes.

11        MR. GOODMAN:  Thank you, sir.  I have no more

12   questions.

13        THE COURT:  Okay.  In terms of cross-examination,

14   I'm assuming you have some, Mr. Cremer; is that correct?

15        MR. CREMER:  Just a few.

16        THE COURT:  Let's do this:  Let's take a short break

17   then, about 10 minutes, until 10:30 and then I'll give

18   Mr. Goodman time to clean up his part of the podium and get

19   everything ready and give you an opportunity to get ready

20   for the cross-examination.  And then we'll go for about an

21   hour or so before we take the next break so that I have --

22   because I have that hearing at noon.

23        Take a short break now.

24   (Recess taken from 10:19 to 10:34 a.m.)

25        THE COURT:  I'll just add -- so just -- we're back

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    on the record now and then just -- I -- we were having a

2    slight issue with the overhead screen in terms of the

3    quality of being able to see the Exhibits, but both

4    Mr. Cremer and Mr. Goodman have indicated that it's okay

5    because our monitors are fine.

6            Go ahead, Mr. Cremer, whenever you're ready.

7            MR. CREMER:  Thank you, Judge.

8                        CROSS-EXAMINATION

9    BY MR. CREMER:

10    Q    Mr. Vieten, I want to start by going back to a

11    document that you were shown yesterday which was marked as

12    Plaintiff's Exhibit 1.  It's also Defendants' Exhibit 4.

13            Do you recall the OSHA report being shown to you

14    yesterday?

15    A    Yes, I do.

16    Q    And, Mr. Goodman, he read to you various sections

17    from the OSHA report about events that transpired on the

18    date of this accident, February the 19th, 2018; is that

19    right?  Remember that?

20    A    That's correct, yes.

21    Q    Would you have any personal knowledge of the events

22    that took place on that date at this accident site?

23    A    No.  None whatsoever.

24    Q    You weren't present?

25    A    I was not present.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Was anyone from Liebherr US present?

2    A    Nobody was present.

3    Q    Was anyone from Liebherr Germany present?

4    A    Nobody from Germany was present.

5    Q    Do you know whether or not Liebherr ever came to

6    LUS -- when I refer to LUS, that's Liebherr US so we're

7    clear on the record.

8         Did OSHA ever come to LUS to conduct any

9    investigation regarding the reasons for the issuance of the

10   Safety Bulletin?

11   A    No.

12   Q    To your knowledge, did OSHA ever contact LWE,

13   Liebherr Germany, to obtain information about the event

14   that's referred to in the Safety Bulletin that led to the

15   issuance of the Safety Bulletin?

16   A    No knowledge of that.

17   Q    To your knowledge, did Liebherr Germany ever inform

18   OSHA that the redesign of the dust cover was not related to

19   any prior incident where the original dust cover was left on

20   the 84-meter boom and which resulted in the T4 pin being

21   improperly manipulated?

22   A    No.  No knowledge.

23        MR. GOODMAN:  Objection, Your Honor.  Calls for

24   speculation.

25        THE COURT:  If you could just rephrase the question,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Mr. Cremer.

2          MR. CREMER:  I asked to his knowledge.

3          THE COURT:  I thought you did, but if you could --

4    It's okay.  So to your knowledge.  You can answer to your

5    knowledge.

6          THE WITNESS:  Not to my knowledge.

7    BY MR. CREMER:

8    Q    To your knowledge, was LUS ever aware of a prior

9    incident where the original dust cover was left on the T3

10   pin when it was inserted into the crane before the Sims

11   accident?

12   A    No knowledge of that.

13   Q    Do you have an understanding as to whether or not

14   the Japan incident that we now understand led to the

15   issuance of the Safety Bulletin, whether the redesign of the

16   dust cover had anything to do with the original single dust

17   cover being left on the 84-meter boom?

18   A    No knowledge.

19   Q    Do you have an understanding if the redesign of the

20   dust cover after the Japan incident from a single cover to a

21   cover which would extend over both the T3 and T4 pins was

22   intended to protect against the T4 pin being manipulated if

23   that cover was left on the 84-meter boom when it was

24   inserted into the crane?

25   A    That's correct.

 1     Q    Do you have an understanding of whether it was
 2    intended to do that or not?
 3     A    No.  I have no knowledge of that.
 4     Q    Do you know if the original single T3 dust cover pin
 5    was left on the boom when it was inserted into the crane,
 6    whether that would be a correct or incorrect assembly of the
 7    84-meter boom?
 8     A    I have no knowledge of that.
 9     Q    Are you aware if leaving the modified dust cover
10    which extends over both the T3 and T4 pin were left on the
11    boom when it was inserted into the crane, would that be an
12    incorrect or correct assembly practice?
13     A    That is an incorrect assembly practice.
14     Q    And it would also be incorrect if it was the T3 pin
15    dust cover was left on?
16     A    That's correct.
17     Q    I want to show you a photograph, which is
18    Defendants' Exhibit 5 -- and actually I think Mr. Goodman
19    has already -- go to the next one, please.
20          This is a group exhibit.  It has -- the next one.
21    It has three photographs in it.  No.  There you go.
22          There's a similar photograph like this that's
23    already been admitted into evidence, but just for purposes
24    of the questions, I'm going to ask you, Mr. Vieten, looking
25    at this photograph, do you recognize this to be an 84-meter

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    boom of an LTM 1500?

2        A    Yes, I do.

3        Q    You can see on this particular photograph, you see

4    there's some stickers, decals that are the size of the two

5    pins that we see there in the photograph?

6        A    That is correct.

7        Q    So this would have been after the modification was

8    issued?

9        A    Yes.

10       Q    Do you have any knowledge as to whether or not if

11   the safety decals were left -- were actually on the boom in

12   the position shown in Exhibit No. 5 and then the 84-meter

13   boom is inserted into the T2 portion of the crane that

14   you're looking through the access holes whether you're

15   capable of seeing those stickers on the sides?

16       A    You cannot see those because it would not be seen.

17       Q    Okay.  And if you're doing a correct assembly, you

18   would have removed the dust cover that also had stickers on

19   it?

20       A    That is correct.  If you don't remove it, the wing

21   nuts would be knocked off on the top.

22       Q    While you're on the subject of wing nuts, that issue

23   came up when Mr. Goodman was asking you questions

24   yesterday --

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    -- about whether this particular crane that was
 2   delivered to Sims, which was a used crane, had wing nuts on
 3   that single plate when it was delivered and you said you
 4   didn't know?
 5        A    I did not know.
 6        Q    And he asked you some questions about whether if it
 7   should or shouldn't have had wing nuts -- whether it's wing
 8   nuts or regular nuts, the purpose -- is it your
 9   understanding the purpose of whatever the fasteners were was
10   to hold the plate in place?
11        A    Correct.
12        Q    It wasn't to prevent the boom from being inserted
13   into the crane?
14        A    That's correct.
15        Q    So would it be a safety issue in your mind if
16   instead of wing nuts it had regular nuts?
17        A    No.
18        Q    Looking again at this photograph -- are you capable
19   from looking at this photograph, from observation alone and
20   not referring to the stickers which is the T3 pin and which
21   is the T4 pin?
22        A    The one on the right underneath the yellow piece
23   there is the T3.  The one on the left is the T4.
24        Q    And can you tell us how you're able, by observation
25   alone, able to determine which is which?
```

1      A    Observation alone is okay because S, you saying

2    around, the pin is below the wing on the right-hand side,

3    you know, I'm seeing there, which is something.  There's a

4    ring.  That means that that this is the disassembly

5    connection for that section.

6      Q    And when you go to the T4 pin, what is it about the

7    T4 pin that distinguishes it in your eye from the T3 pin?

8      A    There's nothing there, you know, that says okay,

9    nothing there visibly that I would say, "Okay, well, that's

10   the pin."  You know what I'm saying?  That's the connection

11   where I would have to manipulate anything.

12     Q    And if you look at what you've identified as the T3

13   pin with the collar around it --

14     A    That's correct.  The collar around it.

15     Q    -- can you tell from observation alone whether that

16   particular pin is locked or unlocked?

17     A    This looks to me locked.

18     Q    And can you tell from observation whether the T4 pin

19   is lock or unlocked?

20     A    T4 pin is locked, too.

21     Q    When OSHA -- strike that.

22          When -- you said that OSHA never contacted LUS

23   during the course of their investigation other than this

24   letter we saw where they were asking about when the Safety

25   Bulletin was issued; is that correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          A      That's correct.

2          Q      All the information, to your knowledge, that was

3      given to OSHA was provided by Sims Crane?

4          A      That's correct.

5          Q      All right.  Let's -- Darrin, let's go back --

6      Darrin, go back to IAI2707 of the OSHA investigation.  It's

7      our Exhibit 4, Plaintiff's Exhibit 1.

8                All right.  Mr. Vieten, if you're looking at this

9      Exhibit, which is contained within the OSHA report, you see

10     actually one of the last pages and it's captioned "special

11     issues and problems."

12               Do you see that?

13         A      Yes.

14         Q      And I want to direct your attention to the

15     highlighted portion of that document where it says, "All

16     information obtained for this investigation was based solely

17     on Sims Crane & Equipment's documentation and interviews."

18     Do you see that?

19         A      Yes, I do.

20         Q      Does that confirm your understanding that the

21     circumstances and situation for this incident became solely

22     from Sims --

23         A      Solely from Sims.

24         Q      Let me finish my question.  -- and Liebherr had no

25     opportunity to give input?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A    No opportunity.  Correct.

2        Q    I want to talk about the training checklist, which

3   was Plaintiff's Exhibit 46, Defendants' Exhibit 1.

4             And, Your Honor, am I making a problem when

5   referring to both exhibits?

6             THE COURT:  No.  It's no problem.  And what we'll do

7   is when you're finished or, perhaps, during the break, if

8   you and -- well, it seems so far the exhibits you've gone

9   over are the ones that are already in evidence as

10  Plaintiff's.  So we can just clean it up at some point and

11  go ahead and have you move to admit yours.  It's no problem.

12  My order will just reference both exhibits.

13            MR. CREMER:  I want to make sure I'm not confusing

14  the situation here.

15            Okay.  Bring that document up.  No.  No.  Talking

16  about Defendants' Exhibit 1.

17  BY MR. CREMER:

18       Q    Okay.  This is a cover sheet for a document that you

19  were shown yesterday that's been admitted into evidence, and

20  you remember this was the training checklist that Henry Ward

21  completed when he trained the two operators at Sims?

22       A    Yes.

23       Q    I want to go to the first page of that document and

24  talk to you about some of the information there.  It says,

25  "The operator is signing the form to confirm that he or she

1   fully understands and comprehends the training provided." Do

2   you see that?

3       A    Yes.

4       Q    I think Mr. Goodman said you know what you know.  I

5   didn't follow all these permutation had.  You know what you

6   know.  You know what you don't know.

7            But this information here suggests that unless the

8   operator comes forward and asks questions or indicates he's

9   not aware that he understands, there's the presumption that

10  he understands the training?

11      A    Yes.

12      Q    And the operator then would sign, or the trainee

13  would sign, this document to confirm that he understands and

14  comprehends the training?

15      A    Yes.

16      Q    The training, it says in the next section under

17  "objective," it says, "The training is based on the manual"?

18      A    Yes.

19      Q    And if we consider that this training and this

20  document was completed in the end of January, the first few

21  days of February of 2017, almost one year before the

22  accident, whatever was included in the manual at that time

23  would not have been information that was in the Safety

24  Bulletin that was issued in November of 2017 some 11 months

25  later?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    That is correct.

2       Q    And this time period when this training was

3    conducted, it would have been five months before this event

4    in Japan occurred that led to the issuance of the Safety

5    Bulletin; correct?

6       A    That's correct.

7       Q    If you go within that manual, Darrin, section

8    IAI0510.  Would you blow up the section on boom system, boom

9    options?

10          So this page has various topics listed on it that

11   pertain to issues that Henry Ward was training Andrew Farris

12   and Jason D'Angelo that pertained to the booms; right?

13      A    That's correct.

14      Q    And, specifically, if you look at this section 5.2,

15   the training covered areas such as general description of

16   boom options.  It discussed or included configuration,

17   weights and dimension.  It discovered removal of the boom

18   options and it discovered cautions and safety issues.  Do

19   you see that?

20      A    That's correct.  Yes, sir.

21      Q    And then there's checkmarks for each of those topic

22   areas?

23      A    That's correct.

24      Q    And if you go -- if you put the entire document up

25   again, you can see at the bottom on the left it says,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   "Operator" and the operator signs that section, which is

2   consistent with what the document says at the beginning,

3   that he's to sign it to confirm that he comprehends the

4   information that was provided in the training?

5       A    That's correct.

6       Q    Also, if you go to the very last page of that

7   document, which is LAI0514 -- if you go at the top and

8   highlight that -- it has an emergency contact number for

9   Liebherr Cranes, Inc.  There's a couple of numbers.

10  Emergency contact, couple of other numbers.

11      So part of the training also includes necessary

12  information that if an operator after the training has

13  questions and needs information, here's the numbers he can

14  call?

15      A    That is correct, sir.

16      Q    And if you go down that list a bit, there's also

17  even the instructor's business card listed there.  Do you

18  see that?

19      A    Yes.

20      Q    So Henry Ward would have given his personal contact

21  information if either Andrew Farris or Jason D'Angelo had

22  any issues?

23      A    That's correct.

24      Q    And you have him signing -- find out that that

25  actually is Jason D'Angelo's signature -- excuse me --

```
1    that's Andrew Farris' signature.
2         A    Okay.
3         Q    I want to talk to you about one other photograph
4    before we go on to the next topic and it's Defendants'
5    Exhibit 157.
6              Do you recognize this photograph to be a fair and
7    accurate representation of the 84-meter boom on an LTM 1500?
8         A    Yes, I do.
9         Q    And you see there's a pin sticking up there.  And do
10   you know what pin that is?
11        A    I think this is pin No. 3.
12        Q    The T3 pin that we've been talking about?
13        A    The pin 3 we've been talking about and boom section
14   2.
15        Q    I want to, just for the benefit of everyone,
16   particularly the Court, to see another photograph, which is
17   in our Defendants' Exhibit 5.
18             Darrin, it's this one, the one that has two
19   (indicating).
20             And does that also appear to you to be an 84-meter
21   boom of an LTM 1500?
22        A    Yes.
23        Q    And do you see there's two holes visible there?
24   What is your understanding as to how many holes are on each
25   boom section?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    One and sometimes there are two.  It's on the
2    section No. 3.
3    Q    And on this particular section, there's a hole, and
4    if the T3 pin is being connected to that section based on
5    the instructions, does that tell you that's the 100 percent
6    hole of the T2 section?
7    A    It's the 100 percent hole.
8    Q    The hole that's behind it to the right that's empty,
9    that's in the T2 section, too?
10   A    Yes.
11   Q    Is that the 92 percent hole?
12   A    That's the 92 percent hole.
13   Q    And if you're following the manual and you are going
14   to do an assembly/disassembly of the 84-meter boom, you do
15   so at the point that the 100 percent hole of the T2 section
16   that's shown in this photograph?
17   A    Correct.
18   Q    And if we go back to Exhibit 157, now we're looking
19   from the T3 pin hole that's accessed at the 100 percent hole
20   of the T2 section?
21   A    That's correct.
22   Q    And looking down toward the end of the boom?
23   A    That's correct.
24   Q    And further into the foreground would be the T4 pin?
25   A    That's correct.

1   Q    That T4 pin isn't accessible, is it?  It's
2   underneath the sheet metal?

3   A    It's underneath the sheet metal.

4   Q    If you follow the manual's instruction, if you set
5   the 84-meter boom T3 pin and the 100 percent hole of T2, can
6   you access the T4 pin and inadvertently manipulate it?

7   A    I cannot.

8   Q    Go back to the other photograph.

9        What you have to do is bypass the correct hole and
10  move it from the 100 percent hole to the incorrect hole at
11  92 percent?

12  A    That's correct.

13  Q    And that would be an incorrect assembly/disassembly?

14  A    That's an incorrect assembly/disassembly.

15  Q    Let's talk about the Safety Bulletin, Plaintiff's
16  Exhibit 15.  Okay.

17       You've seen this document many times already in the
18  past day or so?

19  A    Yes.

20  Q    And this is a document that's been admitted into
21  evidence as Plaintiff's Exhibit 15, which is the Product
22  Safety Bulletin that was issued on November the 8th, 2017
23  that pertains to potential confusion over manipulation of
24  the locking pins on the -- manipulations of the locking pins
25  on the LTM 1500?

1    A    That's correct.

2    Q    Now, you've read this bulletin word for word -- it's

3    only a couple pages -- haven't you?

4    A    Yes, I have.

5    Q    Is there anything contained within this Safety

6    Bulletin that requires that the customer stop using the

7    crane until it receives the retrofit cover and the safety

8    decals and stickers that were to be put onto the boom?

9    A    No, it does not.

10   Q    What does the Safety Bulletin actually advise

11   customers that they can do before they get the Retrofit Kit

12   and the safety decals?

13   A    Say that again.

14   Q    What does the document, the Safety Bulletin that

15   came from Germany, tell your customers they can do while

16   they're waiting for this information and the actual Retrofit

17   Kit to arrive?

18   A    They can operate the crane still.

19   Q    It says on the second page, very top sentence "In

20   the meantime, you may continue to operate your Liebherr

21   mobile crane safely so long as you meticulously follow the

22   operation manual".  Right?

23   A    That's correct.

24   Q    It informs customers you can use this crane without

25   a cover that covers the T3 pin and the T4 pin; right?

1      A    That's correct.

2      Q    It says, "You can continue to operate the crane

3    without having these safety stickers either on the crane

4    cover or on the dust cover or adjacent to the sides of the

5    pins"?

6      A    That's correct.

7      Q    When was the LTM 1500 first released into the

8    marketplace?

9      A    1999.

10     Q    Okay.  And how many of these LTM 1500 cranes, if you

11   know, have been manufactured and sold since that time and

12   put into the market?

13     A    Over 500 probably.

14     Q    Now, some of these cranes have the two-boom

15   configuration.  Some just have one boom.

16          Do you have any idea how many have both booms?

17     A    I would have to say maybe north of 200.

18     Q    In all fairness, before this trial started I asked

19   you to get that.

20     A    Yeah.  You asked me, but, you know, but -- I mean,

21   again, I don't exactly know how many because they've changed

22   so many times, you know, so.

23     Q    And for those 200 or so cranes that were

24   manufactured since 1999 that have both the 50 meter and the

25   84-meter boom, that means those customers are likely

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   swapping those booms out every so often?

2        A    Every other week or every other job, depending on

3   what they need, yes, sir.

4        Q    Would it be reasonable to say that with a couple

5   hundred of these cranes with these dual booms out in the

6   marketplace, that before this Safety Bulletin came out, that

7   these -- and the Retrofit Kit was available in 2018, that

8   these cranes had hundreds, if not thousands, of boom swaps

9   without incident?

10       A    Yes.

11            MR. GOODMAN:  Objection, Your Honor.  Calls for

12   speculation.

13            THE COURT:  The question was qualified was it

14   reasonable.  So overruled.

15  BY MR. CREMER:

16       Q    Do you recall from your review of the OSHA report

17   with Mr. Goodman yesterday that Sims performed the boom swap

18   safely without manipulating the T4 pin some 35 times before

19   this accident?  Do you remember that testimony?

20       A    Yes.  He did say that.

21       Q    And all of -- and out of all of those occasions, the

22   boom swap was performed without a Retrofit Kit that had a

23   modified cover plate; true?

24       A    True.

25       Q    And without any stickers adjacent to the T3 and T4

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   pin saying *touch this pin but don't touch this pin?*

2   A   That's correct.

3   Q   Did Liebherr US ever have any notice, to your

4   knowledge, of an incident that occurred where a customer

5   that owned one of these cranes that had the two booms had

6   left the T3 single dust cover on the boom before they

7   inserted it into the crane?

8   A   No knowledge of that.

9   Q   Until the Sims accident?

10   A   Until the Sims accident.  That's correct.

11   Q   Let me go to Exhibit 48 -- Defendants' Exhibit 48

12   is -- contains the notification to customers that included

13   proof of delivery of the Retrofit Kits.

14       Do you remember going through some of those

15   yesterday with Mr. Goodman?

16   A   Oh, yeah, yeah, yeah.  Yes.  Yep.

17   Q   You see there's one --

18   A   The proof of delivery UPS, yes.

19   Q   -- UPS proof of delivery stuck on the top?

20   A   Yes.

21       MR. PENDER:  148 for the record.

22       MR. CREMER:  I'm sorry, Your Honor.  I misspoke.  It

23   was Defendants' Exhibit 148.

24       THE COURT:  So 148.  And then just to caution the

25   witness again, try not to speak over each other.  I know

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     it's natural in conversation that we do, but for the

2     transcript it's important.

3              THE WITNESS:  Yes, Your Honor.

4     BY MR. CREMER:

5        Q    And if you look at the delivery dates that are on

6     each of these, and there's a number of them, some of these

7     Retrofit Kits are being delivered in late January and early

8     February; correct?

9        A    That's correct.

10       Q    And there's even some kits that are -- a kit that's

11    delivered after this incident that occurred in February 19,

12    2018?

13       A    That is correct.

14       Q    Does the fact that we have a number of these kits

15    being delivered to customers in early February, and even

16    after the date of this incident, give you any indication

17    whether this was a completed or ongoing safety campaign?

18       A    It's an ongoing safety campaign.

19       Q    I want to talk about the crane business a little bit

20    so we have a better understanding of what happens to a crane

21    once it's sold by Liebherr to a customer.

22              Does that mean that that crane is going to forever

23    and a day stay with that customer?

24       A    No.

25       Q    Can you explain to the Court what are the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    possibilities that can occur when a sale is made that would

2    cause a crane to not be in the possession of the original

3    purchaser?

4        A    Customers do not tell Liebherr that they sold the

5    crane or rent the crane or not have the crane in their

6    possession anymore or they gave it to somebody else.

7        Q    So you didn't have a situation where you sell a

8    crane to Schuch and it did what it did in this case, it

9    resells it through a broker to another party?

10       A    It can happen every day.

11       Q    And you could have situations where you have a

12   customer like Sims and they own the crane, but then they

13   will actually lease it out to another --

14       A    Yes, sir.  Yes, sir.

15       Q    And you have to wait for me --

16       A    Yes, sir.

17       Q    You have to wait for me to finish.  Take a breath

18   and that will make the court reporter so very happy.

