UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

-   -   -

HONORABLE AMANDA ARNOLD SANSONE
UNITED STATES MAGISTRATE JUDGE PRESIDING

```
NBIS CONSTRUCTION & TRANSPORT,      )
INSURANCE SERVICES, INC., a/s/o     )
SIMS CRANE & EQUIPMENT COMPANY,     )
                                    )
              PLAINTIFF,            )
                                    )
          VS:                       )8:19-CV-2777-VMC-AAS
                                    )
LIEBHERR-AMERICA, INC., d/b/a       )
LIEBHERR USA, CO., and              )
LIEBHERR CRANES, INC.,              )
                                    )
              DEFENDANTS.           )
```

BENCH TRIAL - VOLUME III
REPORTER'S REPORT OF PROCEEDINGS
FEBRUARY 9, 2022
TAMPA, FLORIDA

SHARON A. MILLER, CSR, RPR, CRR, RMR
IL CSR 084-2617
FEDERAL OFFICIAL COURT REPORTER
801 N. FLORIDA AVENUE, SUITE 13A
TAMPA, FLORIDA 33602

Proceedings recorded by mechanical stenography,
transcript produced by computer-aided transcription

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   APPEARANCES OF COUNSEL:

2   ON BEHALF OF PLAINTIFF:

3           COZEN O'CONNOR
            BY:  MR. JOSHUA ROSS GOODMAN
4                MR. JOSEPH FRANK RICH
            200 South Biscayne Boulevard, Suite 3000
5           Miami, FL  33131
            (305) 704-5940
6           jgoodman@cozen.com
            jrich@cozen.com
7
            COZEN O'CONNOR
8           BY:  MS. MARIA ERMAKOVA
            175 Greenwich Street, 55th Floor
9           New York, NY  10007
            (212) 883-4902
10          Mermakova@cozen.com.

11

12  ON BEHALF OF DEFENDANTS:

13
            CREMER, SPINA, SHAUGHNESSY, JANSEN & SIEGERT
14          BY:  MR. WILLIAM J. CREMER
                 MR. THOMAS R. PENDER
15               MR. CONNOR SINGLETON
            One North Franklin Street, 10th Floor
16          Chicago, Illinois 60606
            (312) 726-3800
17          wcremer@cremerlaw.com
            tpender@cremerlaw.com
18          Csingleton@cremerlaw

19

20

21

22

23

24

25

    UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1
 2                     I   N   D   E   X
 3   WITNESSES                                      PAGES
 4
 5                   ANDREW FARRIS
 6   Direct examination by Mr. Goodman                7
 7   Cross examination by Mr. Cremer                108
 8   Redirect examination by Mr. Goodman           160
 9   Recross examination Mr. Cremer                165
10
11                   SHANE BURROWS
12   Direct examination by Mr. Goodman             167
13   Cross examination by Mr. Cremer               178
14   Redirect examination by Mr. Goodman           187
15   Recross examination by Mr. Cremer             187
16                    BOB BERRY
17   Direct examination by Mr. Goodman             190
18   Cross examination by Mr. Pender               215
19   Redirect examination by Mr. Goodman           249
20
21               CHRISTOPHER ALLEN PEEK
22   Direct examination by Mr. Goodman             251
23   Cross examination by Mr. Cremer               261
24
25
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1                 E   X   H   I   B   I   T   S

2    <u>Plaintiff's Exhibits</u>

3    No. 112                                          175

4    No. 113                                          175

5    No. 111                                          193

6    Nos. 114 through 117                             214

7    Nos. 2, 7, 9 and 10                              249

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TAMPA, FLORIDA; FEBRUARY 9, 2022
 2                            -   -   -
 3               (COURT IN SESSION AT 9:02 A.M.)
 4               THE COURT:  Okay.  Anything we need to address
 5      before plaintiffs call their next witness?
 6               MR. GOODMAN:  There are some exhibits, Your Honor.
 7      We've gone over Exhibits 106, 107, 108, 109.  I don't
 8      believe there are any objections.
 9               MR. CREMER:  No objection.
10               MR. GOODMAN:  There is an objection to 110 about its
11      admissibility at this time.  There's an objection to 111
12      about its admissibility at this time.  110 is the ASME 30
13      and 111 is the Code of Federal Regulations, Title 29, Part
14      1926.
15               THE COURT:  Okay.  What's the objection to 110?
16               MR. CREMER:  Well, actually, it's the same for both.
17      These are standards that certainly a layperson like
18      Mr. Farris has no expertise to determine whether they are or
19      are not applicable in this case.  There hasn't been a
20      foundation as to whether these standards are applicable or
21      not.  I have no problem with them referring to the
22      standards, but the admissibility of those standards into
23      evidence I think is inappropriate at this point in time.
24               THE COURT:  And when are you intending to ask
25      Mr. Farris about with regard to these two exhibits?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       MR. GOODMAN:  Just some of the definitions in them

2   and how they're applicable, but we would agree to the rest

3   of the characterizations made by the defense regarding their

4   argument.

5       THE COURT:  So you're just going to ask if he's

6   aware of the definitions and if he understands the

7   definitions?

8       MR. GOODMAN:  No, just if he met some of those

9   definitions.

10      MR. CREMER:  I don't object to him including whether

11  he complied with ASME or OSHA.  He can talk about what he

12  did, but to then relate that as being compliant with a

13  particular standard, I think, is outside his expertise.

14      THE COURT:  And I agree, that's something to address

15  with the expert based on the facts that you elicit from

16  Mr. Farris.  So to the extent that you want to ask him about

17  the definitions and if he's aware of definitions or aware of

18  the standards, those are questions I think you can ask.

19      To the extent that you're wanting to admit these

20  through him as if he had some type of expertise with them,

21  that would not be appropriate.  It would be more appropriate

22  for your expert.

23      MR. GOODMAN:  That's fine, Your Honor.

24      THE COURT:  So at this point 106, 107, 108 and 109

25  of plaintiff's exhibits are admitted.  110 and 111 will not

1    be admitted through this witness.  Of course, if you want to
2    generally ask about those standards and if he's aware of
3    them, you may.  And if he's aware of the definitions, you
4    may, but any type of conclusion based on those standards
5    would not be appropriate for a fact witness.
6            MR. GOODMAN:  Thank you, Your Honor.
7            THE COURT:  Go ahead and call Mr. Farris.
8            MR. GOODMAN:  The plaintiffs call Andrew Farris.
9    (Witness sworn.)
10           THE WITNESS:  Yes, ma'am.
11           DEPUTY COURTROOM CLERK:  Thank you.  Please have a
12    seat.
13           COURTROOM DEPUTY CLERK:  Sir, can you state your
14    name for the record.
15           THE WITNESS:  Andrew Farris.
16           THE COURT:  Mr. Goodman, whenever you're ready.
17           MR. GOODMAN:  Thank you, Your Honor.
18               ANDREW FARRIS,
19    having been first duly sworn under oath, was examined and
20    testified as follows:
21               DIRECT EXAMINATION
22    BY MR. GOODMAN:
23        Q    Mr. Farris, who are you presently employed with?
24        A    Sims Crane.
25        Q    How long have you been employed with Sims Crane?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        A    November of 2015.  Ten years.  Yes, sir.
 2        Q    You're continuing to be employed by Sims?
 3        A    Yes.
 4        Q    And you were employed continuously during that time?
 5        A    Yes.
 6        Q    Before we get started, I just want to talk about
 7   some definitions and discuss some terms we're going to be
 8   using.
 9             Are you familiar with the events that occurred on
10   February 19th, 2018 when a 2012 Liebherr LTM 1500 had an
11   uncontrolled retraction of boom section 6, 5 and 4 while
12   being operated by you?
13        A    Yes.
14        Q    And if I refer to the loss today or the incident,
15   can we agree that that's the loss or the incident?
16        A    Yes.
17        Q    And if I refer to Sims, I'm referring to the company
18   that you work for, okay?
19        A    Yes.
20        Q    And if I refer to the crane or the crane at issue,
21   discussing the Liebherr LTM 1500 that you were operating,
22   okay?
23        A     (Nodding head.)
24        Q    How old were you when you first started your
25   education in the crane industry?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
1        A    18 going on 19.

2        Q    And how old are you now?

3        A    38.

4        Q    So you've been doing it for 20 years?

5        A    Yes.

6        Q    And how did your education in the crane industry

7   start?

8        A    Through the international union and operator's

9   engineers --

10       Q    Can you tell us --

11       A    -- went throughout apprenticeship program.

12       Q    Can you tell us about the apprenticeship program?

13       A    Basically, it's on-the-job training and classroom

14  training once a week and you have to meet a certain amount

15  of hours to graduate.

16       Q    What were -- do you recall what the classroom hours

17  were?

18       A    I believe it was 8,000 hours total was to graduate.

19       Q    8,000 hours of classroom and on-the-job training?

20       A    Right.

21       Q    And did you complete those 8,000 hours?

22       A    I did.

23       Q    And did you complete the apprenticeship program

24  successfully?

25       A    I did.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Were you graded in the apprenticeship program?

2    A    No.

3    Q    It's either a pass or a fail?

4    A    Pretty much.

5    Q    After your apprenticeship program, did you take a

6    test to become certified?

7    A    Yes.

8    Q    And what test was that?

9    A    The NCCO test.

10   Q    Did you pass that on the first attempt?

11   A    I did.

12   Q    And what does the NCCO test involve?

13   A    Basically about the rules and regulations of cranes

14   and practical applications of cranes.  So you have to take a

15   written exam and a practical exam on a crane.

16   Q    So you take a written exam and a practical exam?

17   A    Yes.

18   Q    And you passed both the written exam on the first

19   time?

20   A    Yes.

21   Q    Did you pass the practical exam on the first time?

22   A    Yes.

23   Q    After you obtained your NCCCO certification, did you

24   become employed?

25   A    I was already employed at Kelly Equipment at the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    time.

2        Q    What's Kelly Equipment?

3        A    It's another crane company in the area.

4        Q    And how long were you with Kelly Equipment?

5        A    Six years.

6        Q    And what did you do for Kelly Equipment.?

7        A    I went through the apprenticeship program and I was

8    also an operator.

9        Q    And what kind of cranes did you operate at Kelly

10   Equipment?

11       A    Telescopic boom cranes, crawler cranes mostly.

12       Q    Is the telescopic boom crane similar to the crane,

13   the Liebherr LTM 1500?

14       A    It is.

15       Q    And when did you start operating telescopic boom

16   cranes?

17       A    In 2002, 2003 is when I joined my apprenticeship

18   program and it was pretty much right away.

19       Q    So --

20       A    I didn't start operating on my own until a couple

21   years after that.

22       Q    But from that time until today, you've been

23   operating telescopic boom cranes?

24       A    Yes.  A variety of cranes.

25       Q    How many types of cranes are there in the industry?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    There's probably five.

2    Q    Can you explain to us what the five types are?

3    A    Yeah.  You have the telescopic truck cranes,

4    altering cranes and then you have crawler cranes and tower

5    cranes and Gantry cranes.

6    Q    And the Liebherr LTM 1500 would be what type of

7    crane?

8    A    A hydraulic truck crane, large hydraulic truck

9    crane.

10    Q    And that's with the telescopic boom?

11    A    Yes, sir.

12    Q    During your crane operation career, how many

13    different types of manufacturers of cranes have you

14    operated?

15    A    Probably five or six different manufacturers.

16    Q    And before operating the Liebherr LTM 1500 in this

17    case, did you ever operate a Liebherr crane before?

18    A    I operated a Liebherr tower crane.

19    Q    And how long did you operate a Liebherr tower crane

20    for?

21    A    Two-and-a-half years.

22    Q    And what was the tonnage of that Liebherr tower

23    crane?

24    A    Tower cranes are pretty much typically lower in

25    tonnage, just heighth.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

13

1      Q    And did that tower crane have a boom on it?

2      A    Yeah.  Well, it's a boom, but we call it a jib in

3  the industry.

4      Q    And how long is that boom or jib?

5      A    The one I was operating was 200 feet.

6      Q    What's the longest boom that you've ever operated in

7  the crane industry?

8      A    Roughly 500 feet.

9      Q    What was the boom on the Liebherr LTM 1500?

10     A    At the time?

11     Q    Yes.

12     A    It was 256 feet, I believe.

13     Q    It was 84 meters?

14     A    That's the total package, yes, sir.

15     Q    So you have operated, in your experience, cranes

16  with larger booms than the Liebherr LTM 1500?

17     A    Roughly the same size.  Are you talking about

18  length?

19     Q    Length of the boom.

20     A    If not longer, yeah.

21     Q    And can you give us an estimate of how many times

22  you operated a crane with boom lengths longer than

23  84 meters?

24     A    I couldn't begin to tell you.

25     Q    Would it be --

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A     It's a lot.

2      Q     Would it be tens?  Would it be hundreds?  Would it

3   be thousands?

4      A     It would probably be close to a hundred.

5      Q     Are you certified in the crane operation?

6      A     I am.

7      Q     And you're certified today?

8      A     I am.

9      Q     You were certified between February 16th, 2018 and

10  February 19th, 2018?

11     A     I was.

12     Q     I'm going to show you Exhibit 106.  Can you tell us

13  what this is?

14     A     That's my NCCO certification.

15     Q     When was it issued?

16     A     8/31 of 2016.

17     Q     When does it expire?

18     A     8/31 of 2021.

19     Q     So you've been certified for that entire time?

20     A     Currently am, yeah.

21     Q     And then there are certification designations.  Do

22  you see that?

23     A     I do.

24     Q     Do any of those reference the type of crane, the

25  Liebherr LTM 1500?

1      A     The first one lattice boom truck LBT.

2      Q     You were certified in operating --

3      A     I'm sorry.  Telescopic.

4      Q     So you were certified in operating that type of

5   crane?

6      A     Yes.

7            THE COURT:  Try to not talk over each other just

8   because it makes it hard for the court reporter to take down

9   everything that you're saying.  I know naturally in

10  conversation we do, but this is an unnatural conversation.

11           THE WITNESS:  Yes, ma'am.

12  BY MR. GOODMAN:

13     Q     So you had mentioned that you worked for Kelly

14  Cranes initially?

15     A     Yes.

16     Q     And after Kelly Cranes, where did you go?

17     A     I went to West Virginia.

18     Q     What did you do in West Virginia?

19     A     I ran a large lattice boom crane, crawler crane.

20     Q     And how long did you do that?

21     A     I was on that job site for a little over a year.

22     Q     And then what type of crane was that?

23     A     That was a lattice boom crawler crane.

24     Q     And how long was the boom on that crane?

25     A     420 feet.

1    Q    And after that job, what was your next job?

2    A    I believe I went down to Texas to the oil refineries

3    down there and ran a telescopic boom crane.

4    Q    And how long did you do that for?

5    A    I was there for a little over a year as well.

6    Q    What kind of crane did you operate?

7    A    It was a cherry picker -- what we call a cherry

8    picker.  It was a telescopic boom crane on an all-terrain

9    chassis.

10   Q    And how long was the boom on that crane?

11   A    It was a small crane.  I think it had like 150-foot

12   in it.

13   Q    How long did you operate that crane?

14   A    Roughly over a year.

15   Q    And then where did you go after that job?

16   A    I think I went down to -- I went to Killeen, Texas

17   to the Army base after that and ran a similar crane there.

18   Q    How long did you do that for?

19   A    I was there for six months.

20   Q    And then where did you go after that?

21   A    I went to New Orleans and ran a crawler crane there,

22   lattice boom crawler crane.

23   Q    Does that have a boom on it as well?

24   A    It did.

25   Q    How long was that, though?

1    A    150 feet as well.

2    Q    After that job, where did you go?

3    A    I went to Stuart, Florida and ran the same crane

4    that I ran in New Orleans.

5    Q    And how long was that job?

6    A    I was there for six months.

7    Q    And then when did you start with Sims?

8    A    In 2000 -- November of 2015, I believe.

9    Q    Explain to us why, before going to Sims, you were

10   going to various jobs?

11        Can you tell us how that works?

12   A    Just part of the industry.  You're hired for the

13   job, and before when I worked at Kelly, it was a rental

14   company, so they rent cranes out and they would send me out

15   with them.  And then in 2008, when the economy crashed,

16   basically you were, you know, just traveling around finding

17   jobs and going from place to place and picking up work.

18   Q    And you stayed employed during that time until you

19   got employed with Sims?

20   A    I did.

21   Q    And what year was it when you first got employed at

22   Sims?

23   A    What's that?

24   Q    When did you first get employed with Sims?

25   A    I believe it was November of 2015.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And what types of cranes did you operate at Sims?

2    A    The hydraulic truck cranes, lattice boom crawler

3    cranes and tower cranes.

4    Q    And what was the largest crane that you had operated

5    before the Liebherr LTM 1500 tonnage-wise?

6    A    Tonnage-wise, 330 ton, I believe.  But we also had a

7    450 that I would occasionally go out and relieve.

8    Q    So you would operate that larger crane?

9    A    Yes.

10    Q    And you were -- is it normal to have a primary

11    operator and a secondary operator like you just mentioned?

12    A    They always want people that can, you know, be

13    versatile and be able to hop from crane to crane, so it's

14    pretty normal.  You know, people get sick or take days off

15    and they need more than one guy to be able to operate a

16    crane.

17    Q    And how would you get educated on operating those

18    specific pieces of equipment?

19    A    As far as learning how to operate it?

20    Q    Correct.

21    A    Basically through the union you learn how to operate

22    the cranes and deal with them and put them together, take

23    them apart and stuff like that.

24    Q    Do cranes always work perfectly in your experience?

25    A    No.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

19

1    Q    Are there times when something might happen to a

2    crane that you have to troubleshoot?

3    A    Yes.

4    Q    Is that a normal occurrence in the crane industry?

5    A    Yes.

6    Q    Is every time that there's a trouble-shooting

7    requirement also a safety issue?

8    A    Not necessarily.

9    Q    I'd like to show you what's marked as Exhibit 100.

10    Was there a time that you went out to assist and

11    help obtain a Liebherr LTM 1500?

12    A    Yes.

13    Q    And who were you employed with at the time?

14    A    Sims Crane.

15    Q    Can you tell me about that process?

16    A    Basically they bought a new crane and they got a

17    group of guys together to go to Jacksonville and pick it up.

18    Q    I'm showing you what's been marked as Exhibit 100.

19    Can you take a look at this and let me know if this

20    references that job?

21    A    It does.

22    Q    What was the start date of the job?

23    A    January 18th of 2017.

24    Q    And what was the end date of the job?

25    A    January 20th, 2017.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
1        Q    And this worksheet is accurate?

2        A    Yes.

3        Q    And what was the address?

4        A    To the job site?

5        Q    Correct.

6        A    It's Blount Island Marine Terminals, 9620 Dave Rawls

7   Boulevard, Jacksonville, Florida.

8        Q    And I see on the bottom it references you as an

9   operator along with Jason D'Angelo?

10       A    Yes.

11       Q    Who is Jason D'Angelo?

12       A    He was the lead operator on that crane.

13       Q    And what were you as it related to that crane?

14       A    Secondary operator.

15       Q    And is it normal to have a primary and secondary

16   operator on cranes?

17       A    Yes.

18       Q    And why do companies want to have primary and

19   secondary operators?

20       A    So they have backup for the primary operator to have

21   days off and be able to relieve the crane when it's working.

22       Q    Now, I see also that there is Robert Cutting, a

23   Bernard Wortman, a Bobbi Patterson and a Johnny Egnor on

24   this.

25       A    I see that.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Are Robert Cutting, Bernard Wortman, Bobby Patterson

2  and Johnny Egnor licensed crane operators?

3      A    Not that I'm aware of.  I mean, obviously by the

4  sheet here it says that Bernard is an operator, but I've

5  never met him for operating concern.

6      Q    Do you know Robert Cutting, Bobby Patterson and

7  Johnny Egnor?

8      A    I know Robert Cutting.

9      Q    Is Robert Cutting an operator?

10      A    He's a mechanic.

11      Q    So he's not an NCCCO certified operator?

12      A    I don't know the answer to that.

13      Q    When you were at the commissioning of this crane

14  obtaining it from the port, was Robert Cutting assisting in

15  moving the equipment from the port to trucks?

16      A    He was there, I believe.

17      Q    And was there anybody from Liebherr there?

18      A    There was two people from Liebherr.

19      Q    Do you recall who they were?

20      A    One was Henry Ward and I don't recall the other

21  guy's name.  He didn't stick around very long.

22      Q    At any time, did Henry Ward tell Robert Cutting that

23  he could not be involved in it because he was not an NCCO

24  certified operator?

25      A    Not that I'm aware of.

1    Q    Was Robert Cutting there the entire time the work

2    was going on?

3    A    I believe so.

4    Q    This was the first time that Sims had connection

5    with that Liebherr LTM 1500?

6    A    Yes.

7    Q    So you were involved in the crane since Sims took

8    possession?

9    A    Yes.

10    Q    You mentioned that Henry Ward was there.  Was Henry

11    Ward the same individual that gave you the training?

12    A    He was.

13    Q    At this job, what was your understanding of Henry

14    Ward's job versus the job that Sims had?

15    A    He was there to instruct us how to load the crane

16    out properly and then he was going to do the orientation on

17    the crane.

18    Q    Prior to this Liebherr LTM 1500, had Sims ever been

19    involved with swapping out a boom of 50 to an 84 or an 84 to

20    a 50 on a Liebherr LTM 1500?

21    A    No.

22    Q    How was the crane actually delivered to the port, if

23    you recall?

24    A    It was delivered with -- basically, the crane was

25    set up in the 54-meter boom.  We took the 54-meter boom out

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    and put it on a trailer and then the 84-meter attachment was

2    loaded on another trailer and we trucked it back.

3        Q    How did you get the crane base back?

4        A    Drove it.

5        Q    Was there any issue driving the crane back?

6        A    No.

7        Q    What did you do in all that?

8        A    I hauled the 50-meter boom section back on a truck.

9        Q    Was there any issue?

10       A    No.

11       Q    And then you get the crane back to Sims?

12       A    Yes.

13       Q    What happens then?

14       A    We had the crane back to Sims and, basically, the

15   orientation started with it.

16       Q    And what was the orientation or training involving?

17       A    The orientation involved, you know, basically

18   putting all attachments on the crane, swapping the 54 for

19   the 84 meter, also, the fixed jib on it and also the luffing

20   jib.

21       Q    I'm going to show you Exhibit 64.  Do you recognize

22   this as a document used by Henry Ward during the crane

23   operator training?

24       A    Yes.

25       Q    At any time during that training, did you tell Henry

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Ward to skip any portion of the training?

2        A    No.

3        Q    Did you tell Henry Ward to hurry up, that you knew

4    stuff you didn't need to learn?

5        A    No.

6        Q    Did Henry Ward, at any time, ever tell you that you

7    were getting 40 hours of training, but generally people on

8    the Liebherr LTM 1500 needed 80 hours of training?

9        A    No.

10       Q    If you got 40 hours of training and Henry Ward told

11   you that you needed 80 hours of training, what would you

12   have done?

13       A    Requested it.

14            MR. CREMER:  Objection.  Calls for speculation.

15            THE COURT:  I'm sorry.  What was that?

16            MR. CREMER:  Calls for speculation as to what he

17   would have done or some other circumstance.

18            THE COURT:  Overruled.

19   BY MR. GOODMAN:

20       Q    What would you have done?

21       A    I would have asked for that 40 hours.

22       Q    The additional 40 hours?

23       A    Yes.

24       Q    I'm going to show you page 1 of the Liebherr crane

25   operator training.  The document says, "This training

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    program is made up of individual sections.  Under each

2    section are several topics.  As each topic is covered and

3    completed, it must be checked off.  Each section should then

4    be signed by the Liebherr engineer who conducted the

5    training and by the operator or other personnel who received

6    the training."

7              So in this document -- we'll go through it really

8    quick.  The next page, you go down to the bottom, is your

9    signature on this page?

10   A    No, sir.

11   Q    Can we go to the next page?  Is your signature on

12   this page?

13   A    No, sir.

14   Q    Go to this next page.  Is your signature on that

15   page?

16   A    It is.

17   Q    And what's the date of that?

18   A    3/2 of 2017.

19   Q    Now, did you fully understand and comprehend the

20   issues and the items that went over -- that were went over

21   by Henry Ward at this time?

22   A    Yes.

23   Q    And I'm going to show you Exhibit -- the next page,

24   IAI0508.

25              Is that your signature?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A    It is.

2        Q    Did you fully understand and comprehend the training

3    that was provided in this section?

4        A    I did.

5        Q    I want to go to the next page, IAI0509.  Is your

6    signature on this page?

7        A    No.

8        Q    I'm going to go to the next page, IAI0510, is your

9    signature on this page?

10       A    It is.

11       Q    And did you understand and comprehend the training

12   that was provided in these items?

13       A    I did.

14       Q    And then I'm going -- we're going to go to IAI0511.

15   Is that your signature on this page?

16       A    It is.

17       Q    Did you understand and comprehend the training that

18   was provided that's referenced in this page?

19       A    I did.

20       Q    And you go to IAI0512, is that your signature on

21   this page?

22       A    It is.

23       Q    Did you understand and comprehend the items that

24   were trained on this page?

25       A    I did.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Going to go to IAI0513, is your signature on this

2    page?

3    A    No, sir.

4    Q    Going to go to IAI0514, is your signature on this

5    page?

6    A    It is.

7    Q    Did you understand and comprehend the training that

8    was provided based on this page?

9    A    I did.

10    Q    Now, if we go back to the first -- to the second

11    page IAI0504, there's an objective.  Do you see the

12    objective?

13    A    I do.

14    Q    And the objective says, "The training for crane

15    operators is designed to equip operators with a

16    comprehensive knowledge of the controls, arrangements,

17    operational systems, procedures, characteristics, and safety

18    concerns and considerations relating to the specific crane."

19         Do you see that?

20    A    I do.

21    Q    Did you read that at the time of the training?

22    A    I did.

23    Q    And were you relying on Henry Ward to provide you

24    the training to equip you with comprehensive knowledge of

25    safety concerns related to the crane?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    I did.

2    Q    If a -- would you consider a boom uncontrollably

3    retracting on itself to be a safety concern?

4    A    Yes.

5    Q    Did Henry Ward ever advise or instruct you that if

6    you manipulated the T4 pin that there could be an

7    uncontrolled retraction of boom section 6, 5 and 4?

8    A    No.

9    Q    If he told you that, do you think you would recall

10    that?

11    A    Yes.

12    Q    And then it goes on to say, "The content of the

13    Liebherr crane's operating instructions is the basis for the

14    training."

15         Do you see that?

16    A    I do.

17    Q    In your experience with the Liebherr LTM 1500, have

18    you read the Operator's Manual?

19    A    Not in its entirety.

20    Q    How did you use the Operator's Manual?

21    A    Well, basically we were trained on the crane, so

22    when we had concerns or issues, you know, with the assembly

23    of it, we would refer to the Operator's Manual.

24    Q    Is that how you're taught to use the Operator's

25    Manual in your apprenticeship program and in your

```
 1    experience?
 2         A     Yes.
 3         Q     Do you recall anywhere in this Operator's Manual
 4    where it said that if you manipulate the T4 pin that boom
 5    section 6, 5 and 4 will collapse uncontrollably on itself
 6    causing property damage?
 7         A     No.
 8         Q     During the training, did Henry Ward ever discuss the
 9    T4 pin?
10         A     No.
11         Q     Did he discuss the T3 pin?
12         A     He did.
13         Q     And what was the discussion regarding the T3 pin?
14         A     How to engage it and disengage it for the attachment
15    swap.
16         Q     And how were you taught to engage it and disengage
17    it?
18         A     There's a tool on the crane that's called an
19    S-wrench, and there's a three-quarter nut inside that pin,
20    and you would put that S-wrench on that nut and, basically,
21    screw and unscrew it.  It would come up and down.
22         Q     And how were you taught to make sure that it was
23    locked or unlocked?
24         A     He told us that when you lock and unlock the pin,
25    you go to where it stops, but don't over-torque it because
```

```
 1    you'll ruin the mechanism inside the pin.

 2        Q    Did Henry Ward, during the training, ever instruct

 3    you to measure it to make sure that it was 11 millimeters

 4    over the locking bore?

 5        A    No.

 6        Q    At your training, did Henry Ward ever bring out a

 7    ruler to show you what 11 millimeters above the locking bore

 8    would look like?

 9        A    No.

10        Q    If Henry Ward would have instructed you to use a

11    ruler to measure that the T3 pin was 11 millimeters above

12    the locking bore, would you have done that when you were

13    locking and unlocking the T3 pin?

14        A    Every time.

15        Q    Did Henry Ward ever tell you that you had to use a

16    ruler to make sure that the T4 pin was 11 millimeters above

17    the locking bore?

18        A    No.

19        Q    Did he ever tell you that if the locking pin on the

20    T4 section was not at 11 millimeters, that there would be

21    uncontrolled retraction of the boom sections?

22        A    He did not.

23        Q    Would you recall if he did?

24        A    Oh, yes.

25        Q    And why do you think you'd recall if he did?
```

1    A    That's a very important step.

2    Q    As a crane operator, would you be worried about an

3    uncontrolled retraction of a boom?

4    A    You're always worried about uncontrolled retraction

5    of booms.

6    Q    Why are you worried about an uncontrolled retraction

7    of a boom?

8    A    Mechanical.

9    Q    During the course of the training, did you swap out

10    the booms?

11    A    We did.

12    Q    What was the original boom that was in the crane?

13    A    The 50-meter boom.

14    Q    And did you swap out the 50 meter for 84 meter?

15    A    We did.

16    Q    Did you swap back the 84 for the 50?

17    A    We did.

18    Q    And at that training, who was being trained?

19    A    Jason and I.

20    Q    And to swap out a boom, other than -- strike that.

21         Other than Henry Ward, was there anybody else there

22    from Liebherr?

23    A    Henry Ward was the only one there from Liebherr.

24    Q    Other than yourself and Jason D'Angelo, was there

25    any other NCCCO certified crane operators there?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    No.

2    Q    Do you know whether Henry Ward was an NCCCO

3    certified crane operator?

4    A    I do not.

5    Q    Can you change out a boom, 50 to an 84 and then back

6    from an 84 to a 50 with only three people?

7    A    It would be tough, but it could be done.

8    Q    Now, at the training, was the boom changed out from

9    the 50 to the 84 and the 84 to the 50 with only the three of

10   you?

11   A    No.

12   Q    How many people were there?

13   A    There was roughly 8 or 10 people there.

14   Q    Those 8 or 10 people, who were they employed by?

15   A    Sims Crane.

16   Q    Do you know whether Shane Burrows was there?

17   A    I do not remember if he was there or not.

18   Q    Now, at any time -- strike that.

19        Those 8 or 10 people, do you remember who some of

20   them were?

21   A    No.

22   Q    Do you remember if any of them were NCCCO certified

23   crane operators?

24   A    They were mostly apprentices that were in the yard.

25   Q    And at any time, did Henry Ward tell you or the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    group or did you see Henry Ward tell any of these

2    apprentices, "you guys can't work on this because the

3    Operator's Manual doesn't allow you to work on this"?

4        A    No.

5        Q    Did Henry Ward allow that group of 8 to 10 people

6    assist in the change of the 50-meter boom to the 84 and the

7    84 to the 50?

8        A    He did.

9        Q    Now, when you conducted the swap from the 50 to the

10   84 as it relates to pin section T3 and T4 on the 84-meter

11   boom, was there anything that you needed to do before you

12   put the 84-meter boom in the base?

13       A    There's a cover plate on the T3 pin that we use for

14   storage, and before you were to insert the 84-meter boom,

15   you would take that cover off of that T3 pin.

16       Q    And why did you have to take the cover off the T3

17   pin?

18       A    So you could engage it.

19       Q    Did the T4 pin at that time have a cover on it?

20       A    It did not.

21       Q    And are you supposed to manipulate the T4 to lock

22   down that boom?

23       A    No.

24       Q    With regard to the T3 pin and the T3 pin that was on

25   this Liebherr crane, how was the cover plate mechanically

1    attached to the boom?

2        A    It had two bolts in it.

3        Q    Were they wing nuts?

4        A    No.

5        Q    They were just round bolts?

6        A    They were just regular hex-style bolts.

7        Q    I'm going to show you what's marked as Exhibit 18.

8    This is the first page.  Take a look at that.  I'll show you

9    the second page.  Take a look at that.  And then the third

10   page.  Take a look at that.

11            Is this the cover plate that was on the Sims

12   Liebherr LTM 1500?

13       A    It was.

14       Q    And are those how it was mechanically attached?

15       A    It was.

16       Q    Those are the bolts?

17       A    Those are the bolts.

18       Q    And was the color of the cover plate the same color

19   as the boom itself?

20       A    Yes.

21       Q    So after you take out -- excuse me.  After you take

22   off the cover plate of the T3 on the 84-meter boom, is there

23   a time when you slide the 84-meter boom package into the

24   base?

25       A    Yes.

```
 1        Q    And when you were doing this with Henry Ward, how
 2   was that done?  Was there an assist crane or a truck?
 3        A    We use an assist crane.
 4        Q    And then explain to us, when you were doing that,
 5   how you installed that 84-meter boom into the base of the
 6   crane?
 7        A    So we would take it off.  If it was in the yard or
 8   at the time of the orientation and it was still on the
 9   trailer, we would take the assist crane and rig that boom up
10   to the assist crane and pick it up and basically slide it in
11   with assist crane.
12        Q    And did you slide -- at that time, did you have to
13   extend the boom of the base crane?
14        A    You did.
15        Q    And then was -- did you slide the 84-meter boom
16   package into the boom base or did you extend the boom base,
17   boom section two, over the 84-meter boom package?
18        A    We slid it in with the assist crane.
19        Q    That's how you did it with Henry Ward?
20        A    Yes.
21        Q    I'm going to show you a video, Exhibit 6.  I'd like
22   you to take a look at this video.  And while it's playing,
23   first let us know if it's a fair and accurate representation
24   of how one would change out the 50 to the 84-meter boom; and
25   then, two, let us know if there's any differences in how you
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1    did it versus how it's being shown here.
 2             THE COURT:  Mr. Farris, if you need the lights to go
 3    down to see it better, just let us know that as well.
 4             THE WITNESS:  That would be great.
 5             THE COURT:  Go ahead with the lights.
 6    BY MR. GOODMAN:
 7        Q    Now, they're using a truck here.  Is that how you
 8    did it?
 9        A    No, sir.
10        Q    What did you do?
11        A    We used -- it was on a trailer similar to that, but
12    we used an assist crane.  This is what they're using in this
13    video is called a launch trailer.  We did not have a launch
14    trailer for the boom.
15        Q    Did Henry Ward ever say "hey, that's a problem.  You
16    need to get a launch trailer"?
17        A    No.
18        Q    So you worked it on that day with the assist crane?
19        A    I wasn't operating the assist crane, but I was
20    there.
21        Q    Henry Ward said it was acceptable?
22        A    Yes.
23        Q    Is this gentleman using an S-wrench?
24        A    He is not.
25        Q    What is that called?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    It's a ratchet socket extension.

2      Q    Is that a fair and accurate representation of what

3  it looks like when you're looking down at that pin?

4      A    It is.

5      Q    You can only see the pin head?

6      A    That's it.

7      Q    When it's locked, does that pin head pop up?

8      A    It does.

9      Q    Does that then lock?

10      A    Yes.

11      Q    Do you see that gentleman use a ruler?

12      A    No.

13      Q    Other than that, is that a fair and accurate

14  representation of how you were trained to install the T4 --

15  excuse me -- the 84-meter boom package and lock the T3 pin

16  with those changes that you spoke about?

17      A    Yes.

18      Q    Now, at any time during that work, did Henry Ward

19  ever advise you that if somebody keeps the cover plate on

20  the T3 pin that the T4 pin could end up in that T2 access

21  hole?

22      A    Say that again.

23      Q    Sure.  Did Henry Ward, in the training, ever advise

24  you that if somebody kept the cover plate over the T3 pin

25  that in that access hole that you were looking down to lock

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

 1   the T3 pin that you could actually see the T4 pin?

 2       A    I mean, he never told us that, but you can pretty

 3   much know that that's going to happen.

 4       Q    And so did Henry Ward ever tell you don't touch the

 5   T4 pin?

 6       A    No.

 7       Q    Did Henry Ward ever tell you that if the T4 pin is

 8   manipulated, don't relock it down?

 9       A    No.

10       Q    Did Henry Ward ever tell you that the manner and

11   method by which you're supposed to lock and unlock the T4

12   pin is the same as the T3 pin?

13       A    No.

14       Q    Did Henry Ward ever tell you that when you lock the

15   T4 pin, you're supposed to use a ruler to make sure it's at

16   11 millimeters before the locking bore?

17       A    No.

18       Q    And you previously told us that Henry Ward never

19   mentioned that manipulating that T4 pin can cause an

20   uncontrolled retraction of the boom; correct?

21       A    Correct.

22       Q    I'd like to show you Exhibit 5.  And what's noted is

23   No. 1 on this.  Is that a fair and accurate representation

24   of what an S-wrench looks like?

25       A    It is.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q     Is that the type of tool that you used at Sims?

2      A     Yes.

3            THE COURT:  Mr. Goodman, what's the Bates number on

4      that page?

5            MR. GOODMAN:  The Bates number is NBIS000710.

6            THE COURT:  Thank you.

7   BY MR. GOODMAN:

8      Q     I'd like to show you Exhibit 7 NBIS6431.  Is that a

9      fair and accurate representation of what the T2 access hole

10     looks like locked down in the T3 pin?

11     A     It is.

12     Q     And how does -- were you trained on how to boom in

13     and out the boom on the Liebherr LTM 1500?

14     A     As far as putting the attachment on it or just

15     general operation?

16     Q     General operation.

17     A     Yes.

18     Q     And how does one boom or extend the crane out and

19     retract the boom in?

20     A     In the LICCON system, you have a diagram of the

21     actual boom itself and you can program percentages for each

22     boom section.  And once you program the boom sections to the

23     percentages that you need for the job site, you would enter

24     it into the computer.  And then after that, basically the

25     crane takes over.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And are there specific percentages that you can

2   extend or retract the boom to or can you do it to any

3   percentage?

4      A    No.  There's certain percentages.

5      Q    Do you recall what the percentages are?

6      A    I believe there's three or four percentages.  It

7   was, you know, obviously 0, 50 percent, 92 percent and

8   100 percent, as I recall.

9      Q    Okay.  I'm going to show you what's marked as

10   Exhibit 8.  It's a video.  Let us know if this is a fair and

11   accurate representation of what the LICCON system looked

12   like on the Liebherr LTM 1500 that was owned by Sims.

13      A    It is.

14      Q    Then we go to 46, 92 or 100?

15      A    Right.

16      Q    So when you said 50 earlier, does that refresh your

17   recollection on what the first percentage or the second

18   percentage would be?

19      A    Yes.

20      Q    And did the crane extend at 46, 92 or 100 that Sims

21   had?

22      A    It did.

23      Q    I'd like to show what's marked as Exhibit 9.  Is

24   this a fair and accurate representation of a Liebherr LTM

25   1500?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    It is.

2       Q    And I'd like to know, as this video goes on, whether

3    or not the view that is shown is the view that you would

4    have when operating the crane.

5            Is that the LICCON system?

6       A    It is.

7       Q    Are there pedals there?

8       A    There is.

9       Q    You can extend the boom in and out?  And if you look

10   up with the boom extended out, is that what you're looking

11   at?

12      A    Yes, sir.

13      Q    That's a fair and accurate representation?

14      A    Yes.

15      Q    Now, after the training -- well, strike that.

16           Before the training started, were there things that

17   you knew about the crane and how to operate it?

18      A    This particular crane?  No.

19      Q    Were there a lot of things that you knew you did not

20   know?

21      A    Yes.

22      Q    Did you ask questions about that?

23      A    I did.

24      Q    Let me ask you this question:  As a crane operator,

25   would you agree with the proposition that there are known

1    knowns, that you know what you know?  You agree with that?
2         A    I would.
3         Q    Do you agree with the proposition that there are
4    known unknowns, that you know what you don't know?
5         A    I agree.
6         Q    Would you agree with the proposition that there are
7    even unknown unknowns, things that you don't even know you
8    don't know?
9         A    I would.
10        Q    And in training, is that why you're relying on a
11   trainer?
12        A    I am.
13        Q    After the training, did you get your questions
14   answered?
15        A    I did.
16        Q    And did you feel like you competently understood how
17   to operate the Liebherr LTM 1500 safely?
18        A    I did.
19        Q    I'd like to talk to you about what occurred on
20   Friday, February 16th, 2018.
21             Do you recall that day?
22        A    I do.
23        Q    And where were you that day?
24        A    We were in the yard of Sims Crane, Tampa.
25        Q    And who was with you that day?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    It was myself, a gentleman named Mike King.  He was

2    the assist operator.  Shane Burrows was there.  Cory

3    Adamson, he was my direct apprentice, and there was a few

4    other guys that were in and out throughout the day.

5    Q    Had you worked with Shane Burrows before?

6    A    I had.

7    Q    How many times had you worked with Shane Burrows

8    before that?

9    A    I couldn't say.  A number of times, but it was a

10   lot.

11   Q    What was Shane Burrows' position at that time?

12   A    I believe he was still an apprentice at the time.

13   Q    Was he a good apprentice?

14   A    Great apprentice.

15   Q    Hard working?

16   A    Hard working.

17   Q    Competent?

18   A    Yes.

19   Q    You thought he was qualified?

20   A    Yes.

21   Q    Do you know whether he assisted in a boom swap on

22   the Liebherr LTM 1500 before that?

23   A    What's that?

24   Q    Do you know whether or not Shane Burrows had

25   assisted on a Liebherr LTM 1500 boom swap before that day?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

44

1    A    I believe he assisted me one time prior to that.

2    Q    Did you have to swap out a boom that day?

3    A    Yes.

4    Q    And what boom were you swapping out?

5    A    We were going from the 50-meter boom to the 84-meter

6    boom.

7    Q    Did you do that in the same manner and method by

8    which you were trained with Henry Ward?

9    A    I did.

10    Q    That we previously discussed?

11    A    Yes, sir.

12    Q    Now, when the 84-meter boom is not on the crane,

13    where is it?

14    A    It's stored in the yard.

15    Q    Is that at Sims?

16    A    In Tampa, yes, sir.

17    Q    When stored, does the 84-meter boom have a cover

18    over the T3 pin?

19    A    It does.

20    Q    I'm going to show you Exhibit 18 again.  Is that a

21    fair and accurate representation of the cover that was over

22    the T3 pin on the 84-meter boom?

23    A    Yes.

24    Q    This picture, though, is the 50-meter boom?

25    A    That's the 50-meter boom nose.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And did you give any specific assignments to Shane

2    Burrows that day related to the cover on the 84-meter boom?

3    A    He was to take the cover off the T3 pin before we

4    picked it up and slid it inside.

5    Q    Why did you need to take the cover off?

6    A    So when we slid it inside, we could engage it to

7    lock the boom into place.

8    Q    Did you ask Shane to do anything else that day,

9    after he took over the cover plate?

10   A    He was going to go on top and help guide the boom

11   into the 50-meter boom sections.

12   Q    And after that, was he supposed to do anything else?

13   A    He was going to engage the pin.

14   Q    When you say "engage the pin," is that locking the

15   pin?

16   A    Right.

17   Q    He was going to use the S-wrench?

18   A    Yes.

19   Q    Did any sort of issue occur that day?

20   A    When we got the boom slid into the 50-meter boom

21   sections, he didn't remove the cover plate for that T3 pin.

22   Q    So what happened?

23   A    So it slid past the T3 pin and he saw the first pin

24   that came through was the T4 pin.

25   Q    And were you aware that he had left the cover plate

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  on?

2      A    Not at the time.

3      Q    And was there anything on the LICCON system that

4  would have instructed you that the cover plate had been left

5  on?

6      A    No.

7      Q    Was there anything on the LICCON system that would

8  have instructed you that the pin he started to manipulate

9  was the T4 pin?

10     A    No.

11     Q    So at that moment in time when he manipulated the T4

12  pin, what happened?

13     A    He said he was having a problem engaging the pin all

14  the way, locking it in place, so he asked me to come up

15  there and assist him.

16     Q    So what did you do?

17     A    I went up there and helped him out.

18     Q    And so when you went up there and helped him out,

19  what does that mean?

20     A    I went up there and pretty much took over and

21  realized that he was on the wrong pin.  I tried to engage it

22  all the way and it wouldn't engage all the way.  So I

23  retracted it to its supposed position and I could look

24  inside that hole right there and I could see part of the

25  cover plate that was on the T3 pin.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And at that moment in time, did you have a

2  realization?

3      A    Yes.

4      Q    And what was the realization?

5      A    That he engaged the wrong pin.

6      Q    So then what did you do with regard to that T4 pin?

7      A    We retracked it all the way down into the position

8  that it started in and then we slid the boom out.

9      Q    And then what did you do?

10     A    We took the cover off the T3 pin and reinserted it

11 to engage the T3 pin.

12     Q    And what did you do after that?

13     A    I got back inside the operator's cab of the 1500 and

14 programmed the computer to where we can retrieve the boom.

15     Q    Did that occur?

16     A    It did.

17     Q    And then what happened after that?

18     A    We installed all the wear pads that go on the

19 outside of the boom in between T2 and the T3 sections, and

20 then once that was all installed, basically I got back into

21 the cab of the crane and zeroed out all my percentages on

22 the LICCON computer system to retract all the boom sections.

23     Q    And did that work properly?

24     A    Yes.

25     Q    And then after that, what did you do?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    We -- I boomed the crane up.  We disengaged -- we
2    disconnected the assist crane.  And then I boomed up the
3    1500 and scoped out the head section on the 84-meter boom
4    package so that we could remove the counterweight plates off
5    of the 1500 so we can get it ready to go down the road.
6    Q    And when you said you boomed out the head section,
7    is that just the boom section 6?
8    A    Yes.
9    Q    Is there any requirement at that time to boom out
10   the entire boom?
11   A    No.
12   Q    And could you have boomed out the entire boom at
13   that moment?
14   A    No.
15   Q    Why not?
16   A    It would overturn the crane.
17   Q    Why would it overturn the crane?
18   A    Because the boom is too heavy for the crane, unless
19   you have all the counterweights on the crane.
20   Q    At that time, you did not have all the
21   counterweights?
22   A    We did not.
23   Q    Why didn't you have all the counterweights?
24   A    Because it only calls for a certain amount of
25   counterweights on there to install that attachment.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    When were the counterweights going to be installed?

2    A    On the job site.

3    Q    Is there some reason why you would install them at

4    the job site and not at the Sims' yard?

5    A    You only need a minimum of a certain amount of

6    counterweight on there to hold the 84-meter boom sections

7    without overturning the crane.  So if you were to put on all

8    the counterweights, you could technically, you know, scope

9    out the entire boom section, but per the manual, you don't

10   have to have all those counterweights on there to just

11   install.

12   Q    If you had all the counterweights on it, would you

13   be able to drive that crane down the road to the job site?

14   A    No.

15   Q    You'd have to put on the counterweights, take off

16   the counterweights?

17   A    Yes.

18   Q    Drive it down to the job site and put the

19   counterweights back on?

20   A    Yes.

21   Q    Would you have to put the counterweights on, boom it

22   all out, retract it, take the counterweights all off, drive

23   everything down to the job site, put the counterweights back

24   on?

25   A    That's right.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    How long does it take to put the counterweights on
2  and off?
3      A    Takes a couple of hours depending on logistics.
4      Q    And so you would just put the counterweights on at
5  one time?
6      A    Yes.  You talking about a whole package at one time?
7      Q    Correct.
8      A    No.  They come in -- I believe there was six flat
9  plates and then four T plates that went on that crane.  And
10  on top of that, there was a hoist package that would connect
11  to it.
12      Q    So after you boom out section 6, what's the next
13  thing that you do?
14      A    We remove the counterweight plates off the crane and
15  load them on trailers to be hauled to the job side.
16      Q    And then at that point, do you do anything else that
17  day?
18      A    Retracted the boom and put it in its -- in the rack
19  that is on the crane so that we can go down the road with
20  it.
21      Q    And after that, is that the end of the workday?
22      A    Yes.
23      Q    Let's talk about the next day, Saturday,
24  February 17th.  When did you get to work that day?  Do you
25  recall?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

51

1      A      7:00 a.m.

2      Q      And what did you do that day?

3      A      We drove the crane from the Sims' yard in Tampa to

4      the job site over here in Tampa.

5      Q      And how many people were on the team to do that?

6      A      Roughly 8 or 10 people.

7      Q      Were there any issues getting it down the road?

8      A      No.

9      Q      And you got to the job site?

10     A      I did.

11     Q      I'm going to show you what's been marked as Exhibit

12     93.  Take a look at the first page.  Take a look at the

13     second page.  Take a look at the third page, and the fourth

14     page and the fifth page.

15             Is this a fair and accurate representation of the

16     crane at the job site?

17     A      It is.

18     Q      So you get it to the job site, and what do you do

19     that day?

20     A      So we get the crane on the job site and the chase

21     trailer comes in behind me, and basically he has all the

22     equipment that we need to put the stabilizers together and

23     stabilize the crane and level it.  And from that point, the

24     counterweights started showing up and we started bagging the

25     counterweights.

1    Q    Was there any issue with the stabilization of the
2    crane?
3    A    No.
4    Q    Was it stable?
5    A    It was.
6    Q    Does the LICCON system reflect whether the crane is
7    stable or unstable?
8    A    It does.
9    Q    Did you also do a personal inspection?
10    A    Walk-around inspection.
11    Q    You didn't find any issue with stabilization?
12    A    No.
13    Q    And then with the counterweights, was there any
14    issue putting on the counterweights?
15    A    No.
16    Q    And did you put appropriate amount of counterweight
17    on the crane?
18    A    For that job site, yes.
19    Q    And how do you know you put the appropriate amount
20    of counterweight on the crane for that job site?
21    A    By the load charts.
22    Q    And who prepares the load charts?
23    A    Well, the load charts come from the manufacturer,
24    but when the salesmen sells the crane, he configures the
25    crane for the counterweights to what we're actually going to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    be picking up with the crane.

2        Q    You put the number of counterweights on that was

3    required by those loads charts?

4        A    Yes.

5        Q    Does the LICCON system tell you whether or not you

6    have enough counterweight?

7        A    You program it into the computer -- you program the

8    counterweight package into the computer.

9        Q    And then will the LICCON system tell you whether you

10   didn't have enough or you had too much?

11       A    No.  Just you run it off that computer setting.

12   It's automatically set in the computer so you can't

13   override -- you can't overturn the crane or anything.  It

14   will shut you down before you get to that point.

15       Q    If you boomed out too much and didn't have enough

16   counterweight, the LICCON system would stop you?

17       A    Yes.

18       Q    Now, after you get the counterweight on and you

19   confirm that there's enough counterweight and you confirm

20   the stabilization is fine, what do you do next?

21       A    Say that again.

22       Q    On that Saturday, you've confirmed that the

23   stabilization of the crane is good.  You've confirmed that

24   there's enough counterweight.  What do you do next?

25       A    I scoped out the -- I already had the T6 section

1   scoped out.  I swung around to check the radius for what we

2   were going to be doing with the crane and I scoped it back

3   in and put the crane, basically, the way it's sitting in

4   that picture.

5       Q    And the crane scoped out 6, it extended and

6   retracked boom section 6.  Okay?

7       A    Yes.

8       Q    Is there any issue?

9       A    No.

10      Q    Then what did you do after that?

11      A    That was the end of the day.

12      Q    And when was the next time that you saw the crane?

13      A    Monday morning, the day of the accident.

14      Q    And when did you arrive at the site that day?

15      A    7:00 a.m.

16      Q    And that was Monday, February 19th, 2018?

17      A    Yes.

18      Q    And you get there, and what do you do?

19      A    I did a walk-around inspection on the crane and then

20   we had a pre-job meeting.

21      Q    What are you looking for when you're doing the

22   walk-around inspection?

23      A    Making sure the stabilizers hadn't leaked down and

24   the crane is still level and making sure that, you know,

25   like the wire rope -- there's nothing with the wire ropes

1    and just make sure there's nothing out of place that prevent

2    us from working.

3        Q    And how did everything look?

4        A    Perfect.

5        Q    Then after you do that, what do you do?

6        A    We had a pre-job meeting on the job site and

7    discussed what we were going to do for that day.  And then I

8    got in the crane and started to scope the boom out.

9        Q    Who did you have the pre-job meeting with?

10       A    It was Viking Erection Crew.

11       Q    Why did you have a pre-job meeting?

12       A    Because he was the director on the job site.

13       Q    And why did you do a walk-around?

14       A    It's common.  You do a walk-around inspection every

15   time you get in a crane.

16       Q    You do that for safety purposes?

17       A    Yes.

18       Q    Safety is a concern to you?

19       A    It is.

20       Q    Why is safety a concern to you?

21       A    You want to make sure everybody goes home.

22       Q    And so after you have your pre-job meeting, what do

23   you do next?

24       A    I got in the crane and I programmed the LICCON

25   system for the percentages for the boom sections that I

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    needed and proceeded to scope it out.

2        Q    And can you tell us what happened at that point in

3    time?

4        A    The T6 section went out and the T5 section went out

5    and the T4 section went out, but the cylinder inside the

6    boom that scopes these sections out would not release from

7    the T4 section.

8        Q    Did anything show in the LICCON system?

9        A    No.

10       Q    Was all of the pins showing locked on the LICCON

11   system?

12       A    They were.

13       Q    And then what did you do?

14       A    Well, I realized that the cylinder wasn't releasing

15   from the T4 section, so I zeroed out all the percentages on

16   the LICCON system and retracted the boom and started over

17   again.

18       Q    And so the boom retracked to zero?

19       A    It did.

20       Q    And what did you do next?

21       A    I reprogrammed in the percentages to start over

22   again and proceeded to scope the boom out again.

23       Q    And what happened then?

24       A    It got stuck under the T4 pin again.

25       Q    So the boom section 6 went out, boom section 5 went

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

57

1    out, boom section 4 went out?

2        A    Uh-huh.

3        Q    But then the cylinder would not come back to get

4    boom section 3?

5        A    Yes.

6        Q    What did you do next?

7        A    So after that, I called my supervisor Mike Gay and

8    let him know what was going on and he said that he would

9    send out a mechanic to assist.  And then at that time I

10   continued trying to troubleshoot the crane.

11       Q    And why did you call Mike Gay?

12       A    To have a mechanic come out there and help out and

13   assist and let him know what was going on.

14       Q    In your 18, 20 years' of experience as a crane

15   operator, had you ever had any issue with a boom not

16   extending or retracting?

17       A    No.

18       Q    Did you think at the time -- strike that.

19            In your experience as a boom operator, had you had

20   issues with the crane or any crane before?

21       A    Yes.

22       Q    And is every issue a safety issue?

23       A    No.

24       Q    And when do you consider something a safety issue?

25       A    If something is going to, you know, obviously fall,

1    you know, or there's -- the crane is on the chart or the

2    crane is not stable enough, those are safety issues.

3         Q    At that moment in time when you begin

4    troubleshooting, is there anything under the circumstances,

5    in your experience, your education and the training you had

6    with Liebherr, that would have reflected that this was a

7    safety issue?

8         A    No.

9              THE COURT:  We're off the record for a moment.

10  (Off the record)

11             THE COURT:  You can start again, Mr. Goodman.

12             MR. GOODMAN:  We're back on the record?

13             THE COURT:  Yes.

14  BY MR. GOODMAN:

15        Q    So at that moment in time, you're not thinking that

16   this is a safety issue?

17        A    I'm thinking it's a mechanical issue.

18        Q    And as a crane operator, would you get under the

19   crane with mechanical equipment and start wrenching things?

20        A    No.

21        Q    Who does that?

22        A    Mechanic.

23        Q    Is that why you called Mr. Gay?

24        A    I did.

25        Q    What did he tell you?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    He said that he would dispatch Sergio, which is one

2    of our mechanics from the shop to come assist.

3    Q    Was Sergio at the training with Liebherr?

4    A    No.

5    Q    Did Henry Ward ever tell you at the training "hey,

6    we need to get some of your mechanics involved in this

7    training"?

8    A    No.

9    Q    If Henry Ward would have said "hey, we have to have

10   some mechanics involved in this training," what would you

11   have done?

12   A    Would have been a mechanic there.

13   Q    You would have gone to your boss and told them we

14   need a mechanic out there?

15   A    That wasn't my position to do.

16   Q    So after you hear from Mike Gay that he's sending

17   out Sergio, a mechanic, what do you do next?

18   A    I continue to troubleshoot the crane.  I called one

19   of our senior operators, Bill Piper.  He was the operator on

20   the 550-ton that we had and talked with him a bit about the

21   issues that I was having on the crane and his experience,

22   you know, had you ever crossed this, you know, issue before,

23   you know, bouncing ideas off of him.

24   Q    And had he ever operated the Liebherr LTM 1500?

25   A    No.

1        Q    Was he at the training of the Liebherr LTM 1500?

2        A    No.

3        Q    So why did you think it was a good idea to call him?

4        A    Because he had probably close to 40 years' of

5    experience in cranes.

6        Q    Are cranes similar at all?

7        A    They're similar in certain aspects.

8        Q    And what do cranes generally do?

9        A    They lift and move equipment and, you know, heavy

10   loads.

11       Q    And so do all of the cranes that are similarly typed

12   as the Liebherr LTM 1500 do that?

13       A    Yes.

14       Q    And other than that, what would be the differences

15   in cranes?

16       A    Technology.

17       Q    To the LICCON system?

18       A    Yes.

19       Q    Have you ever used a LICCON system before?

20       A    Not before this crane.

21       Q    At this moment in time, is the LICCON system showing

22   any error codes?

23       A    It's not.

24       Q    If a LICCON system would have shown an error code,

25   would you have taken any different steps?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        A    Well, in the Operator's Manual, there's an error
 2   code section.  So whatever error code that would show up on
 3   the computer system, you can literally flip to the page and
 4   find that error code and find out exactly what the error
 5   code is.
 6        Q    So the LICCON system isn't telling you you have an
 7   error code?
 8        A    It's not.
 9        Q    And did Henry Ward ever tell you that a failure of
10   the cylinder to retract from boom section to boom section
11   likely means that one of the pins is out of alignment?
12        A    No.
13        Q    At that moment in time, did you have any idea that
14   that's what was occurring?
15        A    No.
16        Q    Can boom sections get stuck?
17        A    It can.
18        Q    And in your experience, what do you do when a boom
19   section gets stuck?
20        A    I never personally had one get stuck before.  That's
21   why I called Bill Piper.
22        Q    What did Bill Piper tell you that he generally does
23   when a boom section gets stuck?
24        A    Generally, when the boom section gets stuck, in his
25   experience, he told me that he would have to manually
```

1    retrieve the cylinder from the section.

2        Q    And so after he told you that, did you reference

3    anything?

4        A    The Operator's Manual.

5        Q    And in the Operator's Manual, does it provide for a

6    methodology to mechanically retract the cylinder?

7        A    There's a section there that talks about manual

8    operation, yes.

9        Q    And in that section, did it tell you to call

10   Liebherr?

11       A    No.

12       Q    So what did you do at that moment in time?

13       A    I actually zeroed out all of the percentages on the

14   crane, again, and then proceeded to do the exact same thing,

15   scope it out and see if that -- it would realign itself.

16   And then Cory Adamson had come up there with the Operator's

17   Manual, and when I scoped everything back out to the

18   percentages, the boom cylinder got hung up on the T4 pin

19   again.  I asked Cory Adamson if he was reading the exact

20   same thing on the screen that I was, that all the pins were

21   engaged and locked.

22       Q    And were they all engaged and locked?

23       A    They were.

24       Q    And did Cory Adamson, did he find -- did he convey

25   to you that all of the pins were engaged and locked?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A     He did.

2      Q     What did you do next?

3      A     Then I proceeded to do the manual mode per what the

4   Operator's Manual told us.

5      Q     And then what happened -- what happened when you put

6   it in the manual mode?

7      A     It released from the T4 pin and the cylinder started

8   to retract in to get the T3 section.  And as soon as the T3

9   section was engaged, that's when the collapse occurred.

10     Q     And what happened when the collapse occurred?

11     A     The boom collapsed in on itself.

12     Q     That's section 6, 5 and 4?

13     A     Yes.

14     Q     At any time when you were manipulating the crane

15   manually, did you hear -- strike that.

16           Do cranes make noise?

17     A     They do.

18     Q     And is there a normal noise for cranes?

19     A     There is.

20     Q     And in your experience of 18 to 20 years, have you

21   become accustomed to that normal noise?

22     A     Yes.

23     Q     And when you were using the manual mode, was there

24   any noises that were not normal?

25     A     No.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

64

1    Q    Was there anything while you were doing -- while you

2    were working in the manual mode, that would have given you

3    some sort of understanding that this was a safety issue that

4    you were dealing with?

5    A    No.

6    Q    So when you're doing the manual mode, do you still

7    think that this is a mechanical issue?

8    A    Yes.

9    Q    Now, would you say that manual mode is the same as

10   emergency control telescoping?

11   A    No.

12   Q    Would you have any reason to have gone to the lift

13   director at this stage?

14   A    No.

15   Q    Why not?

16   A    Because I was still in the process of getting the

17   crane set up for the job site.

18   Q    And in extending the boom sections 6, 5, 4, 3, 2,

19   that you were trying to do, were you doing that for a

20   specific reason?

21   A    Well, I mean, you're doing it to actually, you know,

22   be able to perform the job, but while you're doing it, it's

23   also part of, you know, the inspection.

24   Q    So you're still in the inspection process?

25   A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And you're testing the crane?

2    A    Yes.

3    Q    Whether or not it works, 6, 5, 4, 3, 2, 1?

4    A    Yes.

5    Q    Whether it can boom in and out?

6    A    Yes.

7    Q    At that time, do you have any load on the crane?

8    A    No.

9    Q    Just the load block and hook?

10    A    That's it.

11    Q    And the wire rope?

12    A    That's it.

13    Q    Did you add anything that wasn't manufactured by

14   Liebherr onto that crane?

15    A    No.

16    Q    Did you change the crane in any way that wasn't the

17   way it was manufactured by Liebherr?

18    A    No.

19    Q    Was it modified in any way that wasn't manufactured

20   by Liebherr?

21    A    No.

22    Q    Now, what was the degree that the boom was at when

23   you were testing and extending it out?

24    A    I believe that day that crane was at 73 degrees.

25    Q    And why was it at 73 degrees?

1      A    In the manual, it tells you that the crane needs to

2  be between 70 and 72 degrees so that when you scope out the

3  boom sections in the crane, it creates less stress on the

4  crane itself.

5      Q    Now, could you have boomed out the boom completely

6  horizontal to the ground?

7      A    No.

8      Q    Why not?

9      A    One, there's not enough room; and, two, the crane

10  would overturn itself because there's not enough

11  counterweight on the back of it to hold it up.  Even with a

12  full counterweight package, it would overturn itself.

13      Q    And if you would have put all the counterweights on

14  the package, could you have then boomed it out horizontal?

15      A    No.

16      Q    Why not?

17      A    It would overturn itself.

18      Q    Would it also damage the crane components?

19      A    It would.

20      Q    Would it be a violation of the Operator's Manual to

21  boom it out horizontal?

22      A    It would.

23      Q    That's why you boomed it out at 72, 73 degrees?

24      A    That's right.

25      Q    So when the collapse occurs, after that, what do you

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  do?

2      A    Right after the collapse, it took me a second to

3  gather myself because I was kind of in shock.  And then I

4  looked out the window and saw Cory Adamson out there

5  assisting Chris.

6      Q    So when you're sitting in the cab, can you explain

7  to us what you're seeing when this crane is collapsing in on

8  you?

9      A    I'm seeing the entire boom sliding in on itself.

10     Q    And is it coming toward you?

11     A    It is.

12     Q    And what's your thoughts and feelings at that

13  moment?

14     A    That was it.  That was it for me.

15     Q    What do you mean that's it?

16     A    Well, I figured that once that boom collapsed in on

17  itself and hit the base that it would blow the sides of the

18  cab out.

19     Q    What did you think would occur then?

20     A    There's nothing that happened after that if I'm not

21  there.

22     Q    You're saying if that happened, you thought you were

23  going to die at that moment?

24     A    I did.

25     Q    Now, did you put yourself in a situation or would

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    you do something to put yourself in a situation where you

2    would kill yourself with a crane?

3        A    No.

4        Q    I'd like to show you what's been marked as Exhibit

5    107.

6             Now, do you know what this is?

7        A    That is the Sims Crane Accident Report.

8        Q    And did you fill out a Sims Crane Accident Report?

9        A    I did.

10       Q    Is this the Sims Crane Accident Report that you

11   filled out?

12       A    It is.

13       Q    And why did you fill out a Sims Crane Accident

14   Report?

15       A    It's required by Sims.

16       Q    What's the date of the report?

17       A    2/17 of 2018.

18       Q    Is it the same date of the accident?

19       A    The date of the accident is 2/19 of 2018.

20       Q    So would the date of the report be the same day,

21   2/19/2018?

22       A    That probably is a 19.  It's just I have horrible

23   handwriting at the time.

24       Q    Understand.  And how long after the accident are you

25   actually filling this out?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Same day as I recall.

2    Q    Is it within the hour?  Within two hours?

3    A    I think it was several hours later.

4    Q    Several hours later.  Would you mind, because it's a

5    little bit difficult for us to read, can you read this to

6    us?

7    A    It says, "We arrived at the job site at 7:00 a.m.,

8    had a pre-job meeting.  I did a walk-around inspection."

9    Very hard for me to read as well.  "Got in the crane."

10    Q    There might be a better version.

11    A    I hope so.

12         MR. GOODMAN:  May I approach, Your Honor?

13         THE COURT:  You may.  The binders, I think it's a

14    little bit easier to read on the paper.

15 BY MR. GOODMAN:

16    Q    I just gave you the hard copy of Exhibit 107.  This

17    is your statement?

18    A    It is.

19    Q    And could you read it for us the best you can?

20    A    So "We arrived at the job site at 7:00 a.m., had a

21    pre-job meeting.  I did a walk-around inspection on the

22    crane.  Got into the crane and programmed the boom

23    configuration and started the scoping process.  While

24    scoping out the 4 section, the boom cylinder would not

25    release.  I brought them all back in and started the process

1    again when the boom collapsed."  I can't read that.

2        Q    Just read what you can read.

3        A    It says, "I contacted Mike Gay and he would be

4    dispatching a mechanical."

5        Q    Does it also say you contacted Bill Piper?

6        A    That's it.  "I called Bill Piper and" --

7        Q    Does it say Mike Gay had a tech on the way?

8        A    "Mike Gay was going to send a tech.  I contacted

9    Bill Piper and he says that I would probably have to

10   manually retrieve the boom or the boom cylinder.  So I

11   verified that the sections were locked in place and

12   continued and then the collapse occurred."

13       Q    Is that what happened?

14       A    Yes.

15       Q    It's an accurate statement?

16       A    Yes.

17       Q    What was the weather that day?

18       A    It was clear.

19       Q    And what was the wind speed?

20       A    It wasn't hardly any wind that day.

21       Q    What was the load on it?

22       A    There was no load, just the load block.

23       Q    How were you feeling that day emotionally when you

24   showed up on the job site?  Any issues?  Any problems?

25       A    No.  I felt fine.

1    Q    Were you taking any medication that day?

2    A    I was not.

3    Q    Were you on any drugs that day?

4    A    No.

5    Q    Were you on any alcohol that day?

6    A    No.

7    Q    Any problems in the morning?

8    A    No.

9    Q    Angry at traffic?

10    A    No.

11    Q    Were you feeling calm and comfortable in your crane?

12    A    I was.

13    Q    Was it similar to the other times you've gotten into

14    the crane over the last 18 years?

15    A    Yes.

16    Q    Now, I'd like to show you Exhibit 108.  Do you know

17    what this is?

18    A    That is the Department of Labor and Occupational

19    Safety and Health Administration's OSHA report.

20         MR. CREMER:  Your Honor, I'm having a little

21    difficulty hearing the witness.

22         THE COURT:  Okay.  I guess can you talk louder or

23    move the microphone up your shirt a little bit?

24         MR. CREMER:  Thank you.

25         THE WITNESS:  That's the OSHA report.

1              MR. GOODMAN:  Is that better, Bill?

2              MR. CREMER:  Yes.

3    BY MR. GOODMAN:

4        Q    So did you write this or is that your handwriting?

5        A    That's not my handwriting, no.

6        Q    Were you interviewed?

7        A    I was.

8        Q    And can you tell us what this says?

9        A    That is the description of what happened on the job

10   site that day as I gave it to the OSHA reporter.

11       Q    What does line one say?

12       A    It says "16 years."

13       Q    Is that how many years of experience you had at the

14   time?

15       A    Yes.

16       Q    And what's line 2 say?

17       A    "February 19th and Liebherr 1500 600-ton."

18       Q    And was February 19th the day that the loss

19   occurred?

20       A    It was.

21       Q    And Liebherr 1500 600-ton crane is the type of

22   equipment you're using?

23       A    It is.

24       Q    And what does line 3 say?

25       A    "It's operating 600-ton crane."

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   Q   Is that what you were doing that day?

2   A   I was.

3   Q   And what does line 4 say?

4   A   It said it was -- I was directing the job site.

5   Q   Is that what you were doing that day?

6   A   Yes.

7   Q   What does line 5 say?

8   A   "Arrived on job site at 7:00 a.m."

9   Q   Is that when you arrived?

10   A   It was.

11   Q   And what does line 6 say?

12   A   "We had a pre-job meeting and discussed the task."

13   Q   Is that what you did that day?

14   A   It is.

15   Q   And then what's line 7 say?

16   A   "Started to lower the crane, checked the level and

17   do a walk-around inspection."

18   Q   Is that what you did?

19   A   I did.

20   Q   And what does line 9 say?

21   A   "I got into the crane upper and began work."

22   Q   Is that what you did?

23   A   I did.

24   Q   What does line 10 say?

25   A   "Programmed the computer for the boom configuration

1    to use."

2        Q    Is that what you did?

3        A    I did.

4        Q    And what does line 11 say?

5        A    "Started the scoping process."

6        Q    Did you do that?

7        A    I did.

8        Q    And what does line 12 say?

9        A    "No. 6, No. 5, No. 4 sections scoped out, cylinder

10   stopped on No. 4 and would not retract."

11       Q    Is that what happened?

12       A    It is.

13       Q    We'll go to the next page.  What does line 1 say?

14       A    It says, "I zeroed out all sections and brought them

15   back in."

16       Q    Is that what you did?

17       A    It is.

18       Q    And what does line 3 say?

19       A    "I then reprogrammed the boom sections to the

20   correct percentages."

21            Do you want me to read the entire sentence?

22       Q    Yes.

23       A    "So I reprogrammed the boom sections to the correct

24   percentages again and started the process again."

25       Q    Is that what you did?

1       A     It is.

2       Q     And what does line 5 say?

3       A     "The cylinder stopped on the No. 4 section again."

4       Q     Is that what happened?

5       A     It is.

6       Q     And what does the next line say?

7       A     "I called my boss Mike Gay and he dispatched a

8    tech."

9       Q     Is that what you did?

10      A     It is.

11      Q     And what does line 7 say?

12      A     "I called Bill Piper and asked in his experience I

13   would have to retrieve the cylinder."

14      Q     And is that what Mike Gay told you -- excuse me.  Is

15   that what Bill Piper told you?

16      A     It is.

17      Q     Is that what you did?

18      A     It is.

19      Q     Did you think that was a safety issue when he told

20   you to do that?

21      A     No.

22      Q     Do you think it was a safety issue while you were

23   doing it?

24      A     No.

25      Q     What does line 9 say?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    "I had my apprentice get the Operator's Manual."

2      Q    Is that what you did?

3      A    I did.

4      Q    And what does line 10 say?

5      A    "Got on the crane.  We verified that all sections

6    were locked in and no error codes were shown."

7      Q    Is that what happened?

8      A    It is.

9      Q    What does line 12 say?

10     A    "I manually retrieved the cylinder."

11     Q    And is that what you did?

12     A    I did.

13     Q    And what does line 13 say?

14     A    "The cylinder retracted all the way per the

15   computer."

16     Q    Is that what happened?

17     A    It is.

18     Q    What does line 14 say?

19     A    "The cylinder grabbed the No. 3 section and the boom

20   collapsed."

21     Q    Is that what happened?

22     A    It is.

23     Q    I'd like to show you what's been marked as Exhibit

24   109.  Tell me what this is.

25     A    That is my drug test.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    When did you take a drug test?

 2        A    Same day.

 3        Q    After the collapse?

 4        A    After the collapse.

 5        Q    And why did you take a drug test?

 6        A    Company policy.

 7        Q    And what was the results of the drug test?

 8        A    All negative.

 9        Q    Now, what I'd like you to do is to show you Exhibit

10   1, and I don't want you to read it out loud.  I would like

11   you to read it to yourself.  And if you can't see it on the

12   screen, there is a hard copy exhibit in the exhibit book to

13   your right.

14        A    Okay.

15        Q    So tell me when you're done reading the first page.

16             THE COURT:  Mr. Farris, at the moment, experience of

17   having to read while everyone in a room is staring at you

18   reading, take your time.  Don't rush through it and don't be

19   stressed that everybody is staring at you.  I have to do it

20   all the time for my job and I know that it's stressful.

21   BY MR. GOODMAN:

22        Q    Is page 1 accurate?

23        A    Yes.

24        Q    Are there any inaccuracies on page 1 that you note?

25        A    Not that I see.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    I'd like you to turn to page 2 and read that to
 2   yourself and just let us know when you're done.
 3        A    All right.
 4        Q    Is page 2 accurate?
 5        A    It is.
 6        Q    You note any inaccuracies on page 2?
 7        A    No.
 8        Q    Could you turn to page 3 and read it?
 9        A    All right.
10        Q    Did you find any inaccuracies on page 3?
11        A    I did not.
12        Q    Page 3 correct?
13        A    It is.
14        Q    I'd like you to turn to page 4 and read that.
15        A    All right.
16        Q    Is that correct, the statement there?
17        A    It is.
18        Q    Are there any inaccuracies that you found there?
19        A    No.
20        Q    I'd like you to turn to the next page and read that,
21   sir.  Is that an accurate statement?
22        A    It is.
23        Q    Any inaccuracies there?
24        A    Not that I'm aware of.
25        Q    I'd like you to turn to the next page and read that.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
1        A    All right.

2        Q    Any inaccuracies on this page?

3        A    No.

4        Q    I'd like you to read the next page.

5        A    Okay.

6        Q    Is that an accurate statement?

7        A    Yes.

8        Q    Any inaccuracies on this page?

9        A    Not that I'm aware of.

10       Q    On the next page it says, "Sims Crane equipment, no

11   proposed citations."

12            Were you ever cited?

13       A    I was not.

14       Q    Was Shane Burrows ever cited?

15       A    No.

16       Q    Sims ever cited?

17       A    No.  They were not.

18       Q    On the previous page, it says at the bottom, "This

19   incident could have been prevented if the manufacturer

20   supplied the written Product Safety Bulletin notice, a

21   product modification retrofit cover plate with warning

22   labels to be affixed to the crane and the update change

23   revision for the operating instructions, specifically

24   Chapter 90.05 in a timely manner as soon as the manufacturer

25   became aware of this issue."
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1              Do you see that?
 2       A    I do.
 3       Q    Do you agree with that?
 4       A    I do.
 5       Q    Now, in your statements that you gave for Sims and
 6    in your statement you gave for OSHA, you didn't mention
 7    anything about Shane Burrows manipulating the T4 pin or you
 8    coming back and re-manipulating it; is that correct?
 9       A    That's correct.
10       Q    And why didn't you mention those in either of those
11    statements?
12       A    Because I didn't think it was an issue.
13       Q    Why didn't you think it was an issue?
14       A    I mean, it's a common mistake.  You know, anybody
15    could have made that mistake.
16       Q    And had you thought that you fixed the issue?
17       A    I did.
18       Q    Was there any reason to think that you hadn't
19    installed that pin back to its original location?
20       A    No.
21       Q    When you were booming out the sections on the date
22    of the incident and the cylinder was not coming back, did
23    you ever think that it had anything to do with the T4 pin?
24       A    Well, the pin itself, no.  I thought it was probably
25    a mechanical mechanism inside the cylinder.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Did you have any idea or did you think that it was

2    caused by either Shane or you having manipulated the T4 pin

3    the day before?

4    A    No.

5    Q    Did Henry Ward ever provide you any training on what

6    to do if a boom section would not extend or retract?

7    A    No.

8    Q    But the Operator's Manual provides how to manually

9    retract the boom; correct?

10   A    It tells you how to put it in manual mode, yes.

11   Q    I'd like to discuss the Operator's Manual with you

12   for a little bit.

13        Was there a copy of the Operator's Manual in the

14   crane?

15   A    There was.

16   Q    And were you provided with an electronic copy of the

17   manual?

18   A    I was.

19   Q    Did you know how to use the manual for the crane?

20   A    I did.

21   Q    Does any section of the Operator's Manual instruct

22   you that manipulating the T4 pin is a safety issue?

23   A    No.

24   Q    Does any section in the Operator's Manual instruct

25   you what to do or not to do if the T4 pin is manipulated?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1         A    No.
 2         Q    Does any section in the Operator's Manual instruct
 3    you that manipulating the pin can cause a defective
 4    telescoping lock?
 5         A    No.
 6         Q    Does any section in the Operator's Manual instruct
 7    you to contact Liebherr if the T4 pin is manipulated?
 8         A    No.
 9         Q    Does any section in the Operator's Manual advise
10    that manipulating the T4 pin can cause section 6, 5 and 4 to
11    uncontrollably collapse in on itself?
12         A    No.
13         Q    Does any section of the Operator's Manual advise
14    that manipulating the T4 pin can cause death, personal
15    injury or property damage?
16         A    No.
17         Q    I'd like you to turn to page two of the Operator's
18    Manual, which is Exhibit 26.  And page two --
19              THE COURT:  Mr. Goodman, is now a good time to stop
20    if you're going to start going through the manual?
21              MR. GOODMAN:  Yes, Your Honor.
22              THE COURT:  Let's take a brief recess.  Let's go
23    ahead and take a 20-minute break because I imagine the
24    manual part is going to take a while.  Is that accurate?
25              MR. GOODMAN:  The remainder will take a little bit,
```

```
 1    yes.
 2              THE COURT:  Let's just take a little longer break
 3    and we'll power through the rest of Mr. Farris', at least,
 4    direct.  I'm not going to hold you to how long that will be.
 5    Just know this result is us taking a little bit later than a
 6    lunch break than a noon lunch break.  We'll continue until,
 7    hopefully, Mr. Farris can, hopefully, be finished or at
 8    least on his cross.
 9              Do you anticipate him lasting all day?
10              MR. GOODMAN:  I do not, Your Honor.  I mean, my goal
11    is to finish up with Mr. Farris and then to still today put
12    on Shane Burrows, Bob Berry and Chris Peek.
13              THE COURT:  Okay.  We can go off the record for this
14    part.  I'm sorry, Ms. Miller.
15  (Recess taken at 11:15 a.m.)
16              THE COURT:  Go ahead, Mr. Goodman.
17  BY MR. GOODMAN:
18      Q    So before we took our break, we were going to start
19    talking about the manual, which is Exhibit 26.  Okay.
20              Can you switch back to -- page two says, "This crane
21    may only be used when no modifications were made on the
22    crane."
23              Were any modifications made on the crane?
24      A    No.
25      Q    Is changing out the 50-meter boom for the 84-meter
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

 1    boom or vice versa considered a modification?

 2    A    No.

 3    Q    On page 2 it also states, "the terms danger, caution

 4    and attention used in the crane documentation are intended

 5    to point out certain rules of conduct to all persons working

 6    with the crane."

 7         Do you see that?

 8    A    I do.

 9    Q    Did you read that before?

10    A    I have.

11    Q    And in your use of the Operator's Manual, did you

12    ever see the terms danger, warning, caution and attention

13    next to the description of how to manipulate the T3 pin?

14    A    No.

15    Q    And anywhere in the Operator's Manual does it even

16    talk about the T4 pin?

17    A    Not that I'm aware of.

18    Q    So this might sound like a strange question.  So,

19    then, in any way in the Operator's Manual, did you see the

20    terms danger, warning, caution and attention next to

21    anywhere they were talking about the T4 pin?

22    A    No.

23    Q    On the next page, there are warning signs with

24    signal words.  The warning signs are triangle with yellow

25    and a black exclamation point.  And the signal words are

1    danger, warning, caution, and then there's another caution

2    without the warning signs and these collectively designate a

3    dangerous situation, which will lead to death or serious

4    injury or lead to slight or medium injury or lead to

5    property damage if not prevented.

6            Do you see those?

7    A    I do.

8    Q    And had you seen those before February 16th?

9    A    Yes.

10   Q    And anywhere in the manual does it have those

11   danger, warning, caution, caution or warning signs next to

12   anywhere that it's discussing the T3 pin?

13   A    No.

14   Q    And, again, this may sound like a strange question,

15   but does anywhere in the manual have those danger, warning,

16   caution, caution or warning signs next to anywhere where

17   they're discussing the T4 pin?

18   A    No.

19   Q    Then on the bottom, there is a sign with a note that

20   designates useful information and tips.  Anywhere in the

21   Operator's Manual does it have an "i" with a circle around

22   it and a note next to where they're discussing the T3 pin?

23   A    I don't recall.

24   Q    And how about next to the T4 pin, if they're

25   discussing the T4 pin?

```
 1      A    No.

 2      Q    And it goes to say, "The crane documentation is

 3  comprised of all subsequently supplied information, updates

 4  and addenda for the crane documentation."

 5           Do you see that?

 6      A    I do.

 7      Q    So as a crane operator, do you want all subsequently

 8  supplied information, updates and addenda for the crane?

 9      A    Absolutely.

10      Q    Why do you want that?

11      A    So that you can operate the crane safely.

12      Q    And having that supplied information, the

13  subsequently supplied information, updates and addenda for

14  the crane, does it make it possible for you to operate the

15  crane safely?

16      A    Say that again.

17      Q    Having all subsequently supplied information,

18  updates and addenda for the crane documentation along with

19  the crane Operator's Manual, does that make it possible for

20  you to operate the crane safely?

21      A    It does.

22      Q    And does it support you to utilize the permissible

23  application possibilities of the crane?

24      A    It does.

25      Q    And does it provide you with the information about
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the functionality of important components and systems?

2        A    It does.

3        Q    And that's actually what it says in the Operator's

4    Manual; correct?

5        A    Correct.

6        Q    So if we turn to page 4, the first warning says,

7    "Danger of accident due to incorrect operation of the crane.

8    This can result in property damage."

9            Did you know that manipulating the T4 pin was an

10   incorrect operation of the crane?

11       A    Manipulating it?

12       Q    Yes.

13       A    No.

14       Q    Now, it goes on to say, "The only authorized trained

15   and expert personnel are permitted to work on the crane."

16   Correct?

17       A    Yes.

18       Q    On February 16th, February 17th, and February 19th,

19   were you an authorized and trained expert person permitted

20   to work on the crane?

21       A    Yes.

22       Q    And Sims confirmed that?

23       A    They did.

24       Q    Now, on February 16th, was Shane Burrows an

25   authorized and trained expert personnel permitted to work on

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the crane?

2        A    Under my direction.

3        Q    And at the time, February 16 through 19th, was the

4    crane documentation that was supplied to Sims accessible on

5    the crane?

6        A    No.

7        Q    It was not accessible on the crane?

8        A    You talking about the cover plate?

9        Q    No, not the cover plate.  We haven't gotten there

10   yet.  I'm talking about the actual Operator's Manual.  Was

11   that accessible on the crane?

12       A    It was.

13       Q    Now, it goes on to say, "The crane documentation on

14   site regulations and specifications, such as accident

15   prevention regulations must be observed."

16            Do you see that?

17       A    Yes.

18       Q    Did you comply with that?

19       A    I did.

20       Q    It goes on to say, "Using the crane documentation

21   avoids problems due to improper operation;" correct?

22       A    Correct.

23       Q    Do you agree with that?

24       A    I do.

25       Q    It says, "Place the crane documentation accessible

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    in the driver's cab or in the crane cab."

2           Was the Operator's Manual accessible in the driver's

3    cab or in the crane cab?

4       A    It was in the driver's cab.

5       Q    Next warning says, "Outdated versions of crane

6    documentation is subsequently supplied information, updates

7    and addenda to the crane documentation are not observed and

8    added, there's a danger of accidents."

9           Do you see that?

10      A    I do.

11      Q    It goes on to say, "Personnel can be killed or

12   seriously injured." Do you see that?

13      A    I do.

14      Q    It says, "This could result in property damage." Do

15   you see that?

16      A    I do.

17      Q    It goes on to say, "Observe and add all subsequently

18   supplied information, updates and addenda for the crane

19   documentation."  Do you see that?

20      A    Yeah.

21      Q    It goes on to say, "Make sure that all affected

22   persons always know and understand the latest version of the

23   crane documentation."  Do you see that?

24      A    I do.

25      Q    I'd like you to turn to Exhibit 14 -- excuse me, 15.

1          On February 16th through February 19th, had you been

2     provided this Product Safety Bulletin?

3     A     No.

4     Q     If this Product Safety Bulletin had been put out on

5     November 8th, 2017 and it affects and can result in serious

6     injury or death or property damage, would you have wanted to

7     have this information while you were operating the crane?

8     A     Absolutely.

9     Q     I'm showing you what's been marked as Exhibit 17.

10    Read this to yourself and let me know when you're done.

11    A     Can you enlargen it?

12    Q     (Complies).

13    A     Thank you.  Okay.

14    Q     Were you provided this document, "Retrofitting of

15    Cover Plate" before February 16th, 2018?

16    A     No.

17    Q     Would you have liked to have had this document,

18    "Retrofitting of Cover Plate" before February 16th --

19    A     Yes.

20    Q     -- 2018?

21    A     Yes.

22    Q     Now, the next page IAI0752 has warning stickers.

23          Can you take a look at that and let me know when

24    you're done reading it?

25    A     Okay.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Now, what is the top warning sticker?

2      A    That is telling you, basically, that the pin is

3   unlocked.

4      Q    That's how you understand that?

5      A    Yes.

6      Q    Would you have understood that if that was provided

7   to you before February 16th, 2018?

8      A    Yes.

9      Q    And then what is -- how about reading the second

10  sticker?  What do you understand that to mean?

11     A    Don't touch it.

12     Q    And why shouldn't you touch it?

13     A    There's a big X through it.

14     Q    And what does it say underneath it?

15     A    "Do not unlock the telescopic boom locking pin."

16     Q    Is there a warning with a triangle and an

17  exclamation point?

18     A    There is.

19     Q    And what does the warning say?

20     A    It says, "Impermissible telescopic boom locking pin

21  unlocked, the telescopic boom can retract in an uncontrolled

22  manner.  Death, severe bodily injuries, and property damage

23  if a locking pin is marked with this sign.  Never unlock the

24  locking pin."

25     Q    Now, is that terminology and that information in the

1    Operator's Manual that you had?

2        A    No.

3        Q    Would you have liked to have had that information

4    prior to February 16th, 2018?

5        A    Absolutely.

6        Q    And if you would have had that information prior to

7    February 16th, 2018, what would you have done if Shane

8    Burrows advised you that he had manipulated the T4 pin?

9        A    Would have stopped immediately.

10       Q    And why would you have stopped immediately?

11       A    Because, obviously, something was done wrong and it

12   tells you right there not to do it because there's a risk

13   involved.

14       Q    So would you have run the crane?

15       A    No.

16       Q    Would you have extended the boom?

17       A    No.

18       Q    Would you have retracted the cylinder manually?

19       A    No.

20       Q    So if Shane Burrows, on February 16th, told you he

21   had manipulated the T4 pin and you were aware of this

22   information on February 16th, 2018, what would you have

23   done?

24       A    I probably would have taken the whole boom package

25   back out and put it back on the trailer until the issue was

1    resolved.

2        Q    And if somebody said, "hey, we got a job on Monday,"

3    what would you have told them?

4        A    Tough cookies.

5        Q    What do you mean by that?

6        A    No.  I wouldn't do the job until that's fixed.

7        Q    And why would you have told them that?

8        A    Because it says right there that the impermissible

9    telescopic boom locking pin shouldn't be unlocked and if it

10    does, something could happen.

11        Q    And what's the result of what could happen?

12        A    Uncontrollable collapse.

13        Q    And what could happen to people and the crane itself

14    in that situation?

15        A    They would be injured.

16        Q    Now, if we turn to the next page and go down a

17    little bit, is that a fair and accurate representation of

18    what the cover plate on the 84-meter boom looked like?

19        A    Yes.  This one has wing nuts on it, but --

20        Q    And what did the cover plate on the Sims Crane have?

21        A    Bolts.

22        Q    Then was the T4 pin accessible like that that you

23    see on the right of that picture?

24        A    Yes.

25        Q    Go to the next page.  Have you ever seen this

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    before?

2         A    Yes.

3         Q    When was the first time that you saw a cover plate

4    that looked like this?

5         A    Probably about a month and a half, two months after

6    the accident.

7         Q    And what did you understand this cover plate to mean

8    or to be or to be used for?

9         A    It was to cover both pins, and it had the signage on

10   there explaining what pins to engage and disengage.

11        Q    And you had mentioned earlier that Shane Burrows had

12   left the cover plate over the T3 pin on the 84-meter boom

13   package?

14        A    He did.

15        Q    Now, if Shane Burrows would have left this cover

16   plate on the 84-meter boom package and slid in the 84-meter

17   boom package to the boom base, would he have been able to

18   lock down the T4 pin?

19        A    He wouldn't have access to it.

20        Q    And why is that?

21        A    Because the cover plate is on there.

22        Q    Have you ever tested whether or not it could go in

23   even with this cover plate?

24        A    I never had any direct contact with that cover plate

25   on the crane.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And assume that the cover plate's too high to even

2    slide in, what would happen if you tried to slide it in with

3    that cover plate on it and the cover plate was too big?

4    A    It would just jam up in there.  You wouldn't be able

5    to slide the boom inside there.

6    Q    And then what would happen in that situation if that

7    occurred?

8    A    You'd have to take it back out and remove that cover

9    plate.

10   Q    And if somebody removes that cover plate, what are

11   they looking at?

12   A    They're looking at the cover plate and the signage

13   on the cover plate.

14   Q    And there are warnings on it?

15   A    There is.

16   Q    So if that happened, would one be aware of what

17   pin -- or strike that.

18        If that happened, would you be aware of which pin

19   you could manipulate and which pin you can't?

20   A    Yes.

21   Q    And then if you take off that cover plate, what's

22   the first pin that you see in the T2 access hole?

23   A    The T3 pin.

24   Q    I'd like you to go back to Exhibit 26, page 4.  If

25   we go to the bottom warning, it says, "Warning.  Crane

1    Documentation is Not Understood.  If parts of the crane

2    documentation are not understood and the tasks are carried

3    out on or with the crane, then there is a danger of

4    accidents.  This could result in property damage;" correct?

5        A    Correct.

6        Q    Was there anything that you were doing on

7    February 16th or February 19th that you did not think you

8    understood?

9        A    No.

10       Q    Do you understand the Operator's Manual?

11       A    I do.

12       Q    Did you understand your training?

13       A    I did.

14       Q    And you had 18 years of experience?

15       A    Sixteen at the time.

16       Q    I'd like to go to the next page.  Up at the top

17   there's a note.  It says, "Your motto must always be safety

18   first." Do you see that?

19       A    I do.

20       Q    Do you agree with that?

21       A    I do.

22       Q    Why do you agree with that in the crane industry?

23       A    You're dealing with large equipment.  You know,

24   things can happen and people can get hurt.

25       Q    And it's understood that you're dealing with large

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    equipment and you could get hurt; right?  Is that why you

2    need specific warnings about specific issues on cranes?

3        A    Yes.

4        Q    And down below it says, "Warning.  The crane permit

5    and the manufacturer's warranty will become void.  If any

6    original installed parts are modified, manipulated or

7    replaced, e.g., removal of parts, installation of

8    non-original Liebherr parts, both the crane permit and the

9    manufacturer's warranty will become void."

10           Was the Liebherr LTM 1500 that was used by Sims, was

11   it modified, manipulated or were parts that were not

12   original Liebherr parts installed on it?

13       A    No.

14       Q    I'd like to turn to page 533 of the Operator's

15   Manual.  If we zoom in at the top -- actually, if we zoom in

16   at the top, section 6 says "telescoping."  Is that what it

17   says?

18       A    Yes.

19       Q    Is that what you were doing on February 19th, 2018,

20   telescoping?

21       A    Yes.

22       Q    And this notice says, "damage of the push-out

23   mechanism on the telescopic boom?  If the following

24   conditions are not observed, there's a danger that the

25   telescopic boom is significantly distorted on the side

1    during the telescoping procedure and that the telescoping

2    cylinder can no longer retract into the corresponding

3    telescope, but fits against the end section of the front,

4    this can cause damage to the push-out mechanism on the

5    telescopic boom.  If the telescopic boom is telescoped,

6    especially with auxiliary boom or tele extension, then it

7    must be ensured before the telescoping procedure that:  The

8    crane vehicle is supported and horizontally aligned.  The

9    telescopic boom is not significantly heated up on one side

10   due to sun exposure and there is no strong side wind."

11        Do you see that?

12   A    I do.

13   Q    And is that what you were experiencing that day on

14   February 19th, that you had the mechanism of the cylinder

15   not coming back?

16   A    Yes.

17   Q    And the crane you said was supported and

18   horizontally aligned; correct?

19   A    The boom itself?

20   Q    No.  The crane.

21   A    Yes.

22   Q    It was flat?

23   A    It was.

24   Q    And was the telescopic boom significantly heated up

25   on one side to sun exposure?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A     No.

2        Q     And was there any strong wind?

3        A     No.

4        Q     And there's nothing on here that has a triangle with

5   an exclamation point that says danger, warning, or caution,

6   is there?

7        A     No.

8        Q     Then I'd like to go to page 547.  This is for

9   manually telescoping the telescopic boom.  Is that what this

10  is?

11       A     Yes.

12       Q     And this is a section that you referenced on

13  February 19th, 2018?

14       A     It is.

15       Q     And nowhere in this section is there a triangle with

16  an exclamation point and a warning, caution or danger that

17  says that manually telescoping the telescopic boom can cause

18  damage to personal, property or death, does it?

19       A     No.  It does not.

20       Q     Did you undertake the manually telescoping of the

21  telescopic boom according to section 6.7?

22       A     I did.

23       Q     And nowhere in 6.7 does it say that you should

24  contact Liebherr, does it?

25       A     No.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    If we go to section page 749, this has a warning

2    with an exclamation point and a yellow triangle.  Do you see

3    that?

4    A    I do.

5    Q    And it's assembly/disassembly.  Do you see that?

6    A    I do.

7    Q    There's a warning that says, "Risk of fatal injury

8    due to incorrect assembly or disassembly.  The

9    assembly/disassembly of components may never be performed by

10   untrained personnel."

11        Were you a trained personnel?

12   A    I was.

13   Q    Was Shane Burrows a trained personnel?

14   A    Under my direction.

15   Q    And then it goes on to say, "incorrect

16   assembly/disassembly can result in death or severe

17   injuries."

18        Did you believe that manipulating the T4 pin back to

19   the way you found it was an incorrect assembly or

20   disassembly?

21   A    No.

22   Q    Did you believe that it could result in death or

23   severe injuries?

24   A    No.

25   Q    Do you believe that it could result in property

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    damage?

2        A    No.

3        Q    If you thought that, what would you have done?

4        A    Stopped.

5        Q    Now, you are aware -- strike that.

6            Were you aware what pin was supposed to be

7    manipulated for assembly and disassembly of the 84-meter

8    boom to the base with a 50-meter boom to the base?

9        A    Yes.

10       Q    What pin is that?

11       A    T3 pin.

12       Q    You weren't confused about that, were you?

13       A    No.

14       Q    Did Henry Ward ever train you that if you had to

15   retract or extend the boom manually that you should call

16   Liebherr?

17       A    No.

18       Q    I'd like to show you what's been marked as Exhibit

19   105.  Read to yourself, Item No. 1.

20       A    Okay.

21       Q    Now, between February 16th and February 19th, were

22   you using your common sense in your experience?

23       A    I was.

24       Q    And was there any reason, in your common sense and

25   your experience, that told you that what you were

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    experiencing on February 19th with the boom would cause the

2    boom to retract uncontrollably?

3        A     No.

4        Q     Was there anything that you thought was a potential

5    safety hazard on either February 16th or February 19th?

6        A     No.

7        Q     Now, was there any injuries that occurred on

8    February 16th?

9        A     No.

10       Q     Now, on February 19th, did you report what occurred?

11       A     I did.

12       Q     Did you ever submit a false or fraudulent

13   information when reporting anything involving the event that

14   occurred on February 19th?

15       A     No.

16       Q     Were you under the influence of drugs or alcohol on

17   February 16th or 19th?

18       A     No.

19       Q     Did you have any illness or for some reason were you

20   emotionally upset on February 16th or 19th?

21       A     No.

22       Q     Was there any unsafe condition that you identified

23   that you were reporting to a manager or supervisor?

24       A     On what day?

25       Q     On either February 16th or February 19th.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        A    No.

 2        Q    At any time on February 16th or February 19th, were

 3   you unsure of how to perform an assigned task?

 4        A    No.

 5        Q    Now, you did stop and you called Mike Gay; correct?

 6        A    I did.

 7        Q    Did you call him because you were unsure of how to

 8   perform an assigned task?

 9        A    No.

10        Q    Why did you contact him?

11        A    So that he could send a technician out there, so

12   that he was aware of what was going on at the job site.

13        Q    And why did you want a technician to come out?

14        A    To assist in the problem that we were having with

15   the crane.

16        Q    And earlier you said it was because you thought it

17   was a mechanical issue?

18        A    I did.

19        Q    And mechanics are supposed to work on the mechanical

20   stuff; is that correct?

21        A    That's correct.

22        Q    So you can't and shouldn't work on the mechanical

23   stuff?

24        A    Right.

25        Q    You operate the crane?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    That's right.

2      Q    As a crane operator in your 16 years of experience,

3  at that time, would you often troubleshoot issues --

4      A    Yes.

5      Q    -- on cranes?

6      A    Yes.

7      Q    Does that happen daily?

8      A    Not daily, but often.

9      Q    Now, you had used the manual mode?

10     A    Correct.

11     Q    In using the manual mode, were there any guards that

12  you had to bypass?

13     A    No.

14     Q    Did you have the authority to start and operate the

15  crane?

16     A    I did.

17     Q    Were all the guards and safety devices that you knew

18  of, were they in place on February 16th and 19th?

19     A    They were.

20     Q    Now, if Liebherr was aware that there was a guard

21  that was not provided to you, how does that make you feel?

22     A    What's that?

23     Q    If Liebherr was aware that there was a guard that's

24  reflected in Exhibit 19 -- if Liebherr was aware that there

25  was this guard in Exhibit 19 and that it was not provided to

1    you, how does that make you feel?

2        A    Frustrated.

3        Q    And why does it make you feel frustrated?

4        A    Because there's a resolution to the issue that we

5    were having with the crane and we would have known about it

6    prior to the accident.

7        Q    And did you know about it on February 16th or 19th?

8        A    No.

9        Q    Now, No. 10 on Exhibit 105 says, "Do not attempt to

10   repair or tamper with equipment that is not working

11   properly."

12            On February 16th or February 19th, were you

13   attempting to repair or tamper with the Liebherr LTM 1500?

14       A    No.

15       Q    And what does repair, tamper mean to you?

16       A    Repairs to, like, make a mechanical repair.  And

17   tamper is obviously tampering with something that you're

18   obviously not supposed to be messing with.

19       Q    And so what were you doing on February 19th?

20       A    I was troubleshooting the crane.

21       Q    Is that something that you often do as a crane

22   operator?

23       A    It is.

24       Q    Does anything run perfectly on crane jobs all the

25   time?

1     A    No.

2     Q    And that's why you're hired; right?

3     A    Right.

4     Q    That's why you went to school for 8,000 hours; is

5   that right?

6     A    Right.

7     Q    Why you have 18 -- 16 years of experience; right?

8     A    Right.

9     Q    Is that why you get Liebherr operator training;

10  right?

11    A    That's right.

12    Q    Have you heard of, did you know of, did anybody tell

13  you, did you have any information that there was a Product

14  Safety Bulletin that was issued by Liebherr Germany for the

15  Liebherr LTM 1500 that would have provided a cover plate and

16  warning stickers for the crane --

17    A    No.

18    Q    -- before February 19th?

19    A    No.

20    Q    How about before February 16th?

21    A    No.

22    Q    Were you the assembly/disassembly director on

23  February 16th and February 19th?

24    A    I was.

25    Q    Were you an experienced -- were you a qualified

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    person on February 16th and February 19th with regard to

2    operating the crane?

3        A    I was.

4        Q    You were also the crane operator on February 16th

5    and February 19th?

6        A    I was.

7        Q    The crane -- the Liebherr LTM 1500 is not a tower

8    crane, is it?

9        A    No.

10        Q    Now, on February 19th, when you are extending that

11    boom out, are you involved in post-assembly inspection?

12        A    Yes.

13        Q    Did you have authority to stop operation on

14    February 16th and 19th?

15        A    I did.

16        Q    Who gave you that authority?

17        A    Sims Crane.

18            MR. GOODMAN:  Could I have one moment, Judge?

19            THE COURT:  You may.

20   (Brief pause.)

21            MR. GOODMAN:  No more questions at this time, Your

22    Honor.

23            THE COURT:  Thank you.

24            Mr. Cremer or Mr. Pender, which of you will be doing

25    the cross-examination?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1              MR. CREMER:  I will, Your Honor.
 2              THE COURT:  Mr. Cremer, about how long are you
 3     expecting it to last?
 4              MR. CREMER:  I think maybe 45 minutes, an hour.
 5              THE COURT:  Then let's go ahead and do your
 6     cross-examination, and then from there we'll decide whether
 7     to take a lunch break at that time or to have Mr. Goodman do
 8     the redirect.
 9              MR. CREMER:  Okay.
10                        CROSS-EXAMINATION
11     BY MR. CREMER:
12         Q    Good morning, Mr. Farris.
13         A    Good morning.
14         Q    We met once before at your deposition.
15         A    Yes, sir.
16         Q    Your highest level of education was a GED; correct?
17         A    That's right.
18         Q    And I think you testified you began working for Sims
19     Crane in November of 2015?
20         A    That's right.
21         Q    After you got out of high school, you worked for
22     Target.  Is that the retail store?
23         A    Yes, sir.
24         Q    And then you went to work at Harley Davidson for,
25     roughly, eight months or so?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    That's right.

2    Q    What did you do for Harley?

3    A    I was the parts and service guy.  Not manager,

4    but...

5    Q    And you got into working with cranes when you were,

6    did you say, 19 or 18?

7    A    19, 18 going on 19.

8    Q    And you got into the crane industry ultimately

9    through a union apprenticeship program?

10    A    That's right.

11    Q    There was a gentleman named Bob Berry who was one of

12    your instructors in the apprenticeship program; is that

13    right?

14    A    That's right.

15    Q    And Bob Berry was, at least around that time, the

16    safety director for Sims Crane?

17    A    At that time, he was the salesman and safety man for

18    Kelly Equipment.

19    Q    Okay.  And so you got to know him as one of his

20    students?

21    A    He hired me to work for Kelly Equipment out of the

22    hall.

23    Q    And then in 2015 when you're now going to work for

24    Sims, you actually called Bob Berry to see if there is a

25    position open potentially for you?

1    A    I did.

2    Q    Is it true that you did not work on any crawler

3  cranes or all-terrain hydraulic cranes before working at

4  Sims?

5    A    That's not true.

6    Q    Did you work with all-terrain cranes before Sims?

7    A    Yes.

8    Q    And what types were those?

9    A    Those were all-terrain truck cranes.

10    Q    And any as large as the LTM 1500?

11    A    No.

12    Q    Any of those cranes have two-sized booms that could

13  be swapped into the crane?

14    A    No.

15    Q    First time you had any experience with a crane where

16  you could remove one size boom and substitute it with a

17  larger size boom was with the LTM 1500?

18    A    That's right.

19    Q    There was an event that occurred when you were

20  working in 2008?  Was that Kelly Crane?

21    A    Sir?

22    Q    Where were you working in 2008?  Was that Kelly?

23    MR. GOODMAN:  I'm going to object, Your Honor.

24  Trying to bring in prior acts to show actions in conformity

25  therewith, which is not an appropriate way.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  At this point, I'm going to let him

2     continue with the line of questioning.  You had opened the

3     door, at least, to prior employment, at least, through the

4     direct.

5          Go ahead.  You can ask questions about his prior

6     employment and any events that may have occurred.

7     BY MR. CREMER:

8          Q    Where were you working in 2008?

9          A    If you're referring to the accident, that would be

10    in Hillsboro, Illinois.

11         Q    Who were you working for?

12         A    I forget the name of the contractor I was working

13    for there.

14         Q    You were operating a Manitowac 4000 Crawler Crane?

15         A    Manitowac 4100.

16         Q    And this particular contract you're working for was

17    aggressive and he wanted you to exceed the limits of that

18    crane.  He told -- you told him you didn't want to, but

19    ultimately you did because you feared that you'd lose your

20    job?

21         A    That's correct.

22         Q    That crane turned over?

23         A    It did.

24         Q    You took a risk you knew you shouldn't take?

25         A    Eventually, yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    The next time you had a crane accident was the LTM

2    1500 on February the 19th, 2018; correct?

3    A    That's correct.

4    Q    Until the training that was provided to you by Henry

5    Ward on the LTM 1500, you never had any other training that

6    was provided to you by crane manufacturers; is that true?

7    A    That's true.

8    Q    So all the training you had on cranes, that you had

9    operated prior to the LTM 1500, came from what we'll call

10   on-the-job training, hands-on training; true?

11   A    That's right.

12   Q    When you were in the apprenticeship program or even

13   after that, did you ever take any OSHA classes where you

14   were certified in any aspects of OSHA regulations?

15   A    Other than the NCCCO, no.

16   Q    And so you contact Bob Berry because you're unhappy

17   with where you're working and you asked if there is a place

18   for you at Sims; right?

19   A    That's correct.

20   Q    When you interviewed at Sims Crane, you interviewed

21   with Mike Gay?

22   A    That's correct.

23   Q    And he ultimately became your supervisor when you

24   started at Sims Crane?

25   A    Yes.

1    Q    He remained your supervisor all the way through --

2    through your period up until this accident occurred in 2018?

3    A    He did.

4    Q    I'm going to go to Plaintiff's Exhibit 105, which

5    was already a document you looked at.  This is the Sims

6    Crane Equipment General Safety Rules.  And there's a place

7    down at the bottom of that document that actually has your

8    signature on it?

9    A    There is.

10   Q    And it's dated November of 2015?

11   A    That's correct.

12   Q    And that suggests to me that you read the various

13   rules that are listed on that document and that you agreed

14   to abide by them?

15   A    That's right.

16   Q    I think you testified on direct examination that you

17   were part of the crew that went out to the Jacksonville port

18   to retrieve this crane; correct?

19   A    That's right.

20   Q    And your role during that process of offloading the

21   crane from the ship and getting over to the Sims' yard was

22   basically a laborer's position?

23   A    That's right.

24   Q    You weren't operating the crane at that time; right?

25   A    No.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Now, we haven't -- or you haven't yet talked about a

2  gentleman named Jason D'Angelo.  He was a crane operator at

3  Sims, wasn't he?

4      A    He was.

5      Q    And when this used crane LTM 1500 was purchased by

6  Sims, a decision was made to have Jason D'Angelo be the

7  primary operator of that crane.  True?

8      A    He was hired to run that crane directly, yes.

9      Q    And at that time, there wasn't a specific plan to

10  have you do anything with respect to that crane?

11      A    No.

12      Q    Mr. D'Angelo quit the company, didn't he?

13      A    He did.

14      Q    Do you know why he left?

15      A    I don't know.

16      Q    Have you had any contact with him since he left?

17      A    I ran into him on one job after the incident, but we

18  didn't discuss, you know, anything as far as why he quit or

19  anything.

20      Q    At some point in time after the crane -- the LTM

21  1500 crane was acquired by Sims, you showed interest and

22  suggested that you get involved with learning how to operate

23  that crane?

24      A    That's right.

25      Q    Now, do you remember specifically day by day the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    training that you received from Henry Ward in the end of

2    January, beginning of February of 2017?

3         A    Do I remember the day by day?  Yes.

4         Q    But you have a general recollection of the various

5    procedures and tasks that you went through with Mr. Ward

6    during the course of that week?

7         A    That's right.

8         Q    Now, I want to go to a document that was up

9    previously which is Plaintiff's 64, our Defendant Exhibit

10   No. 1.  It's the Liebherr crane operator training -- I'll

11   call it a checklist, if that's all right just so we know

12   what we're talking about.

13        A    (Nodding head.)

14        Q    And if we go to the first page of that document,

15   under record of crane operator training, there's the

16   provision, which -- tell me if you didn't read it, but which

17   says the operator signing this form to confirm that he or

18   she fully understands and comprehends the training provided.

19             And as to the sections that were listed in this

20   document that Henry Ward actually provided training to you,

21   you would have signed this document, and you did sign this

22   document, I think you testified, acknowledging that you

23   received the training, that you understood and comprehended

24   the training?

25        A    That's correct.

1      Q    It also says in the second paragraph, "Objective,"

2    last sentence, "Liebherr will provide this training to the

3    person or persons that are designated by the employer as the

4    crane operator."

5           Do you have any knowledge why it was only you and

6    Mr. D'Angelo that were selected to be part of this training?

7      A    Jason was hired specifically to operate this crane

8    and then I showed interest in the crane.  And Jason being

9    the only person at Sims Crane that could run that crane

10   meant that he was the only one to run the crane.  So if he

11   had to have a day off or if he needed to go take care of

12   personal business, they didn't have anybody to back him up

13   to operate that crane.

14     Q    Is there anything in terms of limitation on the

15   number of trainees that could have been part of that

16   training process during that week with Henry Ward?

17     A    As far as an operator?

18     Q    As far as people attending to get the benefit of the

19   information that came from Liebherr about how to be oriented

20   on this crane.

21     A    No.

22     Q    Are you aware that Jason D'Angelo went to management

23   and suggested that Shane Burrows actually attend that

24   training and he was -- his suggestion was rejected?

25     A    I was not aware of that.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    He never talked to you about that?

2      A    No.

3      Q    Do you think it would have been a good idea for

4  Shane Burrows to have attended that training?

5      A    Yeah.

6      Q    Did you make a request that Shane Burrows attend the

7  training?

8      A    No.

9      Q    It says in the second paragraph of the objective

10  section, "Liebherr expects the employer to designate

11  personnel that are fully competent crane operators and this

12  record does not certify or verify their competence in this

13  regard."

14       Do you understand that the training that was

15  provided by Liebherr had nothing to do with teaching you how

16  to be a crane operator?

17      A    That's correct.

18      Q    The assumption for all involved, including you, that

19  you had that core competence and this training was to orient

20  you on the aspects of the machine that you might not be

21  familiar with?

22      A    That's correct.

23      Q    It says, "It is not the responsibility of Liebherr

24  Cranes to determine the competency of a crane operator."

25       Do you think that's a fair statement?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    It is.

2    Q    Then, if we go to IAI0510, the section on boom, this

3    entire page of the training checklist pertains to the boom;

4    right?

5    A    It does.

6    Q    And Section 5.2 deals with boom options.  It deals

7    with configurations, with removal, caution, safety issues

8    and all those topic areas are checked; right?

9    A    That's right.

10    Q    You would agree with me that Henry Ward covered all

11    of those areas in his training with you during that week?

12    A    To my understanding, he did.

13    Q    And this area that are checked here would have

14    included swapping out the 50-meter for the 84-meter boom?

15    A    That's right.

16    Q    And you -- at the bottom of that page, is that your

17    signature there under "operator"?

18    A    Yes, sir.

19    Q    And you had acknowledged that as to the boom, both

20    the 84 meter and 50 meter, the areas that were covered by

21    Henry Ward, including how to properly and safely swap out

22    the 50 meter for the 84 meter, was covered by him and you

23    understood it?

24    A    That's right.  That's right.

25    Q    And this was a full week of training.  You started

 1    in the morning and went to the end of the workday 4:00 or

 2    5:00 p.m.; correct?

 3        A    That's right.

 4        Q    So originally you were what I'll call the "backup

 5    operator" for this crane; right?

 6        A    Yes, sir.

 7        Q    And at some point in time after -- well, I guess

 8    once Jason D'Angelo quits, you now are the man; you're the

 9    LTM 1500 operator?

10        A    That's right.

11        Q    And that's then your primary piece of equipment from

12    that point forward?

13        A    That's right.

14        Q    And during that time before this accident, how long

15    was it that you were actually operating the LTM on a

16    full-time basis once Mr. D'Angelo left the company up until

17    February the 19th when this accident occurred?

18        A    Say that again so I could understand it.

19        Q    I just want to know how many months or years you

20    were operating the LTM 1500 as a primary operator once Jason

21    left and then the accident takes place?

22        A    I believe it was like six months.

23        Q    And during that time, you had the experience of

24    operating that crane a hundred times and you did that day in

25    and day out?

1          A      Not every single day.  I ran other cranes while
2     Jason was operating that crane.
3          Q      No.  No.  I'm talking about when you were the
4     primary operator.
5          A      Oh, yes.
6          Q      But once you became the primary operator for that
7     six-month period, every day you operated that crane day in
8     and day out?
9          A      If they had a job, I ran that crane.
10         Q      And you would agree that by the time of this
11    accident in February of 2018, you were thoroughly familiar
12    with the operation of that crane?
13         A      That's right.
14         Q      And you had no issues as to how to operate that
15    crane that you felt made you less competent or unqualified
16    to do any aspect of operating that crane, including properly
17    swapping booms?
18         A      That's right.  Correct.
19         Q      I think we already established that when you do a
20    boom swap and you're putting the big boom in, that's a very
21    labor intensive operation?
22         A      Very.
23         Q      It takes a number of men to assist in that process?
24         A      That's right.
25         Q      That would have been true not only when you were

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    trained by Henry Ward, but also each time you actually

2    conducted a boom swap, you would need the support of 8 or 10

3    Sims Crane employees to do that?

4        A    That's right.

5        Q    After you completed the training with Henry Ward,

6    you felt completely qualified to perform the particular

7    procedure of conducting a boom swap, and there wasn't

8    anything you felt unsure about, was there?

9        A    I wanted more training on the luffer application of

10   that crane, installing the luffer application.

11       Q    Did they have a luffer at that time?

12       A    We had a luffer, but we didn't use it.

13       Q    And did you ever receive that training before the

14   luffer was used?

15       A    We never used the luffer.  I never personally used

16   that luffer.

17       Q    So you never had an occasion to use the luffer

18   during the time you were an operator?

19       A    That's right.

20       Q    And what you're saying is, had you -- had you needed

21   to use it, you would have needed more training before you

22   did that particular aspect of the crane?

23       A    That's right.

24       Q    That never came up?

25       A    No.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And it's true that you successfully assembled and
2    disassembled the 84-meter boom on the LTM 1500 at least four
3    or five times before the date of this accident?
4    A    That's right.
5    Q    And each time you did that, you did it safely,
6    properly locking the correct locking pin at T3?
7    A    That's correct.
8    Q    Nobody left the cover on during those four or five
9    other times?
10   A    No, sir.
11   Q    And it's your understanding that Sims Crane as a
12   company had performed a swap of the 50 meter for the
13   84-meter boom on many more times than that?
14   A    As far as I know, Jason did several times.
15   Q    And you just reviewed the OSHA investigation.  You
16   saw the number 35 times that the company reported to OSHA
17   that they had successfully and safely conducted a boom swap
18   of the 50 meter to the 84-meter boom before this accident?
19   A    They may have.  I wasn't directly involved in it.
20   Q    I said you read that in the information that was
21   given to OSHA when they were investigating a very serious
22   event?
23   A    That's right.
24   Q    Do you have any reason to dispute that the company
25   had that amount of experience in conducting boom swaps?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    No.

2      Q    So is there any question in your mind, as you sit

3   here today, that you and Sims Crane had the requisite

4   knowledge and skills to properly and safely swap out the

5   50-meter boom for the 84-meter boom?

6      A    I do.

7      Q    And even though you felt competent and qualified and

8   had been successful in doing it a number of times before the

9   date of this event, every time you had occasion to conduct

10  the boom swap, you still went to the manual and you

11  conducted -- you consulted the specific section of the

12  manual dealing with the boom swap?

13     A    That's right.

14     Q    Because you wanted to make sure that each

15  step-by-step procedure to perform a boom swap was

16  accomplished by you?

17     A    That's right.

18     Q    Based on your training, you understood that the

19  locking pins for each of the telescopic sections were the

20  mechanical locks holding the sections together; isn't that

21  right?

22     A    That's correct.

23     Q    So that's why it was important for you to make sure,

24  when you're securing the 84-meter boom or the 50-meter boom,

25  that the T3 pin is properly locked, because that is the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    connection that holds it in place; right?

2        A    That's right.

3        Q    And if that connection doesn't hold it in place,

4    what will happen to that boom when you boom up?

5        A    Well, if it doesn't lock into place, you're not

6    going to be able to scope it back in to set it inside the

7    50-meter boom section.

8        Q    Would anything prevent it from sliding out or back

9    if it wasn't locked into place?

10       A    Not that I'm aware of.

11       Q    So you would have the concern, wouldn't you when

12   you're setting the T3 pin to make sure it's fully locked

13   because you'd be concerned otherwise that when you boom that

14   boom up, it could slide back in on itself if it wasn't

15   properly locked; right?

16            MR. GOODMAN:  Objection, Your Honor.  Misstates the

17   evidence that I think Mr. Farris just said.

18            THE COURT:  Let me look at the question.

19            MR. GOODMAN:  Mr. Farris said --

20            THE COURT:  I'm looking at it all.

21            MR. GOODMAN:  I apologize.

22            THE COURT:  It's more than -- it's a five-line long

23   question.  It's more -- I'm trying to dissect what the

24   question was even asking.  I'm impressed that you're able to

25   object to it.  I'm not sure.  I'm going to ask you to

1   restate the question.  Perhaps break it up.

2           MR. CREMER:  I'll try to be more concise.

3   BY MR. CREMER:

4       Q    The fact that you understood that these locking

5   pins, including the T3 pin locking pin, was the mechanical

6   connection that hold these sections in place, you knew that

7   the T3 pin had to be fully locked because there was a risk

8   if you didn't that that pin -- that telescopic section could

9   fall in?

10          MR. GOODMAN:  Objection, Your Honor.  Misstates his

11  testimony.

12          THE COURT:  He can answer the question.

13          THE WITNESS:  If that pin is not fully locked in,

14  the cylinder will not literally grab the pin, unlock it to

15  pull those boom sections in, so there's no booming up and

16  telescoping the thing out because it literally will not pull

17  itself in if that thing is not locked in place.

18  BY MR. CREMER:

19      Q    If you leave the T3 pin fully unlocked and you raise

20  up that boom, do you know what's going to happen?

21      A    You can't leave it unlocked because the cylinder

22  won't grab ahold of it to pull it back in.

23      Q    You can certainly boom up that boom, can't you?

24      A    You cannot.

25          MR. GOODMAN:  Objection.  Argumentative.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
1              THE COURT:  He's gotten an answer.  Move along.
2    BY MR. CREMER:
3        Q    Henry Ward trained you and Mr. D'Angelo what pin
4    that you would need to lock and unlock in order to
5    successfully perform a boom swap; true?
6        A    That's true.
7        Q    And you knew that in doing a boom swap, you never
8    needed to touch any other pin other than the T3 pin;
9    correct?
10       A    Correct.
11       Q    You knew you never needed to touch the T4 pin;
12   correct?
13       A    That's correct.
14       Q    And the T4 pin was something that was a factory set
15   position; right?
16       A    I know it now, yes.
17       Q    Well, if you never had to touch it, was it your
18   understanding it was always locked until the cylinder was
19   under it and unlocked it?
20       A    Yes.
21       Q    So whatever position that T4 pin was set at was done
22   by the manufacturer?
23       A    That's right.
24       Q    And you knew under no circumstances was there ever
25   any reason in doing the boom swap to manipulate that pin;
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    correct?

2        A    That's correct.

3        Q    And Shane Burrows should have known that, too,

4    shouldn't he?

5        A    Well, he was under my direct supervision.

6        Q    He should have known, under your supervision, if he

7    was properly instructed that he should never touch that pin,

8    shouldn't he?

9        A    He was not instructed that he should never touch

10    that pin, no.

11        Q    When you were being trained by Henry Ward, you were

12    the person that actually removed the dust cover from the T3

13    pin when you were doing the training swap?

14        A    Yes.

15        Q    So you were shown and you knew that it was a

16    necessary prerequisite before installing the 84-meter boom

17    to take off that particular dust cover; right?

18        A    That's correct.

19        Q    And so you, as the lift director on February the

20    16th, when you were doing the swap in the Sims' yard, you

21    knew that that dust cover needed to come off so that the T3

22    pin could be exposed so that it could be properly locked?

23        A    That's correct.

24        Q    And you instruct Shane Burrows to take it off;

25    right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    That's correct.

2    Q    And he doesn't do that, does he?

3    A    No.

4    Q    And did you ever talk to him about did you forget?

5    Was there a discussion about why that occurred?

6    A    After the fact.

7    Q    Shane Burrows said that you never told him to remove

8    that cover.  Do you disagree with that?

9    A    I do.

10    Q    Do you think he is telling a lie when he said that

11    you never instructed him to remove that dust cover?

12    A    I don't think he's lying, no.

13    Q    Is there -- well, is it possible that you didn't

14    tell him, that you forgot?

15    A    No.

16    Q    Regardless of whether you instructed him or not,

17    you're the lift director on this boom swap?

18    A    That's correct.

19    Q    You're the man that the buck stops at; right?

20    A    That's right.

21    Q    And so when that package was inserted into that boom

22    with that dust cover still on, that ultimately stopped with

23    you, that was your responsibility to make sure it was off?

24    A    Yes, sir.

25    Q    You had direct responsibility as lift director to

1   ensure that before that 84-meter boom went into the T2

2   section that it was properly prepared to do so; correct?

3       A     Yes, sir.

4       Q     And that included making sure the dust cover was off

5   so your apprentice could see the pin; right?

6       A     Yes, sir.

7       Q     That was a mistake, wasn't it?

8       A     There's a lot of moving parts on that crane.

9       Q     I'm sorry?

10      A     There's a lot of moving parts on that crane.

11      Q     Was it a mistake that was made that that dust cover

12  was left on that boom on that date?

13      A     I don't think it was a mistake but, you know, it

14  happens.

15      Q     What would you like to call it?

16      A     I think it was an oversight.  I mean, we put the

17  crane in there and I instructed Shane to take that cover

18  plate off and I fully trust that he did take that cover

19  plate off, so I had no question in my mind that it was done.

20      Q     So it was an oversight that Burrows didn't take it

21  off?  It was an oversight that you didn't verify that it had

22  been taken off; right?

23      A     Yes.

24      Q     And the presence of that plate, whether it was

25  inserted in the case, was a factor that resulted in the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    improper manipulation of the T4 pin, isn't it?

2        A    That's right.

3        Q    If that had been taken off like it should have been,

4    like you should have verified it was, we would not be here

5    today; correct?

6        A    Possibly.

7        MR. GOODMAN:  Your Honor, I understand it's a little

8    bit excitable, but could we ask Counsel not to yell at the

9    witness?

10       THE COURT:  This is the loudest I've heard

11   Mr. Cremer during the entire trial.  If you could bring it

12   down.  There's no jury here.

13       MR. CREMER:  No.  No.

14       THE COURT:  Go ahead, Mr. Cremer.

15       MR. CREMER:  I haven't done this in so long.  I

16   guess I get excited.  I apologize.

17       THE COURT:  Mr. Farris seems to be able to handle it

18   well.  We don't need the theatrics.  Go ahead.

19   BY MR. CREMER:

20       Q    Now, you're the person on that day when this lift

21   was taking place, the swap of the booms, who designated that

22   Shane Burrows be the man that go up on top of the boom and

23   that he be the person to look into that T2 hole to determine

24   when the pin was in its proper position in order to lock it

25   in place; right?

1    A    You're asking me if I designated him to do that?

2    Q    Did you tell him to do that?

3    A    I did.

4    Q    And to do that, you would expect that that's a

5    pretty important function; right?

6    A    Yeah.

7    Q    Because remember, if he doesn't do it right, we

8    could have some serious consequences.

9         You understood that?

10   A    Yes.

11   Q    And what was his experience in being the site man

12   for the T3 pin before this day?

13   A    I believe he'd done it one time prior to that on

14   another --

15   Q    Shane Burrows testifies in this court that he never

16   did it before.  Is it possible that you're wrong about what

17   he did that one time before?

18   A    No.  I'm pretty confident that he was involved in

19   that boom swap --

20   Q    Do you think you remember --

21        THE COURT:  Let him finish his answer and then you

22   can ask your next question, Mr. Cremer.

23        Finish your answer.

24        THE WITNESS:  I'm pretty confident that Shane

25   Burrows took place in that boom swap one time prior to that

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    day.

2    BY MR. CREMER:

3        Q    It would be important for Shane Burrows, or anybody

4    in that position who has a job, to look into that T2 hole to

5    see when the T3 pin is in its proper position to be able to

6    distinguish between the T3 and the T4 pin; right?

7        A    That's right.

8        Q    Do you know whether he could when he was given that

9    assignment that day?

10       A    I was confident that Shane had that ability, yes.

11       Q    I'm sorry, I didn't hear your answer.

12       A    I was confident in Shane's ability to do that, yes.

13       Q    I was asking whether he was trained to distinguish

14   between the T3 and the T4 pin?

15       A    He was not involved in the training that I'm aware

16   of, no, but I told him what pin to engage and disengage on

17   that crane.

18       Q    How did you do that?

19       A    I told him he needed to remove that dust cover

20   before we slid it into place and that would be the pin that

21   he would engage and disengage.

22       Q    Okay.  And had positions been reversed and you were

23   the guy up on the boom looking for that pin to come into the

24   T2 hole, do you think you could have distinguished whether

25   that pin was the T4 pin and not the T3 pin?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          A    Not by visually looking through the boom and seeing

2     that they look identical.

3          Q    Well, let's look at a photograph, Defendants'

4     Exhibit 5.

5               MR. GOODMAN:  Your Honor, I'm going to object to the

6     use of this photo with this line of questioning.  Counsel is

7     asking about how it looked looking through the T2 pin hole

8     but is showing a photo of the boom outside of the boom

9     itself.

10              MR. CREMER:  He has no idea what I'm going to ask.

11              THE COURT:  Excuse me.  Stop, both of you.  Thank

12    you.

13              The question he had asked was about you specifically

14    qualified it with looking through the boom, and he said --

15    his answer was not by visually looking through the boom and

16    seeing that they look identical.  So if you're going to ask

17    him about this question, I think you need to show him one

18    through the boom, and I know we've seen a photo through the

19    boom.  If you want to ask him if these two look identical,

20    that's a different question and you can ask him that.

21              MR. CREMER:  I want to ask him about this

22    photograph.

23              THE COURT:  This is not looking through the boom,

24    which is what he was answering before.

25              MR. CREMER:  Obviously so.  I will move to another

134

 1    question.
 2   BY MR. CREMER:
 3        Q    Looking at this photograph, you recognize this to be
 4   the T3 and T4 pin on an 84-meter boom?
 5        A    Yes.
 6        Q    Now, this has the warning stickers that, of course,
 7   the boom at the time of this incident didn't have, but I
 8   want you to disregard that and just look at these two pins.
 9   And can you tell me which is the T3 pin and which is the T4
10   pin?
11        A    The one on the right would be the T3 pin and the one
12   on the left is the T4 pin.
13        Q    Okay.  Now, do you need to look at the stickers to
14   figure that out?
15        A    No.
16        Q    How did you know that the one on the right is the T3
17   pin?
18        A    Because it's the closest one to the 50-meter boom
19   section.
20        Q    What about the fact that it's recessed?  Does that
21   suggest to you and did you know that that's a fully unlocked
22   pin when you look at that photograph?
23        A    Yes.
24        Q    And when you look at the other pin, you know what
25   pin that is?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    The T4 pin.

2      Q    Is that pin locked or unlocked in that photograph?

3      A    It's locked.

4      Q    And would you be able to distinguish the T3 from the

5   T4 by the position of the pin?

6      A    They look identical if you're looking at it from a

7   standing-up point over the top of it.  If you're looking

8   through a round hole, that's literally four inches,

9   four-and-a-half inches wide.

10     Q    So it's your testimony that you could not

11  distinguish a fully locked pin from a fully unlocked pin

12  looking through the hole?

13     A    Not from that vantage point.

14     Q    That's why I wanted to look at this photograph

15  again.  Assuming that the Retrofit Kit and these decals had

16  been put on the boom prior to the accident, you agree with

17  me that if you're doing the swap properly, you take the

18  cover plate off, whether it's a single plate or double

19  plate; correct?

20     A    Correct.

21     Q    And so whatever information was on the plate, you

22  don't see that once it gets inside the boom; right?

23     A    That's correct.

24     Q    And you might have a different person removing the

25  cover than is up on the top of the boom that's going to be

1    the site guy; right?

2        A    It's possible, yes.

3        Q    So the person that's charged with the

4    responsibility, like Shane Burrows, who's up on the boom may

5    not have been the same person that takes off the cover?

6        A    The way I do it is, I like to make sure the same guy

7    that takes off the cover is the same guy that's going to be

8    engaging and disengaging the pin.

9        Q    Is there anything that would require the same person

10   to remove the cover?

11       A    No.

12       Q    And climb up on the boom?

13       A    No.

14       Q    So it's certainly understandable that you could

15   direct one apprentice to remove the cover while another guy

16   is already up on the boom?  You've got to climb up there?

17       A    That's right.

18       Q    And so now we're in this position, the cover has

19   been removed, being slid in, and once that 84-meter boom is

20   slid into position, can you see those stickers on the side?

21       A    I wouldn't imagine you could, no.

22       Q    Now, on the T2 section where this package is coming

23   into, there's not just one hole.  There's two holes at the

24   very beginning.  There's 100 percent hole, the first hole in

25   the front, and then about a foot and a half or so behind it

1    is the 92 percent.

2            Do you agree with that?

3        A    (Nodding head.)

4        Q    The manual says when you're lining up the T3 pin,

5    you don't do it in the 92 percent hole, you do it in the

6    100 percent hole?

7        A    That's correct.

8        Q    And if you follow the manual and you are -- you have

9    the T3 pin position correctly in the T2 100 percent hole,

10   where is the T4 pin?

11       A    It's in front of the T3 pin covered up by the actual

12   structure of the boom.

13       Q    So if you follow the manual, you can't have this

14   inadvertent manipulation of the T4 pin because it isn't even

15   accessible at this point; right?

16       A    Right.

17       Q    In order to do it, you have to have a mistake.

18   Somebody pushes that 84-meter boom too far into the T2

19   section; right?

20       A    That's right.

21       Q    So during the course of this swap on Friday,

22   something occurs that never happened in your experience

23   before; right?

24       A    Correct.

25       Q    First thing that happened was the T3 dust cover is

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    left on.  That never happened before?

2        A    That's right.

3        Q    Secondly, the boom is pushed in too far, so the T4

4    pin is in the 100 percent hole of the T2, which it shouldn't

5    be.  That happened -- never happened before, did it?

6        A    That's correct.

7        Q    And a T4 pin, which is a factory setting in this

8    locked position, is manipulated from the factory setting to

9    some other position; right?

10       A    That's right.

11       Q    That never happened before?

12       A    No, sir.

13       Q    So now you are operating in the dark because you

14   haven't dealt with it.  You said it wasn't covered in your

15   training; right?  So you decide to try to restore the T4 pin

16   to whatever position Shane Burrows had mistakenly set it in

17   to what should be the correct factory setting.  That's what

18   you tried to do?

19       A    That's right.

20       Q    And when you were trying to do that, did you look at

21   the manual to see whether there was any information in the

22   manual that described the position of the T4 pin that the

23   factory sets so that you could restore it to that exact

24   position?

25       A    Not in the manual, no.

1      Q    You made an assumption, didn't you?  You assumed

2    that the position of the T4 pin, as per factory setting,

3    would be the same as the T3 pin; correct?

4      A    That's right.

5      Q    And so what you were doing is, without any

6    verification, trying to move it back to a position for the

7    T3 pin; true?

8      A    Say that again.

9      Q    I probably -- what you were trying to do when you

10   got back up on the boom and were manipulating the T4 pin

11   that Shane Burrows had touched, you were trying to restore

12   it to a fully locked position?

13     A    That's right.

14     Q    Now, with the T3 pin in the manual, it has a precise

15   position described, correct, when it is locked?

16     A    Correct.

17     Q    The manual says that the pin needs to be at least 11

18   millimeters above the locking bore; correct?

19     A    That's correct.

20     Q    Now, we -- by the way, you didn't know before this

21   accident that the manual had that specific provision, did

22   you?

23     A    That's correct.

24     Q    You said under oath that you read that manual every

25   single time, particularly the section that deals with

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    locking the 84-meter boom, which has that provision, but you

2    never remember in the four or five times or more ever

3    reading that detail, did you?

4        A    That's correct.

5        Q    So you now know that a modification to this boom

6    from its factory setting has, in fact, occurred; true?

7        A    That's true.

8        Q    And you assumed that you set it back to the proper

9    factory setting and the T4 is now locked in place; correct?

10       A    That's right.

11       Q    But you were wrong, weren't you?

12       A    I was.

13       Q    That pin, the T4 pin actually was set lower than it

14   should have been set; correct?

15       A    That's correct.

16       Q    And you were using your best good-faith efforts to

17   try to get this job done, weren't you?

18       A    I was using the knowledge that I had obtained in the

19   orientation of the crane.

20       Q    But you didn't believe that you had set that pin

21   lower than it should have been set, did you?

22       A    Did I believe I set that pin lower than it was

23   supposed to be?  No.  I did not believe that.

24       Q    You were confident in yourself and in your skills

25   that when you restored that pin, that that section was fully

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    locked and safe; right?

2        A    Yes.

3        Q    You're so confident that you didn't feel the need to

4    report this mistake to a supervisor at Sims' yard?

5        A    That's correct.

6        Q    You were so confident that you didn't feel the need

7    to report that error and have somebody with mechanical skill

8    in cranes look at the boom to make sure that you had

9    properly restored that setting, did you?

10       A    That's correct.

11       Q    And you were so confident that that T4 pin was

12   locked and safe and secured that you didn't test the T4 pin,

13   did you?

14       A    Not until I scoped it out the day of the job site.

15       Q    There was nothing that would have prevented you from

16   testing the T4 pin, whether it was locked and secured on the

17   Sims' yard, on that date, if you chose to do so?

18       A    No.  It did prevent me from doing that because I

19   wouldn't be able to scope the crane all the way out without

20   turning it over.

21       Q    What about testing the T4 section?

22       A    There's no way to test the T4 section without having

23   a full counterweight package on the crane.

24       Q    Well, the counterweights are there, aren't they?

25       A    Not all of them.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    You're saying that you need the full compliment of

 2   counterweights in order to scope out one section?

 3        A    Yep.  That boom is really heavy, and if you don't

 4   have the right counterbalance on it, the thing will tip

 5   over.

 6        Q    So it's your testimony it was impossible to test the

 7   T4 section within the yard?

 8        A    That's right.

 9        Q    And so you without testing what you knew to be a

10   mistake that you believed you'd rectified could not and did

11   not verify if that section had any malfunction whatsoever at

12   that time?

13        A    That's right.

14        Q    So when you gave the go-ahead to move that crane

15   from the Sims' yard on Friday prior to the accident, you

16   believed that crane was perfectly safe and that there were

17   no mechanical malfunctions present in the crane?

18        A    Absolutely.

19        Q    And then you go out to the job site on Saturday,

20   Saturday before work is to begin on Monday, and now you set

21   it up?

22        A    That's right.

23        Q    And you set it up with counterweights?

24        A    That's right.

25        Q    And put out the outriggers at that point?  Are the
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    outriggers put out on the crane at that time?

2        A    First thing you do.

3        Q    Now, at that point, can you test the section 4?

4        A    Not until you put counterweights on it.

5        Q    Now you have the counterweights on it.  At that

6    point, can you test section 4?

7        A    You can.

8        Q    But you didn't?

9        A    I did not.

10       Q    Because you were confident that you had properly

11   restored T4 to its locked position; right?

12       A    That's right.

13       Q    Let me go to the date of the accident.  You set up

14   the crane.  You do your walk-around test and now you're

15   going to scope out the crane.  You're scoping it out at this

16   point.  You're ready to go to work, aren't you?

17       A    Not yet.

18       Q    You're building a tower crane that day?

19       A    That's correct.

20       Q    And the work that was going to take place, was this

21   dependent on your crane being operational?

22       A    That's right.

23       Q    So if that crane is shut down, so is the job?

24       A    That's correct.

25       Q    So you were feeling a little bit of pressure to get

1    this crane operational, weren't you?

2        A    No more pressure than I usually go through.

3        Q    Well, there's people standing around a bunch of

4    trades waiting for you to be in a position to start building

5    that tower; correct?

6        A    It's pretty common, yes.

7        Q    And would you have had the same pressure on Saturday

8    before the job started if you had tested that T4 section and

9    found that there was a malfunction?

10       A    No.

11       Q    You then, as you testified, scope out 6, 5 and the

12   telescopic cylinder gets stuck on 4?

13       A    That's correct.

14       Q    You bring it all in and you go back out and it gets

15   stuck again on 4?

16       A    That's correct.

17       Q    This is when you call your supervisor Mike Gay?

18       A    That's correct.

19       Q    And Mike Gay says to you, I am sending out a

20   mechanic because you now had two opportunities to try to

21   resolve this malfunction and you called him for help.

22            By the way, how long does it take to scope out 6, 5,

23   4 to retract and to do it again?  That doesn't happen in a

24   few seconds, does it?

25       A    No.  About three or four minutes usually.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Per each time you did that?

2    A    Yes.

3    Q    And when you had experiences in the past where

4    you've had a problem where you had to call your supervisor

5    to get a mechanic's support, it was generally your

6    understanding you wait for the mechanic to come?  That was

7    the general understanding, wasn't it?

8    A    If there is a safety issue, yeah, you would stop and

9    wait until somebody came out there.

10   Q    You are not a trained crane mechanic, are you, sir?

11   A    No, sir.

12   Q    You wouldn't know, based on your training as an

13   operator, whether a mechanical issue is a safety issue or

14   not, would you?

15   A    No.

16   Q    That's what the mechanics do.  They investigate

17   whether this particular malfunction could be a safety issue,

18   right?

19   A    That's correct.

20   Q    That's outside of your experience?  In all fairness,

21   it's outside of your role?

22   A    Okay.

23   Q    You were aware that the person, with the experience

24   to make the determination whether this particular

25   malfunction that you were facing was a safety issue, was on

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    his way to that job site.  And how far is the Sims' yard

2    from that job site?

3        A    I think about 10 miles or so.

4        Q    How long does it take to drive it on a bad day?

5        A    Maybe 20 minutes.

6        Q    So for that 20 minutes, you don't wait for this

7    mechanic to make that determination.  You take matters into

8    your own hands, don't you, sir?

9        A    There was no telling where that mechanic was coming

10   from, for one, but we never stop troubleshooting in the

11   field when you're out there.  You try to assist the

12   mechanic.  Anything you tell him over the phone or anything

13   you tell him about the crane before he gets there, it's a

14   heads up.

15       Q    At the point you continued to troubleshoot, once you

16   knew the specialist was on his way, you had no idea that

17   there was, in fact, a mechanical issue that affected the

18   safety of that crane, true?

19       A    No.  That's true.

20       Q    And so you call another co-worker and ask for his

21   advice; right?

22       A    Right.

23       Q    Bill Piper.  Now, Bill Piper, he might be an

24   experienced crane operator, but he's not an experienced

25   crane operator on a Liebherr LTM 1500, is he?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A    That's correct.

2        Q    But to your knowledge, he's never read the manual or

3    done a boom swap or had an experience where there was the

4    hydraulic mechanism being stuck in a particular section;

5    right?

6        A    That's correct.

7        Q    So he gave you his words of wisdom.  And you didn't

8    call your supervisor back and say I've got this information

9    and this direction to take this machine out of computer mode

10   and put it into manual mode?  You didn't ask Mike Gay for

11   permission to do so when you knew he had dispatched a

12   mechanic, did you?

13       A    No.

14       Q    You made the decision on your own to continue to

15   troubleshoot and to follow the advice of a mechanic, who was

16   inexperienced in that particular piece of equipment, without

17   contacting Sims; right?

18       A    That's correct.

19       Q    It's only then, when you take it out of computer

20   control mode, put it into manual mode, retract the cylinder

21   and then go in to push out the T3 telescope section, that we

22   have a collapse?

23       A    That's right.

24       Q    So the other attempts while it's in computer mode,

25   we don't have a catastrophic failure.  It's only when you

1    make an independent decision to move it into manual mode

2    without the authority from Sims to do so that we have a

3    failure; right?

4         A    I felt I had authority by Sims.

5         Q    You thought you had authority by Sims to continue to

6    work on the crane even though you know a specialist was in

7    route?

8         A    I thought I had the authority to work and

9    troubleshoot the crane, yes.

10        Q    Should you have stopped and waited for that

11   mechanic, sir?

12        A    Looking back on it now, yes.

13        Q    We might not be here today if you had waited?

14        A    Quite possible.

15        Q    Let's talk about some of the manual sections,

16   Plaintiff's Exhibit 7.  Mr. Goodman went over this with you

17   already, but I want to be clear on what this is.  This

18   section 5.01-14 pertains to assembly and disassembly of

19   crane components; right?

20        A    Yes.

21        Q    And you remember reading this section, don't you --

22        A    Yes.

23        Q    -- before the accident?

24        A    Yes.

25        Q    And this section would be directly applicable to

1    swapping out a 50-meter boom for an 84-meter boom as you

2    were doing on the day of this incident or on the Friday

3    before this incident?

4        A    It's applicable for all assembly/disassembly of the

5    crane.

6        Q    Including what you were doing on that Friday,

7    swapping out the 84-meter boom?

8        A    That's right.

9        Q    Swapping out a boom is an assembly/disassembly

10    procedure that's covered by these warnings.  True?

11        A    Yes.

12        Q    And this warning very clearly says, "if you don't

13    follow the assembly/disassembly instructions, you could have

14    a serious and catastrophic accident that results in property

15    damage, injury and death," doesn't it?

16        A    It does.

17        Q    And for you, that's common sense.  You understood if

18    you don't follow the manual on a critical swap like this,

19    you could have a catastrophic loss; right?

20        A    That's right.

21        Q    And you agree with me, leaving the cover plate on is

22    not a correct assembly procedure for the 84-meter boom when

23    you insert it into the T2 tube; right?

24        A    That's right.

25        Q    And it's not an incorrect assembly protocol for

1    manipulating the T4 pin when you're assembling the 84-meter

2    boom, is it?

3        A    That's right.

4        Q    So you knew from this information and these warnings

5    that those things were contrary to the manual and could

6    result in a catastrophic code; right?

7        A    It could.

8        Q    I want to go to Defendants' Exhibit 8., the general

9    section.  If you'd highlight that, Darrin.

10           This is part of the assembly/disassembly of the

11   telescoping sections and it provides that the crane can be

12   operated with a 50-meter boom, with the 84-meter boom, but

13   it says "the telescopic separation is always between

14   telescope T2 and telescope T3."  And you knew that?

15       A    That's right.

16       Q    Does this say that sometimes it's between T2 and T4?

17       A    No, it does not.

18       Q    And if we go to Section 2.2.3, which is way down at

19   the end, Darrin, page 1345 of the manual.  If you'd

20   highlight 2.2.3.  That's it.

21           Would this have been the section of the manual that

22   you would have consulted when installing the 84-meter boom

23   locking telescope T2 to telescope T3 mechanically?

24       A    Part of it, yes.

25       Q    This particularly -- this specifically applies to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  how to lock the 84-meter boom or the 50-meter boom at the T3

2  using the T3 pin?

3      A    That's right.

4      Q    So is this what you had read?

5      A    There's two sections in that manual.  There's one in

6  the back and then there's the one that I used in the front.

7      Q    How about this section?  Have you ever read this

8  section?

9      A    They're almost identical.  Not exactly identical,

10  but almost identical.

11      Q    But this section is specifically relating to locking

12  the T3 pin when you're doing a boom swap?

13      A    That's right.

14      Q    And this section specifically requires, first of

15  all, that T3 -- that you connect the 84-meter boom at the

16  100 percent hole of T2.  That's in here?

17      A    That's right.

18      Q    And you knew that?

19      A    Yes.

20      Q    I think we already established that had been done.

21  You can't get to T4.  You can't touch it.  True?

22      A    Say the question again.

23      Q    If the boom -- the 84-meter boom is in its proper

24  position in the 100 percent hole of T2, then I think you

25  testified that the T4 pin is covered by a sheet metal.  You

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    can't access it?

2        A    That's right.

3        Q    And then it ultimately says "check if" -- you see

4    that down here?  "Check if the pin overlap on the locking

5    bore is at least 11 millimeters."

6            And that's the part that you don't ever remember

7    reading before?

8        A    That's right.

9        Q    And the -- there's even troubleshooting.  If there's

10   a problem, this might be an issue to look at, is the pin at

11   least 11 meters?  Is it less than 11 meters then?  It should

12   be over 11 meters.  That's the suggestion on the

13   troubleshoot tip; right?

14       A    That's right.

15       Q    Do you have an explanation why, if you read this

16   section four or five times, you don't remember reading that?

17       A    Well, this page here is in the back of the manual.

18   There's another section in the front of the manual.  It's

19   almost the exact same thing.

20       Q    Are you saying this section doesn't apply?

21       A    I'm not saying it doesn't apply.  I'm saying there's

22   two sections.

23       Q    So do you remember reading this particular page

24   before?

25       A    No.  I remember reading some of this verbiage in the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    other section, but not this page directly.

2        Q    In any event, this information about locking the T3

3    pin doesn't give you guidance on what to do if somebody

4    mistakenly unlocks the T4 pin, does it?

5        A    No.

6        Q    Then you have to have different information because

7    you need to know what is the proper setting for T4; true?

8        A    True.  Per our orientation, though, you lock it and

9    unlock it until the pin stops and that was it.  You don't

10   over-torque because you'll break the mechanism inside.  So

11   per the orientation of the crane, I was of the understanding

12   that when that pin stops in either direction, that's as far

13   as you go.

14       Q    But your orientation had nothing to do with T4, did

15   it?

16       A    It did not.

17       Q    Your orientation was how to properly lock and unlock

18   T3?

19       A    That's right.

20       Q    You wouldn't have expected Henry Ward to train you

21   on what to do if someone had accidentally changed a factory

22   setting on a pin that was never designed to be unlocked,

23   would you?

24       A    That's correct.

25       Q    Let's talk about the Safety Bulletin, Plaintiff's

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Exhibit 15.  Now, you've read this today, and I'm sure you

2    have read it a number of times in the past.  Get to my notes

3    on that section.  Oh, before we do that, I want to talk

4    about Bill Piper.

5            When you called Bill Piper and were telling him that

6    you were having a problem with the cylinder not releasing at

7    the T4 section, did you tell him about the mistake that had

8    been made on Friday, that somebody had incorrectly changed

9    the setting of the T4 pin and you think you restored it?

10   A    No.

11   Q    When you called Mike Gay and say I'm having trouble

12   scoping out the boom at T4 because it's locking up on the T4

13   section, did you tell him about the mistake that was made on

14   Friday?

15   A    No.

16   Q    Is there any kind of internal protocol when a

17   mistake is made of that magnitude, you change a factory

18   setting on a pin that is the mechanical support for that

19   section where you should report it to somebody at Sims?

20   A    I didn't feel that it was a big issue, so, no.  I

21   didn't report it.

22   Q    Going back to the exhibit, please.

23           THE COURT:  Mr. Cremer, is this a good time to stop?

24   We've gone past the 45 minutes to an hour you thought you

25   would be taking.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1              MR. CREMER:  Yes, ma'am.
 2              THE COURT:  How much longer do you anticipate
 3    having?
 4              MR. CREMER:  20, 30 minutes.
 5              THE COURT:  Okay.  Then we definitely need to stop.
 6              It's 1:00 o'clock.  Let's take a lunch break, at
 7    least 45 minutes, so come back at 1:45.
 8              Is that going to give -- I understand from the first
 9    day that perhaps there was some -- off the record.
10    (Lunch recess had from 12:59 to 1:47 p.m.)
11              THE COURT:  Go ahead.  Mr. Farris, come up.
12              MR. GOODMAN:  It doesn't matter if he's here.
13              THE COURT:  Okay.
14              MR. CREMER:  So we were having a discussion just
15    before we started about closing, and Mr. Goodman and I
16    agreed that if it's acceptable to the Court, we could do one
17    of two things.  We could do closings at a later date so we
18    can get home for Valentine's Day, be more popular at home,
19    and then when the Court has read the designations -- because
20    we've now designated all damage depositions and several
21    liability witnesses -- at the Court's pleasure and schedule,
22    we would come back and do closing.  Or, if you don't want to
23    hear from us any further, we could dispense with closings
24    and you rely on the record.
25              THE COURT:  It seems to me what would make the most
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    sense is to go ahead and set a date on which we would do

2    closing.  That also forces me to more quickly get through

3    the deposition designations and not put them off to the side

4    and that could be at the end of next week or something.  I

5    don't know how much paper there is in terms of the

6    depositions designations.

7          MR. CREMER:  It's a little bit.

8          THE COURT:  So we could just set a time at the

9    conclusion of all the evidence this week, a time that you

10   can do the closing.  I will be also wanting a proposed

11   findings of facts and conclusions of law.

12         Now, I do know, of course, you're going to want

13   transcripts, and I'm going to give enough time that you're

14   not having to spend extra money for expedited transcripts to

15   be able to do that, but that can be after the closings.

16   anyway.

17         MR. CREMER:  Very good.  Thank you, Your Honor.

18         THE COURT:  So we can focus on that once we know --

19   hopefully we'll have some time at the end of this week to

20   talk about some of those scheduling issues.

21         MR. CREMER:  Thank you.

22         THE COURT:  Go ahead, Mr. Cremer, whenever you're

23   ready.

24         MR. CREMER:  Derrick, if we put it back up 15,

25   Plaintiff's 15.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

157

1          THE COURT:  One thing for you all to consider is we

2     could do the closing by Zoom, too.  That's an option also,

3     if you feel comfortable with the screen sharing.  We could

4     do closings by Zoom.

5          MR. CREMER:  I have no problem coming down here.

6          THE COURT:  It's because it's February.  If it was

7     June/July, I wouldn't be able to get someone from Chicago to

8     come down to Florida.

9          Go ahead.

10         MR. CREMER:  Thank you.

11    BY MR. CREMER:

12    Q    Mr. Farris, when we took our break we were talking

13    about the Product Safety Bulletin.  And you're familiar with

14    this two-page document?  You've read it?

15    A    I have.

16    Q    Before we start discussing it, would you like to

17    read it again?

18    A    Yes.

19    Q    Please, go ahead.

20         Darrin, you're going to have to move it so he can

21    read the entire two pages.

22    A    (Reading)  All right.

23    Q    Ready?  The information contained in the Safety

24    Bulletin has no information concerning what steps to take if

25    the T4 pin has been accidentally manipulated, does it?

1        A    No.

2        Q    It doesn't have the steps to take 1, 2, 3, 4, 5 if

3   that should occur; correct?

4        A    Right.

5        Q    There's no information in the Safety Bulletin that

6   would give you as the operator the actual position that that

7   factory set T4 pin should be at; correct?

8        A    That's correct.

9             THE COURT:  Mr. Farris, I think you have to pull the

10  microphone up a little bit closer to you.

11            THE WITNESS:  All right.

12            THE COURT:  That's probably better.

13  BY MR. CREMER:

14       Q    The Safety Bulletin reinforces the importance of

15  following the information contained in the original

16  Operator's Manual, doesn't it?

17       A    Yes.

18       Q    Now, does the manual tell operators and owners of

19  the LTM 1500 that they should immediately stop using the

20  crane until further notice?  Or does it say that they

21  continue -- they can continue to operate the crane as long

22  as they meticulously follow the manual?

23       A    They say they can operate the crane as long as they

24  meticulously follow the manual.

25       Q    You safely operated that crane for a six-month

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    period and did four or five boom swaps and you didn't have

2    any of this information, did you?

3        A    No.

4        Q    You didn't have the modified dust cover.  You didn't

5    have the warning details that came along with the Retrofit

6    Kit, did you?

7        A    That's correct.

8        THE COURT:  Mr. Farris, I think you may still need

9    to pull it a little bit closer up or speak a little bit

10   louder.  Yeah.  Let's try that side.

11   BY MR. CREMER:

12       Q    And the cover plate and the safety details, they

13   told you which is the correct pin to manipulate and which is

14   the incorrect pin to manipulate, but that's information you

15   knew?

16       A    That's correct.

17       Q    There isn't any information on the cover plate or on

18   the decals that tells you what to do if you had made the

19   mistake as happened here, that the T4 pin had been

20   incorrectly manipulated, does it?

21       A    No, it does not.

22       MR. CREMER:  I collected my thoughts over lunch and

23   I limited my questions.  I thank you very much and I

24   apologize if I raised my voice.

25       THE WITNESS:  You're fine.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1                THE COURT:  Mr. Goodman, any redirect?
 2                MR. GOODMAN:  Yes, Your Honor.
 3                       REDIRECT EXAMINATION
 4   BY MR. GOODMAN:
 5        Q    Mr. Farris, you'd spoken about an incident that
 6   happened in Hillsboro?
 7        A    Hillsboro, Illinois, yes, sir.
 8        Q    And can you explain what happened there?
 9        A    I was -- the superintendent of the job site was
10   trying to get me to exceed the limitations of the crane and
11   I refused to do it and he threatened my job with it.
12        Q    Then what happened?
13        A    Ultimately, I did what he was asking me to do and
14   the crane overturned.
15        Q    And how did that affect you and your experience as a
16   crane operator?
17        A    It made me more aware of safety and, also, not
18   letting a superintendent and other people control my
19   actions.
20        Q    From the point in time of that event until
21   February 19th, 2018, had you ever been on a job and stopped
22   work because of a safety issue?
23        A    Yes.
24        Q    So I think the defense established that you and Sims
25   are competent in operating the LTM 1500.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          Do you feel competent in operating the LTM 1500?

2     A    I do.

3     Q    And at the time that you were operating the LTM

4     1500, would the information in the Product Safety Bulletin

5     provided, would that have provided you some additional

6     information?

7     A    It would have.

8     Q    And what would that have provided you that you would

9     not have known from your experience, training, education in

10    the Operator's Manual?

11    A    It would, basically, tell me not to touch that pin.

12    Q    And would you need the Product Safety Bulletin or

13    stickers to tell you what to do next if it was touched?

14    A    No.

15    Q    And why is that?

16    A    Well, there's no literature in the Product Safety

17    Bulletin telling us what to do if the pin was touched.

18    Q    And so if you had the Product Safety Bulletin,

19    assuming you would have had the Product Safety Bulletin, and

20    the pin would have been touched, would you have needed some

21    additional information to tell you what to do or would you

22    have known what to do based upon your experience and

23    training?

24    A    I would have probably needed more additional

25    information as far as, you know, from a manufacturer

1  standpoint.

2      Q    So at that point in time, would you have had Sims

3  contact the manufacturer?

4      A    Yes.

5      Q    And you would have known how to do that based upon

6  your experience?

7      A    I would have called my supervisor and he would have

8  took it from there and told him.

9      Q    Now, there was some discussion about the T4 being

10  factory set.  Do you recall that?

11      A    Yes.

12      Q    On February 16th and February 19th, were you aware

13  that the T4 pin had to be factory set or did you learn that

14  after the fact?

15      A    After the fact.

16      Q    Are cranes quiet?

17      A    Not at all.

18      Q    So when there's crane operation,

19  assembly/disassembly, is it loud?

20      A    It's very loud.

21      Q    Is that the purpose for warnings on pieces of

22  equipment?

23      A    Yes.

24      Q    You talked about how there was an oversight in the

25  cover plate not being taken off.  Do you recall that?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Yes.

2    Q    If the new cover plate that came with the Product

3    Safety Bulletin was on, do you believe that oversight would

4    have been made?

5    A    It could have possibly been made, but the T4 pin

6    would never have been able to be accessed.

7    Q    Now, in your experience, when you are assembling and

8    disassembling the Liebherr LTM 1500 and exchanging the

9    50-meter boom to the 84 or vice versa, the individual that

10   is taking off the cover plate, is it the same individual who

11   would be locking the pin?

12   A    That's the way I do it.

13   Q    Did you have to ask anybody permission to

14   troubleshoot an issue on a crane?

15   A    No.

16   Q    If we had the Product Safety -- strike that.

17        If you had the Product Safety Bulletin back on or

18   before February 16th, 2019, would we be here today?

19   A    I don't think so.

20   Q    Why wouldn't we be here today?

21   A    Well, you know, obviously you wouldn't be able to

22   access that pin without removing that cover plate.  And,

23   also, the warning decals that are on there would tell you

24   not to touch that pin.

25   Q    Now, when you read the Product Safety Bulletin and

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the warnings that came with it, is that new or additional

2    information that was not provided in the Operator's Manual?

3        A    That's right.

4        Q    Was that new or additional information that was not

5    provided in your training provided by Henry Ward?

6        A    That's right.

7        Q    Now, you had talked about how you had changed the

8    boom from the 84 to the 50 and vice versa a number of times

9    successfully; is that correct?

10       A    That's correct.

11       Q    Did you ever have this specific issue before

12   February 16th through 19th where the T4 pin had been

13   manipulated?

14       A    No.

15            MR. GOODMAN:  Thank you, sir.

16            THE COURT:  Does anyone intend or anticipate having

17   to recall Mr. Farris?

18            Mr. Cremer, were you about to ask one additional

19   question?

20            MR. CREMER:  I believe one question.

21            THE COURT:  That's always dangerous to say one

22   question.

23            MR. CREMER:  I think I will hold myself to it.

24            THE COURT:  I don't think I've ever been able to

25   hold myself to that, but go ahead.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1                          RECROSS EXAMINATION

2    BY MR. CREMER:

3        Q    Sir, even with the new cover plate and the warning

4    decals, you agree with me, you still could have a situation

5    where an inexperienced person would allow the 84-meter boom

6    package to be inserted too far into that T2 section where

7    the T4 pin was then visualized in the 100 percent hole?  You

8    could make a mistake and still manipulate it?

9        A    You could.

10            MR. CREMER:  Thank you.

11            THE COURT:  Mr. Farris, you can step down now.  You

12   can take your microphone off and you're free to go.

13            MR. GOODMAN:  Your Honor, Mr. Farris had asked if it

14   would be acceptable for him to observe the remainder today?

15            THE COURT:  As long as no one is recalling him.

16            MR. CREMER:  I have no objection.

17            THE COURT:  There's no problem.  You're welcome to

18   remain here today.

19            THE WITNESS:  Thank you.

20            THE COURT:  Mr. Goodman, if you want to call your

21   next witness.

22            MR. GOODMAN:  Yes, Your Honor.  Plaintiffs call

23   Shane Burrows.

24            DEPUTY COURTROOM CLERK:  Sir, please, raise your

25   right hand.

           UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1  (Witness sworn.)
 2          COURTROOM DEPUTY CLERK:  Thank you.  Please have a
 3    seat.
 4          MR. CREMER:  Your Honor, we want to consult on
 5    exhibits real quick.
 6          THE COURT:  That's fine.
 7  (Brief pause.)
 8          THE COURT:  We're going to have Mr. Burrows go ahead
 9    and say something to make sure you're getting picked up.
10          THE WITNESS:  Hey everybody, how are you?
11          THE COURT:  Off the record while we're waiting for
12    Counsel to come back in.
13          MR. GOODMAN:  May I approach, Your Honor?
14          THE COURT:  Have you all consulted about the
15    exhibits?
16          MR. CREMER:  That's fine.
17          THE COURT:  Back on the record.
18          Mr. Burrows, we have the lights turned down because
19    there was a video that was being watched at one point and
20    then to look at the documentation, but if any point you need
21    the lights turned back up to be able to see better, just
22    tell us.
23
24
25
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1                    SHANE BURROWS,

2    having been first duly sworn under oath, was examined and

3    testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. GOODMAN:

6        Q    Mr. Burrows, are you familiar with the events that

7    occurred on February 19th, 2018 when the 2012 Liebherr LTM

8    1500 had an uncontrolled retraction of boom package Section

9    6, 5 and 4?

10       A    Yeah.

11       Q    And are you familiar with the event that occurred

12   the Friday before on February 16th, 2018?

13       A    Yes, I do.

14       Q    Now, in today's discussion, I refer to "the loss" or

15   "the incident." Is that okay?  That's the event that

16   occurred on February 19th?

17       A    Yes.

18       Q    And if I refer to Sims, that's the company that you

19   worked for at the time?

20       A    Yes.

21       Q    And if I refer to the crane or the crane at issue,

22   I'm referring to that Liebherr LTM 1500?

23       A    Yep.

24       Q    Do you still work for Sims now?

25       A    No, I don't.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And why do you not work for Sims?

2    A    I had an opportunity to work for my in-laws, so I

3    took the opportunity to work for them.

4    Q    And what do you do there?

5    A    We grow strawberries.

6    Q    And so how long did you work for Sims?

7    A    I worked at Sims for seven years.

8    Q    Did you leave Sims because of this incident?

9    A    No.

10   Q    How old were you when you first started in the crane

11   industry?

12   A    I believe I was 22 years old.

13   Q    And how old are you now?

14   A    Twenty-nine.

15   Q    So you worked in the crane industry for

16   approximately seven years?

17   A    Yes.

18   Q    And how did you start in the crane industry?

19   A    I don't know.  I was just looking for a job.  I

20   needed a job making some more money and the crane industry

21   sounded pretty interesting to me.

22   Q    And did you take a course to get into the crane

23   industry?

24   A    I was accepted into the apprenticeship for the

25   Operating Engineers.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And how many years did you do the apprenticeship?

2    A    I was in the apprenticeship for four years exactly.

3    Q    And what went on in the apprenticeship?

4    A    The apprenticeship was -- it was a class, you know.

5    We had tests and stuff.  We had class hours.  It was, you

6    know, a couple times a week sometimes.  Once a week, you

7    know, five or six hours.  We had classes and OJT,

8    on-the-job.

9    Q    So you had classroom training and on-the-job

10   training?

11   A    Yes.

12   Q    And was that a total of 8,000 hours?

13   A    Yes.

14   Q    And you completed all 8,000 hours?

15   A    Yes.

16   Q    And you passed the apprenticeship program?

17   A    Yes.

18   Q    And then from the apprenticeship program, did you go

19   to work in the crane industry?

20   A    Yeah.  When I finished the apprenticeship program, I

21   was an operator after that.  So, yes.

22   Q    And back in 2018, were you still in the

23   apprenticeship program?

24   A    In 2018, yes.  I would have been in the

25   apprenticeship program.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    So at that time, were you working at Sims?

2      A    Yes.  I was at Sims Crane the whole time.

3      Q    And I'm going to show you what's been marked as

4   Exhibit 112.

5           Can you tell us what this is?

6      A    That's my rigger and signal person certification.

7   It's a class, you know.  It's a certification that you can

8   get for, you know, being able to put rigging together and

9   knowing the types of rigging and stuff for picking whatever

10  you might be picking up.

11     Q    And this was issued on February 28th, 2018?

12     A    Yes.

13     Q    And when did you take the actual exam?

14     A    I would have taken the exam probably a month or so

15  before that.

16     Q    And you passed that exam?

17     A    Yes.

18     Q    So you would have taken the exam in January of 2018?

19     A    Yes.

20     Q    So in January of 2018, you had passed the exam to be

21  and NCCCO certified rigger?

22     A    Yep.

23     Q    Rigging has to do with connections for loads; is

24  that correct?

25     A    Yeah.  Connecting straps, knowing the limits of the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    straps, making sure everything is right with angles.

2        Q    And those loads are being put on and connected to a

3    crane boom; is that correct?

4        A    Yes.  The rigging is for cranes to pick things up.

5        Q    And I'm going to show you what I marked as Exhibit

6    113.

7             Do you know what this is?

8        A    Yes.  That's my OSHA statement.

9        Q    And if you don't mind, would you -- was this a

10   statement that you wrote or did you give this statement and

11   somebody wrote it down?

12       A    No.  That's my bad handwriting.

13       Q    That's your bad handwriting?

14       A    Oh, yeah.

15       Q    Would you mind reading that for us?

16       A    Yeah.  "I am employed by Sims Crane for almost four

17   years.  I am an operator apprentice oilier.  Went to change

18   the boom sections, unpinned short section.  Long section was

19   brought in on truck.  Rigged and lifted long boom section

20   and was told to line up pin with the hole on top of the

21   boom.  Only one screw pin was visible.  Screwed pin and saw

22   that the pin wasn't going in the right direction.  Asked

23   Andrew to" --

24       Q    Scroll it down.

25       A    "Asked Andrew to come check out the situation."  I

1    can't read my own writing there.

2        Q    Pick it up where you can read it.

3        A    "Tool on the pin and" -- "put tool on the pin and

4    saw it was going in the wrong direction.  We pulled the

5    section out, removed the dust cover that had another pin

6    under it, screwed that pin in.  I have been involved -- I

7    don't know -- I had been involved in the boom section

8    change-out on that crane.  I don't remember who told me to

9    get on top of the boom to do the pin.  On-the-job training.

10   I'm not sure if that pin has been touched before.  OJT

11   consists of training on daily operations of cranes.  Don't

12   remember how pin was adjusted after we realized it was the

13   wrong pin.  I took dust cover off but do not remember who

14   screwed the right pin back in.  I have not read Operator's

15   Manual.  I was doing what I was told."

16       Q    So I want to talk about February 16th, 2018.  Do you

17   remember that day?

18       A    Yes.

19       Q    And that day, who were you working with?

20       A    The 16th would have been Friday?

21       Q    Yes.

22       A    I was working with Andrew and a few other Sims'

23   employees.

24       Q    And what were you doing that day?

25       A    Started off the day -- I couldn't tell you what I

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    was doing because I was somewhere else.  I came in and was

2    helping them change out the boom sections.

3        Q    And at some point, did Andrew give you some

4    direction?

5        A    Yes.

6        Q    And what did you understand the direction to be?

7        A    What I understood was we were going to go up top and

8    then line the pin hole up to where we could screw the

9    section back in.

10       Q    And you went up on top?

11       A    I was on top.

12       Q    And did you line up a pin?

13       A    Yes.

14       Q    And was it the first pin that you saw?

15       A    It was the first pin that I saw.

16       Q    And you'd been involved in connecting -- or been

17   around when the boom had been connected previously?

18       A    Yes, I have.

19       Q    And so then what did you start doing with the pin?

20       A    I saw the pin lined up in the hole.  I used the

21   wrench to try to make it connect.

22       Q    What happened then?

23       A    The pin went in the wrong direction.

24       Q    How do you know the pin is going in the wrong

25   direction?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Because I know how cranes work.

2    Q    So you knew that much; correct?

3    A    Yeah.  I work on cranes every day.

4    Q    And so then what did you do?

5    A    I got with the Andrew and said "hey, I don't know

6  what's going on here, but it's not right."

7    Q    And then what did Andrew do?

8    A    Andrew came up, checked it out and said "yeah,

9  that's not right."

10    Q    And then what happened?

11    A    We had to pull the boom section back out and pull

12  the dust cover off.

13    Q    At any point did Andrew re-manipulate that pin, the

14  T4 pin?

15    A    He went and messed with it and then he put it back

16  to where it was.

17    Q    Where he thought it was?

18    A    Where he thought it was.

19    Q    And the boom section was taken out?

20    A    Yes.

21    Q    The cover plate was taken off?

22    A    Yes.

23    Q    And boom section put back in?

24    A    Yep.

25    Q    And T3 pin locked?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    I'd like to show you Exhibit 18.

3           MR. GOODMAN:  Your Honor, just for the record, I'd

4      like to move Exhibits 112 and 113 into evidence.

5           MR. CREMER:  No objection.

6           THE COURT:  Plaintiff's Exhibits 112 and 113 are

7      both admitted.

8      (Plaintiff's Exhibits 112 and 113 were admitted.)

9      BY MR. GOODMAN:

10     Q    Are you familiar with what you see here in this

11     Exhibit?

12     A    Yeah.

13     Q    What do you see?

14     A    That is the Liebherr boom.  I'm sorry.  It's the

15     dust cover on top of the Liebherr boom with the dust cover

16     slid open.

17     Q    Was that the cover that you saw go through the T2

18     boom hole?

19     A    Yes.  But at the time, I didn't know it was a cover.

20     Q    Why didn't you know it was a cover?

21     A    It's the same color as the boom and it has bolts in

22     it.

23     Q    What do bolts in the crane industry mean to you?

24     A    You don't go messing with bolts for no reason.  You

25     don't just loosen stuff up.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Now, I'm going to show you what's been marked as

2    Exhibit 19.  And the actual cover plate is in front of you.

3    Do you see that?

4      A    (Nodding head.)

5      Q    Before February 16th, had you ever seen this before?

6      A    No.

7      Q    Now, if you saw this on February 16th when you were

8    looking into the access hole and you saw that sticker that's

9    on the bottom of that picture with the big X, what would you

10   have done?

11     A    I would not have screwed the pin that was under the

12   one with the X.

13     Q    I mean, could you have gotten it to even screw the

14   pin if that was over it?

15     A    No.

16     Q    I'd like to show you what's been marked as

17   Exhibit 23.

18          Is this a fair and accurate representation of what

19   the crane looked like with the 50-meter boom?

20     A    Yes.

21     Q    And if we were to collapse that boom section -- were

22   you there when the 50-meter boom came out of the crane base?

23     A    I don't remember if I was or wasn't.

24     Q    Now, I'd like to ask you if this is a fair and

25   accurate representation of what you saw on the day,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    February 16th, when the T4 pin was adjusted?

2    A    Yes.

3    Q    When you were up on the boom, is that what you saw?

4    A    Yes.

5    Q    And then the boom came further in?

6    A    Yep.

7    Q    And then you saw the T4 pin?

8    A    Yep.

9    Q    And then when you saw that pin, did you think it was

10   the T4 or did you think it was the T3?

11   A    I thought that was the pin that was supposed to be

12   put in.

13   Q    I got you.  Now, if we go to the next one, if you

14   would have seen this sliding through the boom, could you

15   have manipulated the T3 or the T4 pin there?

16   A    No.

17   Q    And why not?

18   A    Because the plate was on top of the pins.

19   Q    And at that point in time, would you have known that

20   the cover plate was on top of the boom section?

21   A    Yes.

22   Q    And at that point, you would not have manipulated

23   the T4 pin?

24   A    No.

25        MR. GOODMAN:  No more questions, Your Honor.

1          THE COURT:  Any cross-examination?

2          MR. CREMER:  Yes, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. CREMER:

5          Q    Good afternoon, sir.

6          A    How are you?

7          Q    When you started working at Sims, you were not a

8    certified crane operator; correct?

9          A    No, I was not.

10         Q    Prior to working at Sims, you worked at the

11   Hillsborough County Public Works and drove a pothole truck

12   and patched potholes?

13         A    Yes, sir.

14         Q    You were working at Sims under the job title

15   "apprentice" and that in that capacity as apprentice, you

16   didn't have the skill set to operate equipment; true?

17         A    At the time, no.  I could not operate the equipment

18   but I worked with cranes every day.

19         Q    All right.  Now, I have --

20         MR. CREMER:  Your Honor, I'm having a little

21   difficulty hearing him.

22         THE COURT:  Try to pull the microphone up a little

23   bit and speak into it a little more or speak louder.

24         THE WITNESS:  Okay.

25         THE COURT:  You're not the first to have problems

```
 1    with this microphone.  I don't like the microphone, but I
 2    can't change it.  So we're stuck with it.
 3            Go ahead.
 4            MR. CREMER:  Thank you.
 5   BY MR. CREMER:
 6       Q    Andrew Farris was not your usual supervisor; is that
 7    right?
 8       A    No, he was not.
 9       Q    You worked for him before the events of February the
10    16th and 19th just a number of times?
11       A    Yeah.
12       Q    Is it correct that you never received any training
13    from my client Liebherr on how to operate the LTM 1500 crane
14    at any time before this incident; true?
15       A    I was present sometimes during the training, but, I
16    mean, I was labor.
17       Q    So you weren't involved during the time that there
18    was an actual boom swap going on when you were assisting in
19    that process during the training, were you?
20       A    During the training, no.
21       Q    You never discussed any of the Liebherr training
22    with Andrew Farris or Jason D'Angelo, did you?
23       A    No.
24       Q    Did Jason D'Angelo or Andrew Farris ever complain to
25    you about the quality of the training they received?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    No.

2      Q    And when you were up on that crane boom on Friday,

3   February the 16th, 2018, and given the task of looking into

4   that hole to watch for the T3 pin, that was the first time

5   you ever did that, wasn't it?

6      A    I had been involved with the boom swap before.  I

7   don't know that I was directly the person doing that, but I

8   have been involved before.

9      Q    But now I want to be specific here about the task.

10   The task of being on top of the boom looking in the T2 hole

11   waiting for the T3 pin to emerge, that was the first time

12   you ever did that particular task?

13      A    I don't recall if that was the first time.  I had

14   done it before, but I've done it a few times.

15      Q    You do not consider yourself a qualified or

16   competent person to conduct the boom swap, do you?

17      A    I'm capable of looking in a hole and seeing if the

18   pin is there and screwing a screw.  I don't know the

19   definitions on qualified, competent and all that, but I

20   think I'm capable of doing that.

21      Q    And you -- at that time, back in February of 2018,

22   would you have been competent in your mind to conduct a boom

23   swap without supervision?

24      A    Myself?  No.

25      Q    You'd never read any of the sections of the Liebherr

1    manual at any time before you had the assignment to go up on

2    top of that boom and to be the site person for that pin?

3        A    No.

4        Q    Andrew Farris never directed you to the manual to

5    the sections that dealt with the procedures for conducting a

6    boom swap and asked that you read it before you were given

7    that responsibility?

8        A    Andrew Farris reads the manual and tells me what to

9    do.

10       Q    Right.  But he didn't ask you to read the manual and

11   learn the information contained in the manual as it

12   pertained to a boom swap, did he?

13       A    No.

14       Q    On February the 16th, 2018 -- yeah, 2018, Andrew

15   Farris was the assembly/disassembly director for the boom

16   swap project; true?

17       A    Yes.

18       Q    And in that capacity, you understood that he had the

19   responsibility to make sure that the 50-meter boom was

20   properly prepared for its insertion into the base of the

21   crane; correct?

22       A    Yes.

23       Q    Do you remember if Andrew Farris ever trained you on

24   how to unlock the T3 pin before the date of this incident?

25       A    He -- I mean, it's pretty self-explanatory.  Turn a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    wrench, unlock it.

2        Q    But Andrew Farris never trained you on how to know

3    when the T3 pin was fully unlocked; correct?

4        A    Correct.

5        Q    You were aware on that Friday, February 16th, 2018,

6    that the only locking pin you ever needed to manipulate was

7    the T3 pin; true?

8        A    Yep.

9        Q    And there was never any reason to lock or unlock any

10   other locking pin, including the T4 pin; true?

11       A    The T3 pin was the only pin we were supposed to

12   touch.

13       Q    But you feel you were not properly trained to

14   determine where the T3 pin was on the boom; correct?

15       A    Repeat that.

16       Q    You feel you were not properly trained to determine

17   where the T3 pin was on the boom?

18       A    I don't understand your question.

19       Q    What don't you understand about my question?

20       A    I feel I'm not trained to know where the pin was?

21       Q    Where the T3 pin was, yes.

22       A    I was told it's the first one I should see.

23       Q    Do you remember giving your deposition and I was

24   present at that time?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
1         Q    And you were under oath when you gave your
2   testimony, sir?
3         A    Yes.
4         Q    Page 34 of your deposition, I asked you this
5   question and you gave this answer.
6              "Q -- it's line 18 -- "and do you feel that you were
7   properly trained as to how to determine where the T3 pin was
8   on the boom?"
9              "A    No."
10             Do you remember giving that answer to that question
11  in your deposition?
12        A    Yeah.  I'm having a hard time understanding your
13  question again, so that's how I believe I should answer it
14  now.  Maybe I just didn't understand then, but that's how I
15  feel about it now.
16        Q    I just want to understand, was that the testimony
17  you gave under oath back at the time of your deposition?
18        A    Apparently, yes.
19        Q    On February 16th, 2018, you didn't understand that
20  before you installed the 50-meter boom, you needed to remove
21  the T3 dust cover in order to expose the T3 pin?  True?
22        A    True.
23        Q    You didn't know there was a T3 pin on the boom, did
24  you?
25        A    What was that?
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    You didn't know that that dust cover was even on the

2    T3 pin, did you?

3    A    No, I didn't.

4    Q    I didn't hear you.

5    A    I didn't understand it was on there.

6    Q    You didn't know that it was there?

7    A    I did not know that it was on there.

8    Q    Andrew Farris testified just a little while ago that

9    he instructed you to remove the T3 pin dust cover and you

10   don't recall him ever asking you to do that?

11   A    No, I don't.

12   Q    Are you saying you don't remember or that he did not

13   instruct you to remove the dust cover?

14   A    Miscommunications happen.  We're in construction.  I

15   don't remember.  I don't recall.

16   Q    If he asked you to remove the dust cover, you

17   believe you would have done it?

18   A    Yes.

19   Q    Is it your understanding, however, whether he asked

20   you or didn't ask you, that as the assembly/disassembly

21   director for that boom swap, he had the responsibility to

22   ensure that the dust cover was off and the boom was in its

23   proper position to be inserted into the crane?

24   A    Yes.  He's in charge.

25   Q    I want to be clear on this point, that when you were

1    instructed by Andrew Farris to go up on top of the boom to

2    watch for the T3 pin, that was the first time you ever

3    performed that function; correct?

4        A    I don't recall.  I may have done it before.  I just

5    don't remember it.

6        Q    Let me see if this refreshes your recollection.  I

7    refer to your deposition at page 39 starting at line 4.

8            "Q    When you were instructed by Andrew

9        Farris to go up on the top of the boom and to

10       watch for the T3 pin to come up into the

11       100 percent hole of the T2 section?

12           "A    Yes.

13            "Was that the first time you ever did that?

14           "A    Yes."

15           Does that refresh your memory?

16       A    I mean, I don't recall.  I've been around the crane

17   boom swap before, but I don't know if I've actually done

18   that.

19       Q    Would you expect that the time you gave your

20   deposition many months ago, your memory was fresher than it

21   might be today?

22       A    I mean, maybe.

23       Q    When you accidentally manipulated the T4 pin, do you

24   know whether you moved it from its original position to an

25   unlocked position?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    So you understood that it was going in the wrong

3    direction and that pin now was unlocked as opposed to

4    locked?

5      A    Yes.

6      Q    And you informed Andrew Farris of that fact that you

7    had mistakenly unlocked a pin that locked section 4 in

8    place?

9      A    Yes.

10     Q    And you watched him as he tried to correct that

11   mistake and move it back into a locked position?

12     A    I don't know that I watched him, but I was there.

13     Q    You never know whether, ultimately, he was able to

14   restore that T4 pin to its proper locked position or not?

15     A    No.

16     Q    Are you aware that the investigation following this

17   accident revealed that the T4 pin at the time of this

18   incident was approximately 11/16 of an inch lower than it

19   should be set?

20     A    No.  I didn't know that.

21     Q    You agree that the procedures, as outlined in the

22   Liebherr manual, if it had been followed, that the accident

23   would not have occurred?

24     A    If it was done per manual, yep.

25          MR. CREMER:  Thank you.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  Any redirect?

2          MR. GOODMAN:  Yes, Your Honor.

3                    REDIRECT EXAMINATION

4   BY MR. GOODMAN:

5      Q    Mr. Burrows, if the cover plate, that's Exhibit 19

6   that's in front of you, had been on the crane on

7   February 16th, 2018, what would have occurred with regard to

8   you manipulating the T3 pin?

9          MR. CREMER:  Objection.  Calls for speculation.

10         THE COURT:  He can answer.

11         THE WITNESS:  I would have manipulated the correct

12  pin.  I definitely wouldn't have gotten the one with the X

13  over the top of it.

14  BY MR. GOODMAN:

15     Q    Do you know what an X means?

16     A    Yes.  That's not good.  Don't turn.

17     Q    Is that how you would have interpreted that?

18     A    Yes.

19         MR. GOODMAN:  Thank you, sir.

20         THE COURT:  Any recross?

21         MR. CREMER:  Very briefly.

22                    RECROSS EXAMINATION

23  BY MR. CREMER:

24     Q    If you were following proper assembly of that

25  84-meter boom, you would have removed that cover before you

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    inserted it into the boom, wouldn't you?

2        A    I don't read the manuals.  I'm just the labor.

3        Q    If you were to -- if that manual provided that that

4    cover prior to inserting the 84-meter boom into the base of

5    the crane needed to be removed, you would have expected that

6    to be followed?

7        A    Yes.

8        Q    And do you even know whether that cover with its

9    current dimensions could have even fit into the crane if it

10   was left out?

11       A    No.

12       Q    And even if that cover had been removed, there's

13   still the possibility or potential that someone could allow

14   the T3 pin to go past the 100 percent hole and for the T4

15   pin to be in its incorrect position and manipulated?  That

16   could happen, couldn't it?

17            MR. GOODMAN:  Objection, Your Honor.  That calls for

18   speculation.

19            THE COURT:  I'll let him answer that question.

20            THE WITNESS:  I guess it could happen.  But I mean,

21   if you're watching, you're going to see the pin go through

22   first.

23            MR. CREMER:  Okay.  Thank you, sir.

24            THE COURT:  Thank you.  Mr. Burrows, you can step

25   down.  Just make sure you take the microphone off first.

```
1              Does anyone intend to recall Mr. Burrows at any
2       time?
3              MR. GOODMAN:  No, Your Honor.
4              MR. CREMER:  No, Your Honor.
5              THE COURT:  Then you are free to leave, if you'd
6       like to.
7              And, Mr. Goodman, if you'll call your next witness.
8              MR. GOODMAN:  I'm going to call Bob Berry.
9              THE COURT:  Did you say Bob Berry?
10             MR. GOODMAN:  Bob Berry, yes, ma'am.  Is it
11      acceptable if Shane Burrows, also observes?
12             THE COURT:  Do you have any objection, Mr. Cremer?
13             MR. CREMER:  No, Your Honor.
14             THE COURT:  He's welcome to stay.
15             COURTROOM DEPUTY CLERK:  Mr. Berry, please, raise
16      your right hand.
17  (Witness sworn.)
18             COURTROOM DEPUTY CLERK:  Thank you.  Please have a
19      seat.
20             Sir, please, state your name for the record.
21             THE WITNESS:  I'm Charles Berry.
22             COURTROOM DEPUTY CLERK:  Thank you.
23
24
25
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1                           BOB BERRY,

2    having been first duly sworn under oath, was examined and

3    testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. GOODMAN:

6        Q    Mr. Berry, tell us what your occupation is.

7        A    At the current, I'm a semi-retired.  I am the

8    training manager for the crane school in Seffner, Florida.

9        Q    And before that, were you employed by a company?

10       A    Yes.

11       Q    Who were you employed by?

12       A    I was employed by Sims Crane & Equipment.

13       Q    And how long were you employed by Sims Crane &

14   Equipment?

15       A    I believe 13 years.

16       Q    And how old were you when you started in the crane

17   industry?

18       A    Nineteen.

19       Q    And what year was that?

20       A    1972.

21       Q    And from 1972 until your retirement with Sims, had

22   you always been in the crane industry?

23       A    Yes.

24       Q    Are you an NCCCO certified crane operator?

25       A    Yes, I am.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And are you a licensed or certified crane educator?

2    A    There's no certification for crane educator, but

3    I've been teaching crane education for over 30 years.

4    Q    And what is your NCCCO number?

5    A    I'm the No. 1 practical examiner in the United

6    States.

7    Q    And how many practical examiners are there in the

8    United States?

9    A    I think there's over 3,000 now.

10    Q    And you're No. 1?

11    A    Yes.

12    Q    When did you receive that?

13    A    I believe it was in 2000.

14    Q    Now, in teaching about cranes, do you involve the

15    ASME B30.5?

16    A    Yes.

17    Q    And do you also involve Part 1926 of Title 29 of the

18    Code of Federal Regulations?

19    A    That's Subpart CC, yes, sir.

20    Q    And how long have you worked with both of those?

21    A    Thirty years.

22    Q    I'd like to show you what's been marked as Exhibit

23    110.  Tell us what that is.

24        Can you see that on your screen?

25    A    Yes, sir.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Can you tell us what that is?

2    A    That's the ASME B30.5.

3    Q    What is that?

4    A    It's a standard that is written and updated quite

5    often that goes along with crane safety in the industry.

6    Q    And do you work with the ASME B30.5?

7    A    Yes.

8    Q    And was the ASME B30.5 2004 edition the one in

9    effect in 2018?

10   A    Yes.  I believe so.  They updated it in 2018, but I

11   don't remember exactly what part of 2018 it came out.

12        MR. GOODMAN:  Your Honor, I'd like to move Exhibit

13   110 into evidence as Exhibit 110.

14        THE COURT:  Any objection?

15        MR. PENDER:  No.

16        THE COURT:  It's admitted.

17   (Plaintiff's Exhibit No. 110 were admitted.)

18   BY MR. GOODMAN:

19   Q    And I'd like to show you Exhibit 111.  Are you

20   familiar with this document, sir?

21   A    Yes.  That is 1926.1400.  That's the OSHA

22   regulations that pertains to cranes, yes.

23   Q    And is the July 1st, 2017 edition the one that was

24   in effect in 2018?

25   A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          MR. GOODMAN:  Your Honor, I'd like to move Exhibit

2     111 into evidence as Exhibit 111.

3          THE COURT:  Any objection?

4          MR. CREMER:  No objection.

5          THE COURT:  Admitted.

6     (Plaintiff's Exhibit No. 111 was admitted.)

7     BY MR. GOODMAN:

8          Q    Mr. Berry, are you familiar with what occurred on

9     February 16th through 19th, 2018, involving a Liebherr LTM

10    1500?

11         A    Yes, sir.

12         Q    And can you tell us what you understand happened

13    between February 16th and February 19th?

14         A    My understanding is that they were trying to install

15    the 84-meter boom into the Liebherr 1500 in the yard prior

16    to the job.  And in installing it, the apprentice locked the

17    wrong pin and when he realized that the pin was going down

18    instead of up, he realized that something was wrong.  He

19    notified Andrew, the operator.  Andrew got up there.  They

20    put the pin back to where they thought it needed to be,

21    pulled the 84-meter boom out and realized that the cover

22    plate was left on.  And that's how they locked the wrong

23    pin, because the cover plate was still on.  They removed the

24    cover plate, put the boom back in, locked the correct pin at

25    the time and boomed the crane up and extended the boom.

1    Q    And between February 16th and February 19th, 2018,

2    you were employed by Sims?

3    A    Yes.

4    Q    What was your position at Sims?

5    A    I was safety director/trainer.

6    Q    And what's your responsibility as the safety

7    director/trainer?

8    A    See that -- as a safety director, see that the

9    safety policies are adhered to.  And as a trainer, make sure

10   that those that need training for whatever jobs are going to

11   be done, that the training has been done.

12   Q    After February 19th event when the boom collapsed in

13   on itself, were you involved in the investigation for Sims

14   and with communicating with OSHA in that investigation?

15   A    Yes, I was.

16   Q    I'd like to show you what's been marked as Exhibit

17   114.  Are you familiar with this document, sir?

18   A    Yes.  It's an email that I received from OSHA, I

19   believe.

20   Q    Is this also an email that you're communicating to

21   OSHA?

22   A    Yes.

23   Q    And are you cc'ing anybody?

24   A    Excuse me?

25   Q    Are you carbon copying anyone?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A    Chris Peek, Mr. Cutler.

2        Q    And who is Chris Peek?

3        A    Chris Peek is the risk manager, Vice President of

4   Risk Management of Sims Crane at the time.

5        Q    And who is Mr. Cutler?

6        A    Mr. Cutler was an attorney with De La Cruz.  He was

7   a Sims' attorney.

8        Q    What are you communicating to OSHA in this email?

9        A    We communicated that -- we maintained that if we

10  would have had this prior to the incident, that we felt that

11  it probably would not have occurred.

12       Q    And when you said this, you grabbed a cover plate

13  that was in front of you.

14            Is that the cover plate that is shown in Exhibit 19?

15       A    Yes.  This is the cover plate from the Safety

16  Bulletin that we received from Liebherr after the incident.

17       Q    And did you ever receive it before the incident?

18       A    No, sir.

19       Q    And why do you say -- and why did you communicate to

20  OSHA that had you received it, this event would not have

21  occurred?

22       A    Because of the design of this cover plate, that when

23  this cover plate is installed, if it was left on, like the

24  cover plate had been left on that day, this covered the pin

25  so you could not have touched the wrong pin.  And the decals

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    on this are decals designed that you don't touch this pin.

2            So that if we would have had this cover plate prior

3    to the incident, even if it had been left on like the cover

4    plate had been left on, you could not access the T4 pin.

5        Q    And did you come to that conclusion based upon your

6    discussions of what happened with Andrew Farris, Shane

7    Burrows and reviewing the Product Safety Bulletin that was

8    ultimately received by Sims after the loss?

9        A    Yes.

10       Q    I'd like to show you what's been marked as Exhibit

11   115.

12           Can you tell us what your communication -- can you

13   tell us what this is?

14       A    This is an email received from OSHA to me and copied

15   in with Chris Peek, Jeff Cutler.

16       Q    And what is OSHA requesting?

17       A    "Why was the pin removed and replaced in the first

18   place?  I believe you told me the pin was removed and placed

19   in a different spot that enabled the pin to be sheared off."

20       Q    And what was -- what's your answer to No. 1?  Do you

21   recall?

22       A    No. I don't recall what I told them.  I believe he

23   told me the pin was removed and replaced in a different spot

24   and enabled the pin to be sheared off.

25       Q    Okay.  And then what's the second question?

1        A    "Is this a maintenance issue as far as removing and

2    replacing the pin?"

3             "No.  It is not."

4             "If so, how often is this completed and when was the

5    last time the pin was removed and replaced and by whom?"

6        Q    What's the third question?

7        A    "Do you have anything in writing from Liebherr that

8    explains their failure to provide this cover?"

9        Q    I'd like to show you what's been marked as Exhibit

10   116.  If you go down.

11            Are these your answers?

12       A    "The pin was touched as the long boom was

13   installed" --

14       Q    I'm sorry. let me ask you a question.  What are we

15   looking at here?

16       A    This is also communication between myself and the

17   OSHA.

18       Q    And is this Exhibit 116 answers to the prior

19   questions from the OSHA investigator?

20       A    Yes.

21       Q    Can you tell us what your answers to those questions

22   were?

23       A    "The pin was touched as the long boom was installed

24   on the crane and it was the wrong pin.  That enabled it to

25   be sheared off.  If the cover plate had been provided from

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Liebherr, the wrong pin would not ever have been touched.

2    This is not a maintenance issue.  This pin is installed and

3    removed upon installation of different boom lengths of

4    telescoping boom sections."

5        "No.  We have not received any explanation from

6    Liebherr why the update was not sent earlier, but it was

7    dated November 2017 on the letter that came with the

8    update."

9    Q    I'm going to show you what's been marked as Exhibit

10   117.

11       Is Exhibit 117 a response to the top of Exhibit 116?

12   Let me show you Exhibit 116.

13       Can you tell us what this is?

14   A    This is a letter that I received from OSHA and he is

15   saying, "in regards to the incident that occurred, as per

16   our conversation yesterday, can you please provide detailed

17   explanation of why the pin in question was removed during

18   this particular boom change but not on previous boom

19   changes.  Correspondence to Sims Crane from Liebherr in

20   regards to removal of the pin or the changes in a procedure

21   for the removal of the pin, that was received with the date

22   of receipt.  Pictures of the boom sections depicting the

23   pins and and/or pin placement with the cover removed."

24   Q    And then if we go to Exhibit 117, can you tell us

25   what this is?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    This is in response to their request.  "The cover

2    plate in photo 600 was still on the boom section when it was

3    inserted in the boom section.  When the apprentice looked in

4    the hole, he saw only one pin which was the wrong pin.

5    Previously the cover plate was not on the boom section when

6    it was assembled, you can tell by the design of the new

7    cover plate and the safety update from Liebherr this was a

8    previous mistake that caused them to issue the retrofit of

9    the cover plate."

10           "The correspondence from Liebherr is attached with

11   the updates and changes.  We received this on the 28th of

12   February, 2018."

13           "Picture 600 shows you the cover plate and 600 7

14   shows you the two holes that they were looking thru to site

15   the pin."

16    Q    So if we look at the next page on that Exhibit, what

17   is that?

18    A    That is the cover plate.

19    Q    Then, if we look at the next page, what is that?

20    A    That is the hole to look in to lock the pin.

21    Q    And then if we look at the next page and scroll

22   through the next few pages, what is this?

23    A    This is the paperwork that we received with the

24   Safety Bulletin.

25    Q    And when was that received?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        A    The 28th of February.

 2        Q    Did you ever receive that before February 19th,

 3    2018?

 4        A    No, sir.

 5        Q    Were you ever aware of this information that was in

 6    the Product Safety Bulletin before February 19th, 2018?

 7        A    No, sir.

 8        Q    I'd like to talk a little bit about the ASME B30.5.

 9    Okay?

10        A    Okay.

11             MR. PENDER:  Your Honor, before we begin with that,

12    we have an objection.

13             THE COURT:  Okay.  What's that?

14             MR. PENDER:  This witness has not been disclosed as

15    an expert witness, and we object to him giving any expert

16    testimony based on ASME or the OSHA regulations.

17             THE COURT:  Overruled.  Based on what he said, over

18    the 30 years, he can give his experience based on that

19    experience.

20             Go ahead.

21    BY MR. GOODMAN:

22        Q    I'd like you to turn to Exhibit 110.

23             MR. GOODMAN:  May I approach, Your Honor?

24             THE COURT:  You may.

25
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   BY MR. GOODMAN:

2       Q    Under Section 1, Scope, can you tell us what the

3   scope of ASME B30 is?

4       A    It says that "the scope of ASME B30 contains

5   provisions that apply to the construction, installation,

6   operation, inspection, testing and maintenance and use of

7   cranes and other lifting and material movement-related

8   equipment."

9       Q    What's the purpose of the ASME in Section 3?

10      A    "To prevent and minimize injury to workers and

11  otherwise provide for the protection of life, limb and

12  property by prescribing safety requirements.  And provide

13  direction to manufacturers, owners, employees, users and

14  others concerned with or responsible for its application."

15      Q    And if you turn to page 6.  You at page 6?

16      A    Yes.

17      Q    Now, there's a definition for "qualified operator."

18           Do you see that up on the top right of page 6?

19      A    Yes.

20      Q    On February 16th to February 19th, as you know the

21  ASME B30, was Andrew Farris considered a qualified operator?

22      A    Yes.

23      Q    And under that, there's a definition for "qualified

24  person."  Under that definition, between February 16th and

25  February 19th, was Andrew Farris a qualified person?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    Now, as a qualified operator or qualified person,

3    under the ASME B30, can one have apprentices and oilers

4    working at their direction?

5      A    Yes.

6      Q    I'd like you to turn to Exhibit 111 and,

7    specifically, page 715 of 111.  Let me know when you are

8    there.

9      A    Yes, sir.

10      Q    So what is the scope of Section 1926.1400?

11      A    "This standard applies to power-operated equipment,

12    when used in construction, that can hoist, lower and

13    horizontally move a suspended load."

14      Q    If you turn to page 717, which is the next -- and

15    there's a definition for A/D, director, assembly/disassembly

16    director?

17      A    Yes.

18      Q    Do you see that?

19      A    Yes.

20      Q    As you understand Section 1926.1401, did Andrew

21    Farris meet the definition of an A/D director?

22      A    Yes.

23      Q    And he met that definition between February 16th and

24    February 19th?

25      A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q   And between February 16th and February 19th, before

2    conducting any lifts, is Mr. Farris still involved in

3    assembly/disassembly?

4    A   Yes.

5    Q   If you go to page 718, there's a definition for a

6    competent person.

7    Do you see that?

8    A   Yes.

9    Q   Under this definition, is Andrew Farris a competent

10    person between February 16th and February 19th?

11    A   Yes.

12    Q   Is Shane Burrows a competent person?

13    A   No, sir.  The difference between a qualified and a

14    competent person is the authority that goes with the job.

15    Q   And tell us about the authority that goes with the

16    job for a competent person.

17    A   Competent person is a qualified person by training,

18    knowledge and understanding, but he is the

19    assembly/disassembly director.  So he is a competent person

20    because an A/D director has to be a competent person, and

21    he's competent in the fact that he knows who, what, when and

22    where.  Because if you look at B30.5, when it talks about

23    the assembly/disassembly director's responsibilities, when

24    you are putting a crane together and taking a crane apart,

25    it's his job to run the show.

1    Q    When you say "his," Andrew Farris'?

2    A    Yes.

3    Q    Now, if you turn to the next page, there's a

4    definition of -- on 721, excuse me.  If you turn to page

5    721, there's a definition for "qualified person."

6         Was Andrew Farris a qualified person as defined here

7    between February 16th and February 19th?

8    A    Yes.

9    Q    Was Shane Burrows a qualified person as defined here

10   between February -- on February 16th?

11   A    I would say yes.

12   Q    And why would you say that Shane Burrows is a

13   qualified person?

14   A    Because he understood how to change the boom.  He

15   understood, you know, his duties as an apprentice.  Andrew

16   had the competent authority to tell Shane what to do and

17   what not to do.  And he -- based on training, Shane was

18   not -- I think he was a third-year apprentice, so he had had

19   three years' of training up to this point that would be

20   equal to -- qualified to do what an apprentice does.

21   Q    And would that include locking down a pin on top of

22   a boom on the LTM 1500?

23   A    If he's told to do that, yes.

24   Q    Is switching out the 50-meter boom for the 84-meter

25   boom, or vice versa, considered a modification under these

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    two sections that we just looked at under these two

2    exhibits?

3        A    No, sir.  No, sir.

4        Q    Would changing out the boom sections -- strike that.

5             Let me ask you this:  Why is it not considered a

6    modification?

7        A    A modification is a permanent change to the

8    equipment.  To do a modification, you have to notify the

9    crane manufacturer that you are modifying his piece of

10   equipment.  He has, I think, so many days to respond to your

11   request for him to approve the modification, because it's a

12   permanent change to his piece of equipment.  And I believe

13   it says that if he doesn't respond in a certain period of

14   time, that means that he don't care what you do to your

15   equipment.

16       Q    Would a change from the 84 to the 50-meter boom, or

17   vice versa, be considered an alteration to the equipment?

18       A    It would be considered assembly/disassembly.

19       Q    So that's it?

20       A    That's it.  It ain't -- it's not a modification.

21            Now, if you say it's a modification because you're

22   going from a 50 meter to an 84 meter, that's an assembly

23   modification.  That's like adding a jib to the end of the

24   boom.  That's not a modification, but you're modifying the

25   boom by adding the jib to it, but you have a load chart for

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   the 50 meter-meter.  You have a load chart for the 84-meter.

2   You have the load chart for a jib or a luffer.  That's not a

3   modification.  That's assembling the boom into the

4   configuration needed to do the lift.

5        Q    So I just want to be clear.  Under Exhibit 110 we

6   looked at ASME B30 and Exhibit 111 that we looked at, Part

7   1926.  Change from the 50 meter or vice versa is not

8   considered a modification?

9        A    No, sir.

10       Q    It's not considered an addition?

11       A    No, sir.

12       Q    It's not considered an alteration?

13       A    Well, the definition of alteration, if you're

14   changing from a 50 meter to an 84 meter, then you're

15   altering the length of the boom, but that's part of the

16   piece of equipment.  They gave you two sections of boom to

17   reach different lengths based on the Owner's Manual,

18   Operator's Manual, Machine Manual, whatever.  That's why

19   it's not considered, you know -- I guess you could call it

20   an alteration of changing the length of boom, but that's a

21   broad statement for alteration.

22       Q    What I'm asking you, under the code sections that we

23   looked at, 110 and 111, it's not a modification; correct?

24       A    No.

25       Q    And you said it's not an addition; correct?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Correct.

2    Q    And it's not an alteration; correct?

3    A    No.

4    Q    It's assembly/disassembly?

5    A    That's exactly correct.

6    Q    Now, I'd like to show you what's been marked as

7    Exhibit 104.

8         Do you know what this is?

9    A    Yes, sir.  That's the daily inspection booklet that

10   is in the equipment for inspection.

11   Q    And which maintenance inspection is this for?

12   A    The Liebherr TC 529 I believe it is.

13   Q    That's the Liebherr LTM 1500?

14   A    Yes.

15   Q    And what's the month and year of this inspection?

16   A    February 2018.

17   Q    Now, we go to the next page.  There are numbers

18   going across horizontally at the top.  Do you see that?

19   A    Yes, sir.

20   Q    And what are those numbers representative of?

21   A    The days of the month.

22   Q    And now underneath that, there are checkmarks.  Do

23   you see that?

24   A    Yes.

25   Q    And what is that representative of?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A    That's representative of a daily inspection that was

2   done on the equipment for that day.

3        Q    And do you understand that the signature at the

4   bottom, the inspector's initials, that's Andrew Farris'

5   initials?

6        A    I believe so.

7        Q    Are you familiar with Andrew Farris' initials?

8        A    No.

9        Q    Now, the inspector is generally the operator?

10       A    Could be, or the apprentice.

11       Q    Now, here you have checks under the 1st, the 2nd,

12   the 5th, the 8th, the 9th, the 10th and the 19th.  Do you

13   see that?

14       A    Yes.

15       Q    So on the days that aren't checked, what would be

16   happening with the crane?

17       A    The machine would not be operating that day.

18       Q    And where would the LTM 1500 generally be if it was

19   not operating?

20       A    In the Tampa yard.

21       Q    And let's assume that on the 3rd or the 4th you

22   received the Product Safety Bulletin from Liebherr.

23            When you received that Product Safety Bulletin,

24   what's the habit and routine practice of Sims when you

25   receive something like that?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          A    Well, we would install the Safety Bulletin to the

2     equipment if the 84 meter was not in the crane at the time.

3     If the 84 meter was in the crane at the time, we would meet

4     with the operator that day, whatever, and explain to them

5     that we have received an update that addresses the T4 pin

6     and, please, you know, as soon as you pull the 84 meter out

7     of it, we need to install the decals and the cover plate.

8          Q    AND how long would it take you after receiving a

9     Product Safety Bulletin in the mail to have a meeting with

10    the operator?

11         A    If the operator is in the yard at the time, half

12    hour, 45 minutes.

13         Q    And what if the operator is out on the job?

14         A    Then we would meet with the operator when he came

15    back in.

16         Q    Would you call the operator?

17         A    If he was operating the Liebherr 1500, yes, we would

18    call him and say "listen, we received a Safety Bulletin.

19    Make sure when you get back to the yard, you don't go

20    anywhere until you get with me and we'll go over the Safety

21    Bulletin."

22         Q    And if he had the Liebherr LTM 1500, would you go

23    over the Product Safety Bulletin with the operator over the

24    phone?

25         A    No.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Would you discuss the issues with the operator that
2    were raised in the Product Safety Bulletin?
3    A    Yes.  We would tell him, you know, the reason that
4    the Safety Bulletin was issued is because we have a problem
5    with touching the wrong pin.
6    Q    And so based on this worksheet that you're looking
7    at in this Exhibit, if the Product Safety Bulletin came on
8    the 3rd, when would have been the time that the Product
9    Safety Bulletin would have been installed on the LTM 1500?
10    A    It would have been installed on the 3rd to the
11    section of boom in the yard.  If the operator was not
12    available that day because he was on another job or
13    whatever, we would make sure that it was explained to them
14    why.  And in the next monthly safety meeting, the safety
15    bulletin would have been brought up.
16    Q    So in this case, between -- if it was received on
17    the 3rd, and assume for me that the crane is in the yard and
18    the operator is not out on another job with another crane,
19    when would the operator be made aware of the Product Safety
20    Bulletin information?
21    A    As soon as we could contact him.
22    Q    How often -- how long would that have taken on the
23    3rd to contact Andrew Farris?
24    A    If he was in the yard, 35, 40 minutes to walk from
25    the front of the yard to the back of the yard.

1    Q    And what if he was not at the yard?  What if he was

2  at home?

3    A    Then we would have called him and said, hey, listen,

4  you know, you are going to run the crane.  You need to know

5  about this new Safety Bulletin and, you know, there's no job

6  on the 4th.  So, you know, he might have been on another

7  job.  But before he went out on the 5th, he would have had

8  the Safety Bulletin because it would have been installed.

9    Q    And how about if it was received on the 6th, the

10  same process happens?

11    A    Same process.

12    Q    So if it was received on the 6th, the Safety

13  Bulletin would have been on the LTM 1500 by the 7th and

14  Andrew Farris would have known the information in the

15  Product Safety Bulletin by the 7th?

16    A    Yes.

17    Q    And how about on the 11th, same process?

18    A    Same process.

19    Q    12th, same process?

20    A    Same process.

21    Q    13th, same process?

22    A    Same process.

23    Q    14th, same process?

24    A    Same process.  As soon as we received the Safety

25  Bulletin, we would have had it installed on the piece of

1    equipment and stickers, cover plate, explanation to anyone

2    that's going to be working with the piece of equipment, that

3    would come through the safety department, the branch

4    manager.

5        Q    Why do you want to get the Product Safety Bulletin

6    on the equipment so quickly and speak with the operator so

7    quickly?

8        A    Because once again, if this would've been there, I

9    don't believe the incident would have happened.

10           MR. GOODMAN:  Could I have one moment, Your Honor?

11           THE COURT:  You may.

12    (Brief pause.)

13    BY MR. GOODMAN:

14        Q    In your opinion, what was the cause of the

15    February 19th, 2018 incident?

16           MR. PENDER:  Objection.

17           THE COURT:  I'll let him answer.  But, again, it's

18    qualifying.  It's his opinion and he's not being offered as

19    an expert.  Go ahead.  You can answer.

20           THE WITNESS:  I believe the cover plate was left on

21    the 84 meter when it was being installed.  The only pin that

22    was exposed was the T4 pin.  Shane locked -- or tried to

23    lock the T4 pin.  When it went in the opposite direction of

24    normal, he quit and said "Andrew, something's not right."

25           They got up there.  They replaced the pin in the

1    position that they thought it needed to be in and

2    unbeknownst that it was not where it should have been.

3        Q    And I'm going to show you Exhibit 1 and page

4    IAI2706.  Read that last highlighted paragraph, or the

5    second to last highlighted paragraph.

6        A    "The incident could have been prevented if the

7    manufacturer supplied the written Product Safety Bulletin

8    notice, a product modification retrofit cover plate with

9    warning labels to be affixed to the crane and the update

10   changed revision for the operating instructions,

11   specifically, Chapter 90.5 in a timely manner as soon as the

12   manufacturer became aware of the issue."

13       Q    Do you agree with that opinion?

14       A    Yes.

15       Q    In your opinion, did Shane Burrows violate ASME or

16   OSHA or Crane Operating Standards?

17       A    No, sir.

18       Q    Did Andrew Farris violate any of those?

19       A    No, sir.

20            MR. GOODMAN:  No more questions at this time, Your

21   Honor.

22            THE COURT:  Thank you.

23            MR. GOODMAN:  Oh, before we -- I don't believe I

24   moved into evidence --

25            THE COURT:  My note is that Exhibit 114, 115 and 116

1    were not moved into evidence.

2              MR. GOODMAN:  Then we would also have Exhibit 117.

3              THE COURT:  And 117, you're right.

4              MR. GOODMAN:  Thank you, Your Honor.

5              THE COURT:  Any objection, Mr. Pender?

6              MR. PENDER:  No objection to those.  Only the

7    objection I stated as to the ASME and the CFR.

8              THE COURT:  So 114, 115, 116 and 117 are all

9    admitted.  110 and 111 had previously been admitted, but I

10   do -- but, again, your objection as to the testimony

11   provided by this witness is noted.

12             MR. PENDER:  Thank you.

13   (Plaintiff's Exhibit Nos. 114 through 117 were admitted.)

14             THE COURT:  Would you like to do cross now?  How

15   long -- do you anticipate a long cross, short cross?

16             MR. PENDER:  It won't last too long, Your Honor.

17   Half hour.

18             THE COURT:  Let's go ahead and take a break then

19   because we've been going for about an hour and thirty-five

20   minutes.  Let's take a short break, about a 15-minute break

21   and come back at 3:35 and we'll have the cross at that time.

22             Mr. Berry, if you could just remember to take the

23   microphone off when you step down.

24             THE WITNESS:  Yeah.  I'll unplug everything.

25   (Recess had at 3:18 p.m.)

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    (Resumed at 3:34 p.m.)

2              THE COURT:  Okay.  When you're ready, Mr. Pender.

3              MR. PENDER:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    BY MR. PENDER:

6        Q    Mr. Berry, good afternoon.  My name is Tom Pender. I

7    was at your deposition with my partner Bill Cremer.

8        A    Nice to meet you again.

9        Q    Nice to see you again.  I have a few questions for

10   you.

11             Mr. Berry, at the time of the events in this case,

12   you were employed at Sims Crane as the safety director;

13   correct?

14       A    Yes.

15       Q    Was there anyone else at Sims Crane higher in

16   authority whose job it was solely -- was dedicated to safety

17   other than you?

18       A    Yes.

19       Q    Who was he?

20       A    Chris Peek.

21       Q    Chris Peek.  Okay.  I know you've talked about your

22   experience in the crane industry.  You have no experience

23   operating a Liebherr LTM 1500, do you?

24       A    No, sir.

25       Q    And your view of the Liebherr brand in terms of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    quality is that the Liebherr is a good crane.  Agreed?

2        A    Yes.

3        Q    And at least as of the time that your deposition,

4    Sims Crane continued to own Liebherr cranes in its fleet,

5    agreed?

6        A    (Nodding head.)

7        Q    When did you leave Sims Crane?

8        A    October of 2020, I believe.

9        Q    Okay.  A little -- a year-and-a-half ago or so?

10       A    Okay.

11       Q    During the time following this accident up until you

12   left the company, did Sims Crane add some additional

13   Liebherr Cranes to the fleet?

14       A    I don't know.

15       Q    Are you familiar with the Liebherr LR 1300 crane?

16       A    Yes.  Sims has a few.

17       Q    Has a few.  Okay.  Do you know if they have one on

18   delivery for next week?

19       A    I do not know that.

20       Q    You talked a little bit about the OSHA crane

21   regulations, the CFR 1926.1400 and the ASME B30.5

22   provisions.  I take it you're aware then that everyone in a

23   management position at Sims Crane, including yourself, was

24   responsible at all times for the company's compliance with

25   those regulations?  Agreed?

1      A    If you're using ASME B30.5, the crane owner has

2    responsibilities based on Chapter 5 of the standard but, you

3    know, it just talks about maintaining the equipment in a

4    good safe working order.  As far as maintaining safety,

5    that's part of the company.

6      Q    And that's all I'm asking.  Sims Crane was

7    responsible for complying with the OSHA and the ASME

8    standards.  Agreed?

9      A    Yes.

10      Q    Back in 2018, when Andrew Farris joined the company,

11    when a crane operator would come to Sims Crane for a job,

12    they just had to present their operator's card or their

13    license; correct?

14      A    No.  They have to go through the union hall and be

15    dispatched by the union to us as an employee.

16      Q    Since 2018, now there's an evaluation form that you

17    have to do; correct?

18      A    Yes.

19      Q    That was not in effect when Andrew joined the

20    company?

21      A    No, sir.

22      Q    And there's no standard practice, to your knowledge,

23    that Sims Crane with respect to verifying an applicant's

24    prior history of work, is there?

25      A    If he comes out of the union hall, the union hall is

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    our hiring hall and they send him to us based on his work

2    experience out of the hall.

3        Q    Okay.  I'd like you to take a look at what I have

4    marked as Defendants' Trial Exhibit No. 9 for

5    identification, which purports to be Andrew Farris' job

6    application real quickly.

7        A    Yes.

8        Q    It will come up on your screen.  Do you see that?

9        A    Yes, sir.

10       Q    And one of the things it says on here is in the

11   first kind of block is:  How did you hear of us?  And over

12   to the right it gives a name.  It says Bob Berry?

13       A    Yes.

14       Q    And he heard about the company through you, agreed?

15       A    No.  Not necessarily.  Because he was in the union

16   years before me, you know, before this time period and Sims

17   has been around for 60 years, so I'm sure he's heard of Sims

18   Crane and Equipment.

19       Q    Do you know why he put your name there?

20       A    Probably because I was his apprenticeship instructor

21   for four years.

22       Q    And if you turn -- we'll flip up the second page of

23   his application, which is entitled at the top -- it's not

24   super easy to read, but it says "former employers.  List the

25   last three employers."

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          That entire page on Andrew's application is left

2     blank; correct?

3     A    Yes.

4     Q    And do you know why that is?

5     A    No, sir, I do not.

6     Q    Do you know if anyone at Sims Crane checked any of

7     his prior employers before hiring him?

8     A    I don't know the answer to that.

9     Q    And if we go to the next -- let's see, the page at

10    the bottom, 6375.  I believe it's the next to last page of

11    the Exhibit.  We'll get there in a second.

12         That's the Sims Crane & Equipment General Safety

13    Rules.  Agreed?

14    A    Yes.

15    Q    And at the bottom of that page -- I know you don't

16    know Andrew's signature, but if I asked you to assume that

17    the signature at the bottom dated November of 2015 is

18    Andrew's signature, you don't have any reason to disagree

19    with me, do you?

20    A    No, sir, I do not.

21    Q    That indicates by Andrews's signature and the

22    manager's signature -- I think Diane somebody -- that these

23    safety rules were given to Andrew and he reviewed them and

24    understood them.  Agreed?

25    A    Yes.

1    Q    No. 7 of the Sims Crane General Safety Rules reads

2    as follows.  "If at any time you are unsure of how to

3    perform an assigned task, stop and request assistance or

4    direction from your manager/supervisor.  This is for your

5    safety and that of your fellow workers."

6        That's what it says; correct?

7    A    Yes, sir.

8    Q    And No. 10 of those rules reads:  "Do not attempt to

9    repair or tamper with equipment that is not working

10   properly.  Immediately report the condition to your

11   manager/supervisor."

12       That's what No. 10 says?

13   A    Yes.

14   Q    And Sims Crane felt those rules and all of these

15   rules were important enough to include in the application

16   packet at the beginning of someone's employment and have

17   them sign off on them that they read it?

18   A    Yes.

19   Q    And Andrew Farris having signed those safety rules

20   had a duty to comply strictly with those rules at all times

21   while he was employed at Sims Crane.  Agreed?

22   A    Yes.

23   Q    I want to ask you about the training by Liebherr for

24   this LTM 1500.  You had no involvement, sir, in determining

25   what training would be provided by Liebherr as part of the

1    turnover of this crane, did you?

2         A    No, sir.

3         Q    And you don't know who, if anyone, paid for the

4    Liebherr training, do you?

5         A    Not to my knowledge.

6         Q    You had no role in organizing or attending the crane

7    training that a Liebherr technician named Henry Ward

8    provided to Sims Crane in January and February of 2017, did

9    you?

10        A    No, sir.

11        Q    And you gave no input as to who from Sims Crane

12   would attend the training, did you?

13        A    No, sir.

14        Q    And you don't know who decided what topics would be

15   covered in that training and what wouldn't be covered, did

16   you?

17        A    No, sir.

18        Q    Now, if two operators, Andrew Farris and Jason

19   D'Angelo, did attend that training, if these men were to be

20   competent, responsible operators of this pretty massive

21   piece of equipment, union operators, would you expect that

22   if they did not fully understand some aspect of that

23   training that they would speak up and ask for clarification?

24        A    Yes, sir.

25        Q    From your perspective as a safety -- former safety

1    director at Sims Crane, even when an operator goes through

2    an orientation program on a piece of equipment like the LTM

3    1500, that's really just the beginning.  There's much more

4    for them to learn over time; right?

5        A    Yes.

6        Q    And this gentleman that I mentioned, Henry Ward, of

7    Liebherr, you don't know who Henry is and you never observed

8    any of his training, did you?

9        A    No, sir.

10       Q    You've never had any conversations with Andrew

11   Farris about the LTM 1500 before this accident, did you?

12       A    No, sir.

13       Q    And so I take it you've never heard a negative word

14   from Mr. Farris about the training he received?

15       A    No, sir.

16       Q    And the safety department at Sims, you guys didn't

17   debrief Andrew or Jason after the training to find out what

18   they had learned, did you?

19       A    The safety department did, but I'm sure the branch

20   manager and who was involved in dispatching them on that

21   piece of equipment would have communicated with them.

22       Q    But the safety department did not do that?

23       A    No.

24            THE COURT:  Let me just stop for a minute.

25            Mr. Goodman, was that the next witness that came in?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          MR. GOODMAN:  Yes, Your Honor.

2          THE COURT:  Is that Mr. Peek that came in?

3          MR. GOODMAN:  Yes, Your Honor.

4          THE COURT:  He came in and there was a question

5     pending.  I don't think he even had enough time to hear the

6     question and he didn't hear an answer, so I don't think it

7     was any type of issue.

8          Mr. Goodman sprung into action and sent him to the

9     door, but just let the record reflect that Mr. Peek did walk

10    in before he could even sit down and Mr. Goodman had already

11    stopped him and let him out, but I think he maybe heard your

12    question, a part of your question, but there was no answer

13    that he heard by Mr. Berry.

14         Go ahead.

15         MR. PENDER:  Thank you, Your Honor.

16    BY MR. PENDER:

17    Q    Okay.  Mr. Berry, it is a requirement at Sims Crane

18    that crane operators must read the manufacturer's operating

19    manual before they operate a crane; right?

20    A    Yes and no.

21    Q    That's an interesting answer.

22    A    This is 1800 pages long.

23    Q    Okay.

24    A    All right.  If he's going to operate the outriggers,

25    he reads the part about the outriggers.  If he's going to do

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the boom change, he reads the part about the boom change.

2    Because there's a lot of information in these Operator's

3    Manual that pertains to general safety rules that the

4    manufacturer puts in a book to protect them saying that you

5    were safely told how to operate the equipment before.

6        Q    So Sims Crane was okay --

7            MR. GOODMAN:  Your Honor, I believe he didn't finish

8    his answer.

9            MR. PENDER:  He's finished as far as I'm concerned.

10   This is cross-examination.  I wanted to move on to my next

11   question.

12           THE COURT:  Go ahead.  Ask your next question.

13   BY MR. PENDER:

14       Q    As far as Sims Crane was concerned, there might be

15   some general safety information there that an operator

16   wouldn't read, and that would be okay as long as that

17   operator read the specific sections for the task that he was

18   going to be doing?

19       A    It's just like when you buy a new car.  You read how

20   to run the air conditioner, how to program the radio, how to

21   do this, how to do that, but you don't necessarily read the

22   whole manual from front to back before you drive the car off

23   the lot.

24       Q    So the answer to my question was "yes"?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          Q    And I want you to assume, for purposes of my

2     question, that Sims Crane got the Operator's Manual in

3     October of 2016, about three months before they took

4     possession of the crane.  I want you to assume that.

5     October 2016.  The accident happens in February of 2018, so

6     about 16 or so months later.

7               That 16 months is certainly enough time for

8     Mr. Farris to have reviewed, at least, the section of the

9     manual for the tasks that he was going to be doing, agreed?

10         A    Yes.

11         Q    And you're not aware of any additional training that

12    Sims Crane arranged for Mr. Farris or Mr. D'Angelo on this

13    LTM 1500 other than what Liebherr had given them?

14         A    Not that I know of.

15         Q    You didn't -- the safety department didn't organize

16    any additional training for them?

17         A    (Shaking head.)

18              THE COURT:  You need to answer yes or no.

19              THE WITNESS:  No.

20              MR. PENDER:  Thank you.

21    BY MR. PENDER:

22         Q    You talked a little bit about an apprentice named

23    Shane Burrows.  He was working at Sims Crane at the time of

24    these events.  Because he was an apprentice at the time that

25    the 84-meter boom was installed prior to this accident, and

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    assuming than Andrew Farris was the assembly/disassembly

2    director for that activity, Mr. Farris had the obligation to

3    supervise Shane Burrows' work.  Agreed?

4        A    Yes.

5        Q    And it would have been Andrew Farris that had the

6    overall responsibility to ensure that the 84-meter boom was

7    installed safely in accordance with the manufacturer's

8    instructions.  Agreed?

9        A    Yes.

10       Q    Now, it's my understanding that on behalf of Sims

11   Crane, you conducted the investigation of this accident that

12   happened on February 18th -- February 19th of 2018?

13       A    Yes.

14       Q    And, ultimately, your accident investigation

15   findings were what was written by you to OSHA in some

16   emails?

17       A    Yes.

18       Q    Do you even know whether Shane Burrows was qualified

19   to independently distinguish whether the locking pin on T3

20   of the 84-meter boom was in the proper position or not?

21       A    Repeat the question.

22       Q    Do you even know whether Shane Burrows was qualified

23   on his own to determine whether the locking pin on the T3

24   section of the 84-meter boom was in the proper position or

25   not?

1      A     I don't believe he did it on his own.  He questioned

2   Mr. Farris and the two of them decided how to proceed.

3      Q     You're not aware of whether or not Shane knew how to

4   do that, but certainly with Andrew's supervision you believe

5   he should have?

6      A     Based on the conclusion that I came to from the

7   investigation of the accident, Shane had swapped the boom

8   out before, so, therefore, he knew he was qualified to do it

9   because he had done it before.

10     Q     Do you know how many times he had done it before?

11     A     I don't know.  All I know is that he had done it

12  before so, therefore -- done it before without any burps or

13  any problems, so he was qualified to change it out.

14     Q     I want --I want to show you what we marked as

15  Defendants' Trial Exhibit No. 2, which is Andrew Farris'

16  statement to OSHA.

17           During your investigation, you had a chance to read

18  Andrew Farris' statement to OSHA and Shane Burrows'

19  statements to OSHA?

20     A     Yes.

21     Q     If you recall, he said he was having trouble getting

22  the boom sections to scope out and the cylinder kept

23  stopping at the T4 pin.  Do you recall that?

24     A     Yes.

25     Q     And he further told OSHA that he called his

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    supervisor, Mike Gay, who told Andrew "I'm going to dispatch

2    a tech -- a technician"?

3        A    Yes, sir.

4        Q    And that would be a Sims Crane service technician;

5    right?

6        A    Yes.

7        Q    And that would be the correct procedure and be

8    consistent with those general safety rules that we looked at

9    earlier where you run into something where you're unsure,

10   you call your supervisor and ask for help?

11       A    That's what he did.

12       Q    Okay.  And that's because Andrew could not, at that

13   time, resolve the problem and it was a proper step for him

14   to call his supervisor and ask for assistance; right?

15       A    Yes.

16       Q    And that general safety rule says that when you do

17   that, you should STOP, in all caps, you should STOP working

18   once you have notified the supervisor of the problem.

19   You're aware a tech is on the way.  If you are not able to

20   resolve it, you should stop work?

21       A    If you go back and read that sentence that you say,

22   it doesn't necessarily say you stop.  It says you stop if

23   you -- what did it say?

24       Q    Can't resolve the issue?

25       A    It didn't say that.  Read it back again.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q     "If you're unsure how to perform an assigned task

2      stop."  Right?

3      A     He was not unsure about performing an assigned task.

4      He was sure of the task that he was performing because he

5      had no error codes.  The computer was reading properly.  He

6      was under the assumption that it was operating properly, so,

7      you know, he didn't -- he called for a mechanic, but he

8      continued to try to right the situation because he saw no

9      warnings that he had been taught to look for.

10            The pin -- that the dot for the pin T4 engaged was

11     engaged.  The pins for the telescoping ram were engaged and

12     disengaged on the computer and that's all that he has to go

13     by and he saw no problem.  He couldn't understand what was

14     going on because he saw no problem.

15     Q     Even though he couldn't understand what was going

16     on, you believe it was acceptable for him to continue to

17     operate that crane and troubleshoot the issue?

18     A     Sure.  Sure.

19     Q     Mr. Farris also told OSHA that "we verified all

20     sections were locked."

21            And that's what you're talking about.  He did that

22     by looking at the computer you're saying?

23     A     That's the only way he can verify that they're

24     locked because they're 100 feet up the boom and he can't see

25     inside the boom, so, therefore, the only thing that he has

1    to go by is what the computer says.

2         Q    That's acceptable to Sims Crane, that if the

3    computer says there's no errors, you don't need to do

4    anything else to check on it?

5         A    You continue to try to troubleshoot the problem if

6    you don't have an error code.

7              Now, if he would have had an error code show up,

8    then the error code, he would have looked in the book to

9    find out what the error code was and then he would have

10    stopped according to what the error code was, but he got no

11    error codes whatsoever during the process.

12         Q    I know you don't have any knowledge personally of

13    this procedure of how to change the booms on this crane, but

14    you now understand that there are these locking pins for

15    each section, and that those are the actual, physical,

16    mechanical connection that holds one section to the next.

17    Agreed?

18         A    Yes.

19         Q    And you know from your investigation that the cover

20    for the T3 pin, which is supposed to be removed before that

21    exchange, was left on mistakenly by the apprentice Shane

22    Burrows; right?

23         A    Yes.

24         Q    So that when the 84-meter boom package was inserted

25    into the crane, Mr. Burrows only saw the T4 pin mistakenly

1    thinking it was the T3 pin and he started to try and lock

2    that pin into place; right?

3        A    Yes.

4        Q    And to your knowledge, had that ever happened before

5    at Sims Crane where somebody mistakenly forgot to remove the

6    T3 cover?

7        A    No, sir.

8        Q    You agree with me that that's a pretty basic step to

9    know, to remove that cover before you lock down a pin;

10   right?

11       A    Well, as far as a basic step?

12       Q    You remove a couple of screws and you take it off;

13   right?

14       A    Yep.

15       Q    You also know from your investigation and

16   Mr. Burrow's statement to OSHA that he used a tool to

17   lock -- to try and lock that pin.  He realized that he knew

18   he was moving it in the wrong direction, or seemed to be

19   going in the wrong direction, and he called for Mr. Farris

20   to look at it, and Farris saw that he was manipulating the

21   wrong pin; right?

22       A    Yes.

23       Q    And Mr. Burrows further told OSHA that he doesn't

24   remember how the pin was adjusted after they realized they

25   were moving the pin; right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          A    Yes.

2          Q    And, anyway, you agree that the person on the job

3     that had the responsibility once it was discovered that the

4     wrong pin had been manipulated to make sure that it was

5     reset to the factory setting was the lead man, Andrew

6     Farris; right?

7          A    When you say "to the factory setting," from what I'm

8     understanding at the conclusion of this investigation is

9     that the training that was received by the operators on

10    locking the pins and so forth was to turn the pin until you

11    got tension.  All right?  That was what was told.

12             Now --

13         Q    My question is:  Was the person responsible once it

14    was discovered that the wrong pin was manipulated,

15    Mr. Berry, the person responsible to reset it to where it

16    was was Andrew Farris?

17         A    And he did.

18         Q    Well, we know he didn't because it was left too low

19    and it got sheared off?

20             MR. GOODMAN:  Objection.

21             THE COURT:  He can answer the question.

22             Actually, rephrase the question.  The way you asked

23    it is argumentative.

24             THE WITNESS:  Based on the investigation --

25             THE COURT:  Hold on.  Let Mr. Pender rephrase the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    question.

2           Go ahead.

3    BY MR. PENDER:

4    Q    OSHA's investigation concluded that the pin was

5    actually left 11/16 of an inch too low out of position and

6    because of that it got sheared off.  Do you agree?

7    A    That's not OSHA's conclusion, I don't believe.

8    Q    You don't believe that's in there?

9    A    No.  OSHA's conclusion was the cover plate was left

10   off and that's what caused the incident.  That was OSHA's

11   conclusion to the investigation, according to Peter and

12   myself, and the communication that we had with each other.

13   And as far as Peter explained to me, that he contacted --

14   tried to contact Liebherr and got no response.

15   Q    Sir, my question -- you haven't answered any of the

16   questions that I asked you.

17          Does the OSHA's report contain the finding anywhere

18   in it or the OSHA letter or communications that it was

19   concluded that the pin on T4 was left 11/16 of an inch too

20   low and it got sheared off?  Did you see that anywhere in

21   the OSHA investigation?

22   A    I don't believe so.  It says that the pin was

23   touched.

24   Q    You answered my question, sir.  Thank you.

25          The OSHA investigation and the statements of the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    witnesses show that Mr. Farris did know that the wrong pin

2    had been manipulated by Mr. Burrows; right?  That's why he

3    tried to reset it; right?

4        A    Yes.

5        Q    You, sir, because you were not at the training and

6    don't know what went on at the training, you don't know

7    whether or not Liebherr's training of Mr. Farris included

8    any warnings for the failure to adjust the locking pin which

9    could result in the collapse of the boom, do you?

10       A    I don't know that.

11       Q    Is it your view that Sims Crane places total

12   responsibility for this accident on Liebherr?

13       A    No.

14       Q    Did Sims Crane -- did Sims Crane take responsibility

15   for this accident as well?

16       A    Of course.

17       Q    Do you agree that the manipulation of the incorrect

18   locking pin by a Sims Crane employee was the cause of this

19   accident?

20       A    Yes.

21       Q    Do you agree that the failure by Sims Crane to

22   remove the dust cover before installing the boom, failing to

23   remove it from the T3 locking pin was the cause of this

24   accident?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And do you agree that the failure of a Sims Crane

2    employee to remove the dust cover is the reason that that

3    employee manipulated the wrong pin?

4    A    Yes.

5    Q    Do you agree that once Mr. Farris caught the

6    mistake, that his failure to restore the locking pin to the

7    correct position was a substantial cause of the accident?

8    A    Yes.

9    Q    Was the failure of Sims Crane to test the operation

10   of the boom after it was discovered that this T4 pin had

11   been improperly manipulated before the accident, was that

12   failure to do an operational test a cause of this accident?

13   A    He did an operational test.

14   Q    When?

15   A    When he extended the boom.

16   Q    On the morning of the accident?

17   A    Yes.

18   Q    Was the failure of Andrew Farris to -- once he gave

19   his supervisor information about the incident and the

20   supervisor told him a repair tech was coming, was Andrew

21   Farris' failure to stop a cause of this accident?

22   A    No.

23   Q    I want to show you -- I know you, at the time you

24   worked for them, you put a lot of input into videos and

25   things that were on the Sims Crane website.  I know you

 1    spent a lot of time on that and we can still watch a lot of

 2    your videos on YouTube.

 3            I want to show you what I marked for identification

 4    as Defendants' Trial Exhibit No. 21, which is a screenshot

 5    from the Sims Crane website for this crane, and they'll

 6    bring it up in a minute, sir.

 7            Do you recognize that as a page off the Sims Crane

 8    website?

 9    A    Yes, sir.

10    Q    And that's for the Liebherr LTM 1500-8.1 that we're

11    talking about, right?

12    A    Yes.

13    Q    Would it surprise you to know that that page for

14    that crane is still on the Sims Crane website today?

15    A    Yes.  That's marketing tools.

16    Q    Understood, sir.  Understood.  If you go to the next

17    page.  He'll bring it up in just a second.

18            Can you kind of enlarge that language under the

19    photograph there, Darrin?  He'll get that for us in a

20    second, sir.

21            Do you see that where it says, quote, "the Sims

22    Crane team has spent weeks -- pleural -- training on the

23    mobilization and operation of the new Liebherr LTM 1500 at

24    our headquarters," closed quote.  That's what it says,

25    right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A     Yes.

2      Q     That's what the marketing folks were putting out on

3  the website, right?

4      A     Yes.

5      Q     But, again, you have no idea what Sims Crane did for

6  weeks in terms of training on the mobilization or operation

7  of that crane, do you?

8      A     Well, I have a little knowledge that Andrew and

9  D'Angelo went to the port to unload the piece of equipment

10 under the direction of Henry at the port, and that's where

11 it started, and then it was completed a week or weeks later.

12     Q     You talked a bit -- you can take that down, Darrin.

13 Thank you.

14          You talked a bit about the Product Safety Bulletin

15 that came in after this accident, and that Product Safety

16 Bulletin references an event that happened that led Liebherr

17 Germany to issue this Product Safety Bulletin.  Are you

18 generally familiar with that?

19     A     Yes, sir.

20     Q     You have no personal information about the specifics

21 of that event, do you?

22     A     No, sir.

23     Q     And if I tell you it was an event that happened in

24 Japan of May of 2017, you wouldn't know one way or another

25 if I'm accurate or not.  Right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Social media at the time shared the fact on the

2  groups that I belong to.

3      Q    That would be hearsay, sir.  I don't want to hear

4  about hearsay.

5      A    Was it hearsay that you made this, or was it a

6  reason?

7      Q    Let me ask a question.

8      A    All right.

9      Q    Thanks.  You don't know if the incident in Japan

10  involved someone forgetting to remove a T3 dust cover plate,

11  do you?

12      A    No, sir.

13          MR. GOODMAN:  I'm going to object, Your Honor.  He

14  has no personal knowledge.  He said he doesn't have personal

15  knowledge and Defense Counsel didn't allow him to elaborate

16  on what knowledge he has.

17          THE COURT:  He answered he did not know.  He had no

18  knowledge.

19          So go ahead.

20  BY MR. PENDER:

21      Q    You know, I think you told us on direct that the

22  OSHA regulations require that all personnel working on a

23  crane be competent and qualified; correct?

24      A    Not both.  Competent and qualified, or qualified.

25      Q    You would agree with me that on February 16th of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    2018, when Andrew Farris and Shane Burrows did the boom

2    exchange and Mr. Burrows undertook this pinning procedure,

3    he was not a competent person under OSHA.  Agreed?

4        A    Agreed.

5        Q    OSHA also has provisions that deal with the

6    assembly/disassembly of the cranes.  Agreed?

7        A    Yes.

8        Q    And OSHA says the employer and crane owner must

9    comply with the manufacturer's procedures for assembly and

10   disassembly; correct?

11       A    Correct.

12       Q    And OSHA requires that the assembly/disassembly of a

13   boom, like this 84-meter boom, be directed by a person who

14   meets the criteria of competent and qualified.  Agreed?

15       A    Yes.

16       Q    And the assembly/disassembly director in this

17   instance was Andrew Farris; correct?

18       A    Yes.

19       Q    Correct?

20       A    Correct.

21       Q    OSHA also has a requirement for a post-assembly

22   inspection.  Agreed?

23       A    Yes.

24       Q    1926.1404 M2, I believe?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    Do you know whether or not there was a post-assembly
2    inspection at the time of this boom exchange?
3        A    Yes.
4        Q    And that occurred on Monday morning of the accident?
5        A    It occurred on Saturday in the erection of the boom.
6        Q    Do you know whether or not Mr. Farris on Saturday
7    extended all the boom sections and uncovered this issue with
8    the T4 pin?
9        A    I do not know that.
10       Q    You've never managed a safety bulletin campaign for
11   a crane manufacturer, have you?
12       A    No, sir.
13       Q    And you know nothing in terms of what a reasonable
14   time frame is to be able to identify the population of users
15   of a crane in order to get information to them?  You've
16   never done that, have you?
17       A    No, sir.
18       Q    And you have no knowledge of what steps Liebherr
19   took to determine the location of this crane with the serial
20   number, do you?
21       A    Are you talking about when they had it in their
22   factory in Germany?
23       Q    No.  In terms of getting the Product Safety Bulletin
24   out, you don't have any information about what Liebherr US
25   did?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    No.

2       Q    You came to learn that Mr. Farris contacted a fellow

3    operator named Bill Piper when he ran into the issue on the

4    day of this accident?

5       A    Yes, sir.

6       Q    Do you have any knowledge whether or not Bill Piper

7    had any experience with a Liebherr LTM 1500?

8       A    I have no idea.

9       Q    And you don't know if Mr. Piper had ever read any of

10   the LTM 1500 Crane Operator's manual, do you?

11      A    No.

12      Q    And you don't know if Bill Piper had ever performed

13   a boom exchange on a LTM 1500, do you?

14      A    No, sir.

15      Q    You're not a crane design expert?  You're not a

16   crane warnings' expert, are you, sir?

17      A    No, sir.

18      Q    If you could pull up Plaintiff's Exhibit No. 1,

19   Darrin, which was shown to Mr. Berry during his direct

20   examination.

21           This was that OSHA report that was issued -- that

22   was shown to you earlier.  Do you remember that, sir?

23      A    Yes, sir.

24      Q    And, Darrin, if you could go to the page LAI2703 of

25   that report.  And if you could go to the findings.  Stop.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Stop.

2           It says -- there's a black sticker that the

3    Government put in there to block out some information, but

4    it says "Equipment and Manufacturer Documentation."

5           Do you see that heading on the paragraph?

6    A    Yes.

7    Q    And then it says, "Sims Crane and Equipment changed

8    out the boom configuration on February 16, 2018.  The change

9    of boom lengths from 50 meter to 84 meter involves the short

10   boom sections being unlocked, removed and replaced with the

11   longer boom sections inserted into the main boom housing."

12   A    Yes.

13   Q    "This process had been completed up to,

14   approximately, 35 times previously," closed quote.

15          That's what the OSHA report says; correct?

16   A    Yes.

17   Q    And that number of times that Sims Crane had

18   successfully previously changed those boom sections on the

19   crane 35, that was a number that you had provided to OSHA;

20   right?

21   A    That was a highly estimated number.

22   Q    Well, you understood that this was an important

23   federal OSHA investigation and you did your level best to

24   give them accurate information, didn't you?

25   A    Yes.

1      Q    If we can look at Defendants' Trial Exhibit 18,

2  these were the email exchanges that we looked at earlier and

3  you told us that ultimately your investigation report got

4  funneled into these emails, basically; right?

5      A    OSHA required me to do an investigation of the

6  incident for cause.  All right?  We did an intense

7  investigation.  We came to a conclusion.  The conclusion was

8  sent to OSHA.  OSHA agreed with our conclusion.  We received

9  no citation.  We received nothing based on the conclusion of

10  that investigation.

11      Q    You're being a very good soldier.  I just wanted to

12  ask you --

13          THE COURT:  You don't need any comments like that.

14          MR. PENDER:  I apologize, Your Honor.

15  BY MR. PENDER:

16      Q    Mr. Berry, I apologize to you.  I'm going to ask you

17  another question.

18      A    All right.

19      Q    If you go to your May 14th, 2018 communication to

20  OSHA, which is, I think, on the very last page and it starts

21  "Peter."  We'll get there in a second, sir.  He'll blow it

22  up for us in a second.

23          A little bit smaller, Darrin.  All right.  There we

24  go.

25          Showing you what I've marked as Defendant's Trial

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Exhibit 18 and, as I said, I think it's Plaintiff's 114.

2    This is your May 14th, 2018 communication to OSHA in which

3    you expressed the following to OSHA:  Quote, "Peter, Sims

4    Crane maintains that a product defect in the Liebherr crane,

5    including a failure to warn, substantially caused this

6    accident," closed quote.

7            That's what you wrote, sir?

8    A    Yes.

9    Q    And if anybody comes into this courtroom and says

10   that there was no defect in this crane, you disagree with

11   that?  You believe this is a product defect?

12   A    Well, it says "defect" in the Liebherr, including a

13   failure to warn.

14   Q    Right.

15   A    This is a failure to warn.

16   Q    It's a product defect; right?

17   A    It's a product defect.  Why do you guys have Safety

18   Bulletins?  Because you understand that when you manufacture

19   a crane, something can go wrong and you have to issue a

20   Safety Bulletin.  Manitowac does it.  Grove does it.

21   Liebherr does it.  Abound does it.

22           If you have something that is a failure to warn, you

23   have to produce a safety bulletin to get it out into the

24   industry that we're warning you that there's a problem with

25   the machine.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1              Now, is it a defect or is it a failure to warn?  If

2       it's not a defect, why did you modify the piece of

3       equipment?

4       Q    What you're holding up there is the actual cover

5       plate that your company received shortly after this

6       accident.  Agreed?

7       A    Yes.

8       Q    Your company held on to that plate; right?

9       A    Yes.

10      Q    And you held on to the original Product Safety

11      Bulletin, too; right?

12      A    Yes.

13      Q    And you held on to the stickers and the other

14      literature that came with that safety modification; right?

15      A    Yes.

16      Q    Now, if that revised cover was designed such that it

17      was not supposed to fit into the boom and it was

18      accidentally left on, wouldn't that indicate to you that it

19      was not designed by the manufacturer to prevent manipulation

20      of the T4 pin once the boom was installed?

21      A    So you're saying that if this is installed, sliding

22      it in and out of the boom it's going to hit?

23      Q    No.

24      A    Okay.

25      Q    It's designed -- it's designed not to fit within the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    crane if left on?  Well, wouldn't that indicate to you that

2    it's not designed by the manufacturer to prevent

3    manipulation of the T4 pin once the boom gets installed?

4        A    I don't think it's been determined that this

5    prevents it from being installed when this is on the

6    machine.  I don't believe so.

7        Q    You haven't tested that, have you?

8        A    Look, it goes in this way, right?  This goes in

9    first.  This goes in second.  So if it slides in, it's not

10   going to hit, per say.  It will slide in.  And if it were to

11   slide in and be covered, the pressure of the boom sliding in

12   and out would push down on this end and, therefore, not

13   cause it to hang up.  I believe that's the way it was

14   designed.  So that when this end goes in -- because it goes

15   up like this, it's designed not to catch and, therefore, it

16   can be installed with the cover plate on (indicating).

17       Q    Have you ever tested that, what you just told us?

18       A    Huh?

19       Q    Have you ever tested that or tried it?

20       A    We couldn't because the machine was torn apart when

21   we got the Safety Bulletin, so we couldn't test it.  Have

22   you tested it?

23       Q    No.  The answer to my question is:  Sims Crane has

24   not tested this theory you just gave us?

25       A    We couldn't.  We didn't have the capabilities of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    testing it.  But based on the design of it and the questions

2    that were asked after the incident happened, with people all

3    over the United States, you know, I don't know if they ever

4    contacted anybody that had the incident before, because you

5    did not share with us any information about who, where it

6    happened or what incident caused you to create the Safety

7    Bulletin.  Now, social media said there was an outfit out in

8    Texas that had --

9           MR. PENDER:  Your Honor, can I ask the witness to

10   stop?

11          THE COURT:  Go ahead and ask another question.  Your

12   question sort of invited this narrative with the long-winded

13   hypothetical.  So go ahead, Mr. Pender.  Ask another

14   question.

15   BY MR. PENDER:

16   Q    Even with the new cover plate and the new warning

17   decals, you could still have a situation where an

18   inexperienced person allows an 84-meter boom to be inserted

19   too far into the T2 section just past the 100 percent hole

20   and still manipulate incorrectly that T4 pin.  Agreed?

21   A    The question is, if the cover plate is left on could

22   he manipulate the T4 pin?

23   Q    Yep.

24   A    No.

25   Q    If the section slides past the 100 percent hole?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A    No.

2        Q    You don't believe that's true?

3        A    No.  Because the cover plate is attached to the boom

4    section and it covers the T4 pin when it's attached.

5        Q    Do you know whether or not the redesign of the cover

6    plate by the manufacturer had anything to do with preventing

7    the manipulation of the T4 pin once the boom was inserted

8    into the crane?  Do you know?

9        A    I believe that's the reason, yes.

10       Q    Do you know?

11       A    Do I know?  Like I said, if this is installed, you

12   can't see the T4 pin.  It's covered.  So, therefore, you

13   can't manipulate if it's left on.

14       Q    Do you have any information that Liebherr was aware

15   of any prior incidents of a T4 pin being manipulated because

16   the T3 cover plate had been left on?

17       A    I don't know that.

18            MR. PENDER:  That's all the questions I have for

19   you, Mr. Berry.  Thank you very much.  I apologize for my

20   comment earlier.

21            THE WITNESS:  That's all right.

22            THE COURT:  Any redirect?

23            MR. GOODMAN:  Yes, Your Honor.  Could I have one

24   moment?

25            THE COURT:  The exhibits that you went over, let's

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    see, Defendants' Exhibits 9, 7, 10 and 2.  Exhibit 2 was a

2    much better copy of the Exhibit we were struggling with

3    earlier.  It would have been nice to do that when Mr. Farris

4    was testifying, but the different exhibits that you had,

5    Mr. Berry, go over -- you want to move those into evidence?

6            MR. PENDER:  Yes.

7            THE COURT:  And any objection from Plaintiff?

8            MR. GOODMAN:  No, Your Honor.

9            THE COURT:  Defendants' Exhibit 9, 7, 10 and 2 are

10   all admitted.

11   (Plaintiff's Exhibit Nos. 9, 7, 10 and 2 were admitted.)

12                   REDIRECT EXAMINATION

13   BY MR. GOODMAN:

14       Q    Mr. Berry, you were asked whether or not the cause

15   of this incident was Sims doing a number of things that

16   occurred on February 16th and February 19th.  Do you recall

17   that?

18       A    Yes.

19       Q    Now, could all of that been prevented if the Product

20   Safety Bulletin would have been received before

21   February 16th?

22       A    Yes.

23            MR. GOODMAN:  Thank you, Your Honor.

24            THE COURT:  Okay.  Mr. Berry, you may step down.

25            THE WITNESS:  Thank you.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  Take the microphone off.

2          Does anybody intend to recall Mr. Berry?

3     Mr. Goodman, do you plan to recall him at all?

4          MR. GOODMAN:  No, Your Honor.

5          THE COURT:  Mr. Pender, do you intend to recall

6     Mr. Berry?

7          MR. PENDER:  No. I don't, Your Honor.

8          THE COURT:  Then you're free to go, if you'd like.

9          THE WITNESS:  Thank you, ma'am.

10         THE COURT:  Mr. Goodman, do you want to call your

11    next witness?

12         MR. GOODMAN:  Yes, your Honor.  Plaintiff calls

13    Chris Peek.

14         THE COURT:  Mr. Goodman, when he comes in, I'm just

15    going to ask him if he heard any of the question and answers

16    that occurred during the prior testimony.

17  (Witness sworn.)

18         COURTROOM DEPUTY CLERK:  Please have a seat and once

19    you get settled please state your name for the record.

20         THE WITNESS:  Christopher Allen Peek.

21         THE COURT:  You can sit down.  You're welcome to

22    stand, if you want to.  Let me ask you a couple of questions

23    before Mr. Goodman begins.

24         So you walked in during -- when Mr. Berry was on the

25    stand.  I don't know if you even had an opportunity to see

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    that it was Mr. Berry on the stand.  I did not know who you

2    were, but I did see Mr. Goodman spring into action and stop

3    you and divert you to leave.

4         Did you hear any of the testimony stated by

5    Mr. Berry when you walked in?

6         THE WITNESS:  No, Your Honor.

7         THE COURT:  Did you hear the question that was being

8    asked by Counsel for Liebherr?

9         THE WITNESS:  No, Your Honor.

10        THE COURT:  By my estimate, you were probably in the

11   courtroom for all of about three seconds.  Does that sound

12   consistent with what you think?

13        THE WITNESS:  Yeah.

14        THE COURT:  Thank you.

15        Go ahead, Mr. Goodman.

16                  CHRISTOPHER ALLEN PEEK,

17   having been first duly sworn under oath, was examined and

18   testified as follows:

19                  DIRECT EXAMINATION

20   BY MR. GOODMAN:

21        Q    Mr. Peek, can you tell us where you're currently

22   employed?

23        A    I'm not employed currently.

24        Q    And where were you previously employed?

25        A    With Sims Crane & Equipment.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    How long were you employed with Sims Crane?

2    A    Roughly, thirteen-and-a-half years.

3    Q    And the reason for not being at Sims Crane now, is

4  that related to the incident that occurred between

5  February 16th and February 19th, 2018?

6    A    No, sir.

7    Q    What was your position at Sims between February 16th

8  and February 19th, 2018?

9    A    Vice president of risk management.

10    Q    And how long had you been the vice president of risk

11  management at that time?

12    A    I don't remember the exact date, but it had been

13  several years.

14    Q    And when you were undertaking that role, would you

15  receive product information and product literature for

16  cranes that were owned by Sims?

17    A    Yes.

18    Q    And would you receive those from various

19  manufacturers?

20    A    Yes.

21    Q    And I'm going to show you what's been marked as

22  Exhibit 18 for identification.  Do you recall this email?

23    A    Yes.

24    Q    And this is an email from you to Bob Berry and Shane

25  Burrows?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    Yes.

2    Q    And it's on Wednesday August 1st, 2018?

3    A    Yes.

4    Q    And what are you conveying to Bob Berry and OSHA in

5    this email?

6    A    The OSHA investigator was following up on the

7    Product Safety update and confirming whether or not we had

8    received it prior to the event.

9    Q    And had you received the Product Safety Bulletin and

10   retrofit cover plate before the February 19th event?

11   A    Unfortunately, no.

12   Q    Do you recall when you received the Product Safety

13   Bulletin and retrofit cover plate?

14   A    Roughly a week after the incident.

15   Q    I'm going to show you what's been marked as Exhibit

16   25.

17        Do you recall what this is?

18   A    It's shipping information from the Product Safety

19   update we received.

20   Q    And does this say what date you received the Product

21   Safety bulletin on?

22   A    Yes, sir.  February 26th, 2018.

23   Q    And on that date, did you receive the retrofit cover

24   plate as well?

25   A    Yes.  We received it all together.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And had you received the Product Safety Bulletin or

2      retrofit cover plate or learned of its existence or the

3      information that was provided in it at any time before

4      February 26th, 2018?

5      A    No.

6      Q    And if we scroll through this Exhibit to page

7      LAI3143, NBIS1081, NBIS1080, and the following pages of this

8      Exhibit, is that a true and accurate reflection of how the

9      Product Safety Bulletin and retrofit cover plate was

10     received by Sims on February 26th, 2018?

11     A    Yes.

12     Q    Now, what's the process at Sims?  What's the habit

13     and routine practice Sims has when it receives product

14     literature from crane manufacturers?

15     A    Yeah.  So, typically, when it's received, it would

16     be installed on the machine immediately as quickly as it

17     could.  If it was in the yard, for example, that would

18     obviously be the quickest way to do so and we'd have easy

19     access to it.  From there, before any operations will begin

20     mob., de-mob., et cetera, we have to do Product Safety with

21     the operator and those involved in the operation of the

22     crane.

23     Q    How long would it generally take to get this

24     retrofit cover plate onto the machine if you had received it

25     on, say, February 2nd or 3rd?

1      A    I would like to think we would've had it on that

2    same day if the machine was in the yard.

3              THE COURT:  You're talking too fast for the court

4    reporter.

5              THE WITNESS:  Sorry.  I would think we would have it

6    all within the same day.

7    BY MR. GOODMAN:

8      Q    You have to understand she's taking down everything

9    that you and I say.

10             THE COURT:  And Mr. Goodman already goes fast and I

11   already go fast.  It's going to put her over the edge.

12             THE WITNESS:  Understood.

13   BY MR. GOODMAN:

14     Q    So if you received it on February -- Let me ask you

15   this question.  If I show you Exhibit 104, are you familiar

16   with what this is?

17     A    Yes.

18     Q    What is this?

19     A    White book, inspection book.

20     Q    And this is an inspection book.  What's the month

21   and year of this inspection book?

22     A    February 18th.

23     Q    That's February of 2018?

24     A    Yes.

25     Q    And is that for the Liebherr LTM 1500?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    Now, if we turn to the next page, there are numbers

3   going horizontal along the top.  Do you see that?

4      A    Yes.

5      Q    And what do those numbers reference?

6      A    Days of the month.

7      Q    And up at the top right, it says February 2018?

8      A    Yes.

9      Q    So those numbers would be the days of February 2018?

10     A    Yes.

11     Q    So there are checkmarks.  Do you know what the

12  checkmarks mean?

13     A    Yes.

14     Q    What do they mean?

15     A    They represent the day that those inspections or

16  those items were inspected.

17     Q    And are items inspected when a crane is used?

18     A    Correct.

19     Q    So on the dates where there are no checks, the crane

20  is not being used?

21     A    Correct.

22     Q    And so when the crane is not being used, is it fair

23  to say that it would either be at the Tampa yard or idle on

24  a job site?

25     A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Now, if Sims -- if you would have received the

2    Product Safety Bulletin on the 3rd of February, what would

3    you have done with it?

4    A    So the machine is idle on the job?

5    Q    Correct.

6    A    So if it was idle, we would have had to have, one,

7    put a stop on work.  Something like this that we had

8    received, that was obviously quite critical to the

9    operation.  Something that was obviously critical to the

10   operation of the machine and we knew that we had recently

11   swapped out the boom, we would have had to put a stop on

12   work and then also notified the customer, hey, we received

13   an update, we'd like to, at least, install it, review it, do

14   summary training and, then, in this case, probably contact

15   the manufacturer as well.

16   Q    And so if you received it on the 3rd, how long would

17   it have taken you to do all of those steps?

18   A    We can put a stop on work with a phone call.

19   Q    So if you would have received it on the 3rd, would

20   you have done all those steps on the 3rd?

21   A    Oh, yes.

22   Q    And when would you have advised Andrew Farris, the

23   operator of this crane, about the information in the Product

24   Safety Bulletin if you received it on the 3rd?

25   A    If I had received it, he would have been probably my

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1   first call.  I don't know that I would have known the
 2   machine was actually idle.
 3       Q    And how would you have been able to get in touch
 4   with Mr. Farris?
 5       A    Phone.
 6       Q    Did you have his phone number?
 7       A    Yes.
 8       Q    His mobile phone?
 9       A    Yes.
10       Q    And what's your -- have you ever previously called
11   Mr. Farris on the phone?
12       A    Yes.
13       Q    What's your experience with contacting Mr. Farris by
14   mobile phone?
15       A    Very responsive.
16       Q    So if you were to call him --
17            THE COURT:  Hold on.  I'm going to stop you.  If
18   both of you could just at least pause after you speak, it
19   will give Ms. Miller time to catch up with the
20   transcription.
21            MR. GOODMAN:  Yes, ma'am.
22            THE COURT:  That will make it easier.
23            Go ahead, Mr. Goodman.
24   BY MR. GOODMAN:
25       Q    What's your experience with communicating with
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Mr. Farris by phone?

2          A      Good.  Responsive.

3          Q      If you were to call him, is it your experience that

4      he picks up?

5          A      Yes.

6          Q      If he doesn't pick up, is it your experience that

7      his voicemail would work?

8          A      Yes.

9          Q      And if you left him a voicemail, what is your

10     experience with how long it would take Mr. Farris to call

11     you back?

12         A      Within the day.  I mean, it wouldn't take long.

13         Q      So if you were to receive it on the 3rd and left a

14     voicemail on the 3rd, would you expect Mr. Farris to get

15     back to you by the 4th?

16         A      I would.

17         Q      And that's if you have to leave a voicemail; right?

18         A      That's correct.

19         Q      But if you picked up the phone, you would talk to

20     him on the 3rd?

21         A      Yes.

22         Q      And then what type of meeting would you have with

23     Mr. Farris, the operator, about the Product Safety Bulletin?

24         A      If the job was ongoing, we would have obviously

25     delivered the update to the job site, attended and done a

1    retraining probably on the job.

2           Now, this is -- we would have also had to have

3    reached out to the manufacturer as well.  In a case like

4    this, they may have given us some different direction

5    considering the boom swap had recently occurred.  But

6    normally, you know, prior to an event having occurred, we

7    would have gotten the update to the job site immediately,

8    usually go out -- member of the safety department would go

9    out onto the job site, issued some retraining, conducted

10   retraining, participate in retraining, along with the

11   operator and anyone else involved in the operation of the

12   machine.

13      Q    And this may sound like a strange question, but it's

14   not a trick question.  Why didn't you have the Product

15   Safety Bulletin on the crane before February 16th through

16   18th?

17      A    It wasn't sent to us until after the event.

18           MR. GOODMAN:  One moment, Your Honor.

19           THE COURT:  You may.

20   (Brief pause)

21           MR. GOODMAN:  No more questions, at this time, Your

22   Honor.

23           THE COURT:  Any cross-examination?

24           MR. PENDER:  Yes.  Just a few.

25                    CROSS-EXAMINATION

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  BY MR. PENDER:

2      Q    Good afternoon, Mr. Peek.  We met at your

3  deposition.

4      A    Yes, sir.

5      Q    You mentioned, when Counsel was asking you

6  questions, that if the Product Safety Bulletin came in and

7  you felt you needed to put a stop on the crane, you could do

8  that.  Right?

9      A    Yes, sir.

10     Q    Stop work?

11          If a Product Safety Bulletin or update comes in that

12  specifically says to you, your company, you can continue to

13  use the crane, there would be no reason to put a stop on

14  everything; right?

15     A    It depends on the circumstances.  It's hard to

16  answer that.

17     Q    Okay.  I think you testified that you're vice

18  president of risk management.  Is that what I heard?

19     A    Yes, sir.

20     Q    Okay.  And you were involved with and reviewed some

21  of the OSHA investigation and the findings and the

22  statements that were given after this accident?

23     A    Yes, sir.

24     Q    Okay.  And you have some familiarity with that?

25     A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Now, it's your understanding that there was no one

2    else at Sims Crane that performed the exchange of the booms

3    on this LTM 1500 during that year that Sims owned it other

4    than Jason D'Angelo and Andrew Farris, right?

5      A    They were the primary operators.

6      Q    And during the 35 or so boom exchanges, you're not

7    aware, as the risk manager, that Sims Crane had any problems

8    or incidents or errors associated with the boom exchange

9    process, are you?

10     A    No.  I'm not.

11     Q    And it's your understanding that initially the

12   incorrect pin on this boom was manipulated by an apprentice

13   named -- by Shane Burrows by mistake, right?

14     A    Correct.

15     Q    And that pin ended up being left in a different

16   position after Mr. Burrows and Mr. Farris tried to reset it;

17   correct?

18     A    Correct.

19     Q    And then subsequently that pin got sheared off just

20   prior to the accident; right?

21     A    Yes.

22     Q    In this instance, you became aware, that you were

23   involved in after this accident, this crane ended up getting

24   sold for salvage; right --

25     A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    -- to a purchaser?  I believe his name is Eric

2  Hastey in Texas?

3      A    I remember the name Eric.

4      Q    You don't know whether or not Sims Crane or the

5  insurance company ever contacted Liebherr to let them know

6  that this crane was now going to be in the hands of this new

7  owner, do you?

8      A    I do not know that.

9      Q    And you've been -- you testified that your company

10  received from Liebherr the Product Safety Bulletin and the

11  part that's right in front of you, the new cover plate and

12  some decals; right?

13     A    Yes.  We did receive this.

14     Q    And that cover plate right in front of you, that's

15  the one you guys actually received; right?

16     A    I don't know that it's the actual one, but yes.

17     Q    The actual Product Safety Bulletin and the cover

18  plate were retained at Sims Crane for your legal case;

19  right?

20     A    Correct.  Yeah.  We were directed to.

21     Q    And you don't know to this day whether or not

22  Mr. Hastey ever obtained a new safety plate or sticker or

23  Product Safety Bulletin, do you?

24     A    I do not.

25     Q    Your company -- you don't have any knowledge of any

1   industry practices or guidelines for a manufacturer in the

2   dissemination of Product Safety information, do you?

3       A    I'm sorry.  Can you repeat that?

4       Q    You don't have any knowledge of industry guidelines

5   or practices that guide a manufacturer in the dissemination

6   of Product Safety information, do you?

7       A    I personally don't.

8       Q    And you're not aware of any industry standards that

9   apply to manufacturers or distributors regarding the

10  distribution of Product Safety bulletins, do you?

11      A    No.

12      Q    You're not aware of any complaints that any Sims

13  Crane personnel had regarding their crane training that they

14  received from Liebherr, are you?

15      A    Prior to the event, or just now?

16      Q    Prior to the event.

17      A    Prior to the event, no.

18      Q    Okay.

19          MR. PENDER:  That's all I have, Mr. Peek.  Thank you

20  very much.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Any redirect?

23          MR. GOODMAN:  No, Your Honor.

24          THE COURT:  Any plans to recall Mr. Peek as a

25  witness?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          MR. GOODMAN:  No, Judge.

2          THE COURT:  Any plans, Mr. Pender, by defense?

3          MR. PENDER:  No, Your Honor.

4          THE COURT:  Okay.  Mr. Peek, you can take off your

5     microphone and you're free to go.  We can go off the record.

6     Let's just talk a little bit about scheduling.

7  (Discussion had off the record.)

8  (Court adjourned at 4:41 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  UNITED STATES DISTRICT COURT  )

25                                )

    UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  MIDDLE DISTRICT OF FLORIDA    )

2

3          I, SHARON A. MILLER, Official Court Reporter for the

4  United States District Court, Middle District of Florida, do

5  hereby certify that pursuant to Section 753, Title 28,

6  United States Code that the foregoing is a true and correct

7  transcript of the stenographic notes taken by computer-aided

8  transcription taken in the above-entitled cause by the

9  undersigned and that the transcript format is in conformance

10  with the regulations of the Judicial conference of the

11  United States.

12  /S/Sharon A. Miller, CSR, RPR, CRR, FCRR

13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION