1              UNITED STATES OF AMERICA
             UNITED STATES DISTRICT COURT
2              MIDDLE DISTRICT OF FLORIDA

3                    -    -    -

4             HONORABLE AMANDA ARNOLD SANSONE
       UNITED STATES MAGISTRATE JUDGE PRESIDING
5

6  NBIS CONSTRUCTION & TRANSPORT,        )
   INSURANCE SERVICES, INC., a/s/o       )
7  SIMS CRANE & EQUIPMENT COMPANY,       )
                                         )
8                    PLAINTIFF,          )
                                         )
9             VS:                        )8:19-CV-2777-VMC-AAS
                                         )
10 LIEBHERR-AMERICA, INC., d/b/a         )
   LIEBHERR USA, CO., and               )
11 LIEBHERR CRANES, INC.,                )
                                         )
12 _____DEFENDANTS.___)

13

14                BENCH TRIAL - VOLUME IV
15          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                  FEBRUARY 10, 2022
16                   TAMPA, FLORIDA

17

18

19 SHARON A. MILLER, CSR, RPR, CRR, RMR
   IL CSR 084-2617
20 FEDERAL OFFICIAL COURT REPORTER
   801 N. FLORIDA AVENUE, SUITE 13A
21 TAMPA, FLORIDA 33602

22 Proceedings recorded by mechanical stenography,
   transcript produced by computer-aided transcription
23

24

25

   UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1                         I   N   D   E   X

2   <u>WITNESSES</u>                                        <u>PAGES</u>

3                   ANTHONY EDWARD BOND

4   Direct examination by Mr. Goodman                    4

5   Cross examination by Mr. Cremer                      47

6   Redirect examination by Mr. Goodman                 87

7               WILLIAM JOHN VIGILANTE, JR.

8   Direct examination by Mr. Goodman                   93

9   Cross examination by Mr. Cremer                     146

10  Redirect examination by Mr. Goodman                 175

11              E   X   H   I   B   I   T   S

12  PLAINTIFF'S EXHIBITS

13  Nos. 199 through 125                                 3

14

15  DEFENSE EXHIBITS

16  No. 94                                              92

17

18

19

20

21

22

23

24

25

    UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1                      TAMPA, FLORIDA; FEBRUARY 9, 2022

 2                             -   -   -

 3              (COURT IN SESSION AT 9:04 A.M.)

 4              THE COURT:  Anything we need to address before the

 5      witnesses are called today?

 6              MR. GOODMAN:  The only thing, Your Honor, we've

 7      agreed to submit into evidence Exhibits 119 through 124 for

 8      today.

 9              THE COURT:  Okay.  So no objection by the defense.

10              MR. CREMER:  No objection, Your Honor.

11              THE COURT:  Okay.  Exhibits 119 through 124 are

12      admitted.  Will they all be coming in through Mr. Bond or

13      Mr. Vigilante also?

14              MR. GOODMAN:  Through Mr. Vigilante also.  Exhibits

15      119 through 122 will be coming in through Mr. Bond.

16      (Plaintiff's Exhibit Nos. 199 through 124 were admitted.)

17              THE COURT:  Okay.  Mr. Goodman, go ahead and call

18      Mr. Bond when you're ready.

19              MR. GOODMAN:  Plaintiffs call Anthony Bond.

20              THE COURT:  Mr. Bond, if you could come up to one of

21      these microphones, first I'll swear you in.

22      (Witness sworn.)

23              THE COURT:  You can sit down.  You'll need to fasten

24      the lavalier mic onto your jacket.

25              Mr. Bond, we'll get you some water, either get a cup
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     from that table.  That's fine.

2              THE WITNESS:  I have some.

3              THE COURT:  He came prepared.  Never mind.  He's got

4     his own bottle of water.  Okay.

5              Mr. Bond, if you could just start by stating your

6     full name and go ahead and spell your last name.

7              THE WITNESS:  Is this good?

8              THE COURT:  That sounds pretty good.  Maybe pull it

9     a little bit higher if possible.

10             THE WITNESS:  How is that?

11             THE COURT:  That's perfect.  Fine.

12             THE WITNESS:  Anthony Edward Bond.  My last name is

13    spelled B-o-n-d, like James Bond.

14             THE COURT:  Thank you.  Go ahead, Mr. Goodman.

15                     ANTHONY EDWARD BOND,

16    having been first duly sworn under oath, was examined and

17    testified as follows:

18                     DIRECT EXAMINATION

19    BY MR. GOODMAN:

20       Q    Mr. Bond, can you tell us where you're currently

21    employed?

22       A    Haag Engineering Company.

23       Q    And I'm going to show you what's been marked as

24    Exhibit 119.  And to the right of you and to the left of you

25    are notebooks that have the same exhibits that we're going

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    to going over on the screen, so if you prefer to refer to

2    them in the notebooks, that is fine.

3          Can you tell us what Exhibit 119 is?

4    A     This is my CV.  The first page is basically my

5    primary area of consulting which is heavy equipment and

6    primarily aerial lifts and cranes.  In this case we're

7    dealing with what's known in the industry as a boom truck,

8    and so you can see on that second line there under the first

9    line under crane accident analysis, I got boom trucks

10   listed.

11   Q     I see that there's also crawlers, Derricks, Gantry,

12   Maritime, Mobile, Overhead, Pedestal, Rough Terrain,

13   Self-Erecting Tower.  Are those also different types of

14   cranes?

15   A     Yes.

16   Q     How many crane accidents have you investigated in

17   your experience?

18   A     Well, I've investigated over 300 pieces of heavy

19   equipment, and cranes has been about 25 percent of that.

20   Q     And are you a licensed professional engineer?

21   A     Yes, in I think 28 states including the District of

22   Columbia.

23   Q     Are you a licensed engineer in Florida?

24   A     Yes.  Next important thing on the CV is my work

25   experience.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Can you tell us about your work experience?

2      A    I designed cranes, boom trucks in particular for

3   about a decade and a half and we manufactured those cranes

4   as well as other equipment at our plant in Omaha, Nebraska.

5   Elliott Equipment Company was the name that I was employed

6   by and I dealt with the structural, mechanical, electrical

7   and hydraulic aspects of the design.  Also, as you can see

8   down lower on the page, I've been dealing with ASME B30.5

9   for nearly three decades.

10     Q    What is ASME B30.5?

11     A    It's a consensus standard which is basically you

12  have people within the industry that are part of the

13  committee and they vote on different aspects of the

14  standard, and as long as there's over 50 percent of people

15  voting for a particular aspect of the standard, then it's

16  approved which is the consensus.

17     Q    What is the ASME B30.5?

18     A    B30.5?

19     Q    B30.5 apply to?

20     A    It applies to mobile cranes in general, but in this

21  particular case it also applies to the boom truck industry.

22     Q    Would it apply to a Liebherr LTM 1500?

23     A    Yes.

24     Q    Would it apply to the individuals and the companies

25  working with the Liebherr LTM 1500?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   A    Yes, it would.

2   Q    Now, you had spoken about that you were in the

3   design of systems for boom trucks at Elliott Equipment?

4   A    Yes.

5   Q    In that employ, did you get involved in the design

6   and manufacture of booms themselves?

7   A    Yes.

8   Q    And what types of booms were you involved with

9   manufacturing and designing?

10  A    Primarily hydraulic booms.

11  Q    And is the hydraulic boom the same type of the boom

12  that's in the LTM 1500?

13  A    Yes.

14  Q    And how long did you do that for?

15  A    I worked there for over 14 years, you know, about a

16  decade and a half.

17  Q    And during those 14 years, was your involvement in

18  the design and engineering of cranes and booms like the one

19  on the LTM 1500?

20  A    Similar, not exactly the same, but similar, yes.

21  Q    Before working for Elliott Equipment, what were you

22  doing?

23  A    I was in the military for about six years.  I got

24  out of the military and then I got my degree, engineering

25  degree, science of mechanical engineering in 1993, graduated

1    on Saturday, started at Elliott Equipment Company on a

2    Monday following graduation.

3        Q    What branch of military were you in?

4        A    Air Force.

5        Q    What did you do in the Air Force?

6        A    I was in the civil engineering as an enlisted

7    person.

8        Q    Is civil engineering different from mechanical

9    engineering?

10        A    Yes.

11        Q    Can you explain to us the differences between what a

12    civil engineer does versus what a mechanical engineer does?

13        A    Civil engineering deals with structures, typically

14    nonmoving structures, like bridges, dams, and things of that

15    nature.  They allow -- like for dams, they allow the water

16    to go through but they don't themselves deal with the

17    mechanical aspects of something like a dam.

18        Q    So would a civil engineer deal with a moving mobile

19    crane?

20        A    Typically not.

21        Q    Who deals with the design, engineering,

22    manufacturing and investigation of moving mobile cranes?

23    That's a mechanical engineer?

24        A    Typically mechanical, but I should back up.  You

25    know, there's some civil engineers that would handle some

1    aspects of mobile cranes.

2        Q    And what would be the aspect of the mobile crane

3    that they would deal with?

4        A    Typically structures and/or depending on their

5    experience, the duties and responsibilities of the parties

6    referencing the efficiency standard ASME B30.5.

7        Q    Would a civil engineer be more involved with tower

8    cranes versus mobile cranes?

9        A    Not necessarily, just basically more along the lines

10   of the structure itself.

11       Q    So before -- strike that.  You were in the military

12   before you got your degree?

13       A    Yes.

14       Q    And then where did you get your degree from?

15       A    University of Nebraska, Lincoln.

16       Q    And what was your degree in?

17       A    Bachelor of Science, mechanical engineering.

18       Q    And did you complete that degree?

19       A    Yes.

20       Q    And you were awarded a Bachelor of Science in

21   mechanical engineering?

22       A    Yes.

23       Q    Were you involved in any professional memberships?

24       A    Yes.

25       Q    Can you tell us about those?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    I'm involved -- well, I have been involved over the

2    years in several different ones.  It's listed on my third

3    page of my CV.  Currently I'm involved in ASME, SRB-1.

4    That's a Slewing Ring Bearing committee, and that's

5    basically the component between the part of the crane on a

6    mobile crane that rotates at the top versus the lower part

7    which is fixed and is a carrier, so it's a component of the

8    mobile crane.  And then I have been involved in several

9    other ANSI committees, aerial lift committees for a period

10   of about five years or so.

11      Q    And have you given testimony in cases before this

12   one?

13      A    Yes.

14      Q    And in those cases, have you testified at

15   depositions?

16      A    Depositions as well as trial.

17      Q    You testified at trial?

18      A    Yes.

19      Q    Have you ever been excluded by a Daubert challenge?

20      A    I have not.

21      Q    Have you ever been excluded from testifying for any

22   other reason?

23      A    I have not.

24      Q    Are you familiar with the events that occurred on

25   February 19th, 2018 when a Liebherr LTM 1500 owned by Sims

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    had an uncontrolled retraction of its boom sections 6, 5 and

2    4?

3        A    Yes.

4        Q    And were you hired to undertake an investigation of

5    the cause of that uncontrolled retraction of boom section 6,

6    5 and 4?

7        A    We were.

8        Q    Can you explain to us a little bit about the -- your

9    understanding of what occurred from the time Sims owned this

10    Liebherr LTM 1500 crane until the incident on February 19th,

11    2018?

12        A    So, Sims purchased a crane from another owner in

13    2016 I believe, and through buying, purchasing the crane,

14    they end up utilizing it for the work that they did.  And on

15    this particular job, they were hired to put a tower crane,

16    assemble a tower crane and it ended up being the assist

17    crane versus the actual operator of the tower crane.

18        Q    Can you describe --

19        A    Prior to the incident, Liebherr Germany put out a

20    retrofit bulletin and retrofit plate for the involved boom.

21    That had not reached Sims prior to the incident.

22            Now, the cause of the incident, if you want me to

23    explain, go down that path, or am I getting too far?

24        Q    Let's -- first, can you describe for us the LTM

25    1500, what it is?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          A    LTM 1500 is a mobile crane that has an extendible

2     boom section through hydraulics and through a mechanism that

3     grabs individual pins from the boom sections and either

4     separates the pin from a boom section that it's being

5     attached to and then subsequently moving that boom section

6     out further to extend it to be able to pin it in to another

7     area or another section of that same boom.

8          Q    I'm going to show you what's been previously marked

9     as Exhibit 12.  It's a video.  And while this video is

10    playing, if you could explain to us what's occurring.

11              THE COURT:  Mr. Bond, if you need the lights turned

12    down, just let us know.  Is it okay?

13              THE WITNESS:  Can I just look at this?

14              THE COURT:  That's fine, if you want to look at

15    this.

16              THE WITNESS:  This is a little more clearer than --

17    BY MR. GOODMAN:

18         Q    Can you tell us what this is?

19         A    So this is the 7 section version of LTM.  What's

20    happening now is they're removing the external boom

21    sections.  Now, this is the tip section (indicating).  It's

22    being removed and now they're showing the internal workings

23    of the cylinder and how it operates.

24              Two important aspects to note on this is the top

25    portion which is the grabber or yoke mechanism and the two

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    red pins that are on each side of the cylinder.  The grabber

2    pulls down the pin, and then the red pins, the lateral pins

3    are brought in and then the boom section is now extended out

4    to a different section of the same boom.

5              You can see the red pins caught on so it's going to

6    extend the boom section.  The pin then is brought down so

7    it's detached from the current position that is with the

8    next boom section, and now it's going to go extend up to

9    another location on the same boom and then reattach.

10             The grabber will release the pin.  The pin will come

11   through the opening of that boom section, and then the red

12   pins, lateral pins on the side of the mechanism will

13   retract, and now you'll be able to bring the cylinder back

14   in to it to its stowed position and be able to pick up

15   another boom section and repeat the same thing.

16   Q    So what are the important aspects with regard to

17   your investigation of this video?

18   A    Basically the failure was due to the pin that has

19   the rod basically and the disk that the grabber attaches to

20   when it's moved from one side of the boom to another.  That

21   rod disk that's attached to the pin, that actually secures

22   it to the boom section, it failed.

23   Q    So can you tell us how you undertook your

24   inspection?

25   A    After the failure, we brought us and some other

1    investigators, disassembled the boom.  We took the 3rd --

2    no, we took the 4th, 5th and 6th sections of the boom out

3    from the other 7 sections and looked to see what the damage

4    was to the 4th, 5th and 6th section as well as looked at the

5    damage where the rod and disk broke off of the pin of 2-4.

6        Q    I'm going to show you what's been previously marked

7    as Exhibit 13.  Is this first page of Exhibit 13 a fair and

8    accurate representation of the Liebherr LTM 1500 that was

9    involved in the incident?

10       A    Yes.

11       Q    I'm also going to show you what's been marked as

12   Exhibit 13 and NBIS1093.

13       A    This is the process of removing sections 6, 5 and 4.

14       Q    And I'm going to turn to the next page which is

15   NBIS003322.  Can you tell us what's happening here?

16       A    They are actually removing those three sections, 4,

17   5 and 6.

18       Q    And how is that section being removed?

19       A    By another crane.

20       Q    And would that be the assist crane?

21       A    Yes.

22       Q    And we're going to go to the next page.  I want to

23   show you NBIS003345.  Can you tell us what we're looking at

24   here?

25       A    Which Exhibit is this?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     Q    This is Exhibit 13, and it's the fourth page of

2  Exhibit 13.

3          THE COURT:  Is that better, Mr. Bond?

4          THE WITNESS:  Yes.  Thank you.

5  BY MR. GOODMAN:

6     Q    What are we looking at here?

7     A    So you're looking at pin 4 with --

8     Q    Is pin 4 actually there?

9     A    Pin 4 is actually there, however, the rod and disk

10 that attaches to a lower portion of pin 4 is not.  It's been

11 fractured or broken off.

12    Q    Is this -- and the pin and the rod that we see in

13 back of that, that's pin 5?

14    A    Yes.  Pin 5, and you can see that pin 5 still has

15 the rod and disk attached to the pin 5.

16    Q    So pin 4 should look like pin 5?

17    A    Yes.

18    Q    Now, I'm going to show you what's been marked --

19         THE COURT:  Mr. Goodman, if you could go back and

20 use a pointer or something to show what we should be looking

21 at.

22         MR. GOODMAN:  Sure.

23         THE COURT:  I've gotten fairly educated on these

24 cranes this past week, but I'm not nearly as educated as you

25 all are, so just so I have a better understanding.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1              THE WITNESS:  I think your next page, your next page

2      of that exhibit really shows a better view.

3  BY MR. GOODMAN:

4      Q    Sure.  Let's turn to the next page.  So where that

5  red circle is on the Exhibit, is that where the pin should

6  be?

7      A    Well, the pin is actually what you got.  That's the

8  bottom of the pin that you got circled 2-4 -- pin 4.  If you

9  look at pin 5, it should have that rod which is directly

10  below pin 5 and the disk.  If you could circle that, I'd be

11  a little more clearer.  Yeah.  So that's the section that

12  had broken off from T4.  I'm saying T4.  Pin 4.

13      Q    And if we turn to the next page, is that a closer

14  view of the pin T4?

15      A    Yes, pin 4, that's the fractured surface of the pin

16  that remained with the boom section, and I believe that

17  there's another photograph that it will end up showing the

18  piece that actually had broken off.

19      Q    Now, if we turn to Exhibit 14, can you tell us what

20  that is?

21      A    That's the rod disk that had broken off for pin 4.

22      Q    So should what's in Exhibit 14 be in the missing

23  area from what we looked at on Exhibit 13, NBIS003348?

24      A    Yes.

25      Q    And at this point in your investigation, do you have

1    a hypothesis of why this pin broke?

2        A    Well, it could have been either one of two reasons.

3    One, if there was some material flaw with the pin which

4    basically meant that the pin would be a defect or have a

5    defect from the manufacturer, or it was caused by the

6    collapse of the boom 4, 5 and 6.

7        Q    And in your investigation, what was your next step

8    after the actual physical inspection at the site?

9        A    Well, we had a metallurgist get involved to tell us

10   whether there was a material flaw with the pin, the rod and

11   disk itself or whether it was designed or the materials were

12   intended by the manufacturer.

13       Q    And I'm going to show you what's been marked as

14   Exhibit 121.  Are you familiar with what this is, sir?

15       A    Yes.  This is the metallurgist's report, MEG,

16   Material and Engineering Group.

17       Q    And in your investigation, did you have an

18   opportunity to speak with the author of the report?

19       A    I did.

20       Q    And who's the author of the report?  Is it Tom

21   Eager?

22       A    Yes, Mr. Eager.

23       Q    And Tom Eager is a doctor at MIT; is that correct?

24       A    From what I recall, yes.

25       Q    Based on your understanding and the investigation,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    what did Mr. Eager do for you in your investigation?

2         A    Well, he checked the metallurgical properties of

3    that rod and disk that broke off, and he concluded that the

4    material was designed as the manufacturer did it and for its

5    purpose which would be moving -- being grabbed and moved by

6    a hydraulic cylinder to one location of a boom to another.

7         Q    Was it your understanding from Dr. Eager's material

8    testing that he found that the materials used in the pin

9    that broke off were sufficient for the purposes for which

10   they were designed and used?

11        A    Yeah.  He basically concluded that the pin was not

12   defective.

13        Q    How did that effect your hypothesis?

14        A    There's one or two choices that could have possibly

15   happened.  One, there was a material defect in the pin.  The

16   rod and disk broke off because of a material defect.

17             Now, we know that it isn't because we got a

18   metallurgist involved; and, two, that now it's more likely

19   than not that the pin broke due to the collapse of sections

20   4, 5 and 6.

21        Q    And so what did you do moving forward to either get

22   confirmation of that hypothesis or a denial of that

23   hypothesis?

24        A    Well, along with our investigation, our inspection

25   of the boom, the boom -- condition of the boom indicated

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    that there was some traumatic event that ended up damaging

2    the boom which would be consistent with the collapse of

3    section 4, 5 and 6.

4        Q    And in your investigation, did you ever uncover the

5    reasons why there might have been a traumatic event?

6        A    Yes.  It was the improper adjustment of pin 4 when

7    Sims personnel were assembling the -- turning the 50-meter

8    boom into an 84-meter boom.

9        Q    And in undertaking your investigation and finding

10    out that Sims personnel had manipulated the T4 section, did

11    you undertake a review of the Operator's Manual?

12        A    Yes.

13        Q    And in your review of the Operator's Manual, is

14    there anything in there that discusses whether the pin can

15    be manipulated or not?

16        A    There was not.

17        Q    Was there anything in the Operator's Manual that

18    provided the risk associated with manipulating the T4 pin,

19    that being the uncontrollable collapse of sections T6, 5 and

20    4?

21        A    Not prior to the incident.

22        Q    Now, you say not prior to the incident.

23        A    I should rephrase that.  Because really prior to the

24    incident there was a Retrofit Kit that was prepared by

25    Liebherr Germany, however, it wasn't provided to Sims.

1        Q    And I'm going to show you.  Is this the Product

2   Safety Bulletin that you're referencing that was published

3   and prepared by Liebherr Germany prior to the event but not

4   provided to Sims?

5        A    That's correct.

6        Q    And based on your investigation, what did this

7   Product Safety Bulletin add that the Operator's Manual did

8   not have?

9        A    It had a specific warning against manipulating pin

10  4.

11       Q    And is that the second paragraph?

12       A    One of the last paragraphs.

13       Q    It's the second to the last paragraph of that page?

14       A    Yes.

15       Q    And then if we go to the next page of that Exhibit,

16  if we go to the second page of that Exhibit, there's a

17  section that says, "In the meantime, you may continue to

18  operate your Liebherr mobile crane safely so long as you

19  meticulously follow the Operator's Manual."  Do you see

20  that?

21       A    Yes.  Yes.

22       Q    And then it goes on to say at the next paragraph,

23  "We kindly ask that you carefully follow the information in

24  this Product Safety Bulletin in the future and make sure to

25  forward this information to all crane operators."  Do you

1    see that?

2        A    Yes.

3        Q    As an engineer and investigator of crane failures,

4    do you read this as the author contending that there is

5    additional information in the Product Safety Bulletin that

6    needs to be heeded?

7        A    Yes.

8        Q    In your personal opinion as an engineer and

9    investigator, is there information in the Product Safety

10   Bulletin that is not in the Operator's Manual?  Do you

11   understand the question?

12       A    Not really.

13       Q    Is there information in this Product Safety Bulletin

14   that's not in the Operator's Manual?

15       A    Yes.

16       Q    And then I'm going to show you what's been marked as

17   Exhibit 17.  In your investigation, were you familiar with

18   this document, sir?

19       A    Yeah.  This is the retrofit cover plate along with

20   several warnings there to be added both to the retrofit

21   cover plate and to the boom section 3.

22       Q    And is it your understanding that this retrofit

23   cover plate document along with the retrofit cover plate and

24   the warnings that came with it were manufactured and

25   published before this incident?

1    A    Yes.

2    Q    Does the information in the retrofit cover plate

3  document provide information that is not in the Operator's

4  Manual?

5    A    Yes.

6    Q    And can you tell us what information and warnings

7  and material was provided with this retrofit cover plate

8  that is different from the Operator's Manual?

9    A    Well, the cover plate itself and the warnings on the

10  cover plate and the warnings on the boom 3 section are

11  provided as part of this Retrofit Kit for the updated

12  section of the manual, but prior to receiving this retrofit

13  cover plate installation package, the operator would have

14  no -- would not have this information.

15    Q    And based on your investigation, did you consult

16  with any human factors experts?

17    A    Yes.

18    Q    Who did you consult with?

19    A    Dr. Vigilante.

20    Q    And I'm going to show you what's being marked as

21  Exhibit 122.  Did you have an opportunity to obtain the

22  report of Dr. Vigilante?

23    A    Yes.

24    Q    And is this a copy of Dr. Vigilante's report?

25    A    Yes.

1      Q    And based upon -- did you also have an opportunity

2  to communicate over the phone with Dr. Vigilante?

3      A    Several times.

4      Q    Did you ever contact any zoom conference calls with

5  Dr. Vigilante?

6      A    Yes.

7      Q    And based upon your communication with

8  Dr. Vigilante, what is your understanding of the opinion

9  that he provided you that you incorporated into your

10  investigation?

11     A    Basically to summarize it, if the Retrofit Kit would

12  have been provided to Sims prior to the incident, it would

13  have been implemented by Sims and brought to the operator's

14  attention and would have realized basically that if pin 4

15  was accidentally manipulated, that you would stop all

16  activities.

17          MR. CREMER:  I would object to that opinion.  Move

18  to strike.  Not based upon any scientific principals

19  whatsoever.

20          THE COURT:  Overruled.  He's just summarizing his

21  understanding of the opinion.

22  BY MR. GOODMAN:

23     Q    So in your investigation, had you undertaken a

24  physical examination of the crane itself?

25     A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    You obtained the assistance of a doctor at MIT,

2  material scientist?

3      A    Yes.

4      Q    You attained the assistance from a Ph.D. human

5  factors expert?

6      A    Yes.

7      Q    And so at this point in your investigation with

8  regard to your hypothesis, are you on your way to concluding

9  that your hypothesis is getting stronger or is it getting

10  weaker?

11      A    Getting very strong.

12      Q    And so what is the next thing that you do in

13  evaluating your hypothesis?

14      A    I review all the documents that are part of this

15  case, or in this case as well as review all the testimony

16  that has been provided by all the involved parties.

17      Q    And so did you review the testimony of a gentleman

18  called Ralf Vieten?

19      A    Yes.

20      Q    Did you review the testimony of Henry Ward?

21      A    Yes.

22      Q    Did you review the testimony of Johnathan Smith?

23      A    Not sure.

24      Q    Is there something that would refresh your

25  recollection as to whether or not you did or did not?  Would

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   your report refresh your recollection as to whether you did

2   or did not?

3       A    Yeah.  The attachment has a list of documents that

4   were reviewed.

5            MR. GOODMAN:  May I approach, Your Honor?

6            THE COURT:  You may.

7   BY MR. GOODMAN:

8       Q    I'm going to show you a copy of your report.

9       A    It's attached to it.  I'll give it to you.

10      Q    Let me know if it refreshes your recollection on who

11  and what depositions you reviewed.

12      A    Mr. Farris, Mr. Peek, Mr. Burrows.  We already

13  talked about the other gentlemen.  Mr. Ward, Ms. Baughman,

14  B-a-u-g-h-m-a-n, and Mr. Rebman.

15      Q    Are those all the individuals that you reviewed

16  their deposition transcripts?

17      A    Yeah.  I think there was others as well after the

18  report was written.

19      Q    And did you review documents?

20      A    Whose?

21      Q    Did you review documents?

22      A    Yes.

23      Q    And can you tell us what were the important

24  documents that you reviewed that assisted you in either

25  confirming or denying your hypothesis?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    I think the most important one is the OSHA

2    investigation.

3    Q    So I'm going to show you what's been marked as

4    Exhibit 1.  Is this the OSHA report that you're referencing?

5    A    Yes.

6    Q    And based on this report, what did you gain for your

7    hypothesis?

8    A    Well, basically it's consistent with what we found.

9    Q    What is it that you found?

10   A    We found that the failure or collapse of boom 4, 5

11   and 6 was due to this adjustment of pin 4, and that Sims

12   personnel weren't charged with any citations because there

13   was the availability of a Retrofit Kit that was not provided

14   to Sims even though several manufacturers did receive it in

15   late January and early February which was then prior to the

16   incident.

17   Q    I'm going to show you what's been marked as Exhibit

18   110.  Are you familiar with the ASME B30.5?

19   A    Yes.

20   Q    And the version 2014, was that applicable to the

21   event that occurred in 2018?

22   A    Yes, it was.

23   Q    Did you have an opportunity to review the ASME

24   B30.5?

25   A    I have.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Based upon your review of ASME B30.5, how did that

2    apply to the work that was being undertaken by Sims?

3    A    ASME B30.5 lays out the responsibilities for the

4    parties who are conducting the lift to include the owner --

5    sorry.  I said lift -- the owner of the crane, the user of

6    crane which would have been both been Sims personnel, the

7    operator of the crane, again, a Sims personnel as well as

8    single persons and things of that nature.

9    Q    And in your review of ASME B30.5, did you find that

10   Andrew Farris was a qualified and competent individual?

11   A    Yes.  He was certified.  He had certification as an

12   operator.

13   Q    And did you find whether -- or did you have an

14   opportunity as to whether or not with Andrew Farris and

15   Shane Burrows working together, whether that was appropriate

16   under ASME B30.5?

17   A    Yes.  Mr. Farris, I believe he did due diligence at

18   the time prior to the incident.  He knew there was something

19   wrong with the extension because the cylinder wasn't

20   detaching from pin 4.

21   Q    Are you talking about on the date of the incident --

22   A    Yes.

23   Q    -- February 19th?

24   A    Yes.  So the grabber, for whatever reason, didn't

25   seem to release through the automatic telescopic mode which

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1 is the typical mode that the crane is operated in.  So after

2 several attempts of trying to release the grabber, release

3 the pin via the grabber, he talked to his supervisor and his

4 supervisor sent out a service technician, and he also talked

5 to Mr. Piper, an experienced crane operator of over three

6 decades, and asked him his opinion on how he should handle

7 that situation.

8  Mr. Piper suggested, since he had that instant

9 happen in the past, to use the manual, manual telescopic

10 mode which the manufacturer provides on the piece of

11 equipment.

12  So, through the manual telescopic mode, Mr. Farris

13 was able to retract, ungrab and retract the pin 4 and then

14 actually connect to pin 3, and as he was extending out --

15 getting ready to extend pin 3, that's when the collapse

16 occurred of sections 4, 5 and 6.

17 Q Did Mr. Farris' use of the manual mode violate ASME

18 B30.5?

19 A No.

20 Q Did Mr. Farris' actions of contacting his supervisor

21 to troubleshoot and contacting the journeyman crane

22 operator, did that violate ASME B30.5?

23 A No.

24 Q Does it violate ASME B30.5 or change your opinion if

25 the journeyman operator had never operated the Liebherr LTM

1     1500?

2         A     Yes.

3         Q     Why is that?

4         A     Well, he wouldn't have been utilizing the crane as
5     often as he had.

6         Q     And you understand that the journeyman operator that
7     he called had never operated the Liebherr LTM 1500?

8         A     Yes.  I said the journeyman didn't.  I thought you
9     were talking about Mr. Farris.

10        Q     So I was asking about would it affect your opinion
11    on whether or not what Mr. Farris did was appropriate by
12    contacting a journeyman crane operator who had never
13    operated the Liebherr LTM 1500?

14        A     No.  He operated cranes that were similar.  That's
15    why he suggested the type of mode to use in order to retract
16    the boom.

17        Q     So based on your review of ASME B30.5, did Andrew
18    Farris or Sims violate any of those sections in their
19    actions that they undertook to troubleshoot this boom issue
20    on February 19th, 2018?

21        A     They did not.

22        Q     I'd like to talk to you about what occurred before
23    the boom, the uncontrolled boom retraction, what occurred on
24    February 16th.

25        A     Okay.

1    Q    Do you recall what occurred on February 16th between

2    Andrew Farris and Shane Burrows?

3    A    That's when they were swapping out I believe the

4    one -- they were converting the 50-meter boom to an 84-meter

5    boom by swapping out the tip section or No. 3 section of the

6    50-meter boom and replacing it with the 3, 4, 5 and 6

7    section of the 84-meter boom.

8    Q    And is it your understanding that Mr. Farris is an

9    NCCCO certified crane operator at the time?

10    A    Yes.

11    Q    And is it your understanding that Mr. Burrows is an

12    oiler/apprentice at the time?

13    A    Yes.

14    Q    Would it violate ASME B30.5 for a licensed crane

15    operator to be getting assistance from an oiler/apprentice

16    to make that boom swap?

17    A    No, it would not.

18    Q    And would it violate ASME B30.5 for the crane

19    operator to have the oiler/apprentice lock down the pin by

20    himself?

21    A    No.  I mean the crane operator can't be in two

22    places at one time, and it's standard in the industry to

23    have an oiler or assistant, because that process teaches

24    on-the-job training through on-the-job training on how to

25    become an operator of a crane, which eventually Mr. Burrows

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    ended up being certified some years later.

2        Q    Is it your understanding that actually Mr. Burrows

3    had taken the NCCCO rigger exam before this event and had

4    passed it?

5        A    I don't recall that.

6        Q    Now, I'm going to show you what's been marked as

7    Exhibit 111.  Are you familiar with what this, sir?

8        A    Yes.

9        Q    And what is this?

10       A    This is the part of the standard that deals with

11   cranes.

12       Q    And --

13       A    I'm sorry, not standard.  Regulation.

14       Q    And is it the OSHA regulation?

15       A    Yes.

16       Q    And based on this section, was Andrew Farris a

17   qualified and competent crane operator to conduct the

18   operations that he was undertaking on February 16th through

19   February 19th?

20       A    Yes.

21       Q    Did Mr. Farris violate any sections of Title 29,

22   Part 1926 in the manner and method by which he undertook the

23   boom swap on February 16th?

24       A    No.

25       Q    Did it violate any sections of Part 1926 when

1    Mr. Farris had Mr. Burrows go up on the boom and lock down

2    the pin?

3        A    No.

4        Q    Did it violate any parts of OSHA for Mr. Farris on

5    February 19th, 2018 to troubleshoot the boom as he did?

6        A    No.

7        Q    Did OSHA find or issue any citations against Sims,

8    Mr. Farris, Mr. Burrows for any of the actions they took on

9    February 16 or February 19th?

10       A    They did not.

11       Q    I'd like you to turn to Exhibit 1.

12       A    Before we leave those two, the standards and

13   regulations, may I say one thing?

14       Q    Yes.  Of course.

15       A    The manufacturer has designed these two

16   configurations, and one of the things that come out through

17   the OSHA regulation is modification and addition and things

18   of that nature.

19            Well, since the manufacturer has provided two

20   configurations, one, a 4-section boom; two, a 7-section

21   boom, they provide all the information within the manual,

22   then it wouldn't be considered a modification because it's

23   already been given the written approval by the manufacturer

24   through their manual.

25       Q    So is the change from the 50-meter boom to the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    84-meter boom or vice versa a modification pursuant to

2    Exhibits 110 or 111?

3        A    No.

4        Q    Is the swap of the 50-meter boom to the 84-meter

5    boom or vice versa considered an alteration of the crane

6    pursuant to either of those exhibits?

7        A    No.  It's designed by the manufacturer to have that

8    configuration.

9        Q    And is swapping out the 50-meter boom to the

10   84-meter boom or vice versa considered an addition pursuant

11   to those exhibits?

12       A    It is not.  It's no different than having a lattice

13   boom with different sections and different lengths of the

14   boom.  You don't consider that as being a modification,

15   addition.

16       Q    Now, on February 16th, after Andrew Farris had

17   changed out the 50-meter boom to the 84-meter boom and Shane

18   Burrows had manipulated the T4, Andrew Farris comes up and

19   re-manipulates the T4 pin.  Is that in any way a violation

20   of Exhibits 110 or 111?

21       A    No.

22       Q    After he gets the 84-meter boom locked in as it's

23   supposed to and he booms out section 6, would that be part

24   of his post-duty assembly?

25       A    Yes, it would, as well as what he did prior to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    lifting any loads on the day of the incident.

2        Q    You're talking about when he began extending the

3    boom on February 19th?

4        A    Yes.

5        Q    When he began extending the boom 6, 5 and 4, that

6    was part of his post duty -- his post-assembly inspection?

7        A    It's his pre-lift inspection, getting the boom into

8    the configuration that he needed to have it in in order to

9    move the tower section.

10       Q    So the failure occurred during the post-assembly

11   inspection?

12       A    Yes, and pre-lift.  Post-assembly inspection and

13   pre-lift.

14       Q    So he's conducting a post-assembly inspection at the

15   same time he's doing a pre-lift inspection by lifting the

16   sections?

17       A    Yes.

18       Q    And in undertaking the post-assembly inspection and

19   pre-lift inspection in the manner and method by which he did

20   by booming out section 6, 5 and 4, retracting them back and

21   doing it again, retracting it back, calling his supervisor,

22   calling a journeyman crane operator, extending it back out,

23   6, 5 and 4, manually maneuvering the cylinder, did any of

24   that violate Exhibits 110 or 111?

25       A    No, they did not.  In addition, he also tried to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    zero out the boom again and make sure there was nothing that

2    the computer was doing to prevent the retraction of the

3    cylinder from T4.

4        Q    So based upon your investigation and as it related

5    to your hypothesis, what was your conclusion as to whether

6    Mr. Farris, Mr. Burrows and Sims complied with ASME B30 and

7    Part 1926 of Title 29?

8        A    They fulfilled their responsibilities to operate the

9    crane as it was intended while troubleshooting an instance

10   with the crane.

11       Q    And in your review of the Operator's Manual, was

12   there ever any indication in that Operator's Manual that a

13   manipulation of the T4 pin would be a violation of that

14   Operator's Manual?

15       A    No.

16       Q    Now, Andrew Farris booms out on February 19th, he

17   extends out the boom at around 72 degrees.  Is that your

18   understanding?

19       A    Yes.

20       Q    Now, could he have boomed this out horizontal to the

21   deck, to the floor, extended the boom out horizontal?

22       A    All those boom sections?

23       Q    Correct.

24       A    No.

25       Q    Why not?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

96

1      A    It would tip over.

2      Q    Is the crane made to boom out all the sections

3  horizontal?

4      A    No.

5      Q    Now, if --

6      A    Which is typical with big cranes.

7      Q    How do you want to extend that boom when you're

8  doing your test?

9      A    Well, you want to extend it in a -- near one of the

10  higher angles and ensure, one, you have less load on the

11  boom section; two, that it's within the operating

12  configuration of the manufacturer, which means you can't

13  extend it horizontally because it would tip over.  There's

14  just not enough counterweight.  The boom sections aren't

15  designed to be able to handle that kind of load or design at

16  least, but they are designed to handle it at the 72 degrees.

17      Q    Now, if Andrew Farris would have -- strike that.

18  Would it have been appropriate for Andrew Farris to have

19  just boomed out one section horizontally at a time?

20      A    Let me just make sure I understand your question.

21  Are you talking about individually?

22      Q    Yes.

23      A    And then retracting it?

24      Q    Yes.

25      A    So he could have extended section 6 -- well, let me

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    back up, make sure we're clear on this.  If the 7 boom

2    sections are fully retracted, what he could have done was

3    extend section 6, retract section 6; extend section 5 and 6

4    with 6 being collapsed within section 5 and then brought it

5    back in.  And then he could have -- I know this is getting a

6    lot of numbers here.  I'm trying to be methodical.

7            THE COURT:  I'm following you.

8            THE WITNESS:  He could have extended 4, section 4

9    horizontally with booms 5 and 6 retracted and then retracted

10   4 along with 5 and 6.  And then he could have -- and you

11   could see how long and laborious this is.

12           He then could have done section 3 with 4, 5 and 6

13   retracted inside the boom and just checked to see whether

14   section 3 worked as intended.  And he could have done that

15   all the way through the assembly.  But me saying it took a

16   long time, and it's unreasonable for an operator to have to

17   go through that process, and the manufacturer doesn't say to

18   do so.

19   BY MR. GOODMAN:

20       Q    And would it not -- would it also not then provide

21   him in doing that with the post-assembly inspection and

22   pre-lift inspection because he's not booming out or

23   extending the boom in the manner and method by which it's

24   going to be used?

25       A    That's correct.

1    Q    So would it be your opinion that Mr. Farris had to

2    boom out this -- had to extend the boom on January 19th,

3    2018 at approximately 72 degrees by booming out section 6,

4    5, 4, 3, 2, 1?

5    A    That's correct.

6    Q    And only until he does that would he meet the

7    post-assembly inspection and pre-lift inspection?

8    A    That's correct.

9    Q    I'm showing you what's been marked as Exhibit 1.

10   It's in front of you.  Do you recognize what this is?

11   A    The OSHA report.

12   Q    Yes, sir.  What I'd like you to do is just read the

13   first page to yourself and then when you're done, I'm going

14   to ask you whether or not the findings in this report were

15   consistent with the findings in your report and your

16   investigation.

17   A    They're not providing any conclusions here.  They're

18   just providing factual information.

19   Q    Right.  I want to know from you.  Read this first

20   page.  Let me know when you're done.  And I'm going to ask

21   you the question as to whether or not the facts that are

22   here are consistent with what you uncovered in your

23   investigation.

24   A    Yes.

25   Q    So on the first page, that's consistent?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    And anything wrong on this first page?

3      A    Not that I'm aware of.

4      Q    Ask you to turn to page two, IAI2701.  Take a read

5    of this and let us know when you're done.

6      A    I've read this OSHA report several times, numerous

7    times, so it's reflected in my report in my conclusions.  My

8    information is consistent with OSHA's findings and OSHA's

9    factual information.

10      Q    So let me ask you this question.  On page two,

11    IAI2701, are the facts that are reflected there consistent

12    with the facts that you uncovered in your investigation?

13      A    Yes.

14      Q    Anything inconsistent?

15      A    No.

16      Q    I ask you to turn to page IAI2702, and if you want

17    to review this again, let us know when you're done.

18      A    Yes.

19      Q    Are the information, the facts on this page

20    consistent with what you uncovered during your

21    investigation?

22      A    Yes, it is.

23      Q    I'd like you to turn to the next page IAI2703.  Let

24    us know when you're done.

25      A    I'm finished.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Are the facts that are on IAI2703 consistent with

2   the facts that you uncovered during your investigation?

3      A    Yes.

4      Q    Anything inconsistent?

5      A    No.

6      Q    Turn to IAI2704.  Let us know when you're done.

7      A    Should have took the speed reading class.

8      Q    Pardon?

9      A    I should have taken a speed reading class.

10          THE COURT:  Take your time.  There's no rush.  Take

11   your time.

12          THE WITNESS:  I'm finished.

13   BY MR. GOODMAN:

14      Q    Is the information in IAI2704 consistent with the

15   information and facts that you uncovered during your

16   investigation?

17      A    Yes.

18      Q    Anything inconsistent?

19      A    No.

20      Q    I'm going to ask you to read 2705.

21      A    Finished.

22      Q    Is the information and facts in IAI2705 consistent

23   with what you uncovered in your investigation?

24      A    Yes.

25      Q    Anything inconsistent?

1    A    No.

2    Q    I'd like to turn to IAI2706.  Take a read of that.

3    A    Finished.

4    Q    Is the information in this consistent with what you

5    determined and uncovered in your investigation?

6    A    Yes.

7    Q    Now, at the bottom, the second to last paragraph,

8    there's an opinion?

9    A    Yes.

10    Q    Is your opinion consistent with that opinion?

11    A    Yes.

12    Q    And did you come up with that opinion independent of

13    the opinion that OSHA wrote?

14    A    Yes, along with Dr. Vigilante.

15    Q    Now, I'd like you to turn to Exhibit 2.  On the

16    bottom of this page, can you tell us what OSHA concluded as

17    it related to Viking Rigging and Sims as the employer?

18    A    They found no violations of OSHA.

19    Q    Did you find any violations of OSHA section Exhibit

20    111 or the ASME Exhibit 110?

21    A    I did not.

22    Q    And you found that Sims, Andrew Farris and

23    Mr. Burrows did not violate either one of those sections?

24    A    That's correct.

25    Q    In your investigation, did you read the accident

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

42

1    investigation report, Exhibit 107, that was provided by

2    Andrew Farris?

3        A    Yes.

4        Q    And did you consider this information when you

5    evaluated the origin and cause of this incident?

6        A    I did.

7        Q    And did you read Exhibit 108?

8        A    I did.

9        Q    And what is Exhibit 108?

10       A    It's basically his experience and what occurred.

11       Q    This is a statement that's given to OSHA?

12       A    Yes.

13       Q    Do you consider it in your investigation in the

14   origin and cause of this loss?

15       A    I did.

16       Q    Showing Exhibit 109, do you understand it to be the

17   drug test taken of Andrew Farris on the date of the incident

18   after the loss?

19       A    I do.

20       Q    Did you consider this test in your investigation?

21       A    Well, it's relevant that he didn't test positive,

22   so, yes.

23       Q    I'm showing you what's marked as Exhibit 113.  Do

24   you recognize this as Shane Burrows' statement to OSHA?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And did you use the information in this statement in
2  your evaluation of the origin and cause of this loss?
3    A    I did.
4    Q    I'm showing you Exhibit 120.  Are you familiar with
5  what this is, sir?
6    A    Yes.  My conclusions of this matter.
7    Q    And whose conclusions are they?
8    A    Mine.
9    Q    And they're your conclusions after you've undertaken
10  an investigation of the origin and cause of the failure of
11  the Liebherr LTM 1500 on February 19th, 2018?
12    A    Yes.
13    Q    And in sum and substance, let's talk about your
14  first opinion.  What is your first opinion in this case?
15    A    Basically the cause of the accident was the mistaken
16  adjustment of the T4 pin.
17    Q    And then what is your second opinion you state?
18    A    That Liebherr USA failed to provide operating manual
19  warnings and warning decals for the crane, and if they would
20  have done so, then this accident likely wouldn't have
21  occurred.
22    Q    What is your third opinion?
23    A    That Sims fulfilled their responsibilities defined
24  by ASME B30.5 and I didn't find any evidence that they did
25  not.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And would that also be consistent not only with ASME

2    B30.5 but also with Exhibit 111 that we looked at, Section

3    1926?

4    A    Yes.  The OSHA regulation?

5    Q    Right.

6    A    Yes.

7    Q    And what is your fourth opinion in this case?

8    A    That Mr. Farris fulfilled the responsibility for

9    ASME B30.5 when he was changing out the 50-meter boom and

10   turning it into an 84-meter boom.

11   Q    That would also be consistent with Part 1926, that

12   he did not violate Part 1926?

13   A    Yes.

14   Q    And what is your fifth opinion in this, in the

15   origin and cause?

16   A    That Mr. Burrows fulfilled his responsibility as

17   defined by B30.5 when the changing boom configuration took

18   place on the 50-meter to the 84-meter.

19   Q    Is that consistent that he also did not violate Part

20   1926?

21   A    Yes.

22   Q    What is your sixth opinion in your origin and cause?

23   A    If I use it utilizing the manual telescopic mode of

24   the crane, that he did not violate or he fulfilled his

25   responsibilities and did not violate any responsibilities

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    per ASME B30.5.

2        Q    Is that also consistent that he did not violate Part

3    1926?

4        A    Yes.

5        Q    And what is your seventh opinion in your origin and

6    cause investigation?

7        A    That I agree with OSHA's findings and that I agree

8    that they should not have charged any/or provided any

9    citations against Sims.

10            MR. GOODMAN:  Could I have one moment, Your Honor?

11            THE COURT:  You may.

12    (Brief pause.)

13    BY MR. GOODMAN:

14        Q    Was the investigation that you undertook, was it

15    peer reviewed?

16        A    Yes.

17        Q    And who was it peer reviewed by?

18        A    A co-worker, professional engineer at Haag

19    Engineering.

20        Q    And in your investigation, did you have an

21    opportunity to speak with anybody from the ASME B30

22    committee?

23        A    I did.

24        Q    And is that something you would normally do in the

25    undertaking of your origin and causes investigation?

1     A    True.

2     Q    And what was the purpose of your communication with

3  members of the ASME B30 committee?

4     A    To ensure that my understanding of ASME B30.5 about

5  what a modification or addition is was correct.

6     Q    And what was the conclusion or response that you got

7  from the committee members that you spoke with?

8     A    They said my understanding of the standard was

9  correct, that since the manufacturer designed to have two

10  different configurations of a crane, that this was not a

11  modification or addition.

12     Q    Was there anything else that you undertook in the

13  investigation to come to your conclusions that you feel are

14  significant?

15     A    Besides what we went through?

16     Q    Correct.

17     A    I think we covered it pretty well.

18          MR. GOODMAN:  No more questions at this time, Your

19  Honor.

20          THE COURT:  Mr. Goodman, if you could just formally

21  tender your expert as an expert, please.

22          MR. GOODMAN:  The plaintiffs tender Anthony Bond as

23  an expert in mechanical engineering and origin and cause

24  investigations of failures of cranes.

25          THE COURT:  Any objection?

```
 1          MR. CREMER:  Your Honor, I object to all of his
 2    opinions based on the lack of adequate foundation.
 3          THE COURT:  Objection is overruled and he is going
 4    to be accepted as an expert in mechanical engineering and
 5    also origin and causes investigations.
 6          Let's take a brief recess.  Let's take a recess
 7    until 10:45.  That will give about 20 minutes and then at
 8    that time the defense can start their cross-examination.
 9   (Recess had from 10:24 to 10:47 a.m.)
10          THE COURT:  Go ahead.
11                     CROSS-EXAMINATION
12   BY MR. CREMER:
13      Q    You said that you had been retained according to
14    your -- well, you said you had been retained to determine
15    the cause of the accident and the responsibilities of the
16    parties involved.  True?
17      A    True.
18      Q    You determined that the cause of the boom collapse
19    was the improper position of the T4 pin which was sheared
20    off by the telescopic cylinder after it was improperly
21    manipulated during the boom swap on Friday, February 17th,
22    2016?
23      A    Yes.
24      Q    Actually February 16th, 2018?
25      A    Yes.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

Q    All right.  Sorry about the date of confusion.

You also examined factually what led to the T4 pin to be improperly positioned; correct?

A    Yes.

Q    And you found that the adjustment of the T4 pin was first performed by Shane Burrows on Friday, February 16th during the swap of the 84-meter boom for the 50-meter boom at the Sims yard; correct?

A    Yes.

Q    Shane Burrows manipulated the T4 pin while he was up on the boom through the T2 hole; right?

A    He attempted to.  The T4 pin can't go through the No. 2 section because it doesn't have enough stroke to be able to be pushed through the second boom section.

Q    His access to the pin was through the T2 hole?

A    Correct.

Q    And before Shane Burrows touched the T4 pin on that date, do you have any other evidence that the T4 pin was anything other than in a fully locked and proper position?

A    I do not.

Q    And during that boom swap, Mr. Burrows, who's an apprentice, changed the position of the T4 pin from a locked, safe position to an unlocked and unsafe position, didn't he?

A    Correct.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1       Q    Shane Burrows was never trained by Liebherr to
 2  properly assemble or disassemble the 84-meter boom, was he?
 3       A    I think he was in the process of being trained as an
 4  oiler or assistant to Mr. Farris.
 5       Q    I appreciate that.  But I was asking about whether
 6  Liebherr provided any training to Mr. Burrows.
 7       A    Sorry.  No.
 8       Q    Any reason that you're aware of that Sims Crane
 9  couldn't have sent Shane Burrows to be part of the training
10  that actually was provided by Liebherr?
11       A    No.
12       Q    You think that would have been a good idea?
13       A    Yes.
14       Q    Did you read the deposition of Jason D'Angelo who
15  was the other operator on the LTM 1500?
16       A    I did.
17       Q    Do you remember in his deposition he went to
18  management and recommended that Shane Burrows be part of the
19  training and they refused?
20       A    I don't recall that.
21       Q    You reviewed the deposition of Shane Burrows.  Do
22  you recall reading in his deposition that he testified he
23  was never trained on how to determine where the T3 pin was
24  on the 84-meter boom?
25       A    Correct.
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    He should have been trained where the T3 pin was on

2    the 84-meter boom, shouldn't he?

3    A    He was -- yes, he was in the process of being

4    trained through on-the-job training.

5    Q    Shane Burrows before he was given the task and

6    responsibility to lock the T3 pin to the T3 hole, he should

7    have known what the T3 pin is and where it was located,

8    shouldn't he?

9    A    Yes.

10    Q    Now, there was a dust cover, the round dust cover

11    over the T3 pin hole on the 84-meter boom that needed to be

12    removed before you could properly access and ultimately lock

13    the T3 pin and the 84-meter boom package; correct?

14    A    Correct.

15    Q    Andrew Farris, in the deposition that you reviewed,

16    said that he instructed Shane Burrows to remove the T3

17    cover; right?

18    A    I believe so.

19    Q    But Shane Burrows denies in his deposition, that you

20    reviewed, that Andrew Farris ever asked him to remove that

21    cover, didn't he?

22    A    I don't recall that specifically.

23    Q    In any event, whether or not Farris told Burrows to

24    do it or not, ultimately Farris as the lift director had the

25    responsibility to ensure that the 84-meter boom was properly

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    prepared and ready to be inserted into the crane base?

2        A    Yes, and I believe ultimately he did.

3        Q    Well, he had that responsibility before he put that

4    boom package into the crane with a dust cover still left on,

5    didn't he?

6        A    He did.

7        Q    And if Andrew Farris had done his job properly, the

8    dust cover on the T3 pin would have been removed before it

9    was inserted into the crane?

10       A    Yes.

11       Q    And if Andrew Farris had done his job correctly and

12   the T3 dust cover had been removed, you would agree that it

13   would have been more likely that Burrows would have seen it

14   when he came into the T2 section?

15       A    I don't know that to be true.  The two pins, T4 and

16   pin 4 and pin 3 are only about a foot and a half apart.

17       Q    Well, don't you think it would have been a little

18   more likely that Burrows would have seen the pin if it

19   wasn't covered up by the plate?

20       A    I don't know what he would have saw and wouldn't

21   have saw.

22       Q    So you're telling us you don't believe it's more

23   likely that a covered pin would be more difficult to see

24   than an uncovered pin?

25       A    Again, they are only a foot and a half apart.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    I'm talking about the T3 pin, sir.

2    A    Oh, if the T3 pin is covered, certainly you can't

3    see it.

4    Q    That's my point.  So if it had been uncovered as it

5    should have been, it's more likely that Shane Burrows would

6    have seen it.  True?

7    A    Obviously it gives him the ability to be able to see

8    it, yes.

9    Q    Now, when the T3 pin on the 84-meter boom is outside

10   of the crane, it is always in an unlocked position; right?

11   A    In 3, yes.

12   Q    Because when -- when the 84-meter boom is in the

13   crane and locked, if you're going to get it out, you got to

14   unlock it; correct?

15   A    That's correct.

16   Q    And a trained and competent person would be able to

17   tell if a T3 pin is -- let me start over.

18        A trained and competent person could tell that the

19   T4 pin if accidentally inserted too far in was positioned in

20   the T2 hole.  That was wrong because you would have expected

21   the pin you're looking at, if it was the T3 pin, to be

22   recessed and unlocked, not raised and locked.  True?

23   A    That's correct.  And I believe Mr. Burrows'

24   testimony indicated he knew something was wrong and that's

25   when they had Mr. Farris come up and look and see why the T4

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    pin wouldn't go into the second boom section's hole.

2        Q    But it's different, isn't it, Mr. Bond, to realize

3    it after you put the tool on the wrong pin and start to

4    manipulate it in an unlocked direction as opposed to having

5    the training to look at the pin by observation and see that

6    it's already locked?  There's a difference there, isn't

7    there?

8        A    I believe if you look at the photograph, you'll see

9    that both pins are at the same height, so just visually

10    looking at it, you wouldn't be able to tell the difference.

11        Q    Well, they couldn't possibly be at the same height

12    because the T3 pin in its fully unlocked position is

13    recessed in the locking bore, isn't it?

14        A    No.  The unlocked pin 3 is at the same height as the

15    locked pin 4.  If we pull up a photograph, this is a

16    photograph.  You can tell from this side (indicating).

17        Q    We're going to put up on the screen an exhibit which

18    is a photograph admitted into evidence, Defendant's Exhibit

19    5.  Pull that up.  Blow that up a little bit.

20        MR. GOODMAN:  I'm going to object to the use of this

21    photograph with Mr. Bond.  If you want an explanation, I'll

22    be happy to provide.

23        THE COURT:  What's the explanation?

24        MR. GOODMAN:  The explanation is this photograph was

25    not taken by Mr. Bond.  There's been nobody to come in to

1    testify as to what was done to either of these pins prior to

2    the photograph, so I don't think anybody can say whether

3    these are locked, unlocked, partially locked, 11 millimeters

4    above the bore, 11 millimeters below the bore.  We just

5    don't know.

6            It's a picture of two pins.  I think Mr. Bond can

7    answer that.  It's a picture after the Product Safety

8    Bulletin because it has the stickers on it, but other than

9    that, I don't think that there's anything else that can be

10   obtained from this photograph.

11           THE COURT:  I'll let Mr. Cremer ask his questions.

12   Go ahead, Mr. Cremer.

13   BY MR. CREMER:

14       Q    You recognize in this photograph, Mr. Bond, this is

15   an 84-meter boom, and you see the T3 and T2 pins.  And in

16   this photograph, admittedly the warnings stickers are on

17   this particular crane.  But I don't want you to focus on

18   that.  I want you to look at the pins themselves.  Do you

19   see them?

20       A    I do.

21       Q    Do you recognize which of the two is the T3 pin?

22       A    I do, yes.

23       Q    Is it the one that has the collar around it?

24       A    Yes.

25       Q    And is that pin in that photograph locked or

1    unlocked?

2        A    Unlocked.

3        Q    You know it has to be unlocked, right, because it's

4    going into the boom; correct?

5        A    That's correct.

6        Q    If it were up and locked, you couldn't fit it in;

7    right?

8        A    That's correct.

9        Q    And can you tell me whether the position of the T3

10   pin recessed below that collar is the same as the position

11   of the T4 pin which is above the frame?

12       A    They are at different heights relative to the boom

13   section, but if you look at those two pins, they're nearly

14   the same.  T4 is in its unlocked position because it's

15   attached to the boom section 3 which is the boom we're

16   looking at.  T3 pin is slightly below the collar so it could

17   be inserted, and then once inserted into the proper location

18   then it would be unlocked to attach to the second boom

19   section.

20       Q    Am I understanding you right?  Are you telling this

21   Court that the T4 pin in that photograph is in an unlocked

22   position?

23       A    No.

24       Q    It's locked; right?

25       A    Yeah.  That's what I've been saying.  I said that

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the T3 pin in the unlocked position is nearly the same

2    height as the T4 pin in the unlocked position.

3        Q    The only point I wanted to make when I asked you the

4    question originally before I brought up the photograph is

5    that there is a distinction in appearance between an

6    unlocked pin as shown in T3, which is below the locking

7    bore, and a locked pin in T4 which is higher.  That's all I

8    wanted to say.  Do you agree with me?

9        A    I do agree with you on that.

10       Q    Thank you.  Now, you know that there were a number

11   of mistakes that were made by both Andrew Farris and

12   Mr. Burrows that led to this improper unlocking of the T4

13   pin; right?

14       A    Yes.

15       Q    One of them was not removing the cover over the T3

16   pin; correct?

17       A    Yes.

18       Q    A second was not verifying that the cover had been

19   removed before inserting the boom into the crane; correct?

20       A    Correct.

21       Q    Another was not having a person qualified to

22   recognize the T3 pin from the T4 pin; right?

23       A    Correct.

24       Q    The fourth was not having a person qualified to

25   recognize the correct pin to manipulate should be in an

1    unlocked, not locked position; correct?

2        A    Correct.

3        Q    Now, Burrows realizes after he's already manipulated

4    the wrong pin that something is not right, because instead

5    of locking what should be the T3 pin, he starts to unlock

6    what turns out to be the T4 pin; right?

7        A    That's correct.

8        Q    And Farris goes up on the boom.  He sees the wrong

9    pin.  T4 is in the T2 hole, and Farris knows, he looks at it

10   and he determines that Burrows had moved the pin downward

11   which would be in the direction of unlocking T4.  Do you

12   agree with that?

13       A    Yes.

14       Q    And the T4 pin is set by the manufacturer, in this

15   case Liebherr Germany, and that shouldn't be touched for any

16   reason when performing a boom swap.  You agree with that;

17   right?

18       A    I do.

19       Q    And Farris was trained by Liebherr, if you read his

20   deposition, to only manipulate the T3 pin when swapping the

21   84-meter boom for the 50-meter boom; correct?

22       A    I think that misstates his testimony.

23       Q    What is your understanding of his testimony?

24       A    My understanding of the testimony is that he knew

25   that the T3 pin needed to be locked into the second boom

1    section.

2        Q    Are you saying that Farris was never trained to only

3    manipulate the T3 pin when either installing or uninstalling

4    the 50-meter boom or the 84-meter boom?  That's -- you

5    didn't read that in his testimony, sir?

6        A    I didn't read the word "use only."

7        Q    If he testified in this courtroom a couple days ago

8    that he was trained to only manipulate the T3 pin, would you

9    have any reason to disagree with that testimony?

10       A    I would not.

11       Q    Now, Mr. Farris sees this pin had been manipulated

12   in an unlocked direction and he realizes he's got to restore

13   that pin to it's locked position; correct?

14       A    That's correct.

15       Q    Because these pins for each of these telescopic

16   sections, they're the mechanical device that holds these

17   sections in place; correct?

18       A    That's correct.

19       Q    So let's take an example.  I'm having a bad day and

20   my job is to make sure I lock the T3 pin after there's a

21   boom swap, and the 84-meter boom is now in the position in

22   the T2 hole, and whatever happens, I have a fight with my

23   wife and I forget to do it, I don't touch it, just by pure

24   absent neglect.  What would happen if I boomed up that crane

25   given that condition, the T3 pin is fully unlocked?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A      Sections 4, 5 and 6 would slide in.

2        Q      The LICCON system is not going to save the day, is

3   it?

4        A      Excuse me?

5        Q      The computer system isn't going to save the day if

6   you don't lock the pin properly; right?

7        A      Well, if it is unlocked to begin with, that's

8   correct.  We're talking about the -- we're talking about the

9   T3 pin.

10       Q      T3.

11       A      Right.  Okay.

12       Q      When Farris attempts to correct the mistake that was

13   made in unlocking the T4 pin, he had no training from

14   Liebherr US on how to correct that situation because it's

15   not in the manual?

16       A      That's correct.

17       Q      There are no instructions in the LTM 1500 Operator's

18   Manual that gave guidance to Mr. Farris on how to readjust

19   that pin to its factory setting once it had been improperly

20   manipulated.  True?

21       A      That's correct.

22       Q      Do you have any evidence in your review of the

23   record of this case that Liebherr US was ever aware of the

24   T4 pin being improperly manipulated by a customer of an LTM

25   1500 because the dust cover to the T3 pin had been left on

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    at any time before Henry Ward gave his training at Sims?

2        A    I don't know one way or the other.

3        Q    Do you have any evidence that Liebherr US had any

4    evidence of an inadvertent manipulation of the T4 pin before

5    Henry Ward came to train the Sims Crane operators?

6        A    I think I recall something in the OSHA report

7    mentioning an accident.

8        Q    The Japan accident?

9        A    Yes.

10       Q    That was the event that led to the issuance of the

11   Safety Bulletin; right?

12       A    Yes.

13       Q    A Safety Bulletin that wasn't issued until eleven

14   months after the training?

15       A    That's correct.

16       Q    So what I was focusing on is the time period when

17   Henry Ward was training the gentlemen at Sims.  Do you know

18   of any evidence that the company Liebherr US had notice of

19   any customer improperly manipulating the T4 pin before that

20   training took place?

21       A    I do not.

22       Q    You agree that the position of the T4 pin, as

23   adjusted by Shane Burrows and Andrew Farris, was improper

24   and resulted in the T4 pin being sheared off by the

25   telescopic cylinder on the date of this incident,

1    February 19th, 2018?

2        A    Yes.

3        Q    That was operator error, wasn't it, sir?

4        A    Yes.

5        Q    Didn't Farris have an obligation under ASME B30.5 to

6    promptly report the need for adjustment or repair of the

7    boom to a designated person once he had knowledge the T4 pin

8    setting had been altered from its factory setting?

9        A    From my understanding from Mr. Farris' testimony was

10    that he believed he set it properly, because during his

11    training through Liebherr US, they said basically don't over

12    tighten, over torque the position of the pin.

13        Q    But all of the Liebherr US's training was about how

14    to set a T3 pin, not the T4 pin; correct?

15        A    That's correct.

16        Q    Do you know whether or not the physical position of

17    the T3 pin is identical to the physical position of the T4

18    pin when it's fully locked pursuant to the manufacturer's

19    design?

20        A    I believe they're the same.

21        Q    You believe, but do you know?

22        A    Yeah, I think it's 11 millimeters.

23        Q    Did you measure it?

24        A    I did not measure it.

25        Q    Do you have a drawing that would allow you to make

1    that determination, a scale drawing in your file?

2        A    I do not, but I believe in the manufacturer's manual

3    it says 11 millimeters.

4        Q    You're saying the manufacturer's manual has a

5    specific dimension that the T4 pin should be adjusted to?

6        A    Certainly not before the incident.

7        Q    Well, this is my point.  Andrew Farris is adjusting

8    this pin that he had no training on the proper position,

9    that that pin, the T4 pin needed to be adjusted to per

10   factory specifications.  Do you agree with that?

11       A    I do.  And the manual is silent on providing that

12   dimension.

13       Q    So he's operating in the dark, isn't he?  The manual

14   doesn't tell him what to do; he's never experienced it

15   before; he's had no training on it, but he uses his best

16   efforts to put it back in a locked position but he was

17   wrong?

18       A    I agree with everything you said, and that's why it

19   was so important to provide the Retrofit Kit.

20       Q    But he was confident in his own mind -- take that

21   back.

22            He was on the stand the other day and I asked him

23   were you confident after you had made the readjustment that

24   you reset it to its properly locked position, and he said he

25   was, and that's why he didn't contact anyone at the Sims

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    yard to take a look at the issue or contact anyone else.

2            So, if we have an operator who in good faith in his

3    heart of hearts believes that he had locked that pin, then

4    he might not have followed any further instruction, would

5    he?

6    A    I don't think that's what his testimony is during

7    his deposition anyway.  I believe he indicated, Mr. Farris

8    indicated that provided the Retrofit Kit he would have been

9    on notice to stop all activities with the crane and call the

10   manufacturer or Liebherr US.

11   Q    Did Andrew Farris have responsibility under ASME

12   B30.5 to only operate the crane if he first determined the

13   function controls are responding properly?

14   A    Yes.  And I believe that's what he was doing on the

15   day of the incident.

16   Q    Did Mr. Farris test if the 84-meter boom sections

17   could lock properly before he allowed that crane to be

18   removed from the Sims yard to the job site and boom

19   properly?

20   A    Mr. Farris did test the first section 92 percent in

21   its extension and retracted it for mobilization.

22   Q    Now --

23   A    He did not extend all the sections out at

24   72 degrees.

25   Q    Okay.  Now, again, I want to track my question which

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    was a particular point and place in time.

2        I'm talking about in the Sims yard, after the swap

3    was completed, after he realized there had been this

4    mistake, is it your understanding that he tested the crane

5    at that time at that place?

6    A    He only tested one section.  That's my

7    understanding.

8    Q    Right.  And if the testimony in this case was he

9    didn't test it at all because the counterweights weren't on

10   and you need to put on the counterweights, which is a big

11   job.  Right?

12   A    Can you differentiate between testing the whole boom

13   versus testing one section?

14   Q    No.  No.  I'm -- I think you might be mistaken about

15   the day after they installed the boom, they moved the crane

16   to the job site.  That's Saturday.  And on Saturday he set

17   it up.  He put on the counterweights.  He set out the

18   outriggers and he tested one section, the T6.  Might you be

19   confusing Saturday for Friday?

20       MR. GOODMAN:  Object, Your Honor.  I don't know that

21   there's a question.

22       THE COURT:  Let's move along.  Sustained.  If you

23   want to ask a new question, you can.

24   BY MR. CREMER:

25   Q    Do you have a copy of your report with you?

1    Actually it's Defendants' Exhibit 3.  I want to go to page

2    16 of your report, if you have it handy, because at the

3    bottom -- last sentence of the first paragraph under

4    discussion incident.

5           MR. GOODMAN:  I don't think he has a copy of his

6    report, Your Honor.

7           THE WITNESS:  What exhibit?

8           THE COURT:  Give the exhibit number.  He does have a

9    copy but they're looking at different copies I think.  It

10   should be Exhibit 119 in front of you in the binder.

11          THE WITNESS:  Is that where?

12          MR. CREMER:  94, Exhibit 94, Your Honor.

13   BY MR. CREMER:

14    Q    I'll read it to you, and then I'll give it to you.

15   How about that?  So we can save some time.

16    A    94.

17          THE COURT:  94 is the financial.

18          THE WITNESS:  That's not correct.

19          MR. CREMER:  It's Defendant 94.  It's up on the

20   screen.  Darrin, if you go to page 16.

21          MR. GOODMAN:  Could I ask the Court for the Defense

22   Counsel to provide the witness a copy of that report?

23          MR. CREMER:  I will do that as soon as I read a

24   sentence.

25          THE WITNESS:  I have my own version of it.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1            THE COURT:  I think they're going to hand a copy to
 2      you.
 3            MR. CREMER:  16, last sentence we highlighted, last
 4      sentence of the first paragraph.  Not that one.
 5  BY MR. CREMER:
 6      Q    After the involved... Okay?  Are you looking at --
 7      can you see that now?  Or if you have a physical copy.  I
 8      can approach.  I can give the witness a copy because I'll
 9      have some questions later.
10            THE COURT:  You may.  And where is this in
11      plaintiff's exhibits?  I was writing this down.
12            MR. GOODMAN:  Your Honor, we didn't submit his
13      report because I assumed that the defendants would say it's
14      duplicative since he's testifying.
15            THE COURT:  So --
16            MR. GOODMAN:  We just submitted his conclusions.
17            MR. CREMER:  The entire report is submitted as
18      Defendants' 94.
19            THE COURT:  And not Defendants' Exhibit 3, which is
20      what was first said?
21            MR. CREMER:  Yes.  I was wrong.
22            THE COURT:  Defendants' Exhibit 94.  I'm just trying
23      to keep track so when we put this in an order we're citing
24      the right documents.  Go ahead.
25
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    BY MR. CREMER:

2        Q    I just want to just -- I want to just point out the

3    sentence in your report because we're on the subject right

4    now.  It says, "after the involved crane was assembled to

5    its 84-meter boom configuration, it was tested and then

6    transported to the incident site on February 17, 2018."

7        A    What page are you on?

8        Q    This is on page 16.

9        A    Page 16 is talking about the OSHA report.

10       Q    Well, this is the report I was provided by Sims

11   Counsel that purported to be your expert report.

12           THE COURT:  They're showing you the entire page now

13   on the screen.  Do you want to compare that to what you're

14   looking at and perhaps maybe go from the top of the page?

15   It look like it's page 21 of something.  Perhaps you were

16   looking at page 16 of something at the top instead.  Why

17   don't you show him the entire page.  It gets confusing to

18   just see a piece of it.  Thank you.

19           THE WITNESS:  Okay.  We're on the same page.

20           THE COURT:  Now, if you want to zoom in, you can now

21   that we know he's on the same page.

22   BY MR. CREMER:

23       Q    Okay.  So you wrote in your report that "after the

24   crane was assembled to its 84-meter boom configuration, it

25   was tested and then transported to the incident site on

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    February 17th."  You're referring to the February 16th boom

2    swap in this sentence; right?

3         THE COURT:  If you want to take time to read over

4    your report, you can now that it's in front of you too.

5         THE WITNESS:  Now, see, I go from that sentence and

6    I jump right into 19.  I'm not specifying what date that was

7    actually done, just that it was done before the day of the

8    incident.

9    BY MR. CREMER:

10        Q    That's fine.  You reviewed this file.  You reviewed

11   depositions, you reviewed reports.  You know that on

12   February the 16th, 2018, there was a boom swap that took

13   place at the Sims yard; right?

14        A    I do know that, but I'm not being specific here.

15   This is the 17th; right?

16        Q    The sentence --

17        A    It says 17th.

18        Q    The sentence suggests that it was assembled and then

19   transported to the incident site on February 17th; right?

20   That's what it says?

21        THE COURT:  Mr. Cremer, what are you trying to

22   establish, that he thought that it was assembled on the

23   16th?

24        MR. CREMER:  I'm trying --

25        THE COURT:  The way I read the sentence is that the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    17th is modifying the date it was transported.  What -- I'm

2    just missing what you're trying to establish.

3    BY MR. CREMER:

4        Q    The crane was assembled on the 16th.  Boom was

5    swapped and assembled on the 16th in the Sims yard, and this

6    expert indicates in his report that on that -- at that time

7    it was tested.

8            That's my point.  I'm asking him is that his

9    understanding that after it was assembled at the Sims yard

10   was it tested by Andrew Farris.

11       A    My date says the 17th.

12       Q    No, it says, "and then it was transported to the

13   incident site on February 17th."  That's the sequence in

14   that sentence.

15           Let me just ask you this:  Do you know whether or

16   not Andrew Farris tested the boom and its functioning at the

17   yard after it was installed when he was aware there had been

18   a mistake in setting the T4 pin?  Do you know one way or the

19   other?

20       A    I know it was tested.  I might have a day off on

21   when it was extended.

22       Q    And you agree he should have tested it?

23       A    I agree that he should have tested it and he did.

24       Q    I think you told Mr. Goodman that if he wanted to

25   and he had a concern about whether he had locked properly

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    the T4 pin because he was operating in the dark, he could

2    have tested that same single section?

3            MR. GOODMAN:  Objection, Your Honor.  I don't

4    believe -- may I explain?

5            THE COURT:  Go ahead.

6            MR. GOODMAN:  I don't believe the facts show that

7    they were doing any of this in the dark.  They were doing it

8    all during the daylight hours.  I'm not sure what the dark

9    meant.

10           THE COURT:  That's true.  You need to clarify.  I

11   think you were just using a phrase as opposed to the time of

12   day.  Make the question clearer.

13   BY MR. CREMER:

14       Q    Since this boom swap that occurred at the Sims yard

15   encountered a problem where the improper T4 pin had been

16   manipulated, you would have expected that it would have been

17   tested to make sure that that section at least was properly

18   locking and functioning; right?

19       A    I believe he eventually did test it and that's when

20   the --

21       Q    I just -- now I want to know about when it was in

22   the yard.  Eventually, yes, he may have, but in the yard

23   should he have at that point before he removed it from the

24   yard to the job site.

25       A    We could pull up his testimony.  I could look at it.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    I mean, I'm going from my recollection.

2       Q    I'm asking you as an expert now.  I don't care about

3    your recollection.

4            As an expert witness who knows about ASME and OSHA,

5    when you have a situation like we have in these facts where

6    a critical component of a locking device has been

7    manipulated improperly, should that crane boom have been

8    tested immediately after it had been installed to verify if

9    the T4 pin was fully locked or not?  That's my question.

10      A    And the answer to your question is that it

11   eventually did get tested, and whether it's done at the Sims

12   yard or done at the site wouldn't matter.  And I think I

13   explained --

14      Q    So --

15      A    -- I think my testimony was previously stated that

16   Mr. Farris tested the boom.  First he did the inspection at

17   the job site.  He tested the boom prior to lifting anything,

18   which was appropriate for him to do, at a 72-degree boom

19   angle.  Now, in my mind, whether it's done at the yard or

20   done prior to lifting any components at the job site makes

21   no difference.

22      Q    Okay.  But you agree that he could have tested it at

23   the yard; right?

24      A    Yes.

25      Q    And if he did it at the yard and discovered that the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    hydraulic cylinder was getting stuck on the T4 section, he

2    had some resources there right at the yard?  He had his

3    crane technicians right there he might have been able to

4    consult; right?

5        A    Which he did, yes, and which he also did on the day

6    of the incident.

7        Q    And he could have had that boom after it had been

8    installed in the yard on Friday, the 16th of February, 2018,

9    at the zero position so there wasn't gravity operating on

10   this crane and just scoped out the T4 section?  That's

11   feasible; right?

12       A    You just mentioned gravity wasn't involved and

13   gravity is always involved.

14       Q    You're right.  Outside of gravity, but it was

15   feasible for him to have tested the T4 locking pin and the

16   booming capabilities at the yard on the date the swap was

17   completed?

18       A    As long as he would have configured the crane to be

19   able to do so, like all the counterweights and things of

20   that nature.

21       Q    Maybe, yeah, maybe it involved some extra work;

22   right?

23       A    Yes.

24       Q    You'd have to load counterweights?

25       A    It certainly would have involved extra work, yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    When you have a situation where he was facing where
2   a critical pin had been improperly manipulated, shouldn't he
3   have taken the extra time to take the steps to test that
4   section before he brought it to the job site?
5        A    I don't think it's relevant where he tested it at
6   but he -- he eventually did test it.
7        Q    He didn't test it because he thought it was locked.
8   He thought it was perfectly safe and proper; right?
9        A    I think he believed he locked T4 pin in the proper
10  location.
11       Q    And then the crane is moved to the job site on
12  Saturday and all the counterweights are put on the crane,
13  and it's prepared to be put in to use, and at that time and
14  on that date, he could have checked the functionality of the
15  T4 pin?
16       A    That's correct.
17       Q    And that date you may remember he only tested one of
18  the tele sections and it was T6.  Is that your recollection?
19       A    That's correct.
20       Q    Nothing stopped him from checking if T4 was
21  functioning; right?
22       A    That's correct.
23       Q    If you're -- we get to the day of the accident.  Now
24  we have an active job site.  All the tradesmen are there and
25  they're going to build this tower crane.  Is that your

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    understanding?

2        A    Yes.

3        Q    There's a little more pressure on a crane operator

4    to get that crane into operation to get the job going

5    because if the crane isn't functioning, the job is shut

6    down, isn't it?

7        A    Are you wanting me to assume that he was under

8    greater pressure?

9        Q    I'm asking.

10       A    I don't know one way or not whether he was under

11   pressure.  I think from his testimony he indicated he

12   wasn't.  I can't make that leap that he is under pressure

13   when I don't have any evidence that he was.

14       Q    All right.  Well, would you agree that if the

15   crane's not functioning, the job stops as far as

16   constructing the tower crane?

17       A    Yes.

18       Q    So people might be standing around until they figure

19   out what's wrong with that crane, and whether you know or

20   not, that might have an impact on Burrows and his motivation

21   to get this --

22            MR. GOODMAN:  Object, Your Honor --

23            MR. CREMER:  I haven't even asked my question.

24            MR. GOODMAN:  It's a narrative.

25            THE COURT:  Let him finish his question,

1    Mr. Goodman.  Go ahead, Mr. Cremer.

2    BY MR. CREMER:

3        Q    Given the fact that the crane isn't functioning.

4    He's tried a number of times to get it going.  He may have

5    been under more pressure than to try other things to get it

6    going so that he could get the job moving?  You understand

7    that that's a potential here, isn't it?

8             MR. GOODMAN:  Your Honor, I'm going to object.  I'm

9    not sure if he's asking him a hypothetical.

10            THE COURT:  He can ask the question.  I don't see

11   any probative value of it, but he can ask it and he can

12   answer it.  Go ahead.

13            THE WITNESS:  He may have been, but I don't have any

14   evidence that he was under pressure.

15   BY MR. CREMER:

16       Q    After several attempts on the date of the accident,

17   after several attempts to get this crane properly scoped

18   out, Mr. Farris finally calls his supervisor Mike Gay;

19   right?

20       A    That's correct.

21       Q    And he should have done that?

22       A    Yes.

23       Q    Do you agree that Mr. Farris wasn't a trained crane

24   service technician and was not qualified technically to

25   diagnose whatever mechanical problems might be causing that

1      boom to have a malfunction; right?

2          A    He's a certified operator.  He's certainly qualified

3      to troubleshoot the crane and its operation.

4              Now, if you're talking about a repair, it would be a

5      different story.

6          Q    So he certainly wasn't qualified to service or

7      repair the crane.  Was he qualified to determine whatever

8      the mechanical malfunction was that was stopping that crane

9      from telescoping out, whether the condition was a potential

10     safety issue or not?  Do you think he had that skill set?

11         A    I think he had the skill set to be able to operate

12     the crane per the manufacturer's recommendations.  He called

13     the supervisor.  The supervisor was sending out a technician

14     and then he also talked to another certified operator of

15     three-and-a-half decades to help evaluate what was going on

16     with the crane, and the crane itself actually shows that the

17     pin was properly engaged.

18         Q    I'm trying to understand based on your expertise if

19     you believe that Andrew Farris had the skills to determine

20     whether the malfunction that he was experiencing with that

21     boom being stuck on the T4 section was a mechanical issue

22     that involved potential for a catastrophic collapse?  Did he

23     have those skills?

24         A    He wasn't a technician.  He wasn't a mechanical

25     engineer, mechanic or a technician.

1    Q    Is your answer he didn't have those skills?

2    A    That's correct, but I think he was operating on the

3    day of the incident under being a certified operator.

4    Q    And the crane -- strike that.

5         His supervisor when he calls him tells Andrew

6    Farris, I'm sending out a qualified -- he didn't say

7    qualified.  He said I'm sending you one of our crane techs

8    to the job site to resolve this issue, didn't he?

9    A    To assist in resolving the issue, yes.

10   Q    And do you recall in Andrew Farris' deposition

11   testimony that he said that generally he understood when

12   there's a malfunction in the piece of equipment and he calls

13   his supervisor and they're sending out a tech that he should

14   wait until the tech arrives?  Do you remember reading that?

15   A    I don't remember specifically.

16   Q    Would that make sense to you?

17   A    Yeah.  It makes sense that he would have said that.

18   Q    That's an expensive piece of equipment, and if you

19   were the owner of that equipment and you told your employee

20   that you're sending out a trained person to assess what the

21   malfunction is, you as the owner would expect that your

22   employee is going to wait for the qualified person to arrive

23   on the job site; right?

24        MR. GOODMAN:  Object, Your Honor.  These assumes

25   facts that aren't in evidence.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    THE COURT:  He hasn't been qualified about what the

2    supervisor should have been requiring and what he should

3    have been doing in terms of the supervisor.  So sustained.

4    BY MR. CREMER:

5    Q    You would have expected under any circumstances that

6    Andrew Farris would have complied with Sims policy if the

7    policy was that he was to wait, he should have waited.  You

8    agree with that?

9    A    True.

10    Q    And you said he calls this Bill Piper who's an

11    experienced crane operator who works at Sims.  What do you

12    know about Bill Piper's experience with operating an LTM

13    1500?

14    A    I don't believe he had specific experience for the

15    LTM 1500, but...

16    Q    He didn't have any?

17    A    But he had experience with the same type, similar

18    type equipment that also extends sections separately.

19    Q    Did Andrew Farris call his supervisor Mike Gay and

20    say I'm going to call another crane operator even though a

21    trained mechanic is on his way to get advice?  Did he do

22    that?

23    A    He did not, that I'm aware of.

24    Q    And then this person who had no experience with a

25    crane like an LTM 1500 that had dual booms never did a swap,

 1    never read the manual tells him to put the crane from

 2    computer control to manual control; right?

 3         A    That's correct, however, I believe he did have

 4    experience doing similar type equipment.

 5         Q    Now, if you were the owner of that crane, would you

 6    have liked it if Mr. Farris had called you back to say, I

 7    got this advice to change the mode of operation of this

 8    $3,000,000 piece of equipment from manual -- from automatic

 9    to manual while it has this malfunction?  Would you as the

10    owner like to have called to ask permission to do that?

11              MR. GOODMAN:  Object, Your Honor.

12              THE COURT:  Sustained.

13    BY MR. CREMER:

14         Q    Do you have any opinion as to whether or not Andrew

15    Farris should have contacted his supervisor to ask

16    permission to put it into manual mode?

17         A    I don't think he needed to do that.

18         Q    Well, the boom collapse didn't happen until he did

19    that; right?

20         A    Well, the boom collapse didn't occur until after the

21    cylinder was disconnected from T4.

22         Q    And in the sequence of time, it happened when the

23    crane function was changed from automatic to manual; right?

24         A    It occurred after it was changed to manual.

25         Q    That was my question.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1              Now, let's talk about the Safety Bulletin.  Pull it

2       up.  Plaintiff's Exhibit 15.

3              You said you are familiar with this document.

4       You've read it a few times?

5         A    That's correct.

6         Q    Is there any written instruction in the safety

7       bulletin that tells the crane owner or operator what steps

8       to take if a T4 pin is inadvertently manipulated?

9         A    What exhibit is this?

10        Q    15, it's the one in front of you.

11             THE COURT:  If you want to look at a paper copy,

12      it's 15 in that binder.

13             THE WITNESS:  Your question again?

14      BY MR. CREMER:

15        Q    If the bulletin content has any instruction which

16      tells the crane owner what steps to take if the T4 pin is

17      inadvertently manipulated.

18        A    It does not.

19        Q    Does it tell the crane operator to stop using the

20      crane until he verifies that the T4 pin is set to a

21      particular dimension if it's improperly manipulated?

22        A    It does not.

23        Q    In fact, does that Safety Bulletin which is the

24      correct pin and which is the incorrect pin, the number T3,

25      T4?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    T3 is mentioned.

2      Q    Look at the bulletin and tell me, is there a

3  specific reference to the incorrect locking pin in this

4  bulletin being the T4 pin or just does it say make sure you

5  only manipulate the correct pin?

6      A    It doesn't say only the T3 pin, however, the last

7  sentence on the first page, "in the future you will be

8  receiving a product retrofit of the cover plate for locking

9  pin for both 3 and 4."

10     Q    That doesn't say only manipulate the T4 pin, does

11 it?

12     A    It --

13     Q    Anywhere in the Safety Bulletin does it say that?

14     A    It does not.

15     Q    So if Andrew Farris had this Safety Bulletin prior

16 to the date of the accident and read it, that doesn't tell

17 him specifically to not manipulate the T4 pin, does it?

18     A    This is only one piece.  To answer your question, it

19 does not, however, this is only one piece of information

20 that is excluding both the retro plate and the warning

21 labels that adhere to the boom.

22     Q    It says, "in light of a recent event."  The first

23 sentence there, it says, "recent event," singular as

24 written.  Do you see that?

25     A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     Q   Do you know whether that event that led to the

2    issuance of this Safety Bulletin had anything to do with a

3    T3 dust cover accidentally being left on a boom?

4     A   I did not.

5     Q   Do you know if the redesign of the dust cover from a

6    single to a double plate had anything to do with the dust

7    cover accidentally being left on a boom before it's inserted

8    into the crane?

9     A   I do not.

10    Q   You hold Shane Burrows responsible for improperly

11   manipulating the T4 pin, and the improper manipulation of

12   the T4 pin was a cause of the accident?

13    A   Yes.

14    Q   None of your opinions contained in your report are

15   critical of the training performed by Henry Ward in January

16   or February of 2017 to Sims Crane; correct?

17    A   That's correct.

18    Q   And you are not critical of the Operator's Manual

19   for the LTM 1500 that was written by Liebherr Germany

20   because that was not part of your scope of work?

21    A   I disagree with that.  I think I have excerpts of

22   the manual in my book or in my report that specifically

23   talks about the lack of a warning.

24    Q   Do you remember giving your deposition, sir?

25    A   Been some time.

1          Q    Well, do you remember me asking you questions?

2          A    Oh, yeah.  I remember you asking me questions.  I

3     don't remember exactly what questions you asked.

4          Q    We are going to go over one of them.  Page 61,

5     Counsel, line 10.

6              "Q    None of your opinions anywhere in

7          your report are critical of the training --

8          Oops, that's not the one I wanted to ask.

9          Excuse me.

10             Line 25, at page 61.

11             "So you're not critical of the manual that was

12    prepared by Liebherr Germany in any way?

13             "A    It wasn't part of my scope of work."

14         Did you give that answer to that question, sir,

15    under oath?

16         A    I must have.

17         Q    You're aware that this wasn't the first boom swap

18    that was performed by Mr. -- strike that.

19             You were not aware -- start over.

20             Are you aware whether or not the boom swap on

21    February the 16th, 2018 was the first boom swap that Andrew

22    Farris ever performed?

23         A    It was not.

24         Q    All right.  How many did he do?

25         A    Several.  I think it was up in between 3 and 6 or

84

1    somewhere around that ballpark.

2        Q    Okay.  And so if he did 3 to 6 boom swaps properly

3    and safely, does that suggest to you that he had the skill

4    set to do a boom swap?

5        A    Yes.

6        Q    And you're aware from looking at the OSHA report

7    that Sims Crane admitted that they had performed over 35

8    boom swaps safely and successfully; right?

9        A    Yes.  I remember the 35 number, yes.

10       Q    And both Andrew Farris and whoever did the rest of

11   those 30 some boom swaps did so without the Safety Bulletin;

12   correct?

13       A    That's correct.

14       Q    And they did so without the revised plate; correct?

15       A    That's correct.

16       Q    They did so without the additional warning stickers

17   on the boom; correct?

18       A    That's correct.

19       Q    Do you know how many LTM 1500s are out in the

20   marketplace before this safety campaign and Retrofit Kit was

21   even issued?

22       A    I do not.

23       Q    Would you be surprised if it's a couple hundred?

24       A    No.

25       Q    And if Liebherr was not aware of any incident of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    improper manipulation of the T4 pin before they issued the

2    Safety Bulletin, would that suggest to you that the

3    procedure set forth in the manual is a dependable way to

4    instruct customers on how to swap out booms safely and

5    properly?

6        A    Are you talking about Liebherr US or Liebherr

7    Germany.

8        Q    I'm talking about Liebherr anywhere.

9        A    Want to repeat that question again?  You're talking

10   about both Germany and U. S.?

11       Q    I'm talking about the population of Liebherr LTM

12   1500s that are out in the market being used day in and day

13   out for a period of time before the Safety Bulletin is

14   issued.  There had to be hundreds or thousands of boom swaps

15   that took place with that population.  You agree with that;

16   right?

17       A    I don't know that to be true.

18       Q    And if you were to assume that there's been no

19   report of any incidents of improperly manipulating the T4

20   pin, does that suggest to you that the manual as it existed

21   with the information on how to do a boom swap was a

22   dependable resource in order to perform that swap?

23       A    Yes, except for the warning of incorrectly

24   manipulating the pin 4.

25       Q    Is it your understanding that at the time of this

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    accident, February 19th, 2018, that the safety campaign to

2    send out both the Safety Bulletin and the Retrofit Kit was

3    over or still active and underway?

4        A    It certainly would still be underway because all the

5    manufacturers hadn't been provided -- or not the

6    manufacturer.  All the owners hadn't been provided the

7    retrofit material.

8        Q    Some customers had been provided with the bulletin

9    and the Retrofit Kit before February 19th, some after

10   February 19th; correct?

11       A    That's correct.

12       Q    And do you have any idea how many, we call them MOD

13   campaigns, modification campaigns that Liebherr had ongoing

14   in and around that time period?  Do you think it was just

15   the single campaign?

16       A    I don't know one way or the other.

17       Q    The evidence here, there were several hundred, 6 or

18   700 campaigns simultaneously being organized and effectuated

19   by Liebherr US.  Would that surprise you?

20       A    For the LTM 1500?

21       Q    No.  No, on their entire line of products.

22       A    Seems high, but wouldn't surprise me.

23       Q    You have no basis to say whether it's high, low or

24   anything because you just don't know?

25       A    It seems high.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
 1        Q    All right.  Do you remember reviewing the testimony
 2   in the depositions of Andrew Farris and Jason D'Angelo where
 3   they testified under oath they were properly trained on boom
 4   swaps by Liebherr and that the accident would not have
 5   occurred if they simply followed the procedures set forth in
 6   the operator manual?  Do you remember reading that
 7   testimony?
 8        A    I don't remember reading that specifically, however,
 9   if they would have only manipulated the T3 pin, then the
10   accident wouldn't have occurred.
11             MR. CREMER:  Thank you, Mr. Bond.
12             THE COURT:  Any redirect?
13             MR. GOODMAN:  Yes, Your Honor.  I apologize, Judge,
14   I'm just trying to find my space.
15             THE COURT:  You're fine.  You're giving Ms. Miller
16   the break that she's very excited to have.
17             MR. GOODMAN:  Thank you very much.
18                    REDIRECT EXAMINATION
19   BY MR. GOODMAN:
20        Q    I'm going to show you what's been marked as Exhibit
21   464.  Do you recall being asked the question by Defense
22   Counsel as to whether or not Sims should have had Shane
23   Burrows as part of the Liebherr training on the LTM 1500?
24        A    Yes.
25        Q    And I'm going to show you the second page of this
```

1    Exhibit IAI0504, and at the time of the training it was

2    January 30th, 2017 to February 4th, 2017.  Do you see that

3    as the dates of training?

4        A    Yes.

5        Q    And then the last sentence of the objective says,

6    "Liebherr will provide this training to the persons that are

7    designated by the employer as the crane operator."  Do you

8    see that?

9        A    Yes.

10       Q    Between January of 2017 and February 4th of 2017, do

11   you understand that Mr. Burrows was not a certified crane

12   operator for this crane?

13       A    That's correct.

14       Q    And could that be a reason that he was not noted as

15   an operator for training for this crane?

16            MR. CREMER:  Objection, calls for speculation.

17            THE COURT:  I'll allow this question, if he knows.

18   BY MR. GOODMAN:

19       Q    Would that be a reason?

20       A    Yeah.  I believe Mr. Burrows was certified after

21   this training.

22       Q    Now, you had mentioned and you were asked about the

23   cause of the LTM uncontrolled retraction of section 6, 5 and

24   4 and those being the acts of Mr. Burrows and Mr. Farris

25   manipulating the T4 pin.  Do you recall that?

1    A    Yes.

2    Q    Now, in your opinion and with your investigation

3    that you conducted, is it your opinion that the Product

4    Safety Bulletin, cover plate, retrofit stickers and all of

5    the documents that went along with that would have prevented

6    that mistake?

7    A    That's correct.

8    Q    Based on your investigation, your training, your

9    experience and this case, is it your understanding that

10   that's why those types of Product Safety Bulletins are, in

11   fact, issued to prevent those types of mistakes?

12   A    Yes.

13   Q    Is it your opinion that the product retrofit plate,

14   Product Safety Bulletin, warnings stickers and the

15   information that goes along with that would have prevented

16   everything that was done by Farris and Burrows?

17          MR. CREMER:  Objection, calls for speculation.

18          THE COURT:  Overruled.

19          THE WITNESS:  From testimony from Mr. Peek who was

20   VP of -- I forgot his complete title.

21   BY MR. GOODMAN:

22   Q    Bob Berry?

23   A    No.  Mr. Peek as well as Mr. Berry, both of them

24   testified that if they had the Retrofit Kit it would have

25   been implemented and the operators would have been trained

1    on what the hazards would have been for the pin 4,

2    manipulation of the pin 4 pin.

3        Q    Are Product Safety Bulletins in your experience

4    published to prevent operator error and the error of the

5    operator's team?

6        A    Certainly can be.

7        Q    Would it be more prudent for an operator to test a

8    crane at its own yard or the actual job site where the crane

9    is actually going to be used?

10       A    Well, if it would be done prior to getting to the

11   job site, I think he would still have to do it at the job

12   site.

13       Q    In your investigation and training and experience

14   and your review of this file, is there any evidence that you

15   found that would suggest that Mr. Farris would have had more

16   resources if he would have done the testing at the yard?

17       A    I don't know really one way or the other.  I think

18   he utilized the resources.  He had the cellphone numbers of

19   the people he needed to speak with and he did so on the day

20   of the incident.

21       Q    In your opinion, who's ultimately responsible for

22   causing the uncontrolled retraction of boom sections 6, 5

23   and 4 leading to the damages associated with the crane on

24   February 19th, 2018?

25            MR. CREMER:  Objection.  That calls for Your Honor's

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    conclusion, not this witness.

2         THE COURT:  He can offer his opinion.

3         THE WITNESS:  I believe Liebherr US if they would

4    have prudently, expeditiously provided this information,

5    this retrofit plate and its labels to Sims, the accident

6    wouldn't have happened.

7    BY MR. GOODMAN:

8         Q    And were all the opinions that you gave today to a

9    reasonable degree of mechanical engineering certainty as

10   well as origin and cause investigation?

11        A    Yes.

12        MR. GOODMAN:  Thank you, sir.

13        THE COURT:  Okay.  Mr. Bond, you can just take off

14   your microphone and step down.  It's noon.  Seems like the

15   most natural time to break for lunch.  So it's my

16   understanding that just Mr. Vigilante is testifying this

17   afternoon.

18        MR. GOODMAN:  That's correct, Your Honor.

19        THE COURT:  Did the defense -- if Mr. Vigilante does

20   not take the entire afternoon, would the defense like to

21   call its first witness or are you scheduled to have them be

22   called Friday?

23        MR. CREMER:  We have experts that flew in that are

24   prepared to go tomorrow, and we had an understanding.  If

25   the Court -- we should have probably checked with you as

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    well.

2          THE COURT:  It's fine with me.  We can go off the

3     record.

4    (Lunch recess had at 11:57 p.m.)

5    (Proceedings resumed at 1:54 p.m.)

6          THE COURT:  Anything to address before Mr. Goodman

7     calls his next witness?

8          MR. CREMER:  Not from the defense.

9          MR. GOODMAN:  Not from the plaintiff, your Honor.

10          THE COURT:  Mr. Goodman.  Go ahead and call your

11    next witness.

12          MR. GOODMAN:  We please call Dr. William Vigilante.

13          THE COURT:  Mr. Cremer, we talked about defense

14    Exhibit 94 that you were going to move for admission.

15    Mr. Goodman, any objection?

16          MR. GOODMAN:  No, Your Honor.

17          THE COURT:  Then Defense Exhibit 94 is admitted.

18     (Defendants' Exhibit No. 94 was admitted.)

19          THE COURT:  If you could just stand right there,

20     yes, and raise your right hand.

21    (Witness sworn.)

22          THE WITNESS:  Yes, ma'am.

23          THE COURT:  Thank you.  Please be seated and state

24     your name for the record spelling your last name.

25          THE WITNESS:  My name is William John Vigilante, Jr.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    V, as in Victor, i-g-i-l-a-n-t-e.

2            THE COURT:  Thank you.  Mr. Goodman, whenever you're

3    ready.

4                    WILLIAM JOHN VIGILANTE, JR.,

5    having been first duly sworn under oath, was examined and

6    testified as follows:

7                    DIRECT EXAMINATION

8    BY MR. GOODMAN:

9        Q    Dr. Vigilante, where are you presently employed?

10       A    I work for Vigilante Consulting, LLC, also doing

11   business as Vigilante Forensics.

12       Q    And what do you do at Vigilante Forensics?

13       A    So Vigilante Forensics is hired by typically either

14   insurance companies and/or law firms to investigate

15   incidents that occur either with equipment, with products or

16   in the roadway environment or the building environment.

17       Q    And was Vigilante Forensics hired in this case?

18       A    Yes.

19       Q    And what was the purpose of the hiring of Vigilante

20   Forensics, as you understood it, in this case?

21       A    So the purpose of that investigation and my

22   assignment was laid out in my report.  It was to investigate

23   whether or not Sims was provided with adequate warning

24   regarding the danger associated with adjusting the retrofit

25   cover plate, pin and/or if Liebherr US's failure to provide

1    a safety bulletin in a timely manner was improper in a

2    manner which caused the incident.

3         Q    And did you undertake the necessary methodology to

4    come to a conclusion in that -- with those questions?

5         A    I did.

6         Q    And what area of expertise evaluates that type of

7    area?

8         A    So generally it's a two-step area.  The first is

9    human factors and the second is experience with product

10   safety warning development and the factors that affect the

11   adequacies of warnings and how people perceive risks and

12   warnings, and instructions affect those perceptions and

13   people's behavior.

14        Q    What is human factors?

15        A    Human factors is essentially the science that

16   studies how people interact with or use all different types

17   of products, machines, equipment, and environments.  And

18   from a basic science standpoint, human factors seeks to

19   establish people's abilities and limitations with respect to

20   how they collect information through their senses, how they

21   compile that information, make sense of that information,

22   store that information and then use it to make decisions.

23             We also look at people's physical abilities and

24   limitations and how they affect the way they interact with

25   different types of products and activities and so forth.  At

1    its heart, human factors is an applied science and so we

2    take the information, we learn about people's abilities,

3    limitations and we apply it to the design of products,

4    machines, equipment, environments and so forth.

5         So typically we'll work with engineers, architects,

6    designers for the design of what we call systems.  Systems

7    is essentially the things that we utilize and the people

8    that utilize them to accomplish a goal.

9         And so, for example, in this case, the system would

10    be the crane system, and it includes the crane itself, the

11    people that were operating it or assisting in the operation

12    of it and the information that they were provided for the

13    proper operation of it.

14    Q    And how many years have you been in the human

15    factors field?

16    A    So it started -- my basic training in undergraduate

17    where I earned a degree in psychology and a focus on how

18    people perceive information and process information.  From

19    there I went to graduate school where I earned my Master's

20    degree and Doctorate in human factors or ergonomics

21    psychology.

22         While I was finishing up my Ph.D., I went to work

23    for the IBM Corporation working in the design and

24    development of dozens, if not over a hundred, different

25    consumer commercial products.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          Since 2003 I've been doing the forensic assignments,

2     investigations for the most part full time.  I still work

3     for private companies and private individuals doing

4     traditional human factors consulting, so, for example,

5     helping them with their risk assessments when they're

6     designing and developing products and/or helping them with

7     their warning systems.

8          Q    And where did you go to get your BS in psychology?

9          A    That was from the University of Scranton in

10    Scranton, Pennsylvania.

11         Q    You were awarded that BS in psychology?

12         A    Yes, in 1993.

13         Q    And then where did you get your M.S. in psychology?

14         A    It was in ergonomics psychology.  That was 1997 at

15    North Carolina State University.

16         Q    Were you awarded your Master's?

17         A    Yes.

18         Q    And then where did you get your Ph.D. in ergonomics

19    and psychology?

20         A    Same place, North Carolina State University 2001.

21         Q    And you were awarded your Ph.D.?

22         A    Yes.

23         Q    Did you conduct any research while you're

24    undertaking those degrees?

25         A    Yes.

1        Q    Can you tell us about how some of that research
2    might be applicable to this case?
3        A    So, the seven years I spent at North Carolina State
4    University I worked in the cognitive ergonomics laboratory
5    under the direction of Michael Wogalper.  For some time
6    prior to my involvement with the laboratory to some time
7    after that laboratory was the premier laboratory in the
8    world with respect to research on the factors that affect
9    the adequacy of warnings, how people perceive risks and how
10    warnings affect people's risk perception and behavior, so I
11    published over two dozen articles, research papers in that
12    time frame on the topics related to how to present warnings,
13    how different factors affect warnings and how people
14    perceive risk.
15        After leaving North Carolina State University, I
16    continued to collaborate with Michael Wogalper on projects,
17    research projects related to warnings and risk perception.
18        Q    Have you ever provided any lectures in any
19    professional conferences or educational institutions?
20        A    Yes.
21        Q    Can you describe some of those?
22        A    So both nationally at the Human Factors and
23    Ergonomics Society, at the International Ergonomics
24    Association and other organizations.  Those are what I would
25    refer to as my professional publications or presentations,

1    and so most of them, if not all of them, dealt with topics

2    related to warnings, factors that affect warnings and how

3    people perceive risks and so forth.

4           Over the years I've provided numerous presentations

5    that I wouldn't consider peer review to professional

6    organizations such as insurance organizations or continuing

7    education for attorneys and so forth.  Again, the topics

8    range from everything with regard to product safety to

9    warnings, adequacy warnings to driver and pedestrian safety.

10   Q    Do you hold any published patents?

11   A    I do.

12   Q    Can you tell us about those?

13   A    So the patents, there are seven or eight patents

14   awarded to my work at the IBM Corporation and they are

15   related to different product design development projects

16   that I have worked on while I was with IBM.  So IBM

17   typically technically owns the patents, but they range from

18   ways to improve the communication or transfer of bits of

19   information through wireless channels, and so one of the

20   bigger that I headed up was the introduction of 802.11 which

21   we know as wifi or wireless that we use at our homes and our

22   laptops.

23          I headed up the project from a human factors

24   standpoint at IBM during the initial introduction and

25   integration of those technologies.  The same thing with blue

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    tooth.  I was the head of human factors at IBM for their

2    design development of the early blue tooth and the

3    introduction of blue tooth into their products.

4         I also served as IBM's representative on an

5    international blue tooth design specs organization that

6    we're looking early -- began early days in the blue tooth

7    technology looking at ways to standardize how blue tooth

8    communication is done between devices, developed and sold by

9    manufactures all across the world.

10   Q    Was that all in human factors and ergonomics?

11   A    My role was in human factors and ergonomics, yes.

12   Q    I just want to talk about your work history.  Did

13   you have an opportunity to work at Penn State for a while?

14   A    Yes.  Penn State was my first paid, outside of the

15   research laboratory, position as a human factors or

16   ergonomics professional.

17        And essentially I worked for an outreach program at

18   Penn State University through their Industrial Ergonomics or

19   Industrial Engineering Department, and our assignment was to

20   go out to different industries in the state that have

21   high -- high injury issues, so whether they were related to

22   trauma, physical stress and so forth, and so the assignment

23   was to go out and assess the work places, identify those

24   risk factors that put the workers at risk for

25   musculoskeletal injury, repetitive stress injury and so

1    forth, and then worked with the engineers back at the center

2    to find ways to alleviate those injury risk factors.

3        Q    And you spoke about that you worked at IBM, human

4    factors engineer, as an IBM human factors engineer?

5        A    Yes.

6        Q    Did you already speak to all of that?

7        A    Yes.  So the other thing I was responsible for at

8    IBM was not only designing and development of the user

9    interface which is the controls and displays that the users

10   have to -- that utilize to make the technology work, I was

11   also responsible for the design and development of the

12   warnings in the, oftentimes, instructional information that

13   accompany those products, so whether they were on product

14   warnings, warnings that appeared in the interfaces or

15   warnings that were provided in product manuals, owner

16   manuals and instruction manuals and so forth.

17       Q    While you were at IBM, you undertook the tasks of

18   preparing, publishing warnings for operator's manuals?

19       A    Yes.

20       Q    Did you undertake the task of preparing and

21   publishing warning labels?

22       A    Yes, for our own product.

23       Q    Did you undertake the task of publishing and

24   providing subsequent warnings on products?

25       A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     Q    Did you have an opportunity to work at ARCCA

2  Forensic Scientists?

3     A    Yes.

4     Q    Can you explain what that is?

5     A    It's pronounced ARRCA, and they are a forensic

6  engineering firm in the suburbs of Philadelphia.  At least

7  back in the 2001 time frame, I'm not sure if they expanded

8  to other offices at this point or not, but essentially after

9  I earned my Ph.D., I was looking to transition from North

10 Carolina back to Pennsylvania where I'm originally from, and

11 as part of that outreach, I happened to contact an

12 ergonomist that worked for ARCCA who happened to be the

13 president of the Human Factors and Ergonomics Society,

14 Delaware Valley Chapter, so that's like the local chapter

15 for the national organization.

16        And so I contacted him looking for leads for jobs,

17 and so he was helpful in that area, but he also asked if I

18 had done -- had any background or any interest in doing

19 forensic investigations, and I explained to him that, yes,

20 I'd been trained in doing forensic investigations working in

21 Michael Wogalpe's laboratory helping him with some of his

22 work and that I would be interested.

23        And so they didn't have the opportunity for a

24 full-time position, but they had cases and projects that

25 came up every now and again, and I ended up joining them for

1    about two years as basically an independent contractor or

2    moonlighting while I was employed at the IBM Corporation.

3            And so I handled maybe a dozen or so cases in two

4    years for them.

5    Q    And then after that you went to Fournier Robson

6    Forensics?  F-O-U-R-N-I-E-R, Robson, R-O-B-S-O-N, Robson

7    Forensics?

8    A    Yes.  In July of 2003, I took a full-time position

9    for Robson Forensic, resigned my position at IBM and then

10   resigned my work for ARCCA.  Robson Forensic had a system

11   company called Fournier Robson, and essentially their

12   business model is similar to my current business model where

13   Robson Forensic handles the forensic investigations and

14   Fournier Robson, much like Vigilante Consulting handles the

15   traditional consulting, non-forensic, non-litigation work.

16   Q    And while you were there, how many forensic

17   investigations did you undertake involving human factors and

18   warnings?

19   A    On the order of hundreds.

20   Q    And when you did that, did you work for both the

21   plaintiff's side as well as the defense side?

22   A    Yes.

23   Q    Was it true, sir, that you actually handled cases

24   adverse to my law firm Cozen O'Connor; correct?

25   A    I have.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Are you member of any professional associations?

2      A    Yes.

3      Q    Can you tell us about the professional associations

4  that you're a member of?

5      A    Sure.  A member of the Human Factors and Ergonomic

6  Society which is this country's largest professional

7  organization for human factors and ergonomic professionals.

8  I'm a member of the Certification for Professional

9  Ergonomists which is the Board of certification for

10 professional ergonomics, I should say, is the international

11 organization that looks to certify professionals in the

12 field of human factors and ergonomics.  I'm also a member of

13 the American Society of Safety professionals, the

14 Transportation Research Board and the Illuminating

15 Engineering Society.

16     Q    Have you been certified in ergonomics?

17     A    Yes, I have, to the Board of Certificate of

18 Professional Ergonomics.

19     Q    Do you hold any committee leadership positions in

20 any societies or groups?

21     A    I currently do, and I have other positions in the

22 past, so, for example, in the past I've been the program

23 chair for both the product design and the safety technical

24 groups at the Human Factors and Ergonomic Society.  These

25 are essentially just elected positions and the role of the

1   program chair is to put together the program of research

2   papers and presentations for the annual conference to ensure

3   that the papers are peer reviewed, that they meet minimum

4   requirements for validity, reliability and therefore

5   qualified to be published by the society.

6           Currently, I'm also the alternative representative

7   for the Human Factors and Ergonomic Society on the A-N-S-I

8   or ANSI Z535 standards committee, and ANSI Z535 is the

9   standards committee related to safety information and

10  warnings.

11      Q    Do you have any professional certifications?

12      A    I do have some current and some that have lapsed.

13      Q    Can you tell us about your current certifications?

14      A    So, I don't know that anything is relevant to the

15  current, current case, but my past certifications are

16  probably more relevant and what I currently am certified in.

17      Q    Can you tell us about those?

18      A    Sure.  I have been certified as a forklift operator,

19  also been certified as an aerial lift operator, articulated

20  boom aerial lift operator.

21      Q    And can you describe what type of machinery that is?

22      A    So articulated aerial lift is basically a personnel

23  lift that's mounted to a truck chassis and the type of

24  vehicle that I was certified in with multiple boom sections

25  that collapse through articulated elbows and then raise up.

1          My certifications were up to 150 feet, and

2     essentially they're used for putting workers in elevated

3     positions, so they range from anywhere from a few feet off

4     the ground to, like I said, the certification that I had was

5     for 150 feet.

6          Q    In this case, did you apply your education, training

7     and experience to the incidents that they investigated here?

8          A    Yes.

9               MR. GOODMAN:  Your Honor, I'd like to tender

10    Dr. Vigilante as an expert in human factors and warnings.

11              THE COURT:  Any objection?

12              MR. CREMER:  No objection.

13              THE COURT:  He's accepted as an expert in that area.

14    BY MR. GOODMAN:

15         Q    I'd like to show you what's been marked as Exhibit

16    23.  We just talked about your education, training and

17    experience.  Is this a true and accurate copy of your CV,

18    sir?

19         A    So it looks like an old version of my CV.  It looks

20    to be the version that was current at the time I wrote my

21    report in November 2020.

22         Q    And what, if anything, would be added to this CV

23    that's not on here now?

24         A    So I know there were some editing that was done to

25    correct some grammatical issues.  From a substance

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    standpoint I believe I've added the membership as the

2    alternative rep for the ANSI Z535 committee and, of course,

3    I updated the time frame at the top.  It says 24 years.

4        Q    I'd like to show you what's been marked as Exhibit

5    124.  Can you take a look at at this and let me know what

6    this is.

7        A    This is section G from my November 3rd, 2020 report

8    and it's essentially my summary findings from my

9    investigation in this matter.

10       Q    And what was the purpose of your investigation in

11   this matter?

12       A    So it was to determine if Sims was provided with

13   adequate warning regarding the danger associated with

14   adjusting the wrong pin and/or if Liebherr US's failure to

15   provide the Safety Bulletin in a timely manner was improper

16   in a manner which caused the incident.

17       Q    What were the materials that you used in obtaining

18   facts and data for your investigation?

19       A    So there were numerous documents that were

20   discovered, documents that were produced by Sims that I had

21   an opportunity to review as well as some of the pleadings

22   and the Complaint.  There were also discovery documents that

23   were produced by Liebherr.

24            I had the opportunity to review the deposition

25   transcripts and exhibits of multiple witnesses including

1    Andrew Farris and Shane Burrows, Christopher Peek, Henry Ray

2    Ward, Karl Redman, Ralf Vieten Apel and Trina Elizabeth

3    Baughman.

4         I had an opportunity to review some of the Liebherr

5    marketing and technical data and operating instructions

6    related to the subject model crane.

7         I had an opportunity to review multiple photos of

8    the subject crane and an exemplar crane and some photographs

9    of the Safety Bulletin retrofit instructions and manual

10   additions that were provided to Sims after the incident.

11        I also had the opportunity to have a fairly long

12   teleconference with multiple Sims employees and Jim

13   Wiethorn, and then I had the opportunity to review the

14   reports of Anthony Bond and Mr. Thomas Eager.

15   Q    And what was the purpose of your interviews and

16   conferences with the Sims employees?

17   A    So I believe that the purpose was to gather

18   information as to what happened, how it happened, where it

19   happened, why it happened and so forth to give background

20   information, information on the incident, and it was before

21   their deposition testimony was available, so I believe that

22   they were multiple of the Sims employees hadn't been deposed

23   at that time, and so I wanted to get information directly

24   from the people involved.

25        I also had an opportunity to review the OSHA, OSHA

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  documents and the OSHA report as well.

2      Q    Now, were all the methods that you undertook to

3  evaluate this case based on reliable scientific principals

4  and industry standards?

5      A    Yes.

6      Q    And were your methods of evaluation and analysis and

7  your conclusions reached to a reasonable degree of human

8  factors certainty?

9      A    Yes.

10      Q    Can you describe the scientific and technical

11  principals you relied on in reaching your conclusions that

12  we see in this exhibit?

13      A    Certainly.  So one of the methodology --

14  methodologies I employed is consistent with conducting a

15  risk assessment or hazard analysis, and then in that you

16  identify hazards associated with the foreseeable uses and

17  misuse of the product.

18        And so one of the things I wanted to do is to

19  understand how the product is used and understand how it can

20  potentially be misused as it was relevant to the topics that

21  I was investigating in this incident, and so that came from

22  reviewing the manuals, reviewing the information from the

23  Sims employees, reviewing the OSHA report, reviewing the

24  deposition transcripts and exhibits and so forth from the

25  Sims employees and the Liebherr US trainers and so forth.

1    And so basically through that analysis, it became

2    clear that there was a hazard associated with adjusting an

3    incorrect locking pin.  In this case it was the T4 pin.

4    Based upon my review of the documents and analysis

5    and how the crane was set up, it was apparent that

6    inadvertently manipulating the T4 pin was a foreseeable

7    potential compared to the other pins; namely, because the T4

8    pin was exposed at the same time the T3 pin, which is the

9    pin that should be manipulated, was also exposed, and so the

10   other pins on the nesting sections of the boom are not

11   exposed while inserting the nested boom sections into the

12   base boom sections.

13   Of course Liebherr Germany had identified this and

14   started their Product Safety Bulletin process.  And, of

15   course, this is consistent with the incident that occurred

16   in February with the Sims crane, and so that's how I

17   conducted my methodology.

18   And the documents I relied upon to come to the first

19   conclusion listed on the exhibit, and that conclusion is

20   that the manipulation of the T4 pin creates a hazardous

21   condition that the users of the crane needed to be aware of

22   to safely operate the crane.

23   And so once the hazard is identified with the

24   foreseeable use and misuse of the product, a risk assessment

25   also looks at how you're going to address the hazard, and

1    what we apply from a design safety standpoint and product

2    safety standpoint is the design safety hierarchy, which

3    essentially just means that once you identify the hazard,

4    you want to take steps to eliminate or minimize the

5    potential for that hazard to exist.

6        Q    And in your experience working for manufacturers, is

7    it the manufacturer's responsibility to comply with this

8    hierarchy?

9        A    They are.  But it's also everyone that's involved in

10   the selling of the product, so it also involves the

11   distributors and end sales.  And so they all have the

12   opportunity before it gets to the customer to identify

13   hazards and to address them, and that's laid out in the

14   product safety literature or product safety standards.

15       For example, the National Safety Council notes in

16   their Action Prevention Manual that it's the responsibility

17   of the people that are involved in the chain of commerce

18   from the designer, manufacturer, distributor to seller and

19   so forth.

20       Q    So it would be your opinion in this case that not

21   only Liebherr Germany had a responsibility to undertake and

22   implement the necessary safety hierarchy, but it would also

23   be Liebherr US's responsibility to do the same?

24       A    Yes, the sales arm.  So the second -- not only --

25   not all hazards can be eliminated or substituted, so, for

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    example, falls from height are associated with balconies and

2    bridges and you can't eliminate the bridge or the balcony or

3    you lose the ability of the balcony or the bridge, and so

4    when you can't eliminate through design, you look to provide

5    guarding and safety features.

6         And so, you know, a very familiar guard is the

7    railing on a balcony or the guardrail on a bridge.  It's to

8    separate the user from the fall hazard, and so guards and

9    safety features are just that.  They're there to separate

10    the user from a hazard.

11        So the plate that was part of the Product Safety

12    Bulletin is a safety feature, and its intent is to reduce

13    the likelihood that someone would adjust the wrong opinion.

14    It doesn't preclude, doesn't eliminate the hazard, so much

15    like the railing on the balcony doesn't eliminate the fall

16    hazard, but it reduces the risk of somebody falling over,

17    and the guardrail on the bridge doesn't eliminate the fall

18    hazard from the bridge, it reduces the risk associated that

19    a car is going to inadvertently go off the bridge.

20        So that's the role the plate was playing, was to

21    reduce the likelihood that someone would inadvertently,

22    inadvertently probably manipulate the wrong pin, the T4 pin,

23    like I said earlier because it was exposed when the T3 pin

24    needed to be manipulated or potentially exposed when the T3

25    pin needed to be manipulated.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    Is the plate that you're referencing Exhibit 19?

2      A    So I'm not sure if this is marked as an exhibit, but

3    it's right here (indicating).

4      Q    Is that same or similar to what's in Exhibit 19?

5      A    Yes.

6      Q    You were talking further about the safety hierarchy.

7      A    Yes.  So oftentimes with respect to guarding and

8    safety features, if user interaction is required or if it's

9    possible for the guard to be removed or there's a need for

10    the guard to be removed, warnings are often provided to

11    supplement that guarding.

12         In those cases, the warnings there is to alert the

13    user to the presence of the guard, the purpose of the guard,

14    what can happen if the guard is overcome, removed or what

15    have you, and then the hazard or the consequences that the

16    guard was there to protect you from.

17         And so, for example, in this case, there was a

18    safety bulletin that accompanied the guard, and so it acts

19    as a supplement to the safety feature that Liebherr Germany

20    provided after they recognized the hazard associated with

21    the foreseeable manipulation of the incorrect pin during the

22    assembly process.

23      Q    I'm showing you what's been marked as Exhibit 15.

24    Is this the Product Safety Bulletin that you're referencing?

25      A    Yes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q     And can you explain to us the importance of the

2   language in the Product Safety Bulletin, how it would affect

3   a human reading it and then working on the LTM 1500?

4      A     So essentially what's happening with the Product

5   Safety Bulletin, what it's communicating is information that

6   was missing in the operating manual for the crane and was

7   missing from the training provided by Liebherr US.  So the

8   Product Safety Bulletin is calling attention to the fact

9   that it's possible during assembly to have the incorrect pin

10  or an incorrect pin can be manipulated.

11          And then if it is manipulated, and it's not set back

12  to -- dealt with correctly, there is a risk of an

13  uncontrolled collapse of the boom.  And, of course, the

14  uncontrolled collapse of the boom can result in property

15  damage, serious personal injury or possible loss of life as

16  specifically noted in the Product Safety Bulletin.

17          And so this is important information because it's

18  key information that's missing from the manual and missing

19  from the training and was missing from the operator of the

20  crane at the time that was relevant to this incident, that

21  is, Andrew Farris.  And so it provides a key role in filling

22  those knowledge gaps that were so important in identifying

23  the potential -- identifying the hazard with that potential

24  and identifying what needed to be done to prevent negative

25  consequences.

1      Q    Is it your understanding this Product Safety

2   Bulletin, Exhibit 15, came with a retrofit cover plate

3   document, Exhibit 17?  Did you have an opportunity to review

4   that?

5      A    Yeah.  So the retrofitting of the cover plate

6   document was included with the plate.  And it gives --

7   again, it gives more information on what the issue is and

8   how to install the plate and warning labels that accompanied

9   the plate.

10     Q    And did the Product Safety Bulletin, the retrofit

11  cover plate, the retrofitting of cover plate document also

12  come with warning stickers, Exhibit 20?

13     A    It did.

14     Q    And can you explain to us why warnings are

15  important?

16     A    So warnings are used to alert users, for example,

17  the crane operator to hazards associated with the uses and

18  foreseeable misuse of equipment.  They inform the operator

19  of the potential for the hazard, specifically how to avoid

20  it and the consequence for not heeding the warning for being

21  exposed to the hazard.  And so the intended purpose of the

22  warning is to communicate information that is otherwise not

23  available or otherwise may not be available.

24          And the goal of the warning is to provide the

25  operator with sufficient information to understand the --

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   that there was a hazard, how to avoid it and the

2   consequences for not avoiding, to motivate them to act in a

3   safe fashion, act in a fashion that improves safety, to

4   change their behavior.

5          So if an operator is not aware that there's a

6   hazard, not aware of the consequences of their actions, not

7   aware of the proper actions, they can be exposed to the

8   consequences and suffer those consequences.

9          And so the warning is intended to get them to change

10  their behavior by providing them with the knowledge they

11  need to understand the ramifications of what they're doing

12  or what they've done, to either prevent them from doing it

13  or to prevent them from doing something else once they've

14  done something.

15         So, for example, in this case, it's my opinion that

16  it was foreseeable that, for whatever reason, the T4 pin can

17  be manipulated based upon its location, based upon its

18  appearance and based upon how it was actually manipulated, I

19  think the same tool that was used to manipulate the T3 pin

20  and the T4 pin.

21         And so it wasn't a question of if.  It's a question

22  of when.  And so the knowledge needed at that point is,

23  okay, it happened.  For whatever reason it happened.

24  Whoever did it, we've been alerted to it.

25         Now what?

1        And now what is that Andrew Farris and the Sims

2    folks didn't know at the time of Shane Burrows inadvertently

3    manipulating the pin, and so they moved and acted based upon

4    from that point based upon the information they had which

5    was lacking because of the failure of Liebherr US to provide

6    them with the information that Liebherr Germany put together

7    through the Product Safety Bulletin and through the letter

8    that accompanied the plate and through the addition to the

9    manual that Liebherr Germany provided in conjunction with

10   the letter and the plate.

11   Q    What did you understand the risk associated with the

12   Liebherr LTM 1500 crane to be in this case?

13   A    So the risk is that inadvertently manipulating T4

14   and not putting it back to the calibrated setting could

15   result in the uncontrolled collapse.  It interfered with the

16   grabber bar as you're booming in and out the different

17   sections of the boom.

18   Q    Did you have an opportunity -- strike that.

19        I'm going to show you what's been marked as Exhibit

20   26.  It's on the left side of your table in front of you.

21   Did you have an opportunity to review the Liebherr mobile

22   crane with telescopic boom 1500-8.1 Operator's Manual?

23   A    Yes.

24   Q    And based on your review of it, did it provide a

25   reasonable warning against the risks that you identified in

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1     the Liebherr LTM 1500?

2         A    They did not.  It did not.

3         Q    And why do you say that, sir?

4         A    So there are particular sections of the manual that
5     are relevant as to what Andrew Farris and Shane Burrows were
6     doing both on the Friday before and the Monday of the
7     incident or the date of the incident, and so looking at
8     those sections, they failed to communicate, A, that the T4
9     pin should not be manipulated.  If it is manipulated it has
10    to be set back to factory calibration.  And if not, you're
11    risking the potential for an uncontrolled boom collapse.

12            So, again, that's exactly what happened and it's
13    exactly what Liebherr Germany identified prior to sending
14    out the product safety notice in November of 2017.

15        Q    You conducted interviews with both Andrew Farris and
16    Shane Burrows?

17        A    Yes.

18        Q    And you reviewed their deposition transcripts?

19        A    Yes.

20        Q    And based upon your interview with them and the
21    deposition transcripts, are you of the opinion whether they
22    were at the time of February 16th, 2018 through
23    February 19th, 2018 aware of the risk associated with
24    manipulating the T4 pin?

25        A    So I am -- I am aware that they were not.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q    And how are you aware of that?

2        A    Based upon their statements, based upon the OSHA,

3    OSHA report and its findings, based upon their testimony and

4    based upon their actions and based upon my review of the

5    manual which fails to communicate that information and based

6    upon my understanding of what training Liebherr US provided

7    and what Henry Ward and his partner Karl Redman testified

8    that their knowledge was at the time.

9        Q    And do you have an understanding of what the

10   training was that Henry Ward conveyed to Andrew Farris about

11   manipulating the T3 pin?

12       A    Yes.  It's my understanding that based upon their

13   training, Andrew Farris had understood that the T3 pin was

14   the pin that needed to be adjusted, that the T4 pin was not

15   involved in the swapping of the booms, only T3, and that

16   they were to run it down and to run it up fully.

17           That was the extent of the knowledge that Henry Ward

18   had provided them.

19       Q    And in the study of human factors and ergonomics and

20   warnings, would it be reasonable for an operator or someone

21   working on a piece of machinery or crane like this to

22   understand that how you manipulate one piece of equipment,

23   you could manipulate the same identical piece of equipment

24   the same way?

25       A    Sure.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Is there anything that you found in the Operator's

2  Manual that conveyed that the T4 pin should not be

3  manipulated in any way?

4    A    The relevant sections are silent on the T4 pin.

5    Q    In the study of human factors and ergonomics, would

6  it be reasonable for someone who was reading an Operator's

7  Manual to understand that the manner and method by which you

8  can work on one piece of equipment you could do the same to

9  an identical component of the equipment?

10    A    So that does happen often.

11    Q    Is that one of the purposes for warnings and guards?

12    A    It is.  So the guard helps prevent or reduce the

13  risk that occurs and then the warning, again, is intended to

14  communicate that the operator, that they shouldn't do

15  something or if they do something their -- there are

16  consequences associated with that that can result in injury

17  or damage.

18    Q    Now, as we discussed, Liebherr Germany published and

19  provided a Product Safety Bulletin, Exhibit 15.  Can you

20  explain to us how this Product Safety Bulletin -- Product

21  Safety Bulletin would affect a reader who had already read

22  the Operator's Manual?

23    A    So, again, it provides them with information that's

24  missing from the manual and was missing from their training

25  and specifically it puts them on alert that if they were to

1    inadvertently, for whatever reason, manipulate one of the

2    wrong locking pins that there could be catastrophic

3    consequences.

4        Q    And I'll show you -- what would be the catastrophic

5    consequence?

6        A    Well, the boom can collapse and you have a

7    free-falling boom structure block and maybe a hook and

8    whatever may be on the hook.

9        Q    And is that reasonably articulated in this Product

10   Safety Bulletin, Exhibit 15?

11       A    I think that based upon the Product Safety Bulletin

12   Andrew Farris and Sims were aware of the consequences.

13       Q    And I'm going to show you again Exhibit 17.  Now,

14   does this document with its page one, two -- with its six

15   pages, does this add anything to the Product Safety Bulletin

16   that we just looked at and the Operator's Manual that would

17   reemphasize any sort of warning or instruction to a user of

18   the Liebherr LTM 1500?

19       A    Yes.  The package that accompanied the plate

20   provides more context as to the issue being the T3 and T4

21   pins together, so the Product Safety Bulletin just said pin.

22   I don't believe it referenced specifically T4, but in the

23   documents that accompany the retrofit cover plate, it

24   specifically dealt with the T4 pin.

25       Q    Then I want to direct your attention to Exhibit 20.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    These are warning stickers.  Is that your understanding?

2        A    Yes.

3        Q    And those warning stickers would be placed on the

4    84-meter boom section as reflected in Exhibit 21?

5        A    Yes.

6        Q    Now, do the warning stickers add even more to what

7    we've already looked at?

8        A    Yes.  So the warning stickers and the plate provide

9    a manner or provide a way to reduce the likelihood of

10    someone inadvertently touching the wrong pin and communicate

11    that that pin should never be touched.

12        Q    And how is that communicated in this way?

13        A    So, the plate precludes being able to access it if

14    the plate is installed, and then when the plate's removed,

15    both pins are accessible.  With the plate installed, the

16    pictograph said -- or on the different sides communicate to

17    the operator again which pin should be manipulated and which

18    pin should not.  The pictographs that are pasted on either

19    side of the two pinholes and the pin T3 pin, again,

20    reinforce which pin should be manipulated and which pin

21    should never be touched.

22        Q    In your study of ergonomics and human factors, would

23    a warning like this, like the stickers next to each pin,

24    stay with -- would that knowledge stay with an operator or

25    user of the equipment, or once they stop looking at that, do

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    humans automatically forget what they previously have seen?

2        A    So if it's relevant to their task and it's something

3    that they're particularly -- they're repetitively exposed

4    to, it's something they're going to recall.  So certainly

5    viewing one sticker at one point in time that's not relevant

6    to you, I can't say it's going -- people are going to

7    remember it.  But if it's relevant to their tasks, it

8    integrates with the information and the knowledge they

9    already have, and particularly if they've been repeatedly

10   exposed to it they will remember it.

11       Q    And you were able to interview Shane Burrows in this

12   case?

13       A    Yes.

14       Q    You were able to review his deposition transcript?

15       A    Yes.

16       Q    And based upon those interviews and the deposition

17   transcripts, how do you understand that this warning plate

18   and warnings would have affected Shane Burrows?

19       A    So had the plate and the stickers been available and

20   on the crane, he would have never manipulated the wrong pin.

21       Q    And how do you know that?

22       A    So it's my understanding based upon the statement

23   from Burrows, the OSHA report and his deposition, that the

24   reason he inadvertently manipulated the T4 pin was because

25   the cover plate was on the T3 pin, and so this retrofit

1    plate does away with that round plate and therefore the

2    plate would have been on the section when it was inserted

3    into the crane or he would have taken it off before it was

4    inserted into the section, into the base section of the

5    crane.  And he, again, would have been reinforced as to

6    which pin was appropriate to manipulate and which pin he

7    should never manipulate.  And, of course, the reason he

8    didn't see that he manipulated the T4 pin was because the T3

9    pin was covered as it came into the base section.  He saw it

10   go by and he was waiting for the first exposed pin which

11   happened to be T4.  With this cover plate, that never

12   happens.

13          MR. CREMER:  I object to this testimony about the

14   cover plate.  This expert has never disclosed any opinions

15   whatsoever concerning the impact of the cover plate in

16   preventing this accident.  These are new opinions, never

17   been disclosed and I object.

18          THE COURT:  Any response?

19          MR. GOODMAN:  I don't think these are new opinions

20   at all.  They're encapsulated in the opinions that he's put

21   forward.  Just because the defense did not inquire into this

22   information in their deposition does not mean they're new to

23   Dr. Vigilante.

24   BY MR. GOODMAN:

25      Q    If we go back to his summary findings,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1 Dr. Vigilante, can you point out to us where your summation

2 of the lack of warnings reflect that they would have

3 affected the user?

4  A So No. 10 specifically.  No. 10 specifically.

5   THE COURT:  Looks like there's something about

6 warnings in general.  Was that referencing -- scroll back

7 up.  That's sufficient.  The objection is overruled.

8   MR. CREMER:  One other point if I can, your Honor

9 and I'll be quiet, if you tell me not to say it.

10   THE COURT:  Pardon?

11   MR. CREMER:  My objection was that he's testifying

12 that the plate acted as a physical barrier to prevent the

13 accident, not the warnings.  That's an opinion that he never

14 before offered in this report or by this expert.  That was

15 my objection.

16   THE COURT:  Oh, and my understanding is that he's

17 testifying to the information that he identified a potential

18 hazard.  I'm not going to consider it whether there was a

19 physical inability to.  I think we've had sufficient

20 testimony already on that.

21   MR. CREMER:  Thank you, Judge.

22   THE COURT:  Go ahead.

23 BY MR. GOODMAN:

24  Q Now, you had an opportunity also to interview Andrew

25 Farris?

1        A    Yes.

2        Q    And you had an opportunity to read his deposition

3    testimony?

4        A    Yes.

5        Q    And based on your study of ergonomics and human

6    factors, were you able to determine how, if at all, the

7    Product Safety Bulletin and warnings would have affected

8    Mr. Farris?

9        A    Yes.

10       Q    Can you explain how that would have happened?

11       A    So Mr. Farris when he was alerted to the fact that

12   Mr. Burrows was having problems manipulating the locking pin

13   stopped what he was doing and went up to help, you know, his

14   helper, and he identified that they were -- that Shane was

15   attempting to manipulate the wrong pin, and when he realized

16   that, he went to set the pin back to a reasonable position

17   that he thought was a reasonable position.  Again, based

18   upon his review of the manual there was nothing in there to

19   alert him that, hey, if this pin gets manipulated, this T4

20   pin gets manipulated for whatever reason, you need to stop

21   because it was factory calibrated and bad things could

22   happen.

23            And so, again, his training never covered that

24   either, so he had no knowledge that what Shane did wasn't

25   just to make a simple mistake that can be easily fixed right

1    then and there, but he did something that was really -- that

2    had real significance and real consequences associated with

3    it.

4            So he didn't know.  And so he thought that he did

5    the right thing, and then he went about his business not

6    realizing that the pin was set wrong, the pin could be set

7    wrong, and if the pin was set wrong, it could be

8    catastrophic consequences.  And so the Safety Bulletin, the

9    plate and the warnings and the changes to the manual all

10   provide him with that knowledge that he was missing; that,

11   hey, this isn't a simple issue that you just move that pin

12   back out, but, no, you need to stop and have it dealt with,

13   and you don't move on as he did.

14   Q    And so I'm going to show you what's been marked as

15   Exhibit 26, and it should be to the left of you, and I'm

16   going to ask you to turn to page 3 of Exhibit 26.

17           Now, do you see on page 3 of Exhibit 26 where there

18   are warning signs?

19   A    Yes.

20   Q    Are those just general warning signs that are used

21   in human factors and ergonomics and warnings?

22   A    Yes.  So what Liebherr Germany is doing is something

23   that's relatively common in an Operator's Manual where they

24   define symbols that are meant to alert people to hazards or

25   safety or warning information and signal words that are

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    related to safety information, and so they're telling the

2    user if you see the signal words and/or safety alert symbol,

3    that these are related to a safety information that can

4    have, you know, significant consequences.

5        Q    Is it your understanding that in the Operator's

6    Manual by certain section or certain directions or

7    instructions there's a warning seen like the one we see on

8    the left with a signal word, either danger, warning,

9    caution, caution, and then that means that that instruction,

10   that warning, that task can designate a dangerous situation

11   which can lead to either death, serious injury, slight or

12   medium injury or property damage depending upon what warning

13   sign and signal word is next to it?

14       A    That appears to be.  That appears to be the intent

15   of Liebherr Germany.

16       Q    And in your study of human factors and warnings,

17   would it be reasonable for a user of an Operator's Manual to

18   understand that if there is not a danger, warning, caution,

19   caution or warning sign next to a specific section, that

20   there would not be a dangerous situation which could lead to

21   death, serious injury, slight or medium injury or property

22   damage?

23       A    Absolutely.  And that's one of the basic principals

24   of providing warnings is to provide consistent information

25   and consistent ways so that you don't have that mistaken

1    potential or mistake potential.

2        Q    Is it your experience that something like this that

3    is in a manual but is not next to an area that can cause

4    personal injury, property damage or death can confuse the

5    operator?

6        A    So it can give them an incorrect perception as to

7    there not being a hazard associated with the improper --

8    improper followthrough of that task.

9        Q    And is it your experience in the study of human

10   factors and warnings that that incorrect perception is then

11   acted upon?

12       A    Correct.

13       Q    And then what can that lead to?

14       A    It can lead to a dangerous -- potentially dangerous

15   situation.

16       Q    If there's a risk associated with the tasks that

17   they're undertaking that's not warned against?

18       A    That's right.  If there's either a task or step in

19   the task that's done improperly, out of order or so forth,

20   user not warned about it, there's multiple things that can

21   happen.  They cannot take the time and effort to make sure

22   that the task is done correctly, so in any given set of

23   instructions, there are more -- there can be more important

24   steps than others.  And if the potential for them to be

25   incorrectly done, done at the wrong time, not fully done and

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    so forth, you need to call that out, or, you know,

2    preferably you would design it in a way to alert the user

3    when they did do something incorrectly or preclude them from

4    doing something incorrectly, but if you can't do those, then

5    you need to provide warning.

6        Q    In this case Liebherr Germany prepared and published

7    a Product Safety Bulletin, a cover plate, a retrofit cover

8    plate document that described everything and warning

9    stickers.  In your opinion based upon your review of the

10   Operator's Manual and all of those documents in association

11   with all the information that you gained in this case, did

12   Liebherr Germany take the correct steps and kind of plug a

13   hole where a warning needed to be by creating that Product

14   Safety Bulletin, Retrofit Kit, the cover plate and the

15   warning stickers?

16       A    Yes.  That appears to be exactly what they did.

17   They recognized a deficiency in their manual and

18   information.  They recognized the potential for a small --

19   what appeared to be a small mistake that would have

20   catastrophic consequences, and they took corrective steps to

21   bring that to the attention of the owner and user of the

22   crane so that, A, to reduce the likelihood of that mistake

23   occurring, and, B, ensuring that if it does, for whatever

24   reason, the owner and the operator are well aware of the

25   consequences.

1       Q   Now, after that Product Safety Bulletin, retrofit

2   cover plate, the retrofit cover plate material and the

3   warnings are published and distributed, is there a -- as it

4   relates to this T4, do you see any sort of product defect in

5   the crane?

6       A   So I wasn't asked to give any assessment to a

7   product defect.  I was asked to assess the warnings and

8   instructions that were provided and the training that was

9   provided.

10      Q   And what is your assessment of the training that was

11  provided as it relates to the T4 section and the failure

12  that occurred here?

13      A   So same as the manual.  It was silent on the

14  consequences of manipulating the T4 pin.

15      Q   Now, if you go down on that page, it says, "the

16  crane documentation is comprised of all subsequently

17  supplied information, updates and addenda for the crane

18  documentation."

19         In human factors and in warnings, would that be a

20  true statement?

21      A   So, it's common for large industrial equipment such

22  as these cranes to have such supplements and addendums be

23  added to the manuals.  They are very complex systems and not

24  everything is caught when it's sent out the door and there's

25  need for supplemental information that needs to be

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    integrated into the manuals because the manual is supposed

2    to be what's providing the operator in conjunction with the

3    training information on how to properly and safely operate

4    the equipment.

5        Q    Now, I'd like to turn to page 4.  Now, there's a

6    warning up top that says, "warning, danger of accidents due

7    to incorrect operation of the crane.  This could result in

8    property damage."

9             Now, how do you categorize a warning like this

10   versus the warning that's in the Product Safety Bulletin?

11       A    So this is Section 0.01 titled, "the foreward," and

12   it's just general information, whereas the product

13   information related to the product safety retrofit and the

14   bulletin are specific to a particular task and topic.

15       Q    And would it be reasonable in the industry of

16   warnings -- to rely on this warning to provide knowledge to

17   someone like Mr. Farris or Mr. Burrows not to manipulate the

18   T4 pin?

19       A    Absolutely not.

20       Q    And why do you say that?

21       A    Because warnings to be adequate need to identify a

22   specific hazard, how to avoid that hazard and the

23   consequences of not avoiding that hazard.  A general warning

24   such as, you know, exercise caution when operating the crane

25   doesn't give us any idea, you know, where the specific traps

1    and problem areas are and what the consequences of those

2    traps and problem areas are.

3           And so, you know, general warning is often all

4    that -- not all that effective in getting people to

5    understand, you know, what the specific issues are, and

6    warnings at the heart should be dealing with specific

7    issues, not general issues.

8      Q    And then if we go down further to the bottom of this

9    page, it says, "Warning.  Crane documentation is not

10   understood.  If parts of the crane documentation are not

11   understood and the tasks are carried out on or with the

12   crane, then there is a danger of accidents.  This could

13   result in property damage."

14          In your evaluation of Mr. Burrows and Mr. Farris'

15   acts between February 16th and February 19th, do you

16   understand that they were ever not understanding what they

17   were supposed to do or their tasks that they were supposed

18   to carry out?

19     A    Not that I'm aware of.

20     Q    Now, if we go to page 749 of Exhibit 26 and we go to

21   the top of 749, do you see it says assembly/disassembly with

22   a triangle and exclamation point with warning?  "Risk of

23   fatal injury due to incorrect assembly or disassembly.  The

24   assembly/disassembly of components may never be performed by

25   untrained personnel.  Incorrect assembly/disassembly can

1    result in death or severe injuries.  Assembly and

2    disassembly may only be carried out by authorized and

3    trained expert personnel.  For assembly/disassembly of

4    individual components, also refer to the chapter relating to

5    those components".  Do you see that, sir?

6        A    Yes.

7        Q    Was there any chapter in the Operator's Manual that

8    was related to the T4 pin?

9        A    Not that I'm aware of.

10        Q    And in your experience in human factors and

11    warnings, does a warning like this warn Andrew Farris and

12    Shane Burrows against what they did on and between

13    February 16th and February 19th?

14        A    It did not provide sufficient warning to them.

15        Q    Is there anything that you saw that would provide

16    sufficient warning in this warning that manipulating the T4

17    pin in any way would cause an uncontrolled retraction of the

18    boom?

19        A    There is nothing in this section or any other part

20    of the manual that I saw.

21        Q    Is it your understanding that Andrew Farris knew

22    that a connection point between -- strike that -- that the

23    connection point between the 84-meter boom package and the

24    base or the 50-meter boom package and the base was always

25    between 2 and 3?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        A     Yes, he was aware of that.

2        Q     And was he aware that he should always lock and

3   unlock the T3 pin?

4        A     Yes, that was my understanding of his understanding.

5        Q     And before the issues of the Product Safety Bulletin

6   and before this incident, based upon your interviews with

7   Andrew Farris and Shane Burrows and reviewing their

8   deposition transcripts, were either of them aware that

9   manipulating the T4 pin could be determined to be an

10  incorrect assembly or disassembly?

11       A     So, yes.  Well, Andrew Farris knew when Shane

12  Burrows manipulated the T4 pin that that was incorrect, and

13  he ran it back out to where he thought it was appropriate.

14       Q     And then after Andrew Farris realized that the T4

15  pin was improperly manipulated, based upon your interviews

16  with him, did he understand that this was a factory set pin?

17       A     No.

18       Q     And based upon your interviews with him, did he

19  understand whether this would affect the operation of the

20  crane negatively?

21       A     So he did not understand that it had to be set back

22  to factory calibration or it would negatively affect the

23  operation of the crane.

24       Q     Did he ever express that he was aware that there

25  would be an uncontrolled retraction of the boom?

 1        A    He was not aware that what he had done would lead to

 2    an uncontrolled retraction of the boom.

 3        Q    Based upon your review of the Operator's Manual, is

 4    the understanding and acts of Andrew Farris in this

 5    situation between February 16th and February 19th, were they

 6    reasonable?

 7        A    Based upon his knowledge they were.

 8             MR. GOODMAN:  I apologize, Your Honor.

 9             THE COURT:  You're fine.

10    BY MR. GOODMAN:

11        Q    I'd like to go back to Exhibit 124.  And your first

12    conclusion and finding in this case was manipulation of the

13    T4 pin creates a hazardous condition that users of the crane

14    needed to be aware of to safely operate the crane?  Is that

15    a correct finding that you had?

16        A    Yes.

17        Q    And how did you come to that finding?

18        A    So, again, Liebherr Germany identified the potential

19    for it to occur, and then based upon my understanding of

20    what can occur, if the pin is not set back to the factory

21    calibration and the foreseeability of it being inadvertently

22    manipulated, that's how I came to opinion No. 1.

23        Q    And then?

24        A    I'm sorry.  I missed over another part of that.  The

25    part of it is that given the potential hazardous condition

1    from the product safety standpoint, the operator needs to be

2    aware of it so that they can identify when it occurs and

3    identify the consequences of it and what they need to avoid

4    those consequences.

5        Q    Your second finding was adequate warning and

6    instruction were necessary to alert and inform owners and/or

7    operators of the subject crane of the potential hazard so

8    that they could take the steps necessary to avoid the

9    negative consequences associated with the hazardous

10   condition.  Can you tell us how you came to that finding?

11       A    That's right.  So as we discussed, once there's a

12   hazard, manufacturer, distributor, seller is responsible for

13   addressing it to either provide an alternative design,

14   guarding and/or warning.

15            So in this case, Liebherr Germany identified the

16   need to provide both a safety cover plate and a Product

17   Safety Bulletin.

18       Q    Then your third finding was the effective

19   communication of warnings is also necessary so that the

20   crane's owner and/or operator can make an informed decision

21   with regard to the risks associated with the reasonably

22   foreseeable use of the equipment.

23            Can you explain that to us and how you got to that

24   finding?

25       A    So it comes down to informed consent.  Operators,

1    product operators, product users, they need to be aware of

2    the ramifications of their actions so they can decide

3    whether or not they want to take that risk, and they need to

4    be informed so that they understand what they need to do and

5    therefore can do it.  And if they're not informed and

6    they're not appropriately warned, they can't make those

7    decisions based upon sufficient information and/or they

8    don't have the knowledge necessary to understand what is

9    necessary to avoid the hazardous consequence.

10        Q    Your fourth finding was due to the deficiencies of

11   the manual, it was reasonably foreseeable that Sims

12   operators would not recognize the danger inherent in

13   inadvertently adjusting the L4 pin or the need to ensure L4

14   is not adjusted during the installation of the 84-meter

15   extension package.  Do you see that?

16        A    Yes.

17        Q    That's one of your findings?

18        A    Yes.

19        Q    How did you get to that finding?

20        A    My review of the manual, again, comparing the

21   information that was provided regarding the specific steps

22   associated with assembly/disassembly of the nesting boom

23   package, there was no explicit or specific warning or

24   instruction related to manipulation of the L-4 pin, the

25   hazards associated with it and/or the consequences

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    associated with it.

2         Q    The L4 pin you have referenced here, that's the same

3    thing as the T4 pin?

4         A    I referenced it as L4 in my report.

5         Q    Now, your fifth finding was due to the deficiencies

6    of Liebherr US training, it was reasonably foreseeable that

7    Sims operators would not recognize the danger inherent in

8    inadvertently adjusting the L4 pin or the need to ensure L4

9    is not adjusted during installation of the 84-meter

10   extension package.  That's one of your findings?

11        A    Yes.

12        Q    How did you get to that finding?

13        A    So reviewing the information that Liebherr US

14   provided during training, based upon the deposition

15   testimony and statements of Mr. Farris, the testimony of

16   Mr. Ward and the testimony of Mr. Redman.

17        Q    And your sixth finding is Sims was not provided with

18   adequate warning or training to recognize the hazard

19   associated with inadvertently adjusting the T4 pin?  That's

20   one of your findings?

21        A    Yes.

22        Q    How did you get to that finding?

23        A    So the manual and the training were the -- and

24   whatever other product warnings were on the machinery --

25             THE REPORTER:  I'm sorry.  Could you repeat that?

1          THE WITNESS:  The manual and the training and

2     whatever other product warnings were on the machine were the

3     only information that Sims were provided for the proper and

4     safe operation of the crane.  There was nothing -- there

5     were no on-product warnings related to this topic, and as we

6     noted in the preceding paragraphs, the manual was deficient

7     in warning Sims as to the hazards associated with

8     inadvertently adjusting the L4 and T4 pin, and the Liebherr

9     US training was deficient in warning of the hazards

10     associated with inadvertently adjusting the L4 pin or the T4

11     pin.

12     Q    Your seventh finding is Liebherr US to immediately

13     distribute this information to owners of the effected cranes

14     was improper and unreasonably dangerous?  That's one of your

15     findings?

16     A    Yes.

17     Q    And how did you get to that finding?

18     A    So Liebherr Germany identified this problem and they

19     took proactive steps to address it, and the problem was

20     associated with a prior incident that resulted in a death,

21     and so we're talking about a catastrophic, catastrophic

22     consequences associated with this issue.

23          And that information was conveyed to Liebherr US in

24     early to mid-November of 2017, and for whatever reason,

25     Liebherr US failed to disseminate that information both to

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Sims and to other owners of effected cranes until January

2    and February of 2018.

3        And so what this does is it leaves -- I can't

4    remember if it was 30 to 40 cranes out there that were

5    effected by this Product Safety Bulletin.  It left the users

6    and the people that are working around these cranes at

7    danger for an extended period of time for no reason, and so

8    this isn't a small hose that breaks and it's a warranty

9    issue and it causes inconvenience.  This is an issue that

10   can result in the loss of life and significant property

11   damage and it shouldn't have waited until January or

12   February to get that information out to the 30 or 40

13   different crane owners.  It should have been immediately

14   done in the November time frame, and so that -- I'm getting

15   ahead of my findings, but, so it's improper that it was held

16   and delayed for whatever reason until February or after the

17   incident.

18   Q    And that gets into your eighth finding, that

19   Liebherr US Sales and Service were aware that Sims owned and

20   possessed the subject crane in November 2017 when Liebherr

21   Germany launched its safety notification?

22   A    Yes.

23   Q    That's one of your findings?

24   A    Yes.

25   Q    And how did you get to that finding?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    A    That was based upon the discovery information in the

2    depositions of the Liebherr US folks.  There were multiple

3    emails that went out that noted who had the crane.  Liebherr

4    US was involved in the sale of the crane down to Sims.

5    Liebherr US was obviously involved in the training and the

6    initial delivery from the port in Jacksonville, so Liebherr

7    US was well aware that Sims had the crane and were operating

8    the crane.

9    Q    And then you have your ninth finding that, however,

10   Liebherr US failed to disseminate the critical safety

11   information to Sims in a timely fashion.  Is that your ninth

12   finding?

13   A    Yes.

14   Q    How did you get to that finding?

15   A    So basically, again, Sims did not get that safety

16   information out to -- I'm sorry.  Liebherr US did not get

17   that safety information out to Sims until after the crane

18   collapse, but they were alerted to it in, I think November,

19   looks like November 10th at least, 2017.  And, again, as

20   noted in No. 8 -- No. 7 I should say, this should have been,

21   you know, information that was seminated in 2017, not in

22   January 2018, and not February 2018, and certainly not after

23   the incident that occurred.

24   Q    Then your tenth finding is had Liebherr US

25   disseminated the Safety Bulletin and Retrofit Kit to Sims in

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    a timely fashion, Sims would have had the information they

2    needed to identify the potential hazard and avoided the

3    incident.  Is that one of your findings?

4        A    Yes.

5        Q    How did you come to that finding?

6        A    So, multi-step approach.  The first is that the

7    Liebherr Germany Safety Bulletin and then the retrofit

8    plate, it provided information that was missing from the

9    manual and from the training with regard to the hazard

10   associated with inadvertently or purposely manipulating the

11   T4 pin, and then it was also based upon the testimony of

12   Andrew Farris and the Sims safety guy, Bob Berry, that, A,

13   had they gotten the information, they would have gotten the

14   information.  If Sims got the information in the office,

15   they would have got it on the crane and out to the crane

16   operators.

17          Andrew Farris testified had he learned, he would

18   have recognized the potential catastrophic consequences of

19   Shane Burrows' mistake and not have attempted to continue on

20   with the assembly of the crane.

21          Shane Burrows also testified that had the plate been

22   on there, he wouldn't have inadvertently manipulated the

23   wrong pin.

24       Q    And are those positions of Mr. Burrows and

25   Mr. Farris reasonable in regards to the information that

1    they had before the Product Safety Bulletin versus the

2    information that would have been provided after the issuance

3    and receipt of the Product Safety Bulletin, Retrofit Kit,

4    Retrofit Kit information and the warning stickers?

5        A    Yes.  It consisted with Liebherr Germany finding the

6    need to institute this Product Safety Bulletin campaign.

7        Q    And your final finding was Liebherr US's failure to

8    disseminate the critical safety information to Sims in a

9    timely fashion was improper, unreasonably dangerous and

10   created an unreasonably dangerous condition that caused the

11   subject crane failure and damage.  Is that you're eleventh

12   finding?

13       A    Yes.

14       Q    And how did you get to that finding?

15       A    So, again, this is a two-step issue.  First is the

16   lack of the plate and the stickers increases the risk of

17   having the T4 pin inadvertently manipulated, and so if you

18   have the plate and the stickers, it reduces that risk, but

19   more importantly, the Safety Bulletin and the information

20   that accompanied the plate puts Andrew Farris on notice of

21   the hazard, its consequences and what needs to be done or

22   what shouldn't be done.  And this was information that was

23   missing from the manual, information that was missing from

24   the training and therefore miss -- information that was

25   missing from Mr. Farris' knowledge of the crane and how to

1   operate the crane.

2        So Liebherr US was provided with this information in

3   November 2017 or instructed by Liebherr Germany to get this

4   information out.  They were told it was important safety

5   information.  They were told it was a result of a death due

6   to a crane collapse in Japan and they needed to get that

7   information out ASAP before other people were put at risk

8   and they failed to do that.  And their failure was improper

9   and their failure was unreasonably dangerous, and because of

10  their failure an unreasonably dangerous condition was

11  allowed to occur and that unreasonably dangerous condition

12  caused the subject crane collapse.

13  Q    And in this case after everything that you've

14  reviewed and in your experience, training, education, who

15  would have been responsible for making sure that this

16  warning and the Product Safety Bulletin and Retrofit Kit,

17  the retrofit cover plate and the warnings were implemented

18  and provided to Sims?

19       MR. CREMER:  Objection, calls for ultimate issue.

20       THE COURT:  It's his opinion, but just qualify it's

21  his opinion.  It's an issue for the Court to consider.

22       THE WITNESS:  So it's my understanding Liebherr US

23  was responsible for disseminating the information to the

24  crane owners in the U. S.

25

1   BY MR. GOODMAN:

2        Q    And if they did not, would it be your opinion that

3   they were then responsible for failing to provide that

4   information?

5        A    Yes.

6        Q    And --

7             MR. GOODMAN:  Could I have a moment, Your Honor?

8             THE COURT:  You may.

9   (Brief pause.)

10  BY MR. GOODMAN:

11       Q    Would you agree that because the Bulletin and

12  Retrofit Kit were not sent, Farris and Burrows could not

13  have been aware of the hazard with manipulating the T4 pin?

14       A    That's the reason they were not aware in conjunction

15  with the failure of the manual and the training.

16       Q    The methodology that you undertook to investigate

17  and apply your training and experience, was it a peer

18  reviewed methodology?

19       A    So my work specifically wasn't peer reviewed, but

20  the methodology that I utilized is methodology that's

21  accepted in the field of human factors and ergonomics.

22            MR. GOODMAN:  Thank you, sir.  I have no more

23  questions at this time, Your Honor.

24            THE COURT:  We'll take a recess.  Let's take a

25  20-minute recess and come back at 3:45.  At that time the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    defense can start their cross-examination.

2  (Recess had from 3:23 to 3:45 p.m.)

3              THE WITNESS:  Good afternoon.

4              MR. CREMER:  Nice to see you again.

5                      CROSS-EXAMINATION

6  BY MR. CREMER:

7        Q    We've met a few times, haven't we?

8        A    I remember one.  I'm not sure about the other times.

9        Q    I remember a few.  How many times have you been

10   hired by Mr. Goodman or his firm?

11       A    So this may be the first case I've had with

12   Mr. Goodman, but with Cozen O'Connor, I'd say at least two

13   dozen.

14       Q    Good client for you; right?

15       A    Sure.

16       Q    And most of your entire income is derived from your

17   consulting practice, isn't it?

18       A    The majority of my personal income is from my

19   consulting practice.

20       Q    That would be working for lawyers like Cozen

21   O'Connor?

22       A    So for Vigilante Consulting the majority is from

23   Vigilante Forensics.

24       Q    Would most of that come from working for lawyers who

25   are litigating matters?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      A    Yes.

2      Q    It's very important that you keep your lawyer

3    clients happy; correct?

4      A    I'd like to think that I do a good job for all my

5    clients.

6      Q    And you have a high percentage or majority of your

7    cases you're retained by plaintiffs' lawyers; right?

8      A    Yes.  So historically it's been 60, 65

9    plaintiff/defendant.

10     Q    How high has it been historically?

11     A    I don't keep records.  When I was at Robson Forensic

12   they used to keep records.

13     Q    Could it be as high as 90 percent?

14     A    So I don't think my overall case load has ever been

15   90 percent plaintiff.

16     Q    Why do you think you have such a high percentage of

17   your business coming from the plaintiff's bar versus the

18   defense bar?

19     A    I don't know.  I think a lot of it has to do with

20   the product cases I do.  They tend to skew more toward

21   plaintiff than defendant.  That's probably why there's a

22   skew towards plaintiff.

23     Q    How much have you charged on this case so far?

24     A    I don't know if I produced invoices in the

25   deposition.  I'd have to guess.  Somewhere --

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1        Q      Give us your best estimate.

2        A      Maybe between 10 and 12,000.

3        Q      Do you have an estimate of how much you've made from

4    the couple dozen cases you've worked on on behalf of Cozen

5    O'Connor?

6        A      I don't.

7        Q      In the six figures, wouldn't it be?

8        A      I'm sorry?

9        Q      That would be in the six figures or more, wouldn't

10   it?

11       A      Over 20 years?  I'm sure.

12       Q      Would it be in the seven figures?

13       A      I doubt it.

14       Q      Would it be in the mid to high six figures?

15       A      I have no idea.

16       Q      You have a whole section in your report that is

17   dedicated to the Liebherr Germany's Operating Manual; right?

18       A      Yes.

19       Q      And you understand that Germany writes the manual;

20   right?

21       A      That's my understanding.

22       Q      You don't expect Liebherr US to go in and rewrite

23   the Liebherr Germany manufacturer's manual, do you?

24       A      I don't expect Liebherr US to rewrite it.  I would

25   expect Liebherr US to inform Liebherr Germany if they found

1   deficiencies with it.

2       Q    And nothing in the manual address the issue of what

3   steps to take if the T4 pin is accidentally moved --

4   manipulated.  You already said that; right?

5       A    Yes, sir.

6       Q    And are you aware of any incident that Henry Ward

7   was familiar with in which the T4 pin on an LTM 1500

8   50-meter boom had been manipulated that led to a

9   catastrophic collapse before he trained Farris and D'Angelo?

10      A    So my recollection of Mr. Wards' testimony is that

11  there was a crane collapse in 2000 that he was familiar with

12  but that had to do with improperly setting the T3 pin, and I

13  don't know.  I don't recall if Mr. Ward testified that it

14  was a 1500 or not.

15      Q    Well, it was a 1500, and the Maxim case involved an

16  operator who just completely forgot to lock the T3 pin.  Is

17  that your recollection of his testimony?

18      A    It's not.

19      Q    Well, it had nothing to do with the T4 pin.  Can we

20  agree on that?

21      A    That's my understanding.

22      Q    So going back to my question, are you aware of any

23  incidents that Henry Ward was aware of before he trained

24  D'Angelo and Farris in which he was aware that the T4 pin

25  had been accidentally manipulated?

1      A    Not that I'm aware of.

2      Q    How about outside of Mr. Ward?  How about all of

3  LUS, Liebherr US?  Do you have any information that Liebherr

4  US was aware that the T4 pin had ever been accidentally

5  manipulated leading to a catastrophic boom collapse before

6  the Safety Bulletin was issued in November of 2017?

7      A    I'm not aware of whether they knew of an instance or

8  not.

9      Q    Now, you agree that there is never a need to touch

10  the T4 pin when you're swapping out the 84-meter for the

11  50-meter boom.  True?

12      A    I have not seen any instructions that require you to

13  manipulate the pin during the swapping.

14      Q    And the training that Mr. Ward gave at Sims, that

15  was 10 months before the Safety Bulletin was even issued;

16  right?

17      A    Correct.  It was earlier in 2017.

18      Q    January and early February of 2017, and we have the

19  Safety Bulletin coming out in November; right?

20      A    That's right.

21      Q    You wouldn't have expected him to be on a mission to

22  figure out, hey, there might be some issue coming in about

23  10 or 11 months, would you?

24      A    Mr. Ward?

25      Q    Mr. Ward.

1      A    No.  Absolutely not.

2      Q    Is installing the 84-meter boom into the base of the

3   crane, is that an assembly/disassembly procedure?

4      A    That's my understanding.

5      Q    Okay.  And so if we go back to -- well, Defendant

6   Exhibit 7.  I don't know what the Plaintiff's Exhibit was.

7   I'm sorry.

8           THE COURT:  26, Plaintiff's 26.

9           MR. CREMER:  Thank you, Your Honor.

10  BY MR. CREMER:

11     Q    We were talking about this before and this part of

12  the manual pertains specifically to the topic of assembly

13  and disassembly of crane components; right?

14     A    It does deal with the assembly and disassembly of

15  the booms.

16     Q    I'm sorry.  You say it does?

17     A    It does.

18     Q    Oh, okay.  And so you would have expected Andrew

19  Farris to have read these warnings that pertain to

20  assembly/disassembly of the crane components?

21     A    He testified he read the section of the manual each

22  time he swapped the booms.

23     Q    But you would have expected him to do that if he

24  were a competent crane operator to read important portions

25  of the manual; right?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1       A    So, I would have expected him to read the relevant

2    sections of the manual.

3       Q    Right.  In any event, he testified under oath he

4    read this section.  You remember that?

5       A    Yes.

6       Q    And it says, "warning, risk of fatal injury due to

7    incorrect assembly/disassembly!  Incorrect

8    assembly/disassembly can result in death or severe

9    injuries."  Right?

10      A    Yes.

11      Q    And it's more specific to say, if we're looking for

12   assembly/disassembly of individual components, like, for

13   example, the booms, you go to that section.  That's what

14   this says?

15      A    Yes.

16      Q    Would you agree with me that when the dust cover was

17   left on the 84-meter boom when it was installed into the

18   crane, that that constituted an incorrect assembly of the

19   84-meter boom into the crane?

20      A    I don't know that I would qualify that as an

21   incorrect assembly because they didn't actually assembly it

22   because the plate was on there.

23      Q    Well, that was part of the assembly process,

24   inserting it into the boom; right?

25      A    That is a part of the assembly process.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    And the correct assembly process is to remove the

2    pin because -- strike that.

3          And the correct assembly process is to remove the

4    cover, because if you don't remove the cover, you can't

5    access the pin; right?

6    A    If you don't remove the cover, you cannot access the

7    pin.

8    Q    Would you agree that Shane Burrows manipulating the

9    T4 pin from its locked factory setting constituted an

10   incorrect procedure for the assembly of the 84-meter boom?

11   A    Yes.  Correct.  He made a mistake and it was -- it

12   made an incorrect manipulation of the T4 pin.

13   Q    So if I am reading what this warning -- reading what

14   this warning says, if I made an incorrect procedure in

15   assembling the boom, I should be concerned about the

16   potential for serious bodily injury or death?

17   A    That's correct, and that's why they addressed it.

18   Q    So the manual does have relevant warnings that

19   pertains specifically to the assembly of booms that risks --

20   that points out risks and hazards associated with doing it

21   incorrectly?

22   A    Sir, there are warnings in the manual that state if

23   you do not assemble correctly there are risks?

24   Q    What did I say?

25   A    I don't remember.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      Q    And certainly Andrew Farris realized it was an

2    incorrect procedure that was made because he tried to

3    correct it?

4      A    That's right.

5      Q    And Andrew Farris believed that he had restored this

6    pin to its proper locked position.  That's your

7    understanding?

8      A    That's my understanding.

9      Q    Mr. Farris testified that he understood that the T4

10    pin, like the T3 pin, was the mechanical connection that

11    held this T4 telescopic section in place.  Do you remember

12    his testimony?

13      A    I don't remember that specific testimony but that

14    seems reasonable.

15      Q    And that's why he felt it was necessary to restore

16    that pin to a proper locked position; right?

17      A    I don't remember him being asked that, but certainly

18    he knew that when Shane Burrows incorrectly or improperly

19    manipulated it that it had to be manipulated back.

20      Q    Now, there's no guidance in the manual that contains

21    the steps to take if that pin was accidentally manipulated;

22    right?

23      A    That's correct.

24      Q    And there's no information in the Operator's Manual

25    that specifies what position the T4 pin should be in in

1    order to be in a fully lock position; correct?

2        A    That's correct.

3        Q    Now, the manual has detail about the precise

4    position that the locking pin must extend above the locking

5    bore for the T3 pin, doesn't it?

6        A    That's fine, correct.

7        Q    Doesn't it say that it should extend at a minimum of

8    11 millimeters above the locking bore?

9        A    It does.

10       Q    So are you haggling with my precise --

11       A    I'm sorry.  I think it says at least 11 millimeters.

12       Q    Okay.  So if I said there is instruction in the

13   manual that gives direction on how to set the T3 pin a

14   certain minimum distance above the locking bore, would you

15   agree with that?

16       A    Yes.

17       Q    Looking at Plaintiff's Exhibit 15, the bulletin

18   states by its own language that it's intended to alert

19   customers to important safety information in light of a

20   recent event reported to Liebherr; correct?

21       A    Yes.

22       Q    The bulletin itself doesn't detail what that event

23   was or give any detail about the event that led to the

24   issuance of the safety bulletin; right?

25       A    Can I see the rest of that, please?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Q    Sure.

2    A    So the November 8th, 2017 letter did not mention the

3    other event that was the catalyst for the Product Safety

4    Bulletin.

5    Q    And according to the language as its written here,

6    there was a single event that led to the issuance of the

7    Safety Bulletin and the Retrofit Kit; right?

8    A    Yes, it is.  I'm sorry.  Yes, it does.

9    Q    And you have talked about in your direct examination

10   a Japan accident that resulted in a fatality.  Do you

11   remember that testimony?

12   A    Yes.

13   Q    Do you know anything more about that incident other

14   than the fact there was a prior incident that caused a

15   fatality?

16   A    It's my understanding that the L4 was manipulated

17   and not set back to the factory calibrated position.

18   Q    Did you know that the T4 pin that was accidentally

19   manipulated in the Japan incident was outside of the crane

20   on a stand before it was inserted into the crane?

21   A    So, it's my understanding that it was not nested

22   inside the base section at the time it was inadvertently

23   manipulated.

24   Q    And were you aware that the Japan incident had

25   nothing to do with the T3 dust plate left on the 84-meter

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    boom?

2        A    So, yes, I'm not aware that the dust plate being on

3    the T3 pin had anything to do with the Japan incident.

4        Q    So do you have any information that the design or

5    the redesign of the dust cover when it came out on the

6    Retrofit Kit was an effort to protect against inserting that

7    cover or leaving that cover on when the boom was inserted

8    into the crane?  You don't have any basis to conclude that,

9    do you?

10       A    So it's my understanding that the plate and the

11   stickers were intended to reduce the risk of inadvertently

12   manipulating the T4 pin for whatever reason it may occur,

13   whether in the boom or outside, in the base boom or outside

14   the base boom.

15       Q    What do you base your statement that it was designed

16   to protect against inadvertent manipulation when the cover

17   was inside the boom?

18       A    The information that Liebherr Germany provided

19   didn't preclude or state that it was for inside or outside.

20       Q    You don't even know if that cover fit, the new cover

21   fit into the crane, do you?

22       A    I personally don't know.  I know there's a

23   contention that it may not fit, but I haven't seen any data

24   to suggest that it does or does not.

25       Q    If an operator is properly installing the crane with

1    the new boom cover and the new decals and you're doing your

2    job and properly preparing that particular boom for

3    installation, you take that cover off, don't you?

4        A    Sure.  The cover should be removed before the nested

5    section is inserted into the base boom.

6        Q    And in our case, you agree there's no issue that the

7    T3 cover should have been removed from the 84-meter boom

8    before it was inserted into the crane; right?

9        A    It should have been.

10       Q    And Andrew Farris knew that the T3 dust cover needed

11   to be removed because he told Shane Burrows to take it

12   off --

13       A    That's my understanding.

14       Q    -- right?

15           Now, Shane Burrows denies that, but that's what

16   Andrew Farris says?  Is that your understanding of that?

17       A    Yes.  It's my understanding that there's

18   miscommunication between Mr. Burrows and Mr. Farris which,

19   again, is foreseeable.  When you have two people that are

20   completing a task, the risk of miscommunication is always

21   there.

22       Q    You read Shane Burrows' deposition; right?

23       A    Yes.

24       Q    Did you see in his deposition that he admitted under

25   oath that he wasn't even aware there was a dust cover on the

1    T3 pin?

2        A    So it's my recollection that he testified that he

3    thought that the cover, the dust cover on the T3 pin was

4    intended to remain on there because it was put in place by

5    bolts, and anything that was bolted on the crane from his

6    training was not to be removed.

7        Q    That's not what he said in his deposition.  That's

8    what he said to you during your interview; right?

9        A    That's my --

10        MR. GOODMAN:  Object, Your Honor.  It's

11    argumentative.

12        THE COURT:  At this point what's in evidence is in

13    evidence and then the transcript itself will address what

14    Mr. Burrows said during his testimony here.

15  BY MR. CREMER:

16        Q    In any case, if Shane Burrows testified that he

17    didn't even know there was a dust cover on the 84-meter

18    boom, he should have, shouldn't he?

19        A    I don't know that he should have.  He was an

20    apprentice that was learning how to do the work that the

21    operator was instructing him to do and he made a mistake by

22    mistaking the cover plate for a permanent plate.  Again, as

23    an apprentice, it's his job to learn how to do things, and

24    when you're learning how to do things, you sometimes make

25    mistakes and it's the person who's overseeing the job to

1    ensure that those mistakes are addressed and that's what

2    Andrew Farris did as the operator.

3          So Mr. Burrows did make a mistake, Andrew Farris --

4    Mr. Burrows did make a mistake and Andrew Farris, when he

5    learned of it, he addressed it.  He didn't have the

6    information he needed to address it appropriately, but he

7    did believe he addressed it appropriately.

8    Q    So it doesn't matter ultimately to you that Shane

9    Burrows didn't know that the dust cover was on the boom

10   because the assembly/disassembly director, Mr. Farris, had

11   to make sure that that dust cover was off before that boom

12   was put into the crane; right?

13   A    So it's my understanding that Mr. Farris had the

14   responsibility to instruct Mr. Burrows, and according to

15   Mr. Farris, he did instruct Mr. Burrows.  There was

16   miscommunication which resulted in Mr. Burrows believing

17   that the dust cover that was on there was part of the

18   permanent or permanent piece on the nested section and

19   didn't remove it for that reason.

20         But to me, what's important is not whether or not

21   Mr. Burrows did this or that and/or Mr. Farris did this or

22   that.  It was that it was foreseeable that for any reason,

23   whether miscommunication, whether it was somebody was a

24   relatively new apprentice or whether they're having a bad

25   day and whether it was either in the crane or outside the

1    crane, but it was foreseeable that the two pins can get

2    confused and the wrong pin can be inadvertently adjusted.

3    And when that happened, the operator was not provided with

4    the warning that he needed to understand the consequences of

5    that, and that's what the Product Safety Bulletin was meant

6    to address.

7         Therefore, the failure to have it is what is causing

8    this problem, not that somebody inadvertently did something

9    wrong.  We all make mistakes.

10   Q    I'm trying to be polite.  You didn't answer my

11   question.  I need some assistance, Judge, potentially with

12   this witness.

13        THE COURT:  It's so far back, I'm not even sure what

14   the question was.

15   BY MR. CREMER:

16   Q    You agree that if Shane Burrows had manipulated the

17   locking pin, it was in part due to the fact that somebody

18   didn't remove that dust cover; right?

19   A    Yeah.  The presence of the dust cover was a factor

20   of Mr. Burrows manipulating the T4 pin.

21   Q    Thank you for answering that question.

22        If the mistake had been made, you agree that it's

23   less likely that this accident would have occurred because

24   the proper pin would have been manipulated.  Is that fair?

25   A    So if the dust cover had not been on the base of the

1    T3 when it was inserted into the base section of the boom,

2    this incident likely does not occur, at this point in time I

3    should say.

4         Q    You know that after this incident occurred where a

5    critical component of that boom lock mechanism had been

6    manipulated by Shane Burrows, that was never reported to any

7    of the management at Sims Crane or to the crane maintenance

8    department?  You know that; right?

9         A    I don't recall Mr. -- if Mr. Farris had any

10   testimony as to whether he informed anyone else or not.

11        Q    And you know from your review of the file material

12   that Mr. Farris was faced with a situation he had never

13   encountered before; a T4 locking pin being improperly

14   manipulated from its factory setting, and there's no

15   guidance in the manual to tell him what to do.  Do you agree

16   with me?

17        A    I would agree there's no guidance in the manual to

18   tell him what to do.

19        Q    But Farris never contacts anybody, whether it be

20   someone at Sims in the maintenance department, whether it be

21   someone at Liebherr to try to get insight into that issue,

22   does he?

23        A    So I'm not aware of Mr. Farris contacting anybody at

24   Liebherr when he learned that Mr. Burrows inadvertently

25   adjusted the wrong pin.  I don't recall what his testimony

1    is with regard to if he alerted anyone else at Sims to it,

2    but I'm aware that when it occurred he thought that he

3    appropriately addressed it and was not aware of any

4    potential catastrophic consequences because of it.

5        Q    He, again, is in his own mind, and I'm sure in good

6    faith, believed that he had locked the T4 pin; right?

7        A    It's my understanding he believed that he dealt with

8    it appropriately.

9        Q    But he never tested that particular connection after

10   there was this problem, and when there was this absence of

11   information on the proper setting, he didn't test it while

12   it was still in the yard, did he?

13       A    No.  I'm not aware of whether he tested it or did

14   not test it while it was still in the yard.

15       Q    Any reason that you know that it was not feasible

16   for him to test that section 4 pin lock stability in the

17   yard before he took it off the site and to the job site?

18           MR. GOODMAN:  Your Honor, I'm going to object to

19   this line of questioning as Mr. Vigilante is here to discuss

20   the human factors and the warnings.  Prior expert Mr. Bond

21   was here to address standard of care of the crane operator.

22           MR. CREMER:  These are all facts he talks about in

23   his report that leads to his conclusions.

24           THE COURT:  And because the question was qualified

25   with "if you know," I'll let him answer the question, but

1    again to the extent that you know the answer to these

2    questions, Mr. Vigilante.

3            THE WITNESS:  No, ma'am, I don't have on opinion on

4    that question.

5    BY MR. CREMER:

6        Q    Do you remember Mr. Farris saying that he called the

7    supervisor at the job site because he can't get the boom to

8    function properly after trying several times?

9        A    I do recall that he called his supervisor.

10       Q    Does it tell you anything about Mr. Farris and his

11   personality if he's told that a mechanic is on his way and

12   the Sims yard is about a ten-minute drive from the job site,

13   that even though he knows that, he continues to try to

14   operate this crane, that he's the kind of personality that's

15   a risk taker?

16       A    So I did not see anything in his personality to

17   indicate that he's a risk taker.  It's my understanding

18   based upon Bob Berry's testimony that he didn't do anything

19   inappropriate.

20       Q    Do you believe that Mr. Farris should have stopped

21   the operation of the crane until the crane mechanic arrived?

22       A    I don't have an opinion on that topic.

23       Q    Referring to the Product Safety Bulletin again.  The

24   Product Safety Bulletin that was issued, the two-page

25   document has no reference to which pin it's referring to as

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    being the pin you should not manipulate; correct?

2        A    It does not stipulate the T4 pin and it does not

3    identify the pin other than the T3.

4        Q    And would you expect or even do you know if a Safety

5    Bulletin like this goes to people that are laborers once

6    it's issued?

7        A    The bulletin itself?

8        Q    The bulletin.  Would the bulletin be disseminated

9    based on what your knowledge in this industry to people that

10   are laborers and apprentices?

11       A    So I don't have an opinion on that.  I just know

12   what Bob Berry testified to what Sims would have done.

13       Q    They would have gone to the operators?

14       A    That's my understanding.

15       Q    Shane Burrows isn't an operator, at least he wasn't

16   at that time; right?

17       A    That's my understanding.

18       Q    So if we have the situation as we had on the date of

19   this incident when the crane boom was being installed, Shane

20   Burrows testifies that he never did a particular task of

21   being up on top of the boom looking down into the T2 hole

22   waiting for the boom T3 pin to come in before, and if he

23   did, maybe it was one time before.

24            If we are in a situation where the new plate and

25   stickers are on the boom and Shane Burrows is in experience

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   up there, and he's the guy up on the boom, not the guy on

2   the ground that actually takes off the plate, he wouldn't

3   see those warnings stickers on the boom itself, would he, if

4   he's up on the boom?

5       A    So it's my understanding that Mr. Farris asked

6   Mr. Burrows to take the plate off, so he would have been the

7   one taking the plate off, which means he would have been the

8   one there to see the stickers both on the plate and on the

9   boom sections.

10      Q    Well, I'm going with Shane Burrows' story at this

11  time, and he says he didn't ask him to take it off and he

12  was up on the boom.  He wasn't on the ground, and in that

13  scenario he wouldn't have seen the revised cover that had

14  been put on or those stickers, would he?

15      A    So if he had never seen this crane before and

16  dropped onto the top of the base boom section and the crane

17  was pushed in without the plate, he would have never seen

18  the plate before.

19      Q    And he wouldn't have seen the stickers on the side

20  because those were obscured too by the crane, by the T2

21  section?

22      A    So, again, I have -- I don't have an opinion on

23  that.  It's my understanding that there's --

24      Q    That's fine if you have no opinion on it.

25           You certainly didn't test it to see if it's visible,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    did you?

2        A    I didn't personally test to see whether the stickers

3    were visible once the nested section was inserted into the

4    base boom, but it's my understanding that Andrew Farris was

5    able to see the cover plate on T3 when he was up on top of

6    the base boom which would indicate that he would be able to

7    see the stickers that were adjacent to the locking bores.

8        Q    Well, when he was looking at it, he didn't have any

9    stickers on it, did he?

10       A    When Mr. Farris was looking at it on the Friday

11   before the incident, there were no stickers on it.

12       Q    So what I want to know is:  Do you know if the

13   stickers were put on in the configuration and position the

14   Retrofit Kit required and that boom is slid into the base,

15   are they visible when you're looking through that hole?  You

16   don't know that, do you?

17       A    I personally do not.  I did not do an inspection to

18   determine that.  Based upon Mr. Farris' testimony, they

19   likely would have been.

20       Q    Andrew Farris admitted that both in his deposition

21   and here in open court under oath that the training provided

22   by Henry Ward on how to swap the boom was all the

23   information that he required to safely and properly swap out

24   those booms.  Do you have any dispute with that testimony?

25       A    It's my understanding that --

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          MR. GOODMAN:  I object to that.  I don't believe

2     that's exactly what he testified to.

3          THE COURT:  Sustained.  That's not my understanding

4     of his testimony either.

5          THE WITNESS:  It's my understanding that Mr. Farris

6     believed that he was --

7          MR. GOODMAN:  It's sustained.  You don't have to

8     answer the question.

9  BY MR. CREMER:

10    Q    Well, we do know that Andrew Farris performed

11    himself at least four or five boom swaps successfully before

12    this incident; true?

13    A    So I know that Mr. Farris had done swaps before this

14    but I don't recall the number.

15    Q    All right.  Well, take my word for the purposes of

16    this question he did it a number of times before, and when

17    he did it those number of times before, whether it was four

18    or six, he did it without the cover plate; right?  He did it

19    without the safety bulletin?  He did it without the stickers

20    and nobody manipulated the T4 pin, did they?

21    A    So it's my understanding based upon the OSHA report

22    that Bob Berry claimed that that had happened in the past,

23    but I don't have any other information than that.

24    Q    What's contained in the OSHA report is that Sims did

25    that particular swap with that particular crane 35 times

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  before the Safety Bulletin and before the Retrofit Kit and

2  it was all done safely and correctly.  That's what's in the

3  OSHA report, isn't it?

4      A    So the OSHA report does state that they had done it

5  35 times but if they had inadvertently manipulated the 4 pin

6  before, they did not do it appropriately or safely.

7      Q    You talked about Liebherr US disseminating this kit

8  in a timely manner.  You don't know anything about how many

9  modification campaigns were ongoing at any given time at

10  Liebherr and specifically in the period of October of 2017

11  to March of 2018, did you?

12      A    You're right, I do not.  But I didn't see any

13  testimony to indicate that that was the reason why it was

14  delayed.

15      Q    And the Safety Bulletin doesn't tell the owners of

16  cranes to stop using their cranes until the Retrofit Kit

17  shows up and they are to install it onto their cranes, does

18  it?

19      A    It does not.  It puts them on notice of the

20  potential problem and then tells them they can continue

21  using it now that they are on notice.

22      Q    So it's contemplated within the Safety Bulletin

23  itself that crane owners and operators will continue to use

24  the crane for a period of time without these additional

25  devices; right?

1      A    Now that I've been alerted to the problem, that is

2  correct.

3      Q    And do you know how many of these LTM 1500 cranes

4  have been manufactured since they were put into the market

5  in 1998?

6      A    I don't know about the total number.  I just know

7  that there was a list that Liebherr Germany provided.  Like

8  I said, I think it's somewhere in the neighborhood of 30 to

9  40.  I don't remember the specific count.

10     Q    That's in the U. S.?

11     A    In the U. S.

12     Q    Worldwide there are over 200 of these cranes

13  manufactured and out in the market place with boom swaps --

14          MR. GOODMAN:  Object, Your Honor.  Relevance.

15          THE COURT:  What's the objection?

16          MR. GOODMAN:  Relevance.

17          THE COURT:  I'll let it in.  Go ahead and ask the

18  question.  You can answer it.

19  BY MR. CREMER:

20     Q    There are over 200 of these cranes out in the market

21  with boom swaps between the 85 and 50-meter boom and that's

22  been going on for years before the issuance of the safety

23  bulletin.  Do you have any evidence that there were other

24  manipulations of the T4 pin before the Safety Bulletin was

25  issued in November of 2017, 19 years after this product was

1    put into the market?

2           MR. GOODMAN:  Objection, Your Honor.  This is

3    getting to prior bad acts.  He's trying to say that because

4    there was not prior bad acts that this could never have

5    happened now and that is improper impeachment.

6           THE COURT:  I'll let him ask the question, and I'll

7    let him answer the question.  I mean I just think this is

8    starting to get too far afield of what's necessary for me to

9    make a determination in this case, but go ahead and you can

10   answer the question.  Finish asking the question first,

11   Mr. Cremer, and then you can answer it, Mr. Vigilante.

12          MR. CREMER:  I don't remember my question.

13          THE COURT:  Sharon.

14   (Record read.)

15          THE WITNESS:  So the only one that I'm aware of is

16   related to the one in Japan that was the catalyst for the

17   Product Safety Bulletin.

18   BY MR. CREMER:

19      Q    Part of the basis of your opinion is your interviews

20   with Shane Burrows and Andrew Farris and you asked them what

21   they would have done had they had the Safety Bulletin

22   information available to them, and they told you they would

23   have stopped and not continued to operate that crane; right?

24      A    That's what Mr. Farris stated.

25      Q    So part of your opinion is based on the fact that

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

 1    Andrew Farris told you he would stop which doesn't sound

 2    very scientific to me.  Is it scientific?

 3        A    So my opinions are based both on the testimony and

 4    statements of people involved, the analysis of how people

 5    respond to safety information and the intent and presence of

 6    the stickers and the plate.

 7        Q    Have you ever heard of the term hindsight bias?

 8        A    Sure.

 9        Q    That's a term you're familiar with as a human

10    factors expert; correct?

11        A    Sure.

12        Q    And there's been probably a lot written about it in

13    the literature, peer review literature about hindsight bias?

14        A    I don't know that I qualify it as a lot.

15        Q    I want to read a little bit about what it is and see

16    if you agree with this discussion.

17             MR. GOODMAN:  Your Honor, I'm going to object.  This

18    is trying to impeach with a learned treaty.  We don't know

19    what learned treaty he's reading from, and nobody said that

20    learned treaty has been adopted by anybody in the human

21    factors community.

22             THE COURT:  What is this that you are reading from?

23             MR. CREMER:  I'm reading from an article that cites

24    to learned treaties, but I just want to get a definition of

25    what it is out there, so he can correct me --

1          THE COURT:  Why don't you ask him what his -- what

2      his understanding is of hindsight bias.

3  BY MR. CREMER:

4      Q      Would you please tell us what it is?

5      A      It's essentially looking back at an event and

6      believing how you would have responded had you known certain

7      information.

8      Q      And can hindsight bias cause distortions of memory

9      of what was known or believed before an event occurred?

10      A      I don't know that hindsight bias can result in

11      distortions of memory.

12      Q      Can it be a significant source of over confidence

13      regarding an individual's ability to predict the outcome of

14      future events?

15      A      I don't know that I've seen any literature related

16      to hindsight bias and the ability to predict future events.

17      Q      Did you evaluate whether the statements of Andrew

18      Farris in which he attributed the cause of this accident

19      being the failure to have read the Safety Bulletin, how that

20      may have influenced by hindsight bias?

21      A      So my assessment was based upon his testimony being

22      consistent or -- his testimony and statements being

23      consistent with the purpose of a Safety Bulletin being

24      consistent with the literature regarding the purpose and the

25      affect of warnings and the presence of the stickers and the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    plate in preventing the manipulation in the first place.

2        Q    Now, Sims claims that if they received this

3    information and this Retrofit Kit, they would have put it on

4    that day or within that day.  Do you remember that?  Did you

5    read that testimony?

6        A    So my recollection is Bob Berry testified that if

7    the crane was in the yard they would put the stickers and

8    plate on.  If it was out in the field, they would have

9    notified the operator and waited for it to come back to the

10   yard to put the stickers and the plate on.

11       Q    And when they were answering questions about what

12   they would have done in the circumstance where we now know

13   where there was an accident where someone was killed and

14   significant property damage occurred, is that different than

15   if they had just received the information and it said to

16   continue to operate the equipment as long as you follow the

17   manual?

18       A    So the Product Safety Bulletin before they received

19   the Retrofit Kit would have told them that they can continue

20   to operate the crane now that they had knowledge of the

21   potential issue.

22       Q    Do you look at issues such as financial bias why

23   someone may say what they would have done under a given set

24   of circumstances could be effected by their pocket book?  In

25   this case Sims had a catastrophic loss, a man was killed,

1    they're facing civil litigation, OSHA investigation, so when

2    they say we would have done it in a day, under those

3    circumstances, could that be impacted by their financial

4    bias?

5        A    So I have no opinion regarding their financial bias.

6    Again, my opinions are predicated on the purpose and intent

7    of the Safety Bulletin, the research related to the purpose

8    and affect of warnings and the presence of the stickers and

9    the plate and prevention of inadvertent manipulation of this

10   pin on this instance.

11       Q    Is there any way for anyone including the best human

12   factors scientists to say what Sims may have done if they

13   would have received this kit prior to the accident, whether

14   they would have installed it in a day, a week or year or

15   thrown it in the garbage?  Can anyone really say?

16       A    Absolutely.

17       Q    And can they really say without guessing or

18   speculating?

19       A    Based upon having enough facts, based upon having

20   enough data, absolutely.

21           MR. CREMER:  Thank you, sir.

22           THE COURT:  Thank you.

23           Any redirect?

24           MR. GOODMAN:  Yes, Your Honor.  Could I bother Madam

25   Clerk to switch over to the -- Thank you, ma'am.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1                        REDIRECT EXAMINATION

2    BY MR. GOODMAN:

3        Q    I'm going to show you what's was previously marked

4    as Exhibit 26, the Operator's Manual, and specifically page

5    749.

6            THE COURT:  What page did you say, Mr. Goodman?

7            MR. GOODMAN:  749, Your Honor.

8    BY MR. GOODMAN:

9        Q    And on the top of that page, do you recall on

10   cross-examination discussing this warning with Defense

11   Counsel?

12       A    Yes.

13       Q    And I'd like to ask that at the time that the

14   product -- strike that.

15           At the time that the cover plate on the 84-meter

16   boom section was not taken off and installed into the base

17   section, at that moment was there death or severe injuries

18   at that point?

19       A    No.

20       Q    And when Shane Burrows manipulated the T4 pin, was

21   there death or severe injuries at that moment?

22       A    No.

23       Q    And when the boom was taken out, the cover was taken

24   off, the boom was put back in -- strike that.

25           When Andrew Farris went up on the boom before it was

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    taken out and readjusted the T4 pin, was there death or

2    severe injuries at that moment?

3        A    No.

4        Q    Is there anything in human factors study or your

5    experience with warnings that would reflect how warnings are

6    less impactful when there's a distance from an act that may

7    or may not be in violation of an Operator's Manual?

8        A    So typically the rule is you want to provide warning

9    at the time and location that the information is needed.

10        Q    So would it be reasonable in human factors for an

11    individual who failed to take off a cover plate, manipulated

12    a T4 pin, re-manipulated the T4 pin back not having

13    sustained death or severe injuries, would it be reasonable

14    for them to believe that there was not an inappropriate

15    assembly or disassembly?

16        A    I would say there's a conjunction with that.  The

17    conjunction is that there is no information to the contrary

18    provided in the manual or in the training, so that's -- you

19    know, it's two sides of the coin.

20        Q    I'm going to show you what's been marked as Exhibit

21    15 and this is the Product Safety Bulletin?

22        A    Yes.

23        Q    And if we go to the second page, the last paragraph

24    or the second to last paragraph says, "we kindly ask that

25    you carefully follow the information in this Product Safety

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    Bulletin in the future and make sure to forward this

2    information to all crane operators."  Do you see that?

3        A    Yes.

4        Q    Now, based upon reading that and having been in the

5    community providing, publishing, issuing warnings for

6    products, do you understand that Liebherr Germany believes

7    they are adding information in this Product Safety Bulletin

8    to the Operator's Manual?

9            MR. CREMER:  Objection, calls for state of mind.

10           THE COURT:  Yes.  Do you believe, so it's qualified.

11   I'll let you answer it.

12           THE WITNESS:  Yes.  It's my belief that Germany,

13   Liebherr Germany was supplementing the information they had

14   provided in the manual with this Product Safety Bulletin and

15   the retrofit plate kit.

16   BY MR. GOODMAN:

17       Q    Is that consistent that there's information in this

18   Product Safety Bulletin that's not in the Operator's Manual?

19       A    That's right.

20       Q    Then do you recall Defense Counsel asks you about

21   whether Liebherr US and specifically Henry Ward, and I

22   believe the term he used was omniscient, should have been

23   omniscient and should have known that manipulation of the T4

24   locking pin could cause an uncontrollable retraction of the

25   boom sections before the Product Safety Bulletin was issued?

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   Do you recall that?

2       A    Yes.

3       Q    If Liebherr US didn't know and Henry Ward, the

4   trainer for Liebherr US, didn't know that there can be an

5   uncontrolled retraction of the boom sections if the T4 pin

6   locking pin would have been manipulated, would it have been

7   reasonable for Sims Crane operator Andrew Farris and oiler

8   Shane Burrows to have known more than Liebherr US and Henry

9   Ward?

10      A    That wouldn't be reasonable to expect.

11          MR. GOODMAN:  Thank you, sir.  No more questions for

12  this witness, Your Honor.

13          THE COURT:  Thank you.  Was there anything --

14  Mr. Vigilante, you can step down.  Anything else we need to

15  address on the record today?

16          MR. GOODMAN:  Yes, Your Honor.  At this time, the

17  plaintiff, if it's acceptable, would like to designate the

18  depositions of Elizabeth Baughman, also known as Elizabeth

19  Cross, Trina Cross; would designate the deposition of Bret

20  Jacobson; would designate the deposition of Karl Redman;

21  would designate the deposition of Jason D'Angelo; would

22  designate the deposition of Dr. Corbin Reher; would

23  designate the deposition of Keith Martinson; would designate

24  the deposition of Steve Hoffman; would designate the

25  deposition of William Adams; would also designate Liebherr

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   US' Answers to NBIS' first set of interrogatories, second

2   interrogatory, third interrogatories; would designate the

3   affidavit of Dr. Torben Reher, R-E-H-E-R; would designate

4   the affidavit of ratification of Deborah Weber; would

5   designate the affidavit of Paul Steer.

6           THE COURT:  Spell Mr. Steer's last name.

7           MR. GOODMAN:  S-T-E-E-R.  Would designate the

8   deposition of Arthur Kirkner, K-I-R-K-N-ER, the affidavit of

9   Arthur Kirkner, Arthur Kirkner's confirmation of damages,

10  and the agreement between Inter-Hanover and NBIS.  We would

11  designate the deposition of Ron King; and, finally, we would

12  designate the deposition of J.R. Bristow, B-R-I-S-T-O-W.

13          THE COURT:  Do I understand you correctly that

14  you're designating the entire depositions subject to those

15  individuals?

16          MR. GOODMAN:  Yes, Your Honor.

17          THE COURT:  So then I would assume from the defense

18  there aren't cross-designations within there, but are there

19  going to be additional depositions designated?

20          MR. GOODMAN:  We did discuss.  The defense would

21  like to look at these designations that we've put together

22  this evening.  I know we have gone over those designations

23  in the past.  It's my understanding that my office put

24  together highlighted designation -- the entire transcript

25  but with highlights from both plaintiff and the defense.

1          The only thing that may not have both plaintiff and

2    defense highlights are Mr. Kirkner's, J.R. Bristow and Ron

3    King because we just decided during the trial that we were

4    going to designate the damages witnesses.

5          THE COURT:  So then just so that I understand what's

6    been highlighted within the deposition transcript is what

7    the parties would like for me to focus on and then not read

8    the rest of it based on the designations the parties have

9    made.

10          MR. GOODMAN:  That's correct, Your Honor.

11          THE COURT:  And so how many in the remaining

12    transcripts then?  Is that accurate that the defense is

13    wanting to look at those tonight?

14          MR. CREMER:  Yes, Your Honor.

15          THE COURT:  Is that going to give you enough time?

16          MR. CREMER:  We'll get it done.

17          THE COURT:  Anything else on the record that we need

18    to address?  I do have some housekeeping items to address

19    off the record.

20          MR. GOODMAN:  At this point, Your Honor, the

21    plaintiffs rest.

22          THE COURT:  Thank you.  Anything else on the record?

23          MR. CREMER:  We would move for a directed finding

24    but we will file that in the morning in writing.

25          THE COURT:  Okay.  That works.  Off the record.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    (Court adjourned at 4:41 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1

2  UNITED STATES DISTRICT COURT  )

3                                )

4  MIDDLE DISTRICT OF FLORIDA    )

5

6          I, SHARON A. MILLER, Official Court Reporter for the

7    United States District Court, Middle District of Florida, do

8    hereby certify that pursuant to Section 753, Title 28,

9    United States Code that the foregoing is a true and correct

10   transcript of the stenographic notes taken by computer-aided

11   transcription taken in the above-entitled cause by the

12   undersigned and that the transcript format is in conformance

13   with the regulations of the Judicial conference of the

14   United States.

15  /S/Sharon A. Miller, CSR, RPR, CRR, FCRR

16  Official Court Reporter

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION