IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
_____ )
NBIS CONSTRUCTION & TRANSPORT     )
INSURANCE SERVICES, INC.,         )
a/s/o Sims Crane & Equipment      )
Company,                          )
                                  )
          Plaintiff,              )
                                  )
vs.                               )   Case No.:  8:19-CV-2777
                                  )
LIEBHERR-AMERICA, INC., d/b/a     )
LIEBHERR USA, CO., and            )
LIEBHERR CRANES, INC.,            )
                                  )
          Defendants.             )
_____ )
```

**VOLUME VI OF VI (pp. 1-70)**

**BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE AMANDA A. SANSONE**

**March 8, 2022**
**10:09 a.m. to 12:18 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          JOSEPH F. RICH, ESQUIRE
                                JOSHUA R. GOODMAN, ESQUIRE
                                Cozen O'Connor
                                200 South Biscayne Boulevard
                                Suite 3000
                                Miami, Florida 33131

**FOR THE PLAINTIFF:**          MARIA ERMAKOVA, ESQUIRE
                                Cozen O'Connor
                                175 Greenwich Street
                                55th Floor
                                New York, New York 10007

(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**APPEARANCES (CONTINUED):**

**FOR THE DEFENDANTS:**  WILLIAM J. CREMER, ESQUIRE
           THOMAS R. PENDER, ESQUIRE
           Cremer, Spina, Shaughnessy, Jansen &
           Siegert, LLC
           One North Franklin Street
           10th Floor
           Chicago, Illinois 60606

---

### INDEX

Closing Argument by Ms. Ermakova     4

Closing Argument by Mr. Cremer     18

Closing Argument by Mr. Pender     54

Rebuttal Closing Argument by Mr. Goodman   60

Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

Closing Argument - Ms. Ermakova

(Call to Order of the Court at 10:09 a.m.)

**THE COURT:**  Okay.  Good morning, March 8th came
faster than we all thought it would.  It seemed so far away.
But now we're all here together again.  It seems like it was
yesterday that we were all in these same positions.  So I
understand that we had technology issues.  Those have been
resolved, we think.  Right?

**MS. ERMAKOVA:**  Yes, Your Honor.

**THE COURT:**  Let me go ahead and call the case.
19-CV-2777-AAS, NBIS Construction versus Liebherr-America,
Incorporated.

Could counsel go ahead and state their appearances,
starting with Plaintiff, please.  Go ahead.

**MS. ERMAKOVA:**  Maria Ermakova.

**THE COURT:**  Thank you.

**MR. GOODMAN:**  Josh Goodman.

**THE COURT:**  Thank you.

**MR. RICH:**  Joseph Rich, Your Honor.

**THE COURT:**  Thank you.

Go ahead, Mrs. Cremer.

**MR. CREMER:**  William Cremer and Tom Pender for
defendants.

**THE COURT:**  Thank you.

Okay.  Whenever you're ready, go ahead.


UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

**MS. ERMAKOVA:** Good morning, Your Honor. May it please the Court. My name is Maria Ermakova. I'm here on behalf of the plaintiff.

This case is about Liebherr US's failure to timely send updated product safety information to Sims. Liebherr US could have prevented the loss in this case and should have shared the pertinent product safety information, but failed to take any steps to do so until after the accident.

Liebherr US was a training and service company and was responsible for disseminating product updates to all owners of the Liebherr LTM 1500 in the United States.

If you recall, Your Honor, following an accident, Liebherr Germany, the manufacturer, came out with updated product safety information. This information included a product safety bulletin, a cover plate and warning stickers. And all this information concerned one pin, the T4 pin.

Now, the crane had two boom configurations. There were six pins on the 84-meter boom, T1 through T6. T1 and T2 had permanent covers on them. T5 and T6 were not accessible because they were also covered. The T3 and T4 pins, however, were both accessible, but the key detail is that only the T3 pin was supposed to be touched.

Now, the safety bulletin recognized that a wrong pin, the T4 pin, can be manipulated, and warned that property damage or death could occur. These updated safety information also

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

included a safety cover plate.

The original crane did not come with a cover plate that went over the T4 pin, as you can see on the slide. And so the manufacturer provided a new cover plate to cover the T4 pin. This was done to prevent the accidental touching of the wrong pin. Additionally, Liebherr Germany provided warning stickers to be placed on the new cover plate as well as the two pins. One of the stickers had a pin with no X drawn on it. That was next to and on top of the T3 pin. One sticker had a big red X drawn over it to prevent the touching of the T4 pin. Here is another view of the warning stickers.

So the updated product information, the safety bulletin, cover plate, and warning stickers specifically targeted the T4 pin. Liebherr US failed to provide all that information to Sims in a timely manner. The failures have deprived Sims of important safety information, and ultimately caused the death and property damage when the wrong pin was manipulated.

Now, this case is also Liebherr's failure to provide -- to properly train Sims personnel. Again, Liebherr US provided training on how to operate the LTM 1500. That training was deficient because Liebherr's employees skipped providing the full 80 hours of training, deviated from the manual, as well as from defendants' own objectives to provide comprehensive training.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

With respect to the negligence claim, the evidence at trial demonstrates clearly that defendant owed a legal duty to plaintiff to timely send the bulletin. Again, there is no dispute that defendant was a training and service company.

Defendants' corporate designee, Ralf Vieten, admitted that Liebherr Germany charged defendant with distributing product updates. That obligation included sending any safety information, such as information in this case. And Mr. Vieten testified that defendants' duty extended to secondary purchasers of cranes, such as Sims.

Now, Mr. Vieten also testified that the obligation to provide the updated product information was to make sure that the crane was properly operated. And Johnathan Smith, defendants' employee, testified that defendant regularly sent product warnings to crane owners and was responsible for administering over 700 campaigns during the period of time 2017 through March 2018.

And Mr. Smith testified that it was defendants' obligation to actively collect and update its internal database. He stated, and I quote, the list from Germany is going to show the last known location that they saw the machine. But they don't service the machines here. Liebherr US does. So if a customer has moved the crane, they've sold the crane, or they have different operating locations, we have to find out the exact location where the

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

machine would be located.

The damage in this case could have been easily prevented. It should have been prevented. Liebherr US was under an obligation to timely communicate the safety information, and it took zero steps to do so until after the accident.

Now, defendants' position is that it does not know that Sims owned this crane. But there are two problems with this position. The first is that the fact that they did not know does not absolve them of the duty to provide and communicate the safety information.

And they only have themselves to blame here. The only reason they did not know is because they didn't properly maintain their records. Defendant did not even institute minimal procedures to maintain their customer database. If they would have been diligent and maintained an updated -- the ownership information, as they were obligated to, they would have known, and they violated their own company's protocols by not maintaining and updating the information.

But what's important to note here, is that they did know. We have internal e-mails and documents from Liebherr indicating that Sims was the owner of this crane. There is no dispute that as of November 17, 2016, defendants' employees were aware that Sims purchased the crane. In plaintiff's trial Exhibit Number 34, there is an e-mail from Adnan Bulat to Bret

Closing Argument - Ms. Ermakova

Jacobson stating, "please note that the a.m. crane sold to Sims, Florida through company Schuch will again be delivered to Jacksonville, Florida."

And Mr. Vieten testified that Bret Jacobson should have updated the system then in November of 2016, that it was his responsibility to update the system at this point, and that he should have updated it.

Here is another e-mail dated January 2017 from Bret Jacobson to William Lloyd stating, "Crane mentioned above was sold to Sims Crane in Florida."

And here is Mr. Ralf Vieten testifying that everyone on this e-mail chain would have understood this e-mail to mean that Sims purchased the crane.

Now, it is undisputed that as of February 2017, defendants' employees had actual knowledge that Sims owned the crane. Yet they took no steps whatsoever to update their database.

This is plaintiff's trial Exhibit Number 47, an e-mail dated February 2017, from John Ryall to Johnathan Smith stating, "Would you have a read please below and see how we would prepare an offer for the parts for the LTM 1500-8.1 that Schuch bought from us and sold to Sims Crane & Equipment."

And here is Mr. Vieten testifying that both John Ryall and Johnathan Smith now know that Sims owned the crane. Even after Johnathan Smith finds out at this point that Sims

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

was purchasing the crane and purchased the crane, he never took steps to update the ownership information.  It would have taken minutes for him to do so.  He just did not do it.  So from February 2017 until after the accident, a little over a year, they took no action at all to update their records.  Defendant didn't do anything until after Liebherr Germany asked them to. They didn't do anything until after the accident.

But the second point is that Liebherr US actually provided Sims with assistance, obtaining the crane at the Jacksonville port and then trained them for a week.  And this was from January 30th, 2017 through February 4th, 2017.  And, of course, in April 2017, Trina Cross knew that a discrepancy existed, but did not update any information.

Here is an internal document recognizing that a discrepancy exists.  And here is Mr. Johnathan Smith's testimony that a discrepancy -- excuse me, a conflict existed back in April 2017, but was never fixed until after the accident.  Here is another internal document entitled, "Report of Repairs," referencing Sims as a customer and identifying this very crane.

So in sum, there are over 13 internal documents from Liebherr US referencing Sims as the owner or the customer who obtained the crane.  They had these documents readily available.  There are also 16 e-mails sent between November 2016 through January 2017, indicating that Sims was

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

purchasing the crane. And the following individuals were copied on these e-mails: Trina Cross, Jason Cupp, Derrick Harris, Bret Jacobson, Gericke James, Bambi Massiah, Petra Miller, Daniel Pitzer, John Ryall, Samuel Sanchez, Johnathan Smith, William Lloyd.

So defendant could have foreseen that proper recordkeeping was necessary and that the failure to send any product updates to customers would enhance the risk of harm to crane owners. Defendant could have foreseen that timely sending the product documentation was necessary for the proper operation of the crane. This is especially true here because Liebherr Germany identified the magnitude of risk. So when they saw that documentation, the warnings, warnings as to property damage, personal injury, and death, they should have known that the information needs to be delivered quickly to crane owners. They couldn't have just sat back and thought that it's not a big deal.

With regard to proper training, the evidence shows that defendant owed a legal duty to properly train and instruct Sims. Again, defendant is a training and service company offering training on how to operate a 600-ton equipment. Ralf Vieten testified that defendant aimed to provide comprehensive training on the safe operation of the crane. However, Henry Ward has no classroom training on this specific model, and he was not certified either. And, strangely, Henry Ward was

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

supervised by Trina Cross, who was not a crane operator and
never operated a crane.

Now, there are striking admissions by Mr. Ward and
Ralf Vieten that were made right in front of you.  I want to
refer to that testimony now.

Mr. Vieten testified that the objective of the
training was to provide comprehensive training on how to
properly operate the crane.  Mr. Ward testified that he
provided 40 hours of training to Sims when he was supposed to
provide 80 hours of training.  He provided 40 hours of
training, even though he knew that Sims was a first-time owner
of this crane.

Mr. Vieten also admitted that Henry Ward skipped a
number of safety training instructions during the training.
Specifically as you can see on this slide, Henry Ward skipped
the section on locating of all locking pins.  Critically, Henry
Ward deviated from the operating manual, because he instructed
Sims to position the T3 pin until it is tight enough, and he
did not train Sims to measure the T3 pin or how to measure the
T3 pin.  In fact, he testified that he did not bring any tools
to the training.

There is no evidence that Ward's training was
consistent with the crane's operating manual.  And Henry Ward
admitted that he provided additional instructions, instructions
that were outside the manual.  Defendants' failure to properly

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

train Sims enhanced the general risk that the crane would not be safely operated.

The injury to plaintiff was preventable, and it was preventable because it was foreseeable.  Liebherr Germany identified the dangers associated with touching the wrong pin. So when defendant, a training and service company, received that information, they knew that the information was time sensitive.  They should have known that inadequacies exist in the manual when they received the bulletin.  They should have known the importance of timely delivering that information to Sims.

The failure to timely send the additional crane documentation more likely than not caused the accident.  Now, let's take a step back and consider what actually caused the accident.  All witnesses, including defendants' expert, acknowledged that the accident occurred because the T4 pin was touched and then not -- and then not adjusted back to its factory-calibrated setting.

For instance, Jeffrey Travis testified, and I quote, the subject accident wasn't caused by the Sims operator's inability to identify the correct locking pin for the boom swap, but rather his failure to return the T4 locking pin to its previous position prior to inserting it into the boom after Mr. Burrows has manipulated it.  So although Farris was able to identify and knew which pin to touch and which pin not to

Closing Argument - Ms. Ermakova

touch, what he did not know is that there are safety risks associated with touching the T4 pin.

Now, what would the additional updated product safety information provided?  The safety bulletin would have warned that property damage and death may occur if the wrong pin is touched.  The warning stickers warn against touching the wrong pin, the T4 pin.  And the cover plate on the T4 pin, of course, reinforced which pin needs to be touched.

The failure to send the bulletin was the but-for cause of the incident, because the bulletin and the safety cover plate directly addressed the T4 pin.  Liebherr Germany issued the documents to prevent the touching of the wrong pin, so the additional documents would have alerted a person to stop.  They would have alerted the person that the T4 pin should not be touched.

Bob Berry testified that the updated product information would have apprised an operator that the T4 pin should not be touched.  And the cover plate that goes on top of the T4 pin would have also prevented the accidental manipulation of the wrong pin.

So here's the instruction that the manufacturer sent with the warnings.  It reads that the operator, and I quote, should exchange at the next opportunity or unconditionally upon the next telescopic boom separation the presently installed round cover plate.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

Here's a further instruction as to the X sign on the warning sticker, indicating that death, personal injury, or property damage could occur.  Now, the OSHA report similarly concluded that the incident could have been prevented had the safety information been provided in a timely manner.

And it is undisputed that defendant did not save -- send the -- excuse me, send the safety bulletin to Schuch.  We have heard testimony to this extent.  And Schuch, a broker, would have immediately forwarded the information to Sims, as they had done previously when they received similar product information from manufacturers.

It is undisputed that the operator's manual was silent about the T4 pin.  All witnesses testified to this fact.  Sims would have provided the stickers and the updated warnings to the operators on the same day.  In fact, Bob Berry testified that the same information would have been conveyed to the operators and placed on the crane within a matter of hours, depending on the location of the crane at that time.  In addition, they have provided no evidence with respect to the claim that Sims' employees caused the collapse.

Yes, Burrows was an apprentice who was working on this crane, but the fact that an apprentice was working on this crane is not something uncommon.  Indeed, Henry Ward explained that it is common for apprentices to assist operators with large pieces of equipment.  It is not a highly unusual

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

circumstance that an apprentice would be working with a certified operator here to receive liability on defendants' part.

Bob Berry and Anthony Bond, plaintiff's expert, testified that Andrew Farris was a qualified operator and qualified person under the ASME B30. An apprentice may work under a qualified operator. And, in fact, Mr. Bond testified that it was standard in the industry for a operator to have multiple oilers and apprentices assisting him.

Even if Burrows had read the manual in its entirety, he would not have known not to touch the T4 pin, because that information did not exist in the manual. Again, all witnesses testified to this. And Dr. Vigilante explained it was reasonable for Farris to operate the crane even though the T4 pin was manipulated.

He stated, and I quote, it was foreseeable that for any reason, whether miscommunication, whether it was somebody -- a relatively new apprentice or whether they're having a bad day, and whether it was either in the crane or outside the crane, but it was foreseeable that the two pins can get confused. And the wrong pin can be inadvertently adjusted. And when that happens, the operator was not provided with the warning that he needed to understand the consequences of that, and that's what the product safety bulletin was meant to address. Therefore, the failure to have it is what's causing

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

the problem, not that somebody inadvertently did something
wrong.  We all make mistakes.

And, again, the whole point of Liebherr Germany
updating the safety information here was to prevent the
accidental touching that occurred here.

Let's see what we heard could have and should have
been done to prevent the damage.  Defendant could have just
sent information to Schuch.  Defendant could have updated its
database.  And if they did so, they would have known a
discrepancy existed as early as November 2016.  They had an
obligation to send the safety documentation to crane owners.
And if there was proper maintenance of their customer database,
this product information would have been timely sent.

Now, they could have also easily called or e-mailed
Sims the same product information.  They had an obligation to
do so.  And if that had been done, Bob Berry testified that
that information would have been communicated to the operators
within a matter of a few hours.  But, instead, there was no
effort made to contact the owner.  An e-mail to Sims or Schuch,
how long does that take?  Several minutes.  A phone call to
Sims?  Instead of doing that, they sat back and did nothing
until they were contacted by Liebherr Germany after the
accident already occurred.

Now, the incident was a foreseeable consequence of
defendants' training.  Ward provided 40 hours of training,

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Ermakova

skipping several safety sections and deviated from the manual.
A direct consequence of the failure to provide complete
instructions is that the crane will not be operated properly,
which is what happened here.  Ward did not train Sims to lock
the T3 pin at a certain position, and he did not train them to
measure the position or how to measure the position.  Instead,
he trained them to merely tighten the pin.

So when Andrew Farris manipulated the wrong pin, in
the same manner as he was taught to manipulate the T3 pin, that
was a foreseeable consequence of Henry Ward's incomplete
training.  Indeed, we have Andrew Farris who specifically
followed the training provided by Ward and tightened the T4 pin
until it was snug.  Had Henry Ward trained Andrew Farris to
measure the T3 pin, Farris would have performed that same step
on the T4 pin.

How do we know this?  We know this because Mr. Farris
actually performed that step on the T4 pin as he did on the T3
pin.  We know this because the two pins look the same, are in
close proximity, and they use the same tools.  Moreover,
Dr. Vigilante testified that it was reasonable for Andrew
Farris to manipulate the two pins in the same manner, because
the two pins looked the same and are in similar positions.  And
the manual itself lacked any instruction as to the T4 pin.

Again, not a single witness testified that Burrows
and Andrew Farris caused the accident, that the T4 pin was

Closing Argument - Mr. Cremer

accidentally manipulated was not a highly unusual incident here
to relieve defendant from liability for failing to provide
complete and proper instructions.

And Dr. Kelly, defendants' own expert, testified that
Andrew Farris and Burrows could not have known about the safety
risk associated with the T4 pin, because that information was
not conveyed to them.

As to damages, Liebherr US evaluated that to repair
the crane, it would cost about $1.4 million. And Mr. Vieten
testified that the replacement cost would be about
$4.5 million. A fair market valuation was a little in excess
of $3.2 million, and NBIS relied on Bristow Truck & Equipment
Specialists for this valuation.

Plaintiff is entitled to recover $1,744,752.74 in
damages, plus pre- and post-judgment interest, which is the sum
that will place the plaintiff in the same financial position
that it occupied before this accident.

That is it, Your Honor. And I would like to reserve
the remaining time for rebuttal.

**THE COURT:** Thank you.

**MS. ERMAKOVA:** Thank you.

**THE COURT:** Go ahead, Mr. Cremer, Mr. Pender.

**MR. CREMER:** Thank you.

Your Honor, Counsel, as was just mentioned the
plaintiff has two primary legal theories against Liebherr US,

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

inadequate training by Liebherr US of Sims employees, D'Angelo and Farris, which was the proximate cause of the boom collapse, and/or inadequate training of Henry Ward on how to commission a LTM 1500 crane to customers.  And the second primary theory is failure of LUS to deliver the safety bulletin and the retrofit kit to Sims in a timely manner, which was the proximate cause of the boom collapse on February 19th, 2018.

There's the defense claim, that the acts and omissions of Sims Crane in performing the boom swap on February 16th and the negligent operation of the crane on February 19th were the sole or primary causes of the boom collapse.

And I'd like to review the testimony of some of the key witnesses that touched on each of these legal claims and defenses.  As to adequate training, there's only one training question that is relevant to the training provided by Mr. Ward to Farris and D'Angelo, and that issue is, did Ward properly train on the safe and proper procedure to swap the 15-meter boom for the 84-meter boom?  And the evidence is uncontroverted that he did.

Mr. Farris testified he was properly trained by Ward on how to perform a boom swap.  He admitted he understood following the training on how to safely assemble the 50-meter boom and the 84-meter boom.  He knew that the only locking pin that you would ever need to manipulate was the T3 pin.  He knew

Closing Argument - Mr. Cremer

that the locking pin on the boom sections were the mechanical connections that held each boom section in place.  He knew there was never a need to touch the T4 locking pin, which was set by the manufacturer.

He testified that he read and understood the warnings in the operator's manual that improper assembly or disassembly of the crane components could result in a catastrophic accident leading to serious injury, death, or personal injury -- or property damage.  He admitted he understood that these warnings that were contained in the manual pertained specifically to assembly and disassembly of the 50-meter and 84-meter boom.

We also submitted to the Court the deposition testimony of Jason D'Angelo, who was also trained by Liebherr on this particular crane.  He corroborated that the training by Henry Ward was excellent, and he used that adjective, and that he believed the training on the means and methods to perform the boom swap taught to him was proper and allowed him to do a competent and safe boom swap.

We really don't need to solely rely on the testimony of Farris or D'Angelo that they were properly trained on how to safely perform a boom swap.  We have objective evidence that they were properly trained because they and Sims as a company perform boom swaps safely and competently 35 times.

But what was different about the boom swap that took place on February 16, 2018 in the Sims yard that turned out to

Closing Argument - Mr. Cremer

be a critical factor that would lead to the boom collapse? That factor was an inexperienced and poorly supervised apprentice named Shane Burrows. Shane Burrows may have had all the capabilities to be a fine journeyman oiler or crane operator one day. But on February 16th, he was put in a position in which he was clearly over his head, and he was given tasks and responsibilities he was simply untrained to perform.

        According to Farris, he instructed Burrows to remove the cover over the T3 pin, but Burrows testified he was never instructed to remove the cover. In fact, Burrows testified he knew -- never knew there even was a cover over the T3 pin. How could Shane Burrows be assigned a safety critical task of locking a huge, dangerous 84-meter boom in place and not be trained that the very pin he needed to access was covered by a plate? How could he be assigned the safety critical task of being the spotter on top of the crane to determine when the T3 pin was properly positioned in the hundred-percent hole of the T2 section when he was never trained on which pin was the T3 pin and which pin was the T4 pin?

        Whether you find Farris instructed Burrows to remove the T3 cover and Burrows simply forgot, or if you find that Burrows -- or that, rather, that Farris had never instructed him to remove the T3 cover, in the end, the responsibility with -- lies with Andrew Farris. He was the

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

assembly/disassembly director.  He had the responsibility to make -- to ensure that the 84-meter boom package was properly prepared and ready for installation into the crane.  In fact, Mr. Farris admitted on cross-examination it was his responsibility to make sure that the T3 dustcover was off when the boom was inserted into the crane.

Sims, as a company, also bears some of the fault here as well.  The training provided by Liebherr US on the LTM 1500 was open to whomever Sims designated to attend the training. D'Angelo testified in his deposition he went to Sims management and specifically requested that Burrows attend the training, and his request was shot down.

Regardless of whether Sims decided to send Burrows for training that was provided by Henry Ward or not, Sims still had the responsibility to ultimately make sure that the person that was tasked with the responsibility to safely secure that 84-meter boom was adequately trained, and we know Sims completely failed in that responsibility.

It's a good reason -- or this example is a good reason why Liebherr required in its manual only experts, in quotations, who are properly trained in performing boom swaps be allowed to conduct the type of tasks that Shane Burrows was tasked to do.

I don't dispute that Andrew Farris may have been qualified to perform the boom swap, but he wasn't the man on

Closing Argument - Mr. Cremer

top of the crane charged with a task of locking the 84-meter
boom in the correct T2 hole using the correct T3 pin.  And if
Farris chose to delegate that responsibility to an apprentice,
like Shane Burrows, he had to properly train him and supervise
him in the safety critical task.

Given the evidence presented in this courtroom, there
can be no conclusion, other than Shane Burrows was not properly
trained or supervised to perform his task to secure the
84-meter boom properly and safely.  It was this lack of
training and supervision that led to the wrong locking pin
being manipulated by Burrows from a safe, locked position to an
unsafe, unlocked position.

Despite the calamity of errors that led to the T4 pin
being unlocked, the mistake was caught.  Andrew Farris went up
to the boom and observed that the T4 pin was in the wrong hole
and had been moved from his locked factory setting to an
unlocked position by Burrows.  So Farris then takes over, and,
using the S wrench, moves the T4 pin to what he believed was
back to the original, factory-locked setting.

We know from the post-accident inspection that Farris
did not restore the pin to its correct setting, but left it
three quarters of an inch lower than it should have been
positioned, which put the pin in the direct path of a hydraulic
cylinder, which sheered off the pin and caused the boom
collapse.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

I don't doubt that Andrew Farris had a good-faith belief he had restored the T4 pin to its proper, locked position. However, his overconfidence that he had restored it to a proper and safe position resulted in additional errors that ultimately led to this tragedy.

When the T4 pin was modified by Shane Burrows, Farris was in a situation he had never been in before. He had no guidance from the Liebherr operating manual on what steps to take if a T4-pin factory setting was changed. There was no guidance in the manual about the precise setting of -- for what the T4 pin should be, and that's because it was designed never to be manipulated. And Shane Burrows -- or, rather, Andrew Farris admitted that fact that he knew that that particular pin, the T4 pin, was never to be manipulated.

He makes the independent decision, after he discovers Shane Burrows' mistake, not to report this safety critical error that was made during the swap to a supervisor at Sims. He conceals it, either because he wants to protect Burrows from any disciplinary action or because he believed he had restored the problem or resolved the problem or perhaps both.

But he had available to him crane mechanics right there in the Sims yard that could have been called upon to consult on the issue. He had contact information from Liebherr service department and from Henry Ward, which was provided to him during his training, that he could have called for help.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

More importantly, he could have tested the integrity of the T4-pin connection while still in the Sims yard, but he decided not to. Why? He didn't test it, because to do that testing required a lot of extra work. He would have had to set up the outriggers, and he would have had to add thousands of pounds of counterweight, extra work that Andrew Farris decided not to do.

He conducted no performance testing of the boom whatsoever after the boom was installed while it was still in the Sims yard, despite being aware that the mechanical connection, which held the T4 in place, had been moved from a locked position to an unlocked position by Burrows during the swap.

Farris had a second chance to test the functioning of the 84-meter boom once the crane was driven to the jobsite the following day, Saturday February 17, 2018. At this point in time, the crane was set up with outriggers and counterweights. Each of the boom sections could have been tested at this time, but he decides only to scope out one section, the T6 section. Another opportunity to test if telesection 4 and its pin was properly repositioned.

Nothing changes between that Saturday and the start of work on the project on Monday morning. So, presumably, had Farris tested the boom functioning on Saturday, he would have discovered that the hydraulic cylinder was getting stuck on the

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

T4 section, and he would have discovered that malfunction at a point in time when there was no one on the jobsite. He didn't have the pressures looming over his head of an entire group of contractors and tradesmen waiting for him to resolve this problem so that the job could get underway. He had clearly pressures on his decision-making on the morning of this accident.

So let's talk about February 19th, the date of this accident. He sets the boom configuration on the computer in order to ultimately lift components to build the tower crane for this hotel or motel that was being constructed. This is the first time malfunction of the boom operation manifests itself, but it's been lying there undiscovered since Friday.

After multiple attempts to resolve the malfunction, Farris calls his supervisor, Mike Gay, to report the problem, as he was required to do by Sims internal policy.

Mike Gay instructs Farris he is sending out a technician immediately to the jobsite. Now, this jobsite is a matter of seven miles and a 12-minute drive from the Sims yard.

Farris admitted on cross-examination he understood in general that he was to stop and wait for the crane mechanic to arrive on the jobsite, but on this occasion, he didn't do so. Farris makes the independent decision, then, to contact another crane operator, coworker, to ask his advice on how to handle the boom malfunction.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

Bill Piper was an experienced crane operator, but he had no experience on operating an LTM 1500.  He was -- he had never been involved in a boom swap on this type of equipment or any other equipment, because at the Sims yard, only one crane had the dual booms, like the LTM 1500.

Bill Piper was never informed of the critical mistake that had been made during the boom swap when the T4 locking position had been improperly changed.  Bill Piper never read the manual pertaining to this machine.  And he gives advice to Mr. Farris to take the boom operation out of computer mode and put it into manual mode.

And Farris decides to follow that advice.  And before following that advice, Farris does not contact his supervisor, Mike Gay, to ask permission to try to continue to repair this malfunction by putting the crane into manual mode.  He makes the decision to follow Piper's recommendation, even though a trained mechanic was already on his way to remedy or potentially identify and correct this malfunction.  Farris testifies he believed he had the authority, and continued to troubleshoot the problem, but not if the malfunction presented a safety hazard.

Now, I will agree, Farris himself may not have been qualified to determine whether this was a safety hazard or not. He was not a mechanic.  He was a crane operator.  And since he couldn't make that determination, it was incumbent upon him to

Closing Argument - Mr. Cremer

wait for the person with the right skills and training to
determine if the boom could still be safely operated.  It
should have been the Sims-trained mechanic who made the
decision if it was safe to put the crane into manual mode and
to force this hydraulic cylinder to retract, as it was done.

Don't you think it would have been important for
Farris to report to Mike Gay and to Bill Piper that the T4 pin
had mistakenly been adjusted during the swap the prior Friday?
I mean, this is the same boom section, T4, that the malfunction
is manifesting itself on.

We will never know if Andrew Farris, had he just
waited for the Sims mechanic to arrive on the scene, if this
boom collapse would have never occurred.  We do know after it
was taken out of computer control mode and placed into manual
mode, that the boom collapse occurred.

Farris admitted in this very courtroom, under oath,
that he believed if he had stopped and waited for the Sims
mechanic to arrive on the jobsite, this accident likely would
not have occurred.

Farris also admitted that he would not have expected
Henry Ward to train him on what to do if someone had
accidentally changed the setting on the T4 pin since the T4 pin
was never designed to be manipulated during a boom swap.  He
admitted that the product safety bulletin, even assuming had he
received it and read it, had no information or instruction on

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

what to do if the T4 pin was improperly manipulated.

And the product safety bulletin never directed a crane owner or operator to stop operating the crane until the modified cover plate and warning details were installed on the boom.  To the contrary, the bulletin instructs crane owners and operators that they can continue to safely operate the LTM 1500 crane so long as they continue to follow the operator manual's instructions meticulously.

And can there be any doubt that boom swaps could be performed safely and competently without a cover plate and stickers and the information contained in the product safety bulletin?  We know that it can, because it was done.  It was done 35 times by Sims alone.  It was done hundreds of -- or thousands of times by the 200 other owners of these cranes prior to the release of the service -- of the safety bulletin in 2018.

I want to talk about Bob Berry for a second, Bob Berry, who was the safety -- former safety director at Sims. He was the person who had the interface with OSHA during this investigation following the accident.  And he was the one who gave the estimate as to the number of times that Sims had safely and properly performed a boom swap 35 times.

I asked him, did he have any complaints at all about the training provided by Henry Ward to Farris or D'Angelo, and he said no.  In fact, not a single person from Sims will come

Closing Argument - Mr. Cremer

into this courtroom to say that they had any complaints about the training that was provided by LUS or Henry Ward.  Unlike the plaintiffs, who come into this courtroom with paid experts who contend Sims had no responsibility for causing this accident, Bob Berry admitted in his -- in this courtroom that Sims had responsibility and takes responsibility for this accident.

He admitted manipulation of the wrong locking pin by Sims employees was a cause of the accident.  He admitted that the failure to remove the T3 dustcover before installing the boom in the crane was a cause of this accident.  He admitted that the failure to remove the T3 dustcover resulted in the T4 pin being manipulated from a safe, locked position to an unsafe, unlocked position, which caused the accident.  He admitted that after Andrew Farris caught the mistake made by Shane Burrows, that Farris failed to restore the T4 locking pin to its correct locked position, and that that was a cause of the accident.

Sims had no fault in causing this accident? Nonsense.

If I can get a little more water, Your Honor, I'm sorry.

**THE COURT:**  Sure.

**MR. CREMER:**  Talk about Ralf Vieten.  He testified that OSHA never requested any information from Liebherr about

Closing Argument - Mr. Cremer

the reason behind the issuance of the product safety bulletin or the retrofit kit.  The only inquiry that Liebherr US received from OSHA was a letter asking if the bulletin and retrofit kit had been delivered to Sims before the accident. All of the other information contained in the OSHA report came from Sims.  And how do we know that?  Because the OSHA report itself states that very fact.

Ralf Vieten told us that Liebherr US had no notice of any boom collapses involving the LTM 1500 before the issuance of the product safety bulletin in November of 2017.  That was 10 or 11 months after the training was given to Mr. D'Angelo and Mr. Farris.

Liebherr US had -- he testified had no notice of any boom collapse before the Sims accident, which was caused by leaving the T3 dustcover on the boom, which caused an accidental adjustment of the T4 pin.  He testified, like Burrows, like Farris, that if the operator manual steps are followed during a boom swap, that the -- that this accident would not have occurred.  And there was not one mistake on that boom swap that occurred the Friday before this accident.  It wasn't just manipulating the T4 pin.  It was that it was done when it was in the wrong access hole, contrary to the instructions.

Remember, I asked some questions of the witnesses about what the instructions state as to where do you position

Closing Argument - Mr. Cremer

the T3 pin, and it's to be in the first hole, the
hundred-percent hole of the T2 section.  If you do that, and I
showed photographs of this, where is the T4 pin?  It's
protected, hidden under the sheet metal of the T3 section.  It
isn't accessible, if you follow the manual's instructions, to
manipulate it in the first place.

          Mr. Vieten testified that Liebherr Germany designs
and manufacturers the crane, and that it was first sold into
the market in 1999.  Over 200 LTM 1500 cranes were sold to
customers with dual boom configurations.  This would mean
hundreds and thousands of boom swaps would have been completed
safely without the benefit of the product safety bulletin or
the modified dustcover or the warning stickers issued in 2018.

          He reviewed the delivery receipts for the retrofit
kits sent to customers for this particular campaign, and he
found most of the kits were delivered in late January and early
February 2018, just days before the subject accident.  Some
kits were delivered even after the Sims accident, which
evidences that this specific modification campaign was still
open and active when the accident occurred.

          Vieten explained to the Court that at every product
modification campaign in which additional parts need to be
delivered to a customer, in which a customer has to perform the
installation themselves, that Liebherr US needs to take steps
to identify the current location of the crane.  This practice

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

by the LUS modification department to locate the crane is done for each and every modification campaign like this one.  This is in addition to what information may have been contained in the databases as to who the original owners of the crane may have been, because, as we found out in this case, that information could be outdated or changed.

He confirmed that the procedure to identify the precise location of this crane was followed in this case by reviewing e-mails from Derrick Harris, who had worked in the LUS modification department, and made two telephone calls in January to Schuch with the intent of trying to find the current whereabouts of the subject crane.  Schuch never returned those calls, and before further investigation or follow-up, the accident occurs.

As to training, this idea of 80 hours versus 40 hours, there was evidence that if you buy a new crane, that you can get up to 80 hours of training, that's part of the new-crane purchase.  This crane was an as-is sale of a used crane to Schuch with no training whatsoever, including in the purchase.

We know Sims never contracted with Liebherr US for crane training, nor did they ever pay for any training provided by Henry Ward on the subject crane.  There was a request made by Schuch to Liebherr Germany to provide a week of free crane training.  And because Schuch was a good customer of Liebherr

Closing Argument - Mr. Cremer

Germany, it was agreed to provide 40 hours of training without charge.

Ralf Vieten testified he knew of no reason why a proper orientation on the LTM 1500 could not be performed in one week. In this case, as far as training on how to safely and properly conduct a boom swap on the LTM 1500, which is what is a specific issue here, there is no dispute that the training by Liebherr US provided Sims with the knowledge and skill set to safely perform boom swaps from the 50-meter to the 84-meter boom, because they did it, and they did it dozens of times safely and properly.

Ralf Vieten also talked about Henry Ward's training and his work experience while he was employed at LUS. I reviewed with Ralf Vieten several performance evaluations, if the Court recalls. And without exception, Henry Ward received exemplary, if not glowing, evaluations in practically every single category he was evaluated on. He was described to Mr. Vieten as a trainer's trainer. Henry Ward was the go-to person to train other LUS employees on how to perform crane commissionings with customers.

We also heard testimony from Johnathan Smith, whose current position with Liebherr US is nationwide technical manager of crawler cranes. He -- Mr. Smith is familiar with the product modification department and the fact that there are a vast number of products manufactured by Liebherr Germany and

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

other Liebherr companies around the world that would

potentially be subject to various modifications.

        And I think it's necessary to put into some context

the modification campaign involving the LTM 1500 in terms of

its priority.  Mr. Smith, first of all, researched, because I

asked him to, the number of open modification campaigns during

the time frame of the -- we're interested in here, November of

'17 through March of '18.  And during that time, LUS

modification department was actively managing seven to 800 open

modifications simultaneously.

        He explained to the Court about the various priority

of modification campaigns going on at the same time, and that

Liebherr Germany sets the priority.  The highest, the

number-one priority modification is a modification that

requires the Liebherr product to be taken out of service until

the modification is complete.  This is an emergency all-stop

type of modification order.

        Next in the priority level is what he called the 6000

series modifications.  This would include a software update,

component exchange.  An S modification is performed by Liebherr

technicians and needs to be scheduled with the customer.

        The next priority level below that is the 3000 series

modification campaign.  That's our modification campaign.  This

is the type of modification that is informational or involves

components that are simple enough for the customer to install.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

There's even a lower level than that, which is a 2000 series, which relates to basically optional product upgrades.

And he set out the steps that the modification department needs to take to go through a level 3000 modification, like we have here, where there are parts that need to be delivered to customers.

First, LUS would receive the written instruction from Germany that a modification was coming, and that, then, the LUS modification department would assign within its own group who was responsible for a specific modification. And they're numbered. The modification department would wait for delivery of the parts from Germany. And then once the parts are received, they are inspected, they are inventoried, and they are separated into complete sets to be sent to customers. In our case, we had a plate, we had four safety decals, instruction sheets. And these come in as -- in a crate, and you need to take them and break them out and break them up into sets, and this needs to be done.

Then the modification department will review the customer list provided by Germany, as to the last known owners of the crane, and verification would be made as to where the current physical location of the crane is. He explained verification of the current location is important because these cranes are resold, they're leased out for long-term-bear leases.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

In the case of a large customer that might have 20 locations around the country, who's to say that that crane may have been sold to an office in New York, but the crane might actually physically be located in California. And their job is to determine where the crane is so they can get the parts to the location of the crane. And the verification is accomplished by e-mail and telephone calls.

Johnathan Smith testified that based on the priority level of this particular LTM 1500 3000-modification campaign and the number of cranes to be verified, some 35 cranes, it would not be unusual for such a campaign to take anywhere from 8 to 16 weeks. The Sims Crane accident took place in the middle of the 8-to-16-week period at the time when the verification of the crane was still ongoing.

We know from the delivery receipts that were discussed in the course of this trial, that most of these kits or many of these kits were being delivered late January, early February, literally days before the accident occurred.

This was an ongoing modification campaign, and efforts had been made, despite what counsel said about Liebherr US, to contact the record owner of this crane and to find out the current whereabouts of the crane, as is the protocol of the department.

Steve Stodghill testified here. He's the president of Sims Crane. He provided interesting testimony about

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

basically who is the real party in interest in this lawsuit.
Sims is a nominal plaintiff.  But they had damages above and
beyond those compensated by their insurance carrier that's
being sought in this litigation.

Sims made the conscious decision not to participate
in this case, which they easily could have done, as is done in
many subrogation cases where they're seeking their
out-of-pocket expenses.  And you have to wonder why didn't they
do so?  Perhaps they didn't have the same conviction that the
insurance carrier has about the credibility of their
litigation, and they chose not to pursue this case.

One thing we do know is Sims had no choice but to
cooperate with their insurance company in prosecuting this
claim, because that's what was agreed to in their insurance
contract, whether they agreed with the merits of the claim or
not.

Stodghill did admit that Sims would like to see the
insurance carrier prevail, because that would mean potentially
lower insurance premiums and a better loss record.  On
training, Stodghill testified he was aware Sims was getting one
week of training from LUS free.  He testified if after that
one-week period Sims required additional orientation, they
would have ordered it, and they would have paid for it.

I'm going to move to plaintiff's expert testimony and
make some comments.  Anthony Bond, he was the plaintiff's crane

Closing Argument - Mr. Cremer

operation and safety expert.  He was hired to determine the cause of the accident and the responsibility of the parties in causing the accident.  He admitted he had no opinions critical of the training provided by Liebherr US on this crane to Sims.

As to the cause of the accident, what did he say?  It was Mr. Bond's conclusion that the boom collapse was caused by the improper positioning of the T4 pin, which was sheered off by the crane's telescopic cylinder after it had been improperly manipulated by Shane Burrows and Andrew Farris on February 16th, 2018.  That's what he said was the cause of the accident.

He testified Burrows changed the position of the T4 pin from a locked and safe position to an unlocked and unsafe position.  He admitted Burrows had never been trained on how to determine the location of the T3 pin from the T4 pin on the 84-meter boom.  He agreed that Burrows should have been trained on the location and distinction between the T3 and T4 pin before he was given the task to lock the 84-meter boom into the crane.

He admitted that Farris had the responsibility of the assembly/disassembly director to ensure that the T3 dustcover was removed before any attempt to insert the 84-meter boom into the crane took place.  He further admitted if Farris had done his job responsibly, the T3 pin cover would not -- would have been removed, and Burrows would likely not have manipulated the

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

T4 pin.

On cross-examination, he testified to a number of errors made by Sims employees, which he said caused the boom collapse on February 19th, 2018.  He pointed to the failure to remove the cover over the T3 pin.  He testified it was an error for the A/D director to not verify that the boom was properly prepped for installation into the crane.  He admitted it was an error for Sims not to have a person qualified to recognize the T3 from the T4 pin in performing the locking of the boom.  He admitted Sims made the error of having a person not qualified to recognize the proper pin to manipulate must be in an unlocked position, not a locked position, like the T4 pin presented itself when Burrows improperly manipulated it.

Mr. Bond testified contrary to Andrew Farris about the consequence of not fully locking these telescopic locking pins, whether it's T3, T4, T5.  He said if you don't properly lock the T3 or T4 pin, the mechanical connection between the boom sections would not exist and the boom would slide into the unlocked sections.

You may recall that Andrew Farris testified during cross that his -- that the computer controller on the LTM 1500 would not allow the boom to boom up if the pins were not fully locked, and that's -- that is definitely not the case.

Mr. Bond's overall conclusion was that the boom collapse was caused by operator error, Sims operator error.  He

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

also acknowledged that -- on cross-examination that Farris was not a trained crane mechanic and therefore not in a position to make any determination if the mechanical boom malfunction he was experiencing on the jobsite on February 19th involved the safety issue or not.

And unlike our expert, Jeff Travis, who sought out information about the event referenced in the product safety bulletin that led to the issuance of the retrofit campaign, Bond had no information about the event that was the genesis of the safety bulletin, and more importantly, if it -- that event that occurred was substantially similar to the Sims accident or not.

We know from the evidence presented during the trial that the Japan incident that led to the issuance of a product safety bulletin and the retro kit was unrelated to the Sims accident.

Jeffrey Travis, the defense expert, interviewed Mr. Bernd Boos of Liebherr Germany, who was the engineer who was involved in the issuance of the bulletin and in the redesign of the cover plate and safety decals. Jeffrey Travis learned that the Japan incident involved tampering or manipulation of the T4 pin when the boom was positioned on the ground. The Japan incident had nothing to do with the Sims event, where the T4 pin was manipulated when the T3 cover was left on the boom when it was inserted into the crane.

Closing Argument - Mr. Cremer

Mr. Travis also learned, from speaking to the engineers in Germany, that the cover modification was not designed to be -- act as a guard, as I think Mr. Goodman said several times during the course of this trial, but was to prevent tampering with the T4 pin while the boom was on the ground being stored prior to installation into the crane.

Our expert also learned that the modified cover design was never intended to serve as a guard. We know that, because Jeffrey Travis during the inspection of the exemplar crane personally examined the question. He looked to see if the modified guard would fit into the crane. And he said it would not fit. And Mr. Goodman danced with him a little bit about, well, would it at least scrape and get caught? I don't know of any responsible manufacturer who would design what it was intended to be a guard, would design it so that it wouldn't fit into the product it was designed to guard.

When you actually read the information contained in the product safety bulletin carefully, it basically contains information, which reinforces the instructions and warnings that are already contained in the operator's manual. In essence, it warns to only manipulate the correct locking pin, without any detail whatsoever in the product safety bulletin, which pin is correct and which pin is incorrect. The product safety bulletin content doesn't even talk about the T3 pin or T4 pin specifically.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

The purpose of the product safety bulletin and the retrofit kit focused on preventing the improper manipulation of the T4 pin.  It did so by emphasizing to the crane owners to meticulously follow the directions contained in the operation manual.

Now, what about the additional warning decals that are part of this retrofit kit?  These additional visual warning decals we know from Jeff Travis are only visible before the boom is inserted into the crane.  Once it's in the crane and you remove the cover, you can't see it from the access hole where the spotter, like Mr. Burrows, would be positioned.  And we know that Shane Burrows would never have seen these warning decals, assuming they had been installed prior to the day of his involvement in the boom swap, because he was positioned up on the crane, and he said he never removed the cover while it was still on the ground.

However, the facts of this case present a very different problem that was never addressed in the LTM 1500 safety campaign, and that is, what to do if the T4 pin somehow has been changed from its original factory setting.  Should you restore the T4 locking pin to some precise measurement, like specifically is mentioned in the manual for the T3 pin?  Should you test the functioning of the T4 section to make sure it's properly locked?  Should you stop and contact Liebherr?

There is no direction provided on any of these

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

questions, which would have been relevant to the situation that Sims and Mr. Farris faced once the T4 pin had been accidentally moved out of the factory setting by Shane Burrows.  The safety campaign did not address these issues because it was designed to address another problem, and that is the prevention of tampering with the T4 pin while it is on the ground, not the resolution of a situation once the T4 pin has already been changed.  And that is the precise problem Sims faced, and nothing in the safety campaign would have helped address or resolve the mistake that was made at that time.

Talk about Dr. Vigilante.  I want to start by looking at Dr. Vigilante's bias and financial interests and how that might affect his opinions.  He admitted on the stand that his revenue is almost exclusively derived from consulting with lawyers in litigating matters like this case.  He has worked on over two dozen cases with the Cozen O'Connor firm in the past.  So we can deduce from that that Cozen is a very good and dependable source of business for Dr. Vigilante.

When you boil down his opinions, his primary opinion is that had the product safety bulletin and retrofit had been delivered to Sims prior to February 19th, the accident would have been prevented.  What does he base that opinion on?  He bases that opinion on that he asked Andrew Farris what he would have done had he received the bulletin before the accident.  He bases that opinion because he asks Sims Crane how quickly would

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

you have put on those stickers and the cover plate and instructed your operators?

Dr. Vigilante acknowledges the human factors concepts of hindsight bias and how hindsight bias can adversely affect the ability of a person to adequately predict the outcome of their conduct. But he never considers outside bias in his analysis. He ultimately bases his opinion solely on Andrew Farris and Sims self-serving, subjective belief about what they would or would not have done had they reviewed the product safety bulletin with what would have been a few days before this accident.

What is the likelihood the product safety bulletin would have changed Farris' behavior if they're had not been a catastrophic accident that resulted in the death of a construction worker?

Assume the product safety bulletin is delivered to Andrew Farris and he reads it. He already knows what is the correct pin to manipulate. He believes he knows how to restore the T4 pin that was touched by Burrows back in its locked position. He's been successful in locking and unlocking the T3 pin on multiple times before. They're the same type of pin, and they serve the same function.

Dr. Vigilante never looks at issues such as the financial interests that a company like Sims has after this accident occurs. And they are faced with potential of a

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

significant legal case against them for the death of this young

man and for the delay on this project.  And yet --

      **MR. GOODMAN:**  Object, Your Honor.  There's absolutely

no testimony as to any legal cause of action, any involvement

of the death of a young man and any litigation outside of that.

If that's the case, then, I mean --

      **THE COURT:**  And I'm sticking to the evidence.  So I

understand there's been some additional commentary that's gone

beyond the evidence, and that's not going to be part of my

decision.

      **MR. CREMER:**  It was referenced in the OSHA report

that's been talked about in this case.  My point is, on

financial bias, why they would have said what they said when

they said it.  He doesn't look at the fact that when they said,

it was a time after these events that occurred, and they were

exposed.

      And I ask, what is the urgency that Sims would have

to do anything with this modification campaign, when they're

instructed by Liebherr Germany in the campaign itself that they

continue to operate the crane safely so long as they follow the

operator's manual, which they have, some 35 times?  Were they

wrong to do it within hours?  It doesn't make sense that they

would do such a thing.

      I asked Vigilante -- I just want to say that from the

day that Sims received the product safety bulletin, retrofit

Closing Argument - Mr. Cremer

kit after this accident, they used it as a shield to cover up and deflect the actual cause of this accident, which were the multiple errors made by its own employees.  We'll talk briefly about the defendants' experts --

Both of the defense experts are engineers and scientists employed by Exponent.  Exponent is one of the premier forensic engineering firms in the world.  They're professionals that have been called upon to consult on some of the most significant, catastrophic events in history.  Exponent professionals, like Jeffrey Travis and Dr. Rachel Kelly, are not just retained by lawyers for litigating cases.  They consult with major product manufacturers and industry on proactive types of consulting projects.

Mr. Travis offered 17 opinions to this Court, which I will not need to rehash here, but one thing that he did that none of the plaintiff's experts did, which was interview Liebherr's head of engineering, Mr. Boos, because he wanted to understand the reason behind the issuance of the safety bulletin and why Liebherr Germany modified the cover design and added warnings.  The plaintiff's experts were all guessing and assuming the reason behind the campaign was what happened at Sims.

Travis did his homework and found out the actual facts.  He also concluded that Andrew Farris and Sims Crane were in violation of certain OSHA regulations and ASME

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

standards.  I asked Mr. Travis if he thought it was odd that
OSHA didn't any issue any citations to Sims.  His answer was
yes, he thought it was odd.

He testified that the factual investigation by OSHA
concluded that the manufacturer's instructions were not
followed during the boom swap, because a critical support pin
had been improperly modified from its factory setting and that
it remained in that proper position, which caused the T4 pin to
sheer off.  This factual recitation in the OSHA report is in
itself a clear violation of OSHA, yet Sims is not given any
citation.  It was odd, indeed.

Dr. Rachel Kelly is a human-factor scientist.  She
conducted the actual research on the effectiveness of product
warnings and on product-user behavior.  She is familiar with
and relied upon a substantial body of research which has been
developed over the past 50 years on the impact of product
warnings on human behavior.  She applied these scientific
principles of hindsight bias and intrinsic variables when
analyzing the conduct and the statements made by Andrew Farris
and by Sims on what they would have done had they received the
kit and the product safety bulletin.

This is the type of scientific analysis you would
expect from a human-factors scientist.  And she concluded that
the conduct and the behavior of Andrew Farris would not likely
have changed because she had actual experience in conducting

Closing Argument - Mr. Cremer

boom swaps on multiple occasions prior to February 16th, which she completed safely and without incident.

The safety bulletin, which warned only to manipulate the correct pin, was already known to Andrew Farris, and he was confident, which he admitted, in his ability to be able to lock that T4 pin once it had been unlocked by Shane Burrows.

These are the type of what are known as intrinsic variables that affect human behavior, which Dr. Kelly examined, a quite different approach than Dr. Vigilante's approach, which was relying on subjective and self-serving statements made by Sims management and Andrew Farris of what they would have done in hindsight.

Lastly, I want to discuss plaintiff's claim of the failure by LUS to deliver the bulletin and retrofit kit in a more timely manner to Sims was a proximate cause of the boom collapse.

A lot has been made by the plaintiff about when in time LUS should have known Sims owned the LTM 1500.  And there was conflicting information on the issue because of the way it was sold, first to Schuch and then resold by Schuch to Sims through a broker.  There were other events that took place, like the training given by Sims in January and February, and spare parts sales.

However, the LUS service department, which provides the training and the spare parts maintains separate databases

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

from the Liebherr Germany database.  So we have this
discrepancy regarding who was the owner of the crane, who might
continue to -- who might currently be the owner of the crane
because LEW sends a list of owners based on its database, which
is not updated by the activities of the Americans.

　　　But you heard the testimony of Johnathan Smith, who
was familiar with the practice and procedures within the
modification department in determining with where to send
notifications and parts when a modification campaign has been
issued.

　　　The information provided by Germany as to the owner
of the crane is just the starting point.  In fact, for the
modification department, ultimately, it doesn't matter what
owner Germany may list for the crane owner back in 2016.  The
modifications department's job is to confirm not only current
ownership, but actual location of the crane that is subject to
modification at the point in time the modification campaign is
initiated.

　　　And that is exactly what Derrick Harris was doing
when he contacted Schuch on two occasions in January of 2018 to
determine if Schuch owned the crane or more importantly where
the crane was currently located.  Schuch never returned those
calls.

　　　It was during this time period when the retrofit kits
were being sent out and delivered to customer locations, which

Closing Argument - Mr. Cremer

were confirmed to have LTM 1500 cranes, and many of those kits were delivered in early February, just days before this accident. Some of the kits were delivered after this accident. Still others were still in the unknown category after this accident. This was an ongoing modification campaign when this accident occurred, and it occurred in the midst of the campaign.

There has been no evidence presented by the plaintiff as to whether a time period of 8 to 12 weeks to complete a modification campaign like this was anything other than customary for this industry. Johnathan Smith testified that it was.

The modification campaign was not to cure a defective condition of the crane, which made the continued operation of the crane dangerous. Mr. Goodman stood up here many times and said this is not a product liability case. This is not a product defect case. To the contrary, this was an informational campaign to reinforce the importance of customers following the manual and performing -- when performing boom swaps.

This was not a stop order issued by Germany to contact customers immediately to stop using the crane until the modified cover and warning decals were installed on the crane. It was directly contrary to that. It was that the customer continued to operate the crane without the retrofit kits so

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

long as they followed the manual instructions meticulously and defined a causal connection between this delay and the accident.

The Court must also look at what Sims and what Mr. Farris would have done had they had the kit and the information to them within days of the accident that actually transpired. Would Sims have communicated the product safety bulletin to Farris when they received it? When and how? Would they have installed the cover plate and decals on the day it was received, three days later, a week later, a month later? Would they have thrown it in the garbage?

Even if the product safety bulletin had been communicated to Andrew Farris prior to March the 16th, 2018, and the retro kit parts were installed on the boom, what impact if any would any of this information have had in changing Andrew Farris' conduct and behavior? Would he have stopped when Shane Burrows made the mistake? Was he confident enough in his own skill set that he believed he properly relocked the T4 pin, just like he was able to lock the T3 pins on many occasions before?

The answers to each of these causation questions are not capable of being determined without resort to speculation. And as the Court is keenly aware, the law has no place for guesswork or speculation on critical causation questions like these.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Cremer

I'm turning it over to Mr. Pender who is going to talk briefly about damages.  I don't know that you'll get to the issue of damages.  But if you do, Mr. Pender will discuss some evaluation issues.

But before I turn it over, I want to talk about comparative fault.  There's no doubt in this case, all of the active negligence was committed by Sims.  Clearly Sims was the primary tortfeasor, and if there is any award on their behalf, it should be reduced commensurate with an active tortfeasor, and in my humble opinion that should be 90 percent or more.

Thank you, Judge.

**THE COURT:**  Thank you.

Mr. Pender.

**MR. GOODMAN:**  Your Honor, I apologize.  Before we get into damages, may we take a very quick break?

**THE COURT:**  You may.  Let's see, want to take about ten minutes.  Is that enough?

**MR. GOODMAN:**  Great, Your Honor.  So we've gone right at an hour so far for the defense.

**MR. PENDER:**  I've got about five minutes or so.

**THE COURT:**  No problem.  I want to make sure that we're -- is there going to be a longer -- how much longer do you anticipate the plaintiffs to go?

**MR. GOODMAN:**  I don't think we're going to go long on the rebuttal, Your Honor.  I mean, we could.  I think we're

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Pender

probably going to be able to sum it up in ten minutes.

**THE COURT:**  Let's take a ten-minute break.  We'll come back at ten till noon.  Thank you.

**THE COURT SECURITY OFFICER:**  All rise.

(Recess from 11:38 a.m. to 11:50 a.m.)

**THE COURT:**  Okay.  I guess the first time where everyone wanted to come back faster than the amount of time I've allotted.  I don't mean just for this case.  I mean in general, in any case I've ever had.

Go ahead, Mr. Pender.

**MR. PENDER:**  Thank you, Your Honor.

I will address briefly the plaintiff's damages claims.  Mr. Cremer talked a bit about the financial bias about the plaintiff's warnings expert, William Vigilante.  The plaintiff's damages expert is a man named Howard Bristow, who did not testify in court here, but whose deposition and reports are being submitted.  Howard Bristow is so financially entangled with NBIS, the plaintiff, and their law firm, Cozen O'Connor, as to render his expert valuation opinions highly biased and, in our view, compromised.

In his designated deposition testimony, Mr. Bristow testified that his company, Trucking & Equipment Specialists, makes its revenue one way.  It gets assignments from insurance companies and their lawyers to appraise and evaluate equipment.  That's at Page 8 of his testimony.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Pender

In this case, NBIS paid Mr. Bristow $145 an hour, and he spent 90-plus hours to prepare his expert reports, a sum, when you do the math, of about $13,000 just on this case.

Mr. Bristow also testified at Page 34 of his deposition that NBIS is one of his very best clients. But he is even more inextricably intertwined with NBIS's law firm. Mr. Bristow testified that the Cozen O'Connor law firm has retained him several thousand times over the last 15 years. And that's at Page 33 of his deposition.

If you do the simple math of a case like this at $13,000, and you multiply that out by several thousand times or even a thousand times over 15 years, you're talking about seven figures that this witness is getting fees from the attorneys in this case. And, clearly, that financial bias is at play in his valuation here.

The claim for $1.744 million is based on what Bristow provides as the top-line figure, from which other deductions are taken. And he has done that in this case through what we believe is a flawed analysis of comparable crane sales or comps.

Comps, and we will be submitting findings -- proposed findings of law to the Court. Comps are how much is charged -- how much other similar property of similar condition and similar size sells for during recent times. In other words, comps are actual sales of equipment, or in real estate, actual

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Pender

sales of homes, not simply the figures of -- by which that property is offered for sale. Anybody can offer anything for sale at any price. But to find the figure that's relevant to whether there's a willing buyer and a willing seller who have a meeting of the minds, it has to be sold.

And in this case, Mr. Bristow based his entire valuation on four comps, four LTM 1500 cranes that were listed for sale on a website called cranetrader.com. There is no evidence that will be presented that any of the four cranes he relied upon ever sold. And this, as a result, we believe, skews his base calculation. It's a fundamental flaw in his report, and is fatal to the plaintiff's claim of damages in this case.

In addition to the fact that there's no evidence that any of the four cranes that he based his report on ever sold for the prices that they were listed at, there is evidence to the contrary as to at least two of those cranes.

You'll see the deposition submission of our defense expert, Dennis Muron, who followed up on the comps that Mr. Bristow relied upon. The fourth comp that Mr. Bristow relied upon was a crane that was for sale by a company called Atlantic Coast Cranes, which coincidentally is the company through which Sims brokered their purchase of this LTM 1500, a company that we knew where they were located and were able to contact them.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Pender

And Mr. Muron did contact Atlantic Coast Cranes.  And they said to -- and he said to Atlantic Coast, hey, you've got a crane that's listed on cranetrader.com for $3.1 million.  And Atlantic Coast Cranes advised that that crane never sold for that amount and was now being listed as a reduced price.  But Bristow never followed up with Atlantic Coast to find out if the crane had ever sold or if the price had been reduced.

Another one of Bristow's four comps, his second one is a crane that was listed in Belgium by a company called Aertssen, A-e-r-t-s-s-e-n.  The Aertssen crane was listed on cranetrader.com, back when Bristow did his report, for nearly $3.2 million.  And that's shown in defendants' -- trial Exhibit Number 98.  That's the listing that Mr. Bristow relied upon at cranetrader.com that shows that crane being offered for sale at $3,184,000.  But Muron also followed up by the time of his deposition in 2021 as to whether that crane ever sold, and if so, what amount.  It turned out that crane had not sold, and was; now being listed for substantially less, $1.7 million, just about half the price it had initially been listed at when Mr. Bristow relied on that.  And that's defendants' trial Exhibit 91.

So we know that two of the four of his comps are wrong.  Fifty percent of his evidence is -- basis of his report is incorrect.  We know that none of his four comps ever actually sold, or at least there's no proof of that.  And it's

Closing Argument - Mr. Pender

a complete failure, in our view, to establish the pre-accident

value of this crane, which is necessary to prove up their claim

for damages, resulting damages.  Bristow's pre-accident

evaluation is artificially high, and even after backing out the

money that NBIS made in a salvage sale, results in

overcompensation to the plaintiffs.

If the Court considers damages, and if the Court

nonetheless decides that it is going to award some damages to

the plaintiff, the defense suggests there are two more reasoned

ways to calculate fair damages in this case, both of which we

believe the plaintiff has conceded to be fair.

One would be the cost of repair of the crane.  When

Bristow and the folks at Liebherr examined this crane after the

accident, they agreed that there were certain damages to the

crane that were caused.  Those damages were submitted to

Liebherr, and Liebherr came up with a repair quote.  The repair

quote was $1,452,492.

In his testimony, Mr. Bristow at Page 43 testified

that he agreed that that Liebherr repair quote was consistent

with the damages he saw on the crane upon inspection.  He

further stated in his report that it was his recommendation

that that Liebherr quote for repairs be accepted as the true

base representative -- representation of costs to restore the

crane to its preloss condition.  That testimony is at Page 43

of his deposition.

Closing Argument - Mr. Pender

And while he said the ultimate repairs might have
been higher, he performed no analysis or determination as to
whether or not they would have been in this case.  That's
Page 44 of his deposition.

Now, this Court can award costs of repair in a
property damage case.  Plaintiff's own trial brief cites as a
basis for its damage calculation a case called American Equity
Insurance versus Ginhoven, 788 So.2d 388, from 2001, where the
Court found -- and this is, again, from the plaintiff's trial
brief, explaining that ordinarily market value is the measure
of damages.  If the property -- damaged property may be
repaired, restored, replaced, the Court may award those costs
as a means of determining damages.

And so at the high end of our range, we have the
Liebherr repair estimate of $1,400,000 and change.

Another fair and reasonable way to evaluate the
damages in this case comes again from Mr. Bristow.  At Page 52
of his testimony, I asked him, a crane, such as this LTM 1500,
this Liebherr that we're talking about in this case, when
you're evaluating that crane, what typically would you
depreciate that crane for each year in its value.  And he said
that crane would be subject to depreciation rate of five to
ten percent.  Again, that's at Page 52 of his testimony.

We know this crane was sold by LUS in late 2016 for
$3.1 million.  It went to Schuch.  Schuch sold it to Atlantic

Rebuttal Closing Argument - Mr. Goodman

Coast Cranes.  Atlantic Coast sold it to Sims.  But that was --
there was a willing buyer and willing purchaser at $3.1 million
for that crane.  Sims then used that crane for a year before
this accident, such that at the time of the accident, it would
have been subject to a five to ten percent depreciation in
value.

In fairness, if we used the mid range -- the middle
point of that range, seven and a half percent, and you apply
that to the $3.1 million sale price a year earlier, you get a
depreciated 2018 value of $2,867,500.  And when you back out
what NBIS made on the salvage, 1,000,650, you get net damages
of $1,217,500.

Under either of those methods of calculus, either the
cost of repair or the fair market value depreciated
appropriately, the defendants' range for damages in this case
is 1.2 million to 1.4 million.

Again, we believe there's no reason for the Court to
consider damages in this case.  If we do, we believe that 1.2
to 1.4 million is fair compensation for the reasons stated,
subject, of course, to reduction for that percentage of fault
that the Court assigns to Sims Crane.

Thank you.

**THE COURT:**  Thank you.

**MR. GOODMAN:**  Your Honor, if I may talk about damages
first in response, and then I'll go back to liability since we

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Goodman

first heard about damages.

**THE COURT:**  Sure.  No problem.  Go ahead.

**MR. GOODMAN:**  First, you heard initially that the --
Mr. Bristow worked with Cozen O'Connor, was significantly
intertwined, and that he worked for us for thousands, I guess
of time.  That was kind of news to me.

So we looked at his deposition transcript.  And on
Page 32, the question was asked, "Have you worked for the law
firm Cozen O'Connor?"

The answer was, "Yeah, I definitely worked with Cozen
O'Connor in the past."

The question was, "Do you know about how many
occasions?"

The answer is, "No, I do not."

So I'm not sure where the thousands comes in.  But I
think that's kind of what you can expect from Liebherr, is the
constant alteration of facts.

Also, with regard to depreciation, it was my
recollection that Mr. Bristow was not aware of the depreciation
valuation on something like this, because he is not an
accountant.  He is not involved in the taxation of this piece
of material.

And so when asked about the depreciation, on Page 51,
he's asked, "And can you tell us" -- sorry about that, Your
Honor.

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Goodman

"Can you tell us what the depreciation would be on this crane?"

And his answer is, "At this point, probably not."

And then he was asked again, "Is there a range you could tell us?"

He said, "Maybe five percent per year, five to ten percent per year, but it depends."  Says depending.

So I think the fact, as you can see, in both the discussion of liability and damages is awfully skewed.

To go back to the damages, there is a repair estimate that's been put before Your Honor.  We would say that repair estimate is one piece of fact that the Court can use in determining the valuation of these damages.  We've put before Your Honor the replacement cost, and the cases say that that is also something that the Court can use to determine the valuation of these damages.  And we've put before Your Honor the report of Mr. Muron -- excuse me, the report of JR Bristow, which puts forth the fair market valuation of the damages on the date of loss.

And what's interesting is, that is how it is supposed to be done.  No one can look years in the future or years behind to view these damages.  The cases say you're supposed to look at the time of the loss.  And even in the defendants' own expert's report that we see up on the screen, it says the methods used by Bristow to calculate the ACV was consistent

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Goodman

with industry standards.  That's their own expert, the
defendants' expert.  They go on to say, the defendants' expert,
Mr. Muron, the Bristow assessment of the value at 3.2 plus is
fair and reasonable with respect to the insurance claim.  And
then the last is with respect to the selling price, Envista
considers the Bristow estimate to be fair.  Asking price for
the mobile equipment is usually negotiated downward, can be
reasonable -- be purchased for three to five percent below
asking place.

          But then in his deposition, I asked him, it depends
on a lot of factors whether something is negotiated downward or
upward.  It can depend on how much the person is in need of a
crane, who are the negotiating parties, how -- the strength of
negotiating parties.  So he agreed that although it could be
negotiated downward, it could be negotiated upward.  The point
of it, Your Honor, is their own expert found that the manner
and method by which JR Bristow undertook the evaluation of
these damages was fair, reasonable, and according to industry
standards.

          Now, with regard to liability, Your Honor, you know,
you've heard a lot of excuses from Liebherr.  They have a lot
of excuses for their own acts.  They have a lot of excuses for
what Sims should or should not have done.

          But let's talk about what the facts are.  On
February 16th, 2018, the Sims employees working on this crane

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Goodman

had a crane, an LTM 1500, 600-ton crane.  They had an operator's manual.  And they had thousands of hours of training and experience on how to operate cranes.  That's what they had.  They did not have knowledge of the risk associated with what would happen if one manipulated the T4 pin, because Liebherr never provided it to them.

Also, Mr. Ward never advised them during training.  So on February 16th, when they manipulate that pin, and they remanipulate it, they knew what they knew.  They knew what they didn't know, because they looked at the operator's manual.  They didn't know what they didn't know.  You can't know what you don't know.

That's why that is the purpose of this product safety bulletin.  That is the purpose of getting training that is supposed to go over warnings that can cause damage to property, personal injury, and death.

So on February 16th, they did everything that they were supposed to do.  The only witness -- the only witnesses who say that they didn't are their paid witnesses.  You never heard from any Liebherr witnesses, any of their corporate folks, any of their Liebherr employees that said, oh, Sims did anything wrong.  Never once.  What you heard was counsel for Liebherr and their retained experts putting blame on the Sims employees, Mr. Farris and Mr. Burrows, for doing what they were trained to do.

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Goodman

They're expecting -- and then they're expecting them and asking them to do things outside of that. So they're telling them they need to test the boom on specific -- in a specific manner and in a specific way at the yard. It doesn't say that in the manual. It wasn't -- they weren't trained on that by Mr. Ward. Standard of care and standard in the industry and how they were trained on by the NCCO in the -- the way they were brought up didn't provide that.

So they had the operator's manual. They had the crane. They had their experience. On February 17th, when they move it, they do everything fine. Everything is working. They have no knowledge of anything that's going wrong.

On February 19th, Mr. Farris, who is doing everything he is supposed to be doing, he's got again, he's got the operator's manual. He's got his thousands of hours of experience. He's got a phone, and he's calling people. He's calling other people that have even more experience than him.

They're wanting him to call Liebherr, call this, call that, call the other thing. I mean, just because they bring out a tech, they can't tell you what the tech is going to do. I can't tell you what the tech is going to do. They're talking about all this stuff is speculative. They're asking you to think about things that are completely speculative, and there's no evidence of any of that.

So on February 19th, all Mr. Farris has is the

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Goodman

operator's manual, his training, his experience, and in none of
that does it say the risk associated with manipulating the T4
pin.  That's what this case is about, the risk associated with
manipulating the T4 pin and who had knowledge of that.  The
only entity that had knowledge of that, besides Sims, was
Liebherr.

          And with regard to the product safety bulletin and
whether it was provided or not provided in sufficient time,
Mr. Vieten, their corporate representative, he provides the
standard for that.  They were able to get all the others out,
except a few that they failed to get out.

          And then in the e-mail from Johnathan Smith to
everyone at Liebherr, he said you guys need to send this out
ASAP.  But Mr. Ralf Vieten, when asked, "In this instance, was
three and a half, four months acceptable," he says, "No."  You
have the breach.  He admits to the breach.  They have a duty to
send it out.  They breach.

          With regard to the training, the key here is were
they properly trained on how to manipulate the T4 pin?  Henry
Ward also admits the breach.

          "Can you tell me how you measured the T3 locking
pin?"

          And he answers, "I don't believe we measured it at
that time."

          And that was during the training.  He admits to the
UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Goodman

breach.  He had the duty to train him properly.  He breached
it.  And because of this, yeah, the T4 pin was manipulated.
That's what caused the boom to collapse.  But why was the T4
manipulated, and why did the boom collapse?  Because the
knowledge and information in the product safety bulletin was
not provided to Sims, which would have prevented it.

And everybody -- everybody agrees that the OSHA
report, every paragraph is correct.  The only paragraph that
the defendants' experts dispute is this last paragraph, where
it says this incident could have been prevented if the
manufacturer supplied the written product safety bulletin
notice, a product modification retrofit cover plate with
warning labels to be affixed to the crane, and the update
change revision for the operating instructions, specifically
chapter 90.05, in a timely manner as soon as the manufacturer
became aware of the issue.

Now, we understand the manufacturer Liebherr Germany
did provide it.  They provided it to Liebherr US, the
defendants in this case, Liebherr US who didn't provide it.

An OSHA goes on to say this inspection was
comprehensive, because they reached out to everybody.  And Sims
played ball.  They were willing to communicate, willing to
provide information, willing -- you saw the back and forth.
The only people who weren't were those who lawyered up.  And
you get one -- a two-page letter from Mr. Cremer's firm on

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Goodman

behalf of Liebherr saying that we didn't know that Sims owned it, even though we've looked at it, and we know that we knew that Sims owned it.

This is the 84-meter boom with the cover plate on the date of the loss. This is what Andrew Farris and Shane Burrows were working with. They didn't have the information that Liebherr had that could have protected the damage to this crane. And when it slid in, the first pin that you're supposed to lock, as the training was provided, was the T4 pin.

Now, Mr. Burrows knew enough that he knew that the screw was screwing in the wrong direction. And Mr. Burrows at the time had passed the NCCO, certified to become a rigger. That's what riggers do. They deal with crane booms and hooking and connecting and all of that stuff. He had passed that. He just hadn't gotten his card yet.

This is what should have happened. If the product safety bulletin and retrofit cover plate would have been provided, it would have covered the T3. It would have covered the T4, just as Mr. Bob Berry said. It would have slid in there based on how the geometry was. And the T4 pin would never have been altered, and none of us would have been here today discussing this if all they had to do was send out the product safety bulletin to Sims who they know owned the product.

Thank you, Your Honor.

UNITED STATES DISTRICT COURT

**THE COURT:**  So I saw that the one motion, pending motions now, right, and I know we've set the deadlines out already, I believe.  I'm drawing a blank on when the findings of fact and conclusions of law are due.  Is there anything else that we need to do today in terms of logistics or deadlines?  Are we all set?

**MR. GOODMAN:**  Nothing from the plaintiff's side.

**MR. CREMER:**  Not from defense.

**THE COURT:**  Okay.  Then thank you.  I appreciate coming back in person today to do the closing arguments.

And if there's nothing else, then we are in recess. Thank you.

(Proceedings adjourned at 12:18 p.m.)

UNITED STATES DISTRICT COURT

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

       I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

       I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

       IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 14th day of March 2022.

_____
REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida