1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                       TAMPA DIVISION

3

4   NBIS CONSTRUCTION & TRANSPORT    )
    INSURANCE SERVICES, INC.,        )
5                                    )
                 Plaintiff,          )
6                                    )
                                     ) Case No.
7        vs.                         ) 8:19-CV-02777-AAS
                                     )
8                                    )
    LIEBHERR-AMERICA, INC., et al., )
9                                    )
                 Defendant.          )
10

11

12   _____

                    BENCH TRIAL – DAY 5
13      BEFORE THE HONORABLE AMANDA ARNOLD SANSONE
              UNITED STATES MAGISTRATE JUDGE
14
                    FEBRUARY 11, 2022
15                      9:48 A.M.
                    TAMPA, FLORIDA
16   _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23            DAVID J. COLLIER, RMR, CRR
             FEDERAL OFFICIAL COURT REPORTER
24        801 NORTH FLORIDA AVENUE, 7TH FLOOR
                TAMPA, FLORIDA  33602
25

```
1   APPEARANCES:

2

3    FOR THE PLAINTIFF:

4            Joshua Ross Goodman
             Joseph Frank Rich
5            Cozen O'Connor
             Southeast Financial Center
6            200 South Biscayne Boulevard, Suite 3000
             Miami, Florida  33131
7            (305) 704-5940

8
             Maria Ermakova
9            Cozen O'Connor
             175 Greenwich Street, 55th Floor
10           New York, New York  10007
             (212) 883-4902
11

12

13   FOR THE DEFENDANTS:

14

15           William J. Cremer
             Thomas R. Pender
16           Cremer, Spina, Shaughnessy, Jansen & Siegert, LLC
             One North Franklin Street, 10th Floor
17           Chicago, Illinois  60606
             (312) 726-3800
18

19           Michael L. Forte
             Rumberger, Kirk & Caldwell, PA
20           100 North Tampa Street, Suite 2000
             P.O. Box 3390
21           Tampa, Florida  33601-3390
             (813) 223-4253
22

23

24

25
```

```
 1                        I N D E X

 2              FEBRUARY 11, 2022 – DAY 5

 3

 4     DEFENSE WITNESSES:

 5

 6     JEFFREY A. TRAVIS                          PAGE

 7     Direct examination by Mr. Cremer             8

 8     Cross-examination by Mr. Goodman            53

 9     Redirect examination by Mr. Cremer         103

10

11     RACHEL KELLY                               PAGE

12     Direct examination by Mr. Pender           108

13     Cross-examination by Mr. Goodman           147

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                      - - - o0o - - -

 3           THE COURT:  Okay.  So let's go back on the record.

 4           I'm just going to summarize the dates that we

 5   discussed prior to going onto the record, and I'll discuss --

 6   I'll address them in date order.

 7           So by February 16th the parties have agreed that they

 8   will file their stipulated agreed facts.  On March 8th at 9:30

 9   is when the parties will have their in-person closing

10   arguments.  Rather than the one hour limit that was stated in

11   my prior order, each side will have 90 minutes, and those

12   90 minutes may be divided up among the counsel for each side

13   and do not have to be handled by only one attorney for that

14   side.  By March 31st the parties will file their proposed

15   findings of fact and conclusions of law.

16           There has been a motion that was filed this morning,

17   it's docket number 146, motion for judgment on partial

18   findings.  The plaintiffs orally moved to have -- for the Court

19   to defer ruling on that motion until the close of evidence and

20   to have more time to rule on that -- excuse me, to respond to

21   that, and so plaintiffs specifically requested until March 8th

22   and that was unopposed by the defense.

23           And the defense has indicated that they do intend to

24   call two witnesses today, their two experts, one in the morning

25   and one in the afternoon.
```

1          Anything else from the plaintiff's perspective that

2     we need to address on the record that we covered when we were

3     off the record?

4               MR. GOODMAN:  Your Honor, if I may, I've had a few

5     minutes now to review the motion, and if you would -- if

6     Your Honor would just let me make a few points very briefly

7     with respect to the content of the motion.

8               THE COURT:  Go ahead.

9               MR. GOODMAN:  A majority of it appears to be related

10    to the economic loss rule defense that was previously ruled on

11    by the Court, and it would be our position that the Court has

12    already decided this issue and that it would be essentially a

13    waste of judicial resources and the parties' time to have to

14    rebrief what is essentially a summary judgment issue again.

15    And additionally, Your Honor, the defense has not put in any

16    fact witnesses and we're not aware of any additional fact

17    witnesses that will be called to substantiate that there was a

18    product defect.  I have not heard them say throughout the

19    course of the trial that Liebherr Germany produced a defective

20    crane, and we do not believe that their experts, including

21    Mr. Travis, who is sitting in the courtroom, are going to

22    testify that the crane was defective.  If I understand

23    Mr. Travis' opinions, it is that it was an operator error.

24    And therefore they have not put in evidence to support their

25    defense.  Just like the plaintiff is required to meet their

1    burden of proof, the defendants are as well with the defense,

2    and based on what I've briefly read here, we feel it would just

3    be repetitive of what's already been addressed in the case,

4    Your Honor.

5                THE COURT:  Mr. Cremer, any response?

6                MR. CREMER:  Yes, Your Honor.

7                Bob Berry testified to the information that he gave

8    to OSHA where he couched the entire complaint about this

9    incident being related to a product defect.  Bond testified it

10   was a product -- that there was -- there were issued related to

11   the failure to warn, which in essence is a claim which can very

12   well be substantiated as a claim under product liability.  And

13   Vigilante talked about the liability of the manufacturer and

14   those downstream in the sales chain, like Liebherr USA, which

15   is a classic product liability scenario.  So I think that

16   reality is most of this case has been talking about the

17   inadequacies of the manual that ultimately were cured by this

18   subsequent safety bulletin.  That is a product liability case

19   in its very nature, which we contended all along, and I think

20   it's been substantiated by the evidence.

21               THE COURT:  Thank you.

22               As far as the motion goes, the March 8th deadline to

23   respond to that will still stand.  Of course I haven't had an

24   opportunity to even look at the motion, so it's hard for me to

25   say at this point what is or is not a waste of judicial

1  resources, and I also understand, even if it is a statement

2  that or an argument that's been made before, of course the

3  defense has a right to preserve all their arguments throughout

4  the case for appellate purposes as well.  So the March 8th

5  deadline to respond to the motion will still stand.  Of course

6  I won't start considering the motion until I do receive

7  plaintiff's response.

8              MR. GOODMAN:  Thank you, Your Honor.

9              THE COURT:  Anything else to address before the

10  defense calls its first witness?

11             MR. CREMER:  No, Your Honor.

12             THE COURT:  Thank you, Mr. Cremer.

13             Anything else from plaintiff's perspective?

14             MR. GOODMAN:  No, Your Honor.

15             THE COURT:  Let's go ahead.

16             Go ahead.  Mr. Cremer, you may call your first

17  witness.

18             MR. CREMER:  Thank you.  The defense would call

19  Jeffrey Travis.

20             COURTROOM DEPUTY:  Good morning.  Sir, please raise

21  your right hand.

22             Do you solemnly swear that the testimony you will

23  give in this cause will be the truth, the whole truth and

24  nothing but the truth?

25             THE WITNESS:  Yes, ma'am.

1        COURTROOM DEPUTY:  Thank you.  Please have a seat.

2   And once you get settled, if you could state your name,

3   spelling your last name for the record, please.

4        THE COURT:  You may begin.  Thank you.

5        THE WITNESS:  Jeffrey Allen Travis, T-R-A-V-I-S.

6        COURTROOM DEPUTY:  Thank you.

7        **DIRECT EXAMINATION OF JEFFREY A. TRAVIS**

8   **BY MR. CREMER:**

9   Q    Good morning, Mr. Travis.

10  A    Good morning.

11  Q    Where are you employed?

12  A    I'm employed at Exponent, Inc.

13  Q    And if you could tell the Court a little bit about

14  Exponent.

15  A    Exponent is a multidisciplinary engineering consulting

16  firm.  There's a little over 1,000 total consultants, ranging

17  from myself as a structural engineer, we have electrical

18  engineers, medical, food regulation and safety people, human

19  factors people.

20  Q    What is the professional area of expertise as it pertains

21  to this case that you bring to this courtroom?

22  A    For this particular case we are looking at matters

23  involving crane operations and crane safety and crane training.

24  Q    I have marked as Defendant's Exhibit 143 a copy of your

25  CV, and I asked that you bring one up there with you so that

 1  you could consult it.  If you'd like to put it on the screen,

 2  Darren, we could talk about your credentials.

 3          Mr. Travis, are you a professional engineer?

 4  A    Yes, sir.  I'm a professional engineer in 13 or 14 states

 5  and a structural engineer in Illinois.

 6  Q    Are you a licensed engineer in the State of Florida?

 7  A    Yes, sir.

 8  Q    What is your current title at Exponent?

 9  A    At Exponent I'm a principal engineer.

10  Q    What are the duties of a principal engineer as compared

11  with a regular engineer?

12  A    Well, I guess in addition to actually doing engineering,

13  I get the joy of overseeing a group of people.  In fact, we

14  just got done doing reviews for the year on people.  So

15  I manage the Building and Structures Group in the Chicago

16  office.

17  Q    Tell us some of the types of projects that you get

18  involved in as a principal engineer at Exponent.

19  A    The types of projects vary greatly.  We have been involved

20  in looking at earthquake damage, hurricane damage, tornado

21  damage, building defect cases, bridge collapses, crane

22  collapses, other types of crane accidents, building envelope

23  issues, if we have a roof that blows off or a facade that

24  leaks.  So the full gambit.

25  Q    And you, sir, you've been involved in crane accident

JEFFREY A. TRAVIS – FEBRUARY 11, 2022          10
Direct Examination by Mr. Cremer

1   investigation in your professional career, true?

2   A     I believe I've been looking at crane incidents, accidents,

3   for over 20 years now.

4   Q     What type of cranes have you investigated?

5   A     I have looked at incidents involving tower cranes, mobile

6   cranes, gantry cranes, overhead cranes, drill rigs, pile

7   driving units, you know, a lot of the heavy equipment you'll

8   find on a construction site.

9   Q     Referring to the section of Academic Credentials –– if you

10  go down a little bit, please, Darren –– could you tell the

11  Court about your educational background, please.

12  A     I hold a Bachelor's and a Master's degree in civil

13  structural engineering from Michigan State University.

14  Bachelor's in '86.  Masters in '87.  God, that's a long time.

15  Was a member of Chi Epsilon, the civil engineering national

16  honor society, Tau Beta Pi, the national engineering honor

17  society.  My grad school was paid for through a fellowship

18  through the Case Center for Computer Aided Design.

19  Q     And the next area of your CV, I think it contains the list

20  of your licensures in the various states around the country; is

21  that right?

22  A     Yes, sir.

23  Q     I want to talk about your prior professional work

24  experience.  If we can go to that section, please.  There we

25  go.  Blow that up, if you would.  Prior experience.  And let's

1  start with the work at Newport News Shipbuilding.  And if you

2  could perhaps, when you're going through your work experience,

3  focus on those activities and issues and experiences that might

4  have particular relevance to the issues that we're dealing with

5  in this case.

6  A    Well, Newport News was my first job after going back to

7  school and getting my Master's.  We were involved in the design

8  of at the time the new Seawolf nuclear attack submarine, it's

9  no longer new, but as a part of that the shipyard had a number

10 of dry dock areas and other areas where the work was performed.

11 There was a number of jib cranes, overhead cranes, gantry

12 cranes, so also as part of that then we would have to put

13 together the lift plans to make sure that the pieces or parts

14 of the sub that are being designed could be lifted and put in

15 place.  So that was -- would probably be the first real

16 exposure I had for working with cranes.

17 Q    What about your next job at Vectra Technologies?

18 A    Vectra Technologies, six different companies in six years,

19 kept getting bought out, started off as Impel, ended up as

20 Vectra.  That company was involved in design and repair

21 remediation work at nuclear power plants.

22          One of the projects that we had was during the

23 decommissioning of the Zion nuclear plant in Illinois, they

24 figured out that they wanted to offload spent fuel from the

25 spent fuel pool but the new storage casks weighed more than the

JEFFREY A. TRAVIS - FEBRUARY 11, 2022        12
Direct Examination by Mr. Cremer

1   overhead -- existing overhead cranes could handle, so I ended

2   up having to redesign the foundations and steel structures

3   supporting the overhead crane and then replacing the girders

4   for the overhead crane, making sure that the motors were

5   capable of making the lift, replacing the hoist, rope wires,

6   that type of deal.

7   Q    What about your work at Raths, Raths, Johnson?

8   A    RRJ was purely an AE firm, we did design of buildings and

9   investigation of building issues, leaky roofs, leaky windows,

10  we designed parking garages and small industrial buildings.

11  Q    Tell us about your work at Carl Walker.

12  A    Carl Walker was pretty much the same as Raths, although

13  Carl Walker did a lot more investigative work as far as issues

14  with concrete structures, but we designed smaller office

15  buildings.  A lot of times it would be, say, if you had a

16  six story building and the first two floors were parking and

17  the upper floors were either commercial, residential or office

18  space, we would design the whole building, the structural

19  systems for that.

20  Q    Then you worked at Packer Engineering from 1999 to 2008.

21  What is Packer Engineering?

22  A    Well, Packer Engineering is, as far as I know, no more.

23  The company went out of business about two years after I left.

24  Packer Engineering was also a multidiscipline consulting firm,

25  not nearly as big as Exponent but based outside of Chicago, and

JEFFREY A. TRAVIS – FEBRUARY 11, 2022          13
Direct Examination by Mr. Cremer

1   Packer did a lot of product testing.  We had contracts with

2   several of the precasters in the area, where they would bring

3   in –– if they had bridge girders or other precast elements that

4   they needed load tested to make sure they met the State

5   requirements, we had the testing equipment there, we had a

6   million pound Baldwin machine that would be able to test the

7   concrete.  We did testing –– if you remember the Boston tunnel,

8   the big dig when the roof panels collapsed, we tested the epoxy

9   that was being used to make sure, you know, what happened,

10  you know, was it creep in the concrete or creep in the epoxy

11  that lost the bond.  I think that was –– we also did failure

12  investigations there.  I remember I did several crane

13  investigations while I was at Packer.

14  Q    And that brings us to your current employer, Exponent.

15  A    Yes, sir.

16  Q    And have you done crane investigation work during your

17  tenure at Exponent?

18  A    Yes, sir.

19  Q    Approximately how many?

20  A    All told, I would guess more than 30.

21  Q    Are you actively involved at the present time in crane

22  investigations?

23  A    If you count this one, I think this would be either five

24  or six that I'm currently working on.

25  Q    The next section of your CV talks about your professional

1   affiliations, and there are a number of them, but I would ask

2   you to focus on those that might have pertinence to this case

3   and cranes.

4   A    The one that would have the most, I guess, significance as

5   far as this case would be the American Society of Civil

6   Engineers.  As far as the ASCE, they have several institutes

7   inside, they have a Forensic Engineering Division, which I'm

8   part of, but in this case they have a Construction Institute

9   and inside of the Construction Institute is a Crane Safety

10  Committee and I'm on that Crane Safety Committee.

11  Q    And to get onto the Crane Safety Committee do you just put

12  your name in a hat, or is it an appointment, or is it anybody

13  can join?

14  A    Well, to be part of the committee, at first you had to be

15  a member of the American Society of Civil Engineers, which

16  basically you pay your money, you're a member.  To get on the

17  committee you had to fill out a form and then you had to

18  actually be interviewed, and then you could be accepted or you

19  could be rejected from the committee.

20  Q    And if you would talk about your appointments, and again

21  focusing on those that might be relevant to the opinions that

22  you reached in this case or would have given you experience in

23  getting to the point where you're capable of rendering the

24  opinions.

25  A    Well, I think as I just mentioned, you'll see there's the

JEFFREY A. TRAVIS – FEBRUARY 11, 2022          15
Direct Examination by Mr. Cremer

1   ASCE Construction Institute Task Committee on Crane Safety on
2   Construction Sites.  I don't think we could have made the name
3   any longer, but we gave it a shot.  That would be going through
4   a number of the existing standards that were out there for
5   safety practices, and we had involvement with some contractors
6   as well, and just looking at it as almost like a best practices
7   type of publication to go and say, okay, this seems like it's a
8   good idea, this should be incorporated into either site safety
9   plans or a company's safety manual.
10  Q    Now, you list some publications.  Are any of those
11  relevant to cranes or crane safety or crane operation?
12  A    Well, the end product for that ASCE Crane Safety Committee
13  was Policy Statement 424, Crane Safety on Construction Sites,
14  and so ASCE published that, it's available, it talks about
15  different rules and responsibilities of the different parties
16  on a construction site and what we feel would be best practices
17  as far as trying to manage crane safety.
18  Q    You list a number of presentations.  Any of those
19  presentations particularly relevant to the issues in our case?
20  A    A number of them are.  I guess if we start from the top,
21  probably the second one down, the second and third one down
22  actually are the same case, it was just two different
23  presentations on it, and this involved a large crawler crane
24  out in California.  They were building a new bridge overpass,
25  the crawler crane was lifting a long span Bulb-Tee girder for

JEFFREY A. TRAVIS - FEBRUARY 11, 2022          16
Direct Examination by Mr. Cremer

1    the bridge at the time, swung it over the roadway, the girder

2    itself snapped in half, pulling the crane down over top of the

3    roadway, and we were called because everybody figured it had to

4    have been a crane failure that caused the accident, but when

5    you did the math and figured out what the stresses were in the

6    girder, it was actually the girder that snapped first and that

7    swinging motion when it snapped is actually what side-loaded

8    the boom and pulled the crane over.

9          The next one down, presentation at the ASCE/CI

10   Summit, and that was partnering with a lawyer, David Johnson,

11   to talk about the legal realties of crane litigation.  So he

12   talked about the litigation aspect, I talked about how to

13   perform or how I would perform a crane investigation, a crane

14   accident investigation.

15         I guess drop down to the one that starts off as

16   Peraza.  Back at the Fifth Congress on Forensic Engineering

17   back in 2009, Mr. Peraza and I presented a paper talking about

18   "An Industry In Flux," because at that time OSHA was just

19   starting to get into talking about redoing the crane standards,

20   and if you're not familiar, it used to be the cranes were in

21   29 CFR 1926, the 500 series, maybe 550s, now it's the 1400

22   series, and you went from a publication that was maybe an inch

23   thick, now a good three or four inches thick.  So OSHA has

24   expanded their requirements a bit.

25         Next one down, "Claims with Cranes Operations," I put

1   that on for the Houston Claims Association.  That was basically

2   sitting in a room full of insurance claim adjusters and

3   explaining to them, once again, if you get a claim with a crane

4   accident, here are the steps you should be taking as far as

5   looking at the evidence, preserving the evidence, making sure

6   you have this documentation we need to look at, you know, if

7   it's a mobile crane was it set up level, was it on firm ground,

8   do we have the soils test to back that up, and kind of walking

9   them through how I would do an investigation and what would be

10  needed to I guess further that investigation or to back up how

11  we're going to do that analysis.

12  Q    Okay.  And you've included your project experience.  Now,

13  you have a number of them here, but this certainly isn't an

14  exhaustive --

15  A    Well, I did have one more on the --

16  Q    Sorry.

17  A    -- presentations.  I talked about ASME and OSHA Minimum

18  Mobile Crane Safety Requirements, and I presented at the Crane

19  & Hoist Conference in Chicago in 2003.  That was a long time

20  ago.  So basically just talking to crane owners and operators

21  as to at the time what the current ASME requirements were for

22  cranes and OSHA requirements.

23  Q    Are you or do you consider yourself to be expert in

24  various standards and regulations that pertain to crane

25  operations, safety and training?

1    A    Crane operations safety and training, yes, sir.

2    Q    And could you tell the Court some of those regulations or

3    consensus standards that are applicable that you're quite

4    familiar with.

5    A    Well, probably the biggest two would be the ASME B30

6    series, that covers cranes; OSHA 29 CFR 1926, now it's the 1400

7    series, covers cranes; there is the CMAA, which is the Crane

8    Manufacturers Association of America -- and let me know if I'm

9    talking too fast for you.  I have a tendency to do that.

10   Sorry.

11           They deal mostly with overhead cranes.  Then there is

12   the Power Crane and Shovel Association, that's -- they touch on

13   a little bit of everything, they're not that widely referenced,

14   they're a much smaller group.  Then there is the Crane Safety

15   Association of Ontario, which covers most Canadian standards.

16   Then there are also European standards that cover crane

17   operations and maintenance.

18   Q    And you've had occasion to consult all of those standards

19   from time to time in the course of your professional work,

20   correct?

21   A    Yes, sir.

22   Q    All right, looking at your project experience, there are a

23   dozen or so projects referenced with a description, but this is

24   by no means an exhaustive list of all the projects you've

25   worked on; is that right?

1   A    No, sir, this was some that our marketing department

2   picked out and thought they had a wow factor so they put it on

3   there.

4   Q    All right.  And would you tell us at least one or two of

5   those that at least pertain to cranes.

6   A    If you could scroll down there, Concrete Structures Tower

7   Crane Collapse.

8   Q    What was that work about?

9   A    That was a tower crane erected at 8th and Wabash in

10  Chicago.  During a snow storm in February of -- I can't

11  remember the year now, the crane was not in use, the operator

12  prior had actually climbed down, he did release the slewing

13  brake, so he allowed the crane to weathervane.  A winter storm

14  came in.  What we ended up finding was the slewing ring bolts,

15  so basically the turntable for the crane, if you have a tower

16  crane and you'll see the big jib and the counter-jib with the

17  counterweights coming off of it and it turns around up at the

18  top, that's your slewing ring.  The bolts for the slewing ring

19  had actually fatigue fractured through, more than half of them.

20  So try to think of it like a weathervane on top of a barn.  So

21  the jib blows, if you release it, it weathervanes, it basically

22  will go whichever way the wind is telling it to blow, and they

23  just happened to hit the jackpot that the wind blew it to where

24  the uplift on it was enough to cause that set of bolts to

25  fracture and it basically peeled off and fell 300 feet down

JEFFREY A. TRAVIS – FEBRUARY 11, 2022          20
Direct Examination by Mr. Cremer

1    into Wabash Avenue.  And with that one we were asked to take a

2    look at it and it came down to the actual design of the crane

3    was fine, the operations of that crane were fine, the operator

4    did what he should do, he put it in weathervane mode.  It was a

5    maintenance issue by the crane owner and rental company,

6    Morrow, they had never pretensioned the bolts on the slewing

7    ring and that allowed it to vibrate a little bit as it was

8    moving and it developed fatigue fractures in the bolts.

9    Q    And maybe one more that's listed here.

10   A    The KC Iatan Crane Collapse.

11   Q    Tell us about your work on that case.

12   A    That was at a power plant, the Iatan Power Plant just

13   outside of Kansas City.  There was a -- I believe it was a

14   Manitowoc, big crawler crane, and they were installing

15   scrubbers on top of the smokestacks to meet the new EPA

16   requirements.  To increase the load carrying capacity of the

17   crane, Manitowoc -- I know now they do it where it's like an

18   extendable tray, where you can add counterweights and increase

19   the lift capacity that way.  Back then they just called it a

20   MAX-ER wagon.  So try to think like somebody puts a bumper

21   hitch on the back of the crane and they can pull up a wagon

22   with extra weights and hook it to the crane.  So now you have

23   extra counterbalance so you can pick more with your boom.  The

24   only problem was that day the operator forgot to hook up the

25   MAX-ER wagon and when he made the pick, swung it out, the boom

1  fell over, killed a couple of boilermakers that were working on

2  the project site.

3  Q    If we go to the next section of your CV, additional

4  education and training, and would you please inform the Court

5  which of the additional education and training you've had over

6  your professional life were helpful to you in furthering your

7  education in the area of crane operation, crane safety and

8  crane training.

9  A    The first one here would be Overhead Crane Operator Safety

10 Course, went through the -- Chicagoland Construction Safety

11 Council puts on OSHA training, so that one was the training

12 they give for overhead crane operators, so I went through their

13 course.  They don't give licenses for overhead crane operators,

14 but I just still felt, given the number of overhead crane

15 accidents I was seeing, I should become familiar with all the

16 overhead crane operator requirements.

17        The next one is Crane Signal Person Safety Training,

18 once again that's also put on by the Chicagoland Construction

19 Safety Council.  We were seeing also a number of issues dealing

20 with crane signal persons not performing their tasks correctly,

21 so I went and became an OSHA qualified crane signal person.

22        Let's see, if we go down, then we have Current Issues

23 In Crane Safety, that was back in 2016.  That was touching

24 on -- ASCE wanted to be, I guess, ahead of the game a bit, and

25 they were touching on the fact that -- I think that was still

1    when OSHA was in the process of rewriting the crane safety

2    standards, they were making it a consensus standard, so they

3    were looking for input from the contractors, from the unions,

4    from the engineers, safety people, everybody, and it took quite

5    a number of years for them to finally get that right.

6            Second course right below that, the OSHA Regulations

7    and Other Standards, apparently ASCE figured we didn't learn

8    enough the first one so they gave two of them.  Took them both.

9            Right below that, How to Review a Lift Plan, probably

10   over the years I've looked at several hundred lift plans.  We

11   get asked to review them to see if that makes sense, to see if

12   things are covered.  ASME finally had to realize that something

13   had to be done for that, so they accredited a new standard

14   called ASME P30.1, and that's load handling activities or

15   equipment, so we actually sat in on the early meetings for that

16   to help write the standard.

17           If we can go down some more, the ASCE/OSHA Crane

18   Safety Seminar in 2014, same thing at the time, ASCE was going

19   through all the OSHA standards and the changes that were

20   happening, making sure everybody was aware of what was going

21   on.

22           If we go down, Crane Risk Management.  So that was

23   looking more at -- they went over all the different risks that

24   might be involved with cranes on a construction site and how to

25   try to manage those or mitigate the risks, so basically the

1   safety operations.

2           Three down from that, the Crane Safety for Engineers

3   and Supervisors, basically once again hitting on safe practices

4   of crane operations on a construction site.

5           If we keep going down --

6   Q    I think on the next page there's one three or four down.

7   A    Then if you go the fourth one down, Managing Crane and

8   Rigging Operations to Improve Safety and Eliminate Accidents,

9   that was a weeklong course at the University of Wisconsin that

10  we signed up for and it went through everything from the ASME

11  requirements, the OSHA requirements, to a lot of the things

12  dealing with even some of the ironworkers, crane manuals and

13  what they required of their workers, the union.

14          And I think that is it for the courses.

15  Q    In your role in conducting crane investigations, have you

16  written many reports that contain your professional opinions

17  and given many depositions over your professional life?

18  A    Yes, sir.

19  Q    An estimate, is it more than 30?

20  A    Well, I know of -- just depositions actually given on

21  cranes, or depositions total?

22  Q    Well, let's talk about cranes, I think that's most

23  relevant, but what -- depositions total, how many have you

24  given, if you have an estimate, and what portion of those are

25  cranes?

JEFFREY A. TRAVIS – FEBRUARY 11, 2022        24
Direct Examination by Mr. Cremer

1    A    Depositions total would probably be 50 to 60.  Cranes,

2    probably 10 to 12.

3    Q    Have you ever testified in a court and provided expert

4    opinion in a court?

5    A    Yes, sir.  I think this will be the fifth time I've

6    testified at trial.

7    Q    If you go to your -- the first case -- the first case

8    where you testified in court, is that Wynn Jordan versus Bragg

9    Crane?  Oh, I guess it's not.  I've got it wrong.  It was

10   Concrete Structures versus -- Concrete Structures Crane

11   Collapse, right?

12   A    Sorry, I didn't grab the testimony list.

13   Q    That's all right.  We'll just talk about it.

14        Concrete Structures Crane, do you recall giving trial

15   testimony in that case?

16   A    Yes, sir.  That was the tower crane in Chicago that went

17   down at 8th and Wabash.

18   Q    And what -- was that in State Court?

19   A    That was in State Court in Illinois, yes, sir.

20   Q    And what party retained you in that case?

21   A    Concrete Structures.  They were the crane operator.

22   Morrow Equipment rented the crane to them to use.

23   Q    And what professional opinions did you give?  What topic

24   areas did you cover in your professional opinion?

25   A    Well, as I think I might have touched on earlier, with

 1    that crane it came down to -- we looked at the operations of

 2    the crane, and in this case the operator seemed to have abided

 3    by all the regulations that were applicable.  It came down to

 4    maintenance of that crane.  The bolts themselves hadn't been

 5    changed out in quite a while and they hadn't been pretensioned

 6    by Morrow before being sent out to the site, and when we dug

 7    through the snow banks to find them all, what we discovered was

 8    more than half of them had fatigue fractures in the shafts of

 9    the bolts.

10    Q    So that was a crane maintenance case?

11    A    Yes.

12    Q    The next case you testified to is Wynn Jordan versus

13    Bragg.  Where was that case pending?

14    A    That was the case we touched on that was in State Court

15    out in California where the mobile crane got pulled over onto

16    the highway when they were building a new overpass when the

17    bridge girder broke in two.

18    Q    What party retained you in that case?

19    A    Bragg Crane.

20    Q    And do you remember, was it -- were you -- were they a

21    crane owner, operator, lessee?

22    A    They were the crane owner.  They weren't the crane

23    manufacturer.  They were also the operator of that crane.  And

24    what we discovered with that one was it really wasn't --

25    I think that's why the attorney that I presented with came up

1  with the name "the crane accident that wasn't," because when we

2  investigated it turned out that there really wasn't anything

3  wrong with the crane and the crane operator was not operating

4  outside of his limits, it just came down to the fact that the

5  bridge girder itself was under-designed, so when you actually

6  lifted it from the pick points that the precaster put in, it

7  snapped in half, and like I said, that sudden jarring dynamic

8  load was enough to side-load the boom and pull it over.

9  Q    And did you offer professional opinions in that court

10  dealing with crane operations safety or training?

11  A    I did, and I said that was State Court in California.

12  Q    And were your opinions accepted by the Court?

13  A    Yes, sir.

14  Q    Do you recall testifying in a case called Robert Matenago

15  versus Metal Matic, pending in State Court of Illinois?

16  A    Yes, sir.

17  Q    What party retained you in that case?

18  A    Metal Matic.

19  Q    What was their role?  Were they a crane owner, operator?

20  A    None of the above.  They were actually a steel fabricator

21  that made steel coils, and a trucking firm had picked up a load

22  of their steel coils and delivered it to another fab shop to

23  make into different shapes and items.  When the load of steel

24  arrived at the other fab shop, the truck driver was informed

25  that there was nobody available at that time to operate the

JEFFREY A. TRAVIS - FEBRUARY 11, 2022          27
Direct Examination by Mr. Cremer

1   overhead crane, so just go ahead and do it yourself.  So you

2   had a gentleman who had never operated a crane before getting

3   up on his truck, tried rigging the steel coils and didn't end

4   well.  He ended up, I think, losing both legs.

5   Q    And did you offer professional opinions in court in that

6   case dealing with crane safety operation and training?

7   A    Yes, sir.

8   Q    And were your opinions accepted by the Court?

9   A    Yes, sir.

10  Q    The last case that you testified to is Rhonda Ogiego?

11  A    Ogiego.

12  Q    O-G-I-E-G-O.

13  A    Took me a while to get used to that one too, but it's

14  Ogiego, yes.

15  Q    And what party retained you in that case?

16  A    I believe that was Affordable -- or Adjustable Forms.

17  Sorry.

18  Q    All right.  And what was their role with respect to

19  cranes?

20  A    They were the crane owner and operator.

21  Q    And did you give professional opinions dealing with crane

22  operation safety or training?

23  A    Yes, sir.

24  Q    And were your opinions accepted by the Court?

25  A    Yes, sir.

1    Q    Has there ever been a time where any of your opinions has

2    been rejected or stricken by a Court?

3    A    Not that I am aware of, no, sir.

4         MR. CREMER:  Your Honor, at this time we would tender

5    Jeffrey Travis as an expert witness in crane safety training

6    and operation.

7         THE COURT:  Any objection?

8         MR. GOODMAN:  Yes, Your Honor.  Plaintiffs would

9    object and adopt by reference its motion in limine that it

10   previously filed against Mr. Travis.  Also Mr. Travis is a

11   civil engineer, not a mechanical engineer, not a materials

12   scientist, and he didn't consult with anybody involving human

13   factors, so we would ask the Court to preclude him from

14   testifying to any of those disciplines.

15        THE COURT:  And the matters in the motion in limine

16   and then also these additional issues that you raise here can

17   all be addressed via cross-examination, and so the Court does

18   accept Mr. Travis as an expert.

19        Go ahead, Mr. Cremer.

20        MR. CREMER:  Thank you.

21   BY MR. CREMER:

22   Q    Mr. Travis, what did you understand your scope of work to

23   be for this project?

24   A    I was asked to take a look and see if we could determine

25   the cause of an accident involving a Liebherr 1500-8.1 mobile

1  crane on a construction site here in Tampa February 19th, 2018,

2  and what, if any -- the different parties involved in this

3  accident, what responsibility they may bear.

4  Q    And have you reached a number of professional opinions and

5  conclusions based on your work and investigation in this case?

6  A    Yes, sir.

7  Q    What did you do, sir, in order to reach your professional

8  opinions in this matter?

9  A    I did a site visit down to the Liebherr yard in Houston to

10  witness the boom swap of an exemplar 1500-8.1 crane, took a

11  look at the 84-meter boom with the product safety bulletin

12  stickers and cover plate installed on it, tried to determine if

13  with that cover plate on it the boom could actually be inserted

14  into the T2 section of that crane, reviewed a number of

15  depositions, industry standards, OSHA's investigative file,

16  witness statements, performed a phone interview with Mr. Boos.

17  Q    Who is he?

18  A    The Liebherr, I believe, engineering manager for this

19  particular crane design.

20  Q    And who does he work for, if you know?

21  A    He -- as far as I know, he works for Liebherr Germany, the

22  manufacturer of the crane.

23  Q    And why did you want to interview Mr. Boos?

24  A    I wanted to determine if the reason for the product safety

25  bulletin being issued in the first place was an incident

1  similar to what the subject accident was.

2  Q    And what, if anything, did you find from your conversation

3  with Mr. Boos that was significant in reaching the opinions you

4  have in this case?

5  A    According to Mr. Boos, the incident that prompted the

6  creation of the product safety bulletin occurred in Japan

7  I think in May of 2017, and it was a matter of someone had

8  manipulated or tried to manipulate the T4 pin while that boom

9  section was on the ground, it hadn't even been rigged up to

10  insert into the remainder of the booms yet, which was unlike

11  the subject incident which occurred after the boom section had

12  been inserted, the 84-meter boom section had been inserted into

13  T2.

14  Q    Did you have any discussions with Mr. Boos with the

15  purpose behind the redesign of the cover plate?

16  A    From my understanding of the conversation, he was saying

17  that basically the cover plate was put together to prevent

18  anybody from trying to manipulate the pins for T3 or T4 while

19  it was still on the ground, it wasn't a matter of they were

20  worried about it after it's already inserted into the boom

21  because you're supposed to take the cover plate off before you

22  insert it into the boom.

23  Q    As part of your work, preparatory work in this case, did

24  you review any relevant standards and regulations?

25  A    Yes, sir, I went through the applicable ASME standards,

JEFFREY A. TRAVIS – FEBRUARY 11, 2022          31
Direct Examination by Mr. Cremer

1    which would be B30.5 for mobile cranes, and then the different

2    sections of OSHA in 1926.1400 that apply to different aspects

3    of this crane.

4    Q    I'm going to ask Darren to put up Defendant's Exhibit 71.

5         Mr. Travis, Defendant's Exhibit 71, could you please

6    identify the document.

7    A    It appears to be the report that I prepared for

8    Mr. Cremer's law firm, and it's dated November 30th of 2020.

9    Q    Does this report contain all of your opinions and

10   conclusions?

11   A    Yes, sir.

12   Q    At page 3 of the report you have what's captioned Summary

13   of Opinions.

14   A    Yes, sir.

15   Q    And, sir, are all of the opinions that are contained in

16   this report and which you will present testimony today in court

17   based upon a reasonable degree of engineering certainty?

18   A    Yes, sir.

19   Q    How many opinions have you reached in this case?

20   A    Appears to be 17, sir.

21   Q    I know you have a copy of -- a hard copy of your report

22   with you, so you could either look at the screen as we go

23   through them or use your hard copy.  Feel free to do either.

24        I'd like to go to page 5 of your report, at the very

25   bottom, starting Analyses and Opinions, and I'm going to go

1  through or have you go through your opinions, and as you go

2  through them, I want you to state to the Court your opinion and

3  then I want to talk about the bases for that specific opinion,

4  all right?

5  A    Yes, sir.

6  Q    What was the first opinion that you reached in this case?

7  A    That the subject accident wasn't caused by the Sims

8  operator's inability to identify the correct locking pin for

9  the boom swap, but rather his failure to return the T4 locking

10  pin to its previous position prior to inserting it into the

11  boom after Mr. Burrows had manipulated it.

12  Q    And basing that -- the basis for that opinion, did it

13  include your review of any particular witness depositions?

14  A    For that opinion it was mainly Mr. Farris, the crane

15  operator, Mr. Burrows, the crane apprentice.

16  Q    And what from Mr. Farris' deposition did you feel relevant

17  to that opinion?

18  A    In Mr. Farris' deposition he talked about the fact that he

19  knew which pin was supposed to be manipulated when making this

20  boom swap and that he could easily identify T3 and T4.  He

21  talked about the fact that Mr. Burrows, the apprentice, had

22  called him up on top of the boom during the swap operation to

23  say, hey, this pin isn't acting right, and he was able to

24  easily, as he said, go up on top and he's like, it's the wrong

25  pin, you tried manipulating the wrong pin.  So there wasn't

1  anything that I could find that would say there was some issue

2  with Mr. Farris not being able to identify, oh, no, you touched

3  the wrong pin, let's back this out and then we'll make

4  adjustments.

5  Q    Did you rely on any documents in support of opinion number

6  1?

7  A    The Liebherr operating manual talks about, in I think it's

8  Section 5.60, that, you know, there should be -- the connection

9  between these is always between T2 and T3, so T4 has really no

10  point in it; but then also for the fact that the pin overlap on

11  the locking bore should be at least 11 millimeters.  So at that

12  point you're saying, okay, if there's questions as to --

13  you know, we know that Mr. Burrows manipulated the T4 pin.  We

14  have Mr. Burrows saying, yeah, I saw that, but I returned it to

15  what I thought was the correct position.  Well, if there was a

16  question on something you've been told in your training never

17  to touch, you should either consult the manual or you should

18  consult Liebherr or you should consult your own technicians to

19  see, you know, did I do this correctly.

20  Q    You said Mr. Burrows.  Did you mean Mr. Farris?

21  A    Well, Mr. Burrows originally is the one who manipulated

22  the pin the wrong way and Mr. Farris is the one then that tried

23  to correct that manipulation.  Sorry if I used the wrong name.

24  Q    I think you mixed the two, but that's okay.

25       As for this opinion, did you rely on any regulations

1  or standards?

2  A    For this particular opinion, no, sir.

3  Q    Okay.  Let's move to opinion number 2.  If you could

4  highlight opinion number 2, maybe blow it up a little bit,

5  please.

6        Would you please tell the Court what your second

7  opinion was.

8  A    Basically that Farris received training from Mr. Ward, the

9  Liebherr USA technician, that was sufficient to allow him to

10 identify the correct pin that needed to be manipulated when

11 inserting the 84-meter boom into the T2 section.

12 Q    Did the basis for that opinion include any deposition

13 testimony of significance?

14 A    That included deposition testimony from Mr. Farris, and

15 I believe that was it as far as the deposition testimony.

16 Q    What about documents?  Did you rely on any documents as a

17 basis for opinion number 2?

18 A    Yes.  Once again, the Liebherr manual, it was

19 Section 5.60, Telescoping Sections; and then also the Liebherr

20 crane operator training document that indicated that Mr. Farris

21 was trained by Mr. Ward on the boom operations.

22 Q    And if you could let the Court -- we've looked at these

23 sections, but if you could briefly remind the Court about what

24 was pertinent in that particular section of the manual that was

25 relevant to this opinion.

1    A    Well, probably the biggest thing with the manual would be

2    in Section 5.60 it's telling them the telescope separation is

3    always between telescope T2 and telescope T3, so once again,

4    there is no need to be touching anything with T4, which is what

5    happened in this matter.

6    Q    And what about the Liebherr training -- I call it the

7    checklist, but it was -- that's the document that was filled

8    out by Henry Ward when he was training Mr. D'Angelo and

9    Mr. Farris?

10   A    Yes, sir.

11   Q    And what was pertinent about that in reaching your

12   opinion?

13   A    Well, if you go through the different sheets in the -- in

14   the training manual or the training checklist, as you call it,

15   there is one page that was signed by Mr. Farris indicating it

16   covered superstructure equipment boom and special crane

17   operation, and that's where the boom swap operation would have

18   been covered, so Mr. Farris is acknowledging he received that

19   training.

20   Q    Any standards or regulations that applies to this opinion?

21   A    No, sir.

22   Q    All right.  If we could go to number 3.

23   A    Let me see.  Mr. Farris was aware of which locking pin was

24   to be manipulated when swapping from the 50 to the 84-meter

25   boom.

1    Q    You're going way too fast for this court reporter.

2    A    I'm sorry.

3              THE COURT:  For any court reporter.

4    A    I apologize.  I have a tendency to do that.  I apologize.

5              And then Farris was able to identify the fact that

6    the Sims crane apprentice, Mr. Burrows, had manipulated the

7    wrong locking pin when asked about it by Mr. Burrows.

8    Q    And as to opinion number 3, was the basis for that opinion

9    supported by any particular deposition testimony?

10   A    Mr. Farris' deposition and Mr. Burrows' deposition, and

11   then also Mr. D'Angelo.

12   Q    Any documents that you reviewed that formed the basis for

13   this opinion?

14   A    Well, we have the OSHA statement of Mr. Burrows, then we

15   also have OSHA 1926.1403, but we have the Liebherr Operating

16   Instructions, Section 5.60, once again.

17   Q    In the body of the report under opinion number 3, you

18   provide citations to those portions of the deposition or to the

19   crane manual that are pertinent to that particular opinion?

20   A    Yes, sir.

21   Q    Let's go to number 4.

22   A    I'll do my best.  I'm going to go slow.  I'm trying.

23   Q    Reading, you have to be careful.

24   A    The Liebherr Operating Instructions indicate which pin is

25   to be manipulated when inserting the 84-meter boom T3 section

1  into the T2 section.  Mr. Farris, the Sims crane operator, knew

2  which pin to manipulate to mechanically attach boom section T3

3  to T2.

4  Q    And where did you find support to base that opinion on in

5  the deposition testimony?

6  A    In Mr. Farris' deposition, in Mr. Burrows' deposition, in

7  Mr. D'Angelo's deposition.

8  Q    Did you rely on any documents in support of opinion number

9  4?

10  A    The Liebherr Operating Instructions, once again

11  Section 5.60, Telescoping Sections Assembly and Disassembly,

12  and then the -- and I believe -- yeah, different parts of 5.60,

13  but it was all in 5.60.

14  Q    Any of the relevant standards or regulations applicable to

15  this opinion?

16  A    None that I cited to, no, sir.

17  Q    Let's go to 5.

18         If you would tell the Court what opinion number 5 is.

19  A    The Liebherr Product Safety Bulletin did not contain any

20  information not already included in the Liebherr Operating

21  Instructions as far as the boom swap operations.  The product

22  safety bulletin indicated the crane could be continued to be

23  used as long as you followed the operations manual.  Mr. Farris

24  indicated that he referenced the operating manual for

25  step-by-step procedures every time he did a boom swap.

1  Q    And the basis for that opinion as far as deposition

2  testimony is cited in the body of your report under opinion 5?

3  A    Yes, sir.

4  Q    Any --

5  A    That was Mr. Farris, and I believe that was -- for

6  depositions it was just Mr. Farris.

7  Q    Any documents that were relevant to that opinion?

8  A    The Liebherr Product Safety Bulletin itself, the Liebherr

9  Operating Manual/Instructions, and the Liebherr crane operator

10 training document.

11 Q    That's the checklist document we referred to earlier,

12 correct?

13 A    Yes, sir.

14 Q    Any standards apply to this opinion?

15 A    None that I cited to, no, sir.

16 Q    Let's move to number 6.  What is the sixth opinion that

17 you've reached in this matter?

18 A    Basically that the stickers that came with the product

19 safety bulletin wouldn't have been visible once the 84-meter

20 boom section was inserted into the T2 base section.

21 Q    What do you base that on?

22 A    I base that upon my visual examination of the exemplar

23 boom when I was down in the Houston yard of Liebherr, but then

24 also upon Mr. Farris' deposition and Mr. Burrows' deposition.

25 Q    Did you physically climb up on that boom and have the

1   84-meter boom inserted into the correct T2 hole and then

2   observe whether or not the stickers that were on that boom

3   would be visible or not?

4   A    Yes, sir.

5   Q    So that's a personal observation you're reflecting here,

6   right?

7   A    Yes, sir.

8   Q    Let's go to the next one, number 7.

9   A    Basically that the Liebherr manual would alert the user of

10  the crane to danger and warnings -- or through danger and

11  warning labels to the fact that if the crane documentation is

12  not understood --

13  Q    Slow down.

14  A    -- and that tasks are carried out on the crane, there is a

15  danger of accidents, including personnel being killed or

16  seriously injured.  This would include the improper assembly

17  and disassembly of the telescopic boom.  And that Mr. Farris,

18  the operator, stated that he understood the crane documentation

19  as far as the boom swap operations and he did not contact

20  Liebherr service when performing the operation.

21  Q    And what is the basis of that opinion?

22  A    Well, the deposition of Mr. Farris, and then also the

23  Liebherr Operating Instructions, several different sections.

24  You have 0.01, the Forward, Safety and Warning Notes.  You have

25  5.01, Safety Technical Notes for Assembly and Disassembly.

1    Those would be the main portions of the manual that were

2    referenced for this opinion.

3    Q    Any standards or regulations applicable to this opinion?

4    A    Not that I cited to, no, sir.

5    Q    Go to your eighth opinion.

6    A    This one, from my understanding --

7    Q    This was an issue that related to the fatality and it has

8    no pertinence to this issue, correct?

9    A    Correct.

10   Q    So we will withdraw that opinion.  Let's go to 9.

11   A    Basically 9 is saying that Mr. Farris, the operator, had

12   been trained by Mr. Ward, the Liebherr technician, on how to do

13   the boom swap and he had done it several times before this

14   incident without any incident.

15   Q    What is your understanding of the number of times that

16   Mr. Farris performed that exact same operation?

17   A    That seemed to be a moving target with Mr. Farris, but

18   I think probably four or five is what he finally agreed to.

19   Q    And are you aware if Sims as a company had successfully

20   and safely completed a number of boom swaps prior to this

21   incident?

22   A    Well, according to the information Sims gave OSHA and OSHA

23   included in their investigation report, they said they had done

24   a boom swap approximately 35 times prior to this accident.

25   Q    That was done without safety bulletins and without cover

1   plates and without warning stickers?

2   A    Yes, sir.

3   Q    Let's go to the next opinion, number 9.

4   A    Number 10?

5   Q    10.  Sorry.

6   A    Sorry.  We skipped one, so we kind of lost the number.

7   Q    10.  Will you state your opinions as to number 10.

8   A    So basically it's saying that Sims allowed an unqualified

9   apprentice, Mr. Burrows, to perform the boom swap, ignoring

10  Liebherr's requirements that only trained expert personnel may

11  work on the crane.  That's not only in violation of Liebherr's

12  requirements, but it's a violation of the OSHA requirements.

13  And that Sims Crane, when given the opportunity, chose not to

14  send Mr. Burrows for training on the crane from Liebherr as

15  they did Mr. Farris and Mr. D'Angelo.

16  Q    And you cite in your report the portions of the testimony,

17  deposition testimony, from which you base that opinion, right?

18  A    Yes, sir.

19  Q    What was the documents that you relied upon for this

20  particular opinion?

21  A    Well, you have the Liebherr Operating Instructions Manual

22  in the preface, then you also have Section 5.01, then you also

23  have Section 7.01, and then you also have the Liebherr crane

24  operator training, as you call it, the checklist.

25  Q    And you said that this particular opinion involved

1    violations of regulation, OSHA regulation, correct?

2    A    Yes, sir.

3    Q    Okay.  Would you tell the Court about that.

4    A    Well, I cite to two, OSHA 1926.1427, which is Operator

5    Training, Certification and Evaluation, and then 1926-1430,

6    Training.

7    Q    And how are those particular OSHA regulations related to

8    this opinion?

9    A    Well, with 1427 it talks about the employer, in this case

10   Sims, must provide each operator in training, in this case

11   Mr. Burrows, with sufficient training through a combination of

12   formal and practical instruction to ensure that the operator in

13   training develops the skills, knowledge and ability to

14   recognize and avert risk necessary to operate the equipment

15   safely for assigned work.

16   Q    And in your review of the evidence available did you find

17   whether or not Mr. Burrows was a competent and qualified

18   person?

19   A    Well, according to Mr. Burrows --

20         MR. GOODMAN:  Objection, Your Honor.  That's a

21   compound question.

22         THE COURT:  Go ahead and ask it separately then.

23   Break up the two adjectives.

24   BY MR. CREMER:

25   Q    Did you -- based on your review of the record, did you

1   find whether or not Mr. Burrows was a competent person?

2   A    For the boom swap operation Mr. Burrows was not a

3   competent person, no, sir.

4   Q    Why not?

5   A    Well, OSHA defines a competent person as somebody who is

6   not only qualified to do the job, but then can also recognize

7   any hazards associated with that task and make corrections.

8   In this case, if you go by the deposition testimony of

9   Mr. Burrows, and even his statement to OSHA, he said he had

10  never done this before, he had never read the manual, nobody

11  told him what he was supposed to do.  Mr. Farris didn't even

12  tell him to remove the dust cover plate over the T3 pin.  So

13  I'm not sure how you can say he's qualified per not only OSHA

14  but the Liebherr requirements.  He's never -- per his own

15  statement, he had never done this before, he had no idea what

16  he was supposed to do, he was just going to follow what

17  Mr. Farris told him to do.

18  Q    So in your professional opinion he was both not competent

19  or qualified?

20  A    Yes, sir.

21  Q    Any other regulations or standards you relied upon to

22  support opinion number 11?

23  A    No, sir.

24  Q    Let's move to your 12th opinion.  Please tell the Court

25  your 12th opinion.

1    A    Just so I don't get confused, number 11, Mr. Farris --

2    Q    11.  Oh.

3    A    Sorry.

4    Q    Either I'm behind or I'm ahead.  I apologize.

5    A    I'm saying Farris was the A/D Director as defined by OSHA.

6    As such, he's required to follow the manufacturer's procedures,

7    or if Sims has their own procedures, he needs to follow those,

8    is basically the gist of the opinion.

9    Q    And did you base that opinion on any standards or

10   regulations?

11   A    Yes.  OSHA 1926.1403, Assembly and Disassembly; and

12   OSHA 1926.1404, Assembly and Disassembly General Requirements;

13   and then OSHA 1926.1406, Assembly and Disassembly Employer

14   Procedures; and then 1926.1412, Inspections.

15   Q    And could you explain to us in a more simple fashion how

16   each of those sections are relevant to this opinion.

17   A    Well, 1403 is basically -- it boils down to you have to

18   follow the manufacturer's requirements when you're doing a

19   disassembly or assembly of a crane.  That and it gives you the

20   option, if your employer comes up with their own requirements

21   for assembly and disassembly of the crane that meet or exceed

22   whatever the manufacturer has, you can use those as well, but

23   as far as I know in this case Sims did not have their own set

24   procedures for assembly and disassembly of this crane.

25           Then 1404 just says basically the A/D Director must

1    understand the applicable assembly/disassembly procedures and
2    that he has to do a post-assembly inspection.
3            And 1406 talks about employer procedures, but once
4    again, I haven't seen anything in the documents produced that
5    indicates Sims came up with their own assembly/disassembly
6    procedure.
7            And then 1412 is Inspections, and this talks about
8    modified equipment, and it states basically that equipment
9    that's been -- had modifications or additions which affect the
10   safe operation of the equipment, and including anything dealing
11   with the load-sustaining structural components or capacity must
12   be inspected by a qualified person after such
13   modifications/additions.  Well, you swapped from a 50-meter
14   boom to an 84-meter boom, that is the main structural component
15   of this crane, and you have just changed the load-carrying
16   capacity, you've changed whatever you need to enter into the
17   computer, you've changed which load charts you're using, so to
18   me that applied.
19   Q    Would the T4 pin be a structural component of that boom?
20   A    Yes, sir.
21   Q    And if, as we know, Mr. Farris or Mr. Burrows changed the
22   position of that structural load-bearing component and then
23   operated the crane, would that be considered a modification?
24   A    Yes, sir.
25   Q    Any other regulations other than those you've talked

1    about?

2    A    Not that I've cited to, no, sir.

3    Q    All right.  Could we go to your 12th opinion.

4    A    Basically when Mr. Farris experienced a problem with the

5    telescoping boom, he didn't follow the procedures outlined in

6    the Liebherr Operating Instructions or the Sims General Safety

7    Rules.  He didn't adhere to OSHA requirements, which stated

8    he's to comply with all the manufacturer's procedures.

9    Q    What are the Sims General Safety Rules that you reference

10   here that you base this opinion on?

11   A    Well, there were two of them.  There was number 7, which

12   basically states if at any time you are unsure of how to

13   perform an assigned task, stop and request assistance or

14   direction from your manager or supervisor.  And then 10, do not

15   attempt to repair or tamper with equipment that is not working

16   properly.  Immediately report the condition to your manager or

17   supervisor.

18   Q    Well, didn't Andrew Farris stop and call his supervisor?

19   Isn't that consistent with this rule?

20   A    He stopped, he called his supervisor, but then, as it says

21   in number 10, do not attempt to repair or tamper with the

22   equipment if it's not working properly.  We have per

23   Mr. Farris' deposition testimony that as he tried to extend the

24   boom, sections 6 and 5 and even 4 would extend but then he

25   couldn't retract the cylinder inside to grab section 3.

1   He tried it several times, couldn't get it to work.  He then

2   called the office, the office said they were going to send over

3   a technician, but Mr. Farris didn't actually wait for the

4   technician to show up.  So he's attempting to do his own,

5   I guess, repairs or investigation, which according to these

6   rules he's not supposed to do.

7        MR. GOODMAN:  Your Honor, I object to that opinion.

8   I mean, the witness said he guessed that, so I think that

9   should be stricken from the record.

10        THE COURT:  Give me a minute to read back.

11        Okay.  I'm not going to strike it from the record,

12   but I won't be considering it.  It is his opinion of what he

13   thinks occurred.  We've already gotten the testimony of

14   Mr. Farris, so as far as any conclusion or guess that

15   Mr. Travis is making, I have the testimony of the facts from

16   Mr. Farris himself.

17        Go ahead.

18   BY MR. CREMER:

19   Q    Were there any industry standards or OSHA regulations that

20   apply to this opinion?

21   A    Well, in this case the one that would apply, at least

22   I feel applies, is 1926.1417, Operations.

23   Q    What about -- let's go to your 13th opinion.  Would you

24   please state what that is.

25   A    Basically that Mr. Farris, after he reported this issue

1    with the telescoping boom to his supervisor, and knowing that a

2    technician had been dispatched, did not wait for the technician

3    to arrive and diagnose the problem, instead he consulted

4    with -- and I say "past," I've been told that's wrong, that he

5    was at the time still currently employed by Sims Crane -- an

6    employee with no experience or knowledge of the subject crane

7    and then attempted to diagnose and correct the problem himself.

8    Once again, that's not in accordance with Liebherr Operating

9    Instructions or the Sims Crane General Safety Rules.

10   Q    Let's go to your 14th opinion.

11   A    Per ASME B30.5, Sims was to designate a person to perform

12   the required crane inspections.  The Sims Crane operator,

13   Mr. Farris, was the person designated to perform the crane

14   inspections.  As such, it was his responsibility to identify

15   any deficiency that could constitute a hazard and any control

16   mechanism maladjustment that would interfere with proper

17   operation.  Mr. Farris identified a deficiency after assembling

18   the 84-meter boom but did not consider it a hazard - the boom

19   extension controls not responding as anticipated.

20   Q    And what do you base that opinion on?

21   A    Well, I'm citing to ASME B30.5, but it would also be what

22   Mr. Farris stated in his deposition, that, you know, he was

23   having trouble with the boom extension so he kept trying to

24   extend, then he switched over to manual mode to try to still

25   get the booming cylinder to unlock from T4.

1    Q    And is that improper procedure based on the standards?

2    A    Yes.  When you look in ASME B30.5, Chapter 5-2, Section

3    5-2.1, any deficiency identified shall be examined and a

4    determination made by a qualified person as to whether it

5    constitutes a hazard.

6            And then if you look at 5-2.1.2, Frequent

7    Inspections, all control mechanisms for maladjustment

8    interfering with proper operation must be checked daily or when

9    used.

10   Q    Did you conclude that Mr. Farris was not a qualified

11   person to identify the hazard?

12   A    I think Mr. Farris was a qualified crane operator.

13   I don't believe he was a qualified crane technician or

14   mechanic.  At the point that this became an issue with the boom

15   not extending fully, at that point, if you're following the

16   ASME requirements, you know, that's a maladjustment that's

17   doing something, at that point he doesn't know is it

18   electronic, is it mechanical, what's causing the issue, so he

19   tried to investigate it himself, but here it's saying it should

20   be examined and determined by a qualified person.  At this

21   point a qualified person to me would have been a crane

22   technician or mechanic.

23   Q    Let's go to your 15th opinion.

24   A    Sims Crane, as the crane owner, was responsible for

25   providing field assembly, disassembly and operation of the

 1  crane as specified by the crane manufacturer.  Sims Crane

 2  designated Mr. Farris to perform the assembly/disassembly of

 3  the boom on February 16th, 2018.

 4  Q    And in your opinion did that violate any applicable

 5  standards or regulations?

 6  A    It did from the standpoint of, I think as I've stated,

 7  Mr. Farris is a qualified crane operator, but it's talking

 8  about your designated personnel in accordance with

 9  Section 5-0.3 for the purpose of maintenance, repair,

10  transport, assembly and disassembly.

11          So you have Sims assigning Mr. Farris to do the

12  assembly/disassembly operations but Mr. Farris not fulfilling

13  his obligations as an A/D Director, so he's not explaining to

14  Mr. Burrows -- at least according to Mr. Burrows, never told

15  him to remove the dust cover on the T3 pin, never explained to

16  him beforehand exactly what procedures they were going to do

17  and what he should be looking for when the boom gets inserted,

18  both those types of things.

19  Q    Do you recall in the -- Shane Burrows' deposition

20  testimony that he testified that he couldn't -- he was not

21  trained in how to distinguish between the T3 and the T4 pin?

22  A    Yes, sir.

23  Q    Should he have been?

24  A    If you are the A/D Director, there should have been

25  basically a pre-job meeting and you sit down with everybody

1  involved, because the swapping of this boom can take eight to

2  ten people, because you're going to have assist cranes that

3  have to lift the new pieces in and take the old pieces out,

4  you're going to have the operator in the crane itself, you're

5  going to have -- there can be a separate person on the ground

6  that's doing the rigging and then somebody on top of the boom

7  to check for the pins.  In this case Mr. Burrows did both of

8  those, but there's been no indication that there was a pre-job

9  meeting held by Mr. Farris where he explained to everybody,

10 here is your job and here is what you should be doing and here

11 is what you need to look for, and if there's an issue,

12 you know, just stop and come get me.  In this case that was

13 never done.

14 Q    What's your next opinion?

15 A    16.  Per ASME B30.5, Sims, as the crane user, was

16 responsible for complying with the requirements of the

17 manufacturer in ensuring that the crane is in proper operating

18 condition.  Sims Crane, through its designated crane operator,

19 Mr. Farris, did not comply with the Liebherr requirements for

20 assembly and disassembly.

21 Q    So this is looking at the ASME standard as it applies to

22 Sims, right?

23 A    Yes, sir, because it talks about that the crane user has

24 to comply with the manufacturer's requirements to make sure the

25 crane is in, excuse me, proper operating condition.  Well, we

JEFFREY A. TRAVIS - FEBRUARY 11, 2022        52
Direct Examination by Mr. Cremer

1  know that the swap of the boom did not comply with the

2  manufacturer's requirements, and we know from the testimony

3  that the crane was not in proper operating condition.  He

4  couldn't get the boom to fully extend.  So on those two points

5  then Sims is not meeting the ASME requirements.

6  Q    Let's go to your last opinion, number 17.

7  A    Per ASME B30.5, Mr. Farris, the Sims Crane operator, was

8  responsible for understanding and applying the requirements in

9  the crane manufacturer's manual.  Mr. Farris failed to follow

10 the Liebherr procedures for assembly and disassembly of the

11 boom, failed to adequately test the crane functions, and

12 operated the crane even after the crane controls did not

13 respond properly.

14            MR. FORTE:  Pass the witness.

15            THE COURT:  Thank you.

16            It seems like now would be a good time to take a

17 break.

18            Well, let me ask you, Mr. Goodman, how long do you

19 anticipate your cross-examination to last?

20            MR. GOODMAN:  Probably through lunch, Your Honor.

21            THE COURT:  So let's go ahead and take a break.

22 Let's come back at 11:20, a 15 minute break.

23                    - - - - -

24            (Recess at 11:05 a.m. until 11:23 a.m.)

25                    - - - - -

1          MR. GOODMAN:  Would you mind transferring over the

2    video?

3          THE COURT:  Mr. Goodman, you can begin whenever

4    you're ready, and Mr. Travis has his microphone on.

5                **CROSS-EXAMINATION OF JEFFREY A. TRAVIS**

6    **BY MR. GOODMAN:**

7    Q    Good morning, sir.

8          You would agree that the crane incident that we are

9    here discussing has to do with crane warnings, crane

10   instructions and crane operation, correct?

11   A    Crane instructions, crane operations, I would think, yes,

12   sir.

13   Q    You don't think it has to do with crane warnings?

14   A    Well, I guess depending on what you're considering a

15   warning.  To me it's more instructions.  If you're told not to

16   do something, that's an instruction.

17   Q    You would agree that Reinforced Structures did nothing to

18   cause or contribute to the incident, correct?

19   A    Not that I am aware of, no, sir.

20   Q    You would agree Viking Riggings did nothing to cause or

21   contribute to the incident, correct?

22   A    Not that I'm aware of, no, sir.

23   Q    You would agree that Liebherr Germany did nothing to cause

24   or contribute to the incident, correct?

25   A    I only hesitate to answer because as far as the crane

1   itself I'm not aware of any mechanical issues that led to this,

2   but the manual itself was put together by Liebherr Germany, it

3   wasn't put together by Liebherr USA, so any shortcomings in the

4   manual would be the responsibility of Liebherr Germany.

5   Q    So is it your opinion that there was a shortcoming in the

6   operator's manual?

7   A    At this time I would say no.

8   Q    Okay.  So is it your opinion that Liebherr Germany did

9   nothing to cause or contribute to this incident, correct?

10  A    Yes, sir.

11  Q    You would agree that the International Union of Operating

12  Engineers Local 487, District 925, did nothing to cause or

13  contribute to this incident, correct?

14  A    Not that I'm aware of, no, sir.

15  Q    And the maintenance of the crane did not cause or

16  contribute to the incident, correct?

17  A    Not that I'm aware of, no, sir.

18  Q    And the lift plan that was used and prepared prior to this

19  incident did nothing to cause or contribute to this incident,

20  correct?

21  A    Not that I'm aware of, no, sir.

22  Q    And you would agree at the time of the actual uncontrolled

23  retraction of the boom on February 19th, 2018, the crane was

24  not lifting anything, correct?

25  A    I would disagree with you there.  If you read the

 1   regulations, anything past the tip of the boom is considered a

 2   load, and in this case the hook block would have been the load

 3   as well as any wire rope that was below the tip.

 4   Q    The only items on the crane were the 84-meter boom, the

 5   block, the hook, and any wire rope, that's correct?

 6   A    As far as I'm aware, yes, sir.

 7   Q    And the pre-task safety analysis did not cause or

 8   contribute to this incident, correct?

 9   A    For the lifting of the tower crane sections?  Not that I'm

10   aware of, no, sir.

11   Q    And it's your opinion that the incident was not caused by

12   a service-related issue, correct?

13   A    I hesitate to answer only because once Mr. Farris became

14   aware of the issue he should have waited for the technician.

15   That would have been the service that needed to be performed on

16   the crane.

17   Q    You remember you took a deposition, sir?

18   A    Yes, sir.

19   Q    And I was there?

20   A    Yes, sir.

21   Q    And you were there?

22   A    As far as I recall, I was there, yes, sir.

23   Q    And we were up in Chicago?

24   A    Yes, sir.

25   Q    And there was a court reporter?

JEFFREY A. TRAVIS – FEBRUARY 11, 2022          56
Cross-Examination by Mr. Goodman

1    A    Yes, sir.

2    Q    And at that deposition you wouldn't even agree that your

3    children weren't LTM 1500 operators; do you remember that, sir?

4    A    Yes, sir.

5    Q    And so I asked you that day, page 19 and 20, line 23

6    through 2, that:  It is your opinion that this incident we're

7    here for today was caused -- I think we already went over

8    this -- by a manufacturing defect in the product?

9            And you said:  Not that I'm aware of, no, sir.

10           And then I asked you:  Is it your opinion that this

11   incident was caused by a service-related issue, such as that

12   wire that we discussed?

13           You said:  Not that I'm aware of, no, sir.

14           Do you remember that?

15   A    If that's what the trial testimony says, yes, sir.  Or

16   deposition testimony.  Sorry.

17   Q    It's your sole contention that this incident occurred due

18   to operator error, correct?

19   A    Operator and the Assembly/Disassembly Director errors,

20   yes, sir.

21   Q    And you would agree that the failure of Liebherr US to

22   provide the proper safety bulletin and retrofit cover plate was

23   a factor that caused that operator error, correct?

24   A    Correct.

25   Q    You would agree that if someone does not know that doing

1   something can cause an error, that person cannot be culpable

2   for causing the error, correct, sir?

3   A    Yes, sir.

4   Q    Let's talk about your work experience, okay?

5   A    Yes, sir.

6   Q    When you were with Packer Engineering, you did product

7   testing on bridges, tunnels, roofs, epoxy anchors and tower

8   cranes, correct?

9   A    Yes, sir.

10  Q    You didn't do anything that resembled a Liebherr LTM 1500,

11  correct?

12  A    Not that I recall, no, sir.

13  Q    When you were at Packer Engineering you also did some

14  repair, design, worked with some demolition contractors, and

15  you would design the shoring and bracing related to demolition

16  jobs, correct?

17  A    Yes.

18  Q    And while you were at Packer Engineering you did not

19  evaluate crane operators, correct?

20  A    When you say "evaluate crane operators," if you're talking

21  about as far as their actions if we were investigating a crane

22  accident, yes, we would take a look at the actions of the crane

23  operator if they contributed to that accident, yes, sir.

24  Q    While you were at Packer Engineering, you did not work in

25  human factors involving warnings, correct?

1   A    No, sir.

2   Q    And when you worked at Carl Walker, Inc. you did purely

3   design work, correct?

4   A    Yes, sir.

5   Q    And when you were at Carl Walker, Inc. the only thing you

6   did involving cranes was review crane foundation calculations,

7   correct?

8   A    Yes, sir.

9   Q    And while you were at Carl Walker, Inc. you did not

10  evaluate crane operators, correct?

11  A    No, sir.

12  Q    And while you were at Carl Walker, Inc. you did not work

13  in human factors involving warnings, correct?

14  A    Yes, sir.

15  Q    And when you worked at Raths and Johnson you had no crane

16  involvement there, correct?

17  A    That's correct.

18  Q    You did only building design, correct?

19  A    Yes, sir.

20  Q    So while you were at Rath and Johnson you did not evaluate

21  crane operators, correct?

22  A    That's correct.

23  Q    And while you were at Rath and Johnson you did not work in

24  human factors involving warnings, correct?

25  A    That's correct.

1    Q    When you were at Vectra Technologies the only crane work
2    you did was on tower cranes, correct?
3    A    No.  At Vectra most of it was overhead cranes in the
4    nuclear plants above the spent fuel pools.
5    Q    Was that involving tower cranes, sir?
6    A    No, it was overhead cranes in the nuclear plants.
7    Q    Those cranes are different from the Liebherr LTM 1500
8    though, correct?
9    A    Yes, sir.
10   Q    And while you were at Vectra Technologies you did not
11   evaluate crane operators, correct?
12   A    That's correct.
13   Q    And while you were at Vectra Technologies you did not work
14   in human factors involving warnings, correct?
15   A    Correct.
16   Q    And at Newport News Shipbuilding you reviewed lift plans
17   and the rigging, but you did not design the cranes that they
18   were using, correct?
19   A    Correct.
20   Q    And you were not involved in any sort of crane analysis or
21   crane failures either there, correct?
22   A    Crane failures, no.  Analysis, I would consider that part
23   of the lift plan because you have to make sure that you have
24   the proper size crane and you have it rigged properly and it's
25   in the proper position that it can make the picks it needs to.

JEFFREY A. TRAVIS – FEBRUARY 11, 2022          60
Cross-Examination by Mr. Goodman

1    Q    But you didn't involve any forensic evaluation, correct,
2    sir?
3    A    No, thank goodness.  We did not have any failures while I
4    was there.
5    Q    And while you were at Newport News Shipbuilding you did
6    not evaluate crane operators, correct?
7    A    I hesitate to answer that as a yes or no, because as part
8    of the lift plan you'll have to have the crane operator's
9    qualifications included to make sure that he's qualified to run
10   that piece of equipment.
11   Q    You did not forensically evaluate crane operators when you
12   were at Newport News Shipbuilding, correct?
13   A    No, we just made sure they had the proper certifications
14   to run the crane.
15   Q    And while you were at Newport News Shipbuilding you did
16   not work in human factors involving warnings, correct?
17   A    Correct.
18   Q    All right.  Let's talk about your training.  You're a
19   structural engineer, correct?
20   A    Yes, by licensure and education.
21   Q    You're not a materials engineer, correct?
22   A    No, sir.
23   Q    You're not a mechanical engineer, correct?
24   A    No, sir.
25   Q    You're not a human factors expert, correct?

JEFFREY A. TRAVIS – FEBRUARY 11, 2022        61
Cross-Examination by Mr. Goodman

1    A    No, sir.

2    Q    Not a physicist, correct?

3    A    No, sir.

4    Q    And would you agree that Merriam-Webster defines

5    structural engineering as the branch of civil engineering

6    dealing primarily with the design and construction of

7    structures, such as bridges, buildings and dams?

8    A    I don't have it in front of me, but if you're reading it

9    straight from there, I would have no reason to argue with that.

10   Q    And do you agree with that definition of structural

11   engineering?

12   A    It's a lot better than the one they used to use in college

13   that says the structurals build the targets and the mechanicals

14   built the bombs, but, yes, that's a better definition.

15   Q    That's an accurate definition, sir?

16   A    For general structural, yes, sir.

17   Q    And the Liebherr LTM 1500 that we're dealing with is not a

18   bridge, correct?

19   A    No, sir.

20   Q    And the Liebherr LTM 1500 that we're dealing with is not a

21   building, correct?

22   A    No, sir.

23   Q    And the Liebherr LTM 1500 that we're dealing with is not a

24   dam either, correct?

25   A    No, sir.

1  Q    Okay.  You're not a crane operator, correct?

2  A    I am qualified to run overhead cranes per OSHA.

3  Q    You're not a licensed NCCCO crane operator, correct, sir?

4  A    No, sir.

5  Q    You're not certified by the NCCCO, correct?

6  A    That's correct.

7  Q    You do not teach crane operators how to operate cranes,

8  correct, sir?

9  A    That's correct.

10 Q    You've never been involved in training crane operators,

11 correct, sir?

12 A    That would be correct.

13 Q    You have never taken the course on how to operate a

14 Liebherr LTM 1500, correct, sir?

15 A    Other than the instruction in their yard when we were

16 looking at the exemplar, no, sir.

17 Q    And you are not on the ASME B30 committee, correct, sir?

18 A    No, sir.

19 Q    You have never been a crane operator as that term in

20 defined is ASME B30.5, correct, sir?

21 A    That would be correct.

22 Q    You have never been a crane owner, as that term is defined

23 in ASME B30.5, correct, sir?

24 A    Yes, sir.

25 Q    You were not involved in drafting the Code of Federal

 1  Regulations, Title 29, part 1926, correct, sir?

 2  A    Correct.

 3  Q    You are not now, nor have you ever been, a

 4  Assembly/Disassembly Director, as that term is defined in

 5  Section 1926.1401, correct?

 6  A    Correct.

 7  Q    You are not now, nor have you ever been, a competent

 8  person as that term is defined in Section 1926.1401, correct?

 9  A    Competent in regards to?  I'm competent as far as

10  scaffolding.  I'm competent as far as fall protection.  Which

11  section of OSHA are you referring to be a competent person?

12  Q    How about competent as regarding a LTM 1500?

13  A    Well, once again, you can be competent as far as

14  operations, you can be competent as far as the

15  assembly/disassembly.  Which section are we talking about?

16  Q    Both of them.

17  A    No, sir.

18  Q    Okay.  It would have been easier just to say "no," right,

19  sir?

20  A    I'm just answering the question as asked.

21  Q    And you are not now, nor have you ever been, a qualified

22  person as that term is defined in Section 1926 for an LTM 1500,

23  correct, sir?  Both those sections you just discussed.

24  A    Yes, sir.

25  Q    So you're not, correct?

1   A    Correct.

2   Q    You are not now, nor have you ever been, a supervision

3   competent qualified person for an LTM 1500, as that term is

4   defined in Section 1926.1401, correct, sir?

5   A    Correct.

6   Q    You are not now, nor have you ever been, an operator in

7   training on an LTM 1500, correct, sir?

8   A    Correct.

9   Q    You have never acted as an oiler on an LTM 1500, correct,

10  sir?

11  A    Correct.

12  Q    You're not a crane designer, correct, sir?

13  A    Well, once again, I hesitate to answer that only because

14  what part of the crane are you describing?

15  Q    All of it.

16  A    Well, that covers a lot.  That's hydraulics, that's

17  electronics, that's computers.

18  Q    Have you ever put together an entire crane, sir?  Have you

19  designed or been involved in the design of an LTM 1500?

20  A    An LTM 1500, no, sir.

21  Q    You've never been involved in selling cranes, correct,

22  sir?

23  A    Correct.

24  Q    You've never designed a locking pin like the T4 pin,

25  correct, sir?

1   A    Correct.

2   Q    You're never designed any sort of pin for any sort of

3   crane, correct, sir?

4   A    Not that I can think of, no, sir.

5   Q    You've never been involved in crane manufacturing,

6   correct, sir?

7   A    Correct.

8   Q    You've never been involved in quality control for crane

9   manufacturing or design, correct, sir?

10  A    Correct.

11  Q    You've never been involved in writing or publishing crane

12  operator's manuals, correct, sir?

13  A    Correct.

14  Q    You've never been involved in writing or publishing

15  product safety bulletins for cranes, correct, sir?

16  A    Correct.

17  Q    You do not have a degree in psychology, correct, sir?

18  A    Correct.

19  Q    You do not have a degree in psychiatry, correct, sir?

20  A    Correct.

21  Q    You do not have a degree in ergonomics, correct, sir?

22  A    Correct.

23  Q    And prior to your work on this case you never operated a

24  Liebherr LTM 1500, correct, sir?

25  A    Correct.

JEFFREY A. TRAVIS - FEBRUARY 11, 2022        66
Cross-Examination by Mr. Goodman

1  Q    Prior to this case you never read the Liebherr LTM 1500
2  operator's manual, correct, sir?
3  A    Correct.
4  Q    And prior to your work on this case you had never
5  previously before had any incident to investigate the operation
6  of a Liebherr LTM 1500, correct, sir?
7  A    Correct.
8  Q    And you've never had the opportunity to investigate the
9  proper training for a Liebherr LTM 1500, correct, sir?
10 A    For this particular crane?  No, sir, I have not.
11 Q    And you've never had the opportunity to investigate or
12 determine how a team of crane personnel function in the
13 assembly or disassembly of a Liebherr LTM 1500, correct, sir?
14 A    Correct.
15 Q    And you don't really know the reason why Liebherr Germany
16 published the product safety manual, correct, sir?
17 A    Product safety manual or the product safety bulletin?
18 Q    Whatever you want to call it.
19 A    Well, the manual and the bulletin are two different
20 things, that's why I'm asking.
21 Q    All right.  All right.  Well, let's talk about the product
22 safety bulletin, sir.
23 A    Well, as I stated, talking with Mr. Boos in Germany, his
24 description was the fact that in May of 2017 there was an
25 incident in Japan where somebody had actually manipulated the

 1    T4 pin while the boom -- 84-meter boom section was still on the

 2    ground, so they produced this product safety bulletin to try to

 3    prevent that happening again.

 4    Q    Sir, I didn't ask you what it was, I just asked you, you

 5    don't really know the reason why Liebherr Germany published the

 6    product safety manual?  It's a yes or no.

 7    A    Well, you asked me --

 8    Q    Either you do or you don't, sir.

 9    A    You asked me if I knew.  That is what I was told.  So I'm

10    just answering your question.

11    Q    I'm just asking a yes or no.  I didn't ask for -- I'm just

12    asking yes or no.  Do you know what a yes or no question is,

13    sir?

14            THE COURT:  We don't need to be doing the digs.

15            MR. GOODMAN:  I apologize, Your Honor.

16    BY MR. GOODMAN:

17    Q    Do you remember you were at a deposition with me --

18    A    Yes, sir.

19    Q    -- in this case, I was asking you questions --

20    A    Yes, sir.

21    Q    -- and you were under oath?  Do you remember that?

22    A    Yes, sir.

23    Q    And I asked you on page 59 to 60, at the bottom, line 22:

24    And what was the purpose of the product safety bulletin, right,

25    to make up for that issue that you just referenced that

1    Liebherr had in this -- Liebherr Germany had its operating

2    manual?

3            And you answered:  You would have to discuss with the

4    people at Liebherr Germany exactly what all the reasoning was

5    behind their product safety bulletin.

6            Do you remember you answered that question that way,

7    sir?

8    A    Yes, sir.

9    Q    And you would agree that you can't speak as to why the

10   crane manufacturers do what they do when they publish product

11   safety bulletins, correct, sir?

12   A    I wouldn't know what all their reasoning is behind

13   publishing them, no, sir.

14   Q    And you would actually agree that to speak about warnings

15   we would have to find somebody better on warnings than you;

16   isn't that correct, sir?

17   A    I know there are people that specialize just in warnings,

18   so they are probably more knowledgeable than me, yes, sir.

19   Q    And you can't tell us the best way to convey important

20   information to new crane operators, correct, sir?

21   A    Given the number of ways you could do it, which one is

22   best?  No, I couldn't tell you which one is best.  No, sir.

23   Q    Let's talk about your investigation of the claim.

24           You did not collaborate with any other engineers in

25   preparing your report, correct, sir?

1    A    Correct, although I think, as I told you during my

2    deposition, with Exponent it would go through a technical

3    review and a corporate review, but they didn't have input on

4    the actual, I guess, basis of the report.

5    Q    And you did not speak to a human factors expert when you

6    were preparing your report, correct, sir?

7    A    Correct.

8    Q    You did not speak with a human factors expert in your

9    investigation of this matter, correct, sir?

10   A    Correct.

11   Q    And you did not speak with anybody from ASME B30

12   Committee, correct, sir, about this matter?

13   A    Yes.

14   Q    And in your investigation you did not speak with anybody

15   involved in the drafting of the Code of Federal Regulations

16   Title 29, Part 1926, correct, sir?

17   A    Correct.

18   Q    You never went to the Sims yard, correct, sir?

19   A    Sims yard?  No, sir.

20   Q    And you never went to the site of the collapse, correct,

21   sir?

22   A    Correct.

23   Q    And you did not have anyone on your behalf go to either of

24   those two locations, did you, sir?

25   A    No, sir.  As far as I was aware, by the time I was

 1    retained the crane had been moved from the site.  There was no

 2    reason for me to go there.

 3    Q    Let's talk about the boom swap that you attended.  And

 4    where was that, in Germany?

 5    A    No, that was in Houston.

 6    Q    Houston.

 7          And prior to this case you never witnessed a boom

 8    swap on a Liebherr LTM 1500, correct, sir?

 9    A    Correct.

10    Q    And you never witnessed a boom swap that was conducted by

11    Sims, correct, sir?

12    A    Correct.

13    Q    And you never witnessed a boom swap that was conducted by

14    Andrew Farris, correct, sir?

15    A    Correct.

16    Q    You never witnessed a boom swap that involved Shane

17    Burrows, correct?

18    A    Correct.

19    Q    You actually never witnessed a boom swap conducted by

20    Henry Ward either, correct, sir?

21    A    Correct.

22    Q    You never witnessed Henry Ward train an operator on how to

23    conduct the boom swap, correct, sir?

24    A    Not that I'm aware of, no, sir.

25    Q    You never witnessed how Henry Ward trained an operator how

1   to lock down the T3 pin, correct, sir?

2   A    Correct.

3   Q    When you watched the boom swap that was conducted by

4   Liebherr, Henry Ward was not involved in that, correct, sir?

5   A    Not that I'm aware of, no, sir.

6   Q    And during that boom swap there were about seven or eight

7   people participating, correct?

8   A    Yes, sir.

9   Q    And you were involved in physically doing the boom swap,

10  correct, sir?

11  A    Yes, sir.

12  Q    So you were actually sitting in the operator's seat.

13  A    For a portion of it, yes, sir.

14  Q    And that was your first time in a Liebherr LTM 1500,

15  correct, sir?

16  A    Yes, sir.

17  Q    And Liebherr never told you you were not allowed to be

18  there, correct, sir?

19  A    Well, given that the technician was standing next to me --

20  Q    I'm just asking if they ever told you whether you were

21  allowed to be there or not.  Yes or no, sir?

22  A    I'm trying to answer your question.

23  Q    All I need is a yes or no, sir.  Your counsel can clear up

24  any impropriety.

25  A    Are you meaning Liebherr Germany, Liebherr USA?

1  Q    I'm telling you nobody from Liebherr told you that you

2  violated some of the operator's manuals by being there and so

3  that you couldn't be there, did they?

4  A    No, sir.

5  Q    So Liebherr allowed an individual who is not a licensed

6  crane operator to participate in a boom swap, correct, sir?

7  A    Yes, sir.

8  Q    And Liebherr allowed an individual who was not a qualified

9  person, as that term is defined in the ASME and OSHA, to

10  participate in the boom swap of an LTM 1500, correct, sir?

11  A    Yes, sir.

12  Q    And Liebherr allowed an individual who is not a competent

13  person, as that term is defined in OSHA and ASME, to

14  participate in the boom swap, correct, sir?

15  A    Yes, sir.

16  Q    And at that boom swap you did not know the background of

17  the other individuals who participated, correct?

18  A    Not all of them, no, sir.

19  Q    And so you do not know whether or not all of those

20  individuals were NCCCO certified crane operators, correct, sir?

21  A    No, sir.

22  Q    You don't know if some of them were oiler apprentices,

23  correct, sir?

24  A    Correct.

25  Q    Some of them could have been NCCCO licensed riggers,

1  correct, sir?

2  A     Yes, sir.

3  Q     Some of them could have passed the NCCCO riggers course

4  but just not received their NCCCO card yet, correct, sir?

5  A     That's possible, yes, sir.

6  Q     And you don't know whether or not each person that was

7  there was qualified, as that term is defined in those -- ASME

8  and OSHA, correct, sir?

9  A     Do I personally know?  No, I don't, sir.

10  Q     And you don't know whether each of those individuals were

11  competent either, correct, sir?

12  A     That's correct.

13  Q     During the boom swap that you conducted --

14         MR. CREMER:  I would object to the characterization

15  of "conducted."

16         THE COURT:  Rephrase the question please,

17  Mr. Goodman.

18  BY MR. GOODMAN:

19  Q     During the boom swap that was being done, everyone

20  involved had the knowledge of the product safety bulletin and

21  retrofit kit, correct?

22  A     I can only assume so based on the fact that the cover

23  plate was installed on the 84-meter boom as well as the

24  stickers.

25  Q     You were never involved in a boom swap that was done by

1  individuals that had no knowledge of the product safety

2  bulletin, correct, sir?

3  A    Correct.

4  Q    And you never conducted or participated in a boom swap

5  with the old cover plate, correct, sir?

6  A    Correct.

7  Q    At the time of that boom swap you had not read the LTM

8  1500 manual, correct, sir?

9  A    Not cover to cover, but a large portion of it.

10  Q    And during the boom swap with Liebherr, you did not see

11  any of the Liebherr participants have a ruler to measure the T3

12  pin to make sure it was at 11 millimeters above the

13  locking bore, correct, sir?

14  A    I hesitate to answer only because I know I had my scale

15  out, and I'm trying to think if somebody else did as well, but

16  I don't recall, sir.

17  Q    Did you use it to measure whether the T3 pin was

18  11 millimeters above the locking bore?

19  A    Yes, sir.

20  Q    Did you do that because of the issues in this case?

21  A    Yes, sir.

22  Q    Did you see anybody else measure the T3 pin and whether it

23  was 11 millimeters above the locking bore?

24  A    I don't recall specifically, sir.  Sorry.

25  Q    Let's talk about the crane itself.  The LTM 1500 is a

1  mobile crane, correct, sir?

2  A    Yes, sir.

3  Q    It's not a tower crane, correct?

4  A    No, sir.

5  Q    And the crane was designed properly by Liebherr Germany,

6  correct?

7  A    As far as I'm aware, yes, sir.

8  Q    And the crane was engineered properly by Liebherr Germany,

9  correct?

10  A    As far as I'm aware, yes, sir.

11  Q    And the crane was manufactured properly by Liebherr

12  Germany, correct?

13  A    As far as I'm aware, yes, sir.

14  Q    There was no failure of the crane except for the T4 pin

15  that broke in this situation, correct, sir?

16  A    That I'm aware of, yes, sir, that's the part that broke.

17  Q    And the locking pin that broke was properly designed and

18  manufactured by Liebherr Germany, correct?

19  A    As far as I'm aware, yes, sir.

20  Q    And the locking pin that broke was made out of proper

21  materials for the purpose for which it was designed, correct?

22  A    As far as I'm aware, yes, sir.

23  Q    And the LICCON system in the involved crane was not

24  defective in any way, correct, sir?

25  A    Not that anybody has made me aware of, no, sir.

1   Q    And there was not a manufacturing defect with any other

2   component part of the crane, correct, sir?

3   A    Not that I've been made aware of, no, sir.

4   Q    Let's talk about the operator's manual.  The operator's

5   manual is produced by Liebherr Germany, correct?

6   A    Yes, sir.

7   Q    It was not produced by Liebherr US, correct?

8   A    Correct.

9   Q    So you would agree that Liebherr Germany would have more

10  knowledge about the operator's manual and what it conveys than

11  Liebherr US, correct?

12  A    They should know the basis for the requirements in the

13  manual better, yes.

14  Q    The operator's manual does not discuss the T4 pin,

15  correct?

16  A    I'm not aware of T4 being mentioned specifically in that

17  manual, no, sir.

18  Q    And the operator's manual just discusses the T3 pin when

19  it's talking about connecting the 84-meter boom or the 50-meter

20  head, correct?

21  A    It basically says the only connection that should be made

22  is between T2 and T3, which would be the T3 pin, yes, sir.

23  Q    And the operator's manual does not say that the T4 pin has

24  to be 11 millimeters, correct, sir, above the locking bore?

25  A    It doesn't mention T4 at all in the operator's manual,

1    sir.

2    Q    And the operator's manual does not say do not touch the T4

3    pin, correct, sir?

4    A    The manual itself doesn't contain those words, no, sir.

5    Q    And the operator's manual does not discuss what one should

6    do if the T4 pin is manipulated, correct?

7    A    Doesn't mention T4 specifically, no, sir.

8    Q    And the operator's manual does not discuss the risks

9    associated with the manipulation of the T4 pin, correct, sir?

10   A    Once again, it does not mention T4 specifically, no, sir.

11   Q    And the operator's manual does not have any warnings or

12   cautions or any sort of symbols anywhere in the manual where it

13   talks about the T4 pin, correct, sir?

14   A    T4 pin specifically?  No, sir.

15   Q    And it doesn't have any of those warnings, cautions or

16   symbols because it never speaks or talks about the T4 pin,

17   correct, sir?

18   A    Not that I am aware of in the manual, no, sir.

19   Q    The operator's manual has a process and procedure to

20   manually retract the cylinder, correct, sir?

21   A    Yes, sir.

22   Q    And nowhere in that process and procedure does it say that

23   the operator should contact Liebherr, correct, sir?

24   A    For manual retraction?  Not that I am aware of, no, sir.

25   Q    Let's talk about the Liebherr training of Sims.  You don't

1  know how people remember things, do you, sir?

2  A    No, sir.

3  Q    So you can't tell us the best way to convey important

4  information to new crane operators, correct, sir?

5  A    No, sir.

6  Q    Both Mr. Farris and Mr. D'Angelo in their deposition

7  testified that Mr. Ward instructed them when tightening down

8  pins to make them taut but not tighten it down too much because

9  it would damage the internal components; is that correct, sir?

10  A    I believe that's correct, yes, sir.

11  Q    And you would agree that that is not what the operator's

12  manual says, correct, sir?

13  A    That is not contained in the operator's manual, no, sir.

14  Q    So you would agree that Mr. Ward's training of Farris and

15  D'Angelo with regard to how to lock down the T3 pin was not

16  competent information, correct, sir?

17  A    I wouldn't say it's not adequate information because we

18  know that Mr. Farris had no trouble locking the T3 pin.  It was

19  the T4 pin that caused the accident.

20  Q    So the fact that Mr. Farris didn't measure the T3 pin, in

21  your opinion, is acceptable, correct?

22  A    If he felt comfortable that he was at the required

23  11 millimeters, that's his decision, sir.  I have no basis

24  of -- to say he judged it one way or the other or what was the

25  basis for his judgment.

1    Q    And so you wouldn't have any basis to judge how he

2    manipulated the T4 pin, correct, sir?

3    A    Other than the fact that in the OSHA report it talks about

4    it was installed 11-16th of an inch lower than it should have

5    been, that would be the basis for my saying that he did not

6    install it -- or remanipulate it properly.

7    Q    And I'm not saying about whether he remanipulated it

8    properly or not.  I had asked you that the information in the

9    training that Mr. Ward provided Mr. Farris and D'Angelo about

10   how to lock down the T3 pin was not competent and correct

11   information, correct, sir?

12   A    Not having heard the words themselves, I don't know

13   exactly how it was explained to them.  Apparently between the

14   manual, which Mr. Farris said he read before he did any

15   boom swap, and that says 11 millimeters, and that's dealing

16   with the pin between T2 and T3 --

17   Q    You investigated this --

18   A    -- and Mr. Ward said that he trained to the manual, I can

19   only assume then that if he didn't say it specifically, it

20   would have been pointed out in the manual.

21   Q    Okay.  Do you know -- you investigated this case, sir?

22   A    Yes, sir.

23   Q    And at any time in this case did you determine how

24   Mr. Ward conveyed how to lock down the T3 pin to Mr. D'Angelo

25   and Mr. Farris?  Yes or no, sir?

1    A    Word-for-word, no, sir.

2    Q    What is your understanding of how Mr. Ward trained

3    Mr. D'Angelo and Mr. Farris on how to lock down the T3 pin?

4    A    From the depositions it sounds like it was a combination

5    of going through things in the manual but then also doing a

6    hands-on boom swap so they would actually see where the pin was

7    and which one it was and how to back it out.

8    Q    Is it your understanding that Mr. Ward did not use a ruler

9    when locking down the T3 pin?

10   A    I don't recall anybody specifically saying he did or

11   didn't.

12   Q    If Mr. Ward did not use a ruler to measure the T3 pin and

13   whether it was at 11 millimeters, you would agree that that is

14   wrong information in comparison to what's in the manual,

15   correct, sir?

16   A    Well, I don't think the manual says you have to use a

17   ruler, it just says it needs to be 11 millimeters minimum, so

18   if you have some other way that you're judging it that would

19   indicate it's 11 millimeters, you know, we'd have to see what

20   that, I guess, judgment call is or how that's determined, but

21   not knowing how that was determined, I couldn't comment on it,

22   sir.

23   Q    So you can rely on the operator to make a judgment call as

24   to whether something is 11 millimeters, right, sir?  You just

25   said it.

1   A    You should be able to, yes, sir.

2   Q    Thank you, sir.

3        So not measuring the T3 pin, in your opinion, is not

4   a violation of the operator's manual, correct, sir?

5   A    The manual doesn't tell you you have to physically measure

6   it, it just gives you the minimum is 11 millimeters.  How you

7   arrive at that determination is up to you.

8   Q    So would it be your opinion then that one does not need to

9   physically measure the T3 pin and whether it's 11 millimeters

10  above the locking bore to make sure it was locked?

11  A    Well, I think you and I are trying to get to the same

12  answer but in a different way.  As I'm saying, do you have to

13  have a ruler there?  No.  If you have some other means that you

14  use to determine that it's greater than 11 millimeters, that

15  would meet the intent of the manual.

16  Q    And what other means would one use, other than a ruler or

17  a measuring device, to determine whether it's 11 millimeters?

18  A    You could use your finger, you could use your hand, palm

19  of your hand, you could use a bunch of different methods.  You

20  could see where the pin is actually coming up in relation to

21  the opening in the T2 boom section.  If it's hitting that then

22  it's high enough, it's more than your 11 millimeters.

23  Q    Is everybody's hand 11 millimeters?

24  A    No, and that's why I said it's up to the individual.  If

25  he has some determination as he's done in the past, it's like,

1   okay, I know if I'm past this part of my palm it's more than

2   11 millimeters -- I don't know what Mr. Farris used to

3   determine that it was 11 millimeters.  He didn't say he used a

4   ruler.

5   Q    I'm just asking you whether it was incompetent or

6   inappropriate or wrong for Mr. Ward not to convey to Mr. Farris

7   and D'Angelo that they needed to measure the locking bore of

8   the T3 pin to make sure that it was locked at 11 millimeters.

9            MR. CREMER:  Objection.  Asked and answered several

10  times.

11  A    I can only go back to say that Mr. Ward said he trained --

12           THE COURT:  Hold on.  Let me address the objection.

13           This is the last time to answer it and then we're

14  going to move on.

15           Go ahead.

16  A    I can only say that in the training that Mr. Ward provided

17  he said he trained to the manual, and the manual says it must

18  be 11 millimeters minimum.  You know, how Mr. D'Angelo and

19  Mr. Farris went on from there and did it in their day-to-day

20  operations, I don't know, sir.

21  Q    You would agree that an operator cannot be fully educated

22  on operating the crane if the trainer has not provided

23  information that is not in the manual but that the trainer

24  knows could prevent a hazard, correct?

25  A    Could you run that question by me one more time, sir?

JEFFREY A. TRAVIS - FEBRUARY 11, 2022        83
Cross-Examination by Mr. Goodman

1   Q    Sure.  You would agree that an operator cannot be fully

2   educated on how to operate a crane if their trainer has not

3   provided information that is not in the manual but that the

4   trainer knows could prevent a hazard?

5   A    That would be prudent, for him to pass that along, yes,

6   sir.

7   Q    If someone was improperly trained on how to manipulate a

8   pin, would that increase the possibility of improperly

9   manipulating the pin?

10  A    It all depends on -- when you say on the training, if they

11  are trained also then to review the manual when they're doing

12  this operation, which Mr. Farris said he did, I would see the

13  possibility of there being a mistake on the extension of the

14  pin greatly reduced.

15  Q    Do you remember when you took a deposition with me?

16  A    I think I've answered this several times, but I still

17  remember.  My memory is not that bad.

18  Q    All right.  Good.  And so you remember I asked you a

19  question:  Would you agree that if you're improperly trained

20  how to manipulate a pin, that you would then, if you didn't

21  know any better, manipulate the pin improperly?

22            And you asked:  Is this a hypothetical, sir?

23            And I said:  I guess, yes, sir.

24            And you answered:  Not necessarily that would --

25  I guess it would raise the possibility you could.

```
 1              And then I asked:  Would it increase the possibility?
 2    Correct?
 3              And you said:  Yes, sir.
 4              Do you remember that?
 5    A    Yes, sir.
 6    Q    Let's talk about Exhibit 110, ASME B30.5.
 7              You'd agree that Andrew Farris is a qualified
 8    operator, as that term is defined, correct, in ASME?
 9    A    A qualified crane operator?  Yes, sir.
10    Q    And you would agree Andrew Farris is a qualified person,
11    as that term is defined in ASME B30, correct?
12    A    I'm sorry, someone was coughing.  Could you repeat the
13    question?
14    Q    You would agree that Andrew Farris is qualified, as that
15    term is defined in Exhibit 110, correct?
16    A    As an operator, yes, sir.
17    Q    And you would agree that Chapter 5-3.1.1(a)(2) -- and if
18    you need me to pull it up, I can do it -- provides that those
19    who have met the requirements of Section 2, Paragraph
20    5-3.1.2(d), and who are trained for the type of crane being
21    operated, can be involved in the crane operation?
22    A    Hold on.  We're getting there.
23    Q    I can get you a -- hold on one second.
24              Do you read that's what ASME B30.5 says?
25    A    I'm sorry.  Could you repeat the question?  Which section
```

1   were we referring to specifically?

2   Q     Chapter 5 dash -- Section 5-3.1.1(a)(2) provides that

3   those who have met the requirements of Section 2, paragraph

4   5-3.1.2(d), and who are training for the type of crane being

5   operated, can be involved in the crane operation?

6   A     Do we see what paragraph 5-3.1.2(d) says?

7   Q     Sure.  I'm just asking you -- I mean, I'm not going to ask

8   you if somebody met that.  I'm just asking you if that's what

9   that says.

10          Those who have met the requirements of paragraph

11   5-3.1.2(d) and who are training for the type of crane being

12   operated, they can be personnel on that crane, correct, sir?

13   A     Well, it says those who have met the requirements, yes,

14   and then who are training for the type of crane being operated

15   while operating the crane.  Training shall be under the

16   supervision of a designated person.  Yes, sir.

17   Q     You agree with that?

18   A     Yes, sir.

19   Q     I'd like to talk about Exhibit 111, part 1926.

20          Andrew Farris met the definition of

21   Assembly/Disassembly Director, correct?

22   A     Yes, sir.  And he stated in his dep that he was the

23   A/D Director.

24   Q     And Sims was conducting assembly/disassembly, as that term

25   is defined in the regulation, on Friday, February 16th?

JEFFREY A. TRAVIS – FEBRUARY 11, 2022         86
Cross-Examination by Mr. Goodman

1  A    Yes, sir.  Sims and Mr. Farris, yes, sir.

2  Q    And Andrew Farris is a competent person, as that term is

3  defined in that regulation?

4  A    Yes, sir.

5  Q    And Andrew Farris is an operator, as that term is defined

6  in that regulation, correct?

7  A    Yes, sir.

8  Q    Andrew Farris meets the definition of a qualified person,

9  as that term is defined in the regulation, correct?

10 A    Yes, sir.

11 Q    Andrew Farris meets the definition of supervision

12 competent qualified person, as that term is defined in the

13 regulation, correct, sir?

14 A    Can we take a look at that one real quick?

15 Q    Sure.  Of course.

16 A    Is there a definition for supervision qualified person?

17 Oh, there we are.

18            Yes, sir.

19 Q    Andrew Farris had the knowledge of the procedure of how to

20 lock in the 84-meter boom, as that term is defined in the

21 regulation, correct?

22 A    That's what he stated to and that's what his training

23 taught him, yes, sir.

24 Q    Andrew Farris was required to conduct a post-assembly

25 inspection?

JEFFREY A. TRAVIS – FEBRUARY 11, 2022          87
Cross-Examination by Mr. Goodman

1   A    Yes, sir.

2   Q    I'd like to talk about the work that was done on the crane

3   on February 6th.

4         You would agree that it's standard in the crane

5   industry for apprentices and oilers to come up through the

6   ranks with on-the-job training, correct, sir?

7   A    Yes, sir.

8   Q    You would agree that on that day that the operating

9   instructions that Farris was using at the time of the boom swap

10  did not include the additional information that came with the

11  product safety bulletin and retrofit kit, correct?

12  A    And I only hesitate to answer because if you read the

13  product safety bulletin it says keep following what's in the

14  operator's manual, and they had the operator's manual.

15  Q    They didn't have the product safety bulletin though,

16  correct, sir?

17  A    No, sir.

18  Q    They did not have the retrofitted cover plate, correct,

19  sir?

20  A    No, sir.

21  Q    They didn't have the document that went along with the

22  retrofit cover plate, correct, sir?

23  A    That's correct.

24  Q    They didn't have the warning stickers that came along with

25  the retrofit cover plate, correct, sir?

1    A    That's correct.

2    Q    At the time that Mr. Burrows and Mr. Farris were

3    undertaking the boom swap, they had the old cover, correct,

4    sir?

5    A    That's what's been stated, yes, sir.

6    Q    Let's talk about the work that was done on the crane on

7    February 19th.  The incident occurred before the crane was

8    actually used to transport any loads that day, correct, other

9    than the hook and the block?

10   A    Thank you.  I was going to say, as we talked about

11   earlier, that is considered a load, but any outside loads

12   besides that, as far as I'm aware, no, they hadn't lifted

13   anything.

14   Q    I just want to talk about the product safety bulletin.

15        Would you agree that the product safety bulletin

16   clarifies the issue with the T4 pin that's not in the

17   operator's manual?

18   A    Well, at least on the first page of the product safety

19   bulletin it does not mention anything with section T4.  It

20   mentions separation of the respective connections of the

21   telescopic sections are performed incorrectly, wrong emergency

22   release screw -- it doesn't necessarily say T4 specifically.

23   Q    Do you personally think that the product safety bulletin

24   clarifies the issue with the T4 pin that's not in the

25   operator's manual?

1  A    Clarifies?  The product safety bulletin -- when that plate

2  and the stickers are put on the boom, the boom is outside on

3  the ground, those -- the plate itself gets removed before you

4  can shove it into the T2 section.

5  Q    Whether it clarifies or not, sir.  I'm just asking whether

6  it clarifies, in your personal opinion.

7  A    No, and that's why I'm saying, to me it doesn't really

8  clarify -- it doesn't do you any good for clarification when

9  the boom gets inserted into T2.

10  Q    Gotcha.  Okay.  So we're going to go back to the

11  deposition that you took with me, remember, that we've talked

12  about a number of times now?

13  A    Quite a number, yes, sir.

14  Q    And I asked you:  Do you personally think --

15         MR. CREMER:  What page, please?

16         MR. GOODMAN:  162.

17  Q    I asked:  Do you personally think that the product safety

18  bulletin clarifies the issue with the T4 pin that's in the

19  operator's manual?

20         And your answer:  Clarifies, question mark?  To a

21  point, yes, sir.

22         Do you remember that answer?

23  A    And that's what I'm saying now, it's to a point.  When

24  it's on the ground, it will show you what --

25  Q    I just asked you if you remember that answer, sir.

1    I didn't ask you any other questions.

2          Let's talk about the differences between the old

3    cover plate and the new cover plate.

4          The old cover plate was round, correct?

5    A    Yes, sir.

6    Q    The new cover plate is oval, correct?

7    A    I don't know if I'd call it oval, but oblong.

8    Q    Oblong.  Great word.

9          The old cover plate was only capable of covering the

10   T3 pin, correct?

11   A    Yes, sir.

12   Q    The new cover plate was capable of covering both the T3

13   and the T4 pin, correct, sir?

14   A    Yes, sir.

15   Q    The old cover plate was painted the same color as the

16   crane itself, correct?

17   A    As far as I'm aware, yes, sir.

18   Q    And the new cover plate was painted a different color than

19   the crane itself, correct?

20   A    Yes, sir.

21   Q    The old cover plate had no warnings on it, correct?

22   A    No, sir.

23   Q    The new cover plate had warning stickers on it, correct?

24   A    Yes, sir.

25   Q    The new cover warning over the T4 pin warned against

1   manipulating the T4 pin, correct?

2   A    Yes, sir.

3   Q    And before that there was no such warning, correct?

4   A    Correct.

5   Q    Prior to the retrofit kit there was no warning on the

6   physical crane, correct, about the T4 pin?

7   A    By "the crane" do you mean the actual boom?

8   Q    Yes, sir.

9   A    No, sir, there wasn't.

10  Q    After the retrofit kit though, there were sticker warnings

11  on the physical crane next to both the T3 and the T4 pins,

12  correct?

13  A    Yes, sir.

14  Q    And the warning stickers on the new plate are the same as

15  the warning stickers that are on the side of the T3 and T4 pin

16  on the physical crane, correct?

17  A    I believe that's correct.

18  Q    At the time of the incident the boom did not have the

19  warning stickers on the side of the T3 and the T4 pins,

20  correct?

21  A    Correct.

22  Q    And at the time of the incident the cover plate did not

23  have any warnings on it, correct, sir?

24  A    Correct.

25  Q    And neither the boom nor the cover plate had warnings,

JEFFREY A. TRAVIS - FEBRUARY 11, 2022        92
Cross-Examination by Mr. Goodman

1   because Liebherr US had not provided them to Sims, correct,

2   sir?

3   A    From the documents provided, Sims didn't receive the

4   product safety bulletin until after this incident, yes, sir.

5   Q    If the 84-meter package was installed in the T2 boom with

6   the new cover plate on it and everything happened exactly how

7   it happened on the date of the incident, Burrows would not have

8   been able to manipulate the T4 pin, correct, sir?

9   A    I can't say that, sir.

10  Q    The cover plate would cover the T4 pin, correct, sir?

11  A    When it's on the ground, in order to insert that section

12  into the boom, you'd have to remove the cover plate.

13  Q    Have you tested that, sir?

14  A    Yes, sir.  When we were out at the yard that day, when

15  they were doing the exemplar boom swap, if the cover plate was

16  on there with those wing nuts, you couldn't fit it in, it would

17  scrape the top.

18  Q    How about with bolts?  Did you test it with bolts?

19  A    No, sir, because it was wing nuts that were on it.

20  Q    Okay.  You understand that the crane here did not have

21  wing -- excuse me.  You understand that the mechanical

22  connection between the cover plate and the crane here were

23  bolts and not wing nuts, correct, sir?

24  A    Yes, sir, but you were asking me at the time --

25  Q    Okay.  That's all I'm asking.

1   A    You were asking me at the time of -- when I was at their

2   yard.  It was wing nuts and the new plate.

3   Q    So did you ever test whether the new cover plate could be

4   installed into the boom with the new cover plate and bolts?

5   A    No, sir.

6   Q    And when you did it with wing nuts, what happened?

7   A    The wing nuts were actually sticking up higher than the --

8   I forget what they're called, the friction pads that go around

9   the outside.  So if you had tried to slide it in, you would

10  have scraped and done damage to the inside of the T2 boom

11  section.

12  Q    Was it slid in?

13  A    It wasn't slid in.  We weren't going to attempt it.  Why

14  would you -- when you can see that it's sticking up above the

15  areas that would make contact, I'm not going to tell somebody

16  to do damage to a million plus dollar machine.

17  Q    So you don't really know whether it could or couldn't go

18  into the boom, because you didn't attempt it, correct, sir?

19  A    Based upon how it fits together, yes, sir, I can tell you

20  it would have scraped.

21  Q    Did you physically insert the product safety bulletin

22  retrofit cover plate with the wing nuts on it into the T2

23  section?

24  A    No, sir, because as I said, if you look --

25  Q    All I want is a yes or no question.

1   A     You have the friction pad --

2   Q     I'm not asking for you to elaborate.

3   A     -- and the wing nuts are sticking out above the friction

4   pad.

5              THE COURT:  You answered the question.

6              Go ahead and ask the next question.

7   BY MR. GOODMAN:

8   Q     The warning sticker on the cover plate has a big red X,

9   correct, sir?

10  A     Yes, sir.

11  Q     Before that warning sticker there was nothing around, near

12  or next to the T4 pin that had a big red X, correct, sir?

13  A     Correct.

14  Q     I want to talk about your report.

15             So you say that Mr. Farris was the A/D Director,

16  correct?

17  A     Yes, sir.

18  Q     And Mr. Farris knew the assembly/disassembly procedures,

19  correct?

20  A     Yes, sir.

21  Q     He knew that the connection for the 84-meter boom was at

22  the T3 pin, correct?

23  A     That's what he states, yes, sir.

24  Q     Did you ever talk to any Sims employees as to whether

25  Mr. Farris' and Mr. Burrows' actions violated any of the Sims

1  requirements?

2  A    No, sir.

3  Q    Did you ever contact OSHA to find out whether or not the

4  actions by Sims, Farris and Burrows between February 16th and

5  February 19th violated ASME or any OSHA regulations, as OSHA

6  saw it?

7  A    No, sir.

8  Q    In fact, sir, if we go to Exhibit 1 -- or, strike that,

9  Exhibit 2, and we go down to the last paragraph, it determined

10 that Viking Rigging and the employer Sims did not violate

11 anything, correct?

12 A    Could you scroll down a little more, please?  All I saw

13 was it mentioning Viking.  I didn't see it mentioning Sims in

14 that paragraph.

15 Q    If you go to the next page, it says "employer," correct,

16 sir?  And "the employer"?  Do you see "the employer"?

17 A    Yeah.  Could you go up so it's all on one screen?

18 Q    I can get you the hard copy if that's easier for you to

19 see, sir.  Would you like the hard copy?

20 A    Well, in this case Viking Crane & Rigging, from my

21 understanding, is the employer, it's not Sims.

22 Q    All right.  Now I'm going to show you what's been marked

23 as Exhibit 1, and you see under Employer Name on page 1, and

24 this is another OSHA report done by the same guy, and do you

25 see the employer's names?

1    A    There are two listed, yes, sir.

2    Q    And who are the employers' names?

3    A    Viking and Sims.

4    Q    I'd like you to read the first page of Exhibit 1, and when

5    you're done reading the first page of Exhibit 1, let me know.

6    A    Is everything else on the page redacted besides what's up

7    here?

8    Q    Yes, sir.

9    A    Okay.  Then I'm done.

10   Q    Is that information consistent with the information you

11   uncovered in your investigation?

12   A    I don't know that I necessarily am worried about where

13   Viking was headquartered, but they seemed to be the ones that

14   were retained to do the tower crane erection, and then Sims was

15   retained to actually supply the tower crane, the assist crane

16   and the operator for the assist crane.

17   Q    Is there anything in this page that's inconsistent with

18   what you uncovered in your investigation?

19   A    Not that I'm aware of, no, sir.

20   Q    I'm going to show you the next page, and start reading

21   this.  Let us know when you need us to scroll down.

22   A    Could you scroll down just a bit, please?  Thank you.

23            THE COURT:  He's ready for it to be scrolled down.

24   A    Yeah, could you, please?  I'm sorry.

25   Q    Sorry about that, sir.

1          MR. GOODMAN:  May I approach, Judge?

2          THE COURT:  You may.

3    Q    Here is a hard copy, sir.  This may be a little easier for

4    you to read, so you don't have to strain.

5    A    Thank you.  Okay.

6    Q    Anything on page 2, LAI 2701, that's inconsistent with the

7    information you obtained in your investigation?

8    A    Not that I'm aware of, no, sir.

9    Q    Turn to the next page, LAI 2702.  If you wouldn't mind

10   reading this and letting us know when you're done.

11   A    Okay.

12   Q    Anything on this page that's inconsistent with what you

13   found in your investigation?

14   A    No, sir.

15   Q    Turn to the next page.

16   A    Okay.

17   Q    Anything on this page that's inconsistent with what you

18   uncovered in your investigation?

19   A    No, sir.

20   Q    Turn to the next page.

21   A    Yes, sir.

22   Q    Anything on that page that's inconsistent with what you

23   uncovered in your investigation?

24   A    Not inconsistent, because they're saying that both

25   Mr. Farris and Mr. Burrows believed they returned the locking

1    pin for T4 to the correct height.

2    Q    Is that what you uncovered in your investigation as well?

3    A    That is.  And then also, as I'm reading this, I know there

4    was that other letter from one of the Liebherr technicians

5    talking about that the T4 pin was actually set 11-16ths lower

6    than it should have been, so that agrees with what we found.

7    Q    Were you actually at the site to measure that T4 pin?

8    A    No, as I stated earlier, the subject crane had been

9    removed from the site and taken to Sims' yard before I think

10   I was even retained in this case.

11   Q    Can you turn to the next page and take a read of the next

12   page.

13   A    Yes, sir.

14   Q    Did you read that, sir?

15   A    Yes.

16   Q    Anything in that page that's inconsistent with what you

17   found in your investigation?

18   A    No, sir.

19   Q    Turn to the next page.

20   A    Yes, sir.

21   Q    Anything on this page that's inconsistent with what you

22   found in your investigation?

23   A    Yeah, the sentence that states the -- and then it's

24   redacted -- engineer stated that the reason the bulletin states

25   in light of a recent event reported to Liebherr was a reference

1  to the same type of incident that occurred the previous year in

2  Japan.  From my discussions with Mr. Boos, it wasn't the same

3  type of incident, so I would disagree with that.

4  Q    So your position is because the 84-meter boom was outside

5  of the crane base versus this incident where the crane boom was

6  inside the crane base, correct, when somebody manipulated the

7  T4 pin, is that the difference?

8  A    For the most part, yes, sir.

9  Q    Turning to the next page, take a read of this and let me

10  know when you're done.

11  A    Yes, sir.

12  Q    Anything on this page that's inconsistent with what you

13  found in your investigation?

14  A    No, sir, and in fact it affirmed because of the last

15  sentence:  "All information obtained for the investigation was

16  based solely on Sims Crane and Equipment's documentation and

17  interviews."  So basically OSHA took whatever Sims said and put

18  it in their report, they didn't perform really an independent

19  investigation and get everybody involved.

20  Q    That's a great answer.

21        Did you understand that OSHA reached out to Liebherr

22  and was only provided one letter from Mr. Cremer's firm in

23  response?  Is that your understanding?  Is that your

24  understanding?

25  A    Well, it says here:  "At the current time, no

1  correspondence has been received from Liebherr," so that's what

2  you're saying, so that would be consistent with what you're

3  saying.

4  Q    Do you have any understanding of what OSHA did to attempt

5  to get information from Liebherr?

6  A    No, sir.

7  Q    Do you have any information about what Liebherr did or

8  didn't do in trying to communicate information to OSHA?

9  A    No, sir.

10          MR. GOODMAN:  Your Honor, may I approach?

11          THE COURT:  You may.

12  Q    I'm going to show you what's been marked as Plaintiff's

13  Trial Exhibit 26.

14  A    Am I swapping here or am I getting two?

15  Q    Do you have enough room here?

16  A    I think so.  Yep.

17  Q    Can you tell us what that is.

18  A    Heavy.

19  Q    Yes.

20  A    The Liebherr LTM 1500-8.1 operator's manual.

21  Q    And then I know you also have another, and I apologize,

22  huge notebook in front of you.  Would you mind turning to

23  Exhibit 26.

24  A    I thought the manual was 26.

25  Q    I apologize.  Exhibit 15.  I apologize, sir.  Thank you.

 1              Now, can you tell me where in Exhibit 26, the
 2      operator's manual, it says:  If during the assembly and
 3      disassembly of the above-mentioned Liebherr mobile crane types,
 4      for example, during conversion of the 50-meter telescopic boom,
 5      telescopic boom head T3 to the 84-meter telescopic boom
 6      telescope extension, the separation of the respective
 7      connections of the telescopic sections are performed
 8      incorrectly, in particular if the wrong emergency release screw
 9      is mechanically locked or unlocked incorrectly, it can result
10      in an uncontrolled retraction of the telescopic sections.

11              Can you show me where it says that in Exhibit 26, the
12      operator's manual.
13      A    If you're asking me if that exact verbiage appears in the
14      operator's manual, no, sir, it does not.
15      Q    And then if you turn to the second page of Exhibit 15, the
16      writer of this document, you'd agree the writer of this
17      document is Liebherr Germany?
18      A    Yes, sir.
19      Q    And the writer of this document, Liebherr Germany, is also
20      the writer of the operator's manual?
21      A    Yes, sir.
22      Q    And the writer of this document, Liebherr Germany, is also
23      the manufacturer of the Liebherr LTM 1500, correct?
24      A    Yes, sir.
25      Q    And they say:  We kindly ask that you carefully follow the

 1  information in this product safety bulletin in the future and

 2  make sure to forward this information to all crane operators.

 3          Do you see that, sir?

 4  A    Yes, sir.

 5  Q    So, as a reader, how do you understand that when somebody

 6  asks, we kindly ask -- strike that.

 7          You would agree that the writer of this is asking the

 8  reader to follow the information in the product safety

 9  bulletin, correct, sir?

10  A    Yes, sir, and part of the information in --

11          MR. GOODMAN:  Thank you, sir.  That's all I have.

12  I appreciate it very much.

13          MR. CREMER:  Your Honor, he can answer questions.

14          THE COURT:  I'll let him finish his answer to the

15  question.

16  Q    I just asked a yes or no question, if that's what that

17  says, that they're -- you should follow the product safety

18  bulletin, yes or no.

19  A    Yes.  I was just stating what's in the product safety

20  bulletin.  It says you can continue to operate your Liebherr

21  mobile crane safely as long as you meticulously follow the

22  operation manual, so that's also what's in the product safety

23  bulletin.

24  Q    All right.  So you've got two things, right?  You've got

25  to follow the operator's manual and you've got to follow the

1    product safety bulletin, right, sir?

2    A    Yes, sir.

3         MR. GOODMAN:  Thank you, sir.

4         THE COURT:  Any redirect?

5         MR. CREMER:  Very briefly.

6              **REDIRECT EXAMINATION OF JEFFREY A. TRAVIS**

7    **BY MR. CREMER:**

8    Q    When you were at the inspection of the exemplar, what

9    exactly were you doing in terms of operating that crane?

10   A    Well, Liebherr had one of their crane operators --

11   in fact, a whole bunch of their operators involved.  There was

12   probably seven or eight people.  I think there was one or two

13   assist cranes.  The boom was being taken out of the 50-meter

14   and the 84-meter put in.  I wanted to see what was being shown

15   on the LICCON system when all this was going on, because there

16   was some question as to whether an error message showed up or

17   what the pinning diagram would look like on the computer, so

18   I sat in the operator's seat and, you know, basically ran

19   through, with the help of the Liebherr operator, programmed in

20   where the pinning should occur, and then once that occurs

21   the -- basically the crane will take care of itself if you

22   program it correctly, as far as the boom swap.

23   Q    When you spoke with Mr. Boos in Germany, did you speak at

24   all about whether Liebherr Germany ever intended that cover

25   plate to act as some type of guard or protection if it had been

1    accidentally inserted into the crane?

2    A    As far as I recall, as Mr. Boos stated, the real purpose

3    of that plate was just to prevent somebody from manipulating

4    the incorrect pin while the boom was on the ground, it wasn't

5    intended to actually have anybody try to insert the cover plate

6    inside the boom.

7    Q    And from your personal observation during this inspection,

8    you could determine that that plate with those wing nuts would

9    not fit into the crane without damaging the crane?

10   A    Yes, sir, because if you -- if you look on the outside of

11   the boom sections where they fit together, you install

12   basically friction pieces that keeps the metal from rubbing

13   against the other metal, so think of it like a spacer.

14            Now, when you looked, the cover plate is on, the wing

15   nuts are on, the tops of the wing nuts were higher than the

16   friction plates, so if you're going to push it in, they're

17   going to hit, because the friction plate is what is actually

18   supposed to touch the inside of the next section of the boom.

19   So, I mean, to me that said, no, you can't shove it in without

20   doing damage, so, no, we're not going to shove it in.

21   Q    Would the person who was removing the new or modified

22   cover plate necessarily be the same person who was up on top of

23   the boom charged with the responsibility of looking to see once

24   that T3 pin got into the proper hole?

25   A    They don't have to be, it could be two separate people,

 1  but that would be something that should have been discussed in

 2  the pre-job planning meeting when they were doing the

 3  boom swap.

 4  Q    So theoretically you could have a situation where you had

 5  an inexperienced person like Shane Burrows up on the boom for

 6  the first time never touch that modified cover, never saw it,

 7  never saw any of the stickers, correct?

 8          MR. GOODMAN:  Your Honor, I'm going to object to it.

 9  It mischaracterized the former testimony of Shane Burrows and

10  others who have said that he was up there --

11          MR. CREMER:  No, I'm just trying to give him a

12  hypothetical, Your Honor.

13          THE COURT:  Then either don't reference Mr. Burrows

14  or don't describe Mr. Burrows as inexperienced.

15  BY MR. CREMER:

16  Q    If you had an individual who was inexperienced up on the

17  boom and had never actually observed it while it was on the

18  ground while that revised cover plate was in place and with the

19  stickers to the side, would that person have any additional

20  information available to him about which was the T3 and which

21  was the T4 pin?

22  A    Not once it's inside the T2 boom section, no, sir.

23  Q    And again, that's something you personally observed during

24  your inspection, you looked to see if those stickers are

25  visible, correct?

1    A    Yes, sir.  My head is kind of big, I couldn't stick it

2    inside the hole, but I got as close as I could.

3    Q    All right.  Now, the OSHA report, this was prepared by a

4    particular OSHA investigator, correct?

5    A    Yes, and I -- I don't know --

6    Q    I don't need you to know his name, but my question is:

7    Do you agree with that conclusion based on the facts that are

8    contained in that report?

9    A    Um, which conclusion are we --

10   Q    That there was no violation of OSHA.

11   A    Oh.  No, I don't agree with that.  I think as I stated in

12   my report, I don't agree with that.

13   Q    The report itself provides that an improper locking pin

14   was manipulated and left at an incorrect position and the crane

15   continued to be operated, didn't it?

16   A    Yes, sir.

17   Q    Is that a violation of OSHA, based on your experience?

18   A    Yes, sir.  You are now not in conformance with the

19   manufacturer's requirements for that piece of equipment and

20   you're still operating it.

21   Q    Are you surprised at that finding by OSHA?

22   A    And I think I was asked if I agreed with the OSHA findings

23   and, no, I don't, and that's one of the reasons, is because

24   there is blatant violations that they're saying, no, there

25   isn't a violation, but if you read OSHA, it's right there in

JEFFREY A. TRAVIS - JANUARY 11, 2022         107
Redirect Examination by Mr. Cremer

1   black and white.

2           MR. CREMER:  Thank you, sir.

3           THE COURT:  Mr. Travis, you may step down.  Just take

4   that microphone off.

5           Let's go ahead, we can go off the record.

6                   - - - - -

7       (Whereupon a discussion was had off the record.)

8                   - - - - -

9           THE COURT:  We are in recess until 1:30 and we'll

10  come back at that time.

11                  - - - - -

12          (Recess at 12:38 p.m. until 1:36 p.m.)

13                  - - - - -

14          MR. GOODMAN:  Your Honor, I forgot to offer

15  Defendant's Exhibit 143, which is the CV of Jeffrey Travis, and

16  Defendant's Exhibit 71, which is his report.

17          THE COURT:  Thank you, Mr. Cremer.  I had made a note

18  about that and then completely forgot before we left for lunch.

19          Any objection from the plaintiff?

20          MR. GOODMAN:  No, Your Honor.

21          THE COURT:  Then Defendant's Exhibit 143 and

22  Defendant's Exhibit 71 are both admitted, and if the defense

23  wants to call its next witness, you may.

24          MR. PENDER:  Defendant calls Dr. Rachel Kelly.

25          THE COURT:  Thank you.

RACHEL KELLY - FEBRUARY 11, 2022                    108
Direct Examination by Mr. Pender

1          COURTROOM DEPUTY:  Can you please raise your right
2   hand.
3          Do you solemnly swear that the testimony you will
4   give in this cause will be the truth, the whole truth and
5   nothing but the truth?
6          THE WITNESS:  Yes.
7          COURTROOM DEPUTY:  Thank you.  Have a seat.
8          THE COURT:  And, Dr. Kelly, you are welcome to leave
9   your mask on, you're also welcome to take it off.  Now that
10  you're socially distanced, it's up to you.  All I ask is that
11  if you leave it on you just over-annunciate so that we can hear
12  you better, and you'll need to put the microphone on your
13  jacket.
14         If you could go ahead and just say your name and
15  spell your last so we can make sure the sound works.
16         THE WITNESS:  Sure.  Rachel Kelly, K-E-L-L-Y.
17         THE COURT:  Thanks.
18         Whenever you're ready, Mr. Pender.
19         MR. PENDER:  Thank you, Your Honor.
20            **DIRECT EXAMINATION OF RACHEL KELLY**
21  **BY MR. PENDER:**
22  Q    Good afternoon, Dr. Kelly.  Could you tell us where you
23  currently work.
24  A    I currently work at Exponent.
25  Q    What is Exponent?

RACHEL KELLY – FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1    A    Exponent is a scientific engineering and consulting firm.

2    Q    And can you tell us what your position or title is with

3    Exponent?

4    A    I am a managing scientist.

5    Q    How long have you worked at Exponent?

6    A    I have worked at Exponent a little over six years now.

7    Q    Dr. Kelly, what type of doctor are you?

8    A    I am -- I'm a -- my degree is I have a Ph.D. in applied

9    physiology and I'm a cognitive neuroscientist.

10   Q    And what field of expertise will you be offering in the

11   court this afternoon?

12   A    Human Factors.

13   Q    Can you tell us about your post high school education.

14   A    Once I graduated from high school I attended Georgia Tech,

15   and there I received my undergraduate degree in psychology.

16   Once I completed my undergraduate degree in psychology

17   I continued my education at Georgia Tech and I received a Ph.D.

18   in applied physiology.

19   Q    And what year did you obtain your undergraduate degree?

20   A    2009.

21   Q    And how about your doctorate?

22   A    2015.

23   Q    While at Georgia Tech did you receive any scholarships?

24   A    I did.  During my Ph.D., or when I was applying for my

25   Ph.D. position, I was awarded the President's Scholarship, that

RACHEL KELLY – FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1    was used to partially fund my time during my Ph.D., and I also

2    was awarded a travel award.  I worked on some posters for

3    multiple different conferences, we actually had those

4    conferences once a year at Georgia Tech, and I won a travel

5    award, and that money facilitated me going to other conferences

6    in order to share the research that I was currently doing.

7    Q    Did your studies during your doctoral program concentrate

8    on any specific field of subspecialty?

9    A    So my degree is applied physiology, and the way that it is

10   organized at Georgia Tech, we have schools and then within

11   schools there are subspecialties, so my subspecialty and the

12   area that I focused on for the entirety of my Ph.D. was

13   cognitive neuroscience.

14   Q    Can you explain to us what cognitive neuroscience is.

15   A    Cognitive neuroscience is the scientific study of

16   neurophysiology and how that relates to human cognition.

17   Q    And your undergraduate degree was in psychology.  Is

18   cognitive neuroscience separate from the field of psychology?

19   A    They are separate fields, but there is a large amount of

20   overlap between the topics that they cover.

21   Q    What is human factors?

22   A    Human factors is the scientific study looking at the

23   limitations and capabilities of humans and how that relates to

24   or how they interact with their environment with different

25   products or machines.

RACHEL KELLY – FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1    Q    Did your coursework at Georgia Tech, undergrad or

2    doctoral, include the study of human factors?

3    A    It did.  I had specific coursework in human factors, and

4    then human factors is almost like an umbrella, and within human

5    factors there are multiple different disciplines that all speak

6    to elements of human behavior.  So those of us that work in the

7    human factors field have degrees in psychology, neuroscience,

8    cognitive neuroscience, vision science, and also there are some

9    places that do offer specific -- I think they do have human

10   factors engineering degrees as well.

11   Q    You mentioned that you finished your undergrad in I think

12   2009 and your doctoral program in 2015, was it?

13   A    Yes.

14   Q    How long did your doctoral program last?

15   A    The doctoral program isn't necessarily a specified amount

16   of time, but rather you complete the program once you complete

17   your thesis and your research and your thesis has been approved

18   by your doctoral committee.  So I completed my dissertation in

19   five years.  Most people will complete between five to six

20   years.

21   Q    After completing your doctorate, what did you do next?

22   A    After I completed my doctorate I taught a summer program

23   which is called Duke TIP, it is -- it's a talent acquisition

24   program where students do apply, we spend the entire summer

25   going over course material that they have elected to take.

1    Once I did that summer course working for Duke TIP, I then was

2    a visiting professor at Georgia State University, where I

3    taught courses in psychology and biology, and I did that for

4    one semester while I was looking for jobs in industry.

5    I really wanted to take the science and the knowledge that

6    I had spent a decade accumulating and find a place where I

7    could really apply and use that knowledge, and that's when I

8    came to Exponent.

9    Q    Is Exponent your first professional position after you

10   were teaching at Georgia State?

11   A    Yes.

12   Q    And what year did you begin at Exponent?

13   A    January 2016.

14   Q    Okay.  So just a little bit over six years ago, right?

15   A    Yes.

16   Q    Can you tell us what your work has involved at Exponent

17   over the past six years.

18   A    Absolutely.

19          So at Exponent I work on a variety of different

20   cases.  People will come to us with, you know, different

21   problems, whether that's in litigation or nonlitigation.  All

22   of those cases are going to have some kind of human factor

23   component.  So with those cases I will look -- or my area of

24   expertise is looking primarily at risk communication and

25   behavioral response to risk communication, I also look at

RACHEL KELLY - FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1    attention and distraction and human perception, and the cases
2    that I primarily focus on will at least have some kind of
3    element associated with that, no matter whether it is a
4    proactive type of work or it is a litigation focus type of
5    work.
6    Q    So you do have project-based work that is outside of court
7    activity, and you also do, as you've done in this case, work on
8    matters in litigation?
9    A    I do.
10   Q    And could you tell us, give us your best estimate as to
11   how much you do of either of those two.
12   A    My best estimate of the split is about 50/50 between
13   litigation and proactive work.
14   Q    So for the non-litigation matters, the direct projects you
15   do for Exponent clients, how is it that you are typically
16   consulting or providing expertise?
17   A    So in those particular cases I do look at how humans
18   process information, and specifically or in a number of them
19   I look at risk communication and human behavioral response to
20   that.  So there are three main areas I look at proactively.
21   One is we do a large amount of user research, where we'll take
22   a product, whether it's new or it's been out in the field, and
23   we will look at updated software, new hardware, often those are
24   proprietary devices, and we look to see how humans learn to use
25   them, we look to see how they behave in response to a variety

                    RACHEL KELLY – FEBRUARY 11, 2022
                    Direct Examination by Mr. Pender

1    of different stimuli that perhaps those would put out.

2              Secondly, I do a lot of survey work, so I will design

3    a survey, and this is often in relation to or kind of

4    proactively for warnings design, to understand what either a

5    very specific population knows or what we kind of think is

6    common knowledge or the general population.  So an example of

7    this would be say somebody was designing a dry ice package.  We

8    would want to -- we don't really know what is common knowledge

9    with dry ice or safety practices, so we would then design a

10   survey and try to elicit some of that information.  So we're

11   doing some proactive research in order to determine what types

12   of warnings and safety information is presented.

13             And, thirdly, I am involved in doing focus group

14   work, and that is also in relation to behavioral response to

15   warnings information.  We will get a group of individuals and

16   say we would like to look at and see how they respond to the

17   safety information that is presented on a particular new

18   product or a revised product, and so we will then do research

19   and then design an experiment to whether they might read that

20   research -- or, sorry, read that safety information and then

21   watch to see how they utilize it and incorporate that into

22   their actual behavior, or we will have them read that and then

23   answer questions about the particular product or what they

24   understood, what was their interpretation of that safety

25   information.

1    Q    Your work at Exponent over the last six years, both

2    litigation and non-litigation, can you tell us the types of

3    products that you have consulted on.

4    A    The types of products -- where I've looked at warnings

5    information?

6    Q    Sure.

7    A    I have looked at anything from large industrial equipment

8    that's kind of stationary, so some examples of that would be

9    box folders, large industrial tree stump grinders, I've looked

10   at dozers -- oh, excuse me, that would be a moving one.  So for

11   stationary equipment also dishwashers.  For moving equipment

12   I've looked at dozers, cherrypickers, forklifts, and then the

13   products kind of take a wide variety from anything really small

14   to very big.  So one of the smaller ones, I've consulted on

15   warnings with allergy testers, looking at something as simple

16   as -- what do you call them, pow sticks, which are just kind of

17   like electrically charged sticks or distraction that are used

18   in like haunted houses or things like that, that would be some

19   examples.

20   Q    Over the course of the last six years, the litigation

21   matters you've worked on, approximately what has your case load

22   been over those six years?

23   A    Over the six years, I'd probably say I've come across

24   hundreds of cases.  They range from, you know, very short

25   timelines to things that have extended over the years.

RACHEL KELLY - FEBRUARY 11, 2022                    116
Direct Examination by Mr. Pender

1    I would -- I don't have a way of tracking it, but my best

2    estimate would be I would see between 80 to 120 different cases

3    or different projects per year.

4    Q    Per year, did you say?

5    A    Per year.

6    Q    And on all those cases you're consulting on -- in your

7    field of expertise, human factors?

8    A    Yes.  Absolutely.

9    Q    Has your testimony ever been or your opinions ever been

10   barred in any litigation matter?

11   A    No, not to my knowledge.

12   Q    Have you ever been found unqualified by any Court?

13   A    No.

14   Q    While at Exponent, I think you mentioned that you have

15   conducted research in sort of the three different areas that

16   you've talked about.  Have you contributed to the literature in

17   your field of expertise?

18   A    In May of 2021 a -- I had a paper published that was in

19   the area of warnings.  That would be the most recent one that

20   I can think of.  Additionally, other literature, I've always

21   published my dissertation work, so that is also published work

22   as well that's on my CV.

23   Q    And in your CV there are -- or in your report there are

24   listings of the publications that you have contributed to the

25   literature, correct?

1   A     I'm sorry, can you restate the question?

2   Q     Your publications that have been submitted to the

3   literature in your field of expertise are listed?

4   A     Oh.  Sorry.  Yes.

5   Q     And have all those been peer reviewed?

6   A     Yes, they have.

7   Q     The publication that you just mentioned that was in 2021

8   on warnings, can you tell me what journal that was submitted to

9   or published in.

10  A     It was published in <u>Industry Today</u>, and <u>Industry Today</u> --

11  or generally a little bit about the paper was looking at

12  warnings specifically and looking at the types of things people

13  should consider when warning, placing warnings on products.  So

14  there were components of the -- we looked at product warning

15  literature and we were pulling out some of the science and it

16  has components of, you know, do you put something simplified,

17  very complicated, how exhaustive do you need to be, these are

18  all types of things, types of information that you would want

19  to consider when determining what to put on a project --

20  product or to put with a product, so types of safety

21  information that would have been provided.

22        We also touched base on overwarning and the effects

23  that that would have on the safety information provided with a

24  particular product.

25  Q     Are you a member of any professional organizations in your

RACHEL KELLY – FEBRUARY 11, 2022                           118
Direct Examination by Mr. Pender

1  field?

2  A    I am.  I'm a member of the Human Factors Ergonomic

3  Society, Society For Neuroscience and Cognitive Neuroscience.

4  Q    Dr. Kelly, is there and are you familiar with the

5  generally accepted sources of scholarly research in your field

6  of expertise?

7  A    Yes.

8  Q    And can you tell us what those are, generally.

9  A    Generally, there is a body of warning science research,

10  it's about five decades' worth of research that has accumulated

11  over time that is all peer-reviewed that we consistently rely

12  on in the field of human factors to determine and to look at

13  what types of human behavior and what that would look like in

14  response to warnings and safety information.

15  Q    And did you consult the research in your field of

16  expertise in your review of the matters in this case?

17  A    Yes, I did.

18  Q    And we'll get to it, you don't have to pull it up right

19  now, but at the end of your report there are some 20 plus

20  articles that are referenced there.  Are those the articles

21  that you consulted in your field of expertise in this case?

22  A    Yes.  Absolutely.

23  Q    And do you believe that the body of research that you

24  consulted in this case is generally accepted within your field

25  and reliable?

RACHEL KELLY – FEBRUARY 11, 2022                119
Direct Examination by Mr. Pender

1   A    Yes, it is.

2   Q    And is it typical for you and others in your field of

3   human factors to rely on this type of or this body of human

4   factors research?

5   A    Yes, it is.

6   Q    You don't have to call it up right now, but what I have

7   marked as Defendant's Trial Exhibit Number 144 is a copy of

8   your curriculum vitae.  Actually, you can call it up so the

9   witness can look at it.  And once it comes up and you have a

10  chance to look at it, if you could let us know if that is

11  your -- some of your professional qualifications.

12  A    It is.

13         MR. PENDER:  Your Honor, at this time I would move to

14  admit Defendant's Trial Exhibit 144.

15         THE COURT:  Any objection?

16         MR. GOODMAN:  No, Your Honor.

17         THE COURT:  It's admitted.

18         MR. PENDER:  And at this point I would tender to the

19  Court this witness, Dr. Rachel Kelly, to testify as a human

20  factors expert and on the subject of risk communications and

21  human behavioral response.

22         THE COURT:  Any objection?

23         MR. GOODMAN:  Yes, Your Honor.  We would adopt by

24  reference our motion in limine.

25         THE COURT:  And the matters in there you can address

1    by way of cross-examination.

2              Go ahead, Mr. Pender.

3              MR. PENDER:  Thank you.

4    BY MR. PENDER:

5    Q    Dr. Kelly, did my office contact you in this case and

6    request that you look at and analyze certain human factors

7    issues?

8    A    Yes, you did.

9    Q    And then did you conduct a professional investigation into

10   this case?

11   A    Yes, I did.

12   Q    Did you ultimately issue a report of your professional

13   review and findings?

14   A    Yes, I did.

15   Q    And showing what I have marked as Defendant's Trial

16   Exhibit 72 for identification, can you confirm that this is

17   your report of professional findings dated November 30, 2020.

18   A    Yes, it is.

19   Q    Have you had an opportunity to review documents that were

20   provided to you in this case?

21   A    I have.

22   Q    And on pages 21 through 23 of your report, are those the

23   documents that you have reviewed?

24   A    Yes, that is correct.

25   Q    Is there anything that you asked to review or be provided

RACHEL KELLY – FEBRUARY 11, 2022          121
Direct Examination by Mr. Pender

1  with that you did not receive?

2  A    No, there was not.

3  Q    Can you tell us the depositions in the case that you have

4  reviewed.

5  A    I reviewed Andrew Farris, Jason D'Angelo, Trina Baughman,

6  Karl Rebman, Henry Ward, Bob Berry, Shane Burrows, Christopher

7  Peek and Jack Stodghill.

8  Q    And did you review expert reports?

9  A    I did.  I reviewed Anthony Bond, Thomas Eager and William

10  Vigilante.

11  Q    Did you review the operating manual for the crane in this

12  case?

13  A    I did.

14  Q    And if I -- in front of you, you see the two volumes of

15  that operating manual?

16  A    Yes.

17  Q    Did you review all of what's in those two volumes?

18  A    I reviewed the pertinent information that was relevant to

19  this case.

20  Q    Did you review the product safety bulletins, the retrofit

21  cover plate and the information and decals that came with the

22  retrofitted cover plate?

23  A    I did.

24  Q    And based upon your review of that information, did you --

25  and your reliance and analysis of the professional research

RACHEL KELLY – FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1    that we'll talk about in a bit, did you reach opinions in this

2    case that you hold to a reasonable degree of certainty in the

3    area of human factors?

4    A    Yes, I did.

5    Q    And are those the opinions you have listed on pages 19 and

6    20 of your report?

7    A    Yes.

8    Q    We'll start with the first opinion on page 19, if we can

9    call that up.  The first bullet point at the bottom.

10          Before we start with that point, Doctor, can you tell

11   us in your area of expertise how it is determined that

12   instructions and/or warnings are sufficient?

13   A    In my field of expertise what we would do is we would look

14   at all of the case facts, so in a case lake this I would be

15   interested in reviewing the testimony, all of the relevant case

16   materials, whether it's manuals, warnings, and then reviewing

17   all of that information and also reviewing the relevant

18   scientific literature that is accepted in human factors, taking

19   those two components together, and that is where you kind of do

20   like an analysis phase and ultimately conclusions are produced.

21   Q    And are there things that you look for as a human factors

22   expert to reach a conclusion whether a particular warning was

23   sufficient or successful, such as that the -- that the person

24   receiving the warning read it?

25   A    Yes.  So there are components of looking at that,

RACHEL KELLY – FEBRUARY 11, 2022          123
Direct Examination by Mr. Pender

1    including successful operation of something, that would also be

2    an indicator that the warnings were read, understood,

3    comprehended and the appropriate action was performed.

4    Q    So you just mentioned read, understood, comprehended and

5    the appropriate actions in response.  Can you expound on that a

6    little bit more and how that ties in with what we're talking

7    about today?

8    A    Yes.  So in general the warning science is going to look

9    at a number of different factors evaluating whether or not a

10   warning or safety information is effective, and within that

11   there are three branches that ultimately we look at:  One, was

12   the warning -- excuse me, was the warning available, was it --

13   could somebody see it, could they visually perceive what it is;

14   two, did the person who is going to be the end user or who is

15   going to be -- it's going to be relevant to, did they read and

16   understand what that warning ultimately said; and then the

17   third component of whether a warning or not is going to -- or

18   safety information is going to make a difference is does that

19   user actually comply with the warning.  So that is going to be

20   the majority of what this case is focusing on, is looking at

21   human behavior in response to warning and safety information.

22   Q    And so the warning can be something that someone reads.

23   Can it also be something that someone hears in, for instance, a

24   training session?

25   A    Absolutely, but warnings cannot compel behavior.  So you

RACHEL KELLY – FEBRUARY 11, 2022           124
Direct Examination by Mr. Pender

1   can have a warning that states all of the necessary

2   information, but it can't make somebody do something.

3   Q    So your first opinion, I'll read it:  "The training

4   provided by Liebherr USA for the subject crane was sufficient

5   to inform an operator on how to perform a boom swap.  The

6   assembly/disassembly instructions specifically identify the

7   telescopic separation is always between telescope T2 and

8   telescope T3, and that proper engagement of the T3 locking pin

9   needs to be set to 11-millimeters above the locking bore."

10          Did I read that correctly?

11  A    Yes.

12  Q    So if I look at that, I view the opinion as the training

13  provided by Liebherr for the crane was sufficient to inform the

14  operator on how to perform that boom exchange, as a starter,

15  right?

16  A    Yes.

17  Q    And can you tell us what the basis of your opinion is.

18  A    The basis for this opinion is that I looked through the

19  manual and evaluated the safety information that was provided.

20  I know that Liebherr -- from testimony and case materials, that

21  Liebherr US is a service and sales company, and from that

22  information I also know that Liebherr Germany instructed or

23  intended for them to perform training to end users by following

24  the manual specifically.

25          So looking at the testimony from Henry Ward and

RACHEL KELLY – FEBRUARY 11, 2022              125
Direct Examination by Mr. Pender

1    looking at the manual provided, looking at the consistency

2    between those -- that type of information that was given, and

3    then also looking specifically at the testimony of Andrew

4    Farris and Jason D'Angelo, so understanding exactly what they

5    got out of the training, the information that they understood,

6    and then also the facts that kind of surmise that is that at

7    the end of the training both Andrew Farris and D'Angelo were

8    asked and they testified to that the training that was provided

9    by Henry Ward was adequate and that they felt that they could

10   complete their appropriate tasks after that training.

11          And then, to sum all of that, it was also apparent

12   that they were able to do so after the training by Henry Ward

13   because there was a record of approximately 35 successful

14   boom swaps that were performed with the incident crane with

15   about four or five being done specifically by Andrew Farris.

16   Q    And did you come to understand from your review of the

17   evidence that the training that was provided by Liebherr U.S.

18   was based upon and contained in the operator's manual that was

19   published by Liebherr Germany?

20   A    Yes.

21   Q    You mentioned the manual.  Were there sections of the

22   manual that you found particularly relevant regarding the

23   description of this boom exchange process for this opinion?

24   A    Yes, I did.

25   Q    And can you tell us what those sections were.

 1  A    Yes.  Sorry.  Let's refer back.

 2         The particular sections that I thought were relevant

 3  for this one were, looking in the beginning of the manual,

 4  where it's talking about general safety information, it states

 5  that danger or accident due to incorrect operation of the

 6  crane -- or, excuse me, that was a misstatement, danger of

 7  accidents due to incorrect operation of the crane.  Incorrect

 8  operation of the crane can lead to accidents, personnel can be

 9  killed or seriously injured, and this could also result in

10  property damage.

11         There are lines here that also indicate that only

12  authorized and trained expert personnel are permitted to work

13  on the crane.

14         There is information in Section 11.3, Obligations of

15  the Crane Operator, and states that the crane operator must

16  cease crane operation in case of problems endangering the

17  safety.

18         In another Section, 5.01, Safety Technical Notes For

19  Assembly and Disassembly, in this section it -- there is a

20  warning and it states:  The risk of fatal injury due to

21  incorrect assembly or disassembly, the assembly/disassembly of

22  components may never be performed by untrained personnel, and

23  incorrect assembly or disassembly can result in death or severe

24  injuries.

25         Additionally, there were components that I did look

1   at that were relevant for my analysis, which include in

2   Section 2.2.3, Locking Telescope T2 with Telescope T3

3   Mechanically, which states to check if the pin overlap on a

4   locking bore is at least 11 millimeters.

5   Q    When you reviewed the manual and the sections that you

6   just discussed, you as a human factors expert also look at how

7   the warnings are formatted and the symbols that are used?

8   A    Yes.  There are known components in the behavioral

9   response to risk communication literature that talks about

10  specific formatting elements that can aid an information

11  communication to individuals, and an example of that would be

12  bolded headings to call attention to that particular area,

13  bulleted lists, as opposed to writing things in large

14  paragraphs.  Those would be some examples of those.

15  Q    And did you have any concerns upon reviewing this manual

16  of any issues with formatting or conventions or symbols?

17  A    No, I did not.

18  Q    In terms of Mr. Farris' testimony about Liebherr's

19  training, can you tell us what specifically you found relevant

20  on this subject, on this opinion.

21  A    Specifically, his training, his testimony indicated that

22  he knew which T3 pin -- that the T3 pin was the one to be

23  manipulated.  He understood from training that the T4 pin was

24  incorrect.  This is also furthered by his -- or evidence within

25  the actual incident, when Shane Burrows manipulated the T4 pin,

RACHEL KELLY – FEBRUARY 11, 2022                    128
Direct Examination by Mr. Pender

1    that he was able to identify that that was the incorrect pin
2    that was manipulated, knew that it shouldn't be, as he
3    performed something in order to try and remedy that.
4    Q    And the fact that Mr. Farris had safely and successfully
5    exchanged the boom on four or five times and that the company
6    had exchanged it on about 35 times, what does that tell you
7    that's relevant to your analysis?
8    A    That the training that was provided by Liebherr US was
9    sufficient in order for him to be able to successfully perform
10   the boom swap operations.
11   Q    Regarding Mr. Ward's training and the training that came
12   from Liebherr USA, with your analysis of his testimony, did you
13   see or conclude, make any conclusions about information that
14   Mr. Ward and Liebherr USA did not have available to them at the
15   time of the training that was relevant to this opinion?
16   A    He -- I know from Mr. Ward's testimony and case materials
17   that there was no knowledge of the incident that kind of
18   spurred the product safety bulletin and the retrofit kit to be
19   created.
20   Q    Did you see any evidence that Mr. Ward or anyone at
21   Liebherr U.S. was aware at the time of this training of any
22   events of a T4 pin being manipulated resulting in a
23   catastrophic retraction?
24   A    No, I did not.
25   Q    Was there any evidence that Mr. Ward was aware of the

1    product safety bulletin or what later became the retrofitted

2    plate and decals?

3    A    No.

4    Q    And was there any evidence that you saw that Mr. Ward

5    trained Sims personnel that they -- strike that.

6              Did either Mr. Ward's training or the manual give any

7    information about what to do if someone mistakenly manipulated

8    the T4 pin?

9    A    Neither of those indicated that.

10    Q    And did either Mr. Ward's training or the manual give any

11    information that you saw about how to reset the T4 pin to the

12    factory calibrated setting if it was wrongfully touched?

13    A    No, that was not mentioned in either one of those

14    documents.

15    Q    If we could go to the next bullet point opinion, which

16    I'll call your second opinion, which reads as follows:

17    Liebherr USA is a sales and service company that utilizes the

18    information in the operating instructions provided by

19    Liebherr-LWE as the basis for their training.  It is not

20    expected that Liebherr USA would deviate from the instructions

21    and safety information provided or include additional

22    information into their training that is not authorized by

23    Liebherr-LWE."

24              Did I read that correctly?

25    A    Yes.

1   Q    And by "Liebherr-LWE," you're referring to Liebherr Werk

2   Ehingen, the German company, correct?

3   A    That is correct.

4   Q    Can you tell us what the basis of this opinion is.

5   A    The basis of this opinion is my understanding of

6   Liebherr US as a sales and service company only.  There was no

7   information regarding that they had anything to do with the

8   design of the machine.  That was Liebherr Germany.  This crane

9   is a very large machine, a lot of components, takes specialty

10  training, somebody comes out and trains you specifically on it,

11  so there's a lot of information that needs to be conveyed.  The

12  manual is of significant size.  So Liebherr USA, it wouldn't --

13  excuse me, in the beginning of the manual it states that this

14  information must be followed meticulously and that the

15  instructions must be followed, and that if they are not

16  followed, that damage, serious injury and death can occur.

17          There is no information to suggest that Liebherr US

18  would have had anything additional or would have added anything

19  additional to their training, as there was nothing additional

20  authorized by Liebherr Germany.  They are the specialists of

21  the crane and they are the people that are going to determine

22  what information needs to be conveyed ultimately to the end

23  user.

24  Q    So if there was no information in the Liebherr Germany

25  manual about what to do if the T4 pin was mistakenly touched or

1    how to reset it, are you saying you would not expect

2    Liebherr US under those circumstances to have provided such

3    warnings or training?

4              MR. GOODMAN:  Objection, Your Honor.  Leading.

5              THE COURT:  Reframe the question.

6              MR. PENDER:  Sure.

7    BY MR. PENDER:

8    Q    Going back, I think you've mentioned it already, you saw

9    no evidence in the Liebherr Germany manual of any instructions

10   against manipulating the T4 pin or any instructions on how to

11   reset it if it is mistakenly touched; is that correct?

12   A    That is correct.

13   Q    And in this opinion, under those circumstances, would it

14   be your expectation that Liebherr USA would train any

15   differently than that?

16   A    No, it would not.

17   Q    Did you see any evidence in the record that Liebherr U.S.

18   has or employs any design engineers with knowledge equal to or

19   greater than that of the folks at Liebherr Germany?

20   A    No, I did not.

21   Q    If we could go to your next bullet point, your opinion

22   number 3, it reads as follows:  At the time of this incident,

23   Mr. Farris was engaged in a number of tasks contrary to the

24   safety information provided by Liebherr USA, Liebherr-LWE, and

25   his own employer.  Had Mr. Farris complied with the safety

 1    information provided by them, such as that available at the

 2    time of the incident, the incident could have been averted.

 3    There is no scientific reason to believe that additional or

 4    alternative warnings would have prevented this accident.

 5            Did I read that correctly?

 6    A    The last word is "incident," but, yes.

 7    Q    Prevented this accident?

 8    A    Incident.

 9            MR. GOODMAN:  Incident.

10    Q    Incident.  Got it.  Sorry.

11            Can you tell us what the basis for that opinion is?

12    A    Yes.  I think in order to explain something I'm going to

13    have to break this down into two components, since there is --

14    this is one of the larger opinions in my report.

15            So there -- looking overall, in order to determine

16    whether additional or alternative warnings or safety

17    information would have been -- would have prevented this

18    incident or how it would have occurred, we would want -- or

19    I looked specifically at Mr. Farris' behaviors.  Specifically,

20    with respect to -- some of those examples are that he did not

21    follow safety information that his own employer provided.

22    So there is a Sims checklist.  So after the incident of the

23    manipulation of the T4 pin, that following Monday, Andrew

24    Farris testifies that he was having difficulty with extending

25    the boom and he did call his supervisor, Mike Gay, at that

RACHEL KELLY – FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1    point in time, and Mike Gay told him to stop and that he was

2    sending out a technician, I believe his name was Sergio, to

3    come out and to assist.  My understanding was Mr. Farris was a

4    crane operator and the person that was coming out was somebody

5    that was knowledgeable and assigned to troubleshoot and to help

6    with that.

7            One of the policies that is on the Sims General

8    Safety Employee Checklist that Mr. Farris signed along with his

9    supervisor is that they are not to be troubleshooting devices

10   that are having any issues, so he did not comply with the

11   safety information that his own employer -- that he signed on

12   behalf of his own employer, and he was also acting against his

13   supervisor's suggestion to wait, this person is coming out and

14   will provide assistance.

15           Additionally, he was looking to continue to

16   troubleshoot, so he reached out to find somebody who had

17   experience with cranes, but not specifically with this crane,

18   and through that started to perform actions using the manual

19   mode in order to do that and subsequently the incident

20   happened.

21           Additionally, the information provided by Liebherr

22   Germany in the manual, it states to not let an experienced --

23   or that only experienced and trained individuals should be

24   working on the crane.  Mr. Farris allowed Shane Burrows, with

25   not enough appropriate supervision in order to correct the

RACHEL KELLY – FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1   issues.  There were multiple issues that he ultimately made

2   which were contrary to the safety information provided.

3           So those are some examples of the things that he

4   engaged in.

5           Additionally, looking at how he responded to risk

6   communications, inside the manual there is a section talking

7   about the 11 millimeters of the pin, so when Mr. Farris was

8   asked, you know, how he does the assembly and disassembly

9   procedures, he states that he meticulously follows the manual

10  and he opens it every time, so presumably he's opened this

11  manual at least four to five times and read this same

12  information, but he testifies to not remembering that, so that

13  is another component of information seeking, of reading and

14  understanding, so that that information ultimately would speak

15  to his compliance with that.

16  Q    So to go into a couple of those points again, you're

17  talking about when Mr. Farris contacted his supervisor and was

18  advised that a technician was on the way.  Did you see any

19  evidence that Andrew Farris was a mechanic, a crane mechanic?

20  A    No, I did not.

21  Q    And if you assume for purposes of my question that

22  Mr. Farris viewed this incident on the Monday where he couldn't

23  get the T4 boom to retract to be a mechanical issue, is that

24  what you're talking about, where he then went ahead to try and

25  rectify that mechanical issue, even though he wasn't a

RACHEL KELLY – FEBRUARY 11, 2022        135
Direct Examination by Mr. Pender

1    mechanic?  Is that somehow relevant to your analysis?

2              MR. GOODMAN:  Objection, Your Honor.  Leading.

3              THE COURT:  Sustained.

4    Q    Can you tell me what was relevant to your analysis about

5    Andrew Farris' mechanical abilities, if anything.

6    A    Sure.  The fact that he did not, that was not clear in any

7    testimony or documentation, and the most important information

8    here is showing his not following the information provided with

9    his supervisor, so he continued to troubleshoot despite this

10   being a policy at Sims, and also he just got off the phone with

11   his supervisor and he continues to movie forward with that and

12   not wait on the individual that was sent to specifically work

13   on this issue.

14   Q    Are there research studies that you relied upon that

15   guided your opinions in this case about Mr. Farris' behavior

16   and led you to any conclusions about what he would or would not

17   have done if provided with additional warnings?

18   A    Yes.  So looking at the behavior examples that I just

19   gave, so that was looking at his overall behavior within this

20   incident, but then now taking the scientific literature and

21   looking to see, based on what we have observed or seen in those

22   behaviors, what is his likelihood of complying with safety

23   information that is provided and would we have then reason to

24   believe that additional or alternative warnings would have done

25   something different to his behavior.

1              So one of the things that we -- that I did want to

2    discuss for this one is the term "hindsight bias."  So there is

3    testimony from Andrew Farris stating had he known a

4    particular -- had he known that the manipulation of the T4 pin

5    would have caused uncontrolled retraction of the boom, that he

6    would have acted something different, and I'm certainly not

7    saying that he doesn't wholeheartedly believe that.  Hindsight

8    bias is looking -- you know, you look at past -- in this

9    incident something very catastrophic and major that happened

10   and then assuming that you would have behaved differently had

11   you known a particular piece of information, and taking that

12   component and knowing that laypeople often do have those types

13   of biases, again, not that it's not true or that he doesn't

14   think that genuinely, but that it is something that we do see,

15   and then pairing that with the scientific literature about what

16   we know how humans behave and how they very often will

17   overestimate their compliance with warnings and safety

18   information.

19   Q    Can you tell us specifically about the research studies

20   that you relied upon.

21   A    Yes.  So there are several studies that look at this.

22   There are -- I believe -- I know one that is specifically cited

23   in my report that is well-known in the field of human factors,

24   and what that looks at is it is looking at people's predicted

25   behavior or predicted compliance with warnings and safety

RACHEL KELLY - FEBRUARY 11, 2022
Direct Examination by Mr. Pender

 1  information and how that relates to actual behavior change, so
 2  how do they actually respond.  And in that particular article
 3  they look at a number of different products, so warnings and
 4  safety information not just in tools or equipment but also
 5  chemical warnings, response to stop signs, and they would ask
 6  individuals exactly what you would you do in this situation,
 7  what would be your compliance with a warning that looks like
 8  this, that is this, and they would estimate what their
 9  compliance was, whether that be 50 percent of the time,
10  70 percent of the time.  They were also asked what do you think
11  others would do in this situation and they would rate what they
12  think other people would do in that particular situation, and
13  then they were tested in a real world scenario to actually see
14  what they did, and consistently and -- it was always
15  statistically significantly lower than what they ultimately
16  predicted, which lets us know that people do overestimate their
17  compliance with warnings and it is always going to be lower.
18          In a particular -- in that study there is one that's
19  looking at a hammer warning, and I believe that's one that
20  I cited specifically in my report, it's a tool, people
21  complied -- people estimated that they would comply with that
22  warning about 50 percent of the time, they said others would
23  comply with this warning about 40 percent, 42 percent of the
24  time, and the actual compliance with that warning was zero.
25  Q    So tell me about -- I want to ask you to explain a little

RACHEL KELLY – FEBRUARY 11, 2022          138
Direct Examination by Mr. Pender

1   bit more about what you just said.

2           In this study, are you saying people were shown a

3   warning and then asked what they believed themselves, what they

4   would do, if they would comply with the warning or not?

5   A    Correct.

6   Q    Okay.  And that resulted in people themselves predicting

7   what percentage of compliance?

8   A    It did vary between -- between products.  So what is --

9   what was tested and what the ultimate data analysis showed

10  is that people would estimate their compliance at some level

11  and then it was always statistically and significantly lower

12  than the actual behavioral compliance with that warning.

13  Q    This research that you're discussing, can you tell us

14  where that comes from and tell us any more about the source of

15  that research or the studies.

16  A    The research -- the actual article is Dorris and Purswell

17  and it is a peer reviewed scientific literature.  I don't

18  recall the exact journal that it is in, but it has been around

19  for some time and nothing has changed.  There has been other

20  subsequent studies that have come out of that particular

21  research, I believe, that has followed on with that and

22  affirmed the findings of that one.

23  Q    And are these studies used by experts in your field and

24  generally accepted?

25  A    Yes.

RACHEL KELLY – FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1    Q    Your report talks about something, a term "intrinsic

2    variables."  What is that?

3    A    Yes.  So I mentioned earlier that there were three

4    components of determining whether a warning would or would not

5    be effective.  Intrinsic variables are going to be variables

6    that are within a particular individual to assess whether or

7    not they would comply with safety behavior, so those are going

8    to be things like familiarity with a particular product or

9    piece of equipment, benign experience, so to the extent that

10   something -- they have successfully done something a number of

11   times and nothing has ever occurred before, that would also

12   play into whether they would read additional warnings or comply

13   with safety information.  Those would be examples of intrinsic

14   variables.

15   Q    And did you see in Mr. Farris' testimony or any of the

16   other evidence that you reviewed such intrinsic variables that

17   you found relevant?

18   A    Yes.  So in particular, which is, I believe, my next

19   opinion, the familiarity of the crane would -- you know,

20   performing that multiple times on previous occasions,

21   successful boom swaps, would have played into whether or not he

22   would have read any additional warnings or safety information.

23   We know through scientific research that people that are

24   familiar with products often do not read additional or any

25   other warnings or safety information.

RACHEL KELLY – FEBRUARY 11, 2022
Direct Examination by Mr. Pender

1          MR. GOODMAN:  Your Honor, I'm going to object

2    pursuant to 608.  This is all going to Mr. Farris'

3    truthfulness, this is improper manner and method for attacking

4    that, and I would move to strike the entire line of questioning

5    and the entire answer.

6          THE COURT:  I'll let her testify as to the scientific

7    basis for the intrinsic variables and what she saw based on

8    what she read.  I mean, that said, there's plenty more for me

9    to take into consideration other than what this witness is

10   saying about this.

11         Go ahead.

12   BY MR. PENDER:

13   Q    Why don't we go ahead and read your opinion, bullet point

14   number 4, Dr. Kelly, because you mentioned that this sort of

15   flowed into what you were just talking about.

16         "Mr. Farris was a trained operator who was familiar

17   with the incident crane, had performed successful boom swaps

18   previously to the accident, and understood how to identify the

19   T3 pin.  Mr. Farris' familiarity with the machine would be

20   expected to influence his decision making and reliance on any

21   additional warnings and safety information."

22         Did I read that correctly?

23   A    Yes.

24   Q    And what -- tell us again what it is about the science and

25   the research in your field that leads you to that conclusion in

 1   this case.

 2   A      Absolutely.  There are studies that are specifically done

 3   looking at those who are familiar with products or equipment

 4   and looking at how they would incorporate, read, understand,

 5   comply with safety information and behavior compared to those

 6   who are novel or do not have that type of experience, and

 7   consistently it has been found that those that are familiar

 8   with those products or a particular procedure often are not

 9   expected to, you know, comply with any additional warnings and

10   safety information, because they already know, they presume

11   they already know, or think that they understand completely

12   about what is being said.

13           And in this particular case, taking that scientific

14   literature and also looking at the testimony of Mr. Farris, he

15   states that he absolutely knew how to identify the T3 pin, he

16   knew that the T4 pin was not to be manipulated, this is also

17   confirmed by the fact that when Mr. Burrows did manipulate the

18   T4 pin he was able to identify that and try and correct that or

19   put it in a position to where he thought it was appropriate.

20   So not only was he familiar with performing successful

21   boom swaps, but he was also familiar with identifying the T3

22   pin and the T4 pin as well, so information that would have been

23   associated with this, any additional information wouldn't

24   necessarily have made any -- any change.

25   Q      Your last opinion, bullet point number 5, reads as

1    follows:  The opinions of Dr. Vigilante are contrary to

2    scientific research, speculative and ignore facts.

3    Dr. Vigilante fails to adequately evaluate the knowledge and

4    behavior of the Sims operators in this matter, close quote.

5            Did I read that one correctly?

6    A    Yes.

7    Q    Can you tell us what disagreements you had with

8    Dr. Vigilante and the bases for those disagreements.

9    A    So Dr. Vigilante did not take into account relevant case

10   facts that would have been able to speak to the behavior of

11   Andrew Farris.  So Andrew Farris made a number of decisions

12   against current safety information that we had talked about

13   before, using somebody who was untrained to perform specific

14   tasks, he did not follow safety procedures and continued

15   troubleshooting the crane even though he knew that somebody was

16   on their way.  He testifies to reading information and not

17   recalling that information, despite testifying to reading it

18   multiple times.  All of those type -- all of that type of

19   information as a whole is going to speak to these case facts

20   and my opinions here.

21           So Dr. Vigilante is saying that because Mr. Farris

22   testifies that he would have done something different had a

23   particular scenario been presented to him is speculative and it

24   ignores the other case facts that go along with human factors

25   scientific literature to speak to the fact that it is less

RACHEL KELLY – FEBRUARY 11, 2022        143
Direct Examination by Mr. Pender

1   likely and in fact likely not that he would have followed or he

2   would have done anything differently.

3        MR. GOODMAN:  Your Honor, I would move to object to

4   this specific opinion under Advanced Telemedia, FLIR Systems,

5   Inc. and Coquina Investments, based upon it is inappropriate

6   for one expert to strictly criticize another party's expert

7   solely on the manner and method by which they conducted their

8   investigation and formulated their opinions.

9        THE COURT:  What's the case?  What's the citation?

10        MR. GOODMAN:  *Advanced Telemedia, LLC versus Charter*,

11   and that's 2008 WL 6808442.  There is *FLIR Systems, Inc. versus*

12   *Fluke*, F-L-U-K-E, 2012 WL 13051121, and then Coquina,

13   C-O-Q-U-I-N-A, Investments versus Rothstein, and --

14   I apologize, I retract the Coquina one, Your Honor.

15        THE COURT:  I mean, this is a bench trial, so I can

16   always strike the testimony if necessary later or just not

17   consider it, but in terms of the continued testimony by

18   Dr. Kelly and the question she was asked is what she disagreed

19   with, she can provide what she disagreed with.  Just because

20   it's something that she disagreed with it doesn't necessarily

21   mean the Court will, but she can provide that testimony.

22        MR. GOODMAN:  Thank you, Your Honor.

23        THE COURT:  Go ahead.

24   BY MR. PENDER:

25   Q    Dr. Kelly, in your opinion, is it appropriate for a human

RACHEL KELLY – FEBRUARY 11, 2022                    144
Direct Examination by Mr. Pender

1    factors expert to review the subjective testimony about how a

2    witness believes they would behave in response to warnings and

3    simply adopt that testimony as an expert conclusion?

4    A    No.  I would say the appropriate way would be to look at

5    an overall -- take in an overall information about the

6    behavior, whether it's previous related to the actual incident,

7    and then applying that to scientific research and what we know

8    about human behavior in response to risk communication.

9    Q    In your review of the product safety bulletin and the

10   retrofit information that came out, as a human factors expert,

11   based upon your review of the facts of this case, did you find

12   any information, new information, that you believe would have

13   changed the behavior of Andrew Farris?

14   A    I did not.

15   Q    And can you tell us what the basis of that conclusion is.

16   A    Yes.  The basis for that is Mr. Farris testifies that he

17   knew what pin was the appropriate one to manipulate, he knew

18   that the assembly and disassembly needed to be followed, and if

19   it was not followed, that there were consequences to that, such

20   as serious injury, death or property damage.

21        Additionally, the product safety bulletin, the author

22   of that didn't necessarily -- or insinuates that the -- that

23   the information they provided is also not new, and I arrive to

24   that conclusion based on the fact that they still -- they

25   stated that they could still operate the crane and that -- as

 1  long as they followed the operator's manual meticulously.

 2  So the information that is provided in the safety bulletin

 3  corresponds to what is already currently there, was there at

 4  the time in the operator's manual.

 5  Q    The manuals in this case, the operator's manual --

 6  I believe you have a copy in two binders in front of you;

 7  if not, I have them on the table next to me here -- would you

 8  agree with me that each of those binders has about four inches

 9  or so of paper?

10  A    Yes.

11  Q    And this is already a manual that's about 1800 pages,

12  correct?

13  A    Yes, it is a substantial sized manual.

14  Q    To the extent that it is claimed that additional warnings

15  needed to be put into that manual in this case, can you talk

16  about what happens if additional warnings are added on top of

17  1800 pages?  In your field of expertise is there any research

18  that you can rely upon to discuss that issue?

19  A    Yes.  There are several studies that look specifically at

20  overwarning.  So adding additional information has a couple of

21  consequences that could be unintended.  For example,

22  exhaustively listing all the types of consequences that could

23  happen should something not be followed is unbounded,

24  especially with a particular machine as specialized as a crane

25  that requires this much training and this much information to

 1  be conveyed to the end user.

 2          With overwarning there also comes a couple of other

 3  risks.  When you are trying to give too much information, the

 4  information that is presented may not be remembered, we only

 5  remember so much information, and then also it can dilute some

 6  of the very pertinent information that is trying to be

 7  conveyed.  And in this particular case, as, you know, stated

 8  again, Mr. Farris knew that the T3 pin was the only one -- only

 9  pin to be manipulated and the T4 pin was not to be manipulated.

10  The information provided during training and in the operator's

11  manual states exactly which pin is to be manipulated.  It is

12  direct.  It is clear.  He knew that.  He did it successfully

13  multiple times before.

14  Q    Doctor, have all the opinions that you expressed here in

15  court today been to a reasonable degree of certainty in your

16  area of expertise, human factors?

17  A    Yes, it has.

18          MR. PENDER:  Thank you.

19          THE COURT:  Mr. Goodman, I'm anticipating we probably

20  should go ahead and take a short break now that you're -- how

21  long is your cross-examination, do you think, approximately?

22          MR. GOODMAN:  Thank you, Your Honor.  I guess it will

23  depend on how the witness responds to many of my questions, but

24  hopefully it won't be longer than maybe an hour.

25          THE COURT:  So let's do this, let's go ahead and take

1    about -- well, we can go off the record.

2                             - - - - -

3         (Whereupon a discussion was had off the record.)

4                             - - - - -

5         THE COURT:  We'll be in recess.  We'll take a quick

6    one, ten minutes, and come back at ten til three o'clock.

7                             - - - - -

8              (Recess at 2:40 p.m. until 2:50 p.m.)

9                             - - - - -

10        THE COURT:  Go ahead, Mr. Goodman.

11              **CROSS–EXAMINATION OF RACHEL KELLY**

12   **BY MR. GOODMAN:**

13   Q    Dr. Kelly, prior to undergraduate, your undergraduate

14   work, you did not do any work involving cranes, correct?

15   A    Correct.

16   Q    And you received your undergraduate degree in four years

17   in 2009?

18   A    Yes.

19   Q    And then during undergrad you did not complete any work in

20   human factors, correct?

21   A    I was taking courses in human factors.

22   Q    During undergrad you did not complete any studies or do

23   any work involve cranes, correct?

24   A    Correct.

25   Q    And in the year after undergrad you worked in some

1   academic labs involving testing of humans?

2   A    Yes.

3   Q    And that academic lab testing involved human perception?

4   A    Yes.

5   Q    During those years you did not work in any sort of human

6   factors capacity though, correct?

7   A    There were elements of human factors, because I'm looking

8   at human perception and behavior.

9   Q    And then you went on to your Ph.D. program?

10  A    Yes.

11  Q    While you were working on your Ph.D. program you didn't

12  work in any studies involving the construction industry, cranes

13  or heavy equipment, correct?

14  A    Correct.

15  Q    And prior working -- prior to working for Exponent you

16  never worked for a company or manufacturer in their

17  instructions and warnings group, correct?

18  A    I did not.

19  Q    You went from school then directly to Exponent, correct?

20  A    To teaching to then Exponent.

21  Q    So you went from an academic place then to Exponent,

22  correct?

23  A    Yes.

24  Q    Before joining Exponent you never practiced psychology,

25  correct?

RACHEL KELLY – FEBRUARY 11, 2022
Cross-Examination by Mr. Goodman

1    A    Practicing in the sense of counseling or therapy?

2    Q    Correct.

3    A    No.

4    Q    And before joining Exponent you never practiced

5    neuroscience, correct?

6    A    I'm not sure what practicing neuroscience would be, but

7    I studied neuroscience.

8    Q    Before joining Exponent you never practiced biology,

9    correct?

10    A    No.

11    Q    As a biologist.

12    A    No.

13    Q    And while at Exponent you've only evaluated warnings for

14    two or three pieces of heavy equipment, which were two

15    forklifts and one bulldozer, correct?

16    A    No.

17    Q    Do you recall that we had a deposition?

18    A    We did.

19    Q    And you and I were there?

20    A    Yes.

21    Q    And there was a court reporter?

22    A    Yes.

23    Q    And you raised your right hand and took an oath?

24    A    Yes.

25    Q    And I'm on page 160, and I asked you:  So I'm wondering

1    whether you were in a team or did it by yourself.

2            And you said:  Both.

3            And then I asked you:  Right.  And all I'm asking is

4    how many products have you proactively been on a team

5    assisting, directing, participating, discussing, consulting in

6    the creation of a warning for a product?

7            And you said:  Sure.  It would obviously be an

8    estimate.  I'm going to estimate 10 to 20.

9            I said:  And of those 10 to 20, were any cranes?

10           You said:  No.

11           I said:  Were any heavy equipment?

12           You said:  Yes.

13           I asked:  How many of those 10 to 20 were heavy

14   equipment?

15           You said:  I look at heavy equipment also, like

16   industrial heavy equipment, like two to three, I believe.

17           Do you remember that answer?

18   A    Yeah.

19   Q    So let's talk about your first opinion in this case.

20           The first part of your first opinion is that the

21   training provided by Liebherr for the subject crane was

22   sufficient to inform an operator how to perform a boom swap,

23   correct?

24   A    Correct.

25   Q    But it was not sufficient to inform an operator of how to

1  manipulate the T4 pin, correct?

2  A    There was no information provided to state anything about

3  the T4 pin.

4  Q    And it was not sufficient enough to inform the operator of

5  the risk associated with manipulating the T4 pin, correct?

6  A    There was information in the manual stating that incorrect

7  assembly or disassembly could perform -- could result in

8  serious injury, death or --

9  Q    But there is nowhere in the manual that says manipulating

10  the T4 pin is incorrect assembly or disassembly, is there?

11  A    It states that the pin to be manipulated is the T3 pin.

12  Q    I understand that, but it never says -- because you said

13  that there's a warning about incorrect assembly or disassembly.

14  That was your statement, ma'am?

15  A    Yes.

16  Q    But you would agree with me that there's nowhere in that

17  large manual that says manipulating the T4 pin is incorrect

18  assembly or disassembly, correct?

19  A    It does not state anything about the T4 pin.

20  Q    All right.  Let's talk about your training and experience

21  that would allow you to make such an opinion that the training

22  provided by Liebherr for the subject crane was sufficient to

23  inform an operator of how to perform a boom swap.

24        So you don't have any experience working on cranes,

25  correct?

1   A    Correct.

2   Q    And you're not a certified crane operator, correct?

3   A    Correct.

4   Q    You've never designed a crane, correct?

5   A    Correct.

6   Q    Never been involved in the manufacturing of cranes,

7   correct?

8   A    Correct.

9   Q    You've never operated a crane, correct?

10  A    Correct.

11  Q    You've never been involved with creating instructions for

12  cranes, correct?

13  A    Correct.

14  Q    You've never been involved with creating warnings for

15  cranes, correct?

16  A    Correct.

17  Q    You've never been involved with creating operator's

18  manuals for cranes, correct?

19  A    Correct.

20  Q    You've never been involved with producing product safety

21  bulletins for cranes, correct?

22  A    Correct.

23  Q    You've never been involved with crane operator procedures

24  for cranes, correct?

25  A    Correct.

1          THE COURT:  Mr. Goodman, just slow down a little bit.
2    You're going very fast.
3          MR. GOODMAN:  I apologize.  We're trying to get
4    everybody home.
5    BY MR. GOODMAN:
6    Q    You have never been involved with OSHA investigations
7    involving cranes, correct?
8    A    Correct.
9    Q    You have never been involved with training someone on a
10   crane, correct?
11   A    Correct.
12   Q    You have never been involved with being trained on a
13   crane, correct?
14   A    Correct.
15   Q    You have never been involved with training trainers who
16   train people on cranes, correct?
17   A    Correct.
18   Q    You've actually never even been on an LTM 1500, correct?
19   A    I have not.
20   Q    And you've never consulted with anybody in the crane
21   industry before issuing your opinion in this matter, correct?
22   A    Like spoken to them directly?  No.
23   Q    You have never been involved with creating instructions
24   for heavy equipment, correct?
25   A    I have been asked to consult on instructions for heavy

1  equipment and they have been in litigation, at issue in

2  litigation cases as well.

3  Q    But you've never been involved with creating instructions

4  for heavy equipment that is going to be actually applied and

5  used, rather than in litigation, correct?

6  A    The ones that I have consulted on to look at the

7  formatting, yes, they would ultimately be used, that would be

8  the intent.

9  Q    But have you ever been involved with creating instructions

10 for heavy equipment?

11 A    I wouldn't write instructions, that would be outside of my

12 expertise.  That would be on a manufacturer or somebody who

13 designed that particular product.

14 Q    And you've never been involved in writing the warnings for

15 heavy equipment, correct?

16 A    Generally, again, the warnings are going to come from

17 somebody who is --

18 Q    So that would just be correct, right?

19 A    I don't think I can answer it as a yes or no.

20 Q    Well, did you ever do it?

21 A    Can you repeat the question?  I'm sorry.

22 Q    I said, you've never been involved in writing warnings for

23 heavy equipment, have you?

24 A    I would not write a warning for heavy -- yeah.

25 Q    Then it would be easy to just say "correct," right?

RACHEL KELLY – FEBRUARY 11, 2022
Cross-Examination by Mr. Goodman

1   A    Sorry.

2   Q    And you've never been involved in creating an operator's

3   manual for heavy equipment, correct?

4   A    I wouldn't write an operator's manual, no.

5   Q    You've never been involved with producing product safety

6   bulletins for heavy equipment, correct?

7   A    No.

8   Q    And you've never been involved with creating any

9   procedures communicated from a manufacturer to an end user of a

10  piece of construction equipment, correct?

11  A    Correct.

12  Q    And you've never before this case even seen an LTM 1500

13  before, correct?

14  A    I may have seen one.  I don't know if I would have

15  identified it as such.

16  Q    So before this case you couldn't even identify a Liebherr

17  LTM 1500, correct?

18  A    No.

19  Q    In doing your evaluation you never asked to inspect an LTM

20  1500, correct?

21  A    No.  It was not relevant for my analysis.

22  Q    So that would just be correct?

23  A    Correct.

24  Q    And in doing your evaluations you never asked to watch an

25  individual being trained on how to operate an LTM 1500,

1    correct?

2    A    Correct.

3    Q    And in doing your evaluation you never asked to watch

4    individuals swap out a 50-meter boom for an 84-meter boom,

5    correct?

6    A    Correct.

7    Q    You never participated in a boom swap of an LTM 1500,

8    correct?

9    A    Correct.

10   Q    You did not speak with any Liebherr crane operators about

11   what's necessary for training on a Liebherr LTM 1500, correct?

12   A    Correct.

13   Q    And you've never spoken with a crane operator of a

14   Liebherr LTM 1500 to understand what would be necessary to be

15   trained on a Liebherr LTM 1500, correct?

16   A    Correct.

17   Q    You've never sat in a cab of a Liebherr LTM 1500, correct?

18   A    Correct.

19   Q    You've never gone through the Liebherr LTM 1500 training

20   in Germany, correct?

21   A    Correct.

22   Q    You've never taken classes on the operation of Liebherr

23   LTM 1500, correct?

24   A    Correct.

25   Q    You've never had on-the-job training on a Liebherr LTM

1   1500, correct?

2   A    Correct.

3   Q    Have you ever watched anyone participate in on-the-job

4   training of a Liebherr LTM 1500?

5   A    No.

6   Q    And you've never operated a Liebherr LTM 1500, correct?

7   A    Correct.

8   Q    You've never been on top of a boom looking through the T2

9   access hole to wait and see if you can identify the T3 or T4

10  pin on a Liebherr LTM 1500, correct?

11  A    Correct.

12  Q    You've actually never seen a Liebherr LTM 1500 in service,

13  correct?

14  A    Correct.

15  Q    So would you agree, with having no experience in either

16  how to train or how to receive that training on a Liebherr LTM

17  1500, that you really have no experience to say whether or not

18  the training provided by Liebherr to Sims was sufficient?

19  Isn't that correct, ma'am?

20  A    Specific --

21  Q    Just a yes or no is fine.

22  A    No.

23  Q    You smiled a little though, right?  You're smiling now

24  just a little, right?

25  A    Just a little.

1    Q    Yeah.  The second part of your first opinion is that the

2    assembly/disassembly instructions specifically identify that

3    telescopic separation is always between telescope 2 and T --

4    excuse me, T2 and T3, and that the proper engagement of the T3

5    locking pin needs to be set at 11 millimeters above the locking

6    bore; is that correct?

7    A    Yes.

8    Q    Now, you would agree that Mr. Farris knew that the

9    telescopic separation was always between telescope T2 and T3,

10   correct?

11   A    Yes.

12   Q    And there is no evidence that the T3 pin was not at

13   11 millimeters, correct?

14   A    Correct.

15   Q    The failure occurred at the T4 pin, correct?

16   A    Yes.

17   Q    But the operator's manual, as we previously discussed,

18   does not provide any information on the T4 pin, correct?

19   A    Correct.

20   Q    And it's your contention that because the operator's

21   manual does not provide any information on the T4 pin,

22   Mr. Henry Ward would not train the operators about the T4,

23   correct?

24   A    That is correct.  He trained about the T3 pin.

25   Q    And so if Mr. Ward testified that he did train people on

1    the T4 pin, that would mean your opinion is wrong, correct?

2    A    I disagree with that.

3    Q    So then would you agree then that Henry Ward is doing

4    something that he's not supposed to be doing by training people

5    on the T4 pin, if he's only supposed to teach people what's in

6    the manual?

7    A    He is only supposed to teach people what's in the manual.

8    He didn't do anything against the manual or didn't teach

9    anything against the manual.

10   Q    So he -- I guess I'm a little confused.  You had said that

11   they're only supposed to teach what's in the manual, on Direct.

12   Do you remember saying that?

13   A    Yes.

14   Q    But if Henry Ward taught somebody about something that's

15   not in the manual, it would be your contention then that he is

16   doing something that he shouldn't be doing, right?

17   A     If it was something completely different from the manual,

18   which he did not do.

19   Q    Do you agree that the training did not provide any

20   information on the T4 pin, correct?

21   A     It was -- Andrew Farris testified that it was clear from

22   training which pin to manipulate, and that was the T3 pin, and

23   he knew not to touch the T4 pin.

24   Q    No, I agree with you.  I'm asking you whether the training

25   provided any information on the T4 pin, based upon your review

 1  of the materials.

 2  A    Not to my knowledge, it didn't state anything about

 3  manipulation of the T4 pin.  It doesn't contain any information

 4  about what to do if the T4 pin was inadvertently manipulated.

 5  Q    Right.  You're one step ahead of me, because the

 6  operator's manual does not provide whether the T4 pin has to be

 7  11 millimeters, correct?

 8  A    Correct.

 9  Q    So the training did not provide that it had to be at

10  11 millimeters, correct?

11  A    Correct.

12  Q    And the operator's manual does not provide the risk

13  associated with manipulating the T4 pin, correct?

14  A    Not specifically with the T4 pin, but it does cover that

15  information when it states that assembly and disassembly, when

16  that is not followed, that injuries, death and property damage

17  can occur.

18  Q    And can you find -- in front of you is Exhibit 26.  Can

19  you show me in the operator's manual where it provides that

20  manipulation of the T4 pin is improper assembly/disassembly?

21  A    It doesn't contain any information about the T4 pin.

22  Q    And you'd agree that Mr. Ward never instructed Mr. Farris

23  or Mr. D'Angelo what to do if the T4 pin was inadvertently

24  manipulated, correct?

25  A    Correct.

RACHEL KELLY – FEBRUARY 11, 2022
Cross-Examination by Mr. Goodman

1   Q    You'd agree that according to the Liebherr crane operator

2   training document that was signed by Mr. Farris, that -- and

3   I'll show you what's been marked as Plaintiff's Exhibit 64.

4         If we go to the next page, LAI 0504, that the

5   objective is:  The training for crane operators is designed to

6   equip operators with comprehensive knowledge of various things,

7   including safety concerns relating to the specific crane,

8   correct?

9   A    Correct.

10  Q    So that was Liebherr's objective, to provide that to Sims,

11  correct?

12  A    Yes.

13  Q    Do you agree -- I mean, you're a human factors person,

14  right?

15  A    I am.

16  Q    Do you agree that people know kind of what they know?

17  A    I agree with that.

18  Q    And you agree with the fact that people know what they

19  don't know?

20        Like there are known knowns, right?  Like you know

21  what you know, right?

22  A    Correct.

23  Q    And you would agree that people know what they don't know,

24  and that's why they ask questions, right?

25  A    Correct.

RACHEL KELLY – FEBRUARY 11, 2022
Cross-Examination by Mr. Goodman

```
1    Q    Would you agree with the proposition that there are

2    unknown unknowns, things that people don't know they don't even

3    know?  Would you agree with that question?  They don't even

4    know to ask the question?

5    A    I could see how in particular situations that could be --

6    it's kind of a gray zone.

7    Q    You were a professor?

8    A    I was.

9    Q    So you had kids in your class, or adults in your class?

10   A    I did.

11   Q    And they came in, right?

12   A    They did.

13   Q    And it was your responsibility to teach them?

14   A    Yes.

15   Q    And if they didn't know something, it was your

16   responsibility to teach them that, right?

17   A    Yes.

18   Q    And there were probably times when some of the kids in

19   your class or the adults in your class didn't even know what

20   the right question was to ask.  Did you ever find that?

21   A    Not specifically, but yes, I can see where you're going.

22   Q    Yeah.  So would you agree with that proposition, that

23   there are known knowns, there are known unknowns, and there are

24   unknown unknowns?  Correct?

25   A    Yes.
```

1    Q    And it would have been Henry Ward's responsibility in

2    training Sims to update them on those unknown unknowns, don't

3    you think?  Wouldn't you agree?

4    A    The information -- the testimony from Andrew Farris, if

5    you're referring to what --

6    Q    I'm just asking you whether you'd agree with it.  I'm just

7    asking you whether you'd agree with that proposition, that

8    based upon the objective, whether -- that it was Henry Ward's

9    responsibility -- because the objective of the training was

10   designed to equip the operators with comprehensive knowledge of

11   various things, including safety concerns for this specific

12   crane, correct, ma'am?

13   A    Yes, I would agree that -- yes, and he did that.

14   Q    Okay.  And so it's your -- is it your contention that

15   Mr. Ward provided Andrew Farris the information on the risk

16   associated with manipulating the T4 pin?

17   A    No.  He didn't --

18   Q    Thank you, ma'am.

19   A    -- know --

20   Q    That's all I asked.

21        Now, your second opinion is the Liebherr -- is that

22   Liebherr is a sales and service company that utilizes the

23   information in the operating instructions provided by Liebherr

24   Germany as the basis for the training, correct?

25   A    Yes.

RACHEL KELLY – FEBRUARY 11, 2022                164
Cross-Examination by Mr. Goodman

1   Q    And it goes on to say:  It is not expected that Liebherr

2   would deviate from the instructions and safety information

3   provided or include additional information into their training

4   that is not authorized by Liebherr Germany, correct?

5   A    Correct.

6   Q    Did you ever speak to somebody from Liebherr Germany?

7   A    No.

8   Q    So you don't know what Liebherr Germany expects or doesn't

9   expect, do you?

10  A    They write clearly in the manual that they should

11  follow -- anybody working on the crane or doing any procedures

12  with the crane should follow the manual meticulously.

13  Q    Okay.  And I agree that's maybe what the manual says, but

14  here you're talking about the training, right?

15  A    Correct.

16  Q    Do you have any document or any information or anything

17  that you've obtained in your investigation that reflects that

18  what's in your opinion is really Liebherr Germany's intent, or

19  is that just something that your lawyers told you?

20  A    That was my understanding from the case materials.

21  Q    And where in the case materials did you see that anybody

22  from Liebherr Germany was deposed?

23  A    I don't remember.  It was my understanding from case

24  materials that Liebherr Germany -- that Liebherr US was a sales

25  and service company and that the training that they provided

1   was to follow -- was to be in line with the operator's manual.

2   Q    Can you explain what document from the case materials that

3   you got that?

4   A    I don't recall.

5   Q    You don't know as you're sitting here today?

6   A    As I sit here currently, I don't recall specifically what

7   document.

8   Q    Liebherr also trains customers and owners of the LTM 1500,

9   correct?

10  A    I'm sorry.  Can you repeat the question?

11  Q    Sure.  Liebherr trains customers and owners of the LTM

12  1500, correct?

13  A    Yes.

14  Q    So I know you've been saying they're a sales and service

15  company, but they're also a training company, right?

16  A    They are.

17  Q    Why do you keep on leaving that adjective off, if that's

18  an adjective?

19  A    I consider that to be a part of service.

20  Q    Okay.  Now, there's nothing that would say that Henry Ward

21  is limited to only teaching what's in the operator's manual,

22  correct?

23  A    Correct.

24  Q    The -- Exhibit 64, the objective says the content of the

25  Liebherr Cranes operating instructions is the basis for the

RACHEL KELLY - FEBRUARY 11, 2022
Cross-Examination by Mr. Goodman

1    training, right?

2    A    Yes.

3    Q    The basis is like the ground floor, right?

4    A    The fundamentals, the content.

5    Q    And it doesn't say anywhere here that Henry Ward is

6    restricted to only teaching what's exactly in the manual,

7    right?

8    A    It doesn't state those specific words.

9    Q    Right.  Thanks.

10           So if Henry Ward wanted to, he could have provided

11   additional information and let Mr. Farris and Mr. D'Angelo know

12   that manipulating the T4 pin can cause an uncontrolled

13   retraction of booms 6, 5 and 4 and could damage the crane.

14   He could have told them that, correct?

15   A    I have no reason to believe that he would have thought of

16   that at the time, considering when that event happened and when

17   training was given to D'Angelo and Farris.

18   Q    So it would be your opinion that Mr. Ward wouldn't even

19   know about that, right?

20   A    Yes, based on the timeline, that event that spurred the

21   product safety bulletin hadn't occurred.

22   Q    So the Japan accident happened after the training; is that

23   what you're saying?  From what happened with the product safety

24   bulletin.

25   A    Yes, it did.

1    Q    So -- is that what happened?

2    A    Yes, I believe it was a few months after.

3    Q    So Henry Ward at the time of the training didn't even know

4    about the Japanese incident, right?

5    A    Yes.

6    Q    Because it hadn't happened.

7    A    It did happen after, yes.

8    Q    So Henry Ward didn't even know, like you just said, that

9    manipulating the T4 pin can cause an uncontrolled retraction of

10   boom section 6, 5 and 4, correct?

11   A    The T4 pin was never to be manipulated in the first place.

12   Q    I'm just asking you the question.  I'm not asking about

13   the T4 pin.

14        You had said that Henry Ward wouldn't even have

15   known, so I'm just wanting to take that to the next step.

16   A    He could not have known of the Japan accident.

17   Q    He would not have known.

18        And you'd agree if Henry Ward, the trainer at

19   Liebherr US, wouldn't know, then Sims could not have known,

20   correct, ma'am?

21   A    I don't believe anybody -- there was no recorded incidents

22   of something like this happening prior at all.

23   Q    So Liebherr -- excuse me.  So Sims, Shane Burrows and

24   Andrew Farris could not have known that by manipulating the T4

25   pin, the 6, 5 and 4 would uncontrollably retract, correct,

1    ma'am?

2    A    They knew that not following the steps --

3    Q    Ma'am, I'm not asking you that.

4         I'm asking you -- you just said that Henry Ward

5    wouldn't know, that Liebherr U.S. wouldn't know, and if the

6    trainers didn't know and the company that does the training

7    doesn't know, then how is the crane operator supposed to know?

8    They wouldn't know, correct?

9         MR. CREMER:  I'll object to the question.

10        MR. GOODMAN:  I'll retract it and I'll rephrase.

11   Q    Ma'am, you had mentioned, correct, that Henry Ward would

12   not have known that manipulating the T4 pin would cause the

13   uncontrolled retraction of section 6, 5 and 4, correct, ma'am?

14        That's what you said, right?

15   A    I said --

16   Q    We can get it read back if you like.

17   A    Sure.  Yes.  I do agree with that.  He would not have

18   known, due to the fact that the particular event had not

19   occurred.  But not following the assembly/disassembly, which

20   does include the manipulation of the T4, T5, T6 pin, any of

21   those, does not follow the instructions, so therefore serious

22   injury, death or personal injury can occur.  That was known.

23   Q    Okay.  Great, and I appreciate that.  I appreciate that if

24   you're a 600-ton crane, right, and you're out in construction,

25   common knowledge is construction can be dangerous, right?

 1    A     Yes.

 2    Q     So that's why you need specific warnings, right?  Or

 3    do you not think -- yes or no?

 4    A     Totally depends on the particular scenario.

 5    Q     Okay.

 6    A     That's where you get into overwarning territory.  There

 7    are lots of things that go into considering what should be

 8    warned about.

 9    Q     Great.  So let's go back to this Henry Ward thing that we

10    really haven't gotten an answer for.

11          You had mentioned that Henry Ward wouldn't have

12    known, right, about the uncontrollable retraction of boom

13    section 6, 5 and 4 if the T4 pin was manipulated, correct?  And

14    if you say no, we can have it read back.

15    A     I think that that information is implied by the --

16    Q     I'm not asking whether it's implied.  I'm just asking

17    whether you said that to me about four minutes ago.

18    A     I said that he would not have warned about that

19    specifically because the event would not have happened.

20    Q     So I guess I'm just trying to figure out, in your opinion,

21    would Henry Ward have known or would he not have known that

22    manipulating the T4 pin would have caused an uncontrolled

23    retraction of boom section 6, 5 and 4?  He would have or he

24    wouldn't have, before the Japan incident?

25    A     I say he would have known, but he would not have known

1   perhaps specifically that this could occur because it never had

2   before, but he knew that there were risks associated.

3   Q    So if he would not have known that it could specifically

4   occur -- you would agree then, if the trainer doesn't know it

5   could specifically occur, then it's reasonable that the people

6   that are being trained wouldn't specifically know, correct?  Or

7   are you holding the people that are being trained to a higher

8   standard than the teacher?  Did your students know more than

9   you?

10  A    They might have.

11  Q    They might have?

12          You're smiling again.

13          MR. PENDER:  Your Honor, we don't need the side

14  comments.

15          THE COURT:  I agree, we don't need the side comments.

16          MR. GOODMAN:  I apologize.  I apologize, Dr. Kelly.

17  BY MR. GOODMAN:

18  Q    I'm showing you what's previously been marked as

19  Exhibit 18.  Now, do you recognize that yellow round circle as

20  a cover plate?

21  A    Yes.

22  Q    And I'm going to show you the next page.  Do you recognize

23  that as a round cover plate?

24  A    Yes.

25  Q    I'm going to show you the next page.  Do you recognize

RACHEL KELLY - FEBRUARY 11, 2022
Cross-Examination by Mr. Goodman

1    that as a round cover plate on top?

2    A    It's kind of hard to tell the context, but, yes, it looks

3    round and it looks like a cover plate.

4    Q    And I'm going to show you what's been marked as

5    Exhibit 19.

6          Now, what do you think has better warnings on the

7    cover plate, the Exhibit 18 that I just showed you or

8    Exhibit 19, from a human factors perspective, just looking at

9    the cover plates themselves, which has better warnings?

10   A    I would say only one of them has warnings.

11   Q    And which one is that?

12   A    This exhibit here, Exhibit 19.

13   Q    And in your studies, has there ever been any determination

14   in the human factors evaluations of what a big red X might mean

15   to somebody?

16   A    Typically it's a prohibition sign, meaning don't touch.

17   Q    Have you seen any studies on whether or not a product

18   safety bulletin with a retrofit kit like this cover plate is

19   effective on people?

20   A    There would not be anything that specific, and there's

21   a lot of things that go into whether a warning is or is not

22   effective.

23   Q    Now, you reference a lot of scientific articles showing

24   that people very often overestimate their compliance, not only

25   with themselves but other people's compliance with warnings,

1   and that their actual behavior is not even close, correct?

2   A    I would say that it's significantly different than what

3   they state.

4   Q    None of the scientific articles include heavy equipment,

5   correct?

6   A    No, that would be something -- "I don't know" actually is

7   my answer.  I'm not sure if there is anything that is

8   specifically focused on like a crane.

9   Q    One of the articles that you discussed was -- discussed

10  posted warnings, compliance and behavioral intent, correct?  Do

11  you recall that?

12  A    I would have to -- I didn't memorize all the --

13  Q    No, I understand.  It's the Virginia Tech study of the

14  chemistry lab.  Do you recall that study?

15  A    I do.  I think that's the one we talked about at

16  deposition.

17  Q    Yeah.  That's with the 37 participants, right?

18  A    Yes.

19  Q    They were all college students, right?

20  A    Yes.

21  Q    And they got paid, right?

22  A    Most people get paid to participate in studies.

23  Q    And none of the participants though were chemistry or

24  chemical engineering majors, right?

25  A    They were not.

RACHEL KELLY – FEBRUARY 11, 2022
Cross-Examination by Mr. Goodman

1   Q    They were getting like eight dollars for their

2   participation?

3   A    I don't recall the specific amount that they received, but

4   I'll take your word for it.

5   Q    And in that study we don't know what time of day this test

6   was done, whether it was done in the morning, in the middle of

7   the day, at night, do we?  And there's nothing to say that any

8   of those people, any of those college kids at Virginia Tech

9   showed up after hitting the bar, does it?

10  A    It doesn't.

11  Q    They didn't do any alcohol studies, Breathalyzers?  No?

12  A    They did not.

13  Q    They didn't know if all these kids were friends and needed

14  eight dollars for some pizza and beer money, right?

15  A    I wouldn't know that.

16  Q    It's different, right?  You'd agree that kids from

17  Virginia Tech in a chemistry lab is different from a bunch of

18  guys that really work for a living and are outside tossing

19  around 600-ton pieces of equipment, knowing, like you said,

20  that if things go wrong, they're going to go terribly wrong,

21  right?  It's a little different?

22  A    In how people respond to information communication, I --

23  humans are -- you know, whether they are a crane operator,

24  whether they operate machine, whether, you know, they are an

25  adult that doesn't do any of those things, responses to

 1   warnings information can still be studied, no matter what the

 2   population.

 3   Q    But it's a study, it's not going to say exactly what

 4   happens, right?

 5   A    I mean, that information wouldn't be included, about

 6   participants.

 7   Q    And there is in the study a percentage of the population

 8   that complies with the additional warnings, right?

 9   A    There is.  Um-hum.

10   Q    And so you sitting there in that chair, you don't know if

11   Andrew Farris would have been one of the people that would have

12   complied or one of the people that wouldn't have complied,

13   right?

14   A    Well, we -- what goes in with compliance or --

15   Q    I'm just asking whether you know that, based upon those

16   studies, whether Andrew Farris would have been one of the

17   compliant people or one of the noncompliant people.  That's all

18   I want to know, so I can ask the next question.  Would he be

19   compliant or not compliant?

20   A    I can't answer that question.

21   Q    You can't answer?

22   A    Not in a yes or no form.  It's not that simple.

23   Q    I understand.

24        Now I want to talk about some of the key factors that

25   you talk about considered in the literature you reviewed.

 1    A      Um-hum.

 2    Q      Key factors considered in the literature you reviewed for

 3    this matter include the likely effectiveness of providing a

 4    warning about a particular hazard, correct?

 5    A      Yes.

 6    Q      Now, if there is no warning about a particular hazard,

 7    it's 100 percent going to be ineffective, right?

 8    A      Yes.

 9    Q      And there was no warning about the T4 pin in the

10    operator's manual, correct?

11    A      There was not.

12    Q      And another key factor considered in the literature is

13    labeling directives presented in relevant standards and

14    guidelines, right?

15    A      I'm not recalling specifically what you're referring to.

16    Q      I'm not looking to impeach you, I'm just looking to

17    refresh your recollection here, if that's okay.

18    A      Sure.

19    Q      But on page 128, on line 21, we were having a discussion

20    and I asked:  Then it goes on to say labeling directives

21    presented in relevant standards and guidelines.  Do you see

22    that?

23            And you say:  Yes.

24            And I say:  That's another key factor considered in

25    scientific literature?

RACHEL KELLY – FEBRUARY 11, 2022
Cross-Examination by Mr. Goodman

1              And you say:  Yes.

2              Does that refresh your recollection on what that is?

3    A    I don't recall the context, but when considering –– yes,

4    we do look at standards, if there are any relevant ones,

5    voluntary, mandatory, when speaking to warnings information.

6    Q    So here you would agree that Liebherr Germany sent the

7    product safety bulletin, the retrofit cover plate and the

8    warnings to Liebherr US to send out to customers, correct?

9    A    That is my understanding, yes.

10   Q    And that would have been the directive about that warning,

11   correct?  The product safety bulletin is a warning?

12   A    I'm sorry.  Say that again?

13   Q    The product safety bulletin and everything that went along

14   with it, the cover plate and the warnings ––

15   A    I would say that's safety information.

16   Q    And the directive from Liebherr Germany would have been ––

17   was –– you understand, to Liebherr US, was to send it to

18   customers, correct?

19   A    Yes.

20   Q    And if it wasn't sent to customers, then the customer

21   can't comply with it, right, if they don't know about it,

22   right?

23   A    Yes, I would agree with that.

24   Q    If ––

25   A    But I would say it's –– whether they received it or not,

1    that is outside of what I would -- sorry.

2    Q    If Sims hadn't received and were not -- was not provided

3    the cover plate, they couldn't implement -- they didn't have an

4    opportunity to implement that warning, correct?

5    A    Yes, they did not have the cover plate.  They didn't have

6    that.

7    Q    The last key factor that you considered from the

8    scientific literature is the selection of hazards to warn

9    about.  Here Liebherr Germany selected the T4 pin and the fact

10   that it could have been uncontrolled retraction of a boom as

11   the hazard to warn about, right?

12   A    There was no information about the T4 pin.  You're talking

13   about that was during training and in the manual?

14   Q    Now I'm talking about the publication --

15   A    Um-hum.

16   Q    -- and distribution of the product safety bulletin and the

17   retrofit cover plate.

18   A    Yes.

19   Q    You'd agree that Liebherr Germany selected the hazard

20   associated with the T4 pin to warn about, correct?

21   A    They included that information in their product safety

22   bulletin.

23   Q    And you'd agree that the product safety bulletin, the

24   cover plate and the warnings are good warnings, correct?

25   A    I have no opinion on whether they're good or not.  That

 1   was outside of my analysis.

 2   Q    But nonetheless Liebherr Germany wanted to warn about

 3   that, correct?

 4   A    They provided this, yes, to -- in response to proactively

 5   helping prevent something of a similar nature in the future.

 6   Q    Liebherr Germany chose to publish a product safety

 7   bulletin to create this piece of metal, to create those

 8   stickers and to create other stickers that go under the boom to

 9   warn against the risk associated with manipulating the T4 pin,

10   correct?

11   A    I don't --

12   Q    They chose --

13   A    My understanding of the intent of the cover plate --

14   Q    I'm not asking you the intent.  I just want to know that

15   they chose to do it.

16   A    That's my understanding.

17   Q    But they chose to do it, right?

18   A    They chose to create this, yes.

19   Q    You'd agree people are different?

20   A    They are different.

21   Q    People react differently to different stimuli?

22   A    They do.

23   Q    You'd agree that just because some research provides that

24   it would do one thing doesn't mean that that's how it's

25   actually going to come out in real life, right?  Toss-up?

RACHEL KELLY – FEBRUARY 11, 2022          179
Cross-Examination by Mr. Goodman

1   A    Completely depends on the research and what's being

2   studied.

3   Q    Exactly.

4        You don't know Andrew Farris?

5   A    I don't.

6   Q    Did you ever interview Andrew Farris?

7   A    I did not.

8   Q    Do you know Shane Burrows?

9   A    I do not.

10  Q    Did you ever interview Shane Burrows?

11  A    I'm sorry?

12  Q    Have you ever interviewed Shane Burrows?

13  A    No.

14  Q    Did you ever interview anybody over at Sims to find out

15  the intent of the safety directives that they gave and whether

16  or not Andrew Farris and Shane Burrows complied with them at

17  the time between February 16th and February 19th, 2018?

18  A    No.

19       MR. GOODMAN:  May I have one moment, Your Honor?

20       THE COURT:  You may.

21  BY MR. GOODMAN:

22  Q    Now, in talking about the T4 pin, you said that there was

23  no warning in the manual; is that correct?

24  A    Yes.

25  Q    And so if there is a warning put out about the T4 pin, it

1    couldn't be overwarned, because that would be the first warning

2    about the T4 pin, correct?

3    A    Is there -- is there a warning about the T4 pin?

4    Q    Have you ever seen a warning in -- about the T4 pin?

5    A    No, I thought that's what you were asking.

6    Q    So if the product safety bulletin comes out and the

7    retrofit cover plate comes out to warn about the T4 pin, that

8    would be the first warning about the T4 pin, right?

9    A    It doesn't state anything specifically about the T4 pin.

10   It says that -- you know, manipulating a pin that is

11   unintended.  There is nothing specific about the T4 pin.

12   Q    And you understand that Andrew Farris and Shane Burrows

13   understood that this X over the T4 pin was a warning for the T4

14   pin, right?

15   A    They understood that, but they also understood not to

16   touch it, that that was not a pin to be manipulated.  They

17   already knew that information.

18   Q    So if this cover plate -- and they touched -- strike that.

19        Shane Burrows touched the T4 pin because the cover

20   plate was left on the T3 pin, correct?

21   A    I don't know why Shane Burrows touched the T4 pin.  He

22   thought he was -- I don't know what he was doing at the time.

23   Q    Now, let me ask you this.  If there is a guard over

24   something you're not supposed to touch so you can't access it,

25   would you say that's a good warning to prevent somebody from

1   accessing it?

2   A    I couldn't speak to that.  Guarding is outside of my

3   expertise.

4            MR. GOODMAN:  Thank you, Your Honor.

5            Thank you, Doctor.

6            THE COURT:  Any redirect?

7            MR. PENDER:  No.  The only thing is, Your Honor,

8   Josh, I forgot to move into evidence my Exhibit 72, which was

9   Dr. Kelly's report, and I'd ask that --

10           MR. GOODMAN:  I would object to the report as being

11  cumulative, since she's here testifying.

12           THE COURT:  I'm going to let the report in.  We let

13  the report in also of all of the witnesses at this point,

14  I believe, so I will go ahead and let the report in as well.

15           MR. GOODMAN:  Okay.  No objection.  I withdraw it.

16           THE COURT:  That's a what's good for the goose is

17  good for the gander.  Everyone's reports are in.

18           Mr. Pender, do you have any other questions for

19  Dr. Kelly?

20           MR. PENDER:  I do not.

21           THE COURT:  Dr. Kelly, you are welcome to step down.

22  Just don't forget to take the microphone off.

23           Is there anything else then that we need to do on the

24  record today?

25           MR. GOODMAN:  Your Honor, the plaintiff would like to

1  make a motion for partial findings on the record.

2          THE COURT:  Are you wanting to do that in writing or

3  are you wanting to do that orally?

4          MR. GOODMAN:  On the record, orally.

5          THE COURT:  Okay.  Go ahead.

6          MR. GOODMAN:  Ms. Ermakova is going to take care of

7  that, Your Honor.

8          THE COURT:  Okay.  Let me just give Dr. Kelly time to

9  get out of the well of the courtroom.

10         MR. PENDER:  And not to interrupt, before we --

11  before the defense rests we have some additional documents to

12  move into evidence, just a few, but there's another deposition

13  and some other items.

14         THE COURT:  Let's go ahead and do that first then so

15  the evidence part is complete.  And did the -- did both sides

16  work out the deposition designation issues?

17         MR. GOODMAN:  I believe so, Your Honor.

18         THE COURT:  Do I get a lovely package of binders then

19  to take?

20         MR. GOODMAN:  Fortunately, yesterday I think you got

21  all the plaintiff's, and I think you're just getting the ones

22  that the plaintiffs did not provide you.  Is that correct?

23         MR. PENDER:  Yeah, so we have the Dennis Muron

24  deposition transcript and the two exhibits thereto.  We have --

25  Mr. Muron is the defense damages expert.

1          THE COURT:  And how do you spell that last name?

2          MR. PENDER:  M-U-R-O-N.

3          THE COURT:  Okay.

4          MR. PENDER:  And we have his expert report, and the

5     defense also designates plaintiff's responses to defendant's

6     requests for production, plaintiff's responses to defendant's

7     second set of requests for production, plaintiff's responses to

8     defendant's third set of requests for production, and

9     plaintiff's amended responses to defendant's third set of

10    requests for production.

11         THE COURT:  Thank you.  And you're providing copies

12    of all that today?

13         MR. PENDER:  Yes.

14         THE COURT:  Any objection to any of that from the

15    plaintiff?

16         MR. GOODMAN:  No, Your Honor.

17         THE COURT:  Okay.  All of that is also into evidence.

18         You know, I know we mentioned the deposition

19    designations yesterday that you went over, Mr. Goodman.

20    I don't know that we formally admitted those into evidence.

21    I know that was the intent, but I don't know that we did that,

22    so the ones that were listed yesterday we'll have to just make

23    sure, but that was your intent, correct, those all be admitted

24    into evidence?

25         MR. GOODMAN:  Yes, Your Honor.

1              THE COURT:  And I believe that you all worked out any

2        issues and those were all agreed to as well?

3              Okay.  And that was a long list, I believe that long

4        list made it into the minutes yesterday, but I just want to be

5        clear that we've accepted them into evidence.

6              Okay.  And now anything else before -- anything else

7        for defense, or does defense rest?

8              MR. CREMER:  Defense rests.

9              THE COURT:  Thank you.  Go ahead.

10             MS. ERMAKOVA:  Your Honor, plaintiff moves for

11       judgment on partial findings pursuant to Federal Rule 52(c).

12             THE COURT:  And let me stop you for a minute.  Do you

13       want us to turn the lights back up?  We had the lights down

14       because of exhibits and things for a while.  I mean, we've all

15       gotten used to this mood lighting now, but I just want to make

16       sure that you're able to see to do your presentation.

17             MS. ERMAKOVA:  It is fine for me.

18             THE COURT:  Okay.  Go ahead.

19             MS. ERMAKOVA:  The evidence demonstrates clearly that

20       defendant owed a legal duty to plaintiff to timely send the

21       safety bulletin.  Defendant's corporate designee admitted that

22       defendant was responsible for sending any updated product

23       warnings to customers, including secondary purchasers of

24       cranes.  Indeed, we heard testimony that Jon -- from Jonathan

25       Smith that defendant regularly sent product warnings and was

responsible for administering over 700 product safety campaigns
during the period of time 2017 through March 2018, and
defendant's employee testified that defendant was responsible
for collecting and updating its internal database, yet
defendant did not even institute basic procedures to maintain
its internal database.

The evidence is clear that by January of 2017
defendant was on notice that a discrepancy existed in its
records as to the owner of this crane, yet it did not update
its system until after the accident.

Defendant could have easily foreseen that proper
recordkeeping was necessary and that the failure to send any
product warnings to customers would enhance the risk of harm to
crane operators.

With respect to proper training, the evidence shows
that defendant owed a legal duty to properly train and instruct
Sims.  We heard testimony that defendant owed -- aimed to
provide comprehensive training to train crane operators.
Therefore a legal duty existed to provide proper and complete
instruction on the operation of the crane; however, Farris
testified that Ward -- Henry Ward's instruction was to position
the pin until it is snug.  Ward did not train Sims on how to
measure the T3 pin.  Indeed, he testified that he did not bring
any tools to the training.

Henry Ward never had classroom training on the same

1  model of the crane, and he was supervised by Trina Cross, who

2  was not a crane operator and never operated a crane.

3       They provided no evidence that Ward's training was

4  consistent with the crane's operating manual.  Indeed

5  Henry Ward admitted that he provided additional warnings

6  outside the manual.

7       Defendant's failure to provide train -- excuse me,

8  defendant's failure to properly train Sims enhanced the risk of

9  harm that the crane would not be safely operated.

10      With respect to causation, defendant is a training

11  company.  It should have known that inadequacies exist in the

12  manual when it received the safety bulletin and should have

13  known the importance of timely communicating the information.

14      The failure to send the bulletin was the but-for

15  cause of the incident because the bulletin and the safety cover

16  address the T4 pin.

17      The defendant's own experts opine that the bulletin

18  would have sufficiently apprized the employees as to risks

19  associated with the improper manipulation of the T4 pin.

20      In addition, they have provided no evidence with

21  respect to the claim that Sims employees caused the collapse.

22      Defendant admitted that an operator undertaking the

23  operation solely based on the manual would not have any

24  understanding that there could be property damage or a death

25  just from reading the troubleshooting section.

1          Even if Sims had read the manual in its entirety, the

2     incident would not have been prevented because the information

3     did not exist in the manual.

4          A direct consequence of the failure to provide

5     complete instruction is that the crane will be operated in an

6     improper manner, which is what happened here.  That the T4 pin

7     was accidentally manipulated by Burrows was not a highly

8     unusual incident to relieve defendant from liability for

9     failing to properly train Sims.

10         As such, we move for judgment on partial findings.

11         THE COURT:  Thank you.

12         MS. ERMAKOVA:  Thank you, Your Honor.

13         THE COURT:  And does the defense wish to respond

14    today?

15         MR. CREMER:  It sounds like closing argument to me.

16    I don't know what I would say other than more argument.

17         THE COURT:  Then at this point I'm going to defer the

18    ruling.  I'm going to view everything once I get the closing

19    arguments and receive the proposed findings of fact and

20    conclusions of law.  I also have a lot of additional testimony

21    to read, because even though all of those deposition

22    transcripts have been put into evidence, I don't believe I've

23    had all of them before.  I know for summary judgment we had

24    some, but I think all of this now, some of it perhaps may be

25    new.  So I will be deferring ruling and I'll ultimately be

1  entering very detailed findings of fact and conclusions of law

2  once everything has been briefed.

3          Anything else we need to do today then for this case,

4  starting with plaintiffs?

5          MR. GOODMAN:  Not from plaintiffs, Your Honor.

6          THE COURT:  Anything from the defense's perspective?

7          MR. CREMER:  Nothing further.

8          THE COURT:  Thank you.

9          Then I appreciate all of your efforts and the

10 testimony and we are in recess.  Thank you.

11                      - - - - -

12              (Proceedings concluded at 3:47 p.m.)

13                      - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4     proceedings taken in a bench trial in the United States

5     District Court is a true and accurate transcript of the

6     proceedings taken by me in machine shorthand and transcribed by

7     computer under my supervision, this the 2nd day of March, 2021.

8

9

10                                      /S/ DAVID J. COLLIER

11

12                                 DAVID J. COLLIER

13                                 OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25