## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**NBIS CONSTRUCTION &
TRANSPORT INSURANCE
SERVICES, INC., a/s/o Sims
Crane & Equipment Company,**

        **Plaintiff,**                **Case No.:  8:19-cv-2777-AAS**

**v.**

**LIEBHERR-AMERICA, INC.,**

        **Defendant.**

                                /

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff NBIS Construction & Transport Insurance Services, Inc. (NBIS) a/s/o Sims Crane & Equipment Company (Sims) (collectively, the plaintiff) brought claims against Defendant Liebherr-America, Inc. d/b/a Liebherr USA, Co. (Liebherr-America) for negligence (count I) and negligent training (count II). [1] (Doc. 24).

The court held a five-day bench trial; heard extensive testimony, both live and through depositions; and reviewed many exhibits, including emails, photographs, manuals, and safety campaign literature. (*See* Docs. 142, 143,

---

[1] The court's April 13, 2021 order granted summary judgment for Liebherr-America on count III for alleged violations of Florida's Deceptive and Unfair Trade Practices Act (FDUPTA). (*See* Docs. 57, 74).

144, 145, 147). Liebherr-America moved for judgment on partial findings (Doc. 146) and NBIS responded in opposition (Doc. 151).

For the reasons stated, Liebherr-America's motion for judgment on partial findings (Doc. 146) is granted only as to count II and otherwise denied. After a five-day bench trial, judgment is entered in favor of Liebherr-America on count II for negligent training. Judgment is entered in favor of NBIS on count I for negligence.

## FINDINGS OF FACT

This civil action arises from an accident on February 19, 2018, when a 2012 Liebherr LTM 1500-8.1 crane's boom collapsed (the accident).

### A.    The Parties and Relevant Non-Parties

Sims is a crane and rigging company based in Tampa, Florida. (Doc. 148, ¶ 17). Non-party insurance company International Insurance Company of Hanover SE (IICH) insured Sims against losses and damages to cranes in its fleet. (Doc. 167, Exs. 15, 17). NBIS is a third-party administrator and managing general agent of IICH. (*Id.*).

Non-party Liebherr Werk Ehingen GMbH (Liebherr-Germany) is an international crane and heavy equipment manufacturer based in Germany. (Doc. 148, ¶¶ 10, 11). Liebherr-America is a Virginia-based company providing sales and services for Liebherr-Germany's cranes in the United States. (Doc. 155, p. 96, ln. 17–19). Under the service portion of its business, Liebherr-

America provides training to crane customers that own Liebherr-Germany's cranes. (Doc. 155, p. 97, ln. 10–16). Liebherr-America also sends product safety updates issued by Liebherr-Germany to current crane owners in the United States. (Doc. 155, p. 200, ln. 13–15). This product safety service includes verifying, updating, and maintaining ownership records to reflect the current owners of the Liebherr-Germany cranes. (Doc. 156, p. 109, ln. 19–25, p. 110, ln. 1–2).

### B.    The Purchase of the Crane

In September 2016, Liebherr-America purchased the 2012 Liebherr LTM 1500-8.1 crane at issue from Liebherr-Germany and sold it to crane broker Schuch HeavyLift Corporation (Schuch).[2] (Doc. 148, ¶¶ 19, 20). Schuch never took possession of the crane and resold it to another crane broker, Atlantic Coast Cranes. (Doc. 148, ¶¶ 23, 24).

In August 2016, Atlantic Coast Cranes contracted to re-sell the crane to Sims. (Doc. 148, ¶¶ 25, 26). The Sims/Atlantic Coast Cranes contract states "Liebherr factory trained technician to be provided to commission this machine and train Sims' personnel at no charge." (Doc. 156, p. 185, ln. 5–18). According to Liebherr-America's designated corporate representative Ralf Vieten,[3] the

---

[2] Schuch sells, buys, and rents cranes and construction equipment. (Doc. 167, Ex. 7, pp. 8–9, ln. 25, 1–9).

[3] Ralf Vieten is Liebherr-America's General Manager of Customer Service. (Doc. 155, p. 70, ln. 11–12).

purpose of the Liebherr training was to provide "comprehensive knowledge" to crane operators on the safe and proper operation of the crane. (Doc. 155, p. 74, ln. 17–21).

### C.   The Crane and Its Relevant Components

The Liebherr LTM 1500 crane has two configurations, a 50-meter boom and an 84-meter boom. (Doc. 148, ¶ 28). There are six locking pins on the 84-meter boom: T1 through T6. (Doc. 155, p. 111, ln. 8–25, p. 112, ln. 1–13). Next to the T3 pin is the T4 pin. (Doc. 155, p. 133, ln. 6-10; see Doc. 158, p. 51, ln. 7–25). The T3 and T4 pins look similar and can be adjusted using the same wrench. (Doc. 157, p. 135, ln. 4–9; see Doc. 155, p. 105, ln. 1–6). However, the T4 pin is open and accessible and, at the time of the accident, did not have a cover plate or was not otherwise labelled to reflect it should not be touched. (Doc. 155, p. 88–89, ln. 15–25, p. 89, ln. 1–13, p. 111, ln. 24–25, p. 112, ln. 1–25, p. 113, ln. 1). The other locking pins on the 84-meter boom (i.e., T1, T2, T3, T5, T6 pins) each have a cover plate over them. (Doc. 155, p. 111, ln. 8–25, p. 112, ln. 1–11).

To install the 84-meter boom, a specific locking pin, the T3 pin, must be adjusted to a precise position of 11 millimeters above the locking bore. (Doc. 155, p. 103, ln. 19–24; *see* Doc. 157, p. 139, ln. 14–19). Before adjusting the T3 pin, the bolted cover plate over the pin must be removed. (Doc. 158, p. 50, ln. 10–14).

The photo below shows the T3 and T4 pins of the LTM 1500 crane. (Doc. 155, p. 134, ln. 2–17). However, the cover plate for the T3 pin on the crane in this action was secured by bolts, not the wing nuts on the photo below. (Doc. 155, p. 134, ln. 7–9). Like the crane in the photo, the T4 pin is exposed on the LTM 1500 crane in this action. (Doc. 155, p. 133, ln. 11–12).



The T4 pin should never be manipulated. (Doc. 155, p. 103, ln. 23–24). If the T4 pin is manipulated, it must be reset to a factory calibrated position. (Doc. 158, p. 117, ln. 4–11). The improper manipulation of the T4 pin or improper positioning of the T3 pin can cause an uncontrolled boom collapse. (*Id.*; *see* Doc. 149, Ex. 15).

### D.    The Crane's Operator's Manual

On October 14, 2016, three months before Sims received the Liebherr LTM 1500 crane, Atlantic Coast Cranes provided Sims with the Operator's Manual (the Manual) published by Liebherr-Germany. (Doc. 148, ¶ 27; Doc. 156, p. 154, ln. 16–25, p. 155, ln. 1). The Manual consists of approximately 2,000 pages of information. (*See* Doc. 169, Exs. 4, 5, 6). The Manual provides

no warnings or instruction about the T4 pin. (Doc. 156, p. 81, ln. 17–25, p. 82, ln. 1–10; *see* Doc. 155, p. 139, ln. 6–12; *see* Doc. 156, p. 139, ln. 15–18). The Manual only addresses the T3 pin. (Doc. 157, p. 150, ln. 18–25, p. 151, ln. 1–13). The instructions applicable to the T3 pin do not contain any warning that property damage, personal injury, or death may occur if the T4 pin is improperly adjusted. (Doc. 156, p. 81, ln. 17–25, p. 82, ln. 1–10).

### E.   Delivery of the Crane

On January 18, 2017, the Liebherr LTM 1500 crane arrived at the port in Jacksonville, Florida. (Doc. 167, Ex. 4, p. 13, ln. 15–25, p. 14, ln. 1–10; Doc. 157, p. 19, ln. 9–25). Sims' crane operators Jason D'Angelo and Andrew Farris were at the Jacksonville port for its arrival. (Doc. 167, Ex. 4, p. 14, ln. 20–15, p. 15, ln. 1–4; Doc. 157, p. 19, ln. 9–25).

Liebherr-America employee and trainer Henry Ward also was at the Jacksonville port and instructed D'Angelo, Farris, and other Sims employees during the boom assembly and disassembly to transport the crane to Tampa. (Doc. 167, Ex. 4, p. 17, ln. 13–25, p. 18, ln. 1–5; Doc. 157, p. 21, ln. 17–21, p. 22, ln. 10–12). D'Angelo and Farris assembled boom sections T-1, T-2, and T-3 (50-meter boom) into the crane, and placed the T-3, T-4, T-5, and T-6 boom sections (84-meter boom) on a trailer. (Doc. 167, Ex. 4, p. 16, ln. 10–25, p. 17, ln, 1–6; Doc. 157, p. 22, ln. 22–25, p. 23, ln. 1–2). On January 20, 2017, D'Angelo and

Farris drove the crane to Sims headquarters in Tampa, Florida. (Doc. 167, Ex. 4, p. 18, ln. 14–25, p. 19, ln. 1–22; Doc. 157, p. 23, ln. 3–15).

### F.   Sims Employee Training

Ward trained D'Angelo and Farris on the LTM 1500 crane at Sims' yard in Tampa from January 30, 2017 to February 4, 2017. (*See* Doc. 150, Ex. 1, p. 3). It was Ward's responsibility to properly train Sims' employees and to cover the safety topics during the training. (Doc. 155, p. 241, ln. 2–11).

D'Angelo and Farris received only forty hours of training from Ward, even though Liebherr-America typically provides eighty hours to new customers of cranes. (Doc. 155, p. 227, ln. 8–22; *see* Doc. 155, p. 242, ln. 16–25, p. 243, ln. 1; *see* Doc. 156, p. 134, ln. 15–18). Ward knew Sims was a first-time owner of an LTM 1500 crane. (Doc. 156, p. 136, ln. 25, p. 137, ln. 1–2).

Farris testified Ward's training involved putting on the crane attachments and swapping out the 50-meter and 84-meter booms. (Doc. 157, p. 23, ln. 16–20, p. 118, ln. 2–24; Doc. 150, Ex. 1, p. 9). However, Ward skipped training on multiple topics listed in the training manual, including the sections on "locating of all locking pins" and "[c]aution and safety issues." (Doc. 169, Ex. 44; *see* Doc. 155, p. 244, ln. 2–11). Ward also did not train Sims' employees to position the T3 pin to 11 millimeters above the locking bore. (Doc. 157, p. 30, ln. 6–9). Nor did Ward train Sims' employees how to measure the position of the pins. (Doc. 156, p. 145, ln. 16–17 ("Q. Can you tell me how you measured

the T3 locking pin? A. I don't believe we measured it at that time.")). Instead, Farris credibly testified Ward directed him to adjust the T3 pin "to where it stops" but not to "overtorque" so there is no risk of damaging the internal components of the pin. (Doc. 157, p. 29, ln. 22–25, p. 30, ln. 1). Consistent with Farris's testimony, D'Angelo testified Ward did not instruct them that the T3 pin must be at 11 millimeters, he only instructed them to "back [the T3 pin] out until it stops." [4] (Doc. 167, Ex. 4, pp. 46, ln. 25, p. 47, ln. 1–6).

Ward testified he told Farris and D'Angelo "two or three times" that manipulating the T-4 pin could cause an uncontrolled boom retraction and could risk damage. (Doc. 156, p. 138, ln. 17–24). This testimony is not credible as it contradicts the separate testimony of both Farris and D'Angelo, as well as Liebherr-America's corporate representative. When asked whether Liebherr-America failed to inform Sims of the risk associated with manipulating the T4 pin during the training; Vieten responded, "[c]orrect." (Doc. 155, p. 75, ln. 9–12). Similarly, when confirming Ward never mentioned that the manipulation of the T4 pin could cause an uncontrolled boom collapse; Farris responded, "[c]orrect." (Doc. 157, p. 38, ln. 18–21). D'Angelo further testified Ward did not advise them if the T4 pin was not adjusted to 11 millimeters above the locking bore, boom sections 6, 5, and 4 could collapse. (Doc. 167, Ex. 4, p. 57, ln. 4–8).

---

[4] D'Angelo left his employment at Sims on May 25, 2017, prior to the accident at issue here. (Doc. 167, Ex. 4, p. 7, ln. 11).

In addition, this is the only training Farris and D'Angelo received on the LTM 1500 crane so it is likely they would specifically remember the details of the training. Ward, on the other hand, conducted numerous trainings and utilized a checklist for topics covered. That checklist does not indicate Farris and D'Angelo received training on the locking pins. (*See* Doc. 169, Ex. 44, p. 3).

### G.    The Accident

On February 16, 2018, Farris prepared to install the 84-meter boom on the crane to be used on February 19, 2018.[5] (Doc. 157, p. 44, ln. 4–6). Farris supervised apprentice Shane Burrows during the installation. (Doc. 157, p. 43, ln. 1–12). Farris instructed Burrows to go on top of the crane and lock the T3 pin. (Doc. 157, p. 45, ln. 1–16).

Burrows testified that because the T3 pin had a cover plate on it attached with bolts, he thought the cover plate should not be removed. (Doc. 157, p. 175, ln. 20–25; *see* Doc. 157, p. 45, ln. 20–24). Burrows mistakenly manipulated the T4 pin because it was open and did not have a cover plate on it, so he thought the T4 pin was the T3 pin. (*Id.*). Burrows testified he did not know the cover plate over the T3 pin should be removed because it was the "same color as the boom and it [had] bolts in it." (Doc. 157, p. 175, ln. 20–25).

---

[5] Farris started operating cranes in 2002, received 8000 hours of classroom and field training and obtained his National Commission for the Certification of Crane Operators (NCCCO) certification in 2016. (Doc. 157, p. 9, ln. 16–22; p. 11, ln. 15–18; p. 14, ln. 14–16). Jack Stodghill, Sims' former president, testified Farris was qualified to operate and assemble the crane. (Doc. 156, p. 177, ln. 11–16).

When Burrows adjusted what he thought was the T3 pin (but was actually the T4 pin), he noticed the pin was unlocking rather than locking and advised Farris that something was not right. (Doc. 157, p. 173, ln. 16–23, p. 186, ln. 2–5). Farris went on top on the crane and realized Burrows mistakenly manipulated the wrong pin—the T4 pin. (Doc. 157, p. 46, ln. 20–25, p. 47, ln. 1–8). Farris adjusted the T4 pin to the position he thought it was originally. (*Id.*; *see* Doc. 157, p. 44, ln. 7–9). Farris removed the cover plate from the T3 pin, engaged the T3 pin, and installed the 84-meter boom on the crane. (Doc. 157, p. 47, ln. 6–24). Farris tightened the T3 pin as he was taught to by Ward. (*Id.*). Farris then performed a post-assembly inspection of the crane. (Doc. 157, p. 48, ln. 1–11, p. 240, ln. 1–5).

Three days later, on February 19, 2018, Farris arrived at the job site and did a "walk around inspection on the crane." (Doc. 157, p. 54, ln. 14–20). Farris then got into the crane's cabin and started to telescope out boom sections T6, T5, and T4. (Doc. 157, p. 55, ln. 6–8). However, Farris testified the telescopic cylinder would not detach from section T4, even though the crane's computer system (the LICCON system) read no errors. (Doc. 157, p. 56, ln. 2–9).

Farris contacted his supervisor, Mike Gay, to inform him of the situation. (Doc. 169, Ex. 88, p. 2; Doc. 157, p. 57, ln. 6–10, p. 144, ln. 17–18). Gay dispatched a Sims crane technician to the jobsite. (Doc. 169, Ex. 88, p. 2; Doc. 157, p. 57, ln. 6–13, p. 70, ln. 2–4). Farris also called a senior crane operator,

Bill Piper, to ask him for advice in dealing with the issue. (Doc. 169, Ex. 88, p. 2; Doc. 157, p. 59, ln. 16–19, p. 146, ln. 20–25, p. 147, ln. 1). Piper told Farris that, in his experience, when a boom section gets stuck, he would have to manually retrieve the telescopic cylinder from the section. (Doc. 157, p. 61, ln. 22–25, p. 62, ln. 1). Farris instructed Burrows to retrieve the Manual and Farris consulted the section on operation of the telescoping sections. (Doc. 169, Ex. 88, p. 2; Doc. 157, p. 65, ln. 5–8, p. 147, ln. 7–18).

Sims' policy was when an operator experiences a mechanical problem, the operator must stop and wait for the Sims technician to arrive. (Doc. 169, Ex. 85, ¶¶ 7, 10; Doc. 157, p. 145, ln. 3–22). The Manual also warned that an operator must stop operating the crane if a crane malfunction occurs that might endanger safety. (Doc. 169, Ex. 4, p. 97). Farris testified he troubleshooted the crane because he did not know there was any safety risk with touching the T4 pin, and the crane's computer system did not provide any warning of a crane malfunction or mechanical problem. (Doc. 157, p. 80, ln. 21–25).

Farris took the crane out of computer control mode and put it in manual mode. (Doc. 169, Ex. 88, p. 2; Doc. 157, p. 147, ln. 7–23; p. 63, ln. 2–4). Farris proceeded to manually telescope out boom sections 6, 5, and 4. (Doc. 157, p. 63, ln. 2–13, p. 147, ln. 19–23). While trying to manually attach the telescopic

cylinder to T3, the boom collapsed uncontrollably causing a fatal accident and damage to the crane. (*Id.*, p. 63, ln. 5–13).

### H.   The Product Safety Bulletin

In November 2017, three months prior to the accident, Liebherr-Germany published updated product safety information addressing the risk associated with manipulating the T4 pin on the LTM 1500 crane. (Doc. 155, p. 119, ln. 4–5, p. 120, ln. 24–25). The product safety information included: (1) a product safety bulletin (the Safety Bulletin), (2) a cover plate for the T4 pin, and (3) warning stickers (collectively, the retrofit kit). (*See* Doc. 149, Exs. 15, 17, 19). Liebherr-Germany issued this updated product information following an accident in Japan when a crane operator manipulated the T4 pin, resulting in an uncontrolled retraction of the boom.[6] (Doc. 149, Ex. 15).

The Safety Bulletin warns that if the wrong pin, the T4 pin, is manipulated, it could cause "property damage, serious personal injury, or possibly loss of life" and "uncontrolled retraction of the telescopic sections." (*Id.*; *see* Doc. 155, p. 123, ln. 15–19; p. 124, ln. 4–9). The top of the Safety Bulletin states:

THIS   BULLETIN   CONTAINS   IMPORTANT   SAFETY
INFORMATION PERTAINING TO THE PROPER SAFE SET UP

---

[6] Liebherr-America's expert Jeffrey Travis testified to his investigation of the "recent event" referenced in the Safety Bulletin. (Doc. 161, pp. 29–30, ln. 7–25, 1). Travis learned that the incident that led to the creation of the Safety Bulletin and retrofit kit occurred in Japan in May 2017 and involved the improper manipulation of a T-4 pin while the 84 meter-boom was still on the ground. (Doc. 161, p. 30, ln. 2–13).

AND OPERATION OF LIEBHERR MOBILE CRANES LTM 1500-8.1, LTM 1500, AND LTM 1550N. FAILURE TO FOLLOW THESE INSTRUCTIONS COULD RESULT IN THE UNCONTROLLED RETRACTION OF THE TELESCOPIC BOOM DURING OPERATION RESULTING IN SERIOUS INJURY OR DEATH.

(Doc. 149, Ex. 15) (emphasis in original); Doc. 155, p. 121, ln. 9–17).

The product safety information also included a retrofit kit with a safety cover plate to cover the T4 pin. (*See* Doc. 149, Ex. 17; *see* Doc. 155, p. 137, ln. 7–14). This cover plate was a different color from the crane. (*Id.*; *see* Doc. 155, p. 137, ln. 15–17). The retrofit kit also provided warning stickers to be placed on the new T4 cover plate and next to the T3 and T4 pins on the crane boom. (*See* Doc. 149, Exs. 19, 20).

As shown in the picture below, the stickers placed on top of the cover plate over the T4 pin had a red "X" drawn over them. (Doc. 149, Ex. 17; *See* Doc. 155, p. 137, ln. 23–25). Similarly, the stickers to be placed on top of the boom, next to the T4 pin, also had a big red "X" drawn over them. (*Id.*). The stickers placed on top of, and immediately next to, the T3 pin have *no* X drawn. (*See* Doc. 149, Ex. 17; Doc. 155, p. 138, ln. 5–11).



The sticker with the "X" over the T4 pin states "do not unlock the telescopic boom locking pin." (Doc. 149, Ex. 17; *see* Doc. 155, p. 138, ln. 15–17). Then there is a yellow triangle with the following warning,

> WARNING
> Impermissible telescopic boom locking pin unlocked!
> The telescopic boom can retract in an uncontrolled manner.
> Death, severe bodily injuries, property damage.
>
> If a locking pin is marked with this sign:
> ▶ **Never** unlock the locking pin.

(Doc. 149, Ex. 17, p. 2; *see* Doc. 155, p. 138, ln. 20–25, p. 139, ln. 1–5).

## I.    Distribution of the Safety Bulletin and Retrofit Kit

Liebherr-America is responsible for disseminating Liebherr-Germany's product safety updates to Liebherr-America's customer base in the United States. (Doc. 155, p. 72, ln. 16–24). Liebherr-America routinely administers and sends product updates, including safety warnings, to crane owners. (Doc. 155, p. 73, ln. 12–16, p. 153, ln. 15–19). During the period from October 2017 through March 2018, Liebherr-America administered over 700 similar products safety update campaigns. (Doc. 156, p. 105, ln. 19–25, p. 106, ln. 1–3). Liebherr-America's modification department has approximately 1,200 to 1,300 open, ongoing safety campaigns. (Doc. 156, p. 106, ln. 6–9)

Liebherr-America's obligation to send the product updates extended to subsequent purchasers of cranes, such as Sims. (Doc. 155, p. 120, ln. 15–23. Once Liebherr-America is on notice a crane has been sold to a subsequent purchaser, Liebherr-America has an obligation to send the product updates to

that purchaser. (*Id.*). Vieten testified the obligation to provide updated product information was to ensure the crane was safely operated to "prevent personal injury and prevent property damage." (Doc. 155, p. 199, ln. 22–25, p. 200, ln. 1). Liebherr-America was obligated to manage its internal database and actively collect and update the customer list to reflect the correct ownership information of cranes. (Doc. 156, p. 109, ln. 3–25, p. 110, ln. 1–2 (testifying Liebherr-America would verify the "proper customer" and "find out the exact location where the machine would be located")).

On October 10, 2017, Liebherr-Germany emailed Liebherr-America a list of Liebherr LTM 1500-8.1 crane customers in the United States and advised it would soon issue the retrofit kit to be delivered to the United States customers. (Doc. 169, Ex. 56, pp. 3–4). Liebherr-Germany requested that Liebherr-America check the customer list and confirm whether the cranes on the list were in the United States.[7] (*Id.*).

On October 18, 2017, Liebherr-America employee Derrick Harris emailed Liebherr-Germany to confirm that the cranes identified on the

---

[7] The list of United States owners of LTM 1500 cranes included the crane involved here and identified the owner as "Schuch Heavylift" with an address of "New York, New York." (*See* Doc. 169, Ex. 54). Steve Hoffman, Schuch's manager in New York, testified Liebherr-America never sent the Safety Bulletin to Schuch. (Doc. 167, Ex. 7, p. 5, ln. 21–24, p. 37, ln. 3–12; p. 67, ln. 23–25). Had Schuch received the Safety Bulletin, it would have immediately forwarded the materials to Sims as it has done before when it received other similar product updates for the cranes it sold to others. (Doc. 167, Ex. 7, p. 39, ln. 14; p. 46, ln. 16–21).

customer list were in the United States. (Doc. 169, Ex. 56, p. 3). On November 10, 2017, Liebherr-America received the Safety Bulletin. (Doc. 169, Ex. 33). The letter issued by Liebherr-Germany attached to the Bulletin instructed Liebherr-America to "immediately forward" the updated product safety information to any new owner and "simultaneously contact [Liebherr] to advise [] of the new contact information for the crane's new owner." (Doc. 149, Ex. 15).

On November 21, 2017, Elizabeth Baughman, Liebherr-America's former Field Service Manager, emailed Harris and said they would work on the "logistics" for disseminating the Safety Bulletin when she returned unless Harris could handle it on his own. (Doc. 169, Ex. 57, p. 1). According to her testimony, Ms. Baughman would be traveling for weeks. (Doc. 167, Ex. 1, p. 40, ln. 24–25, p. 41, ln. 1–4). From November 8, 2017 through February 28, 2018, Liebherr-America took no action to correct its records of the owner of the Liebherr LTM 1500 crane at issue, despite the various internal communications referencing Sims as the owner. (Doc. 169, Exs. 78–88; *see* Doc. 155, p. 157, ln. 15–23). Although Liebherr-America received the Safety Bulletin on November 10, 2017, Sims did not receive it until February 26, 2018.[8] (Doc. 156, p. 22, ln. 15–23; *see* Doc. 169, Ex. 73). This was due to contact

---

[8] Sims received the Safety Bulletin four days after Liebherr-America mailed it from Houston, Texas. (*See* Doc. 169, Ex. 25).

discrepancies in Liebherr-America's database that were only addressed after the accident occurred. (Doc. 156, p. 24, ln. 17–25; *see* Doc. 169, Exs. 86–88).

Numerous employees at Liebherr-America, however, knew Sims owned the crane long before the accident. (Doc. 156, p. 26, ln. 11–24). Liebherr-America has many internal records dated 2017, referencing Sims as a "customer" and revealing Sims purchased and owned the crane. (*See* Doc. 169, Exs. 42, 43, 49, 51, 55, 56, 59, 60, 61, 62). From November 2016 through January 2017, there were sixteen emails exchanges between Liebherr-America employees referencing Sims purchased the crane. (*See* Doc. 169, Exs. 34, 35, 38–41, 44–48, 50–54, 57; *see* Doc. 156, p. 25, ln. 1–18; Doc. 155, p. 194, ln. 10–13 (testifying that employees copied on an email dated January 3, 2017 would be aware the crane was sold to Sims)). The emails also reference parts sent to Sims for the LTM 1500 crane. (*Id.*). At no time during the timeframe of these communications did Liebherr-America update its ownership records.

Many employees copied on the emails held managerial positions who should have updated the ownership records and were responsible for verifying and collecting ownership information. (*See* Doc. 156, p. 126, ln. 1–10 (testifying Baughman[9] should have corrected the ownership discrepancy before the

---

[9] Baughman knew there was a discrepancy in Liebherr-America's client records as to who owned the crane, but she never confirmed the true owner of the crane and never updated the customer database system. (Doc. 156, p. 32, ln. 1–8; p. 33, ln. 15–22; p. 34, ln. 3–4).

accident); Doc. 155, p. 187, ln. 13–16 (testifying Bret Jacobson[10] should have updated the records in November 2016)).

Besides Liebherr-America's internal records and emails, Liebherr-America provided training to Sims on the Liebherr LTM 1500 crane. (*See* Doc. 169, Ex. 44). The in-person training occurred in Tampa, Florida from January 30, 2017 through February 4, 2017. (*Id.*). Thus, at least at the time of the training, Liebherr-America knew Sims was a new customer and owner of the crane. (Doc. 156, p. 136, ln. 25, p. 137, ln. 1–6).

## J.    Internal and OSHA Investigations

Sims' former Safety Director, Bob Berry, investigated this accident.[11] (Doc. 157, p. 194, ln. 6–15). Berry stated these actions caused the accident: (1) failing to remove the dust cover from the T3 pin before installing the 84-meter boom in the crane; (2) Burrow's manipulation of the T4 locking pin; and (3) Farris's failure to restore the T4 pin to the correct position at 11 millimeters above the locking bore. (Doc. 157, p. 234, ln. 17–25, p. 235, ln. 1–8).

---

[10] Jacobson is Liebherr-America's general manager of sales administration and marketing. (Doc. 167, Ex. 2, p. 7, ln. 13–15). As early as November 21, 2016, Jacobson knew the crane had been sold to Sims but never updated the customer database system. (Doc. 167, Ex. 2, p. 49, ln. 13–25).

[11] Berry is a NCCCO certified crane operator and has worked in the crane industry since 1972. (Doc. 157, p. 190, ln. 6–26). Berry has taught crane education for over 30 years. (Doc. 157, p. 191, ln. 1–3).

Switching the boom sections (i.e., from 50-meter to 84-meter configuration) is considered assembly/disassembly and not a modification of equipment. (Doc. 157, p. 205, ln. 4–15). Thus, Berry testified, it was acceptable for Farris to troubleshoot the crane because he was not apprised of any safety risk of touching the T4 pin and there were otherwise no indications there was an error. (Doc. 157, p. 229, ln. 1–18, p. 230, ln. 5–11). Berry testified a crane operator is expected to resolve a problem unless the computer reads an error, which the crane's computer system did not. (Doc. 157, p. 230, ln. 2–11). Berry testified Farris acted reasonably and consistent with company policy in troubleshooting the crane. (Doc, 157, p. 229, ln. 1–14).

Berry testified if the warning stickers had been timely provided, Sims would have promptly placed the cover plate over the T4 pin and installed the decals that came with the Safety Bulletin on the crane. (Doc. 157, p. 209, ln. 1–25). Berry further testified if the crane was in the Tampa yard, Berry would have met with the operator within an hour to install the product updates. (Doc. 157, p. 210, ln. 6–15). Berry then testified if the operator was out on a jobsite at the time, Berry would have called the operator to meet, provided the updates, and instructed the operator to install the cover plate and decals before the next job. (Doc. 157, p. 211, ln. 1–25, p. 212, ln. 1–4).

Chris Peek, Sims' former Vice President of Risk Management, also testified it was routine practice for Sims to immediately install updated

product warnings on equipment. (Doc. 157, p. 254, ln. 12–22; p. 255, ln. 1–2). Peek testified "we would have gotten the update to the job site immediately, . . . member of the safety department would go out onto the job site, issued some retraining, conducted retraining, participate in retraining, along with the operator and anyone else involved in the operation of the machine." (Doc. 157, p. 260, ln. 2–12). Arthur Kirkner, NBIS's Vice President of Claims, opined the timely receipt of the Safety Bulletin would have prevented the accident. (Doc. 167, Ex. 19, p. 60, ln. 9–20, p. 59, ln. 18–25, p. 60, ln. 1–20, p. 65, ln. 21–25, p. 66, ln. 1–13).

Following the accident, the Occupational Safety and Health Administration (OSHA) conducted an independent investigation.[12] (Doc. 149, Exs. 1, 2). OSHA's investigation concluded the accident could have been prevented if Liebherr-America timely provided the updated product safety information to Sims. (*See* Doc. 149, Ex. 1).

Mr. Travis and Mr. Berry testified Farris violated no OSHA standards, American Society of Mechanical Engineers (ASME) standards, or the Manual when he tried to troubleshoot the crane on February 19, 2018. (Doc. 158, p. 32, ln. 4–10; *see* Doc. 157, p. 213, ln. 13–19). Mr. Stodghill testified Farris did not violate company policies by continuing to operate the crane after the T4 pin

---

[12] The court's consideration of the OSHA reports is discussed in the in the "Conclusions of Law" section below.

was inadvertently manipulated. (Doc. 156, p. 163, ln. 10–14). Further, although Burrows was an apprentice, multiple witnesses testified it was "standard in the industry" for apprentices to assist operators. (*See* Doc. 156, p. 141, ln. 21–25, p. 142, ln. 1–2; Doc. 157, p. 202, ln. 2–5; Doc. 158, p. 30, ln. 18–25, p. 31, ln. 1).

### K.   Liability Expert Testimony

NBIS's expert Anthony Bond is a licensed professional engineer and has investigated over 300 heavy equipment accidents. (Doc. 158, p. 5, ln. 16–25). Bond testified that because the Manual did not mention the T4 pin, the manipulation of the T4 pin did not violate the Manual. (Doc. 158, p. 35, ln. 11–15). The Safety Bulletin apprised a crane operator to stop all activities if the T4 pin is manipulated. (Doc. 158, p. 23, ln. 7–16). Bond opined the accident could have been prevented if Liebherr-America expeditiously delivered the product safety information. (Doc. 158, p. 91, ln. 1–6). Bond also opined Farris did not violate OSHA or ASME standards. (Doc. 158, p. 32, ln. 4–6, p. 46, ln. 19–21). As a certified operator, Farris was qualified to troubleshoot the crane. (Doc. 158, pp. 75–76, ln. 23–25, 1–3).

Dr. William J. Vigilante, Jr., Ph.D., CPE, is NBIS's expert in human factors. Dr. Vigilante testified it was "foreseeable" that a crane operator could confuse the T3 and the T4 pin. (Doc. 158, p. 160, ln. 13–25, p. 61, ln. 1–9). And "when that happened, the operator was not provided with the warning he

needed to understand the consequences of that, and that's what the Safety Bulletin was meant to address. Therefore, the failure to have it is what is causing this problem, not that somebody inadvertently did something wrong." (*Id.*).

Dr. Vigilante opined that had Liebherr-America distributed the Safety Bulletin and retrofit kit promptly, Sims would have had the information needed to identify the potential hazards and the accident could have been prevented. (Doc. 158, p. 99, ln. 24). Dr. Vigilante also opined training provided by Ward was ineffective because Sims was not instructed to stop and recalibrate the T3 pin back to 11 millimeters. (Doc. 158, p. 121, ln. 20–25, p. 122, ln. 1–2, p. 83, ln. 1–10).

Liebherr-America's expert Jeffrey Travis is a structural engineer. (Doc. 161, p. 60, ln. 18–20). His experience is limited to the design and construction of structures, such as bridges, buildings, and dams. (Doc. 161, p. 61, ln. 1–25). Travis concluded that Sims violated OSHA crane regulations and ASME standards on the safe operation of a crane. (Doc. 150, Ex. 15, p. 2). Travis testified the Manual required Farris to cease operation of the crane when he began experiencing the problem while telescoping the boom. (Doc. 150, Ex. 15, pp. 19–20). Additionally, Travis testified Sims' safety rules required Farris to stop operation of the crane once he experienced the problem telescoping the boom. (Doc. 150, Ex. 15, p. 4).

Travis testified the Safety Bulletin did not contain any additional information not already in the Manual. (Doc. 161, p. 37, ln. 19–25). However, when asked whether the Manual mentions the T4 pin or provides any safety risks associated with the T4 pin, he testified the Manual "doesn't mention the T4 at all." (Doc. 161, p. 76, ln. 25). Travis testified Liebherr-America's failure to provide the product updates was a factor that caused the operator error. (Doc. 161, p. 56, ln. 21–25 ("Q. And you would agree that the failure of Liebherr US to provide the proper safety bulletin and retrofit cover plate was a factor that caused that operator error, correct? A. Correct."))

Dr. Rachel Kelly, Ph.D. is Liebherr-America's human factors expert. (Doc. 161, p. 109, ln. 12). Dr. Kelly testified the training provided by Liebherr-America to Sims was appropriate to equip an operator with a comprehensive knowledge of the controls, operational systems, procedures, and safety concerns and considerations relating to the crane. (Doc. 161, p. 109, ln. 7–25, p. 110, 1–23). However, Dr. Kelly agreed that Ward knew about the safety risks involving the improper manipulation of T4 pin (even before the accident) but did not instruct Sims as to the same. (Doc. 161, p. 169, ln. 20–25, p. 170, ln. 1–2).

**L.    Damages**

Liebherr-America agreed with NBIS that it would cost $1,452,492.08 to repair the crane following the boom collapse. (Doc. 155, p. 75, ln. 22–25).

Liebherr-America also agreed with NBIS that a new Liebherr LTM 1500 crane would cost $4,580,000. (Doc. 155, p. 76, ln. 1–3).

NBIS paid Sims $3,215,239 for the crane, the fair market value of the crane. (Doc. 167, Ex. 9, p. 49, ln. 10–18; *see* Doc. 167, Ex. 19, p. 18, ln. 23–25, p. 19, ln. 1; *see* Doc. 167, Ex. 18). NBIS relied on its damages expert to determine the fair market value of the crane. The value of the crane was determined using a "market survey analysis" which evaluated four similar cranes currently for sale. (Doc. 167, Ex. 9, p. 55, ln. 22–25, p. 56, ln. 1–5, p. 47, ln. 19–22, p. 68, ln. 5–13). NBIS also paid $179,513.74 for towing and salvage expenses. (Doc. 167, Ex. 18). NBIS recovered $1,650,000, the crane's market value after the accident. (*Id.*). As such, NBIS sustained $1,744,752.74 in damages.

## CONCLUSIONS OF LAW

In Count I, NBIS contends Liebherr-America was negligent for failing to timely provide Sims with the Safety Bulletin and retrofit kit and failing to properly train Sims' employees on the risks involved with the improper manipulation of the T4 pin and how to measure the position of the T3 pin. (Doc. 24). In Count II, NBIS alleges Liebherr-America was negligent in training Ward. (*Id.*).

### A.     Economic Loss Rule

In Liebherr-America's motion for judgment on partial findings, it argues this action is barred by the economic loss rule. (Doc. 146, pp. 5–16). The economic loss rule precludes a tort claim against a product manufacturer when the product damages only itself. *See Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013).

Here, the parties stipulate that the crane was not defective, and the accident was not caused by a defect in the crane. (*See* Doc. 148, ¶ 12). This is an action alleging negligent services provided by Liebherr-America. Thus, the economic loss rule does not apply. *See Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1030 (11th Cir. 2017) (clarifying that the rule only applies to product liability claims); *see B&H Farms, LLC v. Winfield Sols.*, LLC, No. 2:16-CV-323-FTM-99MRM, 2016 WL 6138625, at *2 (M.D. Fla. Oct. 21, 2016) (noting the economic loss rule did not bar negligence claim because the amended complaint did not allege a products liability claim); *S. Wind Aviation, LLC v. Cessna Aircraft Co.*, No. 6:12-CV-1376-ORL-22DAB, 2014 WL 12570958, at *4 (M.D. Fla. July 15, 2014) (holding that the economic loss rule did not bar the plaintiff's negligence claims because the case did not center on a products liability claim).

### B.    The OSHA Reports

The admissibility of the OSHA reports was the subject of pretrial motions the court took under advisement. (Doc. 140; Doc. 141; Doc. 155, pp. 12–16, ln. 18–25, 1). Having heard the evidence, the court concludes the OSHA reports are admissible evidence in this case.

Federal Rule of Evidence 803 provides that certain hearsay statements are not made excludable by the hearsay rule. Rule 803(8) defines the "public records and reports" which are not excludable, as:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, ... or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

*Beech Aircraft Corp. v. Raney*, 488 U.S. 153, 161 (1988) (quoting Fed. R. Evid. 803(8)). The Advisory Committee proposed a nonexclusive list of four factors to consider: (1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation. *Id.* at 167 n. 11 (*citing* Advisory Committee's Notes on Fed. Rule Evid. 803(8)).

The court concludes the OSHA reports contain factual findings resulting from OSHA's investigation made under its authority granted by law. (*See* Doc.

149, Exs. 1, 2). No sources of information or other circumstances indicate a lack of trustworthiness.

Applying the suggested factors in considering trustworthiness, there is no allegation questioning the investigator's experience or skill. Liebherr-America cites the case *Hines v. Brandon Steel Decks, Inc.*, 754 F. Supp. 199 (M.D. Ga. 1991), for exclusion of the OSHA reports for lack of trustworthiness because the investigator had no first-hand knowledge of the events. However, in *Hines* only portions of the OSHA report were excluded. Those portions stated legal opinions and conclusions because the court was not convinced that the investigator had the "necessary expertise in deciding legal issues of agency." *Id.* at 200–01.

Liebherr-America has not pointed to any such problems with the OSHA reports in this case. The reports appear thorough and professional. The investigation was timely. There was no hearing. The reports were prepared under OSHA's own independent responsibilities and not by any party concerned with litigation. Thus, the court finds that the reports are trustworthy.[13]

---

[13] Liebherr-America's expert reviewed the OSHA reports and agreed with all aspects except for conclusion. (Doc. 161, p. 96, ln. 17–25, p. 97, ln. 6–25, p. 98, ln. 1–25, p. 99, ln. 1).

## C.   Negligence Claim (Count I) [14]

"Florida law does not require a plaintiff to establish the violation of a relevant safety statute or regulation to make out a successful cause of action for negligence." *Wenzel v. Boyles Galvanizing Co.*, 920 F.2d 778, 782 n.1 (11th Cir. 1991). "[T]o succeed on a claim of negligence, a plaintiff must establish the four elements of duty, breach, proximate causation, and damages." *Limones v. Sch. Dist. of Lee Cty.*, 161 So. 3d 384 (Fla. 2015) (citing *United States v. Stevens*, 994 So. 2d 1062, 1065–66 (Fla. 2008)).

### 1.   The Duty Element

Duty is defined as an "obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Lincoln v. Fla. Gas Transmission Co.*, No. 14-13510, 2015 WL 1514706, at *2 (l1th Cir. Apr. 6, 2015) (*citing Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003)). Duty is linked to foreseeability and can arise from several sources: "(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the

---

[14] NBIS may maintain any action its insured could have pursued against the tortfeasors. *See State Farm Fl. Ins. Co. v. Loo*, 27 So. 3d 747, 748 (Fla. 3d DCA 2010); *Am. Home Assur. Co. v. National R.R. Passenger Corp.*, 908 So. 2d 459 (Fla. 2005) (a property insurer stepped into the shoes of its insured in a subrogation action to recover for destroying the insured's property).

general facts of the case." *Clay,* 873 So. 2d at 1185 (*quoting McCain v. Fla. Power Corn.*, 593 So. 2d 500, 503 n.2 (Fla. 1992)).

"[E]stablishing the existence of a duty under [Florida's] negligence law ... is ultimately a question of law for the court rather than a jury." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012) (citation omitted). This case falls within the fourth group, and resolution of the existence of a duty requires the court to examine the general facts surrounding the parties' actions and relationship. *See Id.* at 1338–39.

Duty can arise implicitly and contractually where a party voluntarily undertakes a responsibility. "The undertaker's doctrine imposes a duty of reasonable care upon a party that freely or by contract undertakes to perform a service for another party." *Limones*, 161 So. 3d at 388 n.3 (citing *Clay*, 873 So. 2d at 1186). "Whenever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service—i.e., the 'undertaker'—thereby assumes a duty to act carefully and to not put others at an undue risk of harm." *Clay*, 873 So. 2d at 1186. "The undertaker is subject to liability if: (a) he or she fails to exercise reasonable care, which results in increased harm to the beneficiary; or (b) the beneficiary relies upon the undertaker and is harmed as a result." *Limones*, 161 So. 3d at 388 n.3 (citing *Clay*, 873 So. 2d at 1186).

A duty can also arise from the general facts of a case when "the defendant's conduct foreseeably creat[es] a broader 'zone of risk' that poses a general threat of harm to others." *Janis v. Pratt & Whitney Can., Inc.*, 370 F. Supp. 2d 1226, 1229 (M.D. Fla. 2005) (citing *McCain*, 593 So. 2d at 504). "Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." *McCain*, 593 So. 2d at 503 (quoting *Kaisner v. Kolb*, 543 So. 2d 732, 735 (Fla. 1989)). [15]

### a.    The Duty to Properly Train Sims

Liebherr-America's duty to Sims arises out of the nature of its business, which involved providing instruction and training on safely operating the crane. *See McCain*, 593 So. 2d at 504 (evaluating the foreseeable risk created by defendant's business enterprise); *Clay*, 873 So. 2d at 1187 (same, where defendant "undertook the maintenance of [] lights, the company should have foreseen that proper maintenance was necessary for the protection of the plaintiffs.); *Burns Int'l Sec. Svcs. Inc. of Fla. v. Phila. Indem. Ins. Co.*, 899 So. 2d 361, 364–65 (Fla. 4th DCA 2005) (holding there is a duty of care because of

---

[15] In *McCain*, the court found that a legal duty existed because, "by its very nature, power-generating equipment creates a zone of risk that encompasses all persons who foreseeably may come in contact with that equipment." 593 So. 2d at 504.

the security provider's "particular undertaking" to provide security); *Curd*, 39 So. 3d at 1228 (holding a defendant, a fertilizer storage company, owed a duty of care to licensed fisherman when it polluted the body of water in which the commercial fisherman fished).

Liebherr-America's corporate representative testified it endeavored to provide "comprehensive training" to equip crane operators on safely operating the crane. (Doc. 155, p. 74, ln. 17–21). However, the evidence demonstrates the training was deficient. First, although Liebherr-America normally provides eighty hours of training on equipment to new customers, Ward provided only forty hours of training to Sims' employees even though Sims never owned an LTM 1500 crane. (Doc. 156, p. 145, ln. 5–7). Ward also skipped training on several sections of the crane, including the section on "locating of all locking pins." (Doc. 169, Ex. 44; *see* Doc. 155, p. 244, ln. 2–11). Ward did not train Sims to position the T3 pin to the required position at 11 millimeters. (Doc. 157, p. 30, ln. 6–9; Doc. 167, Ex. 4, p. 46, ln. 25, p. 47, ln. 1–6). Instead, Ward instructed Sims to adjust the T3 pin "to where it stops" but not to "overtorque." (Doc. 157, p. 29, ln. 22–25, p. 30, ln. 1).

Importantly, at the time of training, Liebherr-America knew the risks associated with the T4 pin. (Doc. 155, p. 75, ln. 4–12 (testifying Liebherr-America knew the safety risks associated with touching the T4 pin and failed to train Sims about the risks). Yet, Liebherr-America did not train Sims about

the safety risks. Liebherr-America's failure to provide complete instruction on the safe operation of the crane "foreseeably created" a general risk of harm that a catastrophic accident could occur. *See McCain*, 593 So. 2d at 502; *Chirillo v. Granicz*, 199 So. 3d 246, 248 (Fla. 2016); *Clay*, 873 So. 2d at 1187 (finding once defendant undertook a business enterprise to maintain streetlights, it had a duty to do so in a reasonable manner).

For these reasons, a legal duty existed for Liebherr-America to provide training that included information about manipulation of the T4 pin, and the proper position of the T3 pin.

### b.   Duty To Timely Provide the Safety Bulletin and Retrofit Kit

Liebherr-America confirmed it was a service organization responsible for distributing updated product documentation, including safety warnings, to crane owners in the United States. (Doc. 155, p. 71, ln. 24–25, p. 72, ln. 1, p. 153, ln. 15–19). Vieten testified Liebherr-America's duty to convey the Safety Bulletin and retrofit kit extended to secondary purchasers of cranes like Sims. (Doc. 155, p. 120, ln. 15–23). Liebherr-America's employee testified it routinely handles similar product campaigns. (Doc. 156, p. 106, ln. 10–15 ("Q: So the modification department had the responsibility of not only administering the safety bulletin and Retrofit Kit for the LTM 1500 that we are discussing in this

litigation, but they had many other campaigns going on simultaneously; true? A: Yes.")).

As a company responsible for communicating product safety information, Liebherr-America had a duty to timely send the product safety warnings. *See Union Park Mem'l Chapel v. Hutt*, 670 So. 2d 64, 67 (Fla. 1996). In undertaking the business of providing product safety updates, Liebherr-America could have foreseen failing to deliver product safety information would increase the general risk a crane accident would occur. *See Chirillo*, 199 So. 3d at 249 ("[D]uty analysis considers some general facts of the case, it does so only to determine whether a general, foreseeable zone of risk was created, without delving into the specific injury that occurred or whether such injury was foreseeable.") (citation omitted). Liebherr-America should have known if it did not properly maintain customer information, crane purchasers would not receive the pertinent warnings timely. An improperly operated 600-ton crane has a high probability of injuring people and causing property damage. This is especially so here given that the manufacturer specifically identified the extent of the risks. (Doc. 149, Exs. 15, 17).

Thus, when Liebherr-America received the Safety Bulletin and retrofit kit, it should have known, because the Manual lacks any warnings as to the T4 pin, failing to promptly communicate the warnings in the Safety Bulletin increased the risk of harm to Sims.

33

### 2.   Breach of Duties of Reasonable Care

The court concludes Liebherr-America breached its duty to provide proper training. The evidence shows Ward failed to provide the full eighty hours of training, skipped multiple training topics, did not train Sims' employees on how to measure the position of the pins, and did not address the importance of not manipulating the T4 pin.

In addition, there is no dispute Liebherr-America mailed the Safety Bulletin and retrofit kit to Sims over three months after Liebherr-America received it and after the accident occurred. Liebherr-America's failure to promptly send the Safety Bulletin to Sims resulted from its inexplicable failure to update its ownership records. (Doc. 156, p. 24, ln. 17–25; *see* Doc. 169, Exs. 86–88). Given the extent of risks (death or boom collapse) identified by Liebherr-Germany, this failure to update and resulting delay in disseminating important safety information was inexcusable and a breach of Liebherr-America's duty. Further, Liebherr-America testified it knew that Sims was the owner of the crane and should have updated its system with Sims' information by November 2016. (Doc. 155, p. 187, ln. 3–16). Liebherr-America also testified its employees knew a discrepancy existed as to the correct owner of the crane in April 2017 but took no action to determine the true owner until after the accident in February 2018. (Doc. 156, p. 126, ln. 1–7).

### 3.     Proximate Cause of the Accident

Proximate cause is generally a question of fact concerned with "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *McCain*, 593 So. 2d at 502; *see also Florida Power & Light Co. v. Periera*, 705 So. 2d 1359, 1361 (Fla. 1998). This court has stated that "harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *McCain*, 593 So. 2d at 503. The proper question is whether the individual's conduct is "so unusual, extraordinary or bizarre (i.e., so 'unforeseeable') that the policy of the law will relieve the [defendant] of any liability for negligently creating this dangerous situation." *Palm Beach Cnty. Bd. of Cnty. Comm'rs v. Salas*, 511 So. 2d 544, 547 (Fla. 1987). "The law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience." *McCain*, 593 So. 2d at 503.

A negligent actor is not liable for damages suffered by an injured party "when some separate force or action is the active and efficient intervening cause" of the injury. *Gibson v. Avis Rent-A-Car Sys., Inc.*, 386 So. 2d 520, 522 (Fla. 1980) (internal quotation marks omitted). Such an intervening cause supersedes the prior wrong as the proximate cause of the injury by breaking the sequence between the prior wrong and the injury. However, "[i]f an

intervening cause is foreseeable the original negligent actor may still be held liable." *Id.* Whether an intervening cause is foreseeable is for the trier of fact. *See Id.* In reaching this determination, the question is "whether the harm that occurred was within the scope of the danger attributable to the defendant's negligent conduct." *Id.* (determining that a reasonable person would conclude that stopping a car on a multilane highway would create a risk that other cars would collide to avoid impacting the stopped vehicle).

Liebherr-America's failure to provide complete training that included training on the T3 and T4 locking pins "foreseeably and substantially" caused the accident. *See Dorsey v. Reider,* 139 So. 3d 860, 863 (Fla. 2014). A direct consequence of failing to provide complete and necessary instruction is the crane will be operated in an improper manner, which will cause damage or serious injury. *Id.* at 864. The boom was not a "freak" injury that was "unpredictable" to Liebherr-America, a service company providing training on cranes. *McCain,* 593 So. 2d at 503–014; *see also Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1119 (Fla. 2005) (explaining negligent actions of third parties was foreseeable and within the enhanced zone of risk created by defendant). Liebherr-America testified it knew the improper positioning of the pin presented a safety risk. *McCain*, at 503 ("[H]arm is proximate in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question.").

36

Thus, Liebherr-America's failure to provide complete training on the crane proximately caused the accident.

The fact Farris or Burrows did not read the entire Manual is immaterial because the Manual provides no information about the T4 pin. Even if they had read and understood the entire Manual, that action would not have prevented the accident because the Manual lacked information about the risk associated with manipulating the T4 pin. Further, that Farris continued to troubleshoot the crane after touching the T4 pin does not change the analysis because he was not apprised of the risks associated with the T4 pin and the crane's computer did not show any error codes. (Doc. 156, p. 139, ln. 10–21). It was foreseeable for the two pins to get confused, which prompted Liebherr-Germany to issue the product updates. *See Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1119 (Fla. 2005) (finding failure of motorist to stop was not "so bizarre, unusual or outside the realm of . . .  reasonably foreseeable" behavior to relieve liability for failing to warn).

For substantially similar reasons, that Burrows, an apprentice, performed the unlocking of the pin is irrelevant. Had Liebherr-America provided the requisite instructions as to the T3 and T4 locking pins, Farris would have known to either stop the operation or reset the T4 pin to the proper setting when he discovered the T4 pin was manipulated. (Doc. 157, p. 266, ln. 3–19).

Liebherr-America's failure to timely send the Safety Bulletin and retrofit kit foreseeably and substantially caused the accident. The Safety Bulletin specifically identified the safety risks associated with the touching of the T4 pin. (Doc. 149, Ex. 15). The retrofit kit also contained a cover plate for the T3 pin and T4 pin, with warning stickers alerting a person as to which pin should be touched. (Doc. 149, Ex. 17) (directing that "your crane operator or workshop personnel should exchange at the next opportunity or unconditionally upon the next telescopic boom separation the presently installed round cover plate."). The warning stickers located immediately on top of the T4 pin had a red "X" sign on them to show the T4 pin should not be manipulated. (*Id.*). Additionally, the warning stickers that were to be placed next to the T4 pin also reinforced the warnings that the T4 pin should not be touched. (*Id.*).

Had Farris seen the Safety Bulletin, he would not have operated the crane after the T4 pin had been inadvertently adjusted because he would have been informed as to the safety risks associated with adjusting the T4 pin. (Doc. 157, p. 249, ln. 19–22) (testifying the continued operation of the crane could have been prevented if the product safety bulletin had been provided). The new cover plate and the warning decals would have prevented Burrows from touching the wrong pin. The evidence presented shows the cover plate would have been visible to Farris and Burrows from the top of the crane. (*See* Doc.

157, p. 248, ln. 11–13) ("Like I said, if this is installed, you can't *see* the T4 pin. It's covered. So, therefore, you can't manipulate if it's left on.").

The accident would not have occurred had Liebherr-America warned Sims, by training or the Safety Bulletin, that the T4 pin should not be manipulated or, if it is touched, it must be repositioned to 11 millimeters or damage could result. (Doc. 158, p. 91, ln. 1–6, p. 160, ln. 13–25, p. 161, ln. 1–9). This is because Sims would have had the information to identify the hazard and prevent the accident. (*Id.*).

### 4.    Damages Sustained from the Accident

The proper measure of damages is the crane's market value on the date of the loss. *See Ocean Elec. Co. v. Hughes Lab., Inc.*, 636 So. 2d 112, 114 (Fla. 3rd DCA 1994), *review denied*, 648 So. 2d 723 (Fla. 1994); *see Burtless v. Pallero*, 570 So. 2d 1140 (Fla. 4th DCA 1990) (same); *see Allied Van Lines, Inc. v. McKnab*, 331 So. 2d 319, 320 (Fla. 2d DCA 1976) ("proper measure of damages for loss of personal property is its market value on the date of the loss"); *see also Am Equity Ins. Co. v. Van Oinhoven*, 788 So. 2d 388, 391 (Fla. 5th DCA 2001) (explaining ordinarily market value is measure of damages, but if the damaged property may be repaired, restored or replaced, the court may award the cost of replacement).

Based on the evidence, the court finds NBIS sustained $1,744,752.74 in damages because:

- NBIS paid its insured Sims the fair market value, $3,215,239, for the crane. This fair market value of the damaged crane was determined by comparing other similar cranes auctioned to potential purchasers, the usual market where such a product would be sold. *See Ocean Elec.*, 636 So. 2d at 114 (holding proper market value of stock of goods held for sale and damaged or destroyed is the wholesale market to which injured party would have to go to replace them).

- NBIS paid $179,513.74 for towing and salvage expenses.

- NBIS recovered $1,650,000, by selling the crane after the accident.

- NBIS may recover the difference of $1,744,752.74 in damages — the sum that will place the plaintiff in the financial position it occupied before the property was damaged. *Ocean Elec.*, 636 So. 2d at 114.

NBIS is also entitled to recover the prejudgment interest at the statutory rate from the date of the accident to the date of this order entering judgment for the plaintiff. *See Specialty Marine & Indus. Supplies v. Venus*, 66 So. 3d 306 (Fla. 1st DCA 2011); *Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1304 (11th Cir. 2007). The court also awards post judgment interest.

### D.   Negligent Training (Count II)

NBIS alleges Liebherr-America was negligent in training Ward. Under Florida law, an employer may also be liable for "reasonably foreseeable damages resulting from the negligent training of its employees." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1265 (11th Cir. 2001). A plaintiff asserting a negligent training claim must allege that it was harmed because of an employer's failure to adequately train an employee, and that the nature of the

employment put the plaintiff in a "zone of risk" such that the employer had a duty running to the plaintiff. *Clary v. Armor Corr. Health Servs., Inc.*, No. 6:13-cv-90-Orl-31KRS, 2014 WL 505126, at *4–5 (M.D. Fla. Feb. 7, 2014).

The evidence on Ward's experience and competency as a crane trainer is largely uncontested. (*See* Doc. 156, p. 69, ln. 2–5). Liebherr-America's field office coordinator Keith Martinson testified Ward has an extreme amount of knowledge on all machines and is highly recommended and sought after. (Doc. 167, Ex. 6, p. 8, ln. 1–10). Vieten testified Ward had been trained at Liebherr-Germany on the LTM 1750 crane—a similar crane to the LTM 1500, and that he also had thorough hands-on training for the LTM 1500. (Doc. 155, pp. 252–54, ln. 17–25, 1–25, 1). Smith similarly testified hands on field training can be more effective than classroom training. (Doc. 156, p. 124, ln. 25, p. 125, ln. 1–7).

Liebherr-America conducted annual performance evaluations of Ward. The annual evaluations for the years 2007, 2008, 2009, 2015, and 2017 (the year he provided training to Farris and D'Angelo), reflect that Ward met company expectations and that his job performance was "satisfactory" or "above satisfactory." (Doc. 150, Ex. 23; *see* Doc. 156, p. 64, ln. 6–25, p. 65, ln. 1–25, p. 66, ln. 1–25; p. 67, ln. 1–25; p. 68, ln. 1–25; p. 69, ln. 1).

NBIS presented no evidence that questioned Liebherr-America's training of Ward. The court finds that NBIS failed to meet its burden of proof

41

on the claim that Liebherr-America was negligent in training Ward. Thus, Liebherr-America's motion for judgment on partial findings as to count II for negligent training.

## CONCLUSION

For the reasons stated, it is **ORDERED**:

(1)     The Clerk is directed to enter judgment in NBIS's favor on count I for negligence. The judgment amount is **$1,744,752.74**, plus prejudgment interest at the statutory rate from the date of the accident (February 19, 2018) and post judgment interest to start if the damage amount is not tendered within sixty days from the date of this order.

(2)     Liebherr-America's Motion for Judgment on Partial Findings (Doc. 146) is **GRANTED** only to the extent that the Clerk is directed to enter judgment in Liebherr-America's favor on count II for negligent training.

(3)     Consistent with the April 13, 2021 order (Doc. 74), the Clerk is directed to enter judgment in Liebherr-America's favor on Count III, the FDUPTA claim.

(4)     The Clerk is directed to close the case.

**ENTERED** in Tampa, Florida on August 3, 2022.

AMANDA ARNOLD SANSONE
United States Magistrate Judge