19            You could have a lease of this crane from -- this is

20   a hypothetical -- from Sims to another customer for days;

21   right?

22       A    Right.

23       Q    Weeks; right?

24       A    Right.

25       Q    Months?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

60

```
1       A    Yes.

2       Q    So for purposes of trying to locate the physical

3   location of a crane at any given point in time, that might

4   take a little bit of investigation?

5       A    Yes, sir.

6       Q    And the goal in communicating information like

7   Product Safety Bulletins isn't just to send it out, figuring

8   your job is done, but to actually try to determine what is

9   the actual location of the crane at a given point in time

10  when a Safety Bulletin may be issued?

11      A    Yes, sir.

12      Q    And in this instance, we saw from emails that

13  Mr. Goodman put up, you read today, where Derrick Harris was

14  talking about efforts he made to contact Schuch after the

15  Safety Bulletin was issued?

16      A    Yes.

17      Q    He said he called?

18      A    Yes.

19      Q    And he didn't hear back?

20      A    That's correct.

21      Q    Does that suggest to you that it was clear to the

22  modification department where the location of this

23  particular crane was if Derrick Harris was contacting Schuch

24  to ask him that question?

25      A    It was not clear at all.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Is that an unreasonable thing for the modification

2  department to do to try to determine the precise location of

3  a crane so that it can get a kit that needs to be assembled

4  onto the crane to the correct location?

5      A    No.  Say that again.

6      Q    I was asking whether it's unreasonable to do what

7  Derrick Harris was doing trying to find out what the

8  location of the crane was so that he could get this Retrofit

9  Kit to the location where the crane was placed?

10     A    Reasonable.

11     Q    That's reasonable?

12     A    Yes.

13     Q    You were asked questions yesterday about the

14  training that goes with a brand new crane, a brand new LTM

15  1500 and you said typically it's two weeks?

16     A    (Nodding head.)

17     Q    And you think you said that's what Liebherr provides

18  in addition to the crane as part of the sale?

19     A    (Nodding head.)

20     Q    Is that right?

21     A    That's correct.

22     Q    Now, it's not the same for used cranes, is it?

23     A    It's not.

24     Q    If a used crane is -- in this case, you saw the

25  contract.  It says, "as is."  Right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

62

1    A    Yes, sir.

2    Q    Does that mean something to you "as is"?

3    A    It is as it comes, as it is equipped.

4    Q    And in that document that you looked at yesterday,

5    was training included for the sale of the crane that's

6    involved in this litigation as part of the sale?

7    A    It was not included.

8    Q    So in that case, the customer would likely have to

9    pay for it?

10   A    Yes, sir.

11   Q    And are you aware, from your involvement in this

12   litigation, whether or not Sims ever paid for the training

13   or was it provided to them free of charge?

14   A    I'm not aware of it.

15   Q    Any reason you are aware of that is not proper or

16   would not be a proper orientation on an LTM 1500 if it was

17   completed within a week?

18   A    No.

19   Q    Have you known that to be the case on a number of

20   occasions?

21   A    Yes.

22   Q    Is the goal in conducting the orientation on a new

23   piece of equipment or a customer, who buys a used piece of

24   equipment, to make sure the customer is familiar with that

25   piece of equipment?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    We'll talk about Henry Ward and his performance

3  evaluations --

4      A    Yes.

5      Q    -- Defendants' 158.

6           First of all, you know Henry Ward personally, don't

7  you?

8      A    Yes, I do.

9      Q    And you have worked with him for a number of years?

10     A    That is correct.

11     Q    Are you familiar with his reputation in the company

12  for his work ethic, his quality of work?

13     A    Absolutely.

14     Q    You were, we saw yesterday, involved actually in

15  conducting some of his performance evaluations?

16     A    That is correct.

17     Q    And I just want to go over some of these, but can

18  we -- can I just have you tell me what is your overall

19  opinion as to the work performance of Henry Ward based on

20  your personal knowledge?

21     A    Above satisfactory, good and exceptional.

22     Q    When you're doing a performance evaluation, are you

23  an easy grader?  Are you a reasonable grader?  Are you a

24  tough grader?

25     A    I'm a tough grader.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Is it your practice when you're giving performance

2   ratings, you just don't give exceptionals every day of week?

3    A    I do not.

4    Q    You do it when somebody actually truly deserves it?

5    A    Absolutely correct.

6    Q    And if there is -- if we're looking at this

7   document, every one of the factors that he was evaluated on

8   are all good and one was satisfactory.

9         Is there anything wrong with being rated

10  satisfactory from your perspective?

11   A    No.  This is good.  Satisfactory is good.

12   Q    And is satisfactory akin to meeting company

13  expectations?

14   A    Absolutely.

15   Q    So that's not a negative, is it?

16   A    That's a positive.

17   Q    This review, as you look through it, that was done

18  back in 2007.  Is this a positive review overall?

19   A    Positive review.

20   Q    And let's go to the next one, which is -- has a date

21  at the top of April of 2008, the next year.

22        In this instance, he doesn't even have one

23  satisfactory.  All of his evaluation factors are either good

24  or exceptional?

25   A    Yes, sir.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    If we go to the next one, I believe this is the

2   evaluation that you performed yourself.  It's your writing.

3   You can tell us.

4      A    Yes, it is.

5      Q    And how would you characterize overall this

6   performance evaluation for Henry Ward?

7      A    It's as close to being exceptional and expertise is

8   outstanding.

9      Q    Maybe somebody who's an easier grader would have

10  pushed him a little higher?

11     A    Yes.

12     Q    Let's go to the next one.  Now we have a little bit

13  of change of format.  This is a performance review that is

14  dated in 2015.

15          And are you aware, did the format change and got a

16  little more --

17     A    It changed.  It changed to this format.

18     Q    All right.  And if we just go to the first category,

19  which is core competencies, we look at how Henry Ward was

20  performing in 2015.  In this time frame, we're still two

21  years before he did the training at Sims; right?

22     A    Yes, sir.

23     Q    And it says under comments of core competencies on

24  the next page, it says "working within the service industry,

25  customer satisfaction is the No. 1 thing we strive for.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

66

1    Consistently displays pro -- referring to Henry --

2    professionalism even during times of extreme disrespect by

3    disgruntled customers.  He exceeded the section on a daily

4    basis by leaps and bound ensuring all requirements are

5    fulfilled in a timely manner with minimal to any supervision

6    necessary.  Your relationship with customer has far exceeded

7    any expectations within this section.  I have never received

8    anything but positive comments regarding your work ethic and

9    reliability from the customer."

10         Pretty high praise?

11    A    Absolutely.  Yes, sir.

12    Q    You agree with that evaluation?

13    A    Absolutely.

14    Q    I want to go to the topic "position specific

15    competencies," which is 730.  And the first one is position

16    specific competencies.  I want to go to the comments on

17    that.  If you go to the next page, please.

18         It says, by the evaluator, "your skills and

19    knowledge within your job description are consistently

20    exceeding expectation.  You are a self-motivator and able to

21    perform your duties and responsibilities without

22    supervision.  You have surpassed all expectations set forth

23    within your position specific competencies.  You are

24    definitely a role model for any and all employees within the

25    LCI organization."

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          Do you agree with that evaluation?

2     A    Yes, sir.  I do.

3     Q    Let's go to the next one.  Quality of work.  And the

4     overall grade is exceeds expectations.  And it says under

5     comments, "your attention to detail and meticulous work

6     ethic are at a continuum of exceeding expectations for this

7     section.  You hold yourself to the utmost of standards

8     ensuring all work is at the highest quality, completed

9     accurately and within the allotted time.  And, again, with

10    minimal, if any, supervision required and is still in

11    keeping with LCI standards and expectations."

12         Another very, very positive evaluation?

13    A    Yes, sir.

14    Q    And let's go to the very end of this particular

15    evaluation, IAI10734, the very last page, comments.  It says

16    from the evaluator, "it is a pleasure having you on our

17    team.  You are a very passionate employee with a very eager

18    willingness to learn all aspects of your job duties and

19    responsibilities.  Your independence and ability to make

20    sound judgments is not only appreciated by the office, but

21    the customer values your knowledge and work ethic as well.

22    You are an asset to our organization.  Your knowledge and

23    skill set brought to this organization has been spread

24    throughout existing not only the customer but all customers

25    you come in contact with.  You are an exemplary employee, a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    role model for all.  Your work ethic far surpasses many

2    within the professional world.  You are a self-supervisor

3    requiring minimal, if any, supervision on a majority of your

4    duties and responsibilities.  Henry, it is an absolute

5    pleasure working with you.  I look forward to many years to

6    come."

7            Do you agree with those comments?

8    A    Yes.

9    Q    Finally, I want to just go to the next evaluation

10   because I think it's particularly pertinent because the date

11   is February the 12th, 2017 within days of his providing

12   training to Mr. Farris and Mr. D'Angelo at Sims.  And we

13   could go through each of the sections, many of them he

14   excels expectations, and I think we can just get the gist of

15   it by looking to the very last page in the comments, which

16   is 10764.  The evaluator writes: "It is an absolute pleasure

17   working with you.  Your team depends on you daily.  You

18   provide strong teamwork skills and continue to mentor all

19   that seek for future knowledge.  We will continue to provide

20   trainings both at the Houston training facility as well as

21   LWE.  You are an example employee and a true asset to this

22   department.  I look forward to working with you for years to

23   come.  Thank you for all you do, Henry.  Your dedication is

24   seen by all."

25           You agree with that evaluation?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes, sir.

2      Q    Do you consider anyone at LUS, who's in a position

3    of training customers on how to be oriented on equipment

4    like the LTM 1500, to be more qualified than Henry Ward?

5      A    Nobody is more qualified than Henry Ward.

6      Q    Is Henry Ward a trainer's trainer?

7      A    Henry Ward is a trainer's trainer.

8      Q    He trains others on how to do the training?

9      A    Yes, sir.

10     Q    And does -- do you, as a senior manager, have

11   confidence that Henry Ward can do that job?

12     A    Absolutely.

13     Q    And certainly every one of his performance

14   evaluations is testament to that?

15     A    That's correct.

16     Q    One final thing before I stop.  Yesterday during

17   your testimony, I was confused because at one point when you

18   were being asked questions by Mr. Goodman about whether the

19   customer database, computer systems in Germany and the U.S.,

20   whether they communicate with one another, do you remember

21   that testimony?

22     A    Yes.

23     Q    I think originally you said no, they don't.  You

24   have to send an email with a form with the information if a

25   customer change occurs and then Germany will input that into

1    their system.  Do you remember that?

2        A    That's correct.  Yes.

3        Q    And I think later you were asked questions, well,

4    doesn't the H drive -- I don't know what any of this is --

5    doesn't the H drive actually communicate with Germany?  And

6    I think you said yes.

7             Correct me if I'm wrong.

8        A    I think I said yes.

9        Q    Can you clear up my confusion?  Does the customer

10   database in the U.S. communicate with the database in

11   Germany?

12       A    No, it cannot.

13       Q    So if Germany issues or puts a customer ownership

14   information into their database and information is

15   subsequently learned by LUS that that ownership on the crane

16   has changed, there needs to be a step of sending an email to

17   Germany in order to inform them that the ownership has

18   changed?

19       A    That's correct.

20       Q    It's not an automatic once you input it in U. S.,

21   Germany knows?

22       A    That's correct.

23            MR. CREMER:  That's all.  Thank you.

24            THE COURT:  Thank you.  Is that -- are you wrapping

25   up because of the break or are you finished with

1    cross-examination?

2            MR. CREMER:  Oh, I'm done.  I'm not that long.

3            THE COURT:  Okay.  Then let's go ahead -- let me ask

4    you, Mr. Goodman, do you have a long redirect?

5            MR. GOODMAN:  I don't, Your Honor.

6            THE COURT:  Let's go ahead and get in the redirect.

7            Let me ask you, Mr. Goodman.  That may be

8    subjective.  What's your idea of not very long?

9            MR. CREMER:  That's the question.

10           MR. GOODMAN:  I should be done in -- like a quarter

11   'til, Judge.

12           THE COURT:  That will give us enough time.  Go

13   ahead.

14                       REDIRECT EXAMINATION

15   BY MR. GOODMAN:

16       Q    Mr. Vieten, OSHA contacted Liebherr.  We spoke about

17   that, right?

18       A    Yes.

19       Q    And Liebherr's Counsel responded to it; correct?

20       A    That's correct.

21       Q    And nothing prevented Liebherr from contacting OSHA

22   by itself or through its Counsel to provide information to

23   OSHA, did it?

24       A    If it went to our counselor and our counselor

25   answered for us.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

72

1      Q    It's nothing that prevented your Counsel and

2    Liebherr from providing OSHA additional information about

3    the incident, the Product Safety Bulletin, the retrofit

4    cover plate or anything else, right?

5      A    That's correct.

6      Q    It was Liebherr's choice to either provide or not

7    provide information to OSHA, wasn't it?

8      A    That's correct.

9      Q    I'm showing you what's been previously marked as

10   Exhibit 1.  At the end of IAI2706, at the bottom of that it

11   says, "The inspection was comprehensive."  Correct?

12     A    It says it, yes.

13     Q    And so it's your understanding that in this

14   inspection and investigation done by OSHA, OSHA had an

15   opportunity to communicate with both Sims and Liebherr US;

16   correct?

17          MR. CREMER:  Objection.  Calls for speculation.

18          THE COURT:  Sustained.  Rephrase the question.

19   BY MR. GOODMAN:

20     Q    Was Liebherr US contacted by OSHA?

21     A    Yes.

22     Q    And Liebherr US had the opportunity to provide

23   information to OSHA; correct?

24     A    Yes.

25     Q    And the only thing that Liebherr did was provide

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    information through its counsel through that one letter that

2    we discussed; correct?

3        A    That's correct.

4        Q    Nothing prevented Liebherr US from providing more

5    information; correct?

6        A    Correct.

7        Q    Liebherr's US is in the sales, service and training;

8    correct?

9        A    Yes.

10       Q    But you said previously on the examination by your

11   Counsel that Liebherr US has no knowledge of what occurred

12   to cause the Product Safety Bulletin or the purpose of the

13   Product Safety Bulletin; correct?

14       A    Correct.

15       Q    So as a sales, service and training organization,

16   Liebherr US doesn't even know what the Product Safety

17   Bulletin is for; correct?

18       A    That's correct.

19       Q    And Liebherr US doesn't provide the Product Safety

20   Bulletin that it receives from Liebherr Germany to its

21   trainers; correct?

22       A    That is correct.

23       Q    You were shown a picture of a crane with the

24   modification stickers on it; correct?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

        Q    Those modification stickers would be seen before the
84-meter boom is installed into the base; correct?

        A    On the ground, yes.

        Q    The mechanical connection from -- the mechanical
connection for the cover plate, both the old and the new
Product Safety Bulletin, was supposed to be made with wing
nuts; correct?

        A    The new ones for sure.  The old ones, I'm not aware
of.

        Q    The T2 access hole is a small access hole?

        A    The T2?

        Q    The T2 access hole where you lock in T3 pin?

        A    It's a small.  Small, regular size, like the 3.

        Q    And is it just the size of the pin itself?

        A    A little bigger.  It has to go through that.

        Q    We previously looked at a video, Exhibit 6, and you
mentioned earlier this was a fair and accurate
representation of how one would lock down the T3 pin on the
84-meter boom; is that correct?

        A    Yes.  That's correct.

        Q    Now, when we get to the point where the individual
is locking down the pin, tell me whether or not you see the
differences between the T3 pin and the T4 pin, that being
that circle around the T3 pin; okay?

        A    Okay.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    Now, we're going to get to the point now where the
 2   locking pin -- the video is going to be locking the locking
 3   pin.  And all you can see is the pin itself; correct?
 4        A    That's correct.
 5        Q    You can't see the circle around whether it's a T3 or
 6   a T4, can you?
 7        A    No.
 8        Q    I'm going to show you what's marked as Exhibit 73,
 9   which we previously looked at.  This is the email from
10   Liebherr Germany to Liebherr US providing the Product Safety
11   Bulletin on November 10th, 2017; correct?
12        A    Correct.
13        Q    And so on November 10th, 2017 Liebherr US is in
14   possession of the Product Safety Bulletin that is supposed
15   to go out to all Liebherr LTM 1500 crane owners; correct?
16        A    That's correct.
17        Q    Now, if we go to Exhibit 76, this is an email from
18   Liebherr Germany to Liebherr US on November 14th, so that is
19   four days later, to Trina Cross advising that the
20   modification would be leaving Liebherr Germany that week and
21   that the modification should be provided one to two days
22   after the letter; correct?
23        A    That's correct.
24        Q    So if the modification, the retrofit of the cover
25   plate and warnings, had left Liebherr Germany within the
```

1    week of November 14th, 2017, Liebherr US would have received

2    that retrofit of the cover plate and the warning signs

3    within the month of November of 2017; correct?

4         A    I can assume, yes.

5         Q    Would Mr. Hoelz tell you that he was going to do

6    something and not do it?

7         A    No.  No.  He would.

8         Q    You can count on if Mr. Hoelz says he was sending

9    this retrofit cover plate and warning out the week of

10   November 14th, that it was going out the week of

11   November 14th; right?

12        A    Yes, you can.

13        Q    Do you have any experience sending things to and

14   from Liebherr Germany?

15        A    Yes, I do.

16        Q    And how long does it usually take to send something

17   from Liebherr Germany to Liebherr US?

18        A    If it comes with air freight, it's just a couple

19   days.  If it's with sea freight, it takes three to four

20   weeks.

21        Q    So if it was three to four days, you would have

22   gotten it in November; right?

23        A    If it comes air freight, yes.

24        Q    And if it would have gone the other way, the longer

25   way, you would have gotten it in December?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    That's correct.

2       Q    Either way, by the end of 2017, Liebherr US is in

3    possession of both the Product Safety Bulletin, the retrofit

4    cover plate, the warnings; correct?

5       A    Yes.

6       Q    Before you were talking about having to type the

7    physical location of the crane.  That's not, though, what

8    you testified to when we were discussing it with regard to

9    the Product Safety Bulletin and the retrofit cover plate.

10          You send those to the address of the crane owner;

11   correct?

12      A    Yes.

13      Q    And then you rely on the crane owner to implement

14   the Product Safety Bulletin and to attach the modification;

15   correct?

16      A    Yes.

17      Q    So you wouldn't have to go around and find out where

18   the physical crane is located in the world; right?

19      A    No, we do not, but we have to find out the exact

20   physical address for the customer would like to have it

21   sent.

22      Q    So you have the customer addresses on your system;

23   correct?

24      A    We do.

25      Q    And you were provided the customer list from

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Liebherr Germany; correct?

2        A    The customer listing of who gets this modification,

3    yes.

4        Q    And you're supposed to --

5        A    Send it.

6        Q    -- send it to the customer; correct?

7        A    Yes.

8        Q    And you're supposed to also keep the current contact

9    information for the owners of the LTM 1500 in Liebherr US's

10   system; correct?

11       A    Correct.  That's why we call and see who can verify

12   okay, where is the crane at that time.

13       Q    But all in all, you don't need to find the physical

14   location of it in the world because you've got the contact

15   information for the crane owners; correct?

16       A    We have the contact information for the crane owner,

17   yes.

18       Q    When was the last time you conducted training on a

19   crane for a customer?

20       A    Me?

21       Q    Yes.

22       A    Me personally?

23       Q    Yes, sir.

24       A    2004, '5.

25       Q    What crane did you conduct that training?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1       A     It's an 1100.

 2       Q     And how long was that training that you conducted?

 3       A     I conducted it maybe a week.

 4       Q     And before that, when was the last time that you

 5   conducted training?

 6       A     I don't know.  I don't remember that.

 7       Q     When was the last time Trina Cross conducted

 8   training on a crane for a customer?

 9       A     She did not.

10       Q     Now, you mentioned that the basis for the training

11   is the Operator's Manual; correct?

12       A     Yes, sir.

13       Q     So based on the Operator's Manual, would Henry Ward

14   have a responsibility to train Sims that manipulating the T4

15   pin could cause an uncontrolled retraction of the boom?

16       A     You can assume that, yes.

17       Q     Now, I'm going to show you what's been marked -- let

18   me show you what's been marked as Exhibit 15.  And next to

19   you, you have the Exhibit --

20             May I approach, Your Honor?

21             THE COURT:  You may.

22   BY MR. GOODMAN:

23       Q     Next to you, you have the Exhibit, Plaintiff's

24   Exhibit 26, which is the Operator's Manual.

25             Do you see that?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    Yes.

2       Q    What I'd like you to do for me is tell me where in

3   the Operator's Manual it says, "if during the assembly and

4   disassembly of the above-mentioned Liebherr mobile crane

5   types, for example, during conversion of the 50-meter

6   telescopic boom, telescopic boom head T3 to the 84-meter

7   telescopic boom, telescopic extension --

8            THE REPORTER:  I'm sorry.  I lost you.  It is me,

9   not you.

10           MR. GOODMAN:  I'll start over.  No.  It's totally

11  me.  I apologize.  I read too quickly.

12  BY MR. GOODMAN:

13      Q    Can you tell me where in the crane Operator's Manual

14  it says, "If during the assembly and disassembly of the

15  above-mentioned Liebherr mobile crane types, for example,

16  during conversion of the 50-meter telescopic boom,

17  telescopic boom head T3 to the 84-meter telescopic boom

18  telescope extension, the separation of the respected

19  connections of the telescopic sections are performed

20  incorrectly, in particular, if the wrong emergency release

21  screw is mechanically locked or unlocked incorrectly, it can

22  result in an uncontrolled retraction of the telescopic

23  sections."

24           Can you show me where it says that in the Operator's

25  Manual?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     A     5.6 and 5.13.

2     Q     Can you turn to 5.6 or 5.13?  I'd like you to read

3     what I just read to you out of the Operator's Manual where

4     it says that.

5     A     First, now I have to find 5.6.  I'm not that

6     familiar with that anymore, you know, so -- because it has

7     changed.  This book goes from 5.12 to 5.14.  Good.

8     Q     What page is it on, sir?

9     A     1078.

10    Q     Can you read for us where it says that if there is a

11    locking or unlocking pin that is improperly locked you're

12    going to have an uncontrolled retraction of the telescopic

13    boom sections?  Because I've read this manual a number of

14    times and I've never seen that.  So I'm really interested to

15    see where you find those words, sir.

16    A     I'm going to 5.60 to see if I see it there.

17    Q     Okay.  To make it easy on you, sir, would you agree

18    that there is nowhere in the Operator's Manual does it say

19    that there can be an uncontrolled retraction of boom

20    sections 6, 5 and 4 if that disassembly/assembly is done

21    improperly?

22          Would you agree with that, sir?

23    A     Yes.

24    Q     So there is information in the Product Safety

25    Bulletin that is not in the Operator's Manual; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     A    It looks like.

2     Q    And that is the risk associated with manipulating

3  the wrong pin, the uncontrolled retraction of the boom;

4  correct?

5     A    As we know now, yes.

6     Q    And there's nothing in the crane Operator's Manual

7  that was in possession of Sims when they were operating this

8  crane that said there would be an uncontrolled retraction of

9  the boom if telescopic pin 4 was touched.  Correct, sir?

10     A    Correct.

11     Q    Now, it took about three-and-a-half months from the

12  receipt of the Product Safety Bulletin at Liebherr US to

13  send it to Sims.  And I know from your prior testimony with

14  your Counsel you said you're a tough grader; right?

15     A    Yes.

16     Q    Wouldn't you agree that three-and-a-half months is

17  an unsatisfactory amount of time to get the Product Safety

18  Bulletin from Liebherr US to Sims when you'd provided it to

19  most everyone else in the US in January?

20     A    No.

21     Q    Interesting.  You're a tough grader, sir.  Thank

22  you.

23     A    Yes.

24     MR. GOODMAN:  No more questions.

25     THE COURT:  Thank you.  Okay.  We are in recess.

1    And is there any reason -- well, before we go to recess, is

2    there any reason that Mr. Vieten would have to stay?

3            MR. CREMER:  I just have two seconds.

4            THE COURT:  Go ahead.  You get very briefly recross.

5    Go ahead.

6            MR. GOODMAN:  I tried to stick to my quarter 'til.

7            THE COURT:  You did.  You get points for that.

8            MR. GOODMAN:  Thank you.

9            THE COURT:  I'm not sure that gives you anything

10   other than bragging rights, but that's what you get.

                        RECROSS EXAMINATION

12   BY MR. CREMER:

13       Q    You were asked if you can -- you testified that you

14   can't see the warning stickers once the 84-meter boom is

15   inserted into the T2 section through the hole.

16       A    Yes.

17       Q    You said you can see it before it's inserted into

18   the crane; right?

19       A    I can.

20       Q    Now, if you are to assume -- if you are Shane

21   Burrows at Sims and you're on top of the boom as it's being

22   installed and you had nothing to do with preparing the boom,

23   removing the cover and looking at the pins, you wouldn't

24   have seen that, would you?

25       A    No.

1    Q    The manual is not written by LUS?

2    A    That's correct.

3    Q    We don't organize what sections and how they are

4    placed in the manual in whatever sequence.  That's Germany?

5    A    That's correct.

6    Q    But the manual is very clear that you're to only

7    assemble and disassemble the 50-meter and the 84-meter boom

8    at the T3 locking pin?

9    A    Yes, sir.

10    Q    If you were to do it from another locking pin or

11    touch another locking pin, that would be contrary to the

12    instructions?

13    A    That's correct.

14    Q    And there's a warning section of the manual that

15    applies to all assembly and disassembly?

16    A    That is correct.

17    Q    And isn't swapping the 84-meter boom to the 50-meter

18    boom, isn't that assembly/disassembly?

19    A    That's assembly/disassembly.

20    Q    And those warnings would apply to that operation?

21    A    Yes, sir.

22    Q    And in that section, it tells you if you don't do it

23    correctly, that you can have a catastrophic loss, like

24    death, personal injury or property?

25    A    That's correct.

 1          MR. CREMER:  Thank you, Your Honor.

 2          THE COURT:  Thank you.  Mr. Vieten, you can step

 3     down from the witness stand, take your mic off.  And,

 4     Mr. Vieten, subject to recall, if you're going to be called

 5     in your part of your case as well.

 6          MR. CREMER:  He's not.

 7          THE COURT:  Then is it okay then for him to remain

 8     in the courtroom if he would like for the rest of the trial,

 9     Mr. Goodman?

10          MR. GOODMAN:  That's fine, Your Honor.

11          THE COURT:  You can go ahead and step down from the

12     witness stand if you'd like.  I just have some housekeeping

13     matters.  We are going to go off the record so Ms. Miller

14     can get set up for my next hearing.

15  (Recess had at 11:46 a.m.)

16  (Proceedings resumed at 1:24 p.m.)

17          THE COURT:  Now that we're back on the record, I

18     know when we were concluding at 11:45 that Mr. Goodman had

19     indicated the Plaintiff did not object to the admission of

20     Defense Exhibits 4, 5, 1, 157, 148 and 158.

21          And, Mr. Cremer, I understand you're going to move

22     to have those admitted?

23          MR. CREMER:  Yes, Your Honor.  Thank you.

24          THE COURT:  And those are admitted.

25

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1   (Defendants' Exhibit Nos. 1, 4, 5, 148, 157 and 158
 2   were admitted.)
 3              Mr. Goodman, would you like to call your next
 4    witness?
 5              MR. GOODMAN:  Yes, Your Honor.  Thank you.
 6    Johnathan Smith.
 7              COURTROOM DEPUTY CLERK:  Mr. Smith, come up here
 8    first to be sworn in, please.
 9              Please raise your right hand.
10   (Witness sworn.)
11              COURTROOM DEPUTY CLERK:  Thank you.  Have a seat and
12    once you attach the lavalier, if you could please state your
13    name for the record.
14              THE COURT:  Mr. Smith, you are welcome to keep your
15    mask on during your testimony or take it off.  If you leave
16    it on, you need to just over-enunciate so it's not muffled
17    when you speak.
18              THE WITNESS:  Johnathan Smith.
19                      JOHNATHAN SMITH
20   having been first duly sworn under oath, was examined and
21   testified as follows:
22                     DIRECT EXAMINATION
23   BY MR. GOODMAN:
24        Q    Mr. Smith, can you tell us who you're employed by?
25        A    Liebherr USA Company.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And how long have you been employed by Liebherr?

2    A    Twenty-three years seven months.

3    Q    That's continuously?

4    A    Yes.

5    Q    So you're employed by them between 2016 and 2018;

6    correct?

7    A    Yes.

8    Q    Just so we can get some definitions down before we

9    get started, are you familiar with the events that occurred

10   on February 19th, 2018 when a 2012 Liebherr LTM 1500 had an

11   uncontrolled retraction of boom sections 6, 5 and 4 while

12   being operated by Sims Crane & Equipment Company?

13   A    Yes, I'm aware.

14   Q    Now, if I refer to "the loss" or "the incident," can

15   we agree that that's the loss or the incident that I'm

16   referring to today?

17   A    Yes.

18        THE COURT:  Mr. Smith, you may need -- if you move

19   that microphone up a little bit, that may help.  Move it

20   further up your shirt.

21        Go ahead and say something now.

22        THE WITNESS:  How is this?

23        THE COURT:  That's much better.  Thank you.

24   BY MR. GOODMAN:

25   Q    If I refer to Sims, can we agree that it's Sims

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Crane & Equipment Company?

2        A    Yes.

3        Q    And during today's discussion if I refer to the

4    crane or the crane at issue, can we agree that the crane or

5    the crane at issue is the 2012 Liebherr LTM 1500-8.1 with

6    serial number 073386 that was being operated by Sims on

7    February 19th, 2018 when the loss happened?

8        A    Yes.

9        Q    Are you familiar with a company called Liebherr-Werk

10   Ehinghen, GmbH?

11       A    Yes.

12       Q    Is it okay if we refer to them as Liebherr Germany?

13       A    Yes.

14       Q    And is it okay if we refer to the company that you

15   work for as Liebherr US?

16       A    Yes.

17       Q    Your present position with Liebherr is Nationwide

18   Technical Manager for crawler cranes; correct?

19       A    Correct.

20       Q    Your job duties include technical support to both

21   external and internal customers on behalf of Liebherr for

22   supporting their crawler cranes in North America; correct?

23       A    Correct.

24       Q    And when you say "technical support," that includes

25   diagnostics, troubleshooting, education of equipment

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    processes or descriptions of components for the cranes;

2    correct?

3        A    Correct.

4        Q    And is it normal in the operation of a crane for a

5    crane operator to troubleshoot issues?

6        A    To troubleshoot issues, no.

7        Q    It's not?  Is it normal in your operation to

8    troubleshoot issues?

9        A    Yes.

10       Q    Are you a crane operator?

11       A    No.

12       Q    You're not NCCCO certified as a crane operator?

13       A    (Shaking head.)

14       Q    Have you ever operated a crane?

15       A    I have operated a crane.

16       Q    And so you've operated a crane when you're not

17   certified to operate a crane; correct?

18       A    Yes.

19       Q    And you've never worked for a company whose operated

20   cranes for customers; correct?

21       A    No.

22       Q    Prior to your current position, you were the

23   technical manager, before that the service manager, before

24   that a service coordinator, and before that a field service

25   technician; correct?

1      A    Correct.

2      Q    And Henry Ward is a field service technician;

3    correct?

4      A    Yes.

5      Q    You've never operated a Liebherr LTM 1500; correct?

6      A    No.

7      Q    All right.  You've operated, though, the Liebherr LR

8    1350, though; correct?

9      A    Yes.

10     Q    And before you ever first operated the Liebherr LR

11   1350, you had not read the entire Operator's Manual;

12   correct?

13     A    Correct.

14     Q    And you've operated the Liebherr LR 1500; correct?

15     A    Yes.

16     Q    And before you first ever operated the LR 1500, you

17   had not read the entire Operator's Manual; correct?

18     A    Correct.

19     Q    And you've operated the LR 1600; correct?

20     A    Correct.

21     Q    And before you first ever operated the LR 1600, you

22   had not read the entire manual; correct?

23     A    Correct.

24     Q    And you've operated the LR 1750; correct?

25     A    Correct.

1      Q    And before you ever first operated the Liebherr LR

2   1750, you had not read the entire Operator's Manual;

3   correct?

4      A    Correct.

5      Q    You've operated the Liebherr IR 11000; correct?

6      A    Correct.

7      Q    And before you first ever operated the Liebherr LR

8   11000, you had not read the entire Operator's Manual;

9   correct?

10      A    Correct.

11      Q    And you've operated the Liebherr LR 11350; correct?

12      A    No.

13      Q    You've not?  Have you ever operated the LTR 1100?

14      A    Yes.

15      Q    And before you first ever operated the Liebherr LTR

16   1100, you had not read the entire Operator's Manual for that

17   either; correct?

18      A    Correct.

19      Q    You've operated the LTR 1220; correct?

20      A    Correct.

21      Q    And before you first ever operated the LTR 1220, you

22   had not read the entire Operator's Manual; correct?

23      A    Correct.

24      Q    And when you operated all of those cranes without

25   being an NCCCO certified crane operator and without having

1    read the entire Operator's Manual for each of those cranes,

2    you were employed by Liebherr US; correct?

3        A    Yes.

4        Q    At Liebherr, there is an actual class on how to

5    operate the LTM 1500; correct?

6        A    Yes.

7        Q    And at Liebherr, there's classroom instruction

8    provided to its employees on how to operate and service the

9    LTM 1500; correct?

10       A    Can you restate that again?

11       Q    Sure.  At Liebherr, there is classroom instruction

12   provided to its employees on how to operate and service the

13   LTM 1500; correct?

14       A    Correct.

15       Q    I'm going to show you what's been marked as Exhibit

16   47.  There are -- can you either look on the screen in front

17   of you or to your right and left are books of the exhibits

18   with tabs on them.  You could look at either one, if you'd

19   like.  Okay?

20       A    Okay.

21       Q    So we're showing you what's been marked as Exhibit

22   47.

23            Are you familiar with this, sir?

24       A    Yes.

25       Q    And this is an email from John Ryall to yourself on

1    February 7th, 2017; correct?

2        A    Yes.

3        Q    And people call you Smitty?

4        A    They do.

5        Q    That's a nickname?

6        A    Stemming from the military, yes.

7        Q    So John Ryall is asking you -- telling you that it's

8    John Ryall and he just called you from a new mobile phone

9    number and would you have a read below and see how Liebherr

10   could prepare an offer for the parts for the LTM 1500-8.1

11   that Schuch bought from us and sold to Sims Crane &

12   Equipment.

13            As you read that, you understand that the Liebherr

14   that was sold to Schuch by Liebherr was purchased by Sims;

15   correct?

16       A    Yes.

17       Q    It goes on to say, "It was bought with a 70-meter

18   luffer and not 91-meter, which I tried to tell them after

19   they put money down with Schuch."

20            So you understand from this email that the LTM

21   1500-8.1 that Schuch bought from Liebherr was sold to Sims

22   Crane & Equipment; correct?

23       A    Yes.

24       Q    And you understand that as of February 7th, 2017;

25   correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

94

1      A    Yes.

2      Q    And when you understand that, you're a Liebherr

3  employee; correct?

4      A    Yes.

5      Q    Acting in the capacity as an employee; correct?

6      A    Yes.

7      Q    I'm going to show you what's been marked as Exhibit

8  48.  And this is an email from John Ryall of Liebherr US to

9  yourself on Thursday, February 9th, 2017 and the subject is

10 1500-8.1, parts for Sims Crane's LTM 1500-8.1 SN 073386?

11     A    Correct.

12     Q    And it says, "Johnathan, do you have a price for

13 those parts in Houston from the Stevenson's machine."

14 Correct?

15     A    Correct.

16     Q    So he's wanting to know if you have prices; correct?

17     A    Correct.

18     Q    And you understand this to be for the Sims Crane LTM

19 1500; correct?

20     A    Correct.

21     Q    And you understand that Sims Cranes LTM 1500 that

22 they own has serial number 073386; correct?

23     A    Correct.

24     Q    And you're operating as an employee of Liebherr US

25 while you're receiving this email; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Correct.

2      Q    And at the time, John Ryall is an employee of

3   Liebherr US; correct?

4      A    Correct.

5      Q    I'm going to show you Exhibit 15.  This is a Product

6   Safety Bulletin; correct?

7      A    Yes.

8      Q    This is a Product Safety Bulletin for the Liebherr

9   LTM 1500; correct?

10     A    Correct.

11     Q    This is a Product Safety Bulletin for the Liebherr

12  LTM 1500 warning that the manipulation of the wrong locking

13  pin, i.e., the T4 pin, can cause an uncontrolled retraction

14  of the boom; correct?

15     A    No.  It does not state the T4 pin anywhere in this

16  letter.

17     Q    It does say, though, that, for example, during

18  conversion of 50-meter telescopic boom, telescopic boom head

19  T3 to the 84-meter telescopic --

20          THE COURT:  Slow down.

21          MR. GOODMAN:  I'm so sorry.  I'm going to catch on

22  by Friday.

23  BY MR. GOODMAN:

24     Q    It says here on Exhibit 15 that, "for example,

25  during conversion of the 50-meter telescopic boom,

1   telescopic boom head T3 to the 84-meter telescopic boom

2   telescopic extension, the separation of the respective

3   connections of the telescopic sections are performed

4   incorrectly, in particular, if the wrong emergency release

5   screw is mechanically locked or unlocked incorrectly, it can

6   result in an uncontrolled retraction of the telescopic

7   sections."  Correct?

8        A    Correct.

9        Q    Now, I'd like you to turn to Exhibit 75.  This is an

10   email from Ralf Vieten of Liebherr US to you, Mr. Aluzry,

11   and a c.c. to Trina Baughman on November 10th, 2017;

12   correct?

13        A    Yes.

14        Q    And this is forwarding to you that Exhibit, that

15   Product Safety Bulletin we just looked at; correct?

16        A    Correct.

17        Q    And Mr. Vieten is asking you and Auday, "Please read

18   below and see attached letters.  Please take care of this

19   addressing with the customers.  Thanks."  Correct?

20        A    Yes.

21        Q    So did you understand it was Mr. Vieten's

22   instruction to you and Mr. Aluzry to send out the Product

23   Safety Bulletins to the LTM 1500 customers in the US?

24        A    Yes.

25             THE COURT:  Mr. Smith, if you could speak just a

1    little bit louder.

2            THE WITNESS:  Yes, ma'am.

3    BY MR. GOODMAN:

4        Q    But you personally never sent out any Product Safety

5    Bulletins to any LTM 1500 customers; correct?

6        A    Correct.

7        Q    And you never followed up with Trina Cross or Trina

8    Baughman to find out whether or not she had sent out all the

9    Product Safety Bulletins to LTM 1500 customers, correct?

10       A    Correct.

11       Q    Turn to Exhibit 77.  This is an email from Trina

12   Baughman to Derrick Harris and it also c.c.'s you and a

13   number of other people who are Liebherr employees; correct?

14       A    Correct.

15       Q    That's on November 21st of 2017; correct?

16       A    That's correct.

17       Q    And in this email Trina Baughman is conveying to you

18   and others that she has the letter that Paul Hoelz is

19   referring to for the MOD, and the MOD is the Product Safety

20   Bulletin and the Retrofit Kit; correct?

21       A    Correct.

22       Q    And that "We will work the logistics upon my return

23   unless you got this and then I will back away" with smiley

24   face; right?

25       A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And then she goes on to say "Johnathan."  She was

2    referring to you?

3    A    Yes.

4    Q    And she refers to Auday and Mr. Vieten.  The MOD

5    Department, that's Trina Baughman's department; correct?

6    A    Correct.

7    Q    Will tend to this customer letter with the MOD

8    campaign, which it references.

9        And based on that, you understand that she is saying

10   that her department will send out the customer letter, the

11   Product Safety Bulletin that we just looked at and the

12   retrofit cover plate and stickers; correct?

13   A    Correct.

14   Q    And she goes on to say, "Smile.  One less letter for

15   you and one more for the MOD Squad" with a smiley face;

16   correct?

17   A    Correct.

18   Q    So you, Johnathan Smith, were relying on Trina Cross

19   and Trina Baughman and her department to send out the

20   Product Safety Bulletin and Retrofit Kit to all Liebherr LTM

21   1500 owners in the United States; correct?

22   A    Correct.

23   Q    And the Product Safety Bulletin references a

24   life-safety issue; correct?

25   A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    The uncontrolled retraction of the boom can cause

2    personal injury, death or property damage; correct?

3      A    Correct.

4      Q    And you were aware of this; correct?

5      A    Yes.

6      Q    When Trina Baughman advised that she was going to

7    tend to the logistics of this life-safety product Safety

8    Bulletin upon her return, you never reached out to her and

9    asked her how long she was going to be gone, did you?

10     A    No.

11     Q    And you never took it upon yourself or your own team

12   to say, "If you are going to be gone, we'll send this out."

13   Correct?

14     A    Correct.

15     Q    I'd like you to turn to Exhibit 78.  And at the

16   bottom -- this is an email from you while you're employed at

17   Liebherr US to Derrick Harris and a c.c. to Trina Baughman

18   and Auday Aluzry on February 22nd, 2018; correct?

19     A    Correct.

20     Q    And you're essentially forwarding the email that

21   Ralf Vieten had sent to you with the Product Safety

22   Bulletin; correct?

23     A    Correct.

24     Q    And on this date, you're emailing Derrick and you

25   say, "Hello Derrick.  I need to know if you have a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    confirmation of shipping for the letter going to LTM

2    1500-8.1 073386."  Correct?

3         A    Correct.

4         Q    And you sent that because you had heard that there

5    was an accident; correct?

6         A    Correct.

7         Q    And so you wanted to make sure that the Product

8    Safety Bulletin had been sent because you understood that

9    the accident involved the incorrect locking or unlocking of

10   a pin and the uncontrolled retraction of the boom; correct?

11        A    No.

12        Q    Did you send any other emails to anybody else asking

13   if they sent out anything else to Liebherr from Product

14   Safety Bulletins that day?

15        A    No, not that I recall.

16        Q    Just this one; right?

17        A    Just this one.

18        Q    I'd like you to turn to Exhibit 79.  Exhibit 79 is a

19   response from Derrick Harris to your email and saying,

20   "Johnathan, I do have this MOD here.  It can be shipped out

21   today.  Do you have an address location to ship it to?"

22   Correct?

23        A    Correct.

24        Q    It doesn't really answer your question, does it?

25        A    No.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    So did you understand from his response that a

2    Product Safety Bulletin and retrofit cover plate and

3    stickers had not gone out to the crane owner of 073386?

4    A    From this statement or this question, yes, I would

5    have perceived it did not ship out.

6    Q    I'd like you to turn to Exhibit 80.  Excuse me.

7    Going back to Exhibit 79, he asks: "Do you have an address

8    location to ship it to?"  Correct?

9    A    Yes.

10    Q    That's at 12:30 p.m.?

11    A    Yes.

12    Q    On February 22nd?

13    A    Yes.

14    Q    He's in Houston, Texas; right?

15    A    Yes.

16    Q    You're located in Virginia; right?

17    A    Yes.

18    Q    So at 12 -- 11:34, which is 12:34 his time; right?

19    A    Yes.

20    Q    Four minutes later, you provide Derrick, "Sims Crane

21    & Equipment Company, Chris Peek, 1219 North US Highway 301,

22    Tampa, Florida, 33619." Correct?

23    A    Correct.

24    Q    So in four minutes you were able to provide Derrick

25    Harris with the company name, a company contact and an

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    address and a telephone number for the entity that owned

2    crane 073386; correct?

3        A    Correct.

4        Q    If somebody would have contacted you in January of

5    2018 and asked you the same question, you could have

6    provided the same information; correct?

7        A    No.

8        Q    I'd like you to turn to Exhibit 81.  This is Derrick

9    Harris back to you at 12:45, so we're talking about 11

10   minutes later.  And he asked you:  "Did Sims buy this crane

11   from Schuch or are they the same company?"  Correct?

12       A    Correct.

13       Q    That's the question.

14            If you turn to Exhibit 82, two minutes later, you

15   emailed him back "purchased from Schuch in 2016."  Correct?

16       A    Correct.

17       Q    It took you two minutes to respond in that way;

18   correct?

19       A    Correct.

20       Q    That's typing it; right?  Well, first it's reading

21   his email, right, and then typing the answer; right?

22       A    Correct.

23       Q    And then pressing send; right?

24       A    Right.

25       Q    And that email traveling however it travels in its

1    wires or, you know, and then getting to his location; right?

2        A    Correct.

3        Q    I'd like to you turn to Exhibit 83.  And this is a

4    response from Derrick Harris to you, which is 11 minutes

5    later, and he says, "Jonathan, this MOD will be shipped out

6    today.  I have been calling Bill Adams but no answer.  Thank

7    you for the information."  Correct?

8        A    Correct.

9        Q    So this Product Safety Bulletin and the retrofit

10   cover plate was not sent out on February 21st, was it?

11       A    No.

12       Q    Sent out on February 22nd; correct?

13       A    Correct.

14       Q    And then on the next page LAI2574 of Exhibit 83,

15   Derrick Harris asks Tyreanne and Tiarra, "could you please

16   update the system to reflect the owner of crane 073386 is

17   now Sims Crane & Equipment Company."  Correct?

18       A    Correct.

19       Q    And that's at 11:58.  And then if you go to Exhibit

20   84, about two hours later -- or excuse me -- about an hour

21   later, hour and a half later, Tiarra Grace says, "The LTM

22   1500-8.1 customer has been updated."  Correct?

23       A    Correct.

24       Q    I'd like to show you what's been marked as Exhibit

25   91.  Are you familiar with this, sir?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    No.  Can I adjust the monitor?

2    Q    You can look at the hard copy that's right to your

3    right, whatever is easiest for you to see.

4    A    So it's a quotation?

5    Q    It's a quotation.

6    A    Yes.

7    Q    It's a quotation prepared by you; correct?  If we go

8    to the second page, are you Johnathan L. Smith?

9    A    I am Johnathan L. Smith.

10   Q    And that's your signature block?

11   A    It is.

12   Q    And you're the nationwide technical manager for

13   Liebherr Cranes, Inc.; correct?

14   A    Correct.

15   Q    As part of the defendant; correct?

16   A    Yes.

17   Q    And you conducted an evaluation of the Liebherr LTM

18   1500 0073386 after the loss; correct?

19   A    This was provided from our repair shop and I

20   provided the quotation.

21   Q    And your repair shop is -- when you say your repair

22   shop, you're talking about Liebherr US's repair shop;

23   correct?

24   A    Yes.

25   Q    And Liebherr -- and that's within your

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    responsibility at Liebherr US to provide these quotations?

2        A    Yes.

3        Q    And this is a fair and reasonable estimate for the

4    damages that were sustained to the Liebherr LTM 1500 073386;

5    correct?

6        A    At the time of the estimate, yes.

7        Q    And that amount was $1,452,492.08; correct?

8        A    Correct.

9             MR. GOODMAN:  Could I have one moment, Your Honor?

10            THE COURT:  You may.

11   (Brief pause.)

12            MR. GOODMAN:  No more questions at this time, Your

13   Honor.

14            THE COURT:  Thank you.

15            Any cross-examination?

16            MR. CREMER:  Yes, Your Honor.

17                     CROSS-EXAMINATION

18   BY MR. CREMER:

19       Q    Back in November of 2017 when the Safety Bulletin

20   campaign and retrofit campaign came to LUS from Germany

21   pertaining to this particular crane, was that the only

22   modification campaign that was being administered by the

23   modification department at that time?

24       A    No.

25       Q    Do you know approximately how many separate safety

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   campaigns were actually opened during the period of time

2   October 2017 through March of 2018?

3       A    Approximately, between 7 and 800.

4       Q    You know that because I asked you to check?

5       A    Correct.

6       Q    For comparison purposes, do you know how many

7   modifications are currently opened in the modification

8   department?

9       A    Approximately between 12 and 1300.

10      Q    So the modification department had the

11  responsibility of not only administering the Safety Bulletin

12  and Retrofit Kit for the LTM 1500 that we are discussing in

13  this litigation, but they had many other campaigns going on

14  simultaneously; true?

15      A    Yes.

16      Q    Are you aware from your work at Liebherr US if there

17  are certain types of modifications that take priority over

18  others?

19      A    Yes.

20      Q    And I want to, of course, focus on this time frame,

21  November of 2017 through the date of this loss, which is

22  February 2018, and ask you -- first of all, who determines

23  the priority of a particular modification campaign?

24      A    Liebherr Germany.

25      Q    All right.  And what is the highest level of

1    priority that Liebherr Germany might issue?

2         A    It would be a notification to stop work.

3         Q    And why is that considered to be the highest level

4    of priority?

5         A    From engineering they deem that there's a safety

6    concern of the machine or the equipment itself, then they

7    can tell us to to put the machine out of service until we

8    get the machine back into its necessary means.

9         Q    What's the next modification priority level after

10   "stop"?

11        A    So the next priority level is a 6,000 series

12   modification.  6,000 series modifications are for Liebherr

13   Service personnel to conduct whether it's an exchange of a

14   component, product improvement, update software, something

15   of this nature, but it has to be done by Liebherr Service.

16        Q    And that involves scheduling of the work with the

17   customer, tracking down where the crane is located and what

18   would be convenient for the customer in order to do the work

19   if that's possible?

20        A    Yes.

21        Q    And then what would be, in terms of the priority

22   levels, the next one if we have stop all operations, then we

23   have the 6,000 series, which you said that your service

24   people actually performed the modifications.

25             What's the next level below that?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A    The next level is a 3,000 series modification.

2   These are generally customer can do.  We deliver them,

3   whether it be a customer letter, it can be decals, it can be

4   additional parts that the customer is to install or enforce

5   on their machine.

6        Q    And you know that this particular safety campaign

7   involving the LTM at issue in the Sims accident, that was a

8   3,000 campaign?

9        A    Yes.

10        Q    It was anticipated that Sims itself would install

11   the cover plate and put on the safety decals?

12        A    Yes.

13        Q    And is there actually a modification level even

14   below that?

15        A    Yes.  We have a 2,000 series modification.  These

16   are on request that are still product improvements, but it's

17   as-needed basis if the customer sees that they prefer to

18   have the upgrade.

19        Q    Again, keeping your focus on this relevant time

20   period around November 2017 through February of 2018, would

21   you be familiar, based on your work at Liebherr US, with the

22   steps that are taken once a Safety Bulletin and retrofit

23   program like the one involved in this incident needs to be

24   sent to customers, what steps are taken?

25        A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And could you tell the Court, please, what those

2    steps are?

3    A    Okay.  So on the receipt of the notification from

4    Liebherr Germany, I would be assigned to the modification

5    department.  The modification department would then, once

6    the components are received by a shipment, they would then

7    inventory all parts.  Then based off of the list provided of

8    the customers, they would go through and ensure we have the

9    proper customer, proper location for delivery and then, if

10   need be, schedule with the client or customer to attend the

11   crane or ship the parts alone if it's a 3,000 series

12   customer modification.

13   Q    You said the modification department would attempt

14   to determine the whereabouts of the particular crane to

15   determine the safety campaign?

16   A    Yes.

17   Q    And would they do that for every campaign?

18   A    Yes.

19   Q    Why would it be necessary, in a case where you were

20   provided with a list of customers for the LTM 1500 campaign

21   from Germany, would it be necessary to take any followup?

22   A    Because the list from Germany is going to show the

23   last known location that they saw the machine, but they

24   don't service the machines here.  Liebherr US does.  So if a

25   customer has moved the crane, they've sold the crane, or

1    they have different operating locations, we have to find out

2    the exact location where the machine would be located.

3        Q    And how would that be accomplished?

4        A    It can be a series of either telephone calls, email

5    communication, something of that nature, to try to locate

6    the machine.

7        Q    You were shown an email by Mr. Goodman that was sent

8    by Derrick Harris when he was responding to why or whether

9    this notification had been sent out and he said he'd been

10   contacting Schuch HeavyLift -- actually, who was the person?

11   I can't remember his name.

12            MR. PENDER:  Bill Adams.

13            MR. CREMER:  Bill Adams.  Thank you.

14   BY MR. CREMER:

15       Q    The email said, "I called Bill Adams and said I

16   didn't get a response."

17            Does that suggest what you saw on that email, that

18   that would be the type of customer practice followed by the

19   MOD Department to verify the whereabouts of a particular

20   piece of equipment?

21       A    Yes.

22       Q    With the type of campaign we're dealing with, would

23   you consider a period of 8 to 16 weeks to complete the

24   campaign to be an unusual period of time?

25       A    No.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Would you consider it to be an unreasonable period

2    of time, particularly considering the fact that there are

3    hundreds of other modification campaigns going on

4    simultaneously?

5    A    No.

6    Q    Let me go to Plaintiff's Exhibit 15, which is the

7    actual Safety Bulletin itself, which you have seen and

8    reviewed.  It's a two-page document; correct?

9    A    Correct.

10   Q    Is that Safety Bulletin a stop operation bulletin?

11   A    No.

12   Q    What does the bulletin direct customers they can or

13   cannot do with respect to the crane?

14   A    I think there's a highlighted section if we go down

15   further.

16   Q    It says, "In the meantime" at the top there?

17   A    "In the meantime, you may continue to operate your

18   Liebherr mobile crane safely so long as you meticulously

19   follow the Operation Manual."

20   Q    So in this instance, there was a shipment of parts

21   that were part of a retrofit campaign that needed to be sent

22   to customers; correct?

23   A    Correct.

24   Q    And those parts were sent from Germany?

25   A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    And so there would be a delay of some period of time
 2   between the time that the parts arrived and they get sorted
 3   and get posted to the various customers, and Germany is
 4   telling customers, if I understand this correctly, that it's
 5   proper and safe to continue to use their cranes without
 6   these additional components?
 7        A    Yes.
 8        Q    This crane, if you know, was it first manufactured
 9   starting around 1998, 1999?
10        A    Yes.
11        Q    And before this Safety Bulletin, were there any
12   plates that were on the 84-meter boom that covered both the
13   T3 and the T4 pin?
14        A    No.
15        Q    It was a single plate; right?  It was a dust cover
16   to prevent dust from going into the T3 pin hole?
17        A    Yes.
18        Q    And was there warning stickers or decals that were
19   to the side of the T3 pin and to the side of the T4 pin
20   indicating which pin you should manipulate, which pin you
21   should not manipulate before this campaign?
22        A    No.
23        Q    And in all the LTM 1500s that were out there being
24   used in the marketplace with boom swaps taking place, was
25   Liebherr US ever aware of an instance where a T4 pin had
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    been inadvertently manipulated that resulted in a boom

2    collapse?

3        A    No.

4        Q    Before the Sims accident, was LUS ever aware that

5    and LTM 1500 had left on a T3 dust cover while attempting to

6    do a boom swap and was inserted into the T2 section?

7        A    No.

8        Q    Would that be a proper assembly and disassembly to

9    leave a T3 dust cover on an 84-meter boom when you're

10   inserting it into the T2?

11       A    No.

12       Q    A couple of things Mr. Goodman covered with you that

13   I want to touch on.  He asked you whether or not you had

14   read manuals for a number of different models of crane

15   and -- or read the entire manual, I think, is the question.

16            Had you read sections of the manuals?

17       A    Yes, I have.

18       Q    And when you were operating cranes, were you

19   actually conducting critical lifts with the crane?

20       A    No.

21       Q    That's what a certified operator does; right?

22       A    Yes.

23       Q    He also talked about classroom training for the LTM

24   1500.  Do you remember that question?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And since this crane was manufactured in 1998, does

2  Germany offer training when a new product is issued for a

3  period of time and then they rely on the people that have

4  already been trained to train others?

5      A    Yes.

6      Q    So you wouldn't expect a crane that came into the

7  marketplace in 1998 in 2022 to still be getting training

8  classes in Germany for the product that may become obsolete

9  very soon?

10      A    Correct.

11      Q    Is that product still being made?

12      A    No.

13      Q    It's already been -- it's already no longer

14  manufactured?

15      A    Correct.

16      Q    Do you know in 2004, several years after the

17  introduction of this particular product, the LTM 1500, when

18  Henry Ward was hired, if training classes were still being

19  offered in Germany on that product?

20      A    I don't recall.

21      Q    Do you have an opinion if training by an experienced

22  tech hands on on how to operate and swap booms on an LTM

23  1500 is any less valid or effective than classroom training?

24      A    No.  It's not as valid.

25      Q    In your experience, could it be more effective?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     A    Yes.

2     Q    When Mr. Goodman said Trina Baughman went on

3     vacation and he kind of suggested that he just left

4     everything to wait for her to return from vacation.  She was

5     the head of the department, wasn't she?

6     A    Yes.

7     Q    She had people working for her, didn't she?

8     A    Yes.

9     Q    And so other people continued to work on the 700

10    modifications that were open at that time; correct?

11    A    Correct.

12    Q    When you were able to answer those emails so quickly

13    about Sims being the owner -- we just went through those --

14    that's because you had been notified that there was an

15    accident and you looked into it and you determined that the

16    crane, at that time, was in possession of Sims?

17    A    Correct.

18    Q    And so you had that information now available to you

19    when you were responding to Derrick?

20    A    Yes.

21    Q    It's clear from the emails that you just reviewed

22    from Derrick, it was still unclear to him who had possession

23    of the crane because he was asking whether the crane had

24    been sold to Sims or whether it was the same -- another name

25    for Schuch?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A     Yes.

2      Q     There was a long time, about a year or so after this

3   event in February of 2018, there was a supplement to the LTM

4   1500 manual.  Are you familiar with that?

5      A     Yes.

6      Q     And I'm going to show you Defendants' Exhibit 149.

7   Have you seen this letter before?

8      A     Yes.

9      Q     What is this letter?

10     A     This is the letter notification of the supplemental

11  telescopic parts disassembly --

12          MR. GOODMAN:  I'm going to object, Your Honor.  This

13  is subsequent remedial measure.

14          THE COURT:  Well, hold on.  Go ahead and address it.

15  Let's first talk about the Exhibit.  The Exhibit is the

16  April of 2019 and it says, "The 5.60."  Is that what it is?

17  What is this exhibit?

18          MR. CREMER:  This is the cover letter that

19  accompanied the actual supplement to the Operator's Manual

20  for the crane that deals specifically with assembly and

21  disassembly of the telescopic crane.

22          THE COURT:  What's it being offered for?

23          MR. CREMER:  I'm offering it to show that one of the

24  Plaintiff's experts believed that this was part of the

25  actual Safety Bulletin that was issued back in November and

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    he based many opinions on that and, in fact, he was

2    completely wrong.  So I'm just laying the foundation for

3    that.

4            THE COURT:  Mr. Goodman?

5            MR. GOODMAN:  Yes.  That's completely wrong, Your

6    Honor.

7            MR. CREMER:  Okay.

8            MR. GOODMAN:  He didn't base it on this.  It's a

9    subsequent remedial measure and it was not used by any of

10   our experts to formulate any opinions.

11           THE COURT:  To the extent that it needs to come --

12   that it comes through the expert -- is this the expert

13   that's going to testify?  The damages' expert you said is

14   not going to testify.

15           MR. CREMER:  No.  This is a liability expert.

16           THE COURT:  And, Mr. Goodman, when you're --

17           MR. GOODMAN:  I'm not going to be using this Exhibit

18   at any time, Your Honor.

19           MR. CREMER:  Well, I'm going to be using it.

20           MR. GOODMAN:  I don't have this Exhibit in my

21   Exhibits.

22           THE COURT:  Did your expert rely on this subsequent

23   remedial measure or no?

24           MR. GOODMAN:  He obtained a copy of it, but his

25   opinion is not based on this because this was not even

1    around at the time of the incident or before the incident.

2          This came out, as the date shows, on April 16th,

3    2019, with additional information, and that is additional

4    information to supplement the Product Safety Bulletin and

5    retrofit cover plate that came out; thus, it is a subsequent

6    remedial measure.

7          MR. CREMER:  I agree with that.  I'm just pointing

8    out that I took his deposition.  He had it in his file.  He

9    believed mistakenly that it was issued at the same time of

10   the November 2017 bulletin.  That's all I'm pointing out.

11         THE COURT:  That's for cross-examination for that

12   witness, if he testifies to that, then that expert -- in

13   this trial.  But what is the point of asking Mr. Smith about

14   this document?

15         MR. CREMER:  Just to lay the foundation since he's

16   familiar with when this went out and the dates that it went

17   out.  That's the only point.

18         THE COURT:  I'll let in the testimony.  But to the

19   extent that it's a subsequent remedial measures, this is not

20   a jury trial.  I have no problem disregarding all of that in

21   terms of my order.  Just for the narrow point of the time of

22   when this came out and in comparison to the accident and to

23   the original manual, I will let him testify to that.  But,

24   again, to the extent that it's subsequent remedial measure

25   evidence, I'll be disregarding that for purposes of my

1    order.

2          Go ahead.

3    BY MR. CREMER:

4       Q    So I just want to have you look at this letter and

5    tell us the date of this letter.

6       A    April 16th, 2019.

7       Q    And this letter was a cover letter that went with

8    the April supplement to the manual that came out about that

9    same time?

10      A    Yes.

11      Q    And that all this information wouldn't have been

12   available back in 2017 or 2018 prior to this accident on

13   February the 19th, 2019 -- '18?

14      A    Correct.

15          MR. CREMER:  That's all.  Thank you, Judge.

16          THE COURT:  Thank you.

17          Any redirect?

18          MR. GOODMAN:  Yes, Your Honor.

19          Can we switch it back over, ma'am?  Thank you.

20                    REDIRECT EXAMINATION

21   BY MR. GOODMAN:

22      Q    When it comes to modifications and Product Safety

23   Bulletins, it's Liebherr US's job to send those out no

24   matter how many campaigns were being sent out at the time;

25   correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Correct.

2    Q    And you had mentioned that there are certain

3    modifications that have priority, a higher level, a 6,000

4    series, a 3,000 series, and you also mentioned that there's

5    a lot of steps to the process and things like that; right?

6    A    Correct.

7    Q    I'm going to show you Exhibit 90 and I'll ask you to

8    turn to NBIS000333.  And the question here is:  If the

9    document and the documents that OSHA -- excuse me, the

10   documents -- the documents, the Product Safety Bulletin was

11   not provided to Sims Crane Equipment prior to February 19th,

12   2018, and it was dated either -- I'm not sure if that's

13   August 11th or November 8th, 2017, can you please explain

14   why it's not provided to said company sooner?

15        Can you tell me where in that answer it says that

16   it's because there are higher priority modifications,

17   there's a stop work modification, there's next level 6,000

18   series modifications or because the process is so cumbersome

19   and laborious?  Can you tell me where it says that?

20   A    No.

21   Q    From reading that, what's your understanding of why

22   the Product Safety Bulletin wasn't sent out?

23   A    The notification of Sims owning the crane.

24   Q    And we can agree that keeping a cover plate on the

25   T3 pin when you're installing the 84-meter boom is not

1    proper; right?

2        A    Right.

3        Q    If you keep the cover -- keep the old cover on the

4    84-meter boom, the round one, keep that one on the T3 pin

5    and slide in the 84-meter boom, the T4 pin is accessible;

6    right?

7        A    Yes.

8        Q    T4 pin is not supposed to be altered in any way;

9    right?

10       A    Correct.

11       Q    If you manipulate it it can cause an uncontrolled

12   retraction of the boom; right?

13       A    Yes.

14       Q    Now, if you keep on the retrofit cover plate and

15   install the 84-meter boom, the T3 pin is not accessible;

16   right?

17       A    Correct, but I'm not sure that the plate is going to

18   fit inside the T2.

19       Q    So people would then -- and why?

20       A    Because it fits a little bit higher and it's also --

21   it's also mounted with the same fasteners that the other

22   plate should be mounted with.

23       Q    And what are the other fasteners that the other

24   plate should have been fastened with?

25       A    Just -- it could be a secured screw.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Secured screw, like a wing nut?

2    A    Could be if it's available to the customer or if

3    they're using the original or not.

4    Q    Okay.  Have you ever tested that?

5    A    No.

6    Q    So you don't know one way or the other whether that

7    new plate is going to go in or not; right?

8    A    No.

9    Q    So there are two options.  It either goes in;

10   correct?  And if it goes in and fits, the T3 pin is not

11   accessible; correct?

12   A    Are you referring to the new plate or the old plate?

13   Q    The new plate.

14   A    No.

15   Q    Because on the new plate and the old plate, if the

16   plate's on on either one the T3 pin is not accessible;

17   correct?

18   A    Correct.

19   Q    If the old plate is on and the 84-meter boom slides

20   in just a foot more, the T4 pin, the one you're never

21   supposed to touch, is accessible; correct?  That's what

22   happened in this situation; right?

23   A    No.  Because the preparation for installing this

24   boom system is not being done while you're sliding it in.

25   The preparation is removing the plate while it's sitting on

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the ground.

2        Q    I'm not asking you that, sir.  I'm asking you the

3    simple question.  In this situation, you understand that

4    the -- like your attorney asked you -- a cover plate was

5    left on the T3 pin; right?

6        A    Correct.

7        Q    And if a cover plate is left on the T3 pin, I'll

8    agree with you, that's not the way it's supposed to be done;

9    right?

10        A    (Nodding head.)

11        Q    If the 84-meter boom slides in -- and it can slide

12    in with the old cover plate because it happened in this

13    situation.  When somebody is looking in the T2 access hole,

14    they don't see the T3 pin, right, because there's a cover

15    plate on it; right?

16        A    Correct.

17        Q    And if they slide it about a foot more inside that

18    T2 access hole, that little access hole, they see the T4

19    pin; right?

20        A    Right.

21        Q    They can use the S wrench to manipulate on the T4

22    pin that they use on the T3 pin; correct?

23        A    Correct.

24        Q    Now, let's go to the new cover plate, the covers

25    both from the T3 and the T4.  And since you never tested

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    whether or not it can go in, there are two options:  One, it

2    can go in, or, two, it can't.  Let's talk about the first

3    option.

4         If the new cover plate is covering both the T3 and

5    the T4 and it's slid in and the T3 comes into the T2 access

6    hole, you're not going to be able to access the T3 pin,

7    right, because there's a cover plate over it; right?

8    A    Correct.

9    Q    And if you slide it a foot more, you're not going to

10   be able to get to the T4 pin either because it's got a cover

11   over it; correct?

12   A    Correct.

13   Q    So then you got to slide the whole thing out and you

14   realize that you left the cover on; correct?

15   A    Correct.

16   Q    Now, let's take it the other way, because you said

17   if it doesn't fit, what would happen?  Make a lot of noise;

18   right?

19   A    Yes.

20   Q    Or get stuck; right?

21   A    Yes.

22   Q    So now everybody knows "hey, we left the cover plate

23   on it."  Right?

24   A    Yes.

25   Q    You mentioned that field training could be more

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    effective than classroom training?

2    A    Yes.

3    Q    So actually out in the field training working on the

4    crane, learning how to do the crane, learning under people

5    who have operated cranes, that can be more effective than

6    classroom training; correct?

7    A    Yes.

8    Q    And let me ask you this:  So as of the date of your

9    email to Derrick, they had not determined who owned the

10   073386 crane.  Is that your testimony?

11   A    Yeah.

12   Q    I'm going to show you what's been marked as Exhibit

13   63, sir.  This is dated -- I'm not sure if it's April 6th,

14   2017 or June 4th, 2017, but it's in 2017; right?

15   A    Yes.

16   Q    On the bottom it says, "Check customer info on

17   systems.  Says Schuch.  Paperwork says Sims."

18        That's what it says; right?

19   A    Correct.

20   Q    Based on this document, Liebherr US has conflicting

21   information that this crane is either owned by Schuch or

22   owned by Sims; right?

23   A    Correct.

24   Q    They know two parties that may own it; right?

25   A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And you're telling me from either April 6th -- or

2    June 4th, 2017 until February 19th, 2018, Liebherr never

3    fixed that question or found out who owned it?

4    A    From the information that I've read, no.

5    Q    They should have found out, though, shouldn't they

6    have?

7    A    Yes.

8    Q    They should have done it before February 19th, 2018;

9    right, sir?

10    A    Yes.

11         MR. GOODMAN:  Thank you, sir.

12         THE COURT:  Okay.  I know this witness is also

13    listed on Defenses' witness list.  Did you intend to recall

14    him?

15         MR. CREMER:  I would just like to ask one or two

16    questions if I could.

17         THE COURT:  Go ahead.

18         MR. CREMER:  Thank you.

19                   RECROSS-EXAMINATION

20    BY MR. CREMER:

21    Q    Mr. Goodman was asking you about the scenario where

22    the dust cover on the new plate is taken off.

23    A    Yes.

24    Q    It's caught.  It gets caught and now they say, *Oh,*

25    *we shouldn't have that on and we now do the right thing.  We*

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     *take the 84-meter boom out and we remove this modified dust*

2     *cover.  Now it's got to go back in.*

3            And if you have an inexperienced person, like a

4     Shane Burrows, standing up on the top of that boom package

5     who can't determine which is a T3 and which is a T4 pin, is

6     it still possible that he let that pin go in too far and

7     manipulated the wrong pin?

8            MR. GOODMAN:  Objection, Your Honor.  Calls for

9     speculation.

10           MR. CREMER:  No.  That's --

11           THE COURT:  It's presented as a hypothetical, so if

12     you can answer it.  If it's something that you can try and

13     answer, go ahead.  But, again, I'm probably going to

14     disregard the testimony anyway because it's an ultimate

15     issue.

16           THE WITNESS:  If they allow the boom sections to go

17     in too far T4 pin, T3's pin can slide past 100 percent and

18     he sees a pin at T4 inadvertently, he can still manipulate

19     it.

20   BY MR. CREMER:

21       Q    Would you be able to distinguish, just by

22     observation alone, the T4 from the T3 pin when it's in the

23     T2 hole?

24       A    If you're looking straight down on a pin through a

25     hole, no, you are just going to see a pin at the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    100 percent.

2        Q    Are you able to determine whether a pin is fully

3    unlocked versus locked?

4        A    Yes.

5        Q    If you saw the pin that was in the T2 hole in a

6    locked position, would that tell you that that could

7    possibly be the T3 pin?

8        A    No.  If it's locked, it's not going to be the T3

9    pin.

10        Q    So one way that you could determine, if you were

11    trained, whether the correct pin was in the hole would be

12    looking for a pin that was unlocked?

13        A    Yes.

14        Q    And that's visually determinable, isn't it?

15        A    Yes.

16        Q    And when you talked about the position of the T3 pin

17    and the 100 percent hole of the T2 section, that's what the

18    instruction directs an operator to do when they're

19    installing the 84-meter boom?

20        A    Correct.

21        Q    And if you have the boom properly positioned, the T3

22    pin in the 100 percent hole, where is the T4 pin?

23        A    It's locked into the T3 section.

24        Q    And is that accessible from the top of the boom?

25        A    No, not if the T3 pin is in the 100 percent hole of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1   T2.
 2       Q    Where is the T4 pin?  Why can't you access it?
 3       A    It's covered up by the collar of T2.
 4       Q    It's under a bunch of sheet metal, isn't it?
 5       A    Yes.
 6            MR. CREMER:  Thank you.  Thank you, Judge.
 7            THE COURT:  So at this point, then, can Mr. Smith be
 8   excused from the trial?
 9            MR. CREMER:  Yes.
10            THE COURT:  Feel free to go ahead and take off your
11   lavalier mic, Mr. Smith, and then you can step down.
12            Mr. Goodman, who's your next witness?
13            MR. GOODMAN:  Henry Ward.
14            THE COURT:  Let's go ahead and start him and then
15   we'll probably take a break around 3:00 o'clock, just a
16   short afternoon break.
17            COURTROOM DEPUTY CLERK:  Mr. Ward, come up here,
18   please, sir.  Raise your right hand, please.
19  (Witness sworn.)
20            COURTROOM DEPUTY CLERK:  Please have a seat in the
21   witness box.
22            THE COURT:  Mr. Ward, you're welcome to leave your
23   mask on if you'd like.  If you do, all we ask is that you
24   over-enunciate so that we can hear you better through it.
25   You're welcome to take it off, too.
```

1          COURTROOM DEPUTY CLERK:  Sir, please state your name

2     for the record.

3          THE WITNESS:  Henry Ray Ward.

4          COURTROOM DEPUTY CLERK:  Thank you.

5                HENRY RAY WARD,

6     having been first duly sworn under oath, was examined and

7     testified as follows:

8                     DIRECT EXAMINATION

9     BY MR. GOODMAN:

10         Q    Mr. Ward, can you tell us who you're employed by?

11         A    Yes.  Liebherr US.

12         Q    And how long have you been employed by Liebherr US?

13         A    Eighteen years.

14         Q    Is that continuously?

15         A    Yes -- well, I quit for a month and then came back

16    and started as if I never left.

17         Q    Were you employed at Liebherr US between 2016 and

18    2018?

19         A    Yes, sir.

20         Q    And you were continuously employed there at that

21    time?

22         A    Yes, sir.

23         Q    I'd like to define some terms so that we're on the

24    same page when we're talking today.  Is that okay?

25         A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    If I talk about -- are you familiar with the event

2    that occurred on February 19th, 2018 when a 2012 LTM 1500

3    had an uncontrolled retraction of boom package section 6, 5

4    and 4 while being operated by Sims Crane & Equipment?

5    A    Only what I know in this case.

6    Q    Did you hear about it independently of this case?

7    A    No.

8    Q    You didn't hear about it in, like, the --

9    A    Some stuff on the news, but nothing pertaining to

10    the case.

11    Q    If I refer to "the loss" or "the incident," can we

12    agree that it's the event that occurred on February 19th,

13    2018 with that crane?  Is that okay, that if we talk about

14    "the loss" or "the incident," that that's what we're

15    referring to?

16    A    Yes, sir.

17    Q    And if I refer to "Sims," I'm referring to Sims

18    Crane & Equipment Company?

19    A    Yes, sir.

20    Q    And if I refer to the crane, I'm referring to the

21    crane at issue.  I'm referring to the 2012 Liebherr LTM

22    1500.

23    A    Yes, sir.

24    Q    And if I refer to Liebherr Germany, I'm referring to

25    Liebherr-Werk Ehingen GmbH?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes, sir.

2      Q    You don't work for Liebherr Germany, do you?

3      A    No, sir.

4      Q    And if I refer to Liebherr or Liebherr US, I'm

5  referring to the company you work for?

6      A    Yes, sir.

7      Q    Did you train Sims' employees Andrew Farris --

8  excuse me -- yeah.  Did you train Sims' employees Andrew

9  Farris and Jason D'Angelo on how to operate the Liebherr LTM

10 1500?

11     A    Yes, sir.

12     Q    And you did that at the Sims yard in Tampa?

13     A    Yes, sir.

14     Q    At the time, did you know that they were -- Andrew

15 Farris and Jason D'Angelo were employed by Sims?

16     A    That's what they told me, yes, sir.

17     Q    Do you have any reason to question that?

18     A    No, sir.

19     Q    And you were at the yard in Tampa and there's a Sims

20 Building; right?

21     A    Yes, sir.

22     Q    And at the front of the building, it says Sims;

23 right?

24     A    As far as I remember, yes, sir.

25     Q    Do you have any reason to question that that really

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      wasn't Sims?

2         A    No, sir.

3         Q    When you were there, did you believe it was Schuch

4      HeavyLift Corp?

5         A    No.

6         Q    Did you believe it was Sims?

7         A    Yes, sir.

8         Q    When you train someone, do you generally train the

9      owners on how to operate their cranes?

10        A    If it's a bare rental, then it's whoever the company

11     rents the crane to.

12        Q    But if it's a new commissioning and a new crane

13     that's being purchased, is it generally that you're training

14     the company that owns the crane?

15        A    Generally.

16        Q    I'm going to show you what I've marked as Exhibit

17     60.  This is a service report and worksheet; correct?

18        A    Yes, sir.

19        Q    And if you can't see that screen very well, there

20     are copies of the exhibits on your right and left.  If you

21     need, you can refer to the hard copy.

22        A    Yes, sir.

23        Q    And this is for crane 073386; correct?

24        A    Yes, sir.

25        Q    The LTM 1500?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes, sir.

2      Q    And the company name says "Sims Crane Rental."

3   Correct?

4      A    Yes, sir.

5      Q    And down at the bottom, "Customer has taken delivery

6   of an LTM 1500-8.1 and wants machine commissioning and also

7   operator training." Is that correct?

8      A    Yes, sir.

9      Q    You wrote that?

10      A    Yes, sir.

11      Q    And the customer in that is Sims Crane; correct?

12      A    Sir?

13      Q    The customer in that is Sims Crane; correct?

14      A    Yes, sir.

15      Q    And this was -- this work was done -- was this work

16   done on March 2nd, 2017 or February 3rd, 2017?

17      A    February 3rd -- started January 30th until

18   February 3rd.

19      Q    And then up at the top it's says "keyed March 6th,

20   2017." Is that correct?

21      A    Keyed March?

22      Q    Top right, highlighted?

23      A    Yep.

24      Q    So as of February 3rd, 2017, did you know that Sims

25   Crane had taken delivery of this LTM 1500 0073386?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     A    Until when?

2     Q    As of the date of this document.

3     A    Yes, sir.

4     Q    Were you aware that Sims Crane, like you wrote, had

5     taken delivery of this specific crane?

6     A    Yes, sir.  That was my assumption.

7     Q    Did you question it?

8     A    No.

9     Q    Do you have a reason to question it?

10    A    No.

11    Q    I'm going to show you Exhibit 61.  This is -- is

12    that March 2nd or February 3rd, 2017?

13    A    No.  It's February 3rd.

14    Q    It's February 3rd, 2017?

15    A    Yes, sir.

16    Q    This is a Liebherr Crane's document?

17    A    Yes, sir.

18    Q    And you would have prepared this document?

19    A    Yes, sir.

20    Q    And it says, "Customer had bought a used LTM

21    1500-8.1 and wants machine built and some operator

22    training."  Correct?

23    A    Yes, sir.

24    Q    And up at the top it says, "crane number 073386."

25    Correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes, sir.

2      Q    And to the right it says, "type, LTM 1500."

3   Correct?

4      A    Yes, sir.

5      Q    And next it says, "Sims Crane & Equipment."

6   Correct?

7      A    Yes, sir.

8      Q    So as of the date that you prepared this document,

9   you knew that Sims Crane had bought this used LTM 1500;

10  correct?

11     A    Yes, sir.

12     Q    And you were actually involved in the commissioning

13  of this crane; correct?

14     A    Yes, sir.

15     Q    That was in Jacksonville, Florida?

16     A    Tampa.

17     Q    That was in Tampa.  The actual crane, though, was

18  brought to the Jacksonville ship yard; right?

19     A    As far as my knowledge, yes.  It went through the

20  Port of Jacksonville.

21     Q    Went through the Port of Jacksonville.  Were you at

22  the Port of Jacksonville?

23     A    Yes.  We had to pull the complete boom out of the

24  machine to get them to travel it.

25     Q    At that time, were you aware that this was Sims

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    first LTM 1500?

2        A    Yes.  That's what they had mentioned, yes, sir.

3        Q    And you were aware that they didn't have any

4    knowledge about how to swap out the 50-meter boom and the

5    84-meter boom; correct?

6        A    Not to my knowledge, no.

7        Q    So to your knowledge, they didn't have any

8    knowledge; correct?

9        A    No, sir.

10       Q    And they have no experience; correct?

11       A    On the 1500, no.

12       Q    And then after it was commissioned -- or let's talk

13   about when it was commissioned.

14            When it was commissioned, was it just you from

15   Liebherr or were there other people there?

16       A    There was another technician with me at first.

17       Q    And then that person left?

18       A    Yes, sir.

19       Q    And it was you and the guys from Sims?

20       A    Yes, sir.

21       Q    Do you remember meeting Andrew Farris at the

22   commissioning?

23       A    Yes, sir.

24       Q    And that was the first day that the crane had been

25   in the United States; right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    At the port?

2    Q    Yes, sir.

3    A    As far as my knowledge, I don't know how long it was

4    sitting at the port.

5    Q    That's the first place that it came to; correct?

6    A    As far as I understand, yes, sir.

7    Q    So from the time that the crane got there, is it

8    your understanding that Andrew Farris was involved in that

9    commissioning?

10    A    No.  I can't remember if he was at the port with us

11    or not.

12    Q    But then he did some training; right?

13    A    Yes, sir.

14    Q    And you did the training at the Sims yard, which we

15    talked about already; correct?

16    A    Yes, sir.

17    Q    And when you were conducting the training, did you

18    tell them that manipulating the T4 pin could cause an

19    uncontrolled retraction of the boom and could risk personal

20    injury, property damage or death?

21    A    Yes, sir.

22    Q    How many times did you tell them that?

23    A    Honestly, I couldn't tell you how many times.  More

24    than two, three times.

25    Q    Now, is that information in the Operator's Manual?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     A    Yes, sir.

2     Q    The Operator's Manual is right there.  It's either

3     on your right or your left.  That's an exhibit.

4          Would you mind taking a look at the Operator's

5     Manual and finding in there for me where it says that

6     manipulating the T4 pin --

7     A    Oh --

8     Q    -- can cause an uncontrolled retraction of the boom?

9     A    It's not in the book, sir.

10    Q    So you then provided information, or at least your

11    contention is that you provided information in your training

12    to Sims.  It's not in the book.  It's not in the Operator's

13    Manual; is that correct?  Is that what you're telling me?

14    A    No.  I told them not to manipulate pin 4.

15    Q    Okay.  My question to you is, sir:  That is not in

16    the Operator's Manual, doesn't say that in the Operator's

17    Manual; correct?

18    A    No, sir.  No.

19    Q    So you told them something that was not in the

20    Operator's Manual; correct?

21    A    Correct.

22    Q    In telling them that, were you over the T4 pin when

23    you were telling them that?

24    A    Yes, sir.

25    Q    And where were you when you were telling them that?

1     A    We had to have been in their yard when we was

2  getting ready to swap the booms.

3     Q    So you were on top of the boom?

4     A    Normally I'm on the ladder and they're on the top of

5  the boom.

6     Q    And when you were telling them that, were you on the

7  ladder?

8     A    Yes.

9     Q    And who was on the boom?

10    A    Best of my memory, it was Andrew and the oiler.

11    Q    And the oiler?  So there was an oiler out there,

12  yes?

13    A    Well, the two operators, whoever those -- what's the

14  other guy's name?

15    Q    Jason D'Angelo.

16    A    Jason and Andrew, yes.

17    Q    Jason and Andrew.

18         Now, let me ask you this:  When you're swapping out

19  a boom from a 50 to an 84 -- and you did that while you were

20  doing the training; right?

21    A    Yes, sir.

22    Q    You swapped it back from the 84 to the 50?

23    A    Yes.

24    Q    You actually swapped it twice; right?

25    A    Yes, sir.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    When you do that, you can't do that with just you,

2    Andrew and Jason; right?

3    A    No.

4    Q    You have to have oilers and other people around you

5    to assist; right?

6    A    Yes, sir.

7    Q    Now, were there oilers and other people around you

8    that were assisting?

9    A    As far as I remember, yes.

10    Q    And did you go around there and make sure that each

11    one was an expert in the Liebherr Crane before they

12    assisted?

13    A    No, sir.

14    Q    And why didn't you do that?

15    A    Why didn't I do what?

16    Q    Why didn't you go and like test or quiz them and

17    make sure that they were experts in Liebherr Cranes?

18    A    That's not something I do.

19    Q    Not necessary?

20    A    Not for me, no.

21    Q    Because it's normal in the industry, right, when

22    you're swapping out them big booms, because it's a big piece

23    of equipment, to have oilers and apprentices and other

24    individuals who are not certified or trained operators

25    working at the direction of an NCCO certified train

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    operator; correct?

2        A    Correct.

3            MR. GOODMAN:  Couple of minutes, Judge?

4            THE COURT:  You may.

5    (Brief pause.)

6            MR. GOODMAN:  Nothing more at this time, Your Honor.

7            THE COURT:  Thank you.  Mr. Cremer, any cross?

8                    CROSS-EXAMINATION

9    BY MR. CREMER:

10       Q    Just I'd like to get a little more detail for the

11   benefit of the Court on the specific training you gave to

12   Mr. D'Angelo and Mr. Farris as it pertained to how to

13   assemble the 84-meter boom.  If you tell the Judge what

14   steps you train them to do.

15       A    To remove the 50-meter boom, then get the 84-meter

16   boom prepared and then installing the machine and then

17   finish installing all the -- you want like a detailed or --

18       Q    Well, a little more than you just gave.

19       A    Okay.  We boom the crane down over the rear.  We get

20   our boom sections positioned to where we need them and we

21   come in, we uncage the manual pin for T3.  We have our

22   assist crane pick up.  We remove our wear pads and we pull

23   the complete section of T3 out and set it on the ground.

24   Then we grab the T6, prepared on the ground, move it into

25   the crane, lock T3 into T2, reinstall the wear pads and then

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    test it.

2        Q    And when you're doing this training, what is

3    Mr. Farris and Mr. D'Angelo actually doing?

4        A    They were just telling the guys what to do.

5        Q    So you give --

6        A    They made the pin.  They were on top of the boom

7    with me on the ladder when we did the pinning section with

8    the T3 pin and then we all went down and then made the wear

9    pads for the boom.

10       Q    When you say "made the pin," you mean locked the

11   pin?

12       A    Locked the pin, yes, sir.

13       Q    And what information or training did you give these

14   two gentlemen on how to lock the T3 pin?

15       A    Unroll it, unlock the pin.  Make sure your bolt

16   through the center is completely loose.  Then slide it to

17   where you need it where the pin will come all the way up.

18       Q    Did you give them any specific information on how

19   far that pin needs to protrude?

20       A    11 millimeters.

21       Q    Where does that come from?

22       A    From the Liebherr book.

23       Q    Did you train them which of the access holes in the

24   T2 section that you need to secure the T3 pin?

25       A    100 percent of T2.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Is that in the manual?

2    A    Yes, sir.

3    Q    And that would be the correct way to assemble the

4    84-meter boom; correct?

5    A    Yes, sir.

6    Q    Not in the 92 percent hole?

7    A    No.  The 100 percent.

8    Q    If you follow the manual and you install the

9    84-meter boom at the point of the access hole, the

10   100 percent access hole, is the T4 pin accessible in any

11   way?

12   A    If you install the T3 pin in the hole at

13   100 percent, no, you cannot get to T4 because it's

14   physically blocked.

15   Q    It's underneath the sheet metal?

16   A    It's underneath the boom.  There's not an access

17   hole.

18   Q    In order to access the T4 pin once it's inserted

19   into the T2 section, you'd need to go past the 100 percent

20   hole in order to get it into the T4 pin, into the incorrect

21   hole which would be the 100 percent hole?

22   A    Yes, sir.

23   Q    So that would be a mistake --

24   A    Yes, sir --

25   Q    -- thank you.  Nothing further.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  Any redirect?

2          MR. GOODMAN:  Yes, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. GOODMAN:

5      Q    Mr. Ward, how long were you in Tampa to do the

6    training?

7      A    Five or six days, sir.

8      Q    And where did you come from before you were at that

9    training?

10     A    Before the training I was in Jacksonville with the

11   load out.

12     Q    And so when you were in Tampa, did you bring

13   equipment with you or did you rely on the equipment that

14   Sims had?

15     A    I relied on the equipment that Sims had.

16     Q    Can you tell me how you measured the T3 locking pin?

17     A    I don't believe we measured it at that time.

18         MR. GOODMAN:  Thank you, sir.

19         THE COURT:  Mr. Cremer, I see that Mr. Ward is also

20   on your witness list.  Are you intending to recall him or

21   may he be excused?

22         MR. CREMER:  He may be excused.

23         THE COURT:  Mr. Ward, if you want to take off the

24   microphone and then step down, then you are free to go.

25         We are going to wait to do the next witness.  This

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    would be a better time to do it and break until 3:00.

2            Who's your next witness, Mr. Goodman?

3            MR. GOODMAN:  The only witness that is here is Steve

4    Stodghill.  And he is the next witness, but we haven't

5    called the witness for after Steve because I understood the

6    Court had a hard break at 5:00 and I didn't want to put

7    somebody on.  If the Court would like me to, I could get

8    somebody lined up after Steve.

9            THE COURT:  How long do you expect Steve Stodghill

10   to be?

11           MR. GOODMAN:  I would expect my direct of him will

12   be at maximum an hour, and I'm not sure how long the defense

13   will be with him.

14           THE COURT:  It seems to me that what would probably

15   make the most sense then is to call Mr. Stodghill today.

16   Worst case scenario, you all get to leave a little bit early

17   and we start tomorrow morning, unless the witness after that

18   is really a quick witness.

19           MR. GOODMAN:  No.

20           THE COURT:  Then I think we should finish

21   Mr. Stodghill today.  Let's take a break until about 3:00

22   and we'll start with Mr. Stodghill.

23   (Brief recess)

24           THE COURT:  You may call your next witness.

25           MR. GOODMAN:  Before we get started, I've spoken

1    with Defense Counsel and we're going to be submitting into

2    evidence Exhibits 93 through 105.  They advised that they

3    have no objection.

4              MR. CREMER:  That's correct, Your Honor.

5              THE COURT:  93, I think, came in with Mr. Vieten.

6    So it would be starting at 94?

7              MR. GOODMAN:  Correct, Your Honor.

8              THE COURT:  You said 94 through -- what was the last

9    number?

10             MR. GOODMAN:  105, Your Honor.

11             THE COURT:  105.  And they'll all come in, then,

12   through Mr. Stodghill?

13             MR. GOODMAN:  That is correct, Judge.

14             THE COURT:  And no objection, Mr. Cremer?

15             MR. CREMER:  No objection.

16             THE COURT:  Exhibits 94 through 105 -- Plaintiff's

17   Exhibits 94 through 105 are admitted.  Thank you.

18    (Plaintiff's Exhibit Nos. 94 through 105 were admitted.)

19             THE COURT:  Mr. Goodman, whenever you're ready.

20             MR. GOODMAN:  Plaintiffs call Steve Stodghill.

21             COURTROOM DEPUTY CLERK:  Sir, come over here to be

22    sworn please.  Raise your right hand.

23    (Witness sworn.)

24             COURTROOM DEPUTY CLERK:  Thank you.  Please have a

25    seat.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1              Sir, please state your name and spell your last name
 2       for the record.
 3              THE WITNESS:  Jack Steven Stodghill,
 4       S-T-O-D-G-H-I-L-L.
 5              THE COURT:  Thank you.
 6                    JACK STEVEN STODGHILL
 7       having been first duly sworn under oath, was examined and
 8       testified as follows:
 9                        DIRECT EXAMINATION
10       BY MR. GOODMAN:
11           Q    Mr. Stodghill, can you advise us where you were
12       employed between 2006 and 2008?
13           A    Yes.
14           Q    Can you tell me?
15           A    Sims Crane & Equipment Company.
16           Q    And how long before that had you been employed at
17       Sims Crane & Equipment Company?
18           A    Since 1975.
19           Q    And you had been employed at Sims continuously from
20       1975 to 2018?
21           A    Yes.
22           Q    What was your last position while employed at Sims?
23           A    President.
24           Q    And after you were president, did you step down at
25       some point?
```

1    A    Yes.

2    Q    And then did you continue to work for at the behest

3    of Sims?

4    A    Yes.

5    Q    And what was your position there?

6    A    Director.

7    Q    I'd like you to turn to Exhibit 93.  You have a book

8    in front of you.  That's the Operator's Manual.  You have

9    the actual Exhibits on that side or you can look at the

10   screen in front of you which will have the exhibits up, if

11   that's comfortable for you.

12   A    Okay.

13   Q    So can you tell me what that is?

14   A    It's an LTM 1500-8.1 Liebherr.

15   Q    And did Sims own that crane in 2018?

16   A    Yes.

17   Q    If you turn to the fourth page in that composite, do

18   you know what that was?

19   A    It's the serial number plate on the mentioned crane.

20   Q    And what was the serial number that was on the

21   Liebherr LTM 1500 that was owned by Sims?

22   A    073386.

23   Q    And if we turn to the next page, it's got a mark on

24   it.  It says, "Jacksonville."

25            Do you know why that was on there?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    That was the port of discharge.

2    Q    I'd like to show you what's been marked as Exhibit

3    94.  Can you tell me what that is?

4    A    That was the invoice for the LTM 1500 8.1 Liebherr

5    crane.

6    Q    Who did Sims purchase the crane from?

7    A    Atlantic Coast Cranes and Machinery.

8    Q    Why did Sims purchase the crane from Atlantic Coast

9    Cranes and Machinery versus purchasing it directly from

10   Liebherr?

11   A    Well, they had it advertised.  We were out looking

12   for one and they had contacted us and offered this machine.

13   We looked at several others that were not available or had

14   already been prior sold before we made a decision.  So we

15   just explored this and made a commitment to purchase it.

16   Q    And you did purchase it through Atlantic Coast

17   Cranes and Machinery?

18   A    Yes.

19   Q    And can you tell me how much you paid for it?

20   A    $3,349,981 U. S. dollars.

21   Q    And now do you understand that this is more money

22   than Liebherr Germany provided it to Liebherr US for?

23   A    Yes.

24   Q    And is it your understanding -- strike that.

25        Do you understand that Liebherr US sold this crane

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    to a company called Schuch?

2         A    Yes.

3         Q    And do you understand that Schuch sold it to

4    Atlantic Coast Cranes?

5         A    Yes.

6         Q    And you understand --

7         A    Or Atlantic Coast Crane received a commission.  One

8    way or the other, however that worked.

9         Q    And why was Sims okay with spending more money on

10   using Atlantic Coast Cranes than just going directly to

11   Liebherr?

12        A    Well, initially, we didn't have a price from

13   Liebherr.  So, you know, we didn't know what that difference

14   was or might be.  But, you know, going through a third-party

15   broker that's familiar with importing equipment, dealing

16   with all of the logistics of the shipping, of the broker

17   charges, providing all of the contact and information,

18   having one point of contact just made it a lot easier to

19   deal with.

20        Q    And did Sims ultimately pay Atlantic Coast Cranes

21   the total amount that it sought for the sale of the crane?

22        A    Yes.

23        Q    I'd like to show you Exhibit 95, and we're going to

24   scroll down.  Could you tell me what this is?

25        A    That was correspondence to where this was a machine

1    that we had not owned before nor were we really familiar

2    with, and, you know, so we did our due diligence in trying

3    to research all of the components and all the options and

4    available lifting attachments that are supposed to be with

5    the crane.

6            So this is one item that was -- that we wanted to

7    confirm was with the crane, which is a Y guide.  It's a lift

8    enhancement feature for the crane that gives it increased

9    capacity.  So that's what that correspondence is in

10   reference to.

11       Q    Who's this email from?

12       A    It's from Wally Jones.

13       Q    Who is it to?

14       A    Myself and Dean Sims.

15       Q    Who is Dean Sims?

16       A    He's the owner of Sims Crane & Equipment Company.

17       Q    What's the date of this?

18       A    August 4th, 2016.

19       Q    And in this email, is Wally Jones providing you the

20   serial number for the crane that you'll be receiving?

21       A    Yes, he is.

22       Q    And can you tell us what that serial number was?

23       A    073386.

24       Q    And I'm going to show you what's been marked as

25   Exhibit 96.  We're going to turn to the second page.  Can

1    you tell me what this is?

2        A     It was just confirming requests that we had asked

3    about as far as how the machine was going to be equipped,

4    updating the availability and including that they were

5    providing a Liebherr factory-trained technician to come to

6    our location for operator maintenance personnel training

7    that was included in the cost or no charge, whichever, you

8    know -- somebody paid for it, but it was included in the

9    cost of our total purchase.

10       Q     You were getting one week at no charge?

11       A     That's what the email says, yes.

12       Q     Did Liebherr US at the training -- strike that.

13             At any time was Sims advised that training on the

14   Liebherr LTM 1500 should be 80 hours instead of one week?

15       A     I'm not aware of that, no.

16       Q     If Liebherr or someone else would have told you that

17   for the LTM 1500 crane operator you need two weeks and not

18   one, but you are going to have to pay for that second week,

19   what would Sims have done?

20       A     With a total being one to two weeks included with

21   the purchase price.

22       Q     What if they said, *no, we're not giving you two*

23   *weeks, we're only giving you one week, but you need 80*

24   *hours,we suggest have 80 hours,* what would you do?

25       A     We would have received the total training that was

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    offered.

2        Q    So Sims would have paid for that?

3        A    Yes.

4        Q    I'd like you to turn to Exhibit 97.  Can you tell me

5    what that is, sir?

6        A    You know, I saw that and I'm not really privy to how

7    it came about, but evidently our employee, Mike LaPierre,

8    saw or knew that we were negotiating with -- for the

9    Liebherr purchase.  And he had contacts at Liebherr through

10   his prior employment and evidently he called them and they

11   were saying that they, you know -- they were wanting an

12   opportunity to quote it direct, that this was well after we

13   had already, you know, entered negotiations with Wally.

14       Q    What's the date of this email?

15       A    It's August 29th, 2016.

16       Q    Thank you, sir.  I'd like you to turn to Exhibit 98.

17   Tell me what this is.

18       A    Again, this was a request that we had to be provided

19   with the Operator's Manual information, which is provided on

20   the flash stick as well as the full load charts on the

21   crane, and they provided that on October 18th.  We

22   acknowledged receipt of that flash stick so that we could

23   have a little prior information on the machine prior to

24   having the crane and not knowing anything about it.

25       Q    And Sims received the Operator's Manual; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A      Yes.

2      Q      And was that flash stick and the information on it

3   provided to Jason D'Angelo?

4      A      I can't say.  I know it was provided to our

5   operations' manager and dispatch that was to provide it to

6   the operators that were on the crane who were going to be

7   assigned to it.

8      Q      So is it Sims' habit and routine practice to provide

9   the Operator's Manual for cranes to the crane operators?

10     A      It's not routine, but on a machine that you never

11  had before and as large a machine as this is, new to us, we

12  just wanted to have some time to evaluate the manual and

13  become familiar with it so that when we did receive some

14  orientation, we would have some -- maybe some intelligent

15  questions, yes.

16     Q      I'd like for you to turn to Exhibit 99.  Can you

17  tell me what this is?  Once you're done, tell me what it is.

18     A      This is just confirmation the crane is arriving on

19  schedule and that they would provide the bill of ladings or

20  the port paperwork that approves us to be able to remove the

21  equipment from the port and that it's tentatively scheduled.

22  And Mr. Lloyd would be the contact for all coordination of

23  our transports and people that we were going to have on the

24  port and what time to be there and pick up.

25     Q      And did that ultimately happen, a pickup of the

1    crane?

2       A    Yes.

3       Q    And where did that happen?

4       A    At the Port of Jacksonville.

5       Q    I'm going to show you Exhibit 100.  Can you take a

6    look at that and tell me what this is?

7       A    That is our internal dispatch system work tickets

8    for assigning equipment and labor to jobs.

9       Q    What was the start date for this job?

10      A    1/18/2017.

11      Q    That's January 18th?

12      A    Yes.

13      Q    And what's the end date for this job?

14      A    January 20, 2017.

15      Q    And where was the job site going to be?

16      A    This was at the Port of Jacksonville, Port

17   Jacksonville and then transported to Tampa.

18      Q    Who were the operators that were involved in the

19   commissioning?

20      A    Jason D'Angelo, Andrew Farris, Robert Cutting -- for

21   the commission or the picking up?

22      Q    For the picking up.

23      A    Yeah.  We had Bernard Wortman, Bobbi Patterson,

24   Johnny Egnor.  Now, some of those guys are transport drivers

25   or apprentices, but they were on the crew that was there to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    transport the machine back to Tampa.

2        Q    This is a big piece of equipment?

3        A    Oh, yes.

4        Q    600 tons?

5        A    Yes.

6        Q    So you need a number of people to be involved;

7    correct?

8        A    Yeah.  I would say there was probably, you know, a

9    dozen -- 10 to 12 personnel there to get the machine back.

10       Q    And do all those 10 to 12 people have different sort

11   of specialities?

12       A    Yes.

13       Q    And they're all there for a specific purpose?

14       A    Yes.  One goal.

15       Q    One goal.

16            And what was that goal?

17       A    To get the machine back to Tampa, Florida.

18       Q    And did the machine get back to Tampa, Florida?

19       A    Yes, it did.

20       Q    I'm going to show you Exhibit 101.  Can you tell me

21   what this is?

22       A    That was a general physical condition report of the

23   components and the crane that was inspected, so that once it

24   arrived in our yard so that if there were any shortages or

25   damages, that we could properly note those and address those

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    issues.

2         Q    And who completed this form?

3         A    I don't see his name on here, but it's Neal.

4         Q    It would have been a Sims' employee?

5         A    Yes, it is.

6         Q    The crane condition -- the crane condition on the

7    report, it's a new machine to Sims?

8         A    No.  It's used.

9         Q    Used.  And what was the delivery date?

10        A    This was checked in on 1/20.  And I'm not real sure

11   when it arrived in the yard being that we were there from

12   the 17th to the 20th whether the crane -- he could have done

13   it the next day or, you know, if it arrived late in the

14   afternoon.  We'd have to look at the actual tickets when it

15   showed up in the yard.

16        Q    And what was the equipment that was arrived?

17        A    2012 Liebherr LTM 1500.

18        Q    Now, that says, "Equipment rented."

19             Do you provide this document to anybody else or is

20   it just an internal document?

21        A    Well, we use it as an internal document.  It

22   addresses the same issues that we have when we deliver or

23   have a return piece of equipment from either going on rent

24   or coming off rent.

25        Q    And does Sims rent cranes from others?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    Yes.

2       Q    And does Sims rent cranes to others?

3       A    Yes.

4       Q    But this crane, was this an owned crane by Sims?

5       A    It was financed, yes.

6       Q    It was a bank?

7       A    Yes.

8       Q    Okay.  But it was Sims Crane; correct?

9       A    Yes.  Correct.

10      Q    And what's the serial number?

11      A    073386.

12      Q    What was the overall evaluation of this machine when

13   it arrived?

14      A    Very good condition.  Very happy with the purchase

15   for a used piece of equipment.  Excellent shape.

16      Q    I'm going to show you what's been marked as Exhibit

17   102.  Can you tell me what this is?

18      A    It's an application for title for the mentioned

19   crane.

20      Q    And Sims received the title for that crane?

21      A    Yes.

22      Q    Sims owned that crane?

23      A    Yes.

24      Q    And from what period of time did Sims own the crane?

25      A    It was from February of 2017 through -- when it was

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   disposed of in 2018.

2       Q    And Sims owned it on the date of the loss, that

3   would have been February 19th, 2018?

4       A    Yes.

5       Q    I'm going to show you what's marked as Exhibit 103.

6   Can you tell me what this first page is?

7       A    That's the actual sticker that goes on the crane for

8   the Florida Department of Transportation.  It's an annual

9   inspection sticker that's required by D.O.T. to put your

10  equipment on the road.

11      Q    And are pages two, three -- excuse me, page two is

12  the annual vehicle inspection report?

13      A    Yes.

14      Q    That's --

15      A    That's the backup for the sticker that's physically

16  on the crane.

17      Q    Did the crane pass all of the D.M V. inspection?

18      A    Yes.

19      Q    I'd like you to turn to the next page NBIS904.  Can

20  you tell us what this is?

21      A    That's the OSHA required annual inspection that is

22  provided annually for cranes.

23      Q    And what year was this done in?

24      A    It's 1/29/18, 2018.

25      Q    And did the crane pass the OSHA inspection?

1    A    Yes.

2    Q    Now, if we go to the last page of this document,

3    which is NBIS907, there's a deficiency and recommendation

4    report; correct?

5    A    Correct.

6    Q    Were there any deficiencies or recommendations that

7    OSHA provided to Sims about this crane?

8    A    None.

9    Q    I'd like you to turn to Exhibit 104.  Can you tell

10   me what this is?

11   A    It's the daily preoperational inspection report for

12   equipment when it operates.

13   Q    Was this an internal document to Sims?

14   A    This is an internal document to comply with OSHA

15   regulations and the manufacturer's recommendations.

16   Q    And would the operator complete this inspection?

17   A    Yes.

18   Q    And would the operator complete this inspection

19   every time prior to the use of the crane?

20   A    Yes.

21   Q    And the month and year of this particular inspection

22   report is what?

23   A    February 2018.

24   Q    Now, if we turn to the next page, we see numbers

25   going horizontally at the top; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Yes.

2    Q    And what do those numbers represent?

3    A    The day of the month.

4    Q    And this is February of 2018?

5    A    Yes.

6    Q    So those numbers represent every day of February of

7    2018?

8    A    Yes.

9    Q    And there are checks under certain numbers.  What do

10   those checks mean?

11   A    That means the crane was operating that day and the

12   operator did his pre-check inspection on the machine for

13   those days when it worked.

14   Q    And so here the crane operated on the 1st, the 2nd,

15   the 5th, the 8th, the 9th, the 10th.  And the date of loss

16   is the 19th; is that correct?

17   A    Yes.

18   Q    And the dates without checks, would that mean that

19   the crane is either at the Sims yard or holding over at a

20   job site?

21   A    Yes.  Or being assembled or disassembled prior to

22   work.

23   Q    It's not actually being used for lifts?

24   A    It's not operable, correct.

25   Q    I'd like to show you what's been marked as Exhibit

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    105.  Can you tell me what this is?

2        A    General safety rules.  That's in our Safety Policy

3    Manual for Sims Crane Equipment.

4        Q    Was this provided to every employee of Sims?

5        A    Yes.

6        Q    Are you a crane operator?

7        A    No.

8        Q    Are you on the business side of Sims?

9        A    Yes.

10        Q    In the position that you were back in 2018, do you

11    understand that Andrew Farris or Shane Burrows violated any

12    of these general safety rules while working on

13    February 16th, 17th, 18th or 19th of 2018?

14        A    No.

15        Q    Sims had the crane insured; correct?

16        A    Yes.

17        Q    With an insurance company?

18        A    Yes.

19        Q    And Sims worked -- did Sims work through NBIS with

20    their insurance?

21        A    Yes.

22        Q    Was Sims paid for the damages that were associated

23    with the damage to the crane that occurred on February 19th,

24    2018?

25        A    We paid for the recovery of the machine back to our

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   yard and there was no -- there was no loss at that point
2   because we did not repair anything on the crane.
3        Q    Ultimately, though, did Sims get paid by its insurer
4   for the damages?
5        A    Yes.
6             MR. GOODMAN:  Thank you, sir.
7             I have no more questions at this time.
8             THE COURT:  Mr. Cremer, any cross-examination?
9             MR. CREMER:  Mr. Pender?
10            MR. PENDER:  I have cross-examination for this
11   witness, Your Honor.
12            THE COURT:  Go ahead, Mr. Pender.
13                     CROSS-EXAMINATION
14   BY MR. PENDER:
15       Q    Mr. Stodghill, good afternoon.
16       A    Good afternoon.
17       Q    I'm Tom Pender.  I met you at your deposition.  Do
18   you remember that?
19       A    Yes, sir.
20       Q    Mr. Stodghill, you were or are one of the four
21   members of Sims Cranes Board of Directors; correct?
22       A    Yes.
23       Q    Are you still a Board of Directors member?
24       A    Yes.
25       Q    And your company, though, you just mentioned the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    claim that NBIS pursued.  Your company, Sims Crane &

2    Equipment Company, it's not a party to this lawsuit;

3    correct?

4        A    No, we're not.

5        Q    I'm correct.

6        A    (No response.)

7        Q    Now, NBIS, as you understand it, has certain

8    responsibilities that they take care of for claims

9    adjustments and investigations on your behalf; right?

10       A    Right.

11       Q    And in this case, Sims Crane was not satisfied with

12   the insurance company's resolution of this crane entirely,

13   were you?

14       A    No, we were not.

15       Q    In your view, Sims Crane did not receive full

16   compensation for the value of that crane that it held prior

17   to the accident; right?

18       A    Right.

19       Q    Sims Crane believes that the actual value of the

20   crane prior to this accident was greater than what was paid

21   to you by your insurance company; correct?

22       A    Correct.

23       Q    Nonetheless, your company, Sims Crane, would like to

24   see NBIS be successful and recover in this lawsuit; right?

25       A    Right.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

 1      Q    And that's because if NBIS is successful, that will

 2  have potential monetary benefit on future insurance rates

 3  and loss ratios for past experiences for your company;

 4  correct?

 5      A    Correct.

 6      Q    Mr. Stodghill, you're not aware of any other

 7  incidents of an improper assembly or disassembly of an LTM

 8  1500 crane while Sims Crane owned it, are you?

 9      A    I'm not.  No.

10      Q    We've been talking about this time period of 2016

11  through 2018.  At that time, Sims Crane had about a dozen

12  locations; correct?

13      A    Correct.

14      Q    Mostly throughout the Florida area?

15      A    Yes, sir.

16      Q    And I think we heard you touch on it.  Your company,

17  Sims Crane & Equipment does what's called bare leasing of

18  cranes; correct?

19      A    Correct.

20      Q    And that means you rent out or you lease the bare

21  crane, just the crane, to -- or a piece of hoisting

22  equipment to lessees?

23      A    Yes, sir.

24      Q    They provide their own operators, their own

25  maintenance; correct?

1    A    Correct.

2    Q    And when Sims Crane bare leases out one of its

3  cranes, your company provides an orientation, like, about

4  the crane, like when a car salesman gives you a review of

5  the safety features of your new car and answers your

6  questions; correct?

7    A    Yes, sir.

8    Q    And so Sims Crane provides the crane lessees with

9  this orientation and overview of the equipment, but you do

10  not provide training to these crane lessees on the

11  equipment, do you?

12    A    No, sir.

13    Q    And that's because Sims Cranes' expectation is that

14  these lessees will be competent and qualified in the

15  operation of that crane; correct?

16    A    Yes.

17    Q    And it's the crane lessees' duty to be competent and

18  qualified to rent the crane out and operate it on a job

19  site; right?

20    A    Yes.

21    Q    It would not be reasonable or fair for that crane

22  lessee that leases your crane to later come back after

23  something bad has happened and say, *Hey, it's not my fault*

24  *that the crane got damaged.  It's your fault for not telling*

25  *me everything there is to know about the crane?*

1          MR. GOODMAN:  Objection.  Calls for speculation.

2          THE COURT:  Go ahead and qualify the question.

3     Reask the question.

4     BY MR. PENDER:

5          Q    I just want to ask you a hypothetical.  One of the

6     reasons why you don't give training and you expect your

7     crane operators, your crane lessees to be competent in that

8     crane is because it wouldn't be fair or reasonable for that

9     lessee to come back after something has happened and claim

10    that an accident is not their fault, that it's Sims Crane's

11    fault; right?  That wouldn't be fair, would it?

12         A    It wouldn't be fair, no.

13         Q    And you believe it was reasonable, right, for Sims

14    Crane -- you believe it is reasonable for Sims Crane to

15    expect that a company that is competent and qualified and

16    leases out one of your cranes is going to use personnel that

17    are competent and qualified in the operation of that crane;

18    right?

19         A    Right.

20         Q    And the same is true for the customers.  The

21    construction companies that hire Sims Crane to do a job, to

22    run a crane with a Sims Crane operator on a job like this

23    Hampton Inn job that we've been talking about, those

24    customers have a right to expect that Sims Crane's operators

25    are going to be competent and qualified on how to run that

1    crane on their job; right?

2        A    Right.

3        Q    Sims Crane is a professional crane operating

4    company.  You hold yourself out as having that expertise;

5    right?

6        A    Yes.

7        Q    The LTM 1500 Liebherr Crane that Mr. Goodman was

8    just asking you about, Sims considered that to be sort of a

9    specialized piece of equipment designated only to be

10   operated by its own employees; right?

11       A    Yes.

12       Q    You would not lease out that crane for use by others

13   because Sims considered it a specialty piece of equipment?

14       A    Correct.

15       Q    And it was such a highly specialized piece of

16   equipment that you didn't want to trust that a customer --

17   trust it to a lessee to run it; right?

18       A    Well, it generates more income with our operator on

19   it than putting it out bare rental.  That was our largest

20   all-terrain crane and we wanted it available for our

21   customers when we had a need for it.

22       Q    And as you mentioned, Sims Crane designated certain

23   of its own employees to be the operators of that crane,

24   Mr. Andrew Farris and Jason D'Angelo; correct?

25       A    Yes.  Yes.

1     Q     And you had certain of your employees designated to

2     be the assembly and the disassembly supervisors for your

3     fleet of crawler cranes and to make certain that those

4     cranes were assembled and operational with all the safety

5     features in accordance with the manufacturer's

6     recommendations; right?

7     A     Yes.

8     Q     Because Sims Crane believed it was its obligation as

9     a safe crane company to be able to assemble and disassemble

10    its equipment in accordance with the manufacturer's

11    recommendations; agreed?

12    A     Agreed.

13    Q     And the persons that Sims Crane designated as the

14    assembly and the disassembly supervisors for this LTM 1500

15    were, again, those two gentlemen you hired to operate it,

16    Andrew and Jason; right?

17    A     Yes.

18    Q     And if I understand it, Sims Crane hired Jason

19    D'Angelo to be the lead operator of the LTM 1500 and Andrew

20    Farris was going to be the backup operator; is that right?

21    A     That's my understanding.

22    Q     Now, the LTM 1500 Liebherr Crane was considered part

23    of your crane operations department; correct?

24    A     Correct.

25    Q     And in 2016 through 2018, your Tampa general manager

1   for that department -- general manager was a guy named Mike

2   Gay; correct?

3       A    Yes.

4       Q    At Sims Crane, the operators that you hire are all

5   required to be certified operators that have both practical

6   and classroom training completed for the equipment that they

7   operate; correct?

8       A    They'd have to be certified in the classes of

9   equipment, not the individual equipment.  In other words,

10  the certification covers a group of equipment that they're

11  able to operate under the regulations.

12      Q    With both practical and classroom training for that

13  group of equipment?

14      A    Yes.

15      Q    So if an operator was going to, for instance,

16  operate an LTM 1500, they would have to have practical and

17  classroom training in that class of equipment; correct?

18      A    Yes.

19      Q    And it was important for your company that the

20  operators have both the practical and classroom training

21  completed for the classes of equipment they would operate.

22  Agreed?

23      A    Yes.

24      Q    It's important for them to have as much training as

25  they need from whatever source in order to operate the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   equipment they are assigned to?

2       A   Yes.

3       Q   So if a Sims Crane operator gets a week of practical

4   training but still doesn't know everything they need to know

5   about the critical aspects of assembling or disassembling

6   that crane, it's the expectation at Sims that we're going to

7   get them whatever extra training they need; agreed?

8       A   Agreed.

9       Q   Your company's not just going to rest on an operator

10  saying, *Hey, I had a week of practical equipment* if you find

11  out that they still don't know everything that they need to

12  know about that crane; right?

13      A   Yes.  Or refresher courses down the road just to

14  make sure that they're up to current on the machine.

15      Q   And get them trained up if they need it?

16      A   Yes, sir.

17      Q   Because that's a safety concern among others; right?

18      A   Yes.

19      Q   You don't want a crane operator running one of these

20  massive cranes if they've not had all the practical and

21  classroom training on the piece of equipment; right?

22      A   Correct.

23      Q   And you would want Mr. D'Angelo and Mr. Farris to

24  have that type of training on the class of cranes, that

25  includes the LTM 1500, because your company was assigning

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    them to that crane as operators; right?

2        A    I would expect that, yes.

3        Q    Now, did Mr. Farris have any practical or classroom

4    training on this piece of equipment he was operating in

5    February of 2018, the Liebherr LTM 1500, that you know of?

6        A    You would have to refer that question to Mike Gay,

7    our operations manager, as a direct supervisor.  I'm not

8    aware of everybody's credentials or when and where they

9    might have had certification or orientation or training.

10       Q    We know Andrew Farris went through the week of

11   training provided by Liebherr USA when you all purchased

12   this crane; right?

13       A    That's my understanding, yes.

14       Q    Now, at Sims Crane, your salespeople and your

15   supervisors also evaluated the operators on a daily basis if

16   they were on a job site to monitor and observe; right?

17       A    On a periodic basis, whether it's daily or weekly,

18   whatever the schedule is, yes.

19       Q    That's important to have supervisory level personnel

20   evaluating and monitoring and observing your operators;

21   agreed?

22       A    Yes.  Agreed.

23       Q    And your company even has a job site audit form that

24   you use to record these supervisory monitoring sessions to

25   make sure that the operators are complying with all the

1   safety requirements of the crane, observing the operator

2   who's operating the crane, et cetera; correct?

3       A    Yes.

4       Q    And those job site audit forms are used and kept --

5   or they're used internally at Sims Crane to, as I say,

6   record these daily or periodic job site audits by your

7   supervisors; right?

8       A    Yes.

9       Q    And these forms would be a way for Sims Crane to

10  check and make sure that the cranes are properly barricaded,

11  they're properly blocked, they're properly set up?  All of

12  that; right?

13      A    Yes.

14      Q    And those job site audit forms, which included the

15  operation of your crane operators, they would be turned in

16  to the individual dispatchers or managers at the different

17  branches; right?

18      A    Yes.

19      Q    But you and Sims Crane, you're not aware if your

20  company archived or kept any of these supervisory audit

21  evaluation forms; right?

22      A    I'm not aware of where those are stored at.

23      Q    Or if they're stored; right?

24      A    I'm not aware of that, no.

25      Q    And you don't know if there were any job site safety

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    forms filled out or turned in for this -- any supervisor who

2    monitored the setup or assembly at the Hampton Inn project

3    where this accident occurred?

4         A     No.  It's not a requirement.  There's not -- it's an

5    internal form used for us just to help our employees do a

6    better job.

7         Q     I understand.  My question is:  You're not aware of

8    any such form that was ever done for any of the work at the

9    Hampton Inn project; right?

10        A     No, sir.

11        Q     And so there's no way for us to know if the company

12   checked or monitored Andrew Farris on the morning of

13   February 19th when he was starting work with this LTM 1500

14   crane; correct?

15        A     Correct.

16        Q     Certainly, the first day of a project when you're

17   setting up a crane, that would sort of be an ideal time for

18   a supervisor to go out to do a job site safety audit; right?

19        A     It just -- it just happens when it happens.  You

20   know, there's no special time.

21        Q     But hypothetically, if a supervisor were out at the

22   Hampton Inn project and they saw an operator setting up the

23   6 section boom and having some significant problems

24   telescoping and moving the booms, that's the type of thing

25   that a safety audit form might involve; correct?

1        A    It could.  I don't know if this was something that

2   was safety-related prior to the incident.

3        Q    The two operators that Sims Crane designated for

4   this crane, Farris and D'Angelo, as you've said, it's your

5   understanding they went through this orientation, this

6   operator training from Liebherr; correct?

7        A    Yes.

8        Q    And in that training, Mr. Farris and Mr. D'Angelo

9   went through the erection procedure, the disassembly

10  procedure, the different boom exchange procedures, the

11  installation and removal of the luffing jib all in your Sims

12  Crane yard; right?

13       A    That's my understanding.  You would have to ask

14  either one of them exactly what training did occur.

15       Q    And, again, at the time that Sims Crane owned that

16  LTM 1500 and during that year that you owned it before it

17  was salvaged, your company held itself out as having

18  expertise in the operation of that crane; right?

19       A    Yes, sir.

20       Q    And at that time during that entire year, Sims Crane

21  held itself out to the public as having expertise in a safe

22  feature -- safety features of that crane; right?

23       A    All of our equipment we do, yes.

24       Q    And at that point during that year, Sims Crane held

25  itself out to the public as having expertise in the safe

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   operation of that crane; agreed?

2      A    Yes.

3      Q    And during that year that Sims Crane owned this LTM

4   1500, it was competent in the safe operation of that crane

5   in your view; correct?

6      A    Yes.

7      Q    And including the assembly, the disassembly, the

8   boom exchange, Sims Crane was competent and qualified in

9   those aspects of the operation of this crane; agreed?

10      A    Agreed.

11      Q    And at all relevant times, Sims Crane felt that

12   Andrew Farris was competent and qualified to operate,

13   assemble and disassemble the line crane based on the

14   training he received from Liebherr USA?  Agreed?

15      A    Yes.  And his on-the-job experience as he was

16   running it through that year.

17      Q    Sims Crane's policy was that an operator, like

18   Mr. Farris, should have read the Operator's Manual for this

19   crane as it applied to the functioning of that crane that he

20   would be performing on a given job or during a given task;

21   correct?

22      A    Yes.

23      Q    So if he were swapping out the booms, the

24   expectation would be Andrew would be referring to and

25   referencing the manual on that specific task at the very

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

 1   least; right?

 2        A    As needed, yes.

 3        Q    And it was Sims Crane's expectation that the

 4   operators like Mr. Farris would take as much time as would

 5   be needed in order for them to be competent and qualified in

 6   the contents of the manual for the tasks that they would be

 7   performing; right?

 8        A    Yes.

 9        Q    He didn't limit Andrew or Jason and say, *hey you*

10   *guys have got a week to read this manual.  That's it.  No*

11   *more.*  You did not limit them in any way, did you?

12        A    No.

13        Q    Sims Crane -- also, it was a policy of Sims Crane

14   that if an operator was unclear or confused about any aspect

15   of the operation of its crane, the operator should stop

16   operation of the crane and call the Service Department or

17   the supervisor; agreed?

18        A    Agreed.

19        Q    And the policy also was that until they receive word

20   back from the Service Department or the supervisor that they

21   stop operation, they refrain from operating the crane and

22   not restart operation until they receive some information

23   back from the supervisor; right?

24        A     If that was the instructions based on the issue at

25   hand, correct, but if it was something that was -- that you

1    could troubleshoot and try to get it repaired, then they

2    would do that.

3        Q    Now, I want to show you what I've marked as --

4            Darrin, if you pull up first Defendants' Trial

5    Exhibit marked for identification as Trial Exhibit 28.

6            If you go to I believe it's the 3rd page of that

7    document.  It's the first one I want to talk to you about.

8    There.  That one (indicating).

9            You were questioned earlier by Mr. Goodman about

10   your knowledge or understanding of Liebherr US selling this

11   specific crane to a company called Schuch HeavyLift;

12   correct?  In general, you were aware of that; right?

13       A    Yes.  Yes.  Well, I knew Schuch -- I didn't know if

14   they really bought it from Liebherr or one of Liebherr's

15   customers at the time, but I knew that it was going through

16   the Liebherr facility to be, you know, prepped.

17       Q    Okay.

18       A    I wasn't privy to the total --

19       Q    And there were numerous communications that we

20   looked at, emails and we looked at some more, where you were

21   getting information from your broker Wally about information

22   that was coming from a man named Bill Adams at Schuch?

23       A    Yes.  Correct.

24       Q    So you were aware of Schuch's involvement in some

25   way in this crane transaction; agreed?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     A    Yes.

2     Q    And were you aware of this document, this contract

3   where Liebherr USA sold this crane 073386 to Schuch

4   HeavyLift where the buyer's address is listed as an address

5   in New York City?

6     A    No, sir.

7     Q    And you see the price there on the right-hand side

8   of $3.1 million, the top price of $3.1 million; correct?

9     A    I do, yes.

10    Q    Now, even though you had never seen those documents

11  before, as I say, you knew somehow that Schuch was involved

12  in the transaction between yourself, Wally Jones and what

13  ultimately became your crane; right?

14    A    Yes.

15    Q    Your understanding is that Schuch HeavyLift is also

16  a crane rental company.  Agreed?

17    A    Yes.  My understanding.

18    Q    I want to show you the next Trial Exhibit I have,

19  which is Defendants' marked for identification as trial

20  Exhibit No. 16.  We'll cull that up in a second.  It will be

21  on your screen.

22         If you back out just a tiny bit so he can see a

23  little bit more of it.

24         I believe you were shown this earlier during

25  Mr. Goodman's examination.  This quote for Liebherr Crane

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    for service, specifically crane training for crane 073386 to

2    a company called Schuch HeavyLift.  That's what the document

3    appears to be; correct?

4        A    Yes.

5        Q    First of all, do you know why in January of 2017

6    Schuch HeavyLift was asking Liebherr US to give them a price

7    for crane training on number 073386?

8        A    No.

9        Q    I'm just wondering why Schuch wouldn't have asked

10   for a quote from LUS to provide training for Sims Crane in

11   Florida?  Do you know why Sims is not even mentioned in this

12   document?

13       A    No, I do not.

14       Q    And you don't see Sims mentioned anywhere in that

15   document, do you?

16       A    No.

17       Q    Do you know if it was Schuch that asked for a price

18   quote for 80 hours of training or if that number 80 hours

19   was suggested by LUS or anyone else?

20       A    I don't know.  I've never seen this document nor did

21   we negotiate with Schuch or Liebherr for the training.  It

22   was handled through Wally Jones with Atlantic Coast Cranes.

23       Q    And at the bottom of this document --

24            Darrin, if you could scroll to the bottom.

25            It says there "No. 1.  Please return signed copy of

 1   this quote to confirm the service."  It doesn't look like
 2   it's signed.
 3         Do you know whether or not anyone ever signed and
 4   accepted this quote for service?
 5         MR. GOODMAN:  Object, Your Honor.  There's no
 6   personal knowledge.  He's already testified he doesn't know
 7   this document.  He has no information about this document.
 8         THE COURT:  He can go ahead and answer the question
 9   now.
10         Go ahead.
11         THE WITNESS:  I have no idea.
12   BY MR. PENDER:
13    Q    Your company did not pay $9600 for 80 hours of crane
14   training, did it?
15    A    No.
16    Q    If we could look at Defendants' Trial Exhibit No. 30
17   marked for identification.  I believe you've looked at the
18   Plaintiff's version of this already, sir, but I wanted to
19   ask you a few questions.
20         This is the document on letterhead from a company
21   called Atlantic Coast Cranes and Machinery of Ashland,
22   Virginia and references a Mr. Waldo Jones and it relates to
23   Atlantic Coast Crane invoicing your company for the sale of
24   this crane to Sims Crane; agreed?
25    A    Agreed.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And this is the sale that we're talking about that

2    was through your broker Mr. (Wally) Waldo Jones; right?

3    A    Yes.

4    Q    And the first page, which is marked LAI2662 there is

5    the -- I think it's the original invoice dated on August 4th

6    of 2016.  Agreed?

7    A    Yes.

8    Q    And then as Mr. Goodman showed you earlier, if you

9    go to, I think, the fourth page of that document, LAI2665,

10   it's a revised version of the invoice.  The invoice got

11   revised a couple of times as the pricing got negotiated and

12   it ended up being a total price of $3.349 million; correct?

13   A    Correct.

14   Q    And this would be equipped -- this crane was going

15   to be equipped with both a 50-meter and 84-meter boom for

16   that crane; correct?

17   A    Right.

18   Q    Sims Crane knew that it had both an 84 and a

19   50-meter boom and the use of that crane would require an

20   exchange of those boom sections?

21   A    Yes.

22   Q    So even though it looks like Liebherr was willing to

23   sell this crane with these same extras for $3.1 million, as

24   indicated earlier, you decided to purchase it from Atlantic

25   Coast Crane for in excess of $3.3 million; right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes, sir.

2      Q    Nothing prohibited Sims Crane from purchasing this

3    crane direct from Liebherr, did it?

4      A    We never received a proposal from Liebherr.

5      Q    Did you ever seek a proposal from Liebherr?

6      A    No, sir.

7      Q    Your company was a willing buyer for this model of

8    crane.  You were looking for this model of crane at the

9    time; right?

10     A    Yes.  This is correct.

11     Q    It looks like since we saw that sales transaction

12   from Liebherr US to Schuch, that Liebherr US was a willing

13   seller of the same crane at the same time; agreed?

14     A    It appears so.  We researched the internet, went out

15   through all of the pertinent sites that -- like your Auto

16   Trader, there's Crane Trader -- and all of the other

17   publications and websites, and Liebherr didn't have this

18   machine advertised at the time.

19     Q    But you never contacted Liebherr to see if they had

20   such a model?

21     A    Did not.

22     Q    Do you know how Schuch found out that Liebherr had

23   this model?

24     A    I understand he has a real good relationship with

25   them over there.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    So on that -- still that same page on Defendants'
2    Trial Exhibit 30 towards kind of the middle at the bottom of
3    the "equipped as follows" list, which starts with the
4    275-foot boom and has many things.
5          And then the last one says, "Liebherr factory
6    trained technician to be provided on site to commission this
7    machine and train Sims personnel at no charge."
8          Do you see that?
9    A    Yes.
10    Q    And that's what your company -- when you bought this
11    crane from Atlantic Coast Crane, that's what Atlantic Coast
12    agreed to provide to your company at no charge, a week of
13    training; correct?
14    A    This doesn't specify the week, but the email prior
15    to did.
16    Q    Did they offer you one week or two weeks or do you
17    recall?
18    A    Just what was in the email that specified one week.
19    Q    Okay.  We'll get to that in a minute.
20          Certainly if Sims Crane felt that its operators
21    needed more than a week of training because, for instance,
22    they had never run a Liebherr LTM 1500 before, you certainly
23    could have -- I think you mentioned earlier you could have
24    asked Wally, *Hey, we need two weeks of training;* right?
25    A    Yes.

1      Q    And you would try to get the two weeks for free if
2  you could, sure.  And if there was any question that
3  Mr. D'Angelo and Mr. Farris were not properly trained after
4  just a week of training, certainly your company would have
5  done whatever it had to do, asked or demanded to get them
6  more training; right?

7      A    Right.

8      Q    And also it talks about the location of the crane
9  being Frankfurt, Germany and the modifications taking place
10  at a Liebherr factory in Ehingen.

11           Sims Crane understood that this LTM 1500 crane was
12  coming from a factory in Ehingen, Germany.  Agreed?

13      A    Agreed.

14      Q    And Sims Crane understood that this crane had been
15  manufactured by that company in Germany; correct?

16      A    Correct.

17      Q    Now, in addition to any training or orientation that
18  your company receives for a used piece of equipment, when
19  adding a new piece of equipment to your fleet, the policy at
20  Sims Crane was that your own personnel would put that piece
21  of equipment through an operational test and analysis when
22  you get it in; right?

23      A    Yes.

24      Q    And that would typically be done by your folks at
25  the Sims Crane yard; right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    Stem to stern, soup to nuts, you want a

3   full-operational test of everything that you're going to

4   need to do on that crane when it comes into the yard; right?

5      A    Yes.

6      Q    And that was done by your people in this case.

7   Agreed?

8      A    That should have been the procedure.  I wasn't out

9   there to experience exactly what was provided, but that's

10  what would have been expected.

11     Q    You're not aware of any concerns that anyone brought

12  out that during the operational testing of this crane they

13  found any deficiencies, are you?

14     A    No.

15     Q    I want to ask you about some of the emails that have

16  already been asked about and some others as well.  If we

17  could start with Defendants' Trial Exhibit 31.  We'll cull

18  it up here for just a second.

19          This appears to be a set of emails, a chain of

20  emails, as we say, and you were on several of them in the

21  chain such -- if we go to page IAI2598, it's the fourth

22  page.

23          If you go to the very bottom of that page, there's

24  an email from Wally Jones at the bottom at 10:50 a.m. on

25  August 5th.  We'll pull that up.

1          Do you see that one?

2     A    Yes.

3     Q    That's from your crane broker Wally to you and your

4     colleague Dean Sims regarding the Liebherr LTM 1500; agreed?

5     A    Yes.

6     Q    And it starts out "Dear Dean and Steve."  Right?

7     A    Right.

8     Q    And then you go to the next page in the Exhibit 2599

9     at the top, that email picks up.  Right there.

10         And Mr. Jones is reporting to you that -- he says,

11    "See Bill Adams, President of Schuch USA, notes on our 2012

12    Liebherr LTM 1500-8.1 that Schuch is supplying to us. See

13    his notes below."  Right?

14    A    Correct.

15    Q    And a little bit down from there, there's a sentence

16    that starts, "He is also working on the drawings and

17    weights."  Do you see that?

18    A    Yes, sir.

19    Q    And the "he" that Wally is referring to is Bill

20    Adams of Schuch?  He's working on that; right?

21    A    Yes.

22    Q    And then there's the next sentence starts with "He

23    will also get us a price on the Liebherr transport stands

24    that we discussed."

25         And, again, the "he" is Bill Adams of Schuch is

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    going to get that price; right?

2         A    Yes, sir.

3         Q    And then the next sentence starts "He" -- and I

4    think that's Bill Adams again -- "has invited you and the

5    Sims' team to tour the Liebherr plant in Ehingen."  Right?

6         A    Yes, sir.

7         Q    And then again at the bottom it says -- the next one

8    it says "he" and I believe that's Bill Adams at Schuch?

9         A    Yes, sir.

10        Q    "Will also supply a Liebherr factory trained

11   technician to come to Tampa (or wherever you want him) to

12   supervise the commissioning of your new crane, and train

13   your operators and maintenance personnel for one week, at no

14   charge."  Right?

15        A    Yes, sir.

16        Q    And that's what Bill Adams of Schuch was negotiating

17   on your behalf with Liebherr; right?

18        A    Yes, sir.

19        Q    Do you know how it was decided that Mr. Adams and

20   Schuch were going to arrange and negotiate with Liebherr to

21   get a factory trained technician to train your people for a

22   week at no charge?

23        A    No, I do not.

24        Q    And you don't know why Mr. Adams, as it was conveyed

25   to you by Wally Jones, was only offering one week of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    training by the Liebherr factory person, do you?

2         A    I do not.

3         Q    But that was satisfactory to Sims Crane; right?

4         A    They were to provide what they felt was necessary to

5    be trained on the machine -- oriented on the machine.

6         Q    Sims Crane would have requested as much time as it

7    took to get familiar with the machine, whether it was three

8    days or three weeks.  Agreed?

9         A    Agreed.

10        Q    And if your personnel needed two weeks of training,

11   three weeks of training, a month of training, in order to

12   safely operate this crane, you could have and Sims Crane

13   would have ordered that amount of training; agreed?

14        A    Yes.

15        Q    Now, we know that your company sent Andrew Farris

16   and Jason D'Angelo to the training.

17             Was there anything stopping Sims Crane from sending

18   as many operators or maintenance personnel or apprentices as

19   they wanted to attend that training?

20        A    Well, actually, I believe there were numerous people

21   out there in the yard that we had.  There was probably 8 to

22   12 people on different given days to just -- it's a nice

23   machine, a beautiful machine out there to see, you know, to

24   learn a little bit about it.

25        Q    But the only people that signed on the training were

1    Andrew and Jason?  The only people that signed as going

2    through the entire training session; right?

3        A    Right.

4        Q    And so, again, my question is:  There was nothing

5    that prevented Sims Crane from having a third operator

6    attend the entire session?

7        A    No.

8        Q    Or having some of the apprentices attend the entire

9    week.  There was nothing preventing that from happening;

10   right?

11       A    Other than other work schedules.

12       Q    And Sims Crane did not send the apprentice Shane

13   Burrows to attend that full training week by Liebherr, did

14   it?

15       A    I'm sorry?

16       Q    Sims Crane did not send an apprentice named Shane

17   Burrows to attend that full week of training, did it?

18       A    I'm not aware.  I don't know.

19       Q    Now, in the same set of emails where Bill Adams of

20   Schuch is negotiating things your company will ultimately

21   get with this crane, he's then communicating those to Wally

22   of Atlantic Coast Crane and Wally is communicating to them

23   to you and to Dean Sims; right?

24       A    Yes.

25       Q    And Mr. Adams, though, of this Schuch HeavyLift is

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the one that is communicating with Liebherr on behalf of the

2    entire broker group; correct.

3        A    Yes.

4        Q    For instance, if we look at the very first email in

5    that chain, on the last page of that email the chain starts,

6    last page is 2602 -- get to it in a second -- that's an

7    email to you from Wally Jones, the first one in this chain,

8    again, August of 2016 and you say to Wally, "Thanks.  Before

9    we push the deposit, we need to confirm the Y-guide is

10   included," closed quote; correct?

11       A    Yes, sir.

12       Q    And the next email up in the chain is Mr. Jones'

13   response to you where he is passing on information that he

14   has obtained -- still on August 4th of 2016 at 3:58 p.m. --

15   and Wally says to you: "Dear Steve, Bill Adams has

16   confirmed, just confirmed the serial number."

17            And then he says, "He" -- I assume that's Bill

18   Adams; right?

19       A    Yes.

20       Q    "He will also confirm that this crane includes the

21   Y-guide boom suspension....  that you requested."

22            That's what it says; right?

23       A    Yes, sir.

24       Q    So, again, anyone reading this email understands

25   that the person making all of the outrage communications to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the Liebherr on your behalf was the lead person was this

2    Mr. Adams of Schuch.  Agreed?

3        A    Yes.

4        Q    And I guess what you were saying earlier, when

5    Counsel was asking you questions, was the reason why you use

6    a broker like a Wally Jones or Bill Adams is so that you

7    don't have to take care of these issues.  You don't have to

8    be involved in the communications; right?

9        A    Correct.

10       Q    Adams and Jones keep you out of the loop and out of

11   the -- they keep you out of the communications and the

12   negotiations with Liebherr; right?

13       A    Right.  What time is it in Germany right now?

14       Q    I'm sorry?

15       A    What I'm saying is that he stayed up many nights and

16   mornings, you know, trying to get that information for us,

17   so that's correct, so I didn't have to deal with it.

18       Q    And there's another example of how Mr. Jones and

19   Mr. Adams kept Sims Crane out of the flow of communications.

20   If you take a look at what I marked as Defendants' Trial

21   Exhibit 36, which is an email to you -- and we'll get there

22   in a second.  That one is dated November 28th of 2016 and

23   it's regarding the LTM 1500 crane; agreed?

24       A    Yes, sir.

25       Q    And it's from Wally Jones of Atlantic Coast and it's

1    to you and your colleague Dean Sims and some other folks.

2         Mike Gay is on that as well?

3    A    Yes, sir.

4    Q    And he writes: "Dear Dean and Steve, Bill Adams,

5    President of Schuch was at the Liebherr plant in Ehingen

6    last Friday for the final inspection of your 2012 LTM 1500."

7    Right?

8    A    Yes, sir.

9    Q    So apparently the folks at Liebherr Ehingen, in

10   terms of meeting the person that was buying this crane, they

11   met Mr. Bill Adams; right?

12   A    Yes, sir.

13   Q    And towards the middle of that email, there's a

14   sentence, middle bottom, that starts, "As you know" -- we'll

15   get there in a second.

16        And it says, "As you know, delivery to Jacksonville

17   is scheduled for January 9th, and we will schedule the

18   Liebherr factory technician being dispatched from the

19   Liebherr Newport News plant to be in Tampa around

20   mid-January."  Correct?

21   A    Yes, sir.

22   Q    The "we" being either Wally or Bill Adams or both of

23   them, they're going to make that arrangement with Liebherr;

24   correct?

25   A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And he goes on to say, "But we will get the machine

2    delivered."  Mr. Jones and Mr. Adams of Schuch will get that

3    machine delivered; right?

4    A    Yes, sir.

5    Q    And then We'll let you direct us on when the

6    Liebherr crane tech -- I'm going to slow down.

7         "Then we will let you direct us," meaning Wally and

8    Bill, "as to when the Liebherr crane tech should be in

9    Tampa."  Right?

10   A    Yes, sir.

11   Q    "Thank you for the order," et cetera.  So, again,

12   Mr. Adams of Schuch was setting up the crane training and

13   when that trainer was going to show up in Tampa; right?

14   A    Yes.

15   Q    I believe you were asked this earlier, but I want to

16   ask a few more questions.  You were asked about receipt of

17   the flash stick of the Operator's Manual earlier.

18        And, Darrin, if you could cull up Defendants'

19   Exhibit 33 marked 33 for identification.  On the second page

20   of that, that starts with Wally Jones to someone named Bobbi

21   Revels and cc'd to you and Mike Gay dated October of 2016?

22   A    Yes.

23   Q    And it says, "Thank you, Bobbi" -- Wally is saying

24   this.  "Thank you, Bobbi.  Did you receive the flash stick

25   with the LTM 1500 Operator's Manuals?"  Right?

1      A    Yes.

2      Q    And then if we go back to the first page of that

3  Exhibit at the very bottom, your colleague at Sims Crane,

4  Bobbi Revels, replies to Mr. Jones and c.c.s you.  This is

5  in October 24th of 2016.  "Good afternoon, Wally.  Yes.  We

6  received the flash stick."  Right?

7      A    Yes.

8      Q    And so, again, one reading this email understands

9  that Wally Jones has shipped your company a flash stick of

10  the Operators's Manual for this LTM 1500 crane that he must

11  have obtained from Liebherr; right?

12      A    Yes.

13      Q    And then the procedure at Sims Crane, once you've

14  got the flash stick of the Operator's Manual, is to get it

15  downloaded and tell everybody, you know, that's going to be

16  associated with or assigned to this crane, to start reading

17  up on that material in advance of the crane coming in;

18  right?

19      A    Yes, sir.

20      Q    And so you get it in October.  We know the crane

21  comes in January.  So your folks had about three months of

22  time to just read that Operator's Manual; right?

23      A    Yes.

24      Q    And as you mentioned, one of the reasons why they

25  would want to read it in advance of getting the crane was so

1    that they can be more engaged and ask a lot of questions

2    during the training if they have any confusion at all having

3    read the manual; right?

4         A    Yes.

5         Q    So that, after three months of time to review this

6    manual, if Jason D'Angelo or Andrew Farris had questions

7    about what is this T4 pin and what do I do with that, they

8    can ask those kinds of questions at the training; right?

9         A    If that would have been evident to them, correct.

10   Typically, when you get these manuals, there's -- a lot of

11   the stuff is pretty generic that you go over and it's really

12   hard to understand what you're reading a lot of times,

13   unless you're actually -- you have the machine in front of

14   you and performing that task at hand when you're seeing it.

15   Reading it sometimes, it's a little Greek but, yes, if

16   there's anything that stood out that was unusual so that

17   they could be aware to ask questions about it.

18        Q    And we've talked about a lot already about the

19   communications with Liebherr that were conducted on your

20   behalf by Bill Adams of Schuch.  You're not aware of anyone

21   at Sims Crane that ever communicated to Liebherr US or

22   Liebherr Germany that your company was taking title to this

23   crane or that it did take title to this crane, are you?

24        A    Prior to the purchase?

25        Q    At any time prior to the accident.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A     Well, I talked to John Ryalls with Liebherr US and

2  ordered additional parts for this machine that weren't

3  available with it from Liebherr and it was for this

4  particular machine.  It was in March of '17, just after

5  receipt of the machine, and, yeah, so John Ryalls, and I

6  believe he was in Houston.

7      Q     You're not aware of anyone at Sims Crane that ever

8  communicated to Liebherr Germany that your company was

9  taking title to this crane?

10         MR. GOODMAN:  Objection, Your Honor.  Asked and

11  answered.

12         THE COURT:  Answer it again.

13         Go ahead and finish asking your question.

14 BY MR. PENDER:

15      Q     You're not aware of anyone at Sims Crane that ever

16  communicated with Liebherr US or Liebherr Germany that your

17  company was taking title to this crane or it did take title

18  to this crane, are you?

19      A     Yes.

20      Q     You are aware of someone?

21      A     Yes.  Myself.

22      Q     Do you remember giving a deposition in this case?

23      A     I do.

24      Q     I want to ask you a question about your deposition.

25  It's page 103 of your deposition, and it's lines 2 through

1    5.  This is a question I asked you.  Do you recall giving a

2    deposition and being under oath?

3        A    Yes, sir.

4        Q    And you remember I was there and I was asking you

5    questions; right?

6        A    Yes.

7        Q    And you answered those questions truthfully when I

8    took your deposition; agreed?

9        A    Yes.  I understood the questions at that time, yes.

10       Q    And this is a question I asked you: "Did Sims Crane

11   ever notify Liebherr US or Liebherr Germany that it was

12   taking title to this crane or that it did take title to this

13   crane?"

14            Your answer: "No, not that I'm aware of."

15            Do you recall giving that answer under oath?

16       A    Yes.

17       Q    And that was correct; right?

18       A    No.

19       Q    It was the wrong answer?

20       A    It was the wrong answer.

21       Q    I want to show you what I have marked for

22   identification as Defendants' Trial Exhibit No. 45.  It was

23   a document produced by your company and I asked you about it

24   in your deposition.  Do you recognize this?  It's a Liebherr

25   document that has contact information for the service and

1    parts teams?

2        A    Yes, sir.

3        Q    And this was a sheet that your company produced and

4    was found in the business records at Sims Crane.  Agreed?

5        A    Yes, sir.

6        Q    And you believe you had requested from Wally Jones

7    that he send you that contact information bearing all of the

8    telephone numbers that you could contact Liebherr Service

9    Department, their operator's dispatch, et cetera; right?

10       A    We actually had prior experience with Liebherr

11   through their crawler division and buying some crawler

12   equipment, so some of this information we already had.  We

13   had made contact with them.  And so, through the process of

14   ordering this machine, you know, I understood that there was

15   a different division that handles the altering cranes versus

16   the crawler cranes.

17       Q    But in any event, your company had all of this

18   contact information at its availability; right?

19       A    Yes, sir.

20       Q    Including technical support numbers and field

21   service managers and coordinators, contact information for

22   all of them; agreed?

23       A    Yes, sir.

24       Q    And it's your expectation that that Liebherr contact

25   info was made available in the event that any of your

1    operator dispatch people needed to contact Liebherr for

2    assistance; agreed?

3        A    Agreed.

4        Q    I want to look at another, an Exhibit that --

5             THE COURT:  Mr. Pender, is there an exhibit number

6    for that last document?

7             MR. PENDER:  Sorry.  We've marked it as Defense

8    Exhibit No. 45 for identification.  I'm going to move for

9    admission of all these at the end of my thing.  I'll let

10   Mr. Goodman look over these documents to see if he has any

11   issues with that.

12   BY MR. PENDER:

13       Q    If you could enlarge it a little bit at the 6 to 10

14   rule, we'll take a look at that.

15            That's what Mr. Goodman was showing you earlier, the

16   General Safety Rules at Sims Crane, sir?

17       A    Yes, sir.

18       Q    Darrin, you're little bit out of screen with the

19   screen here.  Not that anybody is necessarily using the big

20   screen, but I don't know if there's -- there you go.

21            And No. 6, it's a General Safety Rule that an

22   operator has to report any unsafe condition to a manager or

23   supervisor immediately regardless if the condition directly

24   affects you.  Agreed?

25       A    Agreed.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And so if Andrew Farris ran into a problem operating

2    this LTM 1500 on the date of this accident and he called his

3    supervisor, that would have been a correct thing for him to

4    do under those rules; right?

5    A    You would have to get with him and his supervisor at

6    the time of the call as to whether or not it was -- it was

7    considered to be an unsafe condition with the pin not

8    pinning and him just trying to redo the pinning situation,

9    but I wasn't there.  I'm not an operator.  I wasn't involved

10   with that phone call, so I don't know whether or not he

11   considered it an unsafe condition at the time.

12   Q    What No. 6 says, "Report any unsafe condition."

13   Agreed?

14   A    Agreed.  I'm not aware that that's an unsafe

15   condition.

16   Q    Hypothetically, if Andrew had run into a condition

17   that was potentially unsafe, No. 7 says, "If at any time you

18   are unsure of how to perform an assigned task, STOP," and

19   stop is in all caps and bolded.  Agreed?

20   A    Agreed.

21   Q    That's something that is required of operators if

22   they run into any unsafe condition.  Agreed?

23   A    Agreed.

24   Q    And then No. 8 is a safety rule that says, "Do not

25   remove or bypass any guards on any machinery at any time."

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Agreed?

2        A    Yes.

3        Q    So if an operator bypassed the safety mechanism of a

4    machine and did something manually, that would be a

5    violation of those rules.  Agreed?

6        A    Not necessarily.  I mean, operating something

7    manually is not necessarily removing or bypassing guards.

8        Q    If it did, that would be improper?

9        A    Yeah.  It would be, yes.

10       Q    And No. 10, hypothetically, if an operator ran into

11   an unsafe condition, the rule is "Do not attempt to repair

12   or tamper with the equipment that is not working properly.

13   Immediately report the condition to your manager

14   supervisor."  Agreed?

15       A    Agreed.

16       Q    So hypothetically, if an operator like Andrew had

17   run into a situation where the crane needed -- an unsafe

18   condition, Rule No. 10 would prohibit him from attempting to

19   repair or tamper with the equipment if it was not working

20   properly.  Agreed?

21       A    Agreed.

22       Q    Is it your position -- is it Sims Crane's position

23   that Sims Crane made no mistakes when operating the crane on

24   date of this accident?

25       A    I was not involved with the investigation, just the

1   deposition, and I'm not aware of anything that we did

2   improper on the job site.  I'm not aware of anything, no.

3       Q    From your perspective, you're not aware of Sims

4   making any mistakes on that day.  Agreed?

5       A    Right.

6          MR. PENDER:  That's all I have.  Thank you,

7   Mr. Stodghill.

8          THE COURT:  Mr. Goodman, redirect?

9          MR. GOODMAN:  Sure thing, Your Honor.

10                REDIRECT EXAMINATION

11  BY MR. GOODMAN:

12      Q    Mr. Stodghill, you were shown a number of the

13  exhibits back in 2016 regarding the purchase of the crane

14  and that negotiation between Liebherr and Schuch and Schuch

15  and Atlantic Coast Cranes and Atlantic Coast Cranes and

16  Sims.  Do you recall seeing that?

17      A    Yes.

18      Q    I want to show you Exhibit 44.  Can you tell me what

19  this is?

20      A    That is a correspondence on the machine.  You know,

21  we understood that it was not going to have the full

22  compliment of luffing jib attachments and we researched what

23  we would need, and we -- looks like we originally called our

24  crawler crane contact and they forwarded us to the

25  all-terrain division contact to order the parts.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And what's the date of this email?

2      A    Date of that email is February 3rd, 2017.

3      Q    And it's from you?

4      A    Yes, sir.

5      Q    To a Liebherr employee?

6      A    Herzog --

7      Q    Wolfgang?

8      A    To a Liebherr employee, yes.

9      Q    It says, "We currently have a 70-meter N230-foot

10   luffing jib for our 2012 LTM 1500-8.1 serial number 073386

11   and would like to have pricing for the full maximum luffer

12   jib of 299 feet."  Right?

13     A    Yes.

14     Q    Do you use the word "our" in there?

15     A    Yes.

16     Q    What was the intent of that email?

17     A    The intent was to order parts through Liebherr for

18   that crane.

19     Q    Did you obtain those parts?

20     A    Yes.

21     Q    Were those parts sent to your Tampa location?

22     A    Yes.

23     Q    Did anybody have to call you and ask you for the

24   address?

25     A    I believe after contacting the individual on this,

1    Wolfgang Herzog, that I was referred to the all-terrain

2    crane division, which was a separate division, so we had to

3    set up a new credit app with all of our shipping

4    information, billing information, and that's where we made

5    the arrangements to get set up in the all-terrain side of

6    their company.

7        Q    And you did that?

8        A    Yes.

9        Q    During that period of time, did you communicate to

10   the individual you were speaking with at Liebherr that you

11   owned this Liebherr LTM 1500?

12       A    Yes.

13       Q    At any time, did Liebherr advise you that you had to

14   send something in writing advising that you owned this

15   Liebherr LTM 1500?

16       A    No.

17       Q    I'd like to show you Exhibit 52.  Do you know who

18   Bob Sneed is?

19       A    Yes.

20       Q    Is he a Sims' employee?

21       A    He's in our Parts Department, yes.

22       Q    And do you understand this was an email from Bob

23   Sneed to Jason Cupp at Liebherr US on September 12th, 2017

24   for additional parts?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And did Sims receive parts from Liebherr for the LTM

2    1500?

3    A    I don't know.  I don't know about these parts.  I'm

4    sure we did, but I don't know.

5    Q    You received the luffing jib; correct?

6    A    Yes.

7    Q    That was mailed to your Tampa location?

8    A    It was shipped by truck, large components.

9    Q    Sims paid for that?

10    A    Yes.

11    Q    Now, you were asked about Sims purchasing the

12    Liebherr LTM 1500 through Atlantic Coast Cranes and it cost

13    Sims more money than it would have just to go to Liebherr

14    directly; correct?

15    A    Correct.

16    Q    So would it be Sims' intent, if there was value

17    added, to spend some extra money for that value added?

18    A    Yes.

19    Q    So if someone told Sims that you need two weeks' of

20    training and not just one week and you need to pay for that

21    second week, would Sims have paid that money to get that

22    second week?

23    A    Yes.

24         MR. GOODMAN:  No more questions, Your Honor.

25         THE COURT:  Thank you.

1              MR. GOODMAN:  Just for the record, we have no

2      objection to the Defendants' exhibits.

3              THE COURT:  I kept a list, but I'm sure you did too.

4      So all of the ones that came through, I can go ahead and run

5      through the numbers too if you want to.

6              MR. GOODMAN:  If you'd like, Your Honor.

7              THE COURT:  Would you like to, Mr. Pender?  Are we

8      finished with Mr. Stodghill?

9              MR. PENDER:  I am finished.

10             THE COURT:  You may step down.  And if you're

11     subject to recall at all?

12             MR. GOODMAN:  Not by the plaintiff, Your Honor.

13             THE COURT:  I was going to say, maybe catch him on

14     his way out.

15             The Exhibit Number -- let's just go through this

16     that I wrote down, and if there's any discrepancy here you

17     all can address that and we can deal with it tomorrow.  So

18     Exhibit 149 -- and that's the one where there was an

19     objection to.  That's the one that had the remedial measure

20     issue.  There's Exhibit 28, 16, 30, 31, 36, 33 and 45.

21     That's what I wrote down.

22             Is that what you have, Mr. Pender?

23             MR. PENDER:  That's correct.

24             THE COURT:  So are you objecting to the

25     admissibility of any of those then?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          MR. GOODMAN:  The only one we had an objection to,

2     I'm not sure it was within that, was the subsequent remedial

3     measure.

4          THE COURT:  That was 149 and it is in there.  And I

5     let him ask generally just about the equipment and was not

6     intending to consider it as far as any subsequent remedial

7     measure went.  It's funny.  Usually Liebherr would be

8     objecting to something that's a remedial measure.  But I

9     will go ahead and admit it even over the objection, keeping

10    in mind, of course, that this is not a jury trial and I'm

11    going to disregard any aspect of it being a remedial

12    measure.

13         So otherwise, the other exhibits then are fine,

14    Mr. Goodman?

15         MR. GOODMAN:  Yes, Your Honor.

16         THE COURT:  So then all of those exhibits.  And I'll

17    just state them again.  So 149 over objection is admitted.

18    Exhibit 28, Exhibit 16, Exhibit 30, Exhibit 31, Exhibit 36,

19    Exhibit 33 and Exhibit 45 are all admitted.

20    (Defendants' Exhibit Nos. 149, 28, 16, 30, 31, 36, 33, 45

21 were admitted)

22         MR. PENDER:  Thank you.

23         THE COURT:  We are in recess.  We can go off the

24    record.

25 (Discussion had about scheduling off the record.)

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    (Court adjourned at 4:35 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

        UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1

2   UNITED STATES DISTRICT COURT  )

3                                )

4   MIDDLE DISTRICT OF FLORIDA    )

5

6           I, SHARON A. MILLER, Official Court Reporter for the

7   United States District Court, Middle District of Florida, do

8   hereby certify that pursuant to Section 753, Title 28,

9   United States Code that the foregoing is a true and correct

10  transcript of the stenographic notes taken by computer-aided

11  transcription taken in the above-entitled cause by the

12  undersigned and that the transcript format is in conformance

13  with the regulations of the Judicial conference of the

14  United States.

15  /S/Sharon A. Miller, CSR, RPR, CRR, FCRR

16  Official Court Reporter

17

18

19

20

21

22

23

24

25

    UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